UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 9:18-cv-80110-ROSENBERG/REINHART

WEBSTER HUGHES,

                     Plaintiff,

vs.

PRIDEROCK CAPITAL PARTNERS, LLC,

                     Defendant.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Webster Hughes ("Dr. Hughes"), through undersigned counsel, serves his opposition to defendant Priderock Capital Partners, LLC's ("Priderock") motion for partial summary judgment [DE 52]. The motion should be denied.

## I.    SUMMARY OF ARGUMENT

Dr. Hughes, who has preeminent experience in quantitative analysis of structured mortgage backed securities, provided his expertise to Priderock, on a contingency basis, to assist it in launching a $100 million private investment fund composed of mortgage backed securities named the Priderock Multifamily Debt Opportunity Fund, L.P. (the "Fund"). Upon the successful launching of the Fund, Priderock was to pay Dr. Hughes $200,000.00 per year for the life of the Fund, plus ten percent of the promote share of returns of the Fund, and also to reimburse Dr. Hughes for his out-of-pocket expenses, and to pay him a licensing fee for Priderock's use of the proprietary analytic model that he developed. After Priderock successfully launched the Fund, it refused to pay Dr. Hughes for his work as agreed. Dr. Hughes's claims are for breach of an express contract (Count I), breach of a contract implied-in-fact (Count II), and breach of a contract implied-in-law (unjust enrichment)(Count III).

Priderock argues that there was never a meeting of minds on the essential terms to create an enforceable oral contract or contract implied-in-fact.

Contrary to Priderock's arguments, the evidence shows that the parties agreed, both through words and their conduct, on the essential terms of their agreement – including the assistance Dr. Hughes would provide Priderock and his compensation for that assistance. To the extent Priderock disputes Dr. Hughes's testimony regarding the terms of their oral agreement, that is a matter for the jury, not a basis upon which to grant a motion for summary judgment. Nor does the parties' subsequent unsuccessful efforts to memorialize their oral agreement render their oral agreement unenforceable or render it an "agreement to agree" as Priderock argues.

Priderock also argues that Dr. Hughes's claims for breach of an express contract and breach of contract implied-in-law are barred by the statute of frauds.

The statute of frauds does not apply here for two reasons. First, the parties' agreement - assisting Priderock with the launch of the Fund at issue - was capable of being performed within a year, taking it out of the statute of frauds, regardless of whether the Fund actually launched or failed to launch within a year (in fact, the Fund was launched within a year of the parties' agreement regarding Dr. Hughes's compensation). Second, Dr. Hughes fully performed all of his obligations under the parties' agreement to help launch the Fund. The fact that Priderock was obligated to pay Dr. Hughes after the Fund was launched is irrelevant under Florida law.

Accordingly, Priderock's motion for partial summary judgment should be denied.

## II.   **BACKGROUND**

Dr. Hughes earned a PhD in Mathematics from Princeton University and a bachelor of arts from the University of North Carolina at Chapel Hill.[1] He has extensive Wall Street

---

[1] Plaintiff's Response to Defendant's Statement of Material Facts, p. 7, ¶ 53.

experience in quantitative analysis of structured mortgage securities.[2] His business career includes senior positions at major investment banks, entrepreneurship, and independent consulting.[3] Dr. Hughes currently serves as the managing partner of Metrix Credit LLC, a quantitative consulting and software firm specializing in mortgage backed securities (MBS) and related portfolio advisory services.[4] Dr. Hughes has also taught a lecture series on mortgage-backed securities at the University of North Carolina's Kean-Flagler Business School.[5]

Priderock Capital Partners LLC ("Priderock") is a real estate asset management company that acquires, develops, and manages rental apartment complexes.[6]

In the summer of 2015, David Worley ("Worley") telephoned Dr. Hughes and told Dr. Hughes that Worley and his partners at Priderock were considering starting an investment fund focused on acquiring controlling class subordinated certificates issued under the Freddie Mac K-Series Multifamily Mortgage Securitization Program ("K-Deals").[7] K-Deal certificates are secured by geographically diversified loans on multifamily residential projects (including apartment complexes, student housing, and senior age-restricted housing), which exhibit low delinquency, default, and loss rates.[8] Typical K-Deal securitizations contain on average 60-80 geographically diverse loans secured by garden, mid and high-rise apartment complexes.[9] Average loan size may range from approximately $15 million to over $30 million.[10] Securitizations generally have been $1 billion and $1.5 billion of loan principal.[11] The controlling class security that Priderock intended its investment fund to purchase represented the

---

[2] *Id.* at p. 7, ¶ 53.
[3] *Id.* at p. 7, ¶ 53.
[4] *Id.* at p. 8, ¶ 53.
[5] *Id.* at p. 8, ¶ 53.
[6] *Id.* at p. 9, ¶ 57.
[7] *Id.* at p. 8, ¶ 54.
[8] *Id.* at p. 8, ¶ 55.
[9] *Id.* at p. 8, ¶ 55.
[10] *Id.* at p. 9, ¶ 55.
[11] *Id.* at p. 9, ¶ 55.

most junior 7.5% of the certificates issued by the K-Deal securitization.[12] Priderock believed that owning the controlling class securities would generate risk adjusted returns of 11-13% for the Fund in almost all economic environments.[13] K-Deal securities have varying maturities, including 7-years, 10-years, and 15-years and are a "buy and hold" investment.[14]

Prior to creating the Fund, Priderock had never invested in a K-Deal and had no experience with the acquisition of K-Deals.[15] No one at Priderock had experience in structuring, pricing, or the financial modeling of controlling class subordinated certificates issued by Freddie Mac.[16] Priderock had never created any investment fund to invest in securities related to real estate.[17] As part of Dr. Hughes's 30 years of experience with mortgage backed securities, Dr. Hughes had experience and expertise with Freddie Mac K-Deals, having worked with a number of asset managers and fund managers between 2010 and 2012 regarding the structure of investments in K-Deals, the financing of their acquisition, evaluating the securities, and creating an ability to monitor them,[18] including building Excel financial models regarding their cash flow.[19]

During their 2015 telephone discussion, Worley[20] asked Dr. Hughes to participate in creating the investment fund, which Dr. Hughes agreed to do.[21] Worley also asked Dr. Hughes to provide Worley with any information that Dr. Hughes had regarding K-Deal securities, which Dr. Hughes did, including research reports and primers regarding K-Deals.[22]

---

[12] *Id.* at p. 9, ¶ 55
[13] *Id.* at p. 9, ¶ 55
[14] *Id.* at p. 9, ¶ 56
[15] *Id.* at p. 9, ¶ 58
[16] *Id.* at p. 9, ¶ 58
[17] *Id.* at p. 9, ¶ 59
[18] *Id.* at p. 9, ¶ 60
[19] *Id.* at p. 10, ¶ 60
[20] *Id.* at p. 10, ¶ 61
[21] *Id.* at p. 10, ¶ 61
[22] *Id.* at p. 10, ¶ 62

Dr. Hughes agreed to provide his expertise to Priderock with regard to investing in, analyzing, pricing, and understanding the market for complex mortgage-backed securities, and to develop the financial models required to structure and manage Priderock's planned K-Deal investments.[23] The primary usage of the financial models Dr. Hughes was to develop for Priderock was to assist Priderock in the structuring, money raising, and final negotiation for the purchase of K-Deal securities.[24]

As Priderock later described in its private placement memorandum provided to prospective investors, "[w]ith Dr. Webster Hughes' bond structuring and analytical expertise, the Fund has the ability to evaluate and negotiate with Freddie Mac the structural details of each securitization."[25] According to Priderock:

> Dr. Hughes' mortgage-backed security structuring and analytical expertise is directly relevant to the Fund, as Freddie Mac K-Series Controlling Class tranches are highly specialized investments. Effective negotiation and management of the Controlling Class requires: a specialized understanding of securitization structures, processes, and economics; highly detailed modeling of investment cash flows, returns and financing structures; and in-depth understanding of the underlying multifamily collateral. Modeling includes initial underwriting of the underlying loans and properties, as well as projecting investment cash flows and returns based on input assumptions as to the forward default, loss, and prepayment performance of the underlying loans and properties. This includes statistical analysis of historical loan and property performance data and the ability to use results from the statistical analysis to define input assumptions corresponding to base case, target and stressed economic scenarios. Implementing these capabilities requires specialized quantitative and structural product expertise, as well as understanding of the intricacies and practical aspect of the specific investments.[26]

In the spring of 2016,[27] Priderock and Dr. Hughes agreed that, if the Fund launched, Dr. Hughes would receive a share of the cash flow that the Fund would receive during the "life of

---

[23] *Id.* at p. 10, ¶ 64
[24] *Id.* at p. 10, ¶ 65
[25] *Id.* at p. 11, ¶ 67
[26] *Id.* at p. 11, ¶ 68
[27] *Id.* at p. 14, ¶ 88

Fund" – which was the term of the maturity of the K-Deal securities purchased and held by the Fund.[28] For example, if the Fund purchased a security with a 10-year maturity, the life of the fund would be 10 years.[29] More specifically, during a meeting with David Khoury ("Khoury") in Palm Beach on or about April 27, 2016, Khoury and Hughes agreed that, if the Fund launched, Hughes would receive $200,000 per year, which represented a 10% share of the fixed management fees Priderock was to receive per year during the life of the securities purchased by the Fund, plus 10% of the "promote" that Priderock was to receive.[30] The "promote" is the profit share the general partner of the Fund was to receive to extent the investment outperformed the Fund's target total return.[31] Prior to Dr. Hughes's meeting with Khoury, Worley discussed those terms with Dr. Hughes and, after Dr. Hughes's meeting with Khoury, Worley confirmed those terms in subsequent telephone discussions and face-to-face meetings with Dr. Hughes.[32]

If the Fund did not launch, i.e., for example, if Priderock had been unable to raise sufficient funds to make a purchase of K-Deal securities, Dr. Hughes would, by the parties' agreement, receive no compensation for his work.[33]

After the purchase of the K-Deal securities, it was Worley's job to manage the portfolio of securities purchased, monitoring the performance of the underlying loans.[34] The Fund receives a monthly report from Freddie Mac regarding the performance of the underlying loans.[35] If the loans are performing, there is not a lot for the Fund to do.[36] If there were problems with the performance of the loans, Worley, on behalf of the Fund, would speak with the loan servicer

---

[28] *Id.* at p. 15, ¶ 91
[29] *Id.* at p. 15, ¶ 92
[30] *Id.* at p. 14, ¶ 89
[31] *Id.* at p. 15, ¶ 93
[32] *Id.* at p. 14, ¶ 89
[33] *Id.* at p. 15, ¶ 90
[34] *Id.* at p. 11, ¶ 70
[35] *Id.* at p. 12, ¶ 71
[36] *Id.* at p. 12, ¶ 72

regarding what was going on with a particular property and would make decisions regarding the underlying loans in place of their servicer.[37] Monthly distributions from the Fund to investors are handled by Worley, Zhensi Jin, Dan Ng, and Barbara Gaziano of Priderock.[38]

Dr. Hughes began his work for Priderock in July 2015 and continued through the Fund's April 2017 launch date.[39] During that time period, Dr. Hughes worked on a fully dedicated basis, did not provide services to any other clients, and ceased work on other matters that he had been working on.[40]

Dr. Hughes's work for Priderock consisted of assisting Priderock with the structuring and analysis of prospective K-Deal securities purchases and raising the capital necessary to launch the Fund by providing information to prospective investors regarding the contemplated K-Deal securities purchases.[41] His work included creating specialized financial models whose purpose was to project the returns and quantify risk of the prospective K-Deal investments under varying economic assumptions, which he continually updated, which were also made available to investors.[42] Dr. Hughes built the financial models using his 30 years of understanding, expertise, and experience in this area and his understanding of the needs of the team at Priderock and the prospective investors for this type of security.[43] Priderock provided Dr. Hughes's financial model to prospective investors in order to explain how the cash flows worked.[44] Part of talking to investors was having an analyst who was able to explain the financial model with regards to the K-Deals for prospective investors in the Fund.[45] Dr. Hughes's model was useful with regards to

---

[37] *Id.* at p. 12, ¶ 73
[38] *Id.* at p. 12, ¶ 74
[39] *Id.* at p. 12, ¶ 75
[40] *Id.* at p. 12, ¶ 76
[41] *Id.* at p. 12, ¶ 77
[42] *Id.* at p. 12, ¶ 78
[43] *Id.* at p. 13, ¶ 79
[44] *Id.* at p. 13, ¶ 80
[45] *Id.* at p. 13, ¶ 82

interacting with investors.[46] Priderock did not have anyone in-house to do the analysis with regards to the K-Deal investments.[47] At that time, Priderock had no analysts capable of explaining the K-Deal model to prospective investors.[48] Dr. Hughes's job was to be the analyst.[49]

Dr. Hughes work for Priderock included participation in telephone discussions with prospective investors[50] and travel on five customer marketing trips, including to New York and Philadelphia, and several to Palm Beach and South Florida.[51] In addition, Dr. Hughes assisted the Fund in obtaining a $20 million loan from Key Bank used to partially finance the Fund's first purchase of K-Deal securities by running his models for Key Bank and helping Key Bank understand the cash flows.[52] Dr. Hughes also assisted in the preparation of Priderock's private placement memorandum, which was drafted in April 2016, including writing portions of the PPM that required subject matter expertise regarding the securities, and Dr. Hughes's models, analysis, charts, and explanations were used within the private placement memorandum.[53]

The Fund was launched in April 2017 when made its first K-Deal purchase, purchasing $109,000,000 of FREMF KF-29 (1st floating rate security specified in PPM).[54] Prior to the first purchase of K-Deal securities in April 2017, Priderock raised about $100,000,000.[55]

Dr. Hughes's relationship with Priderock ended when Hughes received a notice from Priderock in early June 2017.[56]

---

[46] *Id.* at p. 13, ¶ 81
[47] *Id.* at p. 13, ¶ 83
[48] *Id.* at p. 13, ¶ 83
[49] *Id.* at p. 13, ¶ 84
[50] *Id.* at p. 13, ¶ 85
[51] *Id.* at p. 13, ¶ 85
[52] *Id.* at p. 14, ¶ 86
[53] *Id.* at p. 14, ¶ 87
[54] *Id.* at p. 16, ¶ 98
[55] *Id.* at p. 16, ¶ 102
[56] *Id.* at p. 16, ¶ 104

The Fund made a second K-Deal purchase in Jan 22, 2018, purchasing $58,000,000 of FREMF K-1504 (1st fixed rate security specified in PPM)[57] and a third K-Deal purchase in May 31, 2018, purchasing $82,000,000 of FREMF KF-46C (2nd floating security specified in PPM).[58]

## III.   LEGAL STANDARD

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there is no genuine issue of material fact that should be decided at trial … [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.* 929 F.2d 604, 608 (11th Cir. 1991). "When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 Fed. Appx. 264, 266 (11th Cir. 2011)

## IV.   LEGAL ARGUMENT

### A.   Contrary to defendant's argument, the evidence shows that the parties agreed, both through words and their conduct, on the essential terms of their agreement.

To show a breach of contract under Florida law, a plaintiff "must prove (1) a valid contract, (2) a material breach, and (3) damages. *Dagnesses v. Target Media Partners*, 711 Fed. Appx. 927,  934 (11th Cir. 2017). A valid contract arises when the parties' assent is manifested through written or spoken words, or 'inferred in whole or in part from the parties' conduct'." *Baron v. Osman*, 39 So.3d 449, 451 (Fla. 5th DCA 2010), citing *Commerce P'ship v. Equity Contracting Co.*, 695 So.2d 383, 385 (Fla. 4th DCA 1997). "A contract based on the parties' words is characterized as "express," whereas a contract based on the parties' conduct is said to

---

[57] *Id.* at p. 16, ¶ 99
[58] *Id.* at p. 16, ¶ 100

be implied-in-fact." *Id.* "The only distinction between an express and an implied-in-fact contract is the manner in which the parties' assent is manifested or proven. *Id.* "Common examples of contract implied-in-fact are where a person performs services at another's request, or 'where services are rendered by one person for another without his expressed request, but with his knowledge and under circumstances fairly raising the presumption that the parties understood and intended that compensation was to be paid.'" *Commerce P'ship*, 695 So.2d at 385.[59]

"The basic elements of an enforceable contract are offer, acceptance, consideration and sufficient specification of essential terms." *Id.* "What constitutes the essential terms of a given contract differs according to the circumstances, but they must include the terms specified in an offer to make a contract." *Id.*

Here,  the evidence is that in July 2015, David Worley, on behalf of Priderock, approached Dr. Hughes and requested Dr. Hughes's assistance in setting up and launching the Fund.[60] At the time, Priderock had never invested in a K-Deal and had no experience with the acquisition of K-Deals[61] and no one at Priderock had experience in structuring, pricing, or the financial modeling of controlling class subordinated certificates issued by Freddie Mac.[62] Dr. Hughes began his work for Priderock in July 2015 and continued through the launch of the Fund.[63] During that time period, Dr. Hughes worked on a fully dedicated basis, did not provide services to any other clients, and ceased work on other matters that he had been working on.[64] Hughes's work for Priderock consisted of assisting Priderock with the structuring and analysis of prospective K-Deal securities purchases and raising the capital necessary to launch the Fund by

---

[59] If no express or implied-in-fact contract exists, a party may recover under quasi-contract, also known as a contract-implied-in law or unjust enrichment. *Baron*, 39 So.3d at 451 (Fla. 5th DCA 2010).
[60] *Id.* at p. 8, ¶ 54 and p. 10, ¶ 61
[61] *Id.* at p. 9, ¶ 58
[62] *Id.* at p. 9, ¶ 58
[63] *Id.* at p. 12, ¶ 75
[64] *Id.* at p. 12, ¶ 76

providing information to prospective investors regarding the contemplated K-Deal securities purchases.[65] His work included creating specialized financial models whose purpose was to project the returns and quantify risk of the prospective K-Deal investments under varying economic assumptions, which he continually updated, which were also made available to investors.[66]

On or about April 27, 2016, as compensation for Dr. Hughes's work, David Khoury and Worley, on behalf of Priderock, agreed with Dr. Hughes that, upon the Fund being launched, Dr. Hughes would receive $200,000 per year, plus 10% of the promote.[67] If the Fund did not launch, i.e., for example, if Priderock had been unable to raise sufficient funds to make a purchase of K-Deal securities, Dr. Hughes would, by the parties' agreement, receive no compensation for his work.[68] Priderock also agreed to reimburse Hughes for his expenses.[69]

This evidence is sufficient for a jury to find an enforceable agreement. *See Community Design Corp. v. Antonell*, 459 So.2d 343, 345 (Fla. 3rd DCA 1984) (where president of design company promised a bonus to any employee still working at Christmas if building drawings were completed by then, while the exact amount of the bonus and the degree of required completion of drawings were disputed, there was sufficient evidence for the jury to find an oral contract between the parties; courts are reluctant to hold contracts unenforceable on grounds of uncertainty, especially where one party has received the benefit of the other's performance; when the existence of a contract is clear, the jury may properly determine the exact terms of an oral contract, which often depends on the credibility of the witnesses), citing *Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.*, 302 So.2d 404, 408 (Fla. 1974); *see also*

---

[65] *Id*. at p. 12, ¶ 77
[66] *Id*. at p. 13, ¶ 78
[67] *Id*. at p. 14, ¶ 89 – 15, ¶ 91
[68] *Id*. at p. 15, ¶ 90
[69] *Id*. at p. 16, ¶ 97

*Wrestlereunion, LLC v. Live Nation Television Holdings, Inc.,* 2009 WL 2473686, at *4 - 6 (M.D. Fla. Aug. 11, 2009)(denying motion for summary judgment regarding whether an "Outline of Terms" constituted an enforceable contract where there was a genuine issue of material fact as to whether the parties agreed on all essential terms and intended the "Outline of Terms" to be binding, or whether there were other essential terms they intended to negotiate; "the contemplation of a subsequent formal agreement 'does not denote that they did not intend to be bound immediately by their oral or written negotiations'").

Although Dr. Hughes asserts that the agreement to pay him $200,000 from the fixed management fee per year was for the life of the Fund - i.e. the maturity of the K-Deal securities purchased - while Priderock asserts that the $200,000 per year would be paid so long as Hughes worked with Priderock, that is a matter for the jury, not a basis upon which to grant a motion for summary judgment. "When parties to a contract dispute their 'understanding as to certain terms,' the question is properly submitted to the jury." *FC Online Marketing, Inc. v. Costa*, 2014 WL 6473770, at *6 (M.D. Fla. Nov. 18, 2014)(denying motion for summary judgment regarding breach of contract claim), citing *Pan Am. Bancshares v. Trask*, 278 So.2d 313, 314 (Fla. 4th DCA 1973)(question of exact terms of alleged contract was properly submitted to jury where each party testified to creation of a contract, the only disagreement being related to variance in understanding as to certain terms); *see also Bowe v. Giardina*, 719 So.2d 941, 942 (Fla. 3rd DCA 1998)( in breach of contract action, faced with conflicting testimony, the trial court was entirely correct to send the case to the jury; if evidence raises any material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it).

### 1.    The parties subsequent unsuccessful efforts to memorialize their
### oral agreement does not render their oral agreement unenforceable.

The fact that Dr. Hughes and Priderock later attempted, but failed, to memorialize their agreement, and subsequently disputed the terms of their agreement, does not render their oral agreement unenforceable or render it merely "an agreement to agree" as Priderock argues. *See New Dirt, Inc. v. Harrison*, 182 So.3d 773, 775 (5th DCA 2015)(where parties agreed that co-founder would receive $100,000 salary, which should "start together when we can afford it," an enforceable oral agreement existed requiring corporation to pay co-founder a salary and repay money that he lent the corporation, despite the parties' unsuccessful efforts to memorialize the various agreements and discussions they had during the formation stages of their enterprise, including emails and employment contracts); *Dagnesses v. Target Media Partners*, 711 Fed. Appx. 927,  934 (11th Cir. 2017)(offer letter allowed a trier of fact reasonably to find that the defendant company had extended an offer of employment to the plaintiff, which the plaintiff accepted and commenced employment with the company; the offer letter supporting finding that consideration existed, as the offer letter promised plaintiff monetary compensation and benefits for his labor; the letter was sufficiently specific to create a contract – it descried the nature of the position that plaintiff was to assume and the duties he was to per form, provided  a detailed compensation schedule, including commission and bonuses for achieving certain sales goals, and a list of benefits; *Specialized Transportation of Tampa Bay, Inc. v. Nestle Waters North America, Inc.*, 2009 WL 975740 at *6 (M.D. Fla. April 9, 2009)(denying motion for judgment at law after jury trial; a reasonable jury could determine that an oral contract between a bottled water company and a delivery company regarding the reconfiguration of a  fleet of vehicles was an agreement to protect the delivery company from loss rather than an unenforceable agreement to agree in the future; the intention to put an agreement in writing at a subsequent time is not, of

itself, sufficient to show that the parties did not intend an oral agreement to be complete and binding without being put in writing).

**B.      The Statute of Frauds does not bar plaintiff's claims for breach of an express contract (Count I) or breach of a contract implied-in-fact (Count II).**

The statute of frauds does not apply here for two reasons. First, the parties' oral agreement regarding Dr. Hughes' compensation was capable of being performed within a year (and in fact was). Second, Dr. Hughes fully performed all of his obligations under the parties' oral agreement. The fact that Priderock was obligated to pay Dr. Hughes after the launch of the Fund until the securities purchased by the Fund matured is irrelevant under Florida law because Dr. Hughes fully performed his obligations.

**1.      The Statute of Frauds does not apply because the parties' agreement was capable of being performed within a year.**

Florida's statute of frauds, Fla. Stat § 725.01 provides, in relevant part:

> *No action shall be brought … upon any agreement that is not to be performed within the space of 1 year from the making thereof,* … *unless the agreement* or promise upon which such action shall be brought, or some note or memorandum thereof *shall be in writing and signed by the party to be charged therewith* or by some other person by her or him thereunto lawfully authorized. (emphasis added)

As explained by the Florida Supreme Court in *Yates v. Ball*, 181 So. 341 (Fla. 1937), under the Statute of Frauds:

> [T]o make a parol contract void, it must be apparent that it was the understanding of the parties that it was not to be performed within a year from the time it was made …
>
> *When ... no definite time was fixed by the parties for the performance of their agreement, and there is nothing in its terms to show that it could not be performed within a year according to its intent* and the understanding of the parties, *it should not be construed as being within the statute of frauds.*

*Yates v. Ball*, 181 So. at 344 (emphasis added)

"Thus, even if performance does, in fact, run beyond one year, the Statute of Frauds may not apply." *Law Offices of David J. Stern, P.A. v. U.S. Bank, National Assoc.*, 2011 WL 13223736 at *2 (S.D. Fla. June 10, 2011). "The relevant question is *could* the contract have been fully performed within one year. *Id.*; *see also Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 2011 WL 845825 at * 4 (S.D. Fla. March 7, 2011) ("where the parties have not specified a time for performance of a contract, the Statute of Frauds only applies where it is apparent that the parties intended and understood that such contract was not to be performed within one year from its making"), citing *Byam v. Klopcich,* 454 So.2d 720, 721 (Fla. 4th DCA 1984)(("The general rule is that an oral contract for an indefinite time is not barred by the Statute of Frauds. Only if the contract could not possibly be performed within one year would it fall within the statute.")

Here, Dr. Hughes orally agreed in 2015 to provide his time, resources, and expertise to assist Priderock in launching the Fund (the fund would launch when the Fund raised sufficient funds and made its first purchase of K-Deal securities).[70] Subsequently, in the spring of 2016,[71] Priderock and Dr. Hughes agreed that, if the Fund launched, Dr. Hughes would receive a share of the cash flow that the Fund would receive during the "life of Fund" – which was the term of the maturity of the K-Deal securities purchased and held by the Fund.[72] For example, if the Fund purchased a security with a 10-year maturity, the life of the fund would be 10-years.[73] More specifically, on or about April 27, 2016, Priderock and Dr. Hughes agreed that, if the Fund launched, Dr. Hughes would receive $200,000 per year, which represented a 10% share of the fixed management fees Priderock was to receive per year during the maturity term of the

---

[70] *Id.* at p. 10, ¶¶ 61-64
[71] *Id.* at p. 14, ¶ 88
[72] *Id.* at p. 14, ¶ 88 and p. 15, ¶ 91
[73] *Id.* at p. 15, ¶ 92

securities purchased by the Fund, plus 10% of the "promote" that Priderock was to receive.[74] The "promote" was the profit share the general partner of the Fund was to receive to extent the investment outperformed the Fund's target total return.[75] If the Fund did not launch, i.e. if it was unable to raise sufficient funds to make a purchase of K-Deal securities, Dr. Hughes would receive no compensation for his work.[76]

The parties did not specify a date when the Fund was to launch. Nothing in the parties' agreement, however, precluded the Fund from launching within a year of their agreement regarding Hughes's compensation. *See New Dirt, Inc. v. Harrison*, 182 So.3d 773, 774 Fla. 5th DCA 2015)(enforceable oral agreement existed requiring corporation to pay co-founder a salary and repay money he lent to corporation if and when corporation had available funds or was sold; statute of frauds not implicated where it was possible for agreement to be performed within a year). In fact, the Fund made its first purchase of K-Deal securities in April 2017 after it raised $100,000,000 and obtained a loan from Key Bank.

### 2.      Even if the Statute of Frauds applied to the parties oral agreement, Plaintiff fully performed his obligations under the parties' agreement.

The plaintiff fully performed his agreed upon services – assisting Priderock with the launch of the Fund at issue. "When an oral contract has been fully performed by one party, the Statute of Frauds may not be employed as a defense." *Law Offices of David J. Stern, P.A.*, 2011 WL 13223736 at *2, citing *Gerry v. Antonio*, 409 So.2d 1181, 1183 (Fla. 4th DCA 1982); *see also Merle Wood & Assocs., Inc.*, 2011 WL 845825 at *4, citing 27 Fla. Jur.2d Statute of Frauds § 8 (2011)("When an oral contract has been fully performed by one party, the Statute of Frauds may not be employed as a defense."); *Luxor Agentes Autonomos de Investimientos, Ltda. v.*

---

[74] *Id*. at p. 14, ¶ 89
[75] *Id*. at p. 15, ¶ 95
[76] *Id*. at p. 15, ¶ 90

*Intertransfers, Inc.*, 2012 WL 13014340 at * 2 (S.D. Fla. April 30, 2012)("Full performance by one party to an oral contract removes the contract from the statute of frauds"), citing *Fresh Capital Financial Services, Inc. v. Bridgeport Capital Services, Inc.*, 891 So.2d 1142, 1145 (Fla. 4th DCA 2005).

The fact that the party who has fully performed is to receive payment after one year is irrelevant. *See Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 2011 WL 845825 at *1 and *5, fn 4 (S.D. Fla. March 7, 2011)(yacht broker entitled to commissions from yacht builder for procuring buyer for yacht to be built by yacht builder even though yacht broker was not entitled to receive the commissions until the buyer made the final payment on the yacht), citing *Fresh Capital Financial Services, Inc.*, 891 So.2d at 1145 (capital company brought action against commercial factor to enforce an oral agreement to split commissions generated from clients referred to factor by capital company; "Fresh Capital's full performance is not altered by the fact that Bridgeport did not owe a commission until a referred client paid Bridgeport a fee."), citing *Glass v. Minn. Protective Life Ins. Co.*, 314 N.W. 2d 393, 396 (Iowa 1982)(holding that agent had fully performed oral contract entitling him to renewal commissions, even though commission were not owed until policy holders paid their premiums), *Am. Chocolates, Inc. v. Mascot Pecan Co*, 592 So.2d 93, 94 (Miss. 1991)(holding that, when plaintiff secured a customer for defendant, plaintiff had fully performed contract, entitling it to a 5% commission on defendant's future sales to customer), and *Linn v. Employers Reinsurance Corp.* 153 A.2d 483, 484-86 (Pa. 1959)(plaintiff fully performed oral contract entitling it to commission on reinsurance premiums when it aided the defendant in securing business); *see also Brodie v. All Corp. of USA*, 876 So.2d 577, 578-79 (Fla. 4th DCA 2004)(oral agreement between a couple where girlfriend secured mortgage on home in exchange for boyfriend's agreement to pay

monthly mortgage payments and household expenses was not subject to statute of frauds because girlfriend fulfilled her obligation under the oral agreement by securing the mortgage); *Coburn Group, LLC v. Whitecap Advisors LLC*, 2009 WL 192479 at *3 (N.D. Ill. Jan. 22, 2009)(Illinois statute of frauds did not bar oral agreement to pay commissions to plaintiff for introducing potential investors to defendant; complete performance by one party renders oral contracts enforceable under the statute of frauds, particularly where the only performance obligation remaining for the other party is the payment of money).

### 3.    Defendant's case citations are inapposite.

The cases Priderock cites in its motion to partial summary judgment are distinguishable and do not apply to the circumstances here. None of the cases Priderock relies on concerns a plaintiff who fully performed or an agreement that could be performed within one year. In *Financial Healthcare Assocs., Inc. v. Public Health Trust of Miami-Dade County*, 488 F.Supp.2d 1231, 1239  (S.D. Fla. 2007), *Mot. for PSJ, p. 7*, the oral contract at issue was to be performed over a three-year period, and there was no allegation that the plaintiff had fully performed it obligations pursuant to the alleged oral contract. In *Dwight v. Tobin*, 947 F.2d 455, 459-60 (11th Cir. 1991), the Court of Appeals Circuit stated that *partial* performance does not remove an oral agreement from the statute of frauds bar. In *Pineda v. PRC, LLC*, 2011 WL 3022564 at *4 (S.D. Fla. July 22, 2011), *Mot. for PSJ, p. 6*, the alleged oral agreement did not meet the statute of frauds because it would not necessarily be completed within one year and there was no allegation that plaintiff fully performed its obligations. In *In re US Capital Holdings, LLC*, 2013 WL 5297352  at *11 (S.D. Fla. Bankr. Aug. 2, 2013), *Mot. for PSJ, p. 6*, the oral agreement was capable of being performed within one year, but the plaintiff could not avoid the application of the statute of frauds on the basis of full performance because it did not fully perform its

obligations under the oral agreement. *In Alpha Data Corp. v. HX5, LLC,* 139 So.3d 907 (Fla. 1st DCA 2013), *Mot. for PSJ, p. 9*, the record showed conclusively that the oral partnership agreement was for a period of three years. In *Marcus v. Garland, Samuel & Loeb, P.*C, 441 F.Supp.2d 1227 (S.D. Fla. 2006), *Mot. for PSJ, p. 7,* an attorney's oral fee sharing agreement was void as against public policy under the Florida Rules of Professional Conduct and Judge King, in passing, alternatively stated the agreement would be unenforceable under the statute of frauds because it clearly was not to be performed within one year. In *All Brand Importers, Inc. v. Tampa Crown Distributors, Inc.*, 864 F.2d 748 (11th Cir. 1989), *Mot. for PSJ, p. 6*, the oral contract was to be perpetual, thus for longer than one year. In *Advanced Protection Technologies, Inc. v. Square D Company*, 390 F.Supp.2d 1155, *Mot. for PSJ, p. 6*, the Court alternatively addressed the statute of frauds, stating that because the alleged oral joint venture would be "extremely long-term and take many years to build and grow," the statute of frauds might apply.

To the extent the decisions in *Chernys v. Standard Pac. of S. Fla., G.P., Inc.*, 2010 WL 11504280 (S.D. Fla. Feb. 10, 2010) and *Roberts v. Stutman,* 2011 WL 13225047 (S.D. Fla. Jan. 19, 2011) reject full performance as an exception to the statute of frauds, those decisions are contrary to the decisions in *Luxor Agentes Autonomos de Investimientos, Ltda. v. Intertransfers, Inc.*, 2012 WL 13014340 at * 2 (S.D. Fla. April 30, 2012)("Full performance by one party to an oral contract removes the contract from the statute of frauds"), citing *Fresh Capital Financial Services, Inc. v. Bridgeport Capital Services, Inc.*, 891 So.2d 1142, 1145 (Fla. 4th DCA 2005) (capital company brought action against commercial factor to enforce an oral agreement to split commissions generated from clients referred to factor by capital company; "Fresh Capital's full performance is not altered by the fact that Bridgeport did not owe a commission until a referred

client paid Bridgeport a fee") and *Merle Wood & Assocs., Inc.*, 2011 WL 845825 at *1 and *5, fn 4 (yacht broker entitled to commissions from yacht builder for procuring buyer for yacht to be built by yacht builder even though yacht broker was not entitled to receive the commissions until the buyer made the final payment on the yacht).

## V.    CONCLUSION

Contrary to Priderock's arguments, the evidence shows that the parties agreed, both through words and their conduct, on the essential terms of their agreement – including the assistance Dr. Hughes would provide Priderock and his compensation for that assistance. To the extent Priderock disputes Dr. Hughes's testimony regarding the terms of their oral agreement, that is a matter for the jury, not a basis upon which to grant a motion for summary judgment. Nor does the parties' subsequent unsuccessful efforts to memorialize their oral agreement render their oral agreement unenforceable or render it an "agreement to agree" as Priderock argues.

Nor are Dr. Hughes's claims for breach of an express contract and breach of contract implied-in-law are barred by the statute of frauds. The statute of frauds does not apply here for two reasons. First, the parties' agreement - assisting Priderock with the launch of the Fund at issue - was capable of being performed within a year, taking it out of the statute of frauds, regardless of whether the Fund actually launched or failed to launch within a year (in fact, the Fund was launched within a year of the parties' agreement regarding Dr. Hughes's compensation). Second, Dr. Hughes fully performed all of his obligations under the parties' agreement to help launch the Fund. The fact that Priderock was obligated to pay Dr. Hughes after the Fund was launched is irrelevant under Florida law.

Accordingly, Priderock's motion for partial summary judgment should be denied.

Dated:  December 19, 2018

Respectfully submitted,

By:___*/s/ Christopher Kammerer*___
    Christopher W. Kammerer
    Florida Bar No.:  0042862
    John F. Mariani
    Florida Bar No. 263524
    KAMMERER MARIANI PLLC
    1601 Forum Place, Suite 500
    West Palm Beach, FL 33401
    Telephone: (561) 990-1591
    Email: jmariani@kammerermariani.com
    Email:ckammerer@kammerermariani.com
    *Counsel for Webster Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

By: *   /s/ Christopher Kammerer*
Christopher W. Kammerer

## SERVICE LIST

**Webster Hughes v. Priderock Capital Partners, LLC**
**United States District Court, Southern District of Florida Case No. 9:18-cv-80110**
**ROSENBERG/HOPKINS**

**Electronic Mail Notice List**

- **Roy E. Fitzgerald, Esq.**
  rfitzgerald@mrachek-law.com

- **William Miossi, Esq.**
  WMiossi@winston.com

- **Mary Lenahan, Esq.**
  MLenahan@winston.com