# EXHIBIT 1

Book No. __065

# PRIDEROCK MULTIFAMILY DEBT OPPORTUNITY FUND, L.P.
## $150,000,000
## LIMITED PARTNERSHIP INTERESTS

ATTACHED PLEASE FIND AN ELECTRONIC COPY OF THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM"), DATED APRIL 2016, RELATING TO THE LIMITED PARTNERSHIP INTERESTS ("LIMITED PARTNERSHIP INTERESTS") OFFERED BY PRIDEROCK MDOF GP, LLC (THE "GENERAL PARTNER"), THE GENERAL PARTNER OF PRIDEROCK MULTIFAMILY DEBT OPPORTUNITY FUND, L.P. (THE "FUND") IN RESPECT OF THE FUND.

THIS MEMORANDUM HAS BEEN FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE INFORMATION OF THE PERSON TO WHOM IT HAS BEEN DELIVERED ON BEHALF OF THE FUND AND DOES NOT CONSTITUTE AN OFFER TO ANY PERSON OTHER THAN THE RECIPIENT TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE LIMITED PARTNERSHIP INTERESTS DESCRIBED HEREIN. EACH PERSON TO WHOM THIS MEMORANDUM HAS BEEN DELIVERED AGREES TO TREAT THE INFORMATION CONTAINED HEREIN IN A CONFIDENTIAL MANNER. SUCH INFORMATION MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY PURPOSE OTHER THAN CONSIDERATION OF AN INVESTMENT IN THE FUND. DISTRIBUTION OF THE MEMORANDUM TO ANY PERSONS OTHER THAN THE PERSON RECEIVING THIS ELECTRONIC COPY FROM THE FUND AND ITS AGENTS, AND ANY PERSONS RETAINED TO ADVISE THE PERSON RECEIVING THIS ELECTRONIC COPY FROM THE FUND WITH RESPECT THERETO IS UNAUTHORIZED. ANY PHOTOCOPYING, DISCLOSURE OR ALTERATION OF THE CONTENTS OF THE MEMORANDUM, AND ANY FORWARDING OF A COPY OF THE MEMORANDUM BY ANY MEANS TO ANY PERSON OTHER THAN THE PERSON RECEIVING THIS COPY FROM THE FUND AND ITS AGENTS, IS PROHIBITED.

THE LIMITED PARTNERSHIP INTERESTS DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, AND NONE OF THE FOREGOING AUTHORITIES HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

EACH PERSON TO WHOM THIS MEMORANDUM IS DELIVERED, BY ACCEPTING THE MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM TO THE GENERAL PARTNER PROMPTLY UPON REQUEST. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, PROSPECTIVE INVESTORS (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT THEREOF) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND ANY FACTS THAT MAY BE RELEVANT TO THE TAX STRUCTURE OF THE FUND AND ANY OF ITS TRANSACTIONS, IT BEING UNDERSTOOD THAT "TAX TREATMENT" AND "TAX STRUCTURE" DO NOT INCLUDE THE NAME OR IDENTIFYING INFORMATION OF: (I) THE FUND; OR (II) THE PARTIES TO A TRANSACTION.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE LIMITED PARTNERSHIP INTERESTS IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SUCH LIMITED PARTNERSHIP INTERESTS IN ANY STATE OR OTHER JURISDICTION WHERE, OR TO OR FROM ANY PERSON TO OR FROM WHOM, SUCH AN OFFER OR SOLICITATION IS UNLAWFUL OR NOT AUTHORIZED. THE LIMITED PARTNERSHIP INTERESTS ARE OFFERED SUBJECT TO THE RIGHT OF THE GENERAL PARTNER TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART.

THERE IS NO PUBLIC MARKET FOR THE LIMITED PARTNERSHIP INTERESTS AND NO SUCH MARKET IS EXPECTED TO DEVELOP IN THE FUTURE. THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), AND OTHER APPLICABLE FEDERAL, STATE AND NON-U.S. SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, THE LIMITED PARTNERSHIP INTERESTS ARE SUBJECT TO CERTAIN OTHER RESTRICTIONS ON TRANSFERABILITY AND RESALE SET FORTH IN THE PARTNERSHIP AGREEMENT OF THE FUND. IN PARTICULAR, ANY TRANSFER OR ASSIGNMENT OF LIMITED PARTNERSHIP INTERESTS WILL BE SUBJECT TO THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER IN ITS SOLE AND ABSOLUTE DISCRETION. LIMITED PARTNERSHIP INTERESTS ARE NOT REDEEMABLE AT THE OPTION OF THE LIMITED PARTNERS, AND THE LIMITED PARTNERS WILL NOT HAVE THE RIGHT TO WITHDRAW THEIR CAPITAL. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

IN MAKING AN INVESTMENT DECISION, PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR ACCOUNTING ADVICE AND EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO THE LEGAL, TAX, REGULATORY, FINANCIAL AND ACCOUNTING CONSEQUENCES OF ITS INVESTMENT IN THE FUND.

THE LIMITED PARTNERSHIP INTERESTS ARE BEING OFFERED AS A PRIVATE PLACEMENT TO A LIMITED NUMBER OF INVESTORS AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY U.S. STATE OR NON-U.S. JURISDICTION. THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, AND THE RULES AND REGULATIONS



PROMULGATED THEREUNDER (COLLECTIVELY, THE "INVESTMENT COMPANY ACT"). CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT. NEITHER THE SEC NOR ANY U.S. STATE OR NON-U.S. SECURITIES COMMISSION HAS REVIEWED OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF THE OFFERING DESCRIBED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE LIMITED PARTNERSHIP INTERESTS ARE BEING OFFERED ONLY TO INVESTORS THAT QUALIFY AS (I) "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT AND (II) "QUALIFIED PURCHASERS" WITHIN THE MEANING GIVEN TO SUCH TERM IN THE INVESTMENT COMPANY ACT.

THIS MEMORANDUM IS THE ONLY DOCUMENT WHICH IS AUTHORIZED TO DESCRIBE THE OFFERING OF THE LIMITED PARTNERSHIP INTERESTS AND SUPERSEDES ALL PRIOR DOCUMENTS AND INFORMATION WHICH MAY HAVE BEEN DISTRIBUTED TO PROSPECTIVE INVESTORS. PROSPECTIVE INVESTORS ARE TO RELY ON THIS MEMORANDUM ONLY IN CONNECTION WITH ANY PURCHASES OF SUCH LIMITED PARTNERSHIP INTERESTS. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS MEMORANDUM, AND ANY REPRESENTATION OR INFORMATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND, THE GENERAL PARTNER OR ANY PLACEMENT AGENT OF THE FUND.

AN INVESTMENT IN THE FUND WILL INVOLVE A HIGH DEGREE OF RISK DUE TO, AMONG OTHER THINGS, THE NATURE OF THE FUND'S INVESTMENTS. PROSPECTIVE INVESTORS SHOULD PAY PARTICULAR ATTENTION TO THE INFORMATION IN SECTION IX – "CERTAIN RISK FACTORS AND CONFLICTS OF INTEREST" OF THIS MEMORANDUM. AN INVESTMENT IN THE FUND IS SUITABLE ONLY FOR SOPHISTICATED INVESTORS AND REQUIRES THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT THE HIGH RISKS AND LACK OF LIQUIDITY INHERENT IN AN INVESTMENT IN THE FUND. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. NO ASSURANCE CAN BE GIVEN THAT THE FUND'S INVESTMENT OBJECTIVE WILL BE ACHIEVED OR THAT INVESTORS WILL RECEIVE A RETURN OF THEIR CAPITAL ON A TIMELY BASIS OR AT ALL.

THE GENERAL PARTNER WILL MAKE AVAILABLE TO EACH OFFEREE OF LIMITED PARTNERSHIP INTERESTS THE OPPORTUNITY TO DISCUSS WITH, ASK QUESTIONS OF AND RECEIVE ANSWERS FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION TO THE EXTENT THE GENERAL PARTNER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. EACH PROSPECTIVE PURCHASER, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL RELATED MATERIALS TO THE ADDRESS STATED BELOW, IF THE PROSPECTIVE PURCHASER DETERMINES NOT TO PURCHASE ANY LIMITED PARTNERSHIP INTERESTS. SUBJECT TO THE FOREGOING, ANY REPRESENTATION OR INFORMATION NOT CONTAINED HEREIN MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND SINCE NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY SUCH REPRESENTATIONS OR TO PROVIDE ANY SUCH INFORMATION.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM CONSTITUTES "FORWARD-LOOKING STATEMENTS" THAT CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "ESTIMATE," "INTEND," "CONTINUE," OR "BELIEVE" OR THE NEGATIVES THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. FURTHERMORE, ANY PROJECTIONS OR OTHER ESTIMATES IN THIS MEMORANDUM, INCLUDING ESTIMATES OF RETURNS OR PERFORMANCE, ARE "FORWARD-LOOKING STATEMENTS" AND ARE BASED UPON CERTAIN ASSUMPTIONS THAT MAY CHANGE. DUE TO VARIOUS RISKS AND UNCERTAINTIES, INCLUDING THOSE SET FORTH UNDER SECTION X – "CERTAIN RISK FACTORS AND CONFLICTS OF INTEREST" OF THIS MEMORANDUM, ACTUAL EVENTS OR RESULTS OR THE ACTUAL PERFORMANCE OF THE FUND MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS. MOREOVER, ACTUAL EVENTS ARE DIFFICULT TO PROJECT AND OFTEN DEPEND UPON FACTORS THAT ARE BEYOND THE CONTROL OF THE GENERAL PARTNER AND ITS AFFILIATES. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME AFTER THE EARLIER OF THE RELEVANT DATE SPECIFIED HEREIN OR THE DATE OF THIS MEMORANDUM. NEITHER THE DELIVERY OF THIS MEMORANDUM, NOR ANY SALES HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE SUBSEQUENT TO THE DATE OF THIS MEMORANDUM.

SEE APPENDIX A "RESTRICTIONS ON SALES IN SELECTED JURISDICTIONS" FOR ADDITIONAL INFORMATION.

ALL REFERENCES TO "DOLLARS" OR "$" HEREIN REFER TO UNITED STATES DOLLARS.

Priderock Multifamily Debt Opportunity Fund, L.P.
Confidential

QUESTIONS AND REQUESTS FOR INFORMATION REGARDING THE FUND AND THE LIMITED PARTNERSHIP
INTERESTS CAN BE DIRECTED TO THE INVESTMENT RELATIONS TEAM OF THE GENERAL PARTNER AT:

| For More Information Please Contact: | |
| --- | --- |
| David Khoury<br>Priderock Capital Partners<br>525 Okeechobee Blvd<br>Suite 1650<br>West Palm Beach, FL 33401<br><br>Telephone: (561) 653-9332<br>Email: dkhoury@prcpllc.com | David Worley<br>Priderock Capital Partners<br>525 Okeechobee Blvd<br>Suite 1650<br>West Palm Beach, FL 33401<br><br>Telephone: (561) 653-9332<br>Email: dworley@prcpllc.com |

April 2016

HUGHES_0000768

*Page Intentionally Left Blank*

Priderock Multifamily Debt Opportunity Fund, L.P.
Confidential

HUGHES_0000769

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | OVERVIEW | 6 |
| II. | INVESTMENT HIGHLIGHTS | 9 |
| III. | EXECUTIVE SUMMARY OF KEY TERMS | 11 |
| IV. | MARKET OPPORTUNITY | 12 |
| V. | INVESTMENT STRATEGY | 14 |
| VI. | INVESTMENT STRUCTURE | 20 |
| VII. | INVESTMENT PROCESS | 22 |
| VIII. | MANAGEMENT | 24 |
| IX. | SUMMARY OF PRINCIPAL TERMS | 27 |
| X. | CERTAIN RISK FACTORS AND CONFLICTS OF INTEREST | 37 |
| XI. | CERTAIN TAX CONSIDERATIONS | 65 |
| XII. | CERTAIN REGULATORY MATTERS | 74 |
| XIII. | EMPLOYEE BENEFIT PLAN CONSIDERATIONS | 76 |
| APPENDIX A | RESTRICTIONS ON SALES IN SELECTED JURISDICTIONS | A-1 |

HUGHES_0000770

# I.   OVERVIEW

Priderock Multifamily Debt Opportunity Fund, L.P. (the "Fund") is a private investment vehicle organized as a Delaware limited partnership and sponsored by Priderock Fund Management Partners LLC (the "Investment Manager"), an affiliate of Priderock Capital Partners LLC ("Priderock"). The General Partner of the Fund, Priderock MDOF GP, LLC, is a Delaware limited liability company, managed and controlled by George Banks, David Khoury and David Worley (collectively, the "Principals"). The Principals will also comprise the Investment Committee of the Investment Manager (the "Investment Committee"), which will be responsible for all investment decisions of the Fund.

The investment strategy of the Fund is to purchase and actively manage controlling class subordinated certificates ("Controlling Class") issued under the Freddie Mac K-Series Multifamily Mortgage Securitization Program ("K-Deals"). K-Deal certificates are secured by geographically diversified loans on multifamily residential projects (including apartment complexes, student housing and senior age-restricted housing) exhibiting some of the industry's lowest delinquency and vacancy rates, along with other strong property fundamentals. Historically, K-Deals have provided excellent downside protection and consistent returns to the Controlling Class throughout both good and bad macroeconomic cycles.

The Fund has been identified by Freddie Mac as having the expertise and infrastructure required to invest in and represent the Controlling Class. This positions the Fund as part of a limited group of buyers for Controlling Class certificates.

The Fund will seek to acquire the Controlling Class of multiple K-Deals backed by loans on stabilized and geographically diverse multifamily assets securitized through Freddie Mac. K-Deals are secured by loans on multifamily assets with some of the industry's lowest delinquency, default and loss rates. Typical K-Deal securitizations contain on average 60-80 geographically diverse loans secured by garden, mid and high-rise apartment complexes, which may include some student and/or senior housing. Average loan size may range from approximately $15 million to over $30mm, with average initial leverage ranging from 70%-75%. Securitizations generally have between $1 billion and $1.5 billion of loan principal and are homogenous in loan term and structure (i.e., either fixed or floating with the clustered maturity dates). (Source: Wells Fargo Securities LLC Structured Products Research – CMBS & Commercial Real Estate - Freddie Mac K-Deal Desk Reference, April 5, 2016).

The Controlling Class security that the Fund will purchase generally represents the most junior 7.5% of the certificates issued by the K-Deal securitization. Typically, 82% of the fixed rate pools and 90% of the floating rate pools are guaranteed by Freddie Mac and sold as public securities. The difference (10.5% on the fixed rate bonds and 2.5% on the floating rate bonds) are sold as mezzanine securities.

HUGHES_0000771

## Multifamily Loan Portfolio Securitization (Floating Rate Example)

**FHLMC Guaranteed**
AAA-Rated Senior Security
90%

*Example Structure*:

- 75 Floating Rate Loans, $1.5B Portfolio, Average Loan Rate *LIBOR+2.30%*
- 90% Financed with FHLMC Guaranteed Debt  Rate *LIBOR+.65%*

**Split-Rated Mezzanine Security**
**2.5%**

**Non-Rated**
**Controlling Class Security**
**7.5%**

The Fund will invest in subordinated debt ("Controlling Class") securities issued by the Freddie Mac K-Series Multifamily Loan Securitization Program. These investments represent the first loss controlling class risk position in Freddie Mac originated multifamily loan portfolios.

- $28B of multifamily loans were securitized in K-Deals in 2013 and $21B in 2014; $21.9B of multifamily loans were securitized into K-Deal product during YTD 3Q15.

- The Controlling Class subordinated tranches in K-Series securitizations represent 7.5% of total loan portfolio principal balances.

- Freddie Mac multifamily loan loss experience since 1994 equals 0.16% of $114B total originated balance and 0.26% of total matured or otherwise terminated loans.

- **Fund investments are projected to generate net 11-13% levered loss-adjusted IRR.**

**Investment Target – Controlling Class Security**
- Produces excellent risk adjusted returns even in severe downside scenarios where loan losses are assumed to be many times greater than historical experience.

The Fund will focus on purchasing floating rate Controlling Class securities while making a smaller allocation to fixed rate Controlling Class securities. Floating rate securities provide a higher level of current yield, while the fixed rate securities are sold as discount bonds and provide a lower current cash yield but a higher potential IRR.

Priderock believes that owning the Controlling Class securities of moderately levered loans from the K-Deal program will generate very attractive risk-adjusted net levered returns of 11-13% for the Fund in almost all economic environments.[1]   The Fund is seeking total capital commitments of at least $150 million (and may accept commitments of up to $400 million), of which the General Partner, the Principals and their respective affiliates intend to commit a minimum of $5 million.

The Fund is managed by a very experienced and cohesive investment team with over one hundred years of cumulative experience owning, operating and financing multifamily residential housing. George Banks, David Khoury, David Worley, Dan Ng, Barb Gaziano and Webster Hughes have worked together for over a decade in various capacities.  Mr. Banks, Mr. Khoury, Mr. Ng and Ms. Gaziano started working together at Bainbridge Cos. (www.bainbridgecompanies.com), and have been together at Priderock (www.prcpllc.com) since its founding by Banks and Khoury in 2007.  Mr. Banks, Mr. Khoury,

---

[1] Determined on a pre-tax basis, net of fees, expenses and carried interest, and assuming that the Fund purchases two floating rate securitizations and one fixed rate securitization, each with an average of 7 years to maturity and 30% leverage.

HUGHES_0000772

Mr. Ng and Ms. Gaziano have collectively acquired, developed financed and managed over $3.5 Billion of multifamily projects.

David Worley, the Fund's portfolio manager and a member of the Investment Committee, served as the Chief Risk Officer for the Fannie Mae Multifamily Division, as well as the First Union/Wachovia Real Estate Capital Markets Division.    Mr. Worley's experience provides directly relevant portfolio management expertise and qualifications for working with Freddie Mac and managing the Fund's investments.  In his role as Chief Risk Officer for the Multifamily Division of Fannie Mae from 2005-2014, Mr. Worley was responsible for underwriting, asset management and loss mitigation for the world's largest portfolio of multifamily loans (over $200 billion).  While at Fannie Mae, Mr. Worley worked with the team at Bainbridge and Priderock in a lender/borrower relationship.  After retiring from Fannie in 2014, he joined the Priderock team to help enhance execution in debt capital markets.  Mr. Worley and Dr. Hughes worked together at First Union from 1996-1999 where Mr. Worley served as the Chief Risk Officer for Real Estate Capital Markets and its predecessor group from 1987-2005 and Dr. Hughes ran the Structured Products Research and Analytics group from 1996-1999.

HUGHES_0000773

## II.  INVESTMENT HIGHLIGHTS

Priderock believes the following are among the highlights that should be considered when evaluating an investment in the Fund:

| INVESTMENT HIGHLIGHTS |
| --- |

### RETURNS[2]

**Attractive Risk-Adjusted Returns.**  Projected unlevered Fund returns are comparable to levered equity returns for value-add multifamily acquisitions.  The Fund's investments in the Controlling Class generally are supported by a 30% cushion provided by the equity investor in the respective multifamily projects financed by the loans relating to the securitization in which the Fund has invested and are spread across a highly diversified and high quality pool of multifamily properties:

- Gross Unlevered Returns: 11-13% IRR / Average Cash-on-Cash 9-10% / Equity Multiple 1.6x-1.8x
- Gross Levered Returns: 13-15% IRR / Average Cash-on-Cash 11-12% / Equity Multiple 1.8x – 2.0x
- Net Unlevered Returns 10-11% IRR / Average Cash-on-Cash 8-9% / Equity Multiple 1.5x -1.7x
- Net Levered Returns: 11-13% IRR / Average Cash-on-Cash 9-10% / Equity Multiple 1.6x - 1.8x

### SAFETY

**Extremely Low Default & Loss History.**  Freddie Mac data illustrate this remarkable performance history:

- Cumulative multifamily loan loss since 1994 is 0.16% of $114B total originated balance and 0.26% of total matured or otherwise terminated loans
- As of September 2015:
  - 99.94% of the K-Deal loans are current
  - Two 90+ days delinquent loans (<3 bps of outstanding principal)
  - Four loans in special servicing (<9 bps of outstanding principal)

  (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015)

**Significant Current Cash Flows.**  A majority of the total return is comprised of monthly cash distributions to investors.

**Strong Downside Protection.**  On average, the Fund's investments in the Controlling Class generally are supported by a 30% cushion provided by the equity investor in the respective multifamily projects financed by the loans relating to the securitization in which the Fund has invested that will absorb losses before the Controlling Class debt is impaired.

- The Fund may have opportunity to buy non-performing loans out of the pool, alongside Fund investors.

**Stringent Lending Criteria.**  Unlike CMBS, K-Deal underwriting is extremely stringent and supervised by Freddie Mac's regulator; waivers are generally discouraged and closely monitored:

- Weighted average debt coverage service ratio: 1.55x (range of 1.30x-2.27x)
- Weighted average loan-to-value ratio: 69.2% (range of 52.4%-79.3%)

  (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015)

---

[2] Returns are determined on a pre-tax basis assuming the Fund participates in two floating rate Controlling Class securitizations and one fixed rate securitization, each with a 7 year average maturity and assuming two underlying loans in each securitization default with a 30% loss severity.  Defaults are assumed to occur in year 3 and year 7. Floating rate projections assume 10% of outstanding loans are prepaid in each of years 2, 3, 4, 5 and 7.  Levered returns assume 30% Fund-level leverage.  Net returns are expressed net of fees, expenses and carried interest.

HUGHES_0000774

## INVESTMENT HIGHLIGHTS (CONT'D)

**Rigorous Underwriting Process.** Collateral will go through three levels of underwriting, including property-level due diligence by the Fund prior to purchasing the Controlling Class securities:
- The Fund retains the right to exclude specific properties from the loan pool.

**Stable Apartment Collateral.** The multifamily sector is historically the top performing asset class relative to office, retail and industrial properties.

Breakdown of CMBS Servicing as of 2/29/16

| Collateral | Balance($Mil) | Portion of Loan Type in Special Servicing(%) |
|---|---|---|
| Retail | $9,712.9 | 6.35 |
| Office | 9,602.8 | 6.83 |
| Hotel | 2,473.0 | 3.38 |
| Multifamily | 1,597.7 | 3.14 |
| Industrial | 1,448.4 | 6.60 |
| Other | 1,884.7 | 2.92 |
| TOTAL | 26,719.4 | 5.30 |

(Source: Trepp/Commercial Mortgage Alert)

**Top-Tier Borrowers.** Freddie Mac is extremely selective with its K-Deals, excluding weaker owner/operators or those that have previously defaulted on Agency debt.

**Favorable Terms for Controlling Class.** Owners of the Controlling Class have direct access to all property books, records and management teams, and also will heavily influence decisions made alongside the Special Servicer.

### ACCESS & CAPITAL DEPLOYMENT

**Approved by Freddie Mac.** The Fund's management team has been pre-qualified to directly purchase Controlling Class certificates in K-Deal transactions:
- Provides investors with unique access to debt instruments that are only sold directly to a limited pool of pre-qualified buyers
- Increased ability to deploy capital more quickly and distribute cash flow to investors

**Limited Investor Base.** There have been only 17 buyers of Controlling Class securities between September 2014-September 2015 (compared with over 200 investors in the guaranteed and mezzanine tranches). (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015).

**Strong Demand for Multifamily Loans.** Multifamily fundamentals are highly positive and we project that they will remain favorable for the foreseeable future. Freddie Mac securitized $28.0B of K-Deal loans in 2013 and $21.3B of K-Deal loans in 2014. (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015). Based on conversations with Freddie Mac, we believe annual K-Deal issuance could grow to $50B in 2016.

### TEAM

**Highly Experienced Manager.** Before becoming the Fund's portfolio manager, David Worley was the Chief Risk Officer for the Fannie Mae Multifamily Division with direct responsibility for the world's largest portfolio of multifamily loans ($200B).

**Active Portfolio Management.** Ongoing loan surveillance and property-level access with monthly reviews.

**Priderock Support.** Priderock is a national, full service multifamily management and development organization. The Fund will benefit from Priderock's national platform for due diligence, underwriting, asset management, administrative support and hands on experience with respect to maximizing value for underperforming loans and assets in the collateral pools.

HUGHES_0000775

## III.  EXECUTIVE SUMMARY OF KEY TERMS

*The following information is presented as a summary of certain of the Fund's key terms only and is qualified in its entirety by reference to the more detailed Section IX – "Summary of Principal Terms" of this Memorandum and to the Fund's Agreement of Limited Partnership (the "Partnership Agreement"). Capitalized terms used but not defined in this executive summary are defined in Section IX – "Summary of Principal Terms" of this Memorandum.*

| | |
|---|---|
| **The Fund:** | Priderock Multifamiliy Debt Opportunity Fund, L.P. |
| **General Partner:** | Priderock MDOF GP, LLC |
| **Investment Manager:** | Priderock Fund Management Partners, LLC |
| **Target Capital:** | $150 million |
| **General Partner Commitment:** | $5 million |
| **Target Investments:** | Investments in Controlling Class certificates issued under the Freddie Mac K-Series multifamily loan securitization program |
| **Commitment Period:** | 2 years from the initial closing |
| **Term:** | 7 years from the initial closing of the Fund, subject to extension by the General Partner for up to three additional one-year terms |
| **Management Fee:** | During the Commitment Period, 1.5% of aggregate capital commitments.  Thereafter, 1.5% of the aggregate capital contributions made with respect to Controlling Class certificates that have not been repaid, disposed of or permanently written down. |
| **Carried Interest:** | 20% |
| **Preferred Return:** | 8% IRR |
| **Leverage:** | The Fund may employ leverage up to 50% of commitments. |

HUGHES_0000776

## IV.   MARKET OPPORTUNITY

Multifamily real estate has historically been a very stable asset class.  Since 1990, the average vacancy rate for multifamily has been 5.51%.  As of the end of the 4th quarter of 2015, the national vacancy rate stood at 3.9% (Source:  CoStar Market Analytics: Criteria - All Apartments in the PPR 54 markets from 1990Q1 – 2020Q1 Annual).  In addition, as indicated in the charts below, multifamily has outperformed the other major real estate asset classes with respect to total return and credit defaults.

| Type | Avg annual return 1994-2015 | Return Stdev |
|------|------|------|
| Apartment | 9.75% | 7.99% |
| Office | 5.57% | 10.81% |
| Industrial | 7.14% | 9.08% |
| Retail | 7.76% | 7.78% |

*source: NCREIF Property Index*



**Credit Losses to Book as of Q2 2015**

Source: Fannie Mae Multifamily Mortgage Business Information Presentation, February 2016

In addition to being a very stable asset class historically, Priderock believes that current multifamily fundamentals are particularly strong due to a confluence of macro factors:

**Strong demand trends**

- Home ownership rates are the lowest since 1967 due to shifts in residential preferences of the two largest demographic groups

- Millennials and Baby Boomers, the prime rental demographic, represent approximately 50% of the population.

- Millennials are delaying home ownership due to a large student debt burden and a need for career mobility.

- Baby Boomers are downsizing with a desire to travel and to reduce their cost of living.

- Millennials favor "24 hour" urban centers with access to public transportation ("live and work" lifestyle).

- Improved post-recession credit standards have made home ownership increasingly difficult.



Source: Census.gov, Urban Institute

## Positive supply trends

- Despite the increased level of apartment deliveries, supply is still falling short of rental demand. According to the Joint Center for Housing Studies of Harvard University, since 2010, 1.05 million net new rental households have been created annually. Multifamily/condo starts as of the 3rd quarter of 2015 were on track to add 400,000 housing units (the majority of which is rental housing), which is still short of demand. (Source JCHS of Harvard University, "America's Rental Housing: Expanding Options for Diverse and Growing Demand" 2015).

HUGHES_0000778

## V.   INVESTMENT STRATEGY

The Fund's investment strategy will be to purchase the Controlling Class of newly securitized first lien mortgages of multifamily loans under the Freddie Mac Multifamily K-Deal program. Priderock believes that a number of characteristics make these securities attractive from a risk-adjusted total return and current yield perspective:



**Superior Attributes of Investment**

| | |
|---|---|
| Extremely Low Default & Loss History | Attractive Risk-Adjusted Returns & Current Cash Flow |
| Historically Stable Underlying Collateral | Significant Downside Protection |
| Strong Supply / Limited Investor Base | Experienced Team |
| Unique Access | |

**A.  Extremely Low Default & Loss History**

- **Freddie Mac (and Fannie Mae) are considered the "Gold Standard" in apartment lending.** Combined, Freddie and Fannie own 33% of all multifamily debt outstanding as of the third quarter of 2015. (Source: Fannie Mae Multifamily Mortgage Business Information Presentation, February 2016).

- **Top Tier Borrowers.** Freddie's K-Deal program offers non-recourse, fixed and floating debt, with very competitive rates. Relative to the CMBS and bank loan markets, the program offers superior terms, and therefore allows Freddie to be very selective with regard to both their seller/servicers and borrower base. As of June 2015, 30 lenders were approved program seller/servicers. Virtually all of the top tier owner/operators are borrowers of Freddie and Fannie, while weaker owner/operators, or those who have previously defaulted on Agency debt are typically precluded from accessing the Agencies' securitization programs.

- **Highly Disciplined & Structured Underwriting Process.** The mortgage loans that will comprise the Fund's Controlling Class collateral will undergo three levels of underwriting. First, all loans are initially underwritten and originated by a small number of Freddie Mac approved lenders. Second, Freddie Mac employees re-underwrite every loan before purchasing from an approved originator; they do not outsource this responsibility. Third, during the due diligence period, and prior to purchasing a Controlling Class, the Fund will re-underwrite every loan as if they were making the equity investment in the underlying asset.

- **Strict Cash Flow and Leverage Ratios.** Cash flow coverage, leverage requirements and exit tests mitigate the risk of declining underwriting standards in aggressive capital environments.

HUGHES_0000779

- **Regulatory Oversight.**  Unlike CMBS, Freddie has strict underwriting guidelines that do not offer much latitude for variances.  Any waivers from program guidelines are reviewed and monitored by the Federal Housing Finance Agency, Freddie Mac's regulator.

  - **Freddie Mac's multifamily loans have had less than 16bps of cumulative losses and less than 1% of cumulative defaults.**  Freddie Mac originated 11,690 loans from the origin of the Multifamily Program in 1994 until the K-Series program began in 2009. Of those loans, only 73 have defaulted (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015).

- **99.94% of the K-Deal loans are current (outstanding principal balance as of September 2015).**  There are two 90+ day delinquent loans (<3bps of outstanding principal), while four loans are in special servicing (<9bps of outstanding principal).  (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015).

- **Freddie Mac and Fannie Mae loans have historically substantially outperformed those of banks, thrifts and CMBS.**  Freddie Mac underwrites securitized loans to the same standards as loans held in its portfolio, and, as shown in the following tables, as of September 2015, Freddie has not realized any credit losses on their K-Deal guarantees.



Sources: Freddie Mac; Fannie Mae; TREPP (CMBS multifamily 60+ delinquency rate, excluding REOs); American Council of Life Insurers (ACLI) Quarterly Investment Bulletin; and FDIC Quarterly Banking Profile.

HUGHES_0000780

**B. Attractive Risk-Adjusted Returns & Current Cash Flow[3]**

▪ **11-13% Gross Unlevered IRR.** Controlling Class debt yields are approximately 30 day Libor plus 10.75%. When blended with fixed rate securities, the Fund is targeting a gross unlevered IRR of 11-13% after accounting for losses in line with historical data. These equity-like returns are attractive relative to other asset classes, and are extraordinary for debt instruments backed by high quality stabilized and geographically diversified multifamily collateral.

▪ **Monthly Cash Distributions.** The Fund will focus on optimizing both high IRR and strong current cash yield. The Fund's anticipated blend of fixed and floating rate securities is projected to generate current annualized levered cash yields, net of fees, in excess of 9%.

**C. Historically Stable Apartment Collateral**

▪ **Apartments are historically the top performing asset class within Real Estate.** K-Deals are secured by occupied, stabilized and completed multifamily properties.

Breakdown of CMBS Servicing as of 2/29/16

| Collateral | Balance($Mil) | Portion of Loan Type in Special Servicing(%) |
|---|---|---|
| Retail | $9,712.9 | 6.35 |
| Office | 9,602.8 | 6.83 |
| Hotel | 2,473.0 | 3.38 |
| Multifamily | 1,597.7 | 3.14 |
| Industrial | 1,448.4 | 6.60 |
| Other | 1,884.7 | 2.92 |
| TOTAL | 26,719.4 | 5.30 |

(Source: Trepp/Commercial Mortgage Alert)

**D. Significant Downside Protection**

▪ **30% Average Subordinated Equity Position on Underlying Collateral.** Freddie Mac multifamily underwriting has very strict leverage constraints. Generally at inception, the average loan-to-value ratio for the mortgage loans relating to K-Deal securitizations is approximately 70%. This means that on average, there is 30% equity in the first-loss position (i.e., borrower's equity) with respect to such underlying loans. These are all newly underwritten loans, and therefore the debt position is a substantial discount to the acquisition price of the underlying asset.

---

[3] Returns are determined on a pre-tax basis assuming the Fund participates in two floating rate Controlling Class securitizations and one fixed rate securitizations, each with a 7 year average maturity. Levered returns assume 30% Fund-level leverage. Net returns are expressed net of fees, expenses and carried interest.

HUGHES_0000781

- **Strong Default Rights & Remedies.** Freddie Mac multifamily first mortgage agreements are standardized, uniform, and transparent documents which strongly protect each mortgagor's rights to receive payments, enforce covenants, and attach collateral. The K-Deal trustee, master servicer, and special servicer act on behalf of certificate holders to enforce mortgagee's rights and exercise remedies in the event of default. The special servicer's function is to determine and carry out the steps of defaulted loan workout and recovery efforts subject to industry standard set forth in the pooling and servicing agreement applicable to the particular securitization. The controlling class certificate holder (referred to in legal documents as the "directing certificateholder"), with consultation with Freddie Mac, appoints the special servicer as part of the underwriting process, and has consent rights over a range of loan workout decisions in the event of a defaulted loan. The directing certificateholder has, but is not be obligated to exercise, an (assignable) right to purchase any mortgage which is delinquent for more than 60 days or otherwise deemed by master and special servicers to be in default. In addition, the directing certificateholder is entitled to remove the special servicer (with or without cause) and appoint a successor special servicer upon 30 day's prior written notice to the parties to the pooling and servicing agreement. By purchasing the Controlling Class the Fund will be the directing certificateholder with respect to the related K-Deal transaction.

### E. Strong Supply & Limited Investor Base

- **Freddie Mac securitizes almost all of its multifamily loans through the K-Series program.** As of September 2015, roughly 90% of Freddie Mac's multifamily mortgage purchases were designated for securitization. (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015)

- **Annual volumes of issuance going forward are expected to be between $30 and $50 Billion.** There have been approximately $114.7B of K-Deal securities issued since the program began in 2009 through September 2015. (Source: Freddie Mac Multifamily Securitization Investor Presentation, September 30, 2015)

- **There are a limited number of approved buyers for the Controlling Class.** All buyers of the Controlling Class must be specifically approved by Freddie Mac. Although Freddie does not publish a list of approved buyers, we estimate there are approximately 17 active investors at the current time.

### F. Experienced Team

- **Priderock Capital Partners LLC ("Priderock").** The Fund will benefit from the General Partner's and the Investment Manager's affiliation with Priderock. Priderock is a strategic owner, operator, and developer of multifamily properties on a national basis. Priderock's focus on distressed assets, value-add, development and management provides an in-depth understanding of the collateral and the ability to maximize value in distressed situations. The Principals and other members of the Fund's investment team have amassed over 100 years of combined experience owning, operating, developing, renovating and financing residential housing, including through Priderock and its affiliates.

- **Portfolio manager is a highly experienced risk manager of multifamily loans.** Mr. Worley served 8 years as the Chief Risk Officer for the Fannie Mae Multifamily Division. At Fannie Mae, he was responsible for setting underwriting guidelines, all underwriting, all commitment of capital, all asset management and all loss mitigation. The $200 billion Fannie Mae portfolio is the largest multifamily

HUGHES_0000782

portfolio in the world. During Mr. Worley's tenure the portfolio grew approximately 80% and Fannie's share of total multifamily debt outstanding grew from 16% to almost 20%. During his tenure, the Fannie Mae multifamily portfolio outperformed FDIC Insured Institutions multifamily loans from a delinquency perspective by 5.9 times and CMBS multifamily loans by 28 times. In addition, during Mr. Worley's tenure, the Fannie Mae multifamily portfolio outperformed FDIC Insured institutions multifamily loans from a loss perspective by about 5 times and CMBS multifamily loans by about 6.8 times. (Source: Fannie Mae Multifamily Mortgage Business Information Presentation, February 2016).

## G.  Unique Access

As of September 2015, Freddie Mac had designated roughly 90% of its multifamily mortgage purchases for securitization. Freddie Mac's business model is inextricably tied to successful capital markets execution, which makes Freddie Mac keenly focused on selecting only the most stable, experienced and sophisticated purchasers for its Controlling Class securities.

Top-tier, long-term buyers of the Controlling Class securities provide comfort to both Freddie Mac's borrowers and other investors who purchase the guaranteed tranches of K-Deal securitizations. From Freddie Mac's perspective, having generalized financial market, business and/or real estate industry understanding is inadequate. Weakness, inexperience, or failure to execute in apartment underwriting, asset performance monitoring, credit surveillance, loan workout and structured transaction analysis exposes Freddie Mac's business model to unacceptable risks.

By virtue of being identified and qualified by Freddie Mac to invest in and represent the Controlling Class, the Fund is part of a limited group of qualified buyers for these securities. Priderock believes that Freddie Mac qualified the Fund because Priderock has the unique expertise, infrastructure and experience required to successfully invest in and represent the controlling class. The Fund was selected by Freddie because it has proven itself as superior in the following four competencies that are essential to Freddie Mac when selecting a Controlling Class buyer:



- **Property-level Underwriting & Performance Monitoring.** Prudent investing in Controlling Class securities requires the investor to conduct property-level underwriting and due-diligence on an average of 80 geographically diverse properties that collateralize a given loan securitization. The Fund's investment professionals collectively have over 100 years of hands-on experience acquiring, owning, managing, improving and developing multifamily assets across the country. Priderock's focus on distressed assets and value-add acquisitions provides the Fund with an unsurpassed ability to evaluate loan collateral and maximize value in distressed situations. Importantly, Priderock's bottoms-up underwriting experience and due diligence process will enable the Fund to manage risk on the front-end, by identifying properties the Fund wishes to

HUGHES_0000783

exclude from a given K-Deal securitization. Armed with this property-level diligence, the Fund will be better able to negotiate the loan pool directly with Freddie Mac.

■ **Credit Surveillance & Loan Workout.** Having successfully managed the world's largest portfolio ($200B) of multifamily loans through the 2008 financial crisis, Mr. Worley brings very direct and specific experience that was sought out by Freddie Mac. Mr. Worley developed and implemented a credit surveillance and loan workout process at Fannie Mae that allowed him to identify and quickly resolve problems at an early stage. Following the protocols he created at Fannie, the Fund will implement procedures designed to identify potential problems well in advance of default. Upon identification of such problems, Mr. Worley will call upon Priderock to work with the property owners and loan servicers. In the event of default, Mr. Worley will assess the problem and direct the Special Servicer to resolve the problem in the most expeditious manner. As an added benefit to the Fund, with the majority of his career spent in multifamily real estate, Mr. Worley has a far reaching knowledge about the universe of borrowers whose loans collateralize the Fund's Controlling Class investments; such institutional knowledge provides the Fund with superior situational awareness, historical experience and qualitative information about many of the borrowers in the loan pools.

■ **Structured Transaction Analysis & Negotiation.** Dr. Webster Hughes, the Fund's Director of Structuring and Analytics, brings both a Ph.D. in Mathematics and 30 years of senior industry experience in structured product investments. Dr. Hughes' experience includes both residential and commercial mortgage backed securities. He spent his career in senior positions in sales, trading, quantitative research and product development at major investment banks (Salomon Brothers, Bear Stearns, First Union/Wells Fargo and Bank of America.)

Dr. Hughes' mortgage-backed security structuring and analytical expertise is directly relevant to the Fund, as Freddie Mac K-Series Controlling Class tranches are highly specialized investments. Effective negotiation and management of the Controlling Class requires: a specialized understanding of securitization structures, processes and economics; highly detailed modeling of investment cash flows, returns and financing structures; and an in-depth understanding of the underlying multifamily collateral. Modeling includes initial underwriting of the underlying loans and properties, as well as projecting investment cash flows and returns based on input assumptions as to the forward default, loss and prepayment performance of the underlying loans and properties. This includes statistical analysis of historical loan and property performance data and the ability to use results from that statistical analysis to define input assumptions corresponding to base case, target and stressed economic scenarios. Implementing these capabilities requires specialized quantitative and structured product expertise, as well as understanding of the intricacies and practical aspects of the specific investments.

■ **Understand, Manage & Mitigate Impaired Collateral.** The Priderock team has many years of experience managing and mitigating losses on impaired collateral. Mr. Worley, in his roles as Chief Risk Officer for Real Estate Capital Markets at First Union/Wachovia and at Fannie Mae, has spent over 25 years managing the workout/loss mitigation/REO functions for two of the largest Real Estate debt platforms in the nation. In addition, the Priderock team has over 100 years of aggregate experience owning, operating and developing multifamily properties. The combined experience of Priderock and Mr. Worley provides the fund with a unique competitive ability to manage underperforming loans and successfully take over collateral positions if needed.

HUGHES_0000784

# VI. INVESTMENT STRUCTURE

The Fund will purchase the Controlling Classes of multiple K-Deal transactions. K-Deal transactions are backed by either fixed or floating rate multifamily mortgage loans as collateral and utilize the following transactional parties performing the following functions:

- Underlying Loan Originators – various multifamily loan originators which follow the Freddie Mac loan origination guidelines originate the underlying mortgage loans which are sold to Freddie Mac and ultimately sold into a K-Deal transaction.

- Underlying Seller – Freddie Mac will sell the mortgage loans to a depositor. As the seller of the mortgage loans, Freddie Mac will provide certain representations and warranties with respect to the mortgage loans and the related collateral which if incorrect will require Freddie Mac to repurchase the related loan.

- Depositor – the depositor is generally an affiliate of a large banking organization which may also originate qualified K-Deal mortgages and which affiliates generally provide other related transaction services including acting as an underwriter for the rated classes of the K Certificates (i.e. not the Controlling Class owned by the Fund). The Depositor will deposit the mortgage loans to a common law trust which will make a REMIC election (the "Trust" is also referred to herein as the "issuing entity").

- Guarantor – Freddie Mac will guarantee certain payments relating to certificates of the Trust but in no event the Controlling Class.

- Master Servicer – The Master Servicer is generally an affiliate of the depositor and is selected by Freddie Mac through a bidding process. The Master Servicer, for a fee, will subject to a prescribed standard of care, collect payments with respect to the mortgage loans as well as make advances with respect to delinquent monthly payments on the mortgage loans; the obligation to make advances is subject to the master servicer's judgment of the likelihood of reimbursement from the obligor of the mortgage loan.

- Special Servicer – The Special Servicer is selected by the Controlling Class (i.e. the Fund) in consultation with Freddie Mac. The Special Servicer will be responsible for servicing and administering mortgage loans that, in general, are in default or as to which default is reasonably foreseeable and any real estate acquired by the issuing entity upon foreclosure of the defaulted loan. The Special Servicer will take direction from the Fund as the owner of the Controlling Class with respect to certain actions unless the Fund loses the right to direct the Special Servicer (See "Risk Factors and Conflicts of Interest – Freddie Mac K-Deal Risk Factors – The Controlling Class May Lose Its Ability to Direct the Special Servicer")

- Trustee/Certificate Administrator/Custodian - Will be selected by Freddie Mac through a bidding process and will be a different entity than the Master Servicer and will perform three separate functions. The Trustee as a contract party to the pooling and servicing agreement will make advances if the Master Servicer does not make them (subject to the Trustee's judgment of the likelihood of reimbursement) as well as allocate the payments on the underlying loans which are securitized; the Certificate Administrator will provide the monthly reports relating to the K-Series transaction and the Custodian will retain the loan files for the mortgage loans securitized in a K-Series transaction.

HUGHES_0000785

The process of bringing a K-Deal transaction to market generally takes between fourteen (14) and eighteen (18) weeks. Freddie Mac will build a critical mass of multifamily loans from multiple Freddie Mac originators and invite various qualified bidders for the related Controlling Class to review the mortgage pool for the potential K-Deal transaction. The winning Controlling Class (in this case the Fund) has the ability to reject mortgage loans from the ultimate pool based on its own credit underwriting analysis. During the Controlling Class' due diligence review process, general mortgage pool accounting and legal due diligence process will occur; the Trustee/Administrator/Custodian/Master Servicer and Special Servicer will be selected and the rating agencies will determine tranche size and related documentation; moreover, the related documentation will be agreed upon. Once these steps are completed the transaction is positioned to be closed. At closing Freddie Mac will sell the final pool to the depositor and the depositor will transfer the pool to a REMIC trust. The Senior Certificate classes will obtain a Freddie Mac guarantee and will be further transferred to other REMIC trusts (the "SPCs"). The Controlling Class' economic interest and control rights will remain at the initial REMIC trust level.

HUGHES_0000786

# VII. INVESTMENT PROCESS

Key attributes of the Fund's highly disciplined and comprehensive investment process include the following:



- **Comprehensive Property-Level Underwriting.** All underlying mortgage loans will be fully underwritten by the Fund, with the benefit of Priderock's national management and development resources. Asset level due diligence will include detailed desktop analysis, property tours, discussions with on-site management and competitive market assessment.

- **Detailed Market Underwriting.** The Fund will use third party providers of market data, such as REIS, Costar, Axiometrics, Real Property Analytics and PPR to help underwrite and analyze market conditions for underlying collateral. These groups are routinely used by Priderock on all of its apartment acquisitions and development projects. Priderock owns, manages and develops apartments nationally, and will leverage its resources across the country for asset and market level analysis. Priderock has owned, managed and developed over 8,000 units to date.

- **Strict Borrower Underwriting.** The Fund is uniquely qualified to underwrite the actual borrowers of the loans in the collateral pools. In his capacity as Chief Risk Officer at Fannie Mae, Mr. Worley has years of experience lending to many of Freddie Mac's borrowers. His assessment, combined with the other Principals' knowledge of borrowers' reputations as owner/operators in the market provide the Fund with a distinct informational advantage.

- **Analytical Approach to Selecting Bonds.** In order to optimize the Fund's current cash on cash yield and total IRR, the Fund will go beyond property-level underwriting when purchasing Controlling Class securities. With Dr. Webster Hughes' bond structuring and analytical expertise, the Fund has the ability to evaluate and negotiate with Freddie Mac the structural details of each securitization.

- **Pure Multifamily Focus.** The Fund is exclusively focused on multifamily rental properties. The Fund's investment professionals collectively have over 100 years of experience as either developers, owners, operators or financiers of multifamily apartments. This unique base of knowledge and experience allows the Fund to not only underwrite and assess risk on the front end, but also to understand and manage risks during the term of the investments. In addition, the Fund's investment professionals are uniquely qualified to understand and navigate the governmental and regulatory complexities associated with Freddie Mac.

HUGHES_0000787

- **Detailed Portfolio Surveillance.** The Fund will have designated employees whose sole responsibility will be to monitor the ongoing performance of the loan portfolio. Each quarter, borrowers of loans within the collateral pool are required to submit financial information and operating performance information to the servicers. All quarterly operating results will be analyzed and any properties with deviations to the norm will be placed on a watch list. All watch list loans will receive special scrutiny, including direct conversations with the borrowers and property managers, inspections of the properties and inspections of the books, records, bank statements and rent rolls of the properties.

HUGHES_0000788

# VIII. MANAGEMENT

All investment decisions of the Fund will be made by an Investment Committee comprised of the three Principals, George Banks, David Khoury and David Worley. The Principals and other members of the Fund's investment team have amassed over 100 years of combined experience owning, operating and financing residential housing.

The three Principals, and Dan Ng, Barb Gaziano and Webster Hughes have worked together for over a decade in various capacities. Mr. Banks, Mr. Khoury, Mr. Ng and Ms. Gaziano started working together at the Bainbridge Companies, and have been together at Priderock since its founding by Mr. Banks and Mr. Khoury in 2007. Priderock is a strategic owner, operator, and developer of multifamily properties on a national basis. Priderock's focus on distressed assets, value-add, development and management provides an in-depth understanding of the collateral and the ability to maximize value in distressed situations. While at Fannie Mae and prior to joining Priderock, Mr. Worley worked with the team at Bainbridge and Priderock in a lender/borrower relationship. Mr. Worley and Dr. Hughes worked together at First Union from 1996-1999, where Mr. Worley served as the Chief Risk Officer for Real Estate Capital Markets and its predecessor group from 1987-2004 and Dr. Hughes ran the Structured Products Research and Analytics group from 1996-1999.

The professional backgrounds of the Principals and the other members of the Fund's senior management team are set forth below:

**Investment Committee**

**George Banks**
*Principal*

Mr. Banks is a principal and a member of the Investment Committee. Mr. Banks is also a co-founder and principal of Priderock, a real estate asset management company focused on acquiring and repositioning value-add/distressed real estate assets. As general contractor and realtor, he built his first development in 1973, and has developed, constructed, and financed over 30,000 multifamily units including 2,000,000 sq. ft. of commercial, single family and multifamily projects. Mr. Banks has extensive experience in structuring complex real estate financing including the formation of joint ventures, private equity structures and partnership financing. Since 2000, Mr. Banks has been a sponsor/partner in multi-family real estate ventures representing an aggregate total capitalization in excess of $2 billion. Mr. Banks was also the sponsor/principal of 70 joint ventures with project partners including ING, Lehman, GE Pension Trust, RREEF, Deutsche Bank, AEW, Fidelity Investments, and the State of Michigan Retirement System. Mr. Banks is a graduate of California State University and graduated from The Harvard Business School Executive Program.

**David Khoury**
*Principal*

Mr. Khoury is a principal and a member of the Investment Committee. Mr. Khoury is also a co-founder and principal of Priderock. Mr. Khoury has financed, acquired, developed or managed over $3.5 billion dollars of residential and commercial real estate as both a principal and advisor. Prior to co-founding Priderock, Mr. Khoury served as the Chief Investment Officer of The Bainbridge Companies from 2006-2008. Prior to joining Bainbridge, Mr. Khoury was a Vice President for Macquarie Capital Partners, LLC, a boutique Chicago investment management firm and investment bank specializing in structuring

HUGHES_0000789

U.S. and European real estate joint ventures and multi-investor funds. Prior to moving to Chicago, Mr. Khoury was an associate in the real estate investment banking group of Merrill Lynch & Co. Prior to his tenure with Merrill Lynch & Co., Mr. Khoury was a partner of Wellington Capital Partners, a joint venture with an institutional capital partner that was formed to acquire and dispose of a portfolio of Class A multifamily properties across the Southeast and Southwest. Prior to Wellington Capital Partners, Mr. Khoury was an analyst in the High Yield Investment Banking Group at Merrill Lynch & Co. Mr. Khoury earned his MBA from the Harvard Business School and his Bachelor of Arts in Economics, with honors, from Boston College.

**David Worley**
*Principal*

Mr. Worley is a principal and a member of the Investment Committee, and will serve as the Fund manager. Mr. Worley has extensive Capital Markets, Real Estate and Risk Management experience. Prior to joining Priderock, Mr. Worley served as the Chief Risk Officer for the Multifamily Division at Fannie Mae for over eight years. In this role he was responsible for all underwriting, structuring, capital committing, asset management and loan workouts/loss mitigation. During his tenure, the Debt Portfolio at Fannie Mae doubled from just over $100 billion to over $200 hundred billion. He was also responsible for managing Fannie Mae's Multifamily Equity Investments of over $7 billion. During his tenure, the Multifamily division at Fannie Mae was the top performing division in the company. Prior to joining Fannie Mae, Mr. Worley spent seventeen years with First Union/Wachovia. He co-founded the Real Estate Capital Markets Division and served as the Chief Risk Officer. The Division became the largest intermediary of capital in the Commercial Real Estate Business and one of the most profitable divisions in the Bank. Mr. Worley co-founded First City Bank of Florida; a de-novo bank located in Palm Beach, Florida. He also co-founded Senderra Funding, a residential mortgage company which was acquired by Goldman Sachs. Mr. Worley is a graduate of the University of Texas Austin with a BBA in Finance and Accounting.


**Senior Management**

**Webster Hughes, PhD**
*Director of Structuring, Surveillance and Analytics*

Dr. Hughes will serve as the Director of Structuring, Surveillance and Analytics for the Investment Manager. Dr. Hughes's has extensive Wall Street experience in quantitative analysis of structured mortgage securities. His business career includes senior positions at major investment banks, entrepreneurship, and independent consulting. Dr. Hughes has served as the Managing Partner of Metrix Credit LLC, a quantitative consulting and software firm specializing in Mortgage Backed Securities (MBS) and related portfolio advisory. Dr. Hughes started his finance career as a Vice President in the Salomon Brothers Bond Portfolio Analysis Group in New York. In 1990, Mr. Hughes moved to Bear Stearns where he became Senior Managing Director specializing in MBS. After Bear Stearns, Dr. Hughes formed and managed the Structured Product Research Group for First Union Capital Markets, and was a Proprietary Consultant to Bank of America in their Real Estate Principal Finance Division from 2005-2008. In addition to business, Dr. Hughes teaches a lecture series on MBS Investments at the UNC Kenan-Flagler Business School. Dr. Hughes holds a PhD in Mathematics from Princeton University and a BA from the University of North Carolina at Chapel Hill.

HUGHES_0000790

**Daniel Ng**
*Head of Underwriting*

Mr. Ng will serve as the head of underwriting for the Investment Manager. Mr. Ng is the Vice President of Finance and Acquisitions at Priderock. At Priderock, Mr. Ng has sourced, acquired, and financed over $1 Billion of multifamily apartments and developments. His is responsible for underwriting and in securing financing for all Fund investments. Prior to joining Priderock, Mr. Ng worked as an Associate at The Bainbridge Companies where he was involved with the acquisition and financing of over $1 billion of real estate. Prior to joining The Bainbridge Companies, Mr. Ng held an Associate position at Crocker Partners LLC, a real estate private equity firm, and at CRT Properties (NYSE:CRO), a publicly traded real estate investment trust. During his tenure at Crocker Partners LLC and CRT Properties, Mr. Ng analyzed acquisition and development opportunities of commercial properties across Southeast Florida, Orlando, Tampa, and Houston, Dallas, Virginia and Maryland, and evaluated joint venture, financing and refinancing structures. Prior to Crocker Partners, Mr. Ng worked as an analyst at Lazard Frères. Mr. Ng graduated cum laude from New York University's Stern School of Business with degrees in Finance and Accounting.

**Barbara Gaziano**
*Chief Compliance Officer and Chief Financial Officer*

Mrs. Gaziano will serve as the Chief Compliance Officer and Chief Financial Officer for the Investment Manager. Barbara Gaziano also has overall responsibility for all accounting functions for Priderock Capital Partners. Ms. Gaziano has over 15 years of experience in senior level finance and accounting positions. Her history is rich in financial programs, trouble shooting, and the preparation of financial reports, special analysis, and information reporting while ensuring compliance with local, state and federal budgetary reporting requirements. She is proficient in the development and implementation of finance, accounting, billing, and auditing procedures along with establishing and maintaining appropriate internal control safeguards. Her previous positions included Controller at Bainbridge Communities Management, Inc. where she managed the accounting functions for construction, development, residential apartment and commercial divisions along with the corporate development, construction, broker, and property management companies. Prior to Bainbridge, Mrs. Gaziano was the Controller of Southstar Management, Inc. where she was responsible for overseeing the accounting, financing, and tax and audit preparation of over 100 companies with strong influence on the onsite operations. Ms. Gaziano was also with Gables Residential where she acquired her strong base in real estate accounting. Ms. Gaziano's educational background includes a Bachelor of Business Administration with a major in Accounting from Florida Atlantic University.

**Margaret Humphrey-Worley**
*GSE Relationship Manager*

Mrs. Worley will be responsible for managing the relationship with Freddie Mac. Mrs. Worley will leverage her extensive experience of over fifteen years with Freddie Mac as a Senior Director. Prior to Freddie Mac she served as an Officer at Citibank. Mrs. Worley holds a BA from Mary Baldwin College and is currently pursuing an executive degree from the Kellogg School of Business at Northwestern University. She serves on the Board of Trustees for Mary Baldwin College.

HUGHES_0000791

## IX.   SUMMARY OF PRINCIPAL TERMS

*The following summarizes the principal terms of the offering of limited partnership interests ("Limited Partnership Interests") in Priderock Multifamily Debt Opportunity Fund, L.P., a Delaware limited partnership (the "Fund"), and the proposed terms of the limited partnership agreement of the Fund (the "Partnership Agreement"). The description of the Partnership Agreement set forth herein does not purport to be a complete statement thereof, and it is qualified by and subject to the definitive provisions of the Partnership Agreement and the subscription agreements relating to the purchase of the Limited Partnership Interests (each a "Subscription Agreement"). If the description of the Limited Partnership Interests in this summary is inconsistent with or contrary to the Partnership Agreement or the Subscription Agreement (copies of which will be furnished to prospective investors prior to any final decision by an investor to invest in the Fund), the Partnership Agreement and/or the Subscription Agreement, as applicable, will control. Investors should carefully review the Partnership Agreement and the Subscription Agreement before subscribing to become a limited partner of the Fund (a "Limited Partner").*

**The Fund:** Priderock Multifamily Debt Opportunity Fund, L.P., a Delaware limited partnership (the "Fund").

**Investment Objective:** The investment objective of the Fund is primarily to acquire, hold, manage and dispose of investments in controlling class ("Controlling Class") subordinated certificates issued under the Freddie Mac K-Series multifamily loan securitization program. The Fund will target primarily floating rate Controlling Class certificates, but also intends to invest a portion of the Fund's capital in fixed rate Controlling Class certificates.

**The General Partner:** Priderock MDOF GP, LLC, a Delaware limited liability company (the "General Partner"). The General Partner will be controlled by George W. Banks, David N. Khoury and David Worley (the "Principals").

**The Manager:** Priderock Fund Management Partners, LLC, a Delaware limited liability company (the "Investment Manager"), an affiliate of the General Partner, will be owned by the Principals. The Investment Manager will be responsible for providing portfolio management and administrative services to the Fund, including investigating, analyzing, structuring and negotiating potential investments, monitoring investments, advising the Fund as to disposition opportunities, and providing day-to-day managerial and administrative services to the Fund. The Investment Committee of the Investment Manager will make all investment decisions on behalf of the Fund. The Investment Committee will be comprised of the Principals. All decisions of the Investment Committee will require the unanimous approval of its members.

**Committed Capital:** The Fund is seeking $150 million in aggregate capital commitments (the "Commitments") from qualified limited partners (each a "Limited Partner", collectively, the "Limited Partners" and together with the General Partner, the "Partners"). Aggregate Commitments less than or in excess of this amount may be accepted at the discretion of the General Partner; provided,

HUGHES_0000792

that a minimum of $100 million of Commitments will be required for the Initial Closing (as defined below), and a maximum of $400 million of Commitments will be accepted.

**Minimum Commitment:**     The minimum Commitment of a Limited Partner will be $5 million, although Commitments of lesser amounts may be accepted at the discretion of the General Partner.

**Commitment of General Partner and Others:**     The General Partner, the Principals and their respective affiliates will commit in the aggregate a minimum of $5 million to the Fund.

**Closings:**     The General Partner may choose to establish the Fund at any time after receiving Commitments of at least $100 million (the "Initial Closing Date"). From time to time after the Initial Closing Date, but not more than 18 months thereafter, one or more additional closings may be held as necessary to accommodate the admission of additional Limited Partners or permit any existing Limited Partner to increase its Commitment (such final additional closing, the "Final Closing Date").

**Subsequent Closing:**     Limited Partners admitted into the Fund (or increasing their Commitments) after the Initial Closing Date will, upon admission (or increase), be required to contribute to the Fund an amount equal to (x) their proportionate share of all drawn Commitments of Partners admitted in prior closings (including sums drawn to pay Management Fees) and Organizational Expenses (as defined below), plus an interest equivalent on all such amounts at the prime rate plus 2% from the date of each applicable funding, less (y) their proportionate share of all distributions made to Partners admitted in prior closings. Any amount paid as Management Fees or as an interest equivalent with respect thereto will be paid to the Investment Manager. All other amounts will be refunded to the existing Partners *pro rata* according to their respective Capital Contributions (as defined below) to the Fund and, other than the interest equivalent thereon, restored to their Available Commitment (as defined below) and will be subject to recall.

**Term:**     The term of the Fund will be seven years from the Initial Closing Date, but may be extended for up to three consecutive one-year periods at the discretion of the General Partner.

**Commitment Period:**     Investments may be made by the Fund through the second anniversary of the Initial Closing Date (the "Commitment Period"). Upon the termination of the Commitment Period, all Partners will be released from any further obligation with respect to their unfunded Commitments (the "Available Commitment"), except to the extent necessary to: (i) cover expenses, liabilities and obligations of the Fund, including Management Fees; and (ii) complete investments by the Fund in transactions which were in process, committed to or under active consideration as of the end of the Commitment Period.

**Co-Investment Policy:**     The General Partner may, but will be under no obligation to, provide co-investment opportunities to Limited Partners and/or third parties. The General Partner may allocate the available co-investment among the Fund,

HUGHES_0000793

the Limited Partners, the General Partner and/or third parties as the General Partner may, in its sole discretion, determine, taking into consideration such factors as the General Partner deems appropriate; provided, however, that prior to allocating any such co-investment to any Limited Partner or to the General Partner or any of its affiliates, such co-investment opportunity shall first be offered to all Partners (including the General Partner and its affiliates) pro rata based on their respective Commitments.

**Defaulted Underlying Mortgage Loans:**

In the event a default occurs with respect to any mortgage underlying a Controlling Class certificate in which the Fund invests, prior to purchasing all or any portion of such mortgage loan, or purchasing all or any portion of the asset or assets that secure such debt, the General Partner shall first offer to the Partners (including the General Partner) the opportunity to participate in such purchase, pro rata in accordance with their respective Commitments, on such terms and conditions as the General Partner may determine. To the extent the Partners collectively elect to purchase less than all of the offered mortgage loan or asset, the General Partner may offer the remaining portion of such mortgage loan or asset to any person or persons, including the General Partner, the Investment Manager, any Limited Partner, the Principals or their respective affiliates, on terms no more favorable than the terms offered to the Partners.

**Drawdowns:**

Commitments will be drawn down *pro rata* as needed during the Commitment Period to fund investments and to pay Partnership expenses, with not less than 10 business days' prior written notice to the Limited Partners. Such contributions will represent each Partner's "Capital Contributions."

**Distributions:**

Net proceeds attributable to any Controlling Class certificates, including, but not limited to, interest and other income ("Current Income"), and proceeds from the repayment or disposition of all or any portion of an investment ("Capital Proceeds"), will be preliminarily apportioned among the Partners (including the General Partner) in proportion to their respective Capital Contributions with respect to such investment. The amount so apportioned to the General Partner or its affiliates shall be distributed to the General Partner and such affiliates, and the amount so apportioned to each other Limited Partner will distributed as follows:

(a)    *8% Internal Rate of Return*:    First, 100% to such Limited Partner until such Limited Partner has received aggregate distributions pursuant to this paragraph (a) sufficient to provide such Limited Partner with an internal rate of return equal to 8% per annum on the Capital Contributions of such Limited Partner, compounded monthly from the date such Capital Contribution was made.

(b)    *80%/20% Split*:    Thereafter, 80% to such Limited Partner and 20% to the General Partner.

The Fund anticipates that it will distribute Capital Proceeds within 90 days of realization and will distribute Current Income at least monthly, other than reasonable amounts held in reserve to meet Partnership expenses,

HUGHES_0000794

obligations and liabilities and subject to the reinvestment provisions described below.

Distributions may take the form of cash or securities.

The Fund may make cash distributions to the General Partner in an amount sufficient to pay the General Partner's income taxes on income allocated for tax purposes to the General Partner. Tax distributions shall be treated as advance distributions of amounts otherwise distributable to the General Partner and shall not alter or increase the total amount to be distributed to the General Partner over the life of the Fund.

**Liability of Partners – LP Givebacks:**   Except as required by the Delaware limited partnership statute or other applicable law, no Limited Partner shall be required to repay to the Fund, any Partner or any creditor of the Fund all or any part of the distributions made to such Limited Partner; provided, that, the General Partner may require a Limited Partner (including any former Limited Partner) to return distributions made to such Limited Partner or former Limited Partner for the purpose of satisfying such Limited Partners' *pro rata* share of Partnership expenses and indemnification obligations in an amount up to, but in no event in excess of, the lesser of (i) 100% of the amount of distributions actually received by such Limited Partner, and (ii) 25% of such Limited Partner's Commitment; provided further, that no distribution may be recalled after the third anniversary of the date of such distribution.

**Allocation of Income, Expenses, Gains and Losses:**   Income, expenses, gains and losses of the Fund generally will be allocated among the Partners in a manner consistent with the distribution of proceeds described in "Distributions" above.

**Reinvestment:**   During the Commitment Period, the Fund may retain or recall for reinvestment the invested capital portion of any proceeds received by the Fund from any investment that is returned within 18 months after the investment was originally made.

**Borrowings:**   The Fund may, directly or indirectly, incur indebtedness or obtain leverage (i) for the purpose of financing any investment-related activities of the Fund, including funding all or a portion of the capital necessary for the acquisition of Controlling Class certificates or (ii) for any other purpose of the Fund or its investments; provided that the aggregate principal amount of indebtedness may not, without the prior consent of the Advisory Board, exceed 50% of aggregate Commitments.  Any such indebtedness may be secured by the assets of the Fund, and the unfunded Commitments and capital accounts of the Partners may be pledged by the Fund to secure any such borrowings or indebtedness.

**Management Fee:**   During the Commitment Period, the Fund will pay the Investment Manager an annual management fee (the "Management Fee"), payable quarterly in advance, equal to 1.5% of the aggregate Commitments.

Thereafter, the Management Fee will be equal to 1.5% of the aggregate Capital Contributions made with respect to Controlling Class certificates

HUGHES_0000795

that have not been repaid, disposed of or permanently written down.

The Management Fee may be paid out of current income and the disposition proceeds of the Fund and, to the extent necessary, from drawdowns, which will reduce the amount of Available Commitments.

**Offering and Organizational Expenses:**

The Fund will be responsible for all legal, accounting, filing and placement fees and other organizational expenses including the out-of-pocket expenses of the General Partner and the Investment Manager incurred in connection with the registration of the General Partner or the Investment Manager as an investment advisor under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), or in connection with the formation of the Fund (collectively, "Organizational Expenses") up to $2.0 million. Organizational Expenses in excess of $2.0 million, if any, will be borne by the Investment Manager.

**Partnership Expenses:**

The General Partner and the Investment Manager will pay all of their ordinary administrative and overhead expenses in managing Partnership investments, including salaries, benefits and rent.

The Fund will pay all other all costs, expenses and liabilities attributable to the activities of the Fund, as reasonably determined by the General Partner, including, without limitation, (i) fees, costs and expenses related to the Fund's investments in Controlling Class certificates (to the extent not reimbursed), including without limitation, diligence, underwriting, purchase, holding, restructuring and/or sale thereof, and any payments required under any guarantee or other credit support with respect to the obligations of any obligor under a Controlling Class certificate; (ii) legal, auditing, consulting and accounting expenses (including expenses associated with the preparation of Partnership financial statements, tax returns and Schedules K-1); (iii) costs, expenses and liabilities of the Fund including, without limitation, extraordinary expenses such as litigation and indemnification costs and expenses, judgments and settlements; (iv) all out of pocket fees and expenses incurred by the Fund, the General Partner, and any of the General Partner's partner members, managers, shareholders, officers, directors, committee members, or employees relating to holding Controlling Class certificates and investment and disposition opportunities for the Fund consummated but not reimbursed by a third party (including, without limitation, legal, accounting, auditing, consulting and other fees and expenses, financing commitment fees, real estate title and appraisal costs, and printing), including underwriting costs and expenses of up to $200,000 per investment in Controlling Class certificates, (v) all out of pocket fees and expenses incurred by the Fund, the General Partner, and any of the General Partner's partner members, manager, committee members, shareholders, officers, directors, or employees relating to investment and disposition opportunities for the Fund not consummated (including, without limitation, legal, accounting, auditing, consulting and other fees and expenses, financing commitment fees, and printing), (vi) costs associated with any meetings of Partners, if any, (vii) insurance expenses, including those associated with obtaining or maintaining director's and officers' liability insurance (to the extent not borne by one or more third parties),

HUGHES_0000796

(viii) all out of pocket fees and expenses incurred by the Fund, the General Partner, or any of their respective partners, members, manager, committee members, shareholders, officers, directors or employees relating to independent pricing services or the monitoring of Controlling Class certificates, (ix) any taxes, fees and other governmental charges levied against the Fund, and (x) any costs associated with the ongoing maintenance and compliance of the General Partner's or the Investment Manager's registration as an investment advisor pursuant to the Advisers Act.

**Other Funds:**

Unless consented to by Limited Partners holding at least two-thirds of the Limited Partner interests in the Fund, neither the General Partner nor any of its affiliates will act as the manager of a new pooled investment fund with investment criteria substantially similar to the Fund until the earlier of: (i) the end of the Commitment Period; or (ii) such time as the Commitments are at least 70% invested or committed for investment (including amounts reserved for reasonably anticipated expenses of the Fund).

**Advisory Board:**

An advisory board of Limited Partners (the "Advisory Board") will be established consisting of at least three and no more than five members selected by the General Partner. The Advisory Board will meet as requested by the General Partner to (i) review any matters involving potential conflicts of interest; (ii) approve any proposed substitute of any Principal who is no longer actively involved in the affairs of the Fund; (iii) discuss other matters as may be raised by the General Partner; and (iv) review or approve other matters set forth in the Partnership Agreement.

**Removal of the General Partner:**

The General Partner may be removed for "Cause" by a vote of two-thirds in interest of the Limited Partners as further described in the Partnership Agreement.

"Cause" shall mean a final non-appealable determination by a court of competent jurisdiction that the General Partner or any Principal has engaged in conduct that constitutes fraud, gross negligence or willful misconduct or the General Partner's material breach of its obligations under the Partnership Agreement.

**Active Involvement of the Principals:**

During the Commitment Period, David Worley shall devote substantially all of his business time and attention to the business and affairs of the Fund, and George Banks and David Khoury shall each be required to devote such business time and attention to the affairs of the Fund as the General Partner determines is consistent with the Fund achieving its investment objectives.

During the Commitment Period, in the event two or more of the Principals (or substitutes therefor approved by the Advisory Board) cease to be actively involved in the affairs of the Fund, and such cessation continues for 90 days following notice thereof to the Partners, the Partners may elect to terminate the Commitment Period by the written consent of Limited Partners holding at least two-thirds of the Limited Partner interests given no later than 120 days after the sending of such notice.

HUGHES_0000797

| | |
|---|---|
| **Reports to Limited Partners:** | Subject to the provisions set forth in "Confidentiality" below, each Limited Partner will receive (i) audited financial statements for the Fund annually and unaudited financial statements quarterly and (ii) quarterly reports providing summary information relating to significant developments of the Fund's investments. Each Limited Partner will also be provided with tax information related to the Fund necessary for the completion of any applicable U.S. Federal tax returns. |
| **Confidentiality:** | Each Limited Partner shall keep confidential and not disclose information or materials relating to the Fund, or any Controlling Class certificate or proposed or prospective Fund investment (whether or not such information or materials have been designated by the General Partner as confidential) ("Confidential Information"), except to the extent (a) disclosure of such Confidential Information is required by law, (b) the information or materials were previously known to such Limited Partner, (c) the Confidential Information becomes publicly available except through the actions or inactions of such Limited Partner or (d) the Confidential Information was received from a third party without a breach of any obligation of confidentiality by such third party. Notwithstanding the foregoing, each Limited Partner shall be entitled to disclose any Confidential Information regarding the Fund and each Fund investment in such Limited Partner's possession: (i) to its trustees, directors, employees, accountants, attorneys, agents, representatives and advisors; provided that such Persons agree to keep such information confidential; (ii) if such Limited Partner is a fund-of-funds, to its current and prospective investors; provided that such Persons agree to keep such information confidential on substantially the same basis as if such Person were a Limited Partner; (iii) to the United States Internal Revenue Service or state or local taxing authority in connection with an audit of such Limited Partner; (iv) as requested or required by regulators having jurisdiction over any Limited Partner or its affiliates; (v) made during routine examinations and audits of it or its affiliates; (vi) made pursuant to subpoena or court order; or (vii) to its regulators or other third parties pursuant to applicable laws or government regulations. In the event a Limited Partner is required pursuant to law or regulation to disclose Confidential Information or it discloses Confidential Information pursuant to the request of a regulator having jurisdiction over it or its Affiliates, or during a routine examination and audit of it or its Affiliates, the Limited Partner shall inform the Person to whom disclosure is made that the information is confidential and request that it be treated as such and promptly thereafter notify the General Partner. |
| **Transfers and Withdrawals:** | With certain limited exceptions, a Limited Partner may not sell, assign, transfer or otherwise dispose of any interest in the Fund without the prior written consent of the General Partner. Further, a Limited Partner may not |

HUGHES_0000798

withdraw any amount from the Fund with certain limited exceptions.

**Defaults:**

Limited Partners will be obligated to make Contributions when called by the General Partner. In addition to all legal remedies available to the Fund, failure by a Limited Partner to make Contributions when due may result in significant penalties under the Partnership Agreement, including, but not limited to, (i) an immediate 50% reduction of its capital account and foregoing any gains arising after its default that relate to any investment in which such Partner made a Contribution prior to such default, (ii) a forced sale of its interest in the Fund to the other Limited Partners or to a third-party in exchange for an aggregate purchase price equal to its capital account balance, (iii) reduction of its unfunded Commitment, and (iv) an interest charge on the default amount equal to the prime rate plus 8.0%. A defaulting Limited Partner will also remain liable to pay its *pro rata* share of the Management Fees and other expenses.

**Indemnification:**

To the fullest extent permitted by law, the Fund shall indemnify, defend and hold harmless the General Partner, the Investment Manager, members of the Advisory Board, the General Partner's and the Investment Manager's respective affiliates or personal representatives, or any of their respective officers, directors, members, partners, stockholders, employees, agents or permitted assignees (the "Indemnified Parties") against any and all expenses, losses, damages, liabilities, demands, charges or claims of any kind or nature whatsoever (including reasonable attorneys' fees and costs and expenses relating to investigating or defending any demands, charges and claims) arising out of or in connection with the assets or business of the Fund (including any such claims or liabilities arising out of or in connection with a proposed investment or the issuance of indebtedness of the Fund or any debt financing of the Fund or any acquisition or disposition of an Investment) or otherwise relating to the Partnership Agreement, except where attributable to the acts or omissions of any such Indemnified Party constituting willful misconduct, gross negligence, fraud or material breach of such Indemnified Party's obligations under the Partnership Agreement

Limited Partners will not be individually obligated with respect to such indemnification beyond their respective Commitments and the amount of distributions by the Fund to Limited Partners described under "Liability of Partners – LP Givebacks" above. The Investment Manager may have the Fund purchase, at the Fund's expense, insurance to cover the Investment Manager or other indemnified party against liability for any breach or alleged breach of their fiduciary or similar responsibilities.

**Parallel Partnerships:**

One or more parallel partnerships (the "Parallel Partnerships") may be organized by the General Partner for legal, regulatory, tax or other reasons. The Parallel Partnerships will invest on a *pro rata* basis in all Partnership transactions. In addition, the General Partner may organize one or more special purpose offshore investment vehicles for investment by certain investors (the "Holding Vehicles"). The Holding Vehicles will be Limited Partners of the Fund and will have no other activities.

HUGHES_0000799

| | |
|---|---|
| **Valuation Policy:** | Fund assets will valued in accordance with U.S. generally accepted accounting principles. |
| **Tax Considerations:** | The Fund expects that it will be classified as a partnership, and not as an association taxable as a corporation, for U.S. federal income tax purposes. |
| | Limited Partners may receive taxable income without corresponding distributions of cash in certain tax years. Limited Partners may be required to use income from other sources to pay a tax liability generated from an investment in the Fund. |
| | Each prospective Limited Partner should consult its tax advisor as to the tax consequences of an investment in the Fund based upon their particular circumstances. |
| **ERISA:** | Investment in the Fund is generally open to institutional investors, including employee benefit and similar plans (each a "Plan" and collectively, "Plans"), that meet the Fund's suitability requirements, subject to certain restrictions. Should investment by Limited Partners subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") (collectively, "Benefit Plan Investors" become "significant" (that is, should Benefit Plan Investor participation in any class of equity of the Fund equal or exceed 25%), the General Partner, the Investment Manager, and their respective affiliates would be subject to the fiduciary provisions of ERISA and the prohibited transaction provisions of ERISA and Section 4975 of the Code. Accordingly, the General Partner will make reasonable efforts to ensure that participation by Benefit Plan Investors is not significant. |
| | ERISA and Section 4975 of the Code and laws substantively similar or of similar effect to ERISA or Section 4975 of the Code raise a number of considerations for prospective Partnership investors and the purchase of Interests by such investors should be evaluated by the investor's independent investment adviser or legal counsel. |
| **UBTI and ECI:** | The Fund may make investments or engage in certain borrowing activity that will cause a tax-exempt U.S. Limited Partner to have "unrelated business taxable income" ("UBTI") or "unrelated debt-financed income" under Sections 512 and 514 of the Code. |
| | While the Fund does not expect to receive income treated as income effectively connected with a U.S. trade or business, it will not be restricted from doing so. If the Fund did receive such income, then any Limited Partner that is not a U.S Limited Partner would generally be subject to U.S. federal (and possibly state and local) income tax at normal graduated rates on their share of income effectively connected with such U.S. trade or business and on their share of gain realized on the disposition of assets attributed to such U.S. trade or business, and, a Non-U.S. Limited Partner that is a corporation may also be subject to a 30% branch profits tax on its "dividend equivalent amount" as defined for purposes of the branch profits tax. Further, Non-U.S. Limited Partners would be required to file |

HUGHES_0000800

appropriate tax returns with the IRS (and possibly state and local taxing authorities). Finally, the Fund would generally be required to withhold upon any distribution made to a Non-U.S. Limited Partner on such Limited Partner's share of effectively connected U.S. trade or business income.

Tax-exempt U.S. Limited Partners and Non-U.S. Limited Partners should consult their tax advisors before investing in the Fund.

**Securities Law Matters:** The limited partnership interests described herein are not being registered under the U.S. Securities Act of 1933, as amended (the "33 Act"), and must be acquired for investment purposes only and not with a view to the distribution thereof. Offers of limited partnership interests will be made only to qualified offerees under applicable law.

**Investor Qualifications:** The Fund only intends to offer and sell interests to a limited number of persons who are (i) "accredited investors," as that term is defined in Regulation D promulgated under the 1933 Act, and (ii) "qualified clients," as that term is defined under the U.S. Investment Advisers Act of 1940, as amended, and the rules and regulations promulgated thereunder (the "IAA").

**Investment Advisers Act:** None of the General Partner, the Investment Manager or any of their respective affiliates are currently registered or required to register as an investment adviser under the IAA. However, the Investment Manager expects to become registered as an investment adviser under the IAA.

**Counsel for the Fund:** Winston & Strawn LLP will act as legal counsel for the General Partner and not for any Limited Partner or the Limited Partners as a group. No independent counsel has been engaged to represent the Limited Partners.

**Auditor:** PricewaterhouseCoopers

HUGHES_0000801

# X. CERTAIN RISK FACTORS AND CONFLICTS OF INTEREST

## RISK FACTORS

*An investment in the Fund is speculative in nature, involves a high degree of risk and is suitable only for investors that are able to assume the risk of losing their entire investment. Prospective investors should carefully consider, among other factors, the risks summarized below. Such risk factors are not meant to be an exhaustive listing of all potential risks associated with an investment in Limited Partnership Interests.*

## I.   FUND RISK FACTORS

### DEPENDENCE ON MANAGEMENT

The success of the Fund will be dependent on the expertise and performance of the investment professionals of the Fund, in particular, the Investment Committee. Investors will not have the opportunity to evaluate fully for themselves the relevant economic, financial, and other information regarding the Fund's assets. Accordingly, no person should purchase Limited Partnership Interests unless such person is willing to entrust all aspects of the activities of the Fund to the investment professionals of the Fund. All decisions with respect to the acquisition and disposition of the Controlling Class and any decisions relating to the special servicer with respect to the underlying loans obtained through the Fund's ownership of the Controlling Class are made exclusively by the Investment Committee. The loss of one or more of these individuals could have a material adverse effect on the Fund.

### DEPENDENCE ON PRIDEROCK RESOURCES

Some of the activities of the Fund will be performed by employees of Priderock. The Fund does not have the resources or personnel to perform all of the administrative functions necessary to be performed by the Fund. Certain activities such as underwriting, due diligence, accounting, parts of asset management and surveillance and reporting will be performed by employees of Priderock. Such employees are subject to certain restrictions on information flow and personal investing as a result of providing such services.

### RELATION TO OTHER INVESTMENT RESULTS

The Fund has no previous operating history. The prior investment results of any other person or entity or portfolio, including the prior results of any previously issued Controlling Class certificates, described in this Memorandum are provided for illustrative purposes only and may not be indicative of the future investment results of the Fund. The nature of, and risks associated with, the future investments of the Fund may differ substantially from those investments and strategies undertaken historically by such persons or entities and from any previously issued Controlling Class certificates. There can be no assurance that the investments of the Fund will perform as well as any past investments described in this Memorandum or that the Fund will be able to avoid losses.

### ILLIQUIDITY OF INVESTMENTS

An investment in the Fund requires a long-term commitment with no certainty of return. The ultimate recognized value of the Controlling Class certificates, the related underlying multifamily loans and the other investments acquired, directly or indirectly, by the Fund will fluctuate with, among other things,

HUGHES_0000802

changes in market rates of interest, market risk premiums on bonds, general economic conditions, economic conditions in particular multifamily real estate markets, the economic status of Freddie Mac, the condition of financial markets and the financial condition of the borrowers of the underlying multifamily loans underlying the Controlling Class certificates acquired by the Fund. In addition, the lack of an established, liquid secondary market for the Fund's investment in the Controlling Class certificates may have an adverse effect on the market value of such investments and on the ability of the Fund to dispose of them either through sale or resecuritization. Therefore, no assurance can be given that the Fund will be able to dispose of a particular Controlling Class certificate investment in a timely manner. There is no certainty of distributions to the Partners, as the Fund will not have a source of funds from which to provide distributions to the investors other than principal and interest payments on the Controlling Class. Investments of the Fund will be illiquid, and there can be no assurance that the Fund will be able to effect a successful realization or exit strategy.

LOSSES

There can be no assurance that the operation of the Fund will be profitable, that the Fund will be able to avoid losses or that cash from its investments will be available for distribution to the investors. Further, if the Fund is determined to dispose of a particular Controlling Class certificate investment, there is no assurance that it will be able to dispose of such investment at the previously prevailing market price.

GENERAL BUSINESS RISKS

In contrast to the markets for investment grade rated securities, the Controlling Class certificates acquired by the Fund are not investment grade rated or actively traded in the secondary market. Therefore, the Fund expects to retain the Controlling Class certificates acquired by the Fund to maturity. The retention of such securities in whole or in part until maturity will subject the Fund to greater credit risk than would otherwise be the case. In the absence of a significant market for the securities and other assets held directly or indirectly by the Fund, the General Partner will not be able to trade such assets in order to respond to changes in market conditions. Limited Partners may experience greater credit risk and a lower return on their investment as a result.

The Controlling Class certificates in which the Fund may invest are also subject to significant fluctuations, and the market value of the same may be subject to substantial variation. In addition to being relatively illiquid, the Controlling Class certificates are highly speculative. No assurance can be given that the Fund's assets will retain their value or appreciate in value.

There occurred, beginning in mid-2007, an extreme downturn in the credit markets and other financial markets. This resulted in deterioration in the credit quality of many securities. These conditions, together with other factors, including declining business and consumer confidence and increased unemployment, contributed to a deep economic recession. Economic growth continues to be slow and highly uncertain. It is difficult to predict how long and to what extent these conditions will continue, whether they will deteriorate further and what the full effects will be on the financial and credit markets and the credit quality and performance of businesses and assets. There can be no assurance that economic conditions will improve and they may deteriorate further. The market value and performance of the Fund's Controlling Class certificates may be adversely impacted by current and future economic conditions, including perceptions of potential, current or future conditions, market trading imbalances or technical dislocation.

To the extent that economic and business conditions fail to improve or deteriorate further, the levels of defaults and delinquencies are likely to increase and market values may decrease or not fully recover,

HUGHES_0000803

which may adversely affect the amount of proceeds that could be obtained upon the sale of the Fund's assets.

## GENERAL NATURE OF THE FUND'S INVESTMENTS

The Controlling Class certificates will be in investments that by their nature involve real estate, financial, market and legal risks. While the Controlling Class certificates offer the opportunity for gains, they also involve a high degree of risk that may result in losses. There can be no assurance that the Fund will correctly evaluate the nature and magnitude of the various factors that could affect the value of the Controlling Class certificates. Prices of the Controlling Class certificates may be volatile, and a variety of other factors that are inherently difficult to predict, such as domestic or international economic and political developments, may significantly affect the results of the" activities of the Fund. As a result, the performance of the Fund over a particular period may not necessarily be indicative of the results that may be expected in future periods.

## REINVESTMENT RISK

Any reinvestment by the Fund with amounts from the pre-payment or disposition of Controlling Class certificates would also expose the Fund to the market conditions prevailing at such time and could result in adverse changes in the characteristics and quality of the Controlling Class certificates held by the Fund. In this respect, the level of returns on amounts reinvested by the Fund during the Commitment Period will depend on the availability of other issuances of Controlling Class certificates determined by the Investment Committee to be an appropriate investment for the Fund and the interest rates thereon at the relevant time. Prevailing market conditions at such time may result in the purchase of Controlling Class certificates having lower yields than the loans whose proceeds are being reinvested. Furthermore, amounts received by the Fund and invested in temporary investments pending reinvestment or while being held as reserves will have significantly lower yields than the yields on the Controlling Class certificates owned by the Fund.

## PARTICIPATION ON CREDITORS' COMMITTEES

The Fund may (through the Investment Manager and ultimately through the special servicer of the applicable Controlling Class certificates (the "Special Servicer")) participate on committees formed by creditors to negotiate the management of financially troubled multifamily projects that may or may not be in bankruptcy or the Fund (through the Investment Manager and ultimately through the Special Servicer) may seek to negotiate directly with such obligors with respect to restructuring issues. If the Fund does join a creditors' committee, the participants of the committee would be interested in obtaining an outcome that is in their respective individual best interests and there can be no assurance of obtaining results most favorable to the Fund in such proceedings. By participating on such committees, the Fund may be deemed to have duties to other creditors represented by the committees, which might expose the Fund to liability to such other creditors who disagree with the Fund's actions. Furthermore, by participating on such committees, the Fund may be contractually obligated to hold the related Fund assets even if it would otherwise be in the best interests of the Fund to sell. In addition, the Investment Manager and its affiliates or other managed funds or accounts may also have or establish relationships with, and participate on credit committees with respect to, obligors (through holding debt obligations issued by such obligors or otherwise) whose loans are held by the Fund, and such debt obligations may have interests different from or adverse to the loans held by the Fund.

## VALUATION

HUGHES_0000804

The Controlling Class certificates held by the Fund are not publicly traded and the fair value of the Controlling Class certificates that are not publicly traded may not be readily determinable. The Fund value the Controlling Class certificates in accordance with U.S. generally accepted accounting principles.. Actual amounts realized with respect to Controlling Class certificates or other Fund assets may vary significantly from the value at which the Fund holds such Controlling Class certificates or other Fund assets at any time.

## FUND'S USE OF LEVERAGE

To the extent that the General Partner does determine to incorporate leverage in the Fund's investment program, the Fund may borrow money and employ other forms of leverage, if any, when the General Partner deems it appropriate for enhancing the Fund's performance. The use of leverage will magnify the volatility of changes in the value of the investments of the Fund in a market that moves adversely to their investments and could result in substantial losses to the Fund, which would be greater than if the Fund were not leveraged. In connection with borrowing, the Fund may use credit facilities for the purchase or implementation of certain investments or for other portfolio management purposes. Should such credit facilities be utilized, the Fund would incur additional interest and other expenses with respect to such facilities. Any such credit facility provider that permits the Fund assets as collateral for such credit facility may require the sale or liquidation of Fund assets held by it as collateral after default by the Fund pursuant to the agreement with such credit facility provider. Events of default under any such credit facility may include, among other things, failure to pay amounts due under such credit facility, failure to inform the credit facility provider of certain events with respect to the Fund, failure to provide the credit facility with certain periodic reports and financial statements, breach by the Fund of other representations and covenants contained in credit facility documentation and other similar terms. In such instances, the credit facility provider may take any such action without notice to the Fund or the General Partner. If any such credit facility provider were to require the Fund to sell or liquidate assets or otherwise act to realize on such collateral, these actions may impair the operational capabilities of the Fund and have adverse tax and economic effects on the Fund. In connection with any financing or other borrowing transaction, the General Partner shall have the right, at its option, to pledge any or all of the assets of the Fund including the Partners' unfunded Commitments as security for any financing incurred directly or indirectly by the Fund. Each Partner shall, upon written request from the General Partner, for the benefit of any lender, acknowledge its obligations to make capital contributions pursuant to the Partnership Agreement. In addition, Limited Partners may be required to honor capital calls made by the lender.

## CONCENTRATION RISKS

The Fund's objective is to acquire a portfolio of Controlling Class certificates (and initially will) acquire a limited number of Controlling Class certificates, and the aggregate return of the Fund may be affected by the performance of only a few investments. To the extent that less capital is raised than targeted, the Fund may invest in fewer Controlling Class certificates and thus be less diversified.

## AVAILABILITY OF SUITABLE INVESTMENTS

Identification of attractive investment opportunities in Controlling Class certificates is difficult and involves a high degree of uncertainty. Furthermore, the availability of investment opportunities generally will be subject to market conditions as well as, in some cases, the prevailing regulatory or political climate. Competition for such opportunities is expected to be substantial. There can be no assurance that the Fund will be able to locate and complete a sufficient number of suitable opportunities to enable it to invest all of the Commitments in opportunities that satisfy its investment objectives or that such investment opportunities in Controlling Class certificates will lead to completed investments by the Fund, nor can there be any assurance as to the timing of investments.

HUGHES_0000805

**FAILURE TO FUND COMMITMENTS; CONSEQUENCES OF DEFAULT**

If Limited Partners fail to fund their Commitments when due, the ability of the Fund to complete its investment program or otherwise to continue operations may be substantially impaired. A default by a substantial number of Limited Partners or by one or more Limited Partners who have made substantial Commitments would limit opportunities for investment diversification and likely would reduce returns to the Fund. In the event that a Limited Partner fails to fund any of its Commitment when required, such Limited Partner's Limited Partnership Interests may be diminished and/or forfeited.

**DILUTION**

Limited Partners admitted to the Fund at subsequent closings will participate in then-existing investments of the Fund, thereby diluting the interest of existing Limited Partners in such investments. Although any such new Limited Partner will be required to contribute its *pro rata* share of previously made capital contributions, there can be no assurance that this contribution will reflect the fair value of the Fund's existing investments at the time of such contributions.

**INVESTMENTS LONGER THAN TERM**

The Fund may make investments that may not be advantageously disposed of prior to the date that the Fund will be dissolved, either by expiration of the term of each such investment or otherwise. Although the General Partner expects that investments will be either disposed of prior to dissolution or be suitable for in-kind distribution at dissolution, the Fund may have to sell, distribute, resecuritize or otherwise dispose of investments at a disadvantageous time as a result of dissolution.

**RESTRICTIONS ON TRANSFER; NO MARKET FOR INTERESTS**

The Limited Partnership Interests will not be registered under the Securities Act or any state or other securities laws and may not be transferred unless registered under applicable federal and state securities laws and in some cases, non-U.S. securities laws or unless an exemption from such laws is available. The Fund has no plans and is under no obligation to register such Limited Partnership Interests under the Securities Act. No market exists for the Limited Partnership Interests, and none is expected to develop. Further, approval by the General Partner of a transfer is required before any transfer may occur, which the General Partner may withhold in its sole discretion.

**DISTRIBUTIONS IN-KIND UPON FUND TERMINATION**

Upon termination of the Fund, distributions may be made by the General Partner consisting of non-cash assets. At the time of such distribution, such assets may have limited liquidity, price volatility or a decline in market value and may have certain investment and transfer restrictions limiting marketability. The ability of the Limited Partners to liquidate positions in such securities is subject to these risks, and investors must be prepared to hold such securities for an extended period of time.

**SIDE LETTERS**

The General Partner may enter into arrangements with certain Limited Partners that have the effect of altering or supplementing the terms of the Limited Partner's investments in the Fund, including arrangements with respect to waivers or reductions of the Management Fee and/or carried interest, access to portfolio information and enhanced transparency.

HUGHES_0000806

## NO RIGHT TO CONTROL THE FUND'S OPERATIONS

Limited Partners will have no opportunity to control the day-to-day operations of the Fund, including investment and disposition decisions. In order to safeguard their limited liability from the liabilities and obligations of the Fund, Limited Partners must rely entirely on the General Partner to conduct and manage the affairs of the Fund.

## PROJECTIONS, FORECASTS AND ESTIMATES

Any projections, forecasts and estimates contained herein are forward looking statements and are based upon certain assumptions that the Fund considers reasonable. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Accordingly, the projections are only an estimate. Actual results may vary from the projections, and the variations may be material. The inclusion of projections herein should not be regarded as a representation by the Fund, the General Partner, the Investment Manager or any of their respective affiliates or any other person or entity of the results that will actually be achieved by the Fund. None of the Fund, the General Partner, the Investment Manager or any of their respective affiliates and any other person has any obligation to update or otherwise revise any projections, including any revisions to reflect changes in economic conditions or other circumstances arising after the date hereof or to reflect the occurrence of unanticipated events, even if the underlying assumptions do not come to fruition.

## FORCE MAJEURE, TERRORISM AND OTHER ACTS

In addition to historic market risks, the performance of the Fund may be adversely affected by market fluctuations resulting from certain risks which are unprecedented in nature or magnitude and therefore not amenable to existing risk management techniques which are based on modeling past events and assigning probabilities to the recurrence of those events. Such events include, without limitation, catastrophic acts of terror resulting in mass casualties and associated destruction and subsequent abandonment of large areas in urban locales; imposition or declaration of martial law in any jurisdiction; mass disruption of telecommunications facilities due to terrorist acts; pandemics resulting from bio-terror attacks or outbreaks of fatal disease for which there is no cure or treatment; urban terror using nerve gas or other toxins; terrorist use of nuclear weapons, radiation dispersal weapons or other weapons of mass destruction; cyber-terror and terrorist attacks on financial markets, exchanges and payments systems; and acts of providence. In no case will the Investment Manager or its respective affiliates be held responsible for such acts or the consequential effects thereof.

## THE FUND AND GENERAL PARTNER NOT REGISTERED

The Fund is not registered under the Investment Company Act. The Investment Company Act provides certain protection to investors and imposes certain restrictions on registered investment companies (including limitations on the ability of registered investment companies to incur debt), none of which will be applicable to the Fund.

The General Partner is not registered as a broker-dealer under the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), or with the Financial Industry Regulatory Authority ("FINRA") and consequently is not subject to the record-keeping and specific business practice provisions of the Exchange Act and the rules of FINRA.

The Investment Manager is not currently registered, but expects to become registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

HUGHES_0000807

LEGAL, TAX AND REGULATORY RISKS

Legal, tax and regulatory changes could occur during the term of the Fund which may adversely affect the Fund.

TAX CONSIDERATIONS

An investment in the Fund may involve complex federal income tax considerations that will differ for each Limited Partner. Under certain circumstances, the Limited Partners could be required to recognize taxable income in a taxable year for federal income tax purposes, even if the Fund does not have cash or property available to be distributed to the Partners during such taxable year. See Section XI – "Certain Tax Considerations" of this Memorandum.

## II.   FREDDIE MAC CONTROLLING CLASS CERTIFICATE RISK FACTORS

It is anticipated that the Fund will purchase Controlling Class certificates from multiple K-Deal securitizations. Each such transaction will be sold pursuant to a prospectus and a prospectus supplement which will provide a detailed analysis of the underlying mortgage loans. Illustrative examples of such prospectuses are available to any prospective investor upon request. The risks and uncertainties described below summarize certain material risks in connection with the purchase by the Fund of Controlling Class certificates under the Freddie Mac K-Deal program.

THE CONTROLLING CLASS MAY LOSE ITS ABILITY TO DIRECT THE SPECIAL SERVICER.

The Fund has certain rights as the holder of the Controlling Class which will be lost if there are losses which exceed seventy five percent of the initial principal balance of the Controlling Class. Such realized losses are recognized by the Controlling Class for losses on the underlying mortgage loans, as well as default-related or other unanticipated issuing entity expenses attributable to the underlying mortgage loans. The rights which the Fund, as the owner of the Controlling Class, would lose with respect to the respective K-Deal transaction and specifically with respect to the underlying mortgage loans include the ability to direct the special servicer when a loan is a default loan, request a recommendation from the servicing consultant relating to a requested waiver of any "due-on-sale" or "due-on-encumbrance" clause as a requested consent to certain modifications, waivers or amendments for certain non-specially serviced mortgage loans, as well as purchase defaulted mortgage loans from the issuing entity.

BECAUSE THE CONTROLLING CLASS CERTIFICATES ARE REMIC CERTIFICATES, IF THE ISSUING ENTITY LOST ITS REMIC STATUS, THE CONTROLLING CLASS CERTIFICATES WOULD BE NEGATIVELY IMPACTED BY TAX DRAG.

As discussed in further detail below, the Fund does not generally have the right to make decisions with respect to the administration of the entity that issues the applicable Controlling Class certificates (the "issuing entity"). Thus, the issuing entity may fail to qualify as a real estate mortgage investment conduit ("REMIC") due to factors outside of the Fund's control. If the issuing entity fails to comply with one or more of the ongoing requirements of the Code for status as a REMIC during any taxable year, the issuing entity would generally not be treated as a REMIC for such year and thereafter; instead, the issuing entity would likely be treated as an association taxable as a corporation for U.S. federal income tax purposes, and the Controlling Class certificates would be treated as equity interests in the issuing entity. If the issuing entity were treated as a corporation it would be subject to regular federal income tax rates applicable to corporations, which could materially reduce the amounts available for distribution to the

HUGHES_0000808

Fund on the Controlling Class certificates and, thus, the amounts available for distribution from the Fund to the Limited Partners. Moreover, to the extent such distributions constitute dividends for U.S. federal tax purposes, withholding tax may also apply to the distributions to Non-U.S. Limited Partners.

## THE CONTROLLING CLASS CERTIFICATES ARE GENERALLY UNRATED.

The Controlling Class certificates generally will be unrated or if rated will have ratings or implied ratings below investment grade. The lower rating of such securities reflects a greater possibility that adverse changes in the underlying loan collateral or in general economic conditions (including, for example, a substantial period of rising interest rates or declining earnings off of the properties) or both may impair the ability of the borrower on the underlying loan to make payment of principal and interest. This will in turn result in the certificate not receiving principal and interest payments. The market for lower-rated and comparable non-rated securities is thinner, often less liquid, and less active than that for higher-rated and comparable securities, which can adversely affect the prices at which the securities can be sold and may even make it impracticable to sell such securities. In addition to the foregoing, such underlying loans may become nonperforming for a variety of reasons. A nonperforming loan may require substantial work-out negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate and/or a substantial write-down of principal of or accrued interest due on the loan as well as substantial legal and other fees and expenses. Because of the unique and customized nature of mortgage loan documentation, certain loans may not be purchased or sold as easily as publicly traded securities. Other risks associated with floating rate securities and the underlying floating rate loans include the fact that pre-payments may occur at any time without premium or penalty and that the exercise of pre-payment rights during the term of the security could cause the Fund to return capital sooner than expected.

Except as described herein, investors in the Controlling Class certificates, including the Fund, do not have the right to make decisions with respect to the administration of the entity that issues the applicable Controlling Class certificates (the "issuing entity"). These decisions are generally made, subject to the express terms of the pooling and servicing agreement for the issuing entity, by the master servicer, the special servicer, the certificate administrator and the trustee. Any decision made by any of those parties in respect of the issuing entity in accordance with the terms of the pooling and servicing agreement, even if it determines that decision to be in the Fund's best interests, may be contrary to the decision that Fund would have made and may negatively affect the Fund's interests. However, the directing certificate holder and Freddie Mac or its designee have the right to exercise various rights and powers in respect of the issuing entity. In addition, in certain limited circumstances, certificate holders have the right to vote on matters affecting the issuing entity. In some cases, these votes are by certificate holders taken as a whole and in others the vote is by class. The Fund's interests as a holder of the Controlling Class certificates may not be aligned with the interests of holders of one or more other classes. In all cases, voting is based on the outstanding certificate balance, which is reduced by losses on or with respect to the underlying mortgage loans arising from the inability of the master servicer and/or the special servicer to collect all amounts due and owing under those mortgage loans. These limitations on voting could adversely affect the Fund's ability to protect its interests with respect to matters voted on by certificate holders.

## GENERAL MARKET AND CREDIT RISKS ASSOCIATED WITH CONTROLLING CLASS CERTIFICATES

The securities acquired by the Fund are subject to credit risk and interest rate risk. "Credit risk" refers to the likelihood that the borrower on the underlying loan will default in the payment of principal and/or interest thereon. Financial strength and solvency of a borrower, property level performance and general market conditions are the primary factors influencing credit risk. In addition, inadequacy of collateral on the underlying loan may affect its credit risk. Credit risk may change over the life of a loan or security. "Interest rate risk" refers to the risks associated with market changes in interest rates. Interest rate

HUGHES_0000809

changes may affect the value of a loan or other debt instrument indirectly (especially in the case of fixed rate securities) and directly (especially in the case of loans whose rates are floating). In general, rising interest rates will negatively impact the price of a fixed rate debt instrument and falling interest rates will have a positive effect on price. Floating rate instruments also react to interest rate changes in a similar manner although generally to a lesser degree (depending, however, on the characteristics of the reset terms, including the index chosen, frequency of reset and reset caps or floors, among other factors). Interest rate sensitivity is generally more pronounced and less predictable in instruments with uncertain payment or pre-payment schedules.

All floating rate loans are required to have a LIBOR cap. The cap is purchased from a dealer at a strike price which is several hundred basis points wide of the current market. The term of the cap is typically three years. During that term, the borrower is required to escrow the price of the next LIBOR cap. The underlying loan is underwritten to the all in rate of the strike price for the LIBOR cap agreement that the respective borrower has pledged as collateral for the underlying mortgage loan (the "LIBOR Cap Strike Rate"), plus the applicable margin on the underlying loan. Although the floating rate loans are underwritten to the ultimate LIBOR Cap Strike Rate plus the applicable margin, and the starting rate is much lower, rising rates could impact the cash flow on the underlying property to the extent that it was not sufficient to generate escrow payments for the next LIBOR cap which needs to be purchased. Rising prices of future caps and insufficient escrow funds to purchase future caps could potentially lead to defaults in the underlying mortgages.

### THE SOURCE OF REPAYMENT ON THE CONTROLLING CLASS CERTIFICATES WILL BE LIMITED TO PAYMENTS AND OTHER COLLECTIONS ON THE UNDERLYING MORTGAGE LOANS.

The Controlling Class certificates will represent interests solely in the issuing entity. The primary assets of the issuing entity will be a segregated pool of multifamily mortgage loans. Accordingly, repayment of the Controlling Class certificates will be limited to payments and other collections on the underlying mortgage loans. The underlying mortgage loans will not be an obligation of, or be insured or guaranteed by: any governmental entity; any private mortgage insurer; the depositor; Freddie Mac; the master servicer; the special servicer; any sub-servicer of the master servicer or the special servicer; the trustee; the certificate administrator; the custodian; or any of their respective affiliates.

### THE ISSUING ENTITY'S ASSETS MAY BE INSUFFICIENT TO ALLOW FOR REPAYMENT IN FULL ON THE CONTROLLING CLASS CERTIFICATES.

The Controlling Class certificates do not represent obligations of any person or entity and do not represent a claim against any assets other than those of the issuing entity. No governmental agency or instrumentality will guarantee or insure payment on the Controlling Class certificates. In addition, neither the depositor of any Controlling Class certificates nor its affiliates are responsible for making payments on the Controlling Class certificates if collections on the underlying mortgage loans are insufficient. If the underlying mortgage loans are insufficient to make payments on the Controlling Class certificates no other assets will be available to the Fund for payment of the deficiency, and the Fund will bear the resulting loss. Any advances made by the master servicer or other party with respect to the underlying mortgage loans are intended solely to provide liquidity and not credit support. The party making those advances will have a right to reimbursement, with interest, which is senior to the Fund's right to receive payment on the Controlling Class certificates.

### THE CONTROLLING CLASS CERTIFICATES HAVE UNCERTAIN YIELDS TO MATURITY.

The yield on the Controlling Class certificates will depend on, among other things—
- the price the Fund pays for the Controlling Class certificates; and

HUGHES_0000810

- the rate, timing and amount of distributions on the Controlling Class certificates.

The rate, timing and amount of distributions on the Controlling Class certificates will depend on, among other things—

- the pass-through rate for, and the other payment terms of, the Controlling Class certificates;
- the rate and timing of payments and other collections of principal on the underlying mortgage loans;
- the rate and timing of defaults, and the severity of losses, if any, on the underlying mortgage loans;
- the rate, timing, severity and allocation of other shortfalls and expenses that reduce amounts available for distribution on the Controlling Class certificates;
- the collection and payment, or waiver, of certain prepayment consideration payable in connection with voluntary or involuntary principal prepayments calculated solely as a specified percentage of the amount prepaid, which percentage may change over time, yield maintenance charges and/or other prepayment premiums with respect to the underlying mortgage loans; and
- servicing decisions with respect to the underlying mortgage loans.

These factors cannot be predicted with any certainty. Accordingly, the Fund may find it difficult to analyze the effect that these factors might have on the yield to maturity of the Controlling Class certificates.

If the Fund purchases the Controlling Class certificates at a premium, and if payments and other collections of principal on the underlying mortgage loans occur at a rate faster than the Fund anticipated at the time of its purchase, then the Fund's actual yield to maturity may be lower than the Fund assumed at the time of purchase. Conversely, if the Fund purchases the Controlling Class certificates at a discount, and if payments and other collections of principal on the underlying mortgage loans occur at a rate slower than anticipated at the time of the Fund's purchase, then the Fund's actual yield to maturity may be lower than assumed at the time of purchase. Yield to maturity may also be adversely affected by—

- the repurchase of any underlying mortgage loans by the mortgage loan seller in connection with a material breach of a representation and warranty or a material document defect;
- the purchase of a defaulted loan by the directing certificate holder pursuant to its purchase option under the applicable pooling and servicing agreement;
- the purchase of the defaulted loan by the holder of any subordinate debt or mezzanine debt pursuant to its purchase option under the related inter-creditor agreement;
- the timing of defaults and liquidations of underlying mortgage loans; and
- the termination of the issuing entity.

**OPTIONAL EARLY TERMINATION OF THE ISSUING ENTITY MAY RESULT IN AN ADVERSE IMPACT ON THE CONTROLLING CLASS CERTIFICATES.**

The certificates will be subject to optional early termination by means of the purchase of the underlying mortgage loans and/or any mortgaged real properties acquired by the special servicer for the benefit of the certificate holders through foreclosure, deed-in-lieu of foreclosure or otherwise following a default on the related underlying mortgage loan ("REO Properties") in the issuing entity. No assurance can be made that the proceeds from a sale of the underlying mortgage loans and/or REO Properties will be sufficient to distribute the outstanding certificate balance plus accrued interest and any undistributed shortfalls in interest accrued on the certificates that are subject to the termination. Accordingly, the holders of certificates affected by such a termination (including the Fund) may suffer an adverse impact on the overall yield on their certificates, may experience repayment of their investment at an unpredictable and inopportune times or may even incur a loss on their investment.

HUGHES_0000811

**PREPAYMENTS ON THE UNDERLYING MORTGAGE LOANS WILL AFFECT THE AVERAGE LIFE OF THE CONTROLLING CLASS CERTIFICATES; AND THE RATE AND TIMING OF THOSE PREPAYMENTS MAY BE HIGHLY UNPREDICTABLE.**

Payments of principal and/or interest on the Controlling Class certificates will depend upon, among other things, the rate and timing of payments on the underlying mortgage loans. Prepayments on the underlying mortgage loans may result in a faster rate of principal payments on the Controlling Class certificates; thereby resulting in a shorter average life for the Controlling Class certificates than if those prepayments had not occurred. The rate and timing of principal prepayments on pools of mortgage loans is influenced by a variety of economic, demographic, geographic, social, tax and legal factors. Although many of the underlying mortgage loans may provide for prepayment lockout periods which cover a substantial portion of the loan terms, prepayments may still occur during such periods as a result of a casualty or condemnation event. In addition, prepayments may occur in connection with a permitted partial release of a mortgaged real property. Accordingly, the rate and timing of principal prepayments on the underlying mortgage loans is uncertain. As a result, repayment of the Controlling Class certificates could occur significantly earlier or later, and the average life of the Controlling Class certificates could be significantly shorter or longer, than expected. The extent to which prepayments on the underlying mortgage loans ultimately affect the average life of the Controlling Class certificates depends on the terms and provisions of the Controlling Class certificates.

The Fund's entitlement to receive payments, including prepayments, of principal of the underlying mortgage loans may—

- vary based on the occurrence of specified events, such as the retirement of one or more other classes of certificates; or
- be subject to various contingencies, such as prepayment and default rates with respect to the underlying mortgage loans.

**LENDER LIABILITY AND EQUITABLE SUBORDINATION**

A number of judicial decisions have upheld judgments of obligors against lenders on the basis of various evolving legal theories, collectively termed "lender liability." Generally, lender liability is founded on the premise that a lender has violated a duty (whether implied or contractual) of good faith, commercial reasonableness and fair dealing, or a similar duty owed to the obligor or has assumed an excessive degree of control over the obligor resulting in the creation of a fiduciary duty owed to the obligor or its other creditors or shareholders. Because of the nature of the loans collateralizing the securities held by the Fund, and the fact that the Fund through its ownership of the Controlling Class certificates is the controlling class (i.e. the party who can direct the Special Servicer in a loan default scenario) the Fund may be subject to allegations of lender liability.

The Fund's investment activities also subject it to the normal risks of becoming involved in litigation by third parties. The expense of defending against claims by third parties and paying any amounts pursuant to settlements or judgments would be borne directly or indirectly by the Fund and would reduce the amounts available for distribution to the Limited Partners. The General Partner, the Investment Manager, the Principals and certain others may be indemnified by the Fund in connection with such litigation, subject to certain conditions, further reducing such available amounts.

**NATURE OF CONTROLLING CLASS SECURITIES AND UNDERLYING LOANS GENERALLY**

Although the Fund expects to invest solely in Controlling Class certificates, the Fund may be exposed to losses resulting from default and foreclosure of the underlying loans or interests in loans. Therefore, the value of underlying collateral, the creditworthiness of borrowers and the priority of liens are each of great

HUGHES_0000812

importance in determining the value of the Fund's investments.  No guarantee can be made regarding the adequacy of the protection of the Fund's security in the loans or other debt instruments in which it invests. Moreover, in the event of foreclosure, the Fund or an affiliate thereof may assume direct ownership of any assets collateralizing such foreclosed mortgage loans.  The liquidation proceeds upon the sale of such assets may not satisfy the entire outstanding balance of principal and interest on such foreclosed loans, resulting in a loss to the Fund.  This is especially the case if the borrower with respect to a specific multifamily project has been provided mezzanine debt.  See "A Borrower's Other Loans May Reduce the Cash Flow Available to Operate and Maintain the Related Mortgaged Real Property or May Interfere with the Issuing Entity's Rights Under the Related Underlying Mortgage Loan" below.  Any costs or delays involved in the effectuation of loan foreclosures or liquidation of the assets collateralizing such foreclosed mortgage loans will further reduce proceeds associated therewith and consequently, increase possible losses to the Fund.  In addition, no assurances can be made that borrowers or third parties will not assert claims in connection with foreclosure proceedings or otherwise, or that such claims will not interfere with the enforcement of the Fund's rights.

**THE MARKET VALUE OF THE CONTROLLING CLASS CERTIFICATES WILL BE SENSITIVE TO FACTORS UNRELATED TO THE PERFORMANCE OF THE CONTROLLING CLASS CERTIFICATES AND THE UNDERLYING MORTGAGE LOANS.**

The market value of the Controlling Class certificates can decline even if the Controlling Class certificates and the underlying mortgage loans are performing at or above the Fund's expectations. The market value of the Controlling Class certificates will be sensitive to fluctuations in current interest rates. However, a change in the market value of the Controlling Class certificates as a result of an upward or downward movement in current interest rates may not equal the change in the market value of the Controlling Class certificates as a result of an equal but opposite movement in interest rates. The market value of the Controlling Class certificates will also be influenced by the supply of and demand for CMBS generally. The supply of CMBS will depend on, among other things, the amount of commercial and multifamily mortgage loans, whether newly originated or held in portfolio that is available for securitization. A number of factors will affect investors' demand for CMBS, including—

- the availability of alternative investments that offer high yields or are perceived as being a better credit risk, having a less volatile market value or being more liquid;
- legal and other restrictions that prohibit a particular entity from investing in CMBS or limit the amount or types of CMBS that it may acquire;
- investors' perceptions regarding the commercial and multifamily real estate markets which may be adversely affected by, among other things, a decline in real estate values or an increase in defaults and foreclosures on mortgage loans secured by income-producing properties; and
- investors' perceptions regarding the capital markets in general, which may be adversely affected by political, social and economic events completely unrelated to the commercial and multifamily real estate markets.

If the Fund decides to sell Controlling Class certificates, it may have to sell at a discount from the price paid for reasons unrelated to the performance of the certificates or the related underlying mortgage loans. Pricing information regarding the certificates may not be generally available on an ongoing basis.

**III.   RISKS RELATED TO THE UNDERLYING MORTGAGE LOANS WHICH MAY IMPACT THE CONTROLLING CLASS CERTIFICATES**

It is anticipated that the Fund will purchase Controlling Class certificates from multiple K-Deal securitizations.  Each such transaction will be sold pursuant to a prospectus and a prospectus supplement which will provide a detailed analysis of the underlying mortgage loans.  Illustrative examples of such

HUGHES_0000813

prospectuses are available to any prospective investor upon request. Please find below certain highlighted mortgage loan risks.

**THE UNDERLYING MORTGAGE LOANS WILL BE NONRECOURSE.**

The underlying mortgage loans relating to the Controlling Class certificates will be nonrecourse loans. This means that, in the event of a default, recourse will generally be limited to the related real property or properties securing the defaulted loan and other assets that have been pledged to secure that underlying mortgage loan. Consequently, full and timely payment on each underlying mortgage loan will depend on one or more of the following:

- the sufficiency of the net operating income of the applicable mortgaged real property to pay debt service;
- the market value of the applicable mortgaged real property at or prior to maturity; and
- the ability of the related borrower to refinance or sell the applicable mortgaged real property at maturity.

In general, the value of any multifamily property, including any manufactured housing community properties and assisted living, memory care and/or independent living facility properties, will depend on its ability to generate net operating income. The ability of an owner to finance a multifamily property will depend, in large part, on the property's value and ability to generate net operating income.

None of the underlying mortgage loans will be insured or guaranteed by any governmental entity or private mortgage insurer.

**REPAYMENT OF EACH OF THE UNDERLYING MORTGAGE LOANS WILL BE DEPENDENT ON THE CASH FLOW PRODUCED BY THE RELATED MORTGAGED REAL PROPERTY, WHICH CAN BE VOLATILE AND INSUFFICIENT TO ALLOW TIMELY DISTRIBUTIONS ON THE CONTROLLING CLASS CERTIFICATES, AND ON THE VALUE OF THE RELATED MORTGAGED REAL PROPERTY, WHICH MAY FLUCTUATE OVER TIME.**

Repayment of loans secured by multifamily rental properties typically depends on the cash flow produced by those properties. The ratio of net cash flow to debt service of an underlying mortgage loan secured by an income-producing property is an important measure of the risk of default on the loan. Payment on each underlying mortgage loan may also depend on the ability of the related borrower to sell the related mortgaged real property or refinance the underlying mortgage loan, at scheduled maturity, in an amount sufficient to repay the underlying mortgage loan; and/or in the event of a default under the underlying mortgage loan and a subsequent sale of the related mortgaged real property upon the acceleration of such underlying mortgage loan's maturity, the amount of the sale proceeds, taking into account any adverse effect of a foreclosure proceeding on those sale proceeds. In general, if an underlying mortgage loan has a relatively high loan-to-value ratio or a relatively low debt service coverage ratio, a foreclosure sale is more likely to result in proceeds insufficient to satisfy the outstanding debt.

The cash flows from the operation of multifamily real properties are volatile and may be insufficient to cover debt service on the related underlying mortgage loan and pay operating expenses at any given time. This may cause the value of a property to decline. Cash flows and property values generally affect the ability to cover debt service; the ability to pay an underlying mortgage loan in full with sales or refinance proceeds; and the amount of proceeds recovered upon foreclosure.

**BORROWERS MAY BE UNABLE TO MAKE BALLOON PAYMENTS.**

HUGHES_0000814

Generally, all of the underlying mortgage loans in a K-Deal transaction will be balloon loans that have amortization schedules that are significantly longer than their respective terms, and many of the underlying mortgage loans may require only payments of interest for part or all of their respective terms.

A longer amortization schedule or an interest-only provision in an underlying mortgage loan will result in a higher amount of principal outstanding on the underlying mortgage loan at any particular time, including at the maturity date of the underlying mortgage loan, than would have otherwise been the case had a shorter amortization schedule been used or had the underlying mortgage loan had a shorter interest-only period or not included an interest-only period at all. That higher principal amount outstanding could both (i) make it more difficult for the related borrower to make the required balloon payment at maturity and (ii) lead to increased losses for the issuing entity either during the loan term or at maturity if the underlying mortgage loan becomes a Defaulted Loan. The borrower under a mortgage loan of these types is required to make a substantial payment of principal and interest, which is commonly called a balloon payment, on the maturity date of the loan. The ability of the borrower to make a balloon payment depends upon the borrower's ability to refinance or sell the mortgaged real property securing the loan. The ability of the borrower to refinance or sell the mortgaged real property will be affected by a number of factors, including:

- the fair market value and condition of the mortgaged real property;
- the level of interest rates;
- the borrower's equity in the mortgaged real property;
- the borrower's financial condition;
- the operating history of the mortgaged real property;
- changes in zoning and tax laws;
- changes in competition in the relevant area;
- changes in rental rates in the relevant area;
- changes in governmental regulation and fiscal policy;
- prevailing general and regional economic conditions;
- the state of the fixed income and mortgage markets;
- the availability of credit for mortgage loans secured by multifamily rental properties; and
- the requirements (including loan-to-value ratios and debt service coverage ratios) of lenders for mortgage loans secured by multifamily rental properties.

Neither the depositor nor any of the depositor's affiliates, the mortgage loan seller or any of the mortgage loan originators will be obligated to refinance any underlying mortgage loan.

The last credit crisis and economic downturn resulted in tightened lending standards and a substantial reduction in capital available to refinance commercial mortgage loans at maturity. These factors have increased the risk that refinancing may not be available for commercial mortgage loans. No assurance can be made that each borrower under a balloon loan will have the ability to repay the principal balance of such underlying mortgage loan on the related maturity date.

The master servicer or special servicer may, within prescribed limits, extend and modify underlying mortgage loans that are in default or as to which a payment default is reasonably foreseeable in order to maximize recoveries on such underlying mortgage loans. The master servicer or special servicer is only required to determine that any extension or modification is reasonably likely to produce a greater recovery than a liquidation of the real property securing the defaulted underlying mortgage loan. There is a risk that the decision of the master servicer or special servicer to extend or modify an underlying mortgage loan may not in fact produce a greater recovery.

HUGHES_0000815

## MODIFICATIONS OF THE UNDERLYING MORTGAGE LOANS.

If any underlying mortgage loans become delinquent or default, the special servicer, at the direction of the Fund as the Controlling Class certificate holder, will be required to work with the related borrowers to maximize collections on such underlying mortgage loans. This may include modifying the terms of such underlying mortgage loans that are in default or whose default is reasonably foreseeable. At each step in the process of trying to bring a defaulted loan current or in maximizing proceeds to the issuing entity, the special servicer will be required to invest time and resources not otherwise required for the master servicer to collect payments on performing underlying mortgage loans. Modifications of underlying mortgage loans implemented by the special servicer in order to maximize the ultimate proceeds of such underlying mortgage loans may have the effect of, among other things, reducing or otherwise changing the mortgage rate, forgiving or forbearing on payments of principal, interest or other amounts owed under the underlying mortgage loan, extending the final maturity date of the underlying mortgage loan, capitalizing or deferring delinquent interest and other amounts owed under the underlying mortgage loan, forbearing payment of a portion of the principal balance of the underlying mortgage loan or any combination of these or other modifications. Any modified underlying mortgage loan may remain in the issuing entity, and the modification may result in a reduction in the funds received with respect to such underlying mortgage loan.

## MULTIFAMILY LENDING SUBJECTS THE FUND'S INVESTMENT TO SPECIAL RISKS THAT ARE NOT ASSOCIATED WITH SINGLE-FAMILY RESIDENTIAL LENDING.

The underlying mortgage loans are secured by multifamily income-producing properties. Multifamily lending is generally thought to be riskier than single-family residential lending because, among other things, larger loans are made to single borrowers or groups of related borrowers. Furthermore, the risks associated with lending on multifamily properties are inherently different from those associated with lending on the security of single-family residential properties. For example, repayment of each of the underlying mortgage loans will be dependent on the performance and/or value of the related mortgaged real property.

## MULTIFAMILY SPECIFIC RISKS

All of the underlying mortgage loans are secured by multifamily rental properties, thereby materially exposing the Controlling Class certificate holders to risks associated with the performance of multifamily rental properties, including, but not limited to, the following:

- the successful operation of a multifamily property depends on tenants;
- property value may be adversely affected even when current operating income is not;
- maintaining a property in good condition may be costly;
- competition may adversely affect the profitability and value of an income-producing property; and
- property management is important to the successful operation of the mortgaged real property.

## THE PERFORMANCE OF AN UNDERLYING MORTGAGE LOAN AND THE RELATED MORTGAGED REAL PROPERTY DEPENDS IN PART ON WHO CONTROLS THE BORROWER AND THE RELATED MORTGAGED REAL PROPERTY.

The operation and performance of an underlying mortgage loan will depend in part on the identity of the persons or entities that control the related borrower and the related mortgaged real property. The performance of the underlying mortgage loan may be adversely affected if control of the borrower

HUGHES_0000816

changes, which may occur, for example, by means of transfers of direct or indirect ownership interests in such borrower.

## LOSSES ON LARGER LOANS MAY ADVERSELY AFFECT DISTRIBUTIONS ON THE CONTROLLING CLASS CERTIFICATES.

Certain of the underlying mortgage loans may have principal balances that are substantially higher than the average cut-off date principal balance in the respective K-Deal transaction. In general, these concentrations can result in losses that are more severe than would be the case if the total principal balance of the underlying mortgage loans backing the Controlling Class certificates were more evenly distributed.

## MORTGAGE LOANS TO RELATED BORROWERS MAY RESULT IN MORE SEVERE LOSSES ON THE CONTROLLING CLASS CONTROLLING CLASS CERTIFICATES.

Certain groups of the underlying mortgage loans may be made to the same borrower or to borrowers under common ownership. Mortgage loans with the same borrower or related borrowers pose additional risks. Among other things:

- financial difficulty at one mortgaged real property could cause the owner to defer maintenance at another mortgaged real property in order to satisfy current expenses with respect to the troubled mortgaged real property; and
- the owner could attempt to avert foreclosure on one mortgaged real property by filing a bankruptcy petition that might have the effect of interrupting monthly payments for an indefinite period on all of the related mortgage loans.

In addition, multiple real properties owned by the same borrower or related borrowers are likely to have common management. This would increase the risk that financial or other difficulties experienced by the property manager could have a greater impact on the owner of the underlying mortgage loans.

## A BORROWER'S OTHER LOANS MAY REDUCE THE CASH FLOW AVAILABLE TO OPERATE AND MAINTAIN THE RELATED MORTGAGED REAL PROPERTY OR MAY INTERFERE WITH THE ISSUING ENTITY'S RIGHTS UNDER THE RELATED UNDERLYING MORTGAGE LOAN, THEREBY ADVERSELY AFFECTING DISTRIBUTIONS ON THE CONTROLLING CLASS CONTROLLING CLASS CERTIFICATES.

Any of the mortgaged real properties may be encumbered in the future by other subordinate debt. In addition, subject, in some cases, to certain limitations relating to maximum amounts, the borrowers generally may incur trade and operational debt or other unsecured debt and enter into equipment and other personal property and fixture financing and leasing arrangements, in connection with the ordinary operation and maintenance of the related mortgaged real property. Furthermore, in the case of any underlying mortgage loan that requires or allows letters of credit to be posted by the related borrower as additional security for the underlying mortgage loan, in lieu of reserves or otherwise, the borrower may be obligated to pay fees and expenses associated with the letter of credit and/or to reimburse the letter of credit issuer in the event of a draw on the letter of credit by the lender.

The existence of other debt could:

- adversely affect the financial viability of a borrower by reducing the cash flow available to the borrower to operate and maintain the mortgaged real property;
- adversely affect the security interest of the lender in the equipment or other assets acquired through its financings;
- complicate workouts or bankruptcy proceedings; and

HUGHES_0000817

- delay foreclosure on the mortgaged real property.

No assurance can be made that the foregoing circumstances will not adversely impact operations at or the value of the mortgaged real property.

### CHANGES IN MORTGAGE POOL COMPOSITION CAN CHANGE THE NATURE OF THE FUND'S INVESTMENT.

The underlying mortgage loans will amortize at different rates and mature on different dates. In addition, some of those mortgage loans may be prepaid or liquidated. As a result, the relative composition of the mortgage pool will change over time. If the Fund purchases Controlling Class certificates with a pass-through rate that is equal to or calculated based upon a weighted average of interest rates on the underlying mortgage loans, the Fund's pass-through rate will be affected, and may decline, as the relative composition of the mortgage pool changes.

In addition, as payments and other collections of principal are received with respect to the underlying mortgage loans, the remaining mortgage pool backing the certificates may exhibit an increased concentration with respect to number and affiliation of borrowers and geographic location.

### GEOGRAPHIC CONCENTRATION OF THE MORTGAGED REAL PROPERTIES MAY ADVERSELY AFFECT DISTRIBUTIONS ON THE CONTROLLING CLASS CERTIFICATES.

The concentration of mortgaged real properties in a specific state or region will make the performance of the underlying mortgage loans, as a whole, more sensitive to the following factors in the state or region where the borrowers and the mortgaged real properties are concentrated:
- economic conditions, including real estate market conditions;
- changes in governmental rules and fiscal policies;
- regional factors such as earthquakes, floods, forest fires or hurricanes;
- acts of God, which may result in uninsured losses; and
- other factors that are beyond the control of the borrowers.

### THE UNDERLYING MORTGAGE LOANS MAY LACK CUSTOMARY PROVISIONS.

The underlying mortgage loans securing the Controlling Class certificates may lack one or more features that are customary in mortgage loans intended for securitization. Among other things, the borrowers with respect to those underlying mortgage loans may not be required to have an independent director or to make payments to lockboxes or to maintain reserves for certain expenses, such as taxes, insurance premiums, capital expenditures, tenant improvements and leasing commissions or the requirements to make such payments may be suspended if the related borrower complies with the terms of the related loan documents, or the lenders under such underlying mortgage loans may not have the right to terminate the related property manager upon the occurrence of certain events or require lender approval of a replacement property manager. In addition, although mortgage loans intended to be securitized often have a guarantor with respect to certain bad acts such as fraud, guarantors may not be required with respect to certain of the underlying mortgage loans.

### SOME REMEDIES MAY NOT BE AVAILABLE FOLLOWING A MORTGAGE LOAN DEFAULT.

The underlying mortgage loans securing the Controlling Class certificates may contain, subject to certain exceptions, "due-on-sale" and "due-on-encumbrance" clauses. These clauses permit the holder of an underlying mortgage loan to accelerate the maturity of the underlying mortgage loan if the related borrower sells or otherwise transfers or encumbers the related mortgaged real property or its interest in

HUGHES_0000818

the mortgaged real property in violation of the terms of the mortgage. The underlying mortgage loans may also include a debt-acceleration clause that permits the related lender to accelerate the debt upon specified monetary or non-monetary defaults of the borrower. The courts of all states will enforce clauses providing for acceleration in the event of a material payment default. The equity courts of a state, however, may refuse the foreclosure or other sale of a mortgaged real property or refuse to permit the acceleration of the indebtedness as a result of a default deemed to be immaterial or if the exercise of these remedies would be inequitable or unjust.

The related borrower generally may collect rents for so long as there is no default. As a result, the issuing entity's rights to these rents will be limited because:

- the issuing entity may not have a perfected security interest in the rent payments until the master servicer, special servicer or sub-servicer collects them;
- the master servicer, special servicer or sub-servicer may not be entitled to collect the rent payments without court action; and
- the bankruptcy of the related borrower could limit the ability of the master servicer, special servicer or sub-servicer to collect the rents.

## SPONSOR DEFAULTS ON OTHER MORTGAGE LOANS MAY ADVERSELY IMPACT AND IMPAIR RECOVERY ON AN UNDERLYING MORTGAGE LOAN.

Principals of the related borrowers under certain of the underlying mortgage loans and/or their affiliates may be subject to defaults with respect to unrelated mortgage loans or, in some cases, with respect to prior mortgage loans that had been secured by real properties currently securing underlying mortgage loans that are assets of the issuing entity.

No assurance can be made that the foregoing circumstances will not have an adverse effect on the liquidity of the sponsors or the borrowers or that such circumstances will not adversely affect the sponsors' or the borrowers' ability to maintain each related mortgaged real property, to pay amounts owed on each underlying mortgage loan or to refinance each underlying mortgage loan.

## THE TERMS OF THE UNDERLYING MORTGAGE LOANS WILL AFFECT PAYMENTS ON THE CONTROLLING CLASS CERTIFICATES.

Each of the underlying mortgage loans will specify the terms on which the related borrower must repay the outstanding principal amount of the loan. The rate, timing and amount of scheduled payments of principal may vary, and may vary significantly, from mortgage loan to mortgage loan. The rate at which the underlying mortgage loans amortize will directly affect the rate at which the principal balance or notional amount of the corresponding component of the Controlling Class certificates is paid down or otherwise reduced. In addition, the underlying mortgage loans may permit the related borrower during some of the loan term to prepay the loan. In general, a borrower will be more likely to prepay its mortgage loan when it has an economic incentive to do so, such as obtaining a larger loan on the same mortgaged real property or a lower or otherwise more advantageous interest rate through refinancing. If an underlying mortgage loan includes some form of prepayment restriction, the likelihood of prepayment should decline. These restrictions may include an absolute or partial prohibition against voluntary prepayments during some of the loan term, during which voluntary principal payments are prohibited or a requirement that voluntary prepayments made during a specified period of time be accompanied by a static prepayment premium or yield maintenance charge. In many cases, however, there will be no restriction associated with the application of insurance proceeds or condemnation proceeds as a prepayment of principal.

HUGHES_0000819

**THE TERMS OF THE UNDERLYING MORTGAGE LOANS DO NOT PROVIDE ABSOLUTE CERTAINTY AS REGARDS THE RATE, TIMING AND AMOUNT OF PAYMENTS ON THE CONTROLLING CLASS CERTIFICATES.**

Notwithstanding the terms of the underlying mortgage loans, the amount, rate and timing of payments and other collections on those underlying mortgage loans will, to some degree, be unpredictable because of borrower defaults, borrower prepayments and casualties and condemnations with respect to the mortgaged real properties. The investment performance of the Controlling Class certificates may vary materially and adversely from the Fund's expectations due to—

- the rate of prepayments and other unscheduled collections of principal on the underlying mortgage loans being faster or slower than anticipated;
- the rate of defaults on the underlying mortgage loans being faster, or the severity of losses on the underlying mortgage loans being greater, than anticipated;
- the actual net cash flow for the underlying mortgage loans being different than the underwritten net cash flow for the underlying mortgage loans; or
- the debt service coverage ratios for the underlying mortgage loans as set forth in the related loan documents being different than the debt service coverage ratios for the underlying mortgage loans as presented in the information circular prepared by the depositor for the relevant Controlling Class certificates. The actual yield to the Fund, as a holder of an Controlling Class certificate, may not equal the yield anticipated at the time of the Fund's purchase, and the total return on investment that the Fund expected may not be realized.

## IV.   IMPACT OF SERVICE PROVIDERS AND OTHER THIRD PARTIES ON THE CONTROLLING CLASS CERTIFICATES

**PROPERTY MANAGERS AND BORROWERS MAY EACH EXPERIENCE CONFLICTS OF INTEREST IN MANAGING MULTIPLE PROPERTIES.**

In the case of many of the underlying mortgage loans, the related property managers and borrowers may experience conflicts of interest in the management and/or ownership of the related mortgaged real properties because—

- a substantial number of those mortgaged real properties are managed by property managers affiliated with the respective borrowers;
- the property managers also may manage additional properties, including properties that may compete with those mortgaged real properties; and
- affiliates of the property managers and/or the borrowers, or the property managers and/or the borrowers themselves, also may own other properties, including properties that may compete with those mortgaged real properties.

**THE MASTER SERVICER, THE SPECIAL SERVICER AND ANY SUB-SERVICERS MAY EXPERIENCE CONFLICTS OF INTEREST.**

In the ordinary course of their businesses the master servicer, the special servicer and any sub-servicers will service loans other than those included in the issuing entity of the applicable Controlling Class certificates. These other loans may be similar to the underlying mortgage loans.

The mortgaged real properties securing these other loans may—

HUGHES_0000820

- be in the same markets as mortgaged real properties securing the underlying mortgage loans; and/or
- have owners and/or property managers in common with mortgaged real properties securing the underlying mortgage loans; and/or
- be sponsored by parties that also sponsor mortgaged real properties securing the underlying mortgage loans.

In these cases, the interests of the master servicer, the special servicer or a sub-servicer, as applicable, and its other clients may differ from and compete with the interests of the issuing entity and these activities may adversely affect the amount and timing of collections on the underlying mortgage loans. Under the pooling and servicing agreement applicable to any Controlling Class certificates, the master servicer, the special servicer and any sub-servicers are each required to service the underlying mortgage loans for which it is responsible in accordance with the servicing standard established pursuant to information circular applicable to the Controlling Class certificates (the "Servicing Standard"). The pooling and servicing agreement generally is expected to provide that in certain circumstances the directing certificate holder (i.e., the Fund as the Controlling Class certificate holder) may, at its own expense, request that a directing certificate holder servicing consultant (which may be the special servicer) prepare and deliver a recommendation relating to a waiver of any "due-on-sale" or "due-on-encumbrance" clause or a requested consent to certain modifications, waivers or amendments for certain non-specially serviced mortgage loans. In making a recommendation in response to such a request, the directing certificate holder servicing consultant will not be subject to the Servicing Standard and will have no duty or liability to any certificate holder other than the directing certificate holder. In addition, because the directing certificate holder servicing consultant may have arranged to be compensated by the directing certificate holder in connection with such matters as to which it is making a recommendation, its interests may conflict with the interests of other certificate holders. In addition, the master servicer, the special servicer and any sub-servicer, or one or more of their respective affiliates, may have originated some of the underlying mortgage loans. As a result, the master servicer, the special servicer or any sub-servicer may have interests with respect to such underlying mortgage loans, such as relationships with the borrowers or the sponsors of the borrowers that differ from, and may conflict with, the Fund's interests. In addition, the pooling and servicing agreement generally is expected to provide that the master servicer, the directing certificate holder servicing consultant and any sub-servicer may consult with Freddie Mac (in its capacity as servicing consultant) with respect to the application of Freddie Mac servicing practices to any matters related to non-Specially Serviced Mortgage Loans. Any advice provided by Freddie Mac (in its capacity as servicing consultant) in connection with any such consultation may conflict with the interests of one or more classes of the Controlling Class certificate holders.

**IF THE MASTER SERVICER, ANY SUB-SERVICER OR THE SPECIAL SERVICER PURCHASES CERTIFICATES OR STRUCTURED PASS-THRU CERTIFICATES ("SPCS"), A CONFLICT OF INTEREST COULD ARISE BETWEEN THEIR DUTIES AND THEIR INTERESTS IN THE CERTIFICATES OR SPCS.**

The master servicer, any sub-servicer and/or the special servicer or an affiliate of any of them may purchase or retain Controlling Class certificates (which may include classes of certificates held by the Fund) or any class of the SPCs. The ownership of any certificates or SPCs by the master servicer, any sub-servicer and/or the special servicer could cause a conflict between its duties under the applicable pooling and servicing agreement or the applicable sub-servicing agreement and its interest as a holder of a certificate or a SPC, especially to the extent that certain actions or events have a disproportionate effect on one or more classes of certificates. However, under the applicable pooling and servicing agreement and any applicable sub-servicing agreement, the master servicer, any sub-servicer and the special servicer are each required to service the underlying mortgage loans in accordance with the Servicing Standard.

**THE MASTER SERVICER AND THE SPECIAL SERVICER WILL BE REQUIRED TO SERVICE CERTAIN UNDERLYING MORTGAGE LOANS IN ACCORDANCE WITH FREDDIE MAC SERVICING PRACTICES,**

HUGHES_0000821

**WHICH MAY LIMIT THE ABILITY OF THE MASTER SERVICER AND THE SPECIAL SERVICER TO MAKE CERTAIN SERVICING DECISIONS.**

The master servicer and the special servicer will be required to service the underlying mortgage loans in accordance with (i) any and all applicable laws, (ii) the express terms of the applicable pooling and servicing agreement, (iii) the express terms of the respective underlying mortgage loans and any applicable inter-creditor, co-lender or similar agreements and (iv) to the extent consistent with the foregoing, the Servicing Standard. In the case of underlying mortgage loans other than underlying mortgage loan deemed to be outstanding with respect to an REO Property ("REO Loans"), REO Properties and specially serviced mortgage loans, the Servicing Standard generally requires the master servicer to follow Freddie Mac Servicing Practices. Freddie Mac Servicing Practices require servicing and administering the underlying mortgage loans and/or REO Properties in the same manner in which, and with the same care, skill, prudence and diligence with which, Freddie Mac services and administers multifamily mortgage loans owned by Freddie Mac. This includes servicing and administering in accordance with the Freddie Mac Multifamily Seller/Servicer Guide (or any successor to the Guide). The Guide comprises Freddie Mac's servicing guidelines for its multifamily commercial mortgage loans and Freddie Mac may modify the Guide and any policies or procedures at any time. Freddie Mac Servicing Practices also includes servicing and administering in accordance with any written Freddie Mac policies, procedures or other written communications made available in writing by Freddie Mac to the master servicer, any sub-servicer or the directing certificate holder servicing consultant, as applicable, including written communications from Freddie Mac as servicing consultant pursuant to the pooling and servicing agreement. The master servicer, the directing certificate holder servicing consultant and any sub-servicer are permitted to consult with Freddie Mac regarding the application of Freddie Mac servicing practices to any matters related to non-Specially Serviced Mortgage Loans. The servicing consultant may contact the related borrower to request any necessary documentation from such borrower in order to provide consultation to the master servicer, any sub-servicer or the directing certificate holder servicing consultant with respect to the proper application of Freddie Mac Servicing Practices. No assurance can be made that the requirement to follow Freddie Mac Servicing Practices in certain circumstances, or consultations between the master servicer, the Directing Certificate holder Servicing Consultant or any sub-servicer and Freddie Mac regarding the application of Freddie Mac Servicing Practices will not limit the master servicer's or any sub-servicer's ability to make certain servicing decisions.

**LENDING ON INCOME-PRODUCING PROPERTIES ENTAILS RISKS RELATED TO PROPERTY CONDITION – THIRD-PARTY ENGINEERS.**

With respect to all of the mortgaged real properties securing the underlying mortgage loans, a third-party engineering firm inspected the property to assess exterior walls, roofing, interior construction, mechanical and electrical systems and general condition of the site, buildings and other improvements located at each of the mortgaged real properties. No assurance can be made that all conditions at the mortgaged real properties requiring repair or replacement have been identified in these inspections, or that all building code and other legal compliance issues have been identified through inspection or otherwise, or, if identified, have been adequately addressed by escrows or otherwise. Furthermore, the condition of the related mortgaged real properties may have changed since the origination of the related underlying mortgage loans. Finally, with respect to certain mortgaged real properties, the loan documents may require the related borrower to make certain repairs or replacements on the improvements on the mortgaged real property within certain time periods. Some of these required repairs or replacements may be in progress as of the date of this information circular, and no assurance can be made that the related borrowers will complete any such required repairs or replacements in a timely manner or in accordance with the requirements set forth in the loan documents.

HUGHES_0000822

**THE MORTGAGE LOAN SELLER MAY NOT BE ABLE TO MAKE A REQUIRED CURE, REPURCHASE OR SUBSTITUTION OF A DEFECTIVE MORTGAGE LOAN.**

The mortgage loan seller is the sole warranting party in respect of the underlying mortgage loans sold by it to the depositor. Neither the depositor of any Controlling Class certificates nor any of the depositor's affiliates are obligated to cure, repurchase or substitute any underlying mortgage loan in connection with a material breach of the mortgage loan seller's representations and warranties or any material document defects, if the mortgage loan seller defaults on its obligations to do so. No assurance can be made that the mortgage loan seller will affect any such cure, repurchase or substitution. If the mortgage loan seller fails to fulfill such obligation, the Fund could experience cash flow disruptions or losses on its Controlling Class certificates. In addition, the mortgage loan seller may have various legal defenses available to it in connection with a cure, repurchase or substitution obligation. Any underlying mortgage loan that is not cured, repurchased or substituted and that is not a "qualified mortgage" for a REMIC may cause designated portions of the issuing entity to fail to qualify as one or more REMICs or cause the issuing entity to incur a tax.

**THE MORTGAGE LOAN SELLER MAY BECOME SUBJECT TO RECEIVERSHIP LAWS THAT MAY AFFECT THE ISSUING ENTITY'S OWNERSHIP OF THE UNDERLYING MORTGAGE LOANS.**

In the event of the receivership of the mortgage loan seller, it is possible the issuing entity's right to payment resulting from ownership of the underlying mortgage loans could be challenged, and if such challenge were successful, delays or reductions in payments on the Controlling Class certificates could occur.

**CHANGES TO REMIC RESTRICTIONS ON LOAN MODIFICATIONS MAY IMPACT AN INVESTMENT IN THE CERTIFICATES.**

The IRS has issued guidance easing the tax requirements for a servicer to modify a commercial or multifamily mortgage loan held in a REMIC by interpreting the circumstances when default is "reasonably foreseeable" to include those where the servicer reasonably believes that there is a "significant risk of default" with respect to the underlying mortgage loan upon maturity of the loan or at an earlier date, and that by making such modification the risk of default is substantially reduced. Accordingly, if the master servicer or the special servicer determined that an underlying mortgage loan was at significant risk of default and permitted one or more modifications otherwise consistent with the terms of the pooling and servicing agreement, any such modification may impact the timing and ultimate recovery on the underlying mortgage loan, and likewise on one or more classes of certificates.

In addition, the IRS has issued final regulations under Sections 860A through 860G of subchapter M of chapter 1 of subtitle A of the Code, and related provisions, and temporary and final regulations and, to the extent not inconsistent with such temporary and final regulations, proposed regulations, and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time (the "REMIC Provisions"), that modify the tax restrictions imposed on a servicer's ability to modify the terms of the underlying mortgage loans held by a REMIC relating to changes in the collateral, credit enhancement and recourse features. The IRS has also issued Revenue Procedure 2010-30, describing circumstances in which it will not challenge the treatment of mortgage loans as "qualified mortgages" on the grounds that the underlying mortgage loan is not "principally secured by real property," that is, has a real property loan-to-value ratio greater than 125% following a release of liens on some or all of the real property securing such underlying mortgage loan. The general rule is that a mortgage loan must continue to be "principally secured by real property" following any such lien release, unless the lien release is pursuant to a defeasance permitted under the original loan documents and occurs more than two years after the startup day of the REMIC, all in accordance with the REMIC Provisions.

HUGHES_0000823

Revenue Procedure 2010-30 also allows lien releases in certain "grandfathered transactions" and transactions in which the release is part of a "qualified pay-down transaction" even if the underlying mortgage loan after the transaction might not otherwise be treated as principally secured by a lien on real property. If the value of the real property securing an underlying mortgage loan were to decline, the need to comply with the rules of Revenue Procedure 2010-30 could restrict the servicers' actions in negotiating the terms of a workout or in allowing minor lien releases in circumstances in which, after giving effect to the release, the underlying mortgage loan would not have a real property loan-to-value ratio of 125% or less. This could impact the timing and ultimate recovery on an underlying mortgage loan, and likewise on one or more classes of certificates.

You should consider the possible impact on your investment of any existing REMIC restrictions as well as any potential changes to the REMIC rules.

### COMMENCING LEGAL PROCEEDINGS AGAINST PARTIES TO POOLING AND SERVICING AGREEMENTS MAY BE DIFFICULT.

The trustee of an issuing entity may not be required to commence legal proceedings against third parties at the direction of any certificate holders unless, among other conditions, at least 25% of the voting rights associated with the certificates join in the demand and offer indemnification satisfactory to the trustee. Those certificate holders may not commence legal proceedings themselves with respect to the applicable pooling and servicing agreement or the certificates unless the trustee has refused to institute proceedings after the conditions described in the proceeding sentence have been satisfied. These provisions may limit the Fund's ability to enforce the provisions of the applicable pooling and servicing agreement.

### THE RIGHT OF THE MASTER SERVICER AND THE TRUSTEE TO RECEIVE INTEREST ON ADVANCES MAY RESULT IN ADDITIONAL LOSSES TO THE ISSUING ENTITY.

The master servicer and the trustee of the issuing entity will each be entitled to receive interest on unreimbursed advances made by it. This interest will generally accrue from the date on which the related advance is made through the date of reimbursement. In addition, under certain circumstances, including a default by the borrower in the payment of principal and interest on an underlying mortgage loan, that underlying mortgage loan will become specially serviced and the special servicer will be entitled to compensation for performing special servicing functions pursuant to the related governing document(s). The right to receive these distributions of interest and compensation is senior to the rights of holders to receive distributions on the Controlling Class certificates and, consequently, may result in losses being allocated to the Controlling Class certificates that would not have resulted absent the accrual of this interest.

### INSOLVENCY PROCEEDINGS WITH RESPECT TO THE MASTER SERVICER, THE SPECIAL SERVICER, THE TRUSTEE OR THE CERTIFICATE ADMINISTRATOR MAY ADVERSELY AFFECT COLLECTIONS ON THE UNDERLYING MORTGAGE LOANS AND THE ABILITY TO REPLACE THE MASTER SERVICER, THE SPECIAL SERVICER, THE TRUSTEE OR THE CERTIFICATE ADMINISTRATOR.

The master servicer, the special servicer, the trustee or the certificate administrator for the certificates may be eligible to become a debtor under the United States Bankruptcy Code or enter into receivership under the Federal Deposit Insurance Act. Should this occur, although the issuing entity may be entitled to the termination of any such party, such provision may not be enforceable. An assumption under the Bankruptcy Code of its responsibilities under the applicable pooling and servicing agreement would require the master servicer, the special servicer, the trustee or the certificate administrator to cure its pre-bankruptcy defaults, if any, and demonstrate that it is able to perform following assumption. The impact of insolvency by an entity governed by state insolvency law would vary depending on the laws of the

HUGHES_0000824

particular state. No assurance can be made that a bankruptcy or receivership of the master servicer, the special servicer, the trustee or the certificate administrator would not adversely impact the servicing or administration of the underlying mortgage loans or that the issuing entity would be entitled to terminate any such party in a timely manner or at all. If the master servicer, the special servicer, the trustee or the certificate administrator becomes the subject of bankruptcy, receivership or similar proceedings, claims by the issuing entity to funds in the possession of the master servicer, the special servicer, the trustee or the certificate administrator at the time of the bankruptcy filing or other similar filing may not be perfected due to the circumstances of any bankruptcy or similar proceedings. In this event, funds available to pay principal and interest on the certificates may be delayed or reduced.

### INABILITY TO REPLACE THE MASTER SERVICER COULD AFFECT COLLECTIONS AND RECOVERIES ON THE MORTGAGE LOANS.

The structure of the servicing fee payable to the master servicer might affect the ability of the trustee to find a replacement master servicer. Although the trustee is required to replace the master servicer if the master servicer is terminated or resigns, if the trustee is unwilling (including for example because the servicing fee is insufficient) or unable (including for example, because the trustee does not have the computer systems required to service mortgage loans), it may be necessary to appoint a replacement master servicer. Because the master servicing fee is structured as a percentage of the stated principal balance of each underlying mortgage loan, it may be difficult to replace the servicer at a time when the balance of the underlying mortgage loans has been significantly reduced because the fee may be insufficient to cover the costs associated with servicing the underlying mortgage loans and/or related REO Properties remaining in the mortgage pool. The performance of the underlying mortgage loans may be negatively impacted, beyond the expected transition period during a servicing transfer, if a replacement master servicer is not retained within a reasonable amount of time.

### RISKS RELATING TO THE MORTGAGE LOAN SELLER AND GUARANTOR

***The Conservator May Repudiate Freddie Mac's Contracts, Including Its Guarantee and Other Obligations Related to the Controlling Class certificates.*** On September 6, 2008, the Federal Housing Finance Agency ("FHFA") was appointed Freddie Mac's conservator by the FHFA director. Freddie Mac is also the mortgage loan seller and as such has certain obligations to repurchase underlying mortgage loans in the event of material breaches of certain representations or warranties. If the conservator were to transfer Freddie Mac's obligations as mortgage loan seller to another party, holders of the certificates would have to rely on that party for satisfaction of the repurchase obligation and would be exposed to credit risk of that party.

***Future Legislation and Regulatory Actions Will Likely Affect the Role of Freddie Mac.*** Future legislation will likely materially affect the role of Freddie Mac, its business model, its structure and future results of operations. Some or all of Freddie Mac's functions could be transferred to other institutions, and it could cease to exist as a stockholder-owned company or at all. On February 11, 2011, the Obama Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, stating that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report recommends using a combination of policy levers to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including: (i) increasing guarantee fees; (ii) increasing private capital ahead of Freddie Mac and Fannie Mae guarantees and phasing in a 10% down payment requirement; (iii) reducing conforming loan limits; and (iv) winding down Freddie Mac and

HUGHES_0000825

Fannie Mae's investment portfolios. In addition to legislative actions, FHFA has expansive regulatory authority over Freddie Mac, and the manner in which FHFA will use its authority in the future is unclear. FHFA could take a number of regulatory actions that could materially adversely affect Freddie Mac, such as changing or reinstating current capital requirements, which are not binding during conservatorship.

*FHFA Could Terminate the Conservatorship by Placing Freddie Mac into Receivership, Which Could Adversely Affect the Freddie Mac Guarantee.* Under the Federal Housing Finance Regulatory Reform Act (the "Reform Act"), FHFA must place Freddie Mac into receivership if FHFA determines in writing that Freddie Mac's assets are less than its obligations for a period of 60 days. FHFA has notified Freddie Mac that the measurement period for any mandatory receivership determination with respect to Freddie Mac's assets and obligations would commence no earlier than the SEC public filing deadline for its quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has also advised Freddie Mac that, if, during that 60-day period, Freddie Mac receives funds from Treasury in an amount at least equal to the deficiency amount under the senior preferred stock purchase agreement between FHFA, as conservator of Freddie Mac, and Treasury (as amended, the "Purchase Agreement"), the Director of FHFA will not make a mandatory receivership determination.

In addition, Freddie Mac could be put into receivership at the discretion of the Director of FHFA at any time for other reasons, including conditions that FHFA has already asserted existed at the time Freddie Mac was placed into conservatorship. These include: a substantial dissipation of assets or earnings due to unsafe or unsound practices; the existence of an unsafe or unsound condition to transact business; an inability to meet its obligations in the ordinary course of business; a weakening of its condition due to unsafe or unsound practices or conditions; critical undercapitalization; the likelihood of losses that will deplete substantially all of its capital; or by consent. A receivership would terminate the conservatorship. The appointment of FHFA (or any other entity) as Freddie Mac's receiver would terminate all rights and claims that its creditors may have against Freddie Mac's assets or under its charter arising as a result of their status as creditors, other than the potential ability to be paid upon Freddie Mac's liquidation. Unlike a conservatorship, the purpose of which is to conserve Freddie Mac's assets and return it to a sound and solvent condition, the purpose of a receivership is to liquidate Freddie Mac's assets and resolve claims against Freddie Mac. In the event of a liquidation of Freddie Mac's assets, there can be no assurance that there would be sufficient proceeds to pay the secured and unsecured claims of the company, repay the liquidation preference of any series of its preferred stock or make any distribution to the holders of its common stock. To the extent that Freddie Mac is placed in receivership and does not or cannot fulfill its guarantee or other contractual obligations to the holders of its mortgage-related securities, including the certificates, such holders could become unsecured creditors of Freddie Mac with respect to claims made under Freddie Mac's guarantee or its other contractual obligations. As receiver, FHFA could repudiate any contract entered into by Freddie Mac prior to its appointment as receiver if FHFA determines, in its sole discretion, that performance of the contract is burdensome and that repudiation of the contract promotes the orderly administration of Freddie Mac's affairs. The Reform Act requires that any exercise by FHFA of its right to repudiate any contract occur within a reasonable period following its appointment as receiver. If FHFA, as receiver, were to repudiate Freddie Mac's guarantee obligations, the receivership estate would be liable for actual direct compensatory damages as of the date of receivership under the Reform Act. Any such liability could be satisfied only to the extent that Freddie Mac's assets were available for that purpose.

The Reform Act also provides that no person may exercise any right or power to terminate, accelerate or declare an event of default under certain contracts to which Freddie Mac is a party, or obtain possession of or exercise control over any property of Freddie Mac, or affect any contractual rights of Freddie Mac, without the approval of FHFA as receiver, for a period of 90 days following the appointment of FHFA as receiver. If Freddie Mac is placed into receivership and does not or cannot fulfill its guarantee obligations or other contractual obligations under the pooling and servicing agreement, holders of the certificates

HUGHES_0000826

could become unsecured creditors of Freddie Mac with respect to claims made under its guarantee or other contractual obligations.

## CONFLICTS OF INTEREST

Various potential and actual conflicts of interest may arise from the overall advisory, investment and other activities of the Investment Manager, its affiliates and their respective clients. This section briefly summarizes some of these conflicts but is not intended to be an exhaustive list of such conflicts. Any reference herein to the Investment Manager will be deemed to include any affiliate to which the Investment Manager has delegated authority to the extent appropriate.

### TIME COMMITMENTS OF KEY INDIVIDUALS

Although the investment professionals of the General Partner and the Investment Manager will commit a significant amount of their time to the Fund, such persons are also actively involved in the other investment activities of Priderock, and the investment activities of the Investment Manager's other affiliates, and will not be able to devote their full time and attention to the Fund's business and affairs. Such persons will however devote such portion of their time as they believe is necessary to effectively conduct the investment activities of the Fund. Such persons may assume additional obligations unrelated to the Fund and may resign or be removed from their positions at the Investment Manager at any time. Further, the team of Priderock investment professionals has changed over time, and may continue to do so. There can be no assurance that any successor investment professionals or any successor to the Investment Manager will have the same level of experience as their respective predecessors.

### ALLOCATION OF OPPORTUNITIES

The Investment Manager, its affiliates, including Priderock and its affiliates, and their respective clients may invest in loans and other securities that would be appropriate for the Fund. Such investments may be different from those made in respect of the Fund. The principals and officers of the Investment Manager, the Investment Manager and its affiliates, including Priderock and its affiliates, may also have ongoing relationships with, render services to or engage in transactions with other investment vehicles which have investment goals similar to those of the Fund. The principals and officers of the Investment Manager or its affiliates, including Priderock and its affiliates, may give advice and recommend securities and other investments to their respective clients, family and friends, which advice or securities may differ from the advice given to, or securities or other investments recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The principals and officers of the Investment Manager, the General Partner and their respective affiliates, including Priderock and its affiliates, may also have ongoing relationships with, render services to or engage in transactions with the borrowers on the underlying mortgage loans securitized in a K-Deal transaction in which the Fund participates and the issuers of the other securities acquired by the Fund. If the Investment Manager recognizes that conflicts could arise among the Fund and other pooled investment vehicles or clients for which the Investment Manager serves as an investment advisor or sub-advisor and will endeavor to treat the Fund and such other vehicles and clients fairly and equitably and taking into account the price and terms that would be obtained in the market for securities issued in similar transactions.

The Investment Manager and its affiliates, including Priderock and its affiliates, may at certain times be simultaneously seeking to purchase or dispose of investments for its respective accounts, the Fund, any similar entity for which it serves as investment advisor and for its clients or affiliates. Subject to the requirements of the governing instruments pertaining to the Investment Manager or its affiliates, including Priderock and its affiliates, investment opportunities identified and structured by the Investment Manager will generally be allocated between the Fund and its other clients and such affiliates' other

HUGHES_0000827

clients in a manner that the Investment Manager and such affiliates believe, in their judgment, to be appropriate given factors they believe to be relevant. Such factors may include the investment objectives, liquidity, diversification, lender covenants and other limitations of the Fund and the Investment Manager or such affiliates and the amount of funds each of them has available for such investment. In the event that the Fund and another account managed by the Investment Manager or any of its affiliates should purchase or sell the same securities or loans at the same time, the Investment Manager anticipates that such purchases or sales, respectively, will be aggregated and allocated. The Investment Manager intends to use its best efforts to ensure that such investments are allocated among its accounts in an equitable manner and in accordance with applicable law. However, due to, among other things, their varying risk tolerance, client guidelines, investment objectives, cash availability, tax considerations and other factors, the allocations of investment and disposition opportunities among the Fund and the various other clients of the Investment Manager or any of its affiliates are not expected to be pro rata. Investment decisions made on behalf of other affiliates and clients may differ from those made for the Fund, though they may have similar investment programs, objectives and strategies, and there can be no assurance that a particular investment opportunity that comes to the attention of the Investment Manager will be allocated to the Fund. Accordingly, clients with similar strategies and advised by the Investment Manager or its affiliates may not hold the same loans or other investments or achieve the same performance. It is the intention of the Investment Manager that all investments will be purchased and sold on terms prevailing in the market.

**OTHER CONFLICTS**

Subject to the provisions of the Partnership Agreement, on any matter involving a conflict of interest, the General Partner will be guided by applicable law and seek to resolve such conflict in good faith.

**CARRIED INTEREST**

The existence of the carried interest may create an incentive for the General Partner to make riskier or more speculative investments on behalf of the Fund than would be the case in the absence of this arrangement. If distributions are made of property other than cash, the amount of any such distribution and any carried interest will be accounted for at the fair market value of such property as determined by the General Partner in accordance with procedures set forth in the Partnership Agreement. An independent appraisal generally will not be required and is not expected to be obtained.

**DIVERSE INVESTORS**

The investors in the Fund may include taxable and tax-exempt entities (including ERISA plan investors) and may include persons or entities organized in various jurisdictions, including foreign investors, who may have conflicting investment, tax and other interests with respect to their investment in the Fund. As a consequence, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one investor than for another investor.

**COUNSEL; NO ARMS'-LENGTH NEGOTIATION**

Winston & Strawn LLP ("Winston") acts as U.S. legal counsel to the Investment Manager in connection with the organization of the Fund, the General Partner and the Investment Manager, the preparation of the Fund's offering documents, including without limitation this Memorandum, and the offering of Limited Partnership Interests in the Fund. Winston will serve as legal counsel to the Investment Manager and certain of its affiliates on an ongoing basis and at the request of the Investment Manager, will advise the Investment Manager on matters relating to the operations of the Fund, the General Partner and/or the Investment Manager. Winston does not assume any affirmative obligation to independently update or

HUGHES_0000828

monitor compliance by the Fund, the General Partner and/or the Investment Manager with this Memorandum, the Partnership Agreement and any related document, and has relied upon and shall be entitled to rely upon all information (whether written or oral) provided by the Fund, the General Partner and/or the Investment Manager and shall not be responsible for the accuracy or completeness of, or have any affirmative obligation to verify, such information.

Winston does not act as legal counsel to prospective investors in connection with this offering or the Limited Partners, and no independent legal counsel has been engaged by the Fund or the General Partner to represent any prospective investor or Limited Partner. Prospective investors and Limited Partners are encouraged to consult with their respective legal counsel.

None of the agreements between the Fund and the Investment Manager and General Partner is or will be the result of arms'-length negotiations.

HUGHES_0000829

# XI.   CERTAIN TAX CONSIDERATIONS

*The following is a summary of certain aspects of the United States ("U.S.") federal income taxation of the Fund and its Limited Partners that should be considered by a prospective purchaser of a Limited Partnership Interest, and is based upon the Internal Revenue Code of 1986, as amended (the "Code"), regulations promulgated under the Code ("Treasury Regulations"), court decisions, and administrative rules, practices, and interpretations of law of the Internal Revenue Service (the "IRS") as in effect on the date of this Memorandum.  Future legislative or administrative changes or court decisions may significantly change the conclusions expressed herein, and any such changes or decisions may have a retroactive effect.*

*The discussion below summarizes certain of the U.S. federal income tax aspects of an investment in the Fund that a Limited Partner should consider. Except as specifically discussed below, this summary describes the general federal income tax considerations applicable only to Limited Partners that are, for U.S. federal income tax purposes, not exempt from tax under the Code and are any of (i) a citizen or resident of the U.S.; (ii) a corporation or other entity taxable as a corporation organized under the laws of the U.S. or any state thereof; (iii) an estate whose income is subject to U.S. federal income tax regardless of its source; (iv) a trust if a court within the U.S. can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust; or (v) an entity that is disregarded as separate from its owner for U.S. federal income tax purposes if all of its interests are owned by a single person described in clauses (i) through (iv) ("U.S. Limited Partners"). For purposes of this discussion, a Limited Partner that is either a corporation, individual or trust and is not a U.S. Limited Partner (and is also not treated for U.S. federal income tax purposes as either a flow-through entity or entity disregarded as separate from its owner) will be referred to as a "Non-U.S. Limited Partner."*

*This summary does not purport to deal with all aspects of federal income taxation that may affect Limited Partners, particularly in light of their specific circumstances, nor with Limited Partners that may be subject to special treatment under the federal income tax laws, such as banks or other financial institutions, insurance companies, government instrumentalities or agencies, tax-exempt entities (except as expressly provided below regarding "unrelated business taxable income"), "controlled foreign corporations" or "passive foreign investment companies" as such terms are defined under the Code (or their shareholders), flow-through entities (e.g., grantor trusts, partnerships and Subchapter S corporations) or hybrid entities and their owners, part-year non-resident aliens, U.S. expatriates or former U.S. citizens or long term residents, individual retirement accounts, traders or dealers in securities or commodities, U.S. Limited Partners whose functional currency is not the U.S. dollar, shareholders, beneficiaries or other owners of a U.S. Limited Partner or Non-U.S. Limited Partner, or persons holding Interests other than as a capital asset. In some cases, the activities of a Limited Partner other than its investment in the Fund may affect the tax consequences to such Limited Partner of an investment in the Fund.*

*The discussion below does not address any U.S. federal tax considerations other than income tax (e.g., estate and gift tax) considerations. A complete discussion of the federal, state, local, and non-U.S. tax and tax treaty consequences of an investment in the Fund is beyond the scope of this summary.*

*No representation is made, and no opinion of legal counsel or IRS ruling is being obtained, as to the tax consequences of the operations of the Fund. Moreover, the Fund generally will not be managed in order to minimize the tax liability of Limited Partners or otherwise in light of the particular tax status of one or*

HUGHES_0000830

*more Limited Partners. The Fund has not sought and will not seek a ruling from the IRS with respect to any federal income tax consequences, and counsel's views on any such consequences are not binding on the IRS or the courts. Terms in quotes not otherwise defined herein, have the meaning ascribed to them under the Code and the Treasury Regulations.*

*For U.S. federal income tax purposes, income earned through an entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes is attributed to its partners or owners. Accordingly, if a partnership or other pass-through entity invests in the Fund, the U.S. federal income tax treatment of a partner or owner of such entity will generally depend on the status of the partner or other owners and the activities of the partnership or other flow-through entity that invests in the Fund. Tax consequences to partners or owners of a partnership or other pass-through entity that is a Limited Partner in the Fund are not discussed in this summary and such prospective Limited Partners should consult their tax advisors in order to understand fully the U.S. federal, state, local, non-U.S. and tax treaty consequences of an investment with respect to the Limited Partner's particular situation. Each Limited Partner that is treated, for U.S. federal income tax purposes, as a partnership or other pass-through entity should consult its tax advisor.*

***Each potential Limited Partner should seek advice from an independent tax advisor based on the potential Limited Partner's particular situation.***

FUND STATUS

Under current law, the Fund is initially classified as a partnership, and not as an association taxable as a corporation, for federal income tax purposes. As a partnership, the Fund itself will not be subject to federal income tax, although it will file an annual partnership information return with the IRS which will report the results of its activities. As discussed below, the income, deductions, gains, losses and credits of a partnership pass-through to its partners for federal income tax purposes.

However, if a partnership is a publicly traded partnership ("PTP") for federal income tax purposes, it is generally taxed as a corporation. If the Fund were treated as a PTP taxable as a corporation, the Limited Partners would not be treated as partners for federal income tax purposes, and income or loss of the Fund would not be passed through to the Limited Partners. Instead, the interest of the Limited Partners in the Fund would be treated as ownership of stock of a U.S. corporation. Thus, the Fund would be subject to federal income tax on its income at the rates applicable to corporations, and distributions from the Fund to the Limited Partners would be taxed to the Limited Partners as corporate distributions. Accordingly, status of the Fund as a PTP taxable as a corporation would materially reduce the after-tax return to a Limited Partner from its investment in the Fund.

Pursuant to a safe harbor established by applicable Treasury Regulations, a partnership will not be a PTP if there are fewer than 100 partners in the partnership and the equity interests in the partnership are not readily tradable on a secondary market. In that regard, each purchaser, beneficial owner, and subsequent transferee of a Limited Partnership Interest will be required to agree to certain transfer restrictions, which are intended to prevent the Fund from being treated as a PTP taxable as a corporation (see Section X – "Certain Risk Factors and Conflicts of Interest – Restrictions on Transfer; No Market for Interests" of this Memorandum). However, the continued availability of this safe harbor cannot be known at present, and there is no assurance that the Fund would qualify under the safe harbor to prevent its treatment as a PTP.

In addition, a partnership that otherwise would constitute a PTP generally will not be taxable as a corporation for a given tax year under an exception which is applicable if at least 90% of the gross income of the partnership for the year consists of certain categories of income (the "Qualified Income Categories"). The Qualified Income Categories consist of income and gains from the buying and selling of commodities held as capital assets or futures, forwards, or options with respect to such commodities

HUGHES_0000831

(where such activity is a principal activity of the partnership); dividends; interest, but only to the extent such interest is neither derived from the conduct of a financial business nor based upon income or profits of any person; certain capital gains; gain from the sale or other disposition of real property; and certain other qualifying income. In general, the income that the Fund receives from its investments is expected to fit within one or more of the Qualified Income Categories; however, there can be no assurance that the Fund's gross income will qualify under this exception.

The discussion set forth in the following paragraphs assumes that the Fund will be classified as a partnership, and not a PTP taxable as a corporation, for federal income tax purposes.

TAXATION OF U.S. LIMITED PARTNERS-IN GENERAL

Pass-Through Treatment. Each U.S. Limited Partner will be required to report on its federal income tax return, and will be taxed upon, its allocable share of each item of the Fund's income, gain, loss, deduction and credit for each taxable year of the Fund ending with or within the U.S. Limited Partner's taxable year. Each item generally will have the same character and source (either U.S. or foreign) as though the U.S. Limited Partner realized the item directly. U.S. Limited Partners must report these items regardless of the extent to which, or whether, they receive cash distributions from the Fund for such taxable year. Moreover, investments in certain securities, such as obligations with OID (as discussed below) could cause the Fund, and consequently the U.S. Limited Partners, to recognize taxable income without the Fund or the U.S. Limited Partners receiving any related cash distributions. Thus, it is very possible that a U.S. Limited Partner's income tax liability in any particular tax year attributable to Fund income could exceed the cash distributed to the Limited Partner by the Fund. In such a case, the U.S. Limited Partner would need to pay the taxes from a source of cash other than the Fund.

In general, the Fund will also recognize ordinary income from interest payable on the Controlling Class certificates. In the unlikely event the Fund is treated as acquiring the Controlling Class certificates or other securities in connection with the active conduct of a lending or other business, for federal income tax purposes the gains or losses realized by the Fund on the sale or other disposition of such Controlling Class certificates or other securities may also be treated as ordinary income or loss. To the extent the Fund is treated for federal income tax purposes as an investor in the Controlling Class certificates or other securities, the gains and losses realized by the Fund on the sale of the Controlling Class certificates or other securities should primarily be capital gains or losses, except in respect of debt securities to the extent of any accrued market discount not previously included in the income of the Fund and any amount realized attributable to accrued but unpaid interest. Generally, securities must be held for more than twelve months for the gain from the sale of the securities to qualify as long-term capital gains. Gains or losses on sales of securities that are held for twelve months or less are treated as short-term gains or losses and are taxed at ordinary income rates. Fund income may also include ordinary income, including from interest and dividends.

Net Investment Income Tax. In addition to the taxes described above, taxable U.S. Limited Partners that are individuals, estates, and certain trusts are subject to an additional 3.8% tax on all or a portion of their "net investment income" (or "undistributed net investment income," in the case of estates or trusts) to the extent of their net investment income that, when added to their other modified adjusted gross income, exceeds $200,000 for an unmarried individual, $250,000 for a married taxpayer filing a joint return (or a surviving spouse), $125,000 for a married individual filing a separate return, or the dollar amount at which the highest tax bracket begins for an estate or trust. Among other items, "net investment income" generally includes gross income from interest and dividends that are not derived in the ordinary course of an active trade or business and net gain attributable to the disposition of certain property, less certain deductions. Prospective Limited Partners should consult their tax advisors concerning the possible implications of this additional tax in their particular circumstances.

HUGHES_0000832

Original Issue Discount, Market Discount, and Bond Premium. The Fund may acquire Controlling Class certificates or other debt instruments for less than their face amount. The amount of the discount (unless *de minimis*) will generally be treated as original issue discount ("OID") for debt instruments purchased at the initial issuance or as "market discount" for debt instruments purchased in the secondary market. The OID that accrues will be reported as interest income by the Fund and an applicable portion will be passed through to the U.S. Limited Partners, although the Fund will generally not receive payments corresponding to this income until the maturity, or the disposition by the Fund of the debt instrument.

Market discount that accrues need not be recognized as income by the Fund until maturity or disposition of the debt instrument, but in such case the Fund will be unable to deduct interest expense it incurs to purchase or carry the instrument until the market discount is recognized as income. Taxable income from OID and market discount recognized by the Fund will result in appropriate adjustments to any gain or loss recognized upon a sale, exchange, or repayment of such obligations.

If the Fund purchases a bond at a cost that, generally, is in excess of the amount payable at maturity, the excess may constitute amortizable bond premium which is treated as a reduction of interest on such bond. If the Fund makes an applicable election, it generally allocates amortizable bond premium among the interest payments on the bond and the amount so allocated generally will be applied against (and operate to reduce) the amount of such interest payments.

## LIMITATIONS ON THE ABILITY OF U.S. LIMITED PARTNERS TO DEDUCT FUND LOSSES AND EXPENSES

The Code provides many restrictions and limitations that may prevent a U.S. Limited Partner from receiving the full tax benefit from expenses and losses of the Fund, if any, passed through to the U.S. Limited Partners. These restrictions and limitations include the following:

"At Risk" / Tax Basis of Interests. A U.S. Limited Partner will only be entitled to deduct the share of Fund taxable losses that are passed through to the U.S. Limited Partners to the extent such taxable losses do not exceed the tax basis of such U.S. Limited Partner's Limited Partnership Interests as of the end of the Fund's taxable year in which such loss occurs. Further, with respect to a U.S. Limited Partner who is an individual, trust, estate, or a closely held C corporation, such U.S. Limited Partner's share of Fund taxable losses that are passed through to it will only be deductible on such U.S. Limited Partner's income tax return to the extent such U.S. Limited Partner's tax basis in its Interests as of the end of the Fund's taxable year in which such loss occurs is considered to be "at risk." For this purpose, a U.S. Limited Partner's "at risk" amount will not include certain types of non-recourse borrowing that the U.S. Limited Partner uses to finance its Interest.

Capital Losses / Loss Carryovers. The excess of a noncorporate U.S. Limited Partner's capital loss over capital gain in any year is only deductible against ordinary income up to $3,000. Net capital losses that exceed this limitation may be carried forward to subsequent years and deducted against capital gains in those years plus $3,000 of ordinary income. A noncorporate Limited Partner generally may not carry back net capital losses to previous taxable years. Corporations are allowed to use capital losses to offset in full capital gains but are not allowed to use capital losses to offset ordinary income. A corporate U.S. Limited Partner's net capital loss in any year generally may be carried back to each of the three taxable years preceding the loss year and carried forward to each of the five taxable years succeeding the loss year.

HUGHES_0000833

**ADDITIONAL LIMITATIONS ON THE ABILITY OF U.S. LIMITED PARTNERS TO DEDUCT FUND LOSSES AND EXPENSES**

In addition to the restrictions and limitations discussed above, many restrictions and limitations that may prevent a U.S. Limited Partner from receiving the full tax benefit from expenses and losses of the Fund, if any, passed through to the U.S. Limited Partners depend on whether or not the Fund is engaged in a trade or business for U.S. federal income tax purposes and if so, whether such losses and deductions are connected with the Fund's trade or business.  Except as specifically discussed below, the discussion below assumes that the Fund will not be treated as engaged in a trade or business for U.S. federal income tax purposes.

Deduction of Fees.  The Code provides that, for non-corporate taxpayers who itemize deductions when computing taxable income, investment advisory fees and other "miscellaneous itemized deductions" will only be deductible to the extent such amount exceeds 2% of such taxpayer's adjusted gross income.  In addition, if a non-corporate taxpayer's adjusted gross income exceeds a threshold amount (adjusted for inflation each year), the amount of certain itemized deductions otherwise allowable is further reduced by the lesser of (i) 3% of the non-corporate taxpayer's adjusted gross income in excess of a threshold amount that is increased annually to account for inflation or (ii) 80% of the amount of the itemized deductions otherwise allowable during the taxable year. Moreover, "miscellaneous itemized deductions" are not deductible by a non-corporate taxpayer in calculating its alternative minimum tax.

Investment Interest Expense.  A noncorporate U.S. Limited Partner's distributive share of interest expense incurred by the Fund and interest incurred by a noncorporate U.S. Limited Partner to acquire or carry its Limited Partnership Interest would likely be treated as investment interest, for U.S. federal income tax purposes, deductible only to the extent of the net investment income of the U.S. Limited Partner for the year (i.e., the excess of income from interest, dividends, and gains from the disposition of investment property over expenses incurred in earning such income).  In computing net investment income, both long-term capital gains and dividends that would otherwise be taxable at preferential rates are includable only if the noncorporate U.S. Limited Partner elects to have such gains and dividends taxed at the same rate as ordinary income.  Excess investment interest expense may be carried over to and deducted in subsequent years to the extent it would be deductible if incurred in that year.  This limitation, if applicable, would be computed separately by each U.S. Limited Partner and not by the Fund.

Income and Losses from Passive Activities.  Losses claimed by a U.S. Limited Partner that is an individual, estate, trust, personal service corporation or closely held C corporation from business activities in which the U.S. Limited Partner does not materially participate ("passive activities") are generally only deductible to the extent of income from other passive activities.  Income and losses derived by a limited partner from a partnership are typically regarded as income and losses from a passive activity. However, Treasury Regulations provide that gross income from the activity of buying, holding and selling of stocks, bonds and other financial securities on established financial markets is not a passive activity, regardless of whether such activity is a trade or business. In addition, portfolio income (such as dividends, interest, royalties and gains from the sale of property producing such income or held for investment) is not treated as income from a passive activity.  Accordingly, it appears that the Fund's investment activities should generally not be treated as passive activity income or loss, and therefore a U.S. Limited Partner's allocable share of such Fund income should not be offset by losses that the U.S. Limited Partner may have from passive activities. Other income or loss from the Fund may be treated as passive income or loss subject to the passive activity rules.

**INVESTMENT BY TAX-EXEMPT U.S. LIMITED PARTNERS**

HUGHES_0000834

UBTI Considerations.   Each otherwise tax-exempt U.S. Limited Partner (including charitable organizations, private foundations, pension funds, and individual retirement accounts) is subject to tax on its unrelated business taxable income ("UBTI"). For federal income tax purposes, the character of a tax-exempt U.S. Limited Partner's share of the Fund's income passes through from the Fund to the Limited Partner. Accordingly, to the extent the activities of the Fund would generate UBTI if undertaken directly by a tax-exempt U.S. Limited Partner, such Limited Partner's allocable share of the income or gains attributable to such activities by the Fund would constitute UBTI. A tax-exempt U.S. Limited Partner generally would be subject to the same provisions as a taxable U.S. Limited Partner with respect to reporting and paying regular and minimum tax (including the requirement to make estimated tax payments) on such UBTI. Private foundations also may be subject to additional income tax on their net investment income (including income from the Fund) as well as various excise taxes. For certain types of tax-exempt entities, the receipt of UBTI may have adverse consequences different from those discussed above. For example, any UBTI earned by a charitable remainder trust is subject to a 100% excise tax.

Generally, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the organization's exempt purpose or function. However, certain types of passive income, such as interest on loans, are excluded from UBTI even if the income is attributable to the active conduct of a trade or business. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition.

There are no restrictions imposed on the Fund's ability to generate UBTI. The Fund will determine, based on the activities of the Fund, that portion of its income or gains, if any, that should be reported for federal income tax purposes as attributable to the active conduct by the Fund of a trade or business generating UBTI for tax-exempt U.S. Limited Partners. Moreover, it is likely that the Fund's borrowings will be treated as "acquisition indebtedness" and thereby cause a corresponding portion of the Fund's income or gains to be treated as unrelated debt-financed income taxable as UBTI to tax-exempt U.S. Limited Partners. Therefore, it is possible that a significant portion of a tax-exempt U.S. Limited Partner's allocable share of income and gain (if any) of the Fund will consist of UBTI. Furthermore, if a tax-exempt U.S. Limited Partner's acquisition of its interests in the Fund is debt-financed, all or a portion of such Limited Partner's income attributable to the Fund will be included in UBTI.

Alternative Investment Vehicle.   The General Partner may establish, in the event of sufficient investor demand, certain Parallel Funds or Feeder Funds primarily to accommodate an investment in the Fund by certain tax-exempt U.S. Limited Partners.

Prohibited Transactions.   Certain tax-exempt entities are subject to a "penalty" excise tax for being a party to (A) a "prohibited tax shelter transaction" if the transaction is a "prohibited tax shelter transaction" at the time the tax-exempt entity became a party to the transaction or (B) a "subsequently listed transaction." The term "prohibited tax shelter transaction" means (i) any listed transaction or (ii) certain "confidential transactions" or certain transactions with "contractual protections." A tax-exempt entity will be treated as a "party" to a transaction if it (1) facilitates the transaction by reason of its tax-exempt, tax-indifferent, or tax-favored status, or (2) is identified in published guidance, by type, class, or role, as a party to a prohibited tax shelter transaction.

The amount of the tax depends upon, among other things, whether the tax-exempt entity knew or had reason to know the transaction was a prohibited tax shelter transaction at the time the entity entered into the transaction. The General Partner does not anticipate that any of its investments would constitute a "prohibited tax shelter transaction" or a "subsequently listed transaction" for this purpose. Further, the

HUGHES_0000835

General Partner does not believe that any tax-exempt U.S. Limited Partner's investment in the Fund will facilitate any particular Fund transaction by reason of such Limited Partner's tax-exempt, tax-indifferent, or tax-favored status. Neither does the General Partner believe that such investment would cause a Tax-exempt U.S. Limited Partner to be a party to a prohibited tax shelter transaction as currently identified in published guidance, by type, class, or role. *However, potential tax-exempt U.S. Limited Partners are urged to consult their tax advisors regarding the application of the prohibited transaction rules to any investment in the Fund.*

### NON-U.S. LIMITED PARTNERS

U.S. Trade or Business Considerations. The previous general discussion of the taxation of Limited Partners in the Fund may not be applicable to Non-U.S. Limited Partners. The federal income tax treatment of a Non-U.S. Limited Partner will depend on whether that investor is found, for federal income tax purposes, to be engaged in a trade or business in the United States as a result of its investment in the Fund. Generally, a Non-U.S. Limited Partner would be deemed to be engaged in a trade or business in the United States if the Fund is so engaged. In that event, the Non-U.S. Limited Partner would be required to file a U.S. tax return (and possibly one or more state or local returns) and pay taxes at the regular rates applicable to U.S. taxpayers with respect to the Non-U.S. Limited Partner's allocable share of Fund taxable income that is effectively connected to such trade or business.

While the Fund does not expect to be engaged in the active conduct of a trade or business in the United States for U.S. federal income tax purposes, the Fund will determine, based on the activities of the Fund, that portion, if any, of its income that is effectively connected with the Fund's active conduct of a trade or business in the United States for U.S. federal income tax purposes. To the extent the activities of the Fund are treated as a trade or business for U.S. federal income tax purposes, then a Non-U.S. Limited Partner generally would be subject to U.S. federal income tax on such Non-U.S. Limited Partner's allocable share of Fund income attributable to such activities in the same manner as a U.S. Limited Partner. Moreover, the Fund may be required to withhold such tax from such Non-U.S. Limited Partner's share of distributions by the Fund to the Limited Partners. Further, a Non-U.S. Limited Partner that is a corporation may also be subject to a 30% branch profits tax on its "dividend equivalent amount" as defined for purposes of the branch profits tax.

Alternative Investment Vehicles. The General Partner may establish, in the event of sufficient investor demand, certain Parallel Funds or Feeder Funds primarily to accommodate an investment in the Fund by certain Non-U.S. Limited Partners.

Investment Income Considerations. To the extent income and gain of the Fund is not effectively connected with a United States trade or business, subject to the exemptions described below, Non-U.S. Limited Partners generally would be subject to withholding of U.S. federal income tax at a 30% rate (subject to any treaty exemption or rate reduction) on their respective shares of interest, dividends and any other fixed or determinable annual or periodic gains, profits, or income from U.S. sources received by the Fund.

Certain types of U.S. source interest are not subject to the 30% withholding tax, including (i) interest paid on bank deposits; (ii) "portfolio interest," which generally includes interest paid on a registered-form obligation of a U.S. obligor (a) where the obligor is unrelated to the holder of the obligation, (b) where the obligation is issued after July 18, 1984 and (c) with respect to which the holder certifies that it is not a U.S. person on IRS Form W-8 (or any substitute form); (iii) original issue discount with respect to certain short-term obligations; and (iv) interest paid on obligations issued by a state or municipality of the U.S. The Fund intends to secure statements from each Non-U.S. Limited Partner documenting such Limited Partner's foreign status on IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or its equivalent.

HUGHES_0000836

A Non-U.S. Limited Partner's distributive share of interest which would otherwise qualify for the portfolio interest exception will not be eligible for the exception with respect to a debt instrument issued by an entity if the Non-U.S. Limited Partner owns directly, indirectly, or by application of prescribed constructive stock ownership rules, 10% or more of the voting stock or capital and profits interest of that entity.

FATCA Withholding Tax. Code Sections 1471-1474 of the Code, the Treasury Regulations promulgated thereunder, and official IRS guidance, commonly referred to as the Foreign Account Tax Compliance Act ("FATCA") establishes a new information reporting regime applicable to "foreign financial institutions." Foreign financial institutions include non-U.S. entities that (i) accept deposits in the ordinary course of a banking or similar business, (ii) hold financial assets for the accounts of others as a substantial portion of their business, or (iii) are engaged primarily in the business of investing, reinvesting, or trading in securities, partnership interests, commodities, or any interests (including futures, forwards, or options) therein. Pursuant to FATCA, a foreign financial institution, in order to avoid becoming subject to a 30% U.S. withholding tax on certain payments received by it, will be required to enter into an agreement with the IRS obliging the foreign financial institution to, among other things, obtain and provide annually to the IRS certain information regarding the holders of its "United States accounts," i.e., accounts held by persons that are specified U.S. persons or that are foreign entities whose owners include specified U.S. persons. Foreign financial institutions that do not comply with and are not exempted from the foregoing requirements generally will be subject to a 30% withholding tax on (i) certain U.S. source payments such as interest, dividends, and other fixed or determinable annual or periodical income, (ii) proceeds of a sale or disposition of property producing U.S.-source interest or dividends received on or after January 1, 2019, and (iii) certain other payments received from other foreign financial institutions no earlier than January 1, 2019 that are allocable, as provided for under final Treasury Regulations to be issued, to payments described in clauses (i) and (ii) above that are received by such other foreign financial institutions ("foreign passthru payments"). In addition, a foreign financial institution resident in a jurisdiction that has entered into an intergovernmental agreement with the United States may not be required to enter into an agreement with the IRS, as described above, but may instead be required to comply with any law implementing such intergovernmental agreement in the jurisdiction in which such foreign financial institution is resident. Non-U.S. Limited Partners that are foreign financial institutions and that fail to comply with the FATCA requirements or the terms of any available exemption therefrom will be subject to the withholding described above.

In addition, FATCA requires that certain "non-financial foreign entities" provide the Fund with information identifying its substantial U.S. owners or a certification that it does not have any such owners (which information the Fund will be required to provide to the IRS) in order to avoid being subject to the 30% withholding tax described above. All foreign entities that are the beneficial owners of withholdable payments, are not "foreign financial institutions" (as described above), and are not specifically excepted from the requirement set forth in this paragraph (such as publicly traded corporations) are subject to such requirement. Thus, such requirement may apply to certain Non-U.S. Limited Partners.

*Prospective investors are urged to consult their own tax advisors regarding the possible implications of FATCA on an investment in the Fund.*

FUND AUDIT PROCEDURES, INTEREST, AND PENALTIES

Informational returns filed by the Fund are subject to audit by the IRS. Any such audit could lead to adjustments, in which event Limited Partners might be required to file amended federal income tax returns. An audit of the Fund's tax return could also lead to an audit of a Limited Partner's tax return. An audit of the Limited Partner's return may, in turn, lead to adjustments other than those

HUGHES_0000837

relating to an investment in the Fund, and interest and penalties (which are non-deductible) may be asserted and imposed on tax deficiencies as the result of an audit.

Newly enacted legislation under Sections 6221 through 6241 of the Code, generally effective for tax years beginning after December 31, 2017 (or earlier per affirmative election), future Treasury Regulations, official IRS guidance and similar provisions of U.S. state and local and non-U.S. law ("Revised Partnership Audit Provisions") may require the Fund to pay an adjusted tax assessment amount (which would be non-deductible) under certain circumstances. The General Partner, as "partnership representative," will have considerable authority to make decisions (including whether or not to make an election to issue an adjusted Schedule K-1 to each person who was a partner during the tax year to which the adjustment relates) effecting the tax treatment, tax burden (including via increased interest and penalties) and procedural rights of all Partners. Each Limited Partner is obligated to indemnify the Fund, the "partnership representative," the General Partner, and the Investment Manager and in each case, their affiliates, for such Limited Partner's share (as determined in the General Partner's sole discretion) of taxes imposed under the Revised Partnership Audit Provisions, and the "partnership representative," for any additional taxes, costs, or expenses incurred in its role as "partnership representative." **Prospective investors should consult with their tax advisor regarding Revised Partnership Audit Provisions in relation to an investment in the Fund.**

### TAX SHELTER TREASURY REGULATIONS; DISCLOSURE

Treasury Regulations directed at abusive tax shelter activity apply to transactions not conventionally regarded as tax shelters. If the Fund participated in one or more reportable transactions, it would be required to file an IRS Form 8886 with its tax return, which may increase the likelihood of an audit, and maintain a list identifying those Limited Partners (if any) that were allocated tax losses from the reportable transaction(s) equal to or greater than certain specified amounts. A Limited Partner that is allocated tax losses from reportable transactions equal to or greater than the specified amounts must file an IRS Form 8886 with its own tax return for each year that the Limited Partner reports tax losses from the reportable transaction(s).

### STATE AND LOCAL TAXES

Each Limited Partner may be required to file returns and pay state and local tax on its share of Fund income (including possibly on its gross income) in the jurisdiction in which it is a resident and/or other jurisdictions in which the Fund earns income. The Fund may be required to withhold and remit payment of taxes to one or more state or local jurisdictions on behalf of the Limited Partners. Any amount withheld will be treated as a distribution to the particular Limited Partner(s) under the Partnership Agreement for the Fund. Also, in certain jurisdictions the Fund itself may be subject to tax with respect to income attributable to certain of its activities due to the application of unincorporated business taxes or similar state or local laws. Whether imposed on the Fund or on the Limited Partners, state and local taxes may be significant.

**The foregoing discussion is not intended as a substitute for careful tax planning, particularly since the income tax consequences of an investment in the Fund may not be the same for all taxpayers.** *ACCORDINGLY, PROSPECTIVE LIMITED PARTNERS ARE ADVISED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATION UNDER FEDERAL LAW AND THE PROVISIONS OF APPLICABLE STATE, LOCAL, FOREIGN, AND OTHER LAWS BEFORE SUBSCRIBING FOR LIMITED PARTNERSHIP INTERESTS.*

HUGHES_0000838

# XII.  CERTAIN REGULATORY MATTERS

**SECURITIES ACT OF 1933**

The Limited Partnership Interests described herein are not registered under the Securities Act in reliance upon the exemptions for transactions not involving a public offering.  Investors will be required to make certain representations to the Fund including that they are "accredited investors" as defined in Regulation D promulgated under the Securities Act; that they are acquiring an interest in the Fund for their own account, for investment purposes only and not with a view to its distribution; that they have received or have had access to all information they deem relevant to evaluate the merits and risks of the prospective investment; and that they have the ability to bear the economic risk of an investment in the Fund.

A Limited Partner's Limited Partnership Interest is not assignable, in whole or in part, without the prior consent of the General Partner.  Upon such consent, a Limited Partner may sell, transfer, or assign its Limited Partnership Interest to those investors who meet certain investor suitability requirements.  No sale, exchange, transfer, or assignment may be made if it would, in the opinion of counsel, cause the Fund to lose its status as a partnership or to be treated as a publicly traded partnership taxable as a corporation for federal income tax purposes, violate any federal securities laws or any state securities laws or cause the Fund to be classified as an investment company under the Investment Company Act of 1940 (the "Investment Company Act").  All reasonable expenses, including attorney's fees, incurred by the Fund in connection with an assignment or transfer of any Limited Partnership Interest must be paid by the Limited Partner prior to the assignment or transfer.  A purported sale, assignment or transfer of a Limited Partner's Limited Partnership Interest will be recognized by the Fund, if ever, only when it has received written notice of such sale, assignment or transfer in form satisfactory to the General Partner, signed by both parties, containing the purchaser's, transferee's or assignee's acceptance of the terms of the Partnership Agreement, and a representation by the parties that the sale or assignment is lawful.

In addition, transferability of the Limited Partnership Interests will be limited by applicable federal and state securities laws, and no ready market will exist for them.  Therefore, investors should anticipate limited liquidity in this investment and expect to retain ownership of the interest for an extended period of time.

**INVESTMENT COMPANY ACT OF 1940**

It is anticipated that the Fund will be excluded from the definition of an investment company under the Investment Company Act. The Fund will rely on the exclusion contained in Section 3(c)(1) or 3(c)(7) of the Investment Company Act. The Fund will obtain appropriate representations and undertakings from investors in order to ensure that the conditions of this exclusion are met.

**INVESTMENT ADVISERS ACT OF 1940**

None of the General Partner, the Investment Manager or any of their respective affiliates are currently registered or required to register as an investment adviser under the Advisers Act.  However, the Investment Manager expects to become registered as an investment adviser under the Advisers Act. Such registration shall not imply any approval by the SEC of the Investment Manager, the General Partner, its affiliates, or their policies. Because the General Partner will be compensated based in part on appreciation of the Fund's investments, each purchaser of a Limited Partnership Interest must be a "qualified client" as defined in Rule 205-3 promulgated under the Advisers Act.

HUGHES_0000839

HUGHES_0000840

# XIII. EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The following is a summary of certain considerations arising with respect to an investment in the Fund by an employee benefit plan subject to Title I of ERISA, ( "ERISA Plans"), individual retirement accounts ("IRAs"), KEOGH Plans which cover only self-employed individuals and other arrangements that are subject to Section 4975 of the Code ("Other Tax-Favored Plans"), and any entity the assets of which are deemed to be "plan assets" of such plans, accounts and arrangements (a "Plan Asset Entity") (any such ERISA Plan, Other Tax-Favored Plan, or Plan Asset Entity, a "Plan" or "Benefit Plan Investor").

This summary is based on applicable provisions of ERISA and the Code, and relevant regulations, rulings and interpretive releases issued by the Department of Labor or the Internal Revenue Service. No assurance can be given that this summary will not be significantly affected by legislative or administrative changes or court decisions. Any such changes may or may not apply retroactively to transactions entered into prior to the date of enactment.

## GENERAL FIDUCIARY REQUIREMENTS

ERISA imposes certain duties on persons who are fiduciaries of an ERISA Plan. Under ERISA, any person who exercises any discretionary authority or control over the administration of an ERISA Plan or the management or disposition of the assets of any ERISA Plan, or who renders investment advice for a fee or other compensation to an ERISA Plan, is generally considered to be a fiduciary of the ERISA Plan.

Fiduciaries of an ERISA Plan should carefully consider whether an investment in Limited Partnership Interests would be consistent with their fiduciary responsibilities to the ERISA Plan and should consider, among other things, whether an investment in Limited Partnership Interests would: (i) be prudent for the ERISA Plan; (ii) be consistent with the ERISA Plan's current and anticipated needs for liquidity, given the limitations on a Limited Partner's ability to transfer its Limited Partnership Interests; (iii) permit the ERISA Plan's investment portfolio to remain adequately diversified; (iv) be permitted under the governing plan documents; (v) involve a potential for conflicts of interest between the ERISA Plan and the General Partner or its affiliates; and (vi) result in negative tax effects to the ERISA Plan as described in the sections of this Memorandum discussing tax considerations and risk factors. A fiduciary also should consider the reasonableness of the compensation to be paid to the General Partner and its affiliates.

Title I of ERISA and Section 4975 of the Code prohibit Benefit Plan Investors from engaging in specified transactions ("prohibited transactions") involving plan assets with persons or entities who are "parties in interest" under ERISA, or "disqualified persons" under Section 4975 of the Code. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code.

## PLAN ASSETS

Under Section 3(42) of ERISA and the related regulation (the "Plan Assets Regulation"), when a Benefit Plan Investor purchases or holds an equity interest in another entity such as the Fund, the Benefit Plan Investor's assets are deemed to include not only its investment in such entity but also an undivided interest in the underlying assets owned by such entity unless: (i) the equity interest is a "publicly-offered security" or a security issued by a registered investment company; (ii) the entity is an "operating company" as such term is defined in the Plan Assets Regulation; or (iii) equity participation in the entity by Benefit Plan Investors is not "significant" - that is, such equity participation is less than 25% of the value of each class of equity security issued by such entity, valued at cost (exclusive, in the case of the

HUGHES_0000841

Fund, of equity securities held by the General Partner and its affiliates other than Benefit Plan Investors). If the underlying assets of the Fund were to be considered "plan assets," the General Partner would be considered an ERISA fiduciary and the assets of the Fund would be subject to the prohibited transaction rules of ERISA and the Code.

The General Partner intends to use its reasonable efforts to avoid having the Fund's assets treated as "plan assets" of any Benefit Plan Investor by limiting participation of Benefit Plan Investors to less than 25% of the value of each class of equity securities. Should participation of Benefit Plan Investors equal or exceed 25% of the value of any class of equity securities, the General Partner may exercise its right pursuant to the terms of the Partnership Agreement to require the withdrawal of Benefit Plan Investors or take any other action consistent with the Plan Assets Regulation.

There can be no guarantee that good faith actions of the General Partner or the Investment Manager will not result in a breach of fiduciary duty under ERISA or give rise to a non-exempt prohibited transaction, and there can be no absolute assurance that the General Partner or Investment Manager will be able to determine whether an ERISA violation or non-exempt prohibited transaction has occurred or might occur or whether any corrective measures by the General Partner or the Investment Manager will have any negative consequences on a Benefit Plan Investor or Plan fiduciary. If the General Partner or Investment Manager believes any transaction would give rise to an ERISA violation or a non-exempt prohibited transaction, the General Partner reserves the right, upon notice to but without the consent of any Benefit Plan Investor, to redeem the Limited Partnership Interests of any such Plan to avoid an ERISA violation or a non-exempt prohibited transaction.

The Fund will operate under the assumption, absent knowledge to the contrary, that Benefit Plan Investor participation will not be significant and therefore, a detailed discussion of the consequences of significant Benefit Plan participation is not included in this Memorandum.

ADDITIONAL FIDUCIARY CONSIDERATIONS

Certain prospective Benefit Plan Investors may maintain relationships with the General Partner, the Investment Manager or any of their respective affiliates under which the General Partner, the Investment Manager or any such affiliate provides investment advisory and/or management services to such prospective investor. These relationships may cause the General Partner, the Investment Manager or the affiliate to be deemed to be a fiduciary or other service provider with respect to such prospective Benefit Plan Investor. As a result, an investment in Limited Partnership Interests by a Benefit Plan Investor for which the General Partner, the Investment Manager or any affiliate provides investment advisory and/or management services could possibly be interpreted to give rise to prohibited transactions or other concerns under ERISA or the Code. Plan fiduciaries should make their own determination regarding whether any relationship the prospective investor (or its fiduciaries) maintains with the General Partner, the Investment Manager or any such affiliate would constitute a prohibited transaction or other violations of applicable law.

REPORTING AND DISCLOSURE

Certain Benefit Plan Investors may be required to report certain compensation paid by the Fund to the Fund's service providers on Schedule C to the Benefit Plan Investor's annual Form 5500. To the extent applicable, any descriptions of such compensation herein are intended to satisfy the disclosure requirements for the alternative reporting option for purposes of Schedule C to the Form 5500. Filing each Plan's Form 5500 is the responsibility of the plan sponsor of the Plan.

SPECIAL RULES FOR OTHER TAX-FAVORED PLANS

HUGHES_0000842

Although certain other plans such as Keogh Plans that do not cover any employees and IRAs are not subject to ERISA, they are subject to the prohibited transaction provisions of Section 4975 of the Code, as well as to additional rules and regulations that could affect a decision to invest in the Fund.  For example, IRA assets are required to be held by a qualified custodian in the name of such custodian.  Potential IRA investors should take care to ensure that amounts used to fund the investor's capital contribution are not inadvertently withdrawn from the IRA's custodial account.  An IRA's capital contribution should be effected as an investment in Limited Partnership Interests and not as taxable distributions from the IRA which distributions would give rise to immediate taxation of the contribution amounts and possibly also significant penalties.  In addition, some IRA custodians may require certain forms of documentation in order to permit investments in private investment funds such as the Fund.  Thus, Individual Retirement Fund investors should consider the unique rules and circumstances applicable to them before making an investment in the Fund.

**EXEMPT PLANS**

Governmental, foreign and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the prohibited transaction provisions of Section 4975 of the Code, may nevertheless be subject to other laws that are substantially similar to the foregoing provisions of ERISA and Section 4975 of the Code.  Fiduciaries for any such plans should consult with their counsel before making an investment in the Fund.

**INFORMATION REQUESTS**

The General Partner reserves the right to request from any investor or potential investor such information as the General Partner deems necessary to monitor compliance with ERISA and other applicable laws.

ACCEPTANCE OF SUBSCRIPTIONS OF ANY BENEFIT PLAN INVESTOR IS IN NO RESPECT A REPRESENTATION BY THE FUND, THE GENERAL PARTNER OR ANY OTHER PARTY THAT SUCH INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO THAT PLAN OR THAT THE INVESTMENT IS APPROPRIATE FOR SUCH PLAN.  EACH PLAN FIDUCIARY SHOULD CONSULT WITH HIS OR HER OWN LEGAL ADVISORS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND IN LIGHT OF THE SPECIFIC REQUIREMENTS APPLICABLE TO THAT PLAN.

HUGHES_0000843

## APPENDIX A

### RESTRICTIONS ON SALES IN SELECTED JURISDICTIONS

FOR PROSPECTIVE INVESTORS IN FLORIDA

WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, ANY SALE IN FLORIDA MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION CONTAINED IN SECTION 517.061(11) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT IS VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

FOR PROSPECTIVE INVESTORS IN GEORGIA

THE LIMITED PARTNERSHIP INTERESTS HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973 AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

FOR PROSPECTIVE INVESTORS IN PENNSYLVANIA

THESE SECURITIES WILL BE SOLD ONLY TO "ACCREDITED INVESTORS" AS REFERENCED IN SECTION 203(T) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (THE "PA ACT"). PURSUANT TO SECTION 207(M)(2) OF THE PA ACT, EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION, DIRECTLY FROM AN ISSUER OR AN AFFILIATE OF AN ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY), OR ANY OTHER PERSON, WITHIN TWO BUSINESS DAYS AFTER THE ISSUER RECEIVES A SIGNED SUBSCRIPTION AGREEMENT.

NOTICE TO NON-U.S. PROSPECTIVE INVESTORS GENERALLY

IT IS THE RESPONSIBILITY OF ANY PERSONS WISHING TO SUBSCRIBE FOR THE LIMITED PARTNERSHIP INTERESTS TO INFORM THEMSELVES OF AND TO OBSERVE ALL APPLICABLE LAWS AND REGULATIONS OF ANY RELEVANT JURISDICTIONS. PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF THE LIMITED PARTNERSHIP INTERESTS, AND ANY NON-U.S. EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT THERETO.

CHI:2975332.14

HUGHES_0000844