# EXHIBIT 3

1                UNITED STATES DISTRICT COURT FOR
                 THE SOUTHERN DISTRICT OF FLORIDA
2         CASE NO.  9:18-CV-80110-ROSENBERG / REINHART
3
4    WEBSTER HUGHES,
5                  Plaintiff,
6    -vs-
7    PRIDEROCK CAPITAL PARTNERS, LLC,
8                  Defendant.
     _____/
9
10                      DEPOSITION OF
                        WEBSTER HUGHES
11
12
                   Thursday, August 16, 2018
13                   9:57 a.m. - 2:49 p.m.
14
15   MRACHEK, FITZGERALD, ROSE, KONOPKA, THOMAS & WEISS, P.A.
                     505 South Flagler
16                     Suite 600
                 West Palm Beach, Florida 33401
17
18
19              Stenographically Reported By:
20                   Dianelis Hernandez
21
22
23            Veritext Legal Solutions
                Mid-Atlantic Region
24         1250 Eye Street NW - Suite 350
                Washington, D.C.  20005
25

1 APPEARANCES:
2
3 On behalf of the Plaintiff:
   KAMMERER MARIANI, PLLC
4   1601 Forum Place
   Suite 500
5   West Palm Beach, Florida 33401
   561-990-1590
6   BY: John F. Mariani, Esquire
   jmariani@kammerermariani.com
7
8 On behalf of the Defendant:
   WINSTON & STRAWN, LLP
9   1700 K Street, N.W.
   Washington, D.C. 20006
10   202-282-5000
   BY: William G. Miossi, Esquire
11   wmiossi@winston.com
12
13 ALSO PRESENT:
   David Worley
14
15
16
17
18
19
20
21
22
23
24
25

1      INDEX OF PROCEEDINGS
2 WITNESS          PAGE
  WEBSTER HUGHES
3 DIRECT EXAMINATION BY MR. MIOSSI   4
  CERTIFICATE OF OATH       113
4 CERTIFICATE OF REPORTER     114
  READ & SIGN LETTER TO WITNESS   115
5 ERRATA SHEET        116
6
7      DEFENSE EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 8 Exhibit 1 | LinkedIn page printout | 8 |
| Exhibit 2 | 10/26/2016 E-mail | 53 |
| 9 Exhibit 3 | 11/4/2016 E-mail | 58 |
| Exhibit 4 | 11/9/2016 E-mail | 60 |
| 10 Exhibit 5 | 12/20/2016 E-mail | 63 |
| Exhibit 6 | 1/10/2017 E-mail | 70 |
| 11 Exhibit 7 | 1/18/2017 E-mail | 70 |
| Exhibit 8 | 1/18/2017 E-mail | 72 |
| 12 Exhibit 9 | 1/24/2017 E-mail | 74 |
| Exhibit 10 | 1/25/2017 E-mail | 78 |
| 13 Exhibit 11 | 2/1/2017 E-mail | 82 |
| Exhibit 12 | 2/6/2017 E-mail | 87 |
| 14 Exhibit 13 | 2/7/2017 E-mail | 92 |
| Exhibit 14 | 2/8/2017 E-mail | 95 |
| 15 Exhibit 15 | 4/20/2017 E-mail | 96 |
| Exhibit 16 | 5/2/2017 E-mail | 98 |
| 16 Exhibit 17 | 5/25/2017 E-mail | 98 |
| Exhibit 18 | WH business expenses spreadsheet | 100 |
| 17 Exhibit 19 | 6/27/2017 E-mail | 102 |
| Exhibit 20 | Metrix Credit Technologies, LLC | 104 |
|        | invoices | |

18
19
20
21
22
23
24
25

1 Thereupon,
2 the following proceedings began at 9:57 a.m.:
3     THE COURT REPORTER: Raise your right hand,
4 please.
5     Do you solemnly swear or affirm the
6 testimony you are about to give in this matter
7 will be the truth, the whole truth and nothing but
8 the truth?
9     THE WITNESS: Yes, I do.
10 Thereupon,
11       WEBSTER HUGHES,
12 having been first duly sworn or affirmed, was examined
13 and testified as follows:
14     DIRECT EXAMINATION
15 BY MR. MIOSSI:
16   Q. Good morning, Mr. Hughes. My name is Bill
17 Miossi. I represent the defendant in the case that you
18 brought against Priderock Capital Partners.
19     Have you ever given a deposition before
20 today?
21   A. Yes.
22   Q. How many times?
23   A. Twice.
24   Q. When were those depositions?
25   A. In 1997 and in 2010.

1   Q. What types of cases, if you know?
2   A. A securities litigation.
3   Q. Both of them?
4   A. Yes.
5   Q. Were you a party to the case?
6   A. I'm not sure, technically. I think I was a
7 party on the first case.
8   Q. Okay. Were those cases resolved one way or
9 another or tried or dismissed?
10   A. One was resolved. The other was tried and
11 resolved.
12   Q. In favor of which side, the plaintiff or
13 the defendant?
14   A. Plaintiff.
15   Q. Were you on the plaintiff side or the
16 defendant side or not a party to that one?
17   A. I was an expert witness.
18   Q. Okay. Do you remember the name of the case
19 or where it was tried?
20   A. I do not remember the name of the case.
21   Q. You have that information perhaps in your
22 records somewhere?
23   A. Yes.
24   Q. We can follow up on that.
25     In case you didn't because I didn't listen

1 carefully enough, will you give us your name so the court
2 reporter has it?
3      A.   Webster Hughes.
4      Q.   The reason I was asking the preliminary
5 question about whether you have given a deposition before
6 is just to make certain that you are familiar with sort
7 of the custom of a deposition in a civil action.
8           I'm virtually certain your lawyer went over
9 this with you, but I like to do it anyway so that there
10 is no misunderstanding and it's clear as to how the day
11 will move along and do so, I hope, very efficiently.
12           My purpose is to ask you questions about
13 the claims and allegations you have made in this lawsuit.
14 My purpose is to understand all the facts that you
15 contend support your claims.  So those will be the focus
16 of my questions.
17           If I ask a question and you don't
18 understand or are unclear, tell me that and I'll work
19 with you to restate the question so that it is clear; is
20 that all right?
21      A.   Yes.
22      Q.   Because when you answer a question, we are
23 going to assume you understood what was asked, okay?
24           I will give you all the time you wish to
25 complete your answer.  It's best that we not speak one

1 another.  Your counsel may wish to note an objection, for
2 instance, and they only pay the court reporter to take
3 down one of us at a time so that will keep the record
4 clear.
5           If you need to take a break, you say so
6 throughout the day.  And I think that's all I want to
7 cover in terms of preliminary sort of rules of the road.
8           How old are you?
9      A.   I am 58 years old.
10      Q.   What is your current address, residential
11 address?
12      A.   My current address is 11802 Stirling Field
13 Drive, Pineville, North Carolina.
14      Q.   Do you have a business address?
15      A.   Yes.
16      Q.   What's that?
17      A.   4100 Carmel Road, Suite 143B, Charlotte,
18 North Carolina.
19      Q.   Okay.
20      A.   That's a post office box.  I also have a
21 business address that I work out of.
22      Q.   What's that?
23      A.   4905 Ashley Park Lane, Charlotte, North
24 Carolina.
25      Q.   That's an office?

1      A.   It is a residential apartment that we use
2 for an office.
3      Q.   Okay.  And I'll ask you more about that in
4 just a minute.
5           MR. MIOSSI:  I'd like to mark as Exhibit 1,
6      please, this document.  Thank you.
7           (Defense Exhibit No. 1 was marked for
8      identification.)
9 BY MR. MIOSSI:
10      Q.   Is it Mr. or Dr. Hughes?  What do you
11 prefer?  Or do you prefer Webster?
12      A.   You may call me Webster.
13      Q.   Okay.  I'll call you Webster.
14           What I've shown you in Exhibit Number 1 is
15 a copy of a LinkedIn page that appears to contain your
16 resume, your professional experience.  Do you recognize
17 this exhibit?
18           MR. MARIANI:  Look at each page, please.
19      A.   Yes, I recognize this exhibit.
20 BY MR. MIOSSI:
21      Q.   All right.  So this is your LinkedIn page;
22 is that correct?
23      A.   This is my LinkedIn page.
24      Q.   And the information contained in this
25 exhibit is information that you have caused to be put

1 there; is that right?
2      A.   It's information that I've caused to be put
3 there.
4      Q.   I'm not going to go through this in any
5 great detail.  It's handy.  It saves a lot of time.  This
6 is an accurate summary of your education, college,
7 postgraduate as well your work experience; is that
8 correct?
9      A.   Yes, this is an accurate representation of
10 my education and work experience and publications.
11      Q.   And if you just focus, I think it's only on
12 the bottom of the first page where it states you are a
13 managing member WH Advisory & Investment, LLC; you see
14 that?
15      A.   Yes.
16      Q.   Is that a business that is, as it states
17 here, been in existence or operation rather from
18 January 2009 to the present time?
19      A.   I have used this business name, WH
20 Advisory, for my business since that time.  There have
21 been two different actual LLCs that I used.
22      Q.   Which are?
23      A.   WH Advisory, LLC, and WH Advisory &
24 Investments, LLC.
25      Q.   Okay.

1    A.   From the time you asked me the question, if
2  that business has been in operation since 2009, from time
3  to time it has been administratively dissolved and I have
4  repaid the fees and started it again.  So those would be
5  technically interruptions, but I've used that trade name
6  since that time.
7    Q.   And it's incorporated in North Carolina?
8    A.   Yes.
9    Q.   Some of the information contained is Metrix
10  Credit Technologies, LLC, what's that?
11    A.   That's a single member LLC where I'm the
12  sole single member, and that is the entity through which
13  I do all my structure product consulting.
14    Q.   Okay.  And is that -- is Metrix Credit
15  Technologies currently in operation?
16    A.   Yes.
17    Q.   And has it been in operation from 2009 to
18  the present time continually?
19    A.   No, it's been in operation since 2012.
20    Q.   Okay.  Between the principal dates at issue
21  in the case, I think we can say -- we can worry about
22  that when I get to some more questions -- the 2015 and
23  2017, if you can focus your attention on those years, was
24  the WH Advisory & Investments in operation during those
25  years, between 2015 and 2017?

1    A.   I did not use WH Advisory for any
2  third-party business during that time period.  I used
3  Metrix Credit Technologies.
4    Q.   Okay.  I was going to ask you that
5  question.
6         So Metrix Credit Technologies was in
7  operation between 2015 and 2017; is that right?
8    A.   Yes.
9    Q.   Who were its customer to whom you were
10  providing services?
11    A.   I had no customers in 2015 other than the
12  prospective customer, Priderock.
13    Q.   What about 2016 or 2017?
14    A.   After separating from Priderock I launched
15  an effort to acquire customers and I obtained customers,
16  and I currently have customers.
17    Q.   And that's what you spend the majority of
18  your time on today?
19    A.   Yes.
20    Q.   You can set that aside for a moment.
21         How did you first get involved with
22  Priderock?  How did that come about?
23    A.   David Worley called me on the telephone,
24  and David said that his partners at Priderock were
25  considering an investment vehicle focused on Freddie Mac

1  multifamily securitization controlling class securities
2  in which David would be the portfolio manager.  And David
3  requested that I -- asked me if I would like to
4  participate, and I said I would.
5    Q.   That was a phone call?
6    A.   Yes.
7    Q.   When was that?
8    A.   That was summer 2015.
9    Q.   What happened next?  How did that -- what
10  proceeded after that initial phone call?
11    A.   David requested that I provide him with any
12  information that I had about the securities, which I did.
13    Q.   Are we talking about these particular
14  securities I think you understand K-Deal certificates?
15    A.   Yes.
16    Q.   And K-Deal certificates are the Freddie Mac
17  K series multifamily mortgage securitization program; is
18  that right?
19    A.   Yes.
20    Q.   Okay.  Did you have information on those
21  particular securities?
22    A.   Yes, I did.
23    Q.   Did you provide it to him?
24    A.   Yes, I did.
25    Q.   What was the information?

1    A.   The initial set of information that I
2  provided David was information that I pulled from the
3  Freddie Mac website the program as well as
4  information from my files from prior customers, including
5  research reports and research primers on the product.
6  Specifically I gave him a research primer that Wells
7  Fargo had written in 2011 that I thought was very
8  informative.
9         Would you like for me to --
10         MR. MARIANI:  Just wait for the next
11    question if you are finished.
12  BY MR. MIOSSI:
13    Q.   Yeah, if you are finished.  Are you
14  finished with your answer?
15    A.   That was the first set of information that
16  I provided David per his request.
17    Q.   Prior to this request in 2015 from
18  Mr. Worley, had you ever worked on any transaction
19  involving the Freddie Mac K-Deal certificates?
20    A.   Yes, I worked on previous transactions.
21    Q.   Involving these particular securities?
22    A.   Involving these specific securities.
23    Q.   Who were the other parties that you worked
24  with on the K-Deal certificates?
25    A.   I worked with a party -- okay.  The parties

1 that I worked with previously were Riverbank Asset
2 Management, Williams Capital, Cortview Capital, a
3 multifamily REIT whose name I cannot remember at the
4 moment. The Och-Ziff Hedge Fund.
5     Q.   Can spell that one?
6     A.   O-C-H-Z-I-F-F, and the CB Richard Ellis
7 Distressed Fund.
8     Q.   Are there any others?
9     A.   No.
10    Q.   Can you go back and give me the dates that
11 you worked with these parties that you just identified on
12 K-Deal certificates?
13    A.   I worked with those parties in 2010, '11,
14 and '12. I cannot give you the exact dates.
15    Q.   But it spanned a period from 2011 and '12;
16 is that correct?
17        MR. MARIANI:  Objection to form.
18        A.   '10, '11, and '12.
19 BY MR. MIOSSI:
20    Q.   I'm sorry?
21    A.   I'm not sure of the exact dates, certainly
22 2011. I'm not sure whether it started in 2010 or whether
23 it extended into 2012.
24    Q.   What did you do for them?  What kind of
25 work did you do in connection with these transactions?

1     A.   For Riverbank, I endeavored to work with
2 the buyer of the securities, which was Riverbank, the
3 asset manager, to help him structure an investment
4 partnership with capital providers. I also worked with
5 him to help him structure any financing transaction for
6 his holdings in those securities.
7     Q.   Anything else?
8     A.   For CB Richard Ellis, hired me as a
9 consultant to evaluate and establish a monthly monitoring
10 capability for their holdings in distressed real estate
11 securities -- excuse me, in distressed and highly
12 complicated real estate securities, which these
13 controlling class of K-Deals were part of.
14    Q.   What did that involve precisely, monitoring
15 these securities?
16    A.   It involved -- it involved, firstly,
17 building Excel models for the securities cash flow,
18 including the financing entities that they had that they
19 utilized to obtain leverage on their purchases, use those
20 models to track the monthly valuation the dealers placed
21 on this security. Track -- create a model to track
22 comparisons between the dealers' monthly valuation of the
23 securities and changes in economic and interest rate
24 indicators.
25    Q.   Webster, when I asked you a question you

1 answered it, but before you did so you wrote down a
2 series of notes for yourself, may I ask why you do that?
3     A.   I wrote down a series of notes to assist me
4 in formulating my answer.
5     Q.   Okay. Is that just something you normally
6 do?  I'm just telling you I haven't seen anyone do that
7 before.
8     A.   When you ask a complicated question I want
9 to make sure that I answer it accurately.
10    Q.   That's fine. I'm not challenging you, it's
11 just so that I'm understanding.
12        Were any of these parties that you
13 identified and worked with of those K-Deal securities, do
14 you know whether they have been approved by Freddie Mac
15 to invest in these particular securities?
16    A.   I do know that at least two of the parties
17 that I worked with had been approved.
18    Q.   Which were those?
19    A.   Riverbank, and the REIT whose name I cannot
20 recall.
21    Q.   Now, the models that you were describing,
22 did you -- they are spreadsheets; is that correct?
23        MR. MARIANI:  Objection.
24 BY MR. MIOSSI:
25    Q.   The model are spreadsheets?

1     A.   Yes.
2     Q.   What's the purpose?  What are you trying to
3 achieve?  What's the goal for the models that you were
4 developing or developed?
5     A.   The goal for the models that I was
6 developing was to provide a projection of the cash flows
7 of the securities and the returns of the securities under
8 different economic circumstances.
9     Q.   What's the database or source of
10 information that you draw from to build your model?
11    A.   I utilized a prospectus to understand the
12 cash flows of the security, and then I draw on my years
13 of knowledge and experience in those security types and
14 my expertise with creating models to build the model.
15    Q.   Are you relying on data that's published,
16 for instance, by Bloomberg?
17    A.   In some cases I may use data that would be
18 published by Bloomberg and other sources.
19    Q.   What other sources would it be?
20    A.   I can get information off the public
21 internet. I can get information from the Federal
22 Reserve. I can get information from the Freddie Mac
23 website. Those are examples.
24    Q.   So you are relying on various public data
25 sources to, I guess I would say, build your model; is

1  that right?

2      A.  Yes.

3      Q.  Let me go back to your conversation with

4  David Worley where -- that you described in 2015 about

5  getting involved with Priderock.  After the initial

6  conversation, what happened next?  And take me through

7  the next whether you interviewed or you mentioned you

8  located and sent Mr. Worley some information, some

9  reports like the Wells Fargo report, et cetera.  How did

10  things progress after that?

11          MR. MARIANI:  Objection.  Form.

12          THE WITNESS:  What's that?

13          MR. MARIANI:  You can answer the question.

14  I'm just objecting for the record because of the

15  nature of the form of the question.

16          THE WITNESS:  Okay.

17      A.   To answer your question, because it's very

18  general and it's open-ended, I think I should start at

19  the beginning, and then you can tell me or John can tell

20  me when I should stop with the chronology.

21          THE WITNESS:  Well, he's asked me -- I

22  mean, I could go on and on.

23          MR. MARIANI:  Counsel, I would ask you not

24      to call for a narrative.

25

1  BY MR. MIOSSI:

2      Q.  Let me ask you this way:  When did you

3  begin work for Priderock.  There was an initial

4  conversation that you described.  When did you start

5  working on Priderock's investment opportunity?

6      A.   I started working on Priderock's investment

7  opportunity when David asked me to get that information.

8      Q.  All right.  Was there a formal or a firm

9  date on which you started with Priderock?

10      A.   That date would be the date -- several days

11  before I sent David the first e-mail containing the

12  information.

13      Q.  Okay.  So whenever that e-mail would

14  reflect, and you think that was the summer of 2015?

15      A.  July.

16      Q.  July 2015?

17      A.  Yes.

18      Q.  Okay.  When was the first time you visited

19  Priderock's offices in Palm Beach?

20      A.   I visited Priderock's offices -- I visited

21  Priderock's offices before I started working on this

22  transaction as a social visit with David and an

23  introduction to Dan Ng who works for David.  And we

24  discussed the potential multifamily investment in

25  Jacksonville.

1      Q.  When was that first visit?

2      A.  Spring 2015.

3      Q.  Okay.  What was it that you were -- what

4  did you understand that you were to do for Priderock?

5      A.   My understanding of what I would do for

6  Priderock was that I would develop all the models that

7  are required to structure and manage these types of

8  investments, and that I would provide the subject matter

9  expertise for dealing with investing in, analyzing, and

10  pricing, and understanding the market for complex

11  mortgage-backed securities, which this is, and which I

12  have years of experience in.

13      Q.  Okay.  I'm going to hand you a copy of the

14  complaint.  I'm not going to make it an exhibit because

15  there is no need to.  But I'm putting it there in case

16  you want to refer to it.  That's the only reason because

17  there is some specific allegations I want to ask you

18  about.

19          In the first one I want to ask you about is

20  Paragraph 15.  So if you wish to look at it.  Let me know

21  when you've read it and are ready for a question.

22      A.  Okay.

23      Q.  You contend here that you allege no one

24  else at Priderock had the experience in structuring

25  pricing and financial modeling of controlling class

1  subordinated certificates issued by Freddie Mac,

2  particularly the K-Deal program, right?

3      A.  Yes.

4      Q.  What is the basis for that allegation?

5  What facts do you have to support that claim?

6      A.   The facts that I have to support that claim

7  is my knowledge of various participants' background as

8  well as personal discussions with the people that

9  demonstrated they had no experience in those areas.

10      Q.  Well, identify the people with whom you had

11  conversations that led you to conclude no one at

12  Priderock had this experience?

13      A.   David Worley, David Khoury, George Banks,

14  Jonathan Diamond, Daniel Ng.  That's the team.

15      Q.  And are you testifying that they each told

16  you that there was no one at Priderock who had the

17  expertise to develop the models they were asking you to

18  develop?

19      A.   I'm not testifying that they told me that.

20  And also, that's a different question than what you

21  asked, but I'm not testifying that anyone told me that.

22  It's my opinion that no one did.

23      Q.  That's fine.  I understand that.  It's your

24  opinion that no one else at Priderock had the capacity to

25  perform the work that you performed; is that fair?

1      A.   I have not said that no one had capacity to
2  perform the work. That's too broad a conclusion to draw
3  from 15. I'm saying no one had prior experience in
4  structuring, pricing, and financial modeling of
5  controlling class subordinated certificates.
6      Q.   That's a fair point. And my question, am I
7  correct that your allegation there is based upon your
8  opinion, not what anyone told you; is that correct?
9          MR. MARIANI: Objection. Form.
10      A.   I would not say it's my opinion. I would
11  say it's my understanding and assessment.
12  BY MR. MIOSSI:
13      Q.   And where did you get that understanding
14  and assessment from?
15      A.   I got that understanding and assessment
16  from knowing people's backgrounds.
17      Q.   And what information did you rely upon in
18  judging their backgrounds?
19      A.   I relied on information that they told me
20  and that I read about on their bios.
21      Q.   Well, that's what I'm getting at, whose
22  bios did you read and what did anyone tell you that led
23  you to conclude that no one had the experience as alleged
24  in Paragraph 15?
25      A.   This is a very complicated and specific

1  area of mortgage-backed securities and structured
2  products. The people -- no one would have experience in
3  that area unless they were in very specific roles that
4  they would have told me about. They did not. And no
5  one's background had provided any indication that they
6  had this prior experience as I've stated in 15.
7      Q.   What did you do to investigate the
8  backgrounds of the people you are referring to?
9      A.   I did not have a formal investigation of
10  the backgrounds. I investigated their backgrounds as any
11  normal business partner would do.
12      Q.   And what would that consist of?
13      A.   That consisted of looking at a bio, talking
14  to the person, finding out in conversation what that
15  person's previous experience had been from having
16  first-hand experience with that person, as I did with
17  David Worley. So those are the ways that I would
18  investigate people's background.
19      Q.   In Paragraph 16 you allege that no one had
20  experience and significant expertise -- excuse me, I
21  apologize. That you had prior experience and expertise
22  required for launching a fund that purchases and actively
23  manages an actively controlling class. I don't need to
24  complete the sentence.
25          Are you referring to the six entities you

1  identified a moment ago; Riverbank, Williams Capital,
2  Cortview Capital, the multifamily REIT that you couldn't
3  remember, Och-Ziff, and CB Richard Ellis?
4          MR. MARIANI: Objection. Form.
5      A.   Those experiences that I discussed
6  specifically related to the securities types. It would
7  be a component of my overall prior experience and
8  significant expertise in the required competencies in a
9  fund that purchases and actively manages those types of
10  securities.
11  BY MR. MIOSSI:
12      Q.   What else would you include then, if
13  anything?
14      A.   I can -- should I give you examples from my
15  entire 30-year career?
16      Q.   That would be fine, if you wish.
17      A.   Okay. In the early -- in the 1980s I
18  worked for Solomon Brothers, a pioneer in mortgage-backed
19  securities. I worked with an investment manager to
20  assist him in launching a leveraged mortgage derivative
21  investment fund purchasing CMO equity residuals using
22  leverage.
23      Q.   Let me interrupt you for a minute, if you
24  don't mind. What I'm really focused on 16 as it's
25  alleged that you indicate here that your experience

1  involved actively managing controlling class subordinated
2  certificates issued under the Federal Home Loan Mortgage
3  Corporation multifamily securitization program.
4          So I'm looking for the names of the
5  entities with whom you worked on that particular -- we
6  are talking about the K-Deal certificates, right? That's
7  what I'm asking you about.
8          MR. MARIANI: Objection. Form.
9      A.   When I say has prior experience and
10  specific expertise and the required competencies for
11  launching a fund that purchases and actively manages,
12  that part before you get to the controlling class, that
13  part is a very extensive set of core competencies. I
14  have those core competencies broadly for complex
15  mortgage-backed securities.
16          That's a required competency that I have,
17  first and foremost, from 30 years of experience. This is
18  a type of complex mortgage-backed securities. So for me
19  to properly answer this question or, in fact, to properly
20  answer 15, it draws on that decades of experience.
21          Now, in addition to the decades of
22  experience that are required for this first part for any
23  type of complex mortgage-backed securities for which this
24  is a subset, in addition to that, I have direct
25  experience in these types of securities.

7 (Pages 22 - 25)

1  BY MR. MIOSSI:
2      Q.   It meaning the K-Deals certificates?
3      A.   Meaning the K-Deals. And that direct
4  experience came from those customers. So my prior
5  experience and significant expertise and required
6  competency for launching a fund is a combination of my 30
7  years of experience in doing all these interrelated
8  activities that are required competencies for launching a
9  fund that purchases and actively manages complex
10  mortgage-backed securities combined with specific
11  information in these types of complex mortgage-backed
12  securities. Namely, the controlling class subordinated
13  certificates issued by Freddie Mac.
14      Q.   In your mind or in your experience then,
15  perhaps you can arrange them in order of importance, in
16  launching a fund like this, what is most important to --
17  I'm not suggesting anything in unimportant -- but to the
18  most important to the lesser important, such as access to
19  capital, access to investors, developing a model,
20  maintaining the model. I don't know whether there are
21  things that you, in your mind, would rank most important
22  to lesser important.
23          MR. MARIANI: Objection. Form.
24          Bill, that sound like a question you would
25      ask an expert.

1          MR. MIOSSI: I don't agree.
2          MR. MARIANI: Can we stipulate Mr. Hughes
3  is an expert?
4          MR. MIOSSI: No.
5          MR. MARIANI: Maybe you can tell me on the
6  record your view of the relevance of how those
7  matters rank in priority.
8          MR. MIOSSI: I don't think that's an
9  appropriate objection. So I'm not going to answer
10  your question.
11          MR. MARIANI: Fair enough.
12          You have my objection to the questions
13  noted?
14          COURT REPORTER: Yes.
15          MR. MARIANI: Thank you.
16      A.   I cannot give an exact ranking. However, I
17  can give you five categories that I think are essential.
18  One, of course, is to raise any fund one has to be able
19  to raise capital. Raising capital requires access to
20  investors and the ability to have the investors listen to
21  your investment proposal.
22          The next and very important thing about
23  raising a fund is understanding the product that you are
24  investing in. In this case, it's understanding those
25  securities. That means understanding all aspects of the

1  securities. That means understanding all of the cash
2  flows of the securities. Understanding the cash flow of
3  the securities in different economic environments.
4  Understanding what can go wrong and what can go right.
5  Understanding the market for those securities, how they
6  are purchased, how they are sold, how to negotiate the
7  price of those securities.
8          Another very important thing is, as part of
9  understanding, is to have financial models and projection
10  of the securities that quantify the various
11  understandings of the securities that one has.
12          And finally, the ability to educate both
13  the -- your team members as to how to set up and
14  signature the investment, and to educate the investors as
15  to how the investments works, the risk, the return of the
16  investment structure that you are offering.
17  BY MR. MIOSSI:
18      Q.   Is it true that access to these securities
19  the K-Deal certificates is restricted, maybe I should say
20  very limited?
21          MR. MARIANI: Objection. Form.
22      A.   To answer your question, we have to qualify
23  what restricted and limited mean. What is true is that
24  to purchase securities, these types of securities, an
25  investor needs to be approved by Freddie Mac.

1  BY MR. MIOSSI:
2      Q.   That's my question.
3      A.   Many investors -- yes, investors need to be
4  approved by Freddie Mac.
5      Q.   So access to these particular securities
6  requires approval by Freddie Mac, and if you don't have
7  that nothing else matters in terms of investing in these
8  securities?
9      A.   One cannot invest in these securities
10  unless one is -- unless the entity is approved by Freddie
11  Mac, correct.
12      Q.   Do you know if Priderock was approved by
13  Freddie Mac to invest in these securities prior to your
14  association with Priderock?
15      A.   Priderock, to my knowledge, had not
16  approached Freddie Mac about these securities prior my
17  involvement. And to my knowledge, Priderock was not
18  approved prior to my involvement.
19      Q.   Did you have any connections with persons
20  at Freddie Mac who had an authority to approve investors
21  for these securities?
22      A.   No, I did not -- sorry, I have to qualify
23  that. I subsequently met people, but when I first
24  started with Priderock I did not.
25      Q.   How did you make the introduction -- how

1 were you introduced to the authority at Freddie Mac that
2 can approve investors through Priderock or some other
3 way?
4    A.   No, I was introduced by Lee Green who is
5 the investment banker at Wells Fargo.
6    Q.   Was this after you left Priderock or while
7 you were at Priderock?
8    A.   While I was at Priderock.
9    Q.   When was that?  When did Mr. Green make the
10 introduction?
11    A.   I can look at the days I attended the Wells
12 Fargo real estate conference.  And at the real estate
13 conference, several people from Freddie Mac were there
14 that I spoke with.
15    Q.   Who?
16    A.   David Brickman.  I don't recall the others.
17    Q.   Is your understanding Mr. Brickman has the
18 authority to approve investors for K-Deal certificates?
19    A.   Yes.
20    Q.   Did you introduce -- as part of your role
21 with Priderock, did you introduce any investors to
22 Priderock?
23    A.   We had one preliminary discussion with the
24 Virginia Retirement System when Priderock was in the
25 early phases of contemplating an investment in this, but

1 I ceased any further introductions.
2    Q.   Did the Virginia Retirement System invest
3 in the securities that the Priderock multi debt
4 opportunity fund offered?
5    A.   You mean -- do you mean did they previously
6 invest in those types of securities or do you mean did
7 they invest the Priderock MDOF?
8    Q.   Did they invest in the Priderock MDOF?
9    A.   No.
10    Q.   Did you invest any capital in the Priderock
11 MDOF?
12    A.   No.
13    Q.   In Paragraph 18 of your complaint, I have a
14 question.  If you want to read it before I ask the
15 question, please do so and then I'll ask.
16    A.   Okay.
17    Q.   In this paragraph you allege that you and
18 Priderock orally agreed you would be paid $200,000 a year
19 for the life of the Priderock MDOF, right?
20    A.   Yes.
21    Q.   I'm paraphrasing.  I'm not trying to
22 mischaracterize anything.
23    A.   Correct.
24    Q.   How long is the life of the fund?
25    A.   That's the time period in which they hold

1 investment and are paid fees from investors.
2    Q.   How long is that with these particular
3 securities?
4    A.   It will depend on the maturity of the
5 securities.
6    Q.   What's the typical maturity of the
7 security?
8    A.   The first security purchase was a
9 seven-years, I believe.  The -- which could extend to
10 eight years.  I believe the second purchase of the fund,
11 based on my understanding of the market, was a 15-year
12 security.  I believe that the third investment of the
13 fund was a 10-year security.
14    Q.   And it was your -- I should say, it's your
15 understanding or your position that your participation
16 with Priderock would require you to perform work during
17 the life of the fund; is that correct?
18       MR. MARIANI:  Objection.  Form.
19    A.   The transaction -- the standard procedure
20 and standard compensation in a transaction of this nature
21 when an investment team purchases a buy-and-hold
22 investment on behalf of investors is for the investment
23 team to be paid a percentage of the cash flows going
24 forward over the life of the transaction.
25       My compensation in exchange for working

1 sweat equity on the comp was to receive a percentage
2 share of that.  The share of the fixed fee was 200,000
3 per year.  The share of the promote was 10 percent.
4 BY MR. MIOSSI:
5    Q.   Maybe you didn't understand what my
6 question was and that's probably because I didn't ask it
7 correctly.
8       After the fund is launched, and until --
9 and as long as you are providing service or support to
10 the fund, the life of the fund, if you will, your input,
11 your active involvement is required; is that correct?
12       MR. MARIANI:  Objection.  Form.
13    A.   There is a small amount of work to be done
14 on an ongoing basis.  The fee structure that's paid on
15 these transactions that extends over the life of a fund
16 cannot be characterized as payment for services rendered
17 during the period on which it is paid.  Cannot be
18 characterized as that.
19 BY MR. MIOSSI:
20    Q.   I'm just trying to understand.  After the
21 fund is launched you still have work to perform with
22 respect to your model; is that correct?
23    A.   A small amount.
24    Q.   And what other work would you be required
25 to do?

9 (Pages 30 - 33)

1          MR. MARIANI: Objection. Form.

2      A.    For this fund, once the money is invested,

3    very little work.

4    BY MR. MIOSSI:

5      Q.    But since you've alleged no one else at

6    Priderock could do what you did on the models, your work

7    was necessary to -- for the life of the fund, right?

8          MR. MARIANI: Objection. Form.

9      A.    Use of my models would be a definite

10   benefit to the fund over the life of the fund. The

11   primary usage of my models was to assist in the

12   structuring, and money raising, and final negotiation for

13   the purchase of the securities.

14   BY MR. MIOSSI:

15     Q.    Okay. But after that, describe for me what

16   sort of work you would do once the fund is closed.

17     A.    Once the fund is closed there are servicing

18   reports that Freddie Mac provides each month. To the

19   extent that there are no loans in default, it is a rare

20   event that a loan defaults. This was expected to be no

21   defaults. So assuming that no loan defaults the monthly

22   monitoring is effectively getting some reports and

23   confirming that the cash flows are what they should be.

24     Q.    And what does that consist of,

25   reconciliation of the cash flow --

1      A.    Yes.

2      Q.    -- with what Freddie Mac is telling you?

3          MR. MARIANI: Wait until he finishes his

4    question before you answer.

5      A.    That would consist of reading the servicing

6    reports themselves and assessing whether the servicing

7    reports themselves are consistent. And then if one

8    wanted to exercise an abundance of caution, one could use

9    their own models to check. If one wanted to demonstrate

10   to investors in abundance of caution, one could produce

11   customized reports and provide it to investors.

12   BY MR. MIOSSI:

13     Q.    And was it your understanding that was a

14   role you were going to play?

15     A.    Yes.

16     Q.    Okay. Prior to the -- between the time

17   that you began work with Priderock, let's just call it

18   July 2015, and the time that your association with

19   Priderock ended, call that June 2017 -- do you agree with

20   that, by the way, June of 2017?

21     A.    Yes, I do.

22     Q.    Did you record the amount of time, the

23   number of hours that you worked on Priderock business?

24     A.    No, I did not record the time I worked on

25   Priderock business.

1      Q.    Do you have any estimate of the number of

2    hours that you worked -- and I don't care if you choose

3    to characterize it in total, annually, weekly, monthly,

4    whatever would provide your best estimate of the time,

5    literally the hours that you committed to Priderock

6    business?

7      A.    I worked on a fully dedicated basis -- it's

8    difficult for me to quantify the hours of working because

9    that could include talking on the telephone, it could

10   include thinking about how to put something together,

11   some time on the weekends. So it's a -- I would

12   characterize it as essentially full-time work.

13     Q.    During the period of July 2015 to

14   June 2017, did you provide services to any other party,

15   any other institution or customer other than Priderock?

16     A.    No, I did not provide services to anyone.

17     Q.    Did you turn away any opportunities during

18   that time period?

19     A.    Yes.

20     Q.    What were those?

21     A.    I ceased work arranging a software

22   licensing agreement with Thomson Financial.

23     Q.    And back to Exhibit Number 1 in your

24   LinkedIn page. The description of the services for this

25   caption under WH Advisory & Investments, during that time

1    period you weren't -- I should say during the period of

2    2015 to 2017, you weren't performing any work as

3    described here under this heading?

4      A.    Only in relation to Priderock.

5      Q.    Did you travel, other than -- you --

6    obviously, you are based in Charlotte. You never

7    relocated to West Palm Beach to perform -- during the

8    time you were working with Priderock, did you?

9      A.    I did not.

10     Q.    So if you take out the travel between

11   Charlotte and West Palm Beach, did you travel to other

12   locations for Priderock business?

13     A.    Yes, I did.

14     Q.    Approximately, describe what that travel

15   consisted of in terms of where you went and how often you

16   went?

17     A.    I can recall two -- I would have to check

18   my notes, it may be three. I can specifically recall two

19   customer marketing trips, one to New York and one to

20   Philadelphia and several in Palm Beach.

21     Q.    Did you travel to those meetings alone or

22   with other Priderock partners?

23     A.    With other Priderock partners.

24     Q.    Okay.

25     A.    And, in fact, a third one would be one in

1 South Florida that I specifically flew down for the
2 meetings.
3    Q.    So would that be -- I'm not trying to limit
4 it -- five trips to meet with investors?
5    A.    Would you like for me to include the trip
6 to Palm Beach in which I both visited offices and met
7 with investors?
8    Q.    Only when you met with investors.
9    A.    I would call it six trips.
10   Q.    During that July 2015 to June 2017 time
11 period?
12   A.    Yes.
13   Q.    I know I asked you if you recorded the time
14 you spent on Priderock business, but did you take any
15 notes that would reflect or keep a diary or any written
16 records that would reflect the quantify or amount of work
17 that you performed for Priderock?
18   A.    I would say that the best accounting for
19 that would be the many e-mails back and forth.  Also, one
20 can see the numerous saved dates on computer files that I
21 have.
22   Q.    Such as what, a Word document, calendar?
23   A.    Word document, an Excel spreadsheet,
24 PowerPoint presentation.  You'll see I would put forward
25 daily e-mails and daily save dates.

1    Q.    Did you have a calendar that recorded the
2 time you spent on or that would reflect time you spent
3 working for Priderock?
4    A.    Only meeting requests on the calendar.
5         MR. MARIANI:  Excuse me, can we take a
6 bathroom break?
7         MR. MIOSSI:  Sure.  Let's do it right now.
8         (Break taken from 11:02 a.m. to 11:13 a.m.)
9 BY MR. MIOSSI:
10   Q.    To go back to the companies that you
11 mentioned you had done K Series deals with Riverbank and
12 the multifamily REIT that you couldn't recall, those are
13 the two you did K Series deals with before, right?
14   A.    Worked on K-Deal.
15   Q.    I should say worked on; is that right?
16   A.    You mean -- all these related to work on
17 deals with.
18   Q.    Okay.  Were you paid for that work?
19   A.    I was -- I did some on a contingent basis
20 and some I was paid for on an ongoing basis.
21   Q.    Which ones did you receive payment from?
22   A.    When I started with the first three,
23 Riverbank, Cortview, Williams Capital, and the REIT that
24 I can't name, I was on salary from Cortview.  So I did
25 that as a brokerage relationship, Cortview was a startup

1 broker deal.  So I did that as part of that.
2    Q.    So Cortview is a broker, right?
3    A.    A broker dealer.  Was, they are no longer
4 in business.
5    Q.    Okay.  And you received, what, a commission
6 or were you paid as a consultant?
7    A.    I was an employee.
8    Q.    For Cortview?
9    A.    Yes.
10   Q.    So you received a salary?
11   A.    Yes.
12   Q.    And you didn't receive any -- did you
13 receive any bonus or extra compensation for the work you
14 did with respect to Riverbank, Williams Capital or the
15 multifamily REIT?
16   A.    No, because the transaction did not close
17 during the time period that I was there.
18   Q.    Okay.  Is Cortview Capital on your Exhibit
19 Number 1, the LinkedIn resume?
20   A.    No, it's not.
21   Q.    Why?
22   A.    Because I didn't think it was a significant
23 part of my career and didn't want to include more things
24 than were necessary on my LinkedIn.
25   Q.    How long were you with Cortview?

1    A.    One year.
2    Q.    And when, the dates?
3    A.    Fall 2010 and fall 2011.
4    Q.    And where are they located.  They are no
5 longer in existence so where were they located?
6    A.    Based in New York with satellite offices.
7    Q.    And how much were you paid or how much
8 income did you earn from Cortview Capital?
9    A.    120,000.
10   Q.    And you worked full time?
11   A.    Essentially.
12   Q.    Well, what do you mean essentially, you
13 either did or you didn't.
14   A.    Yes, full time.
15   Q.    Okay.  And was it -- you were an employee
16 so you received benefits and all that stuff?
17   A.    Yes.
18   Q.    And it was -- as a Cortview employee that
19 you worked on the Williams Capital, Riverbank, and the
20 unnamed multifamily REIT; is that correct?
21   A.    Yes.  Also I worked with Riverbank after I
22 left as an independent consultant.
23   Q.    And were you paid for the work you did for
24 Riverbank?
25   A.    I had an incentive agreement and they ended

11 (Pages 38 - 41)

1  up doing the deal that I was working on with another
2  party.
3      Q.  So you were paid nothing for that?
4      A.  Nothing.  It's incentive.  I worked on a
5  contingency and did not get paid.
6      Q.  When did that happen?
7      A.  2011, 2012.
8      Q.  And the contingency, that was a K-Deal
9  series transaction with Riverbank?
10     A.  That was a financing transaction for a
11 portfolio of the K-Deal investments.
12     Q.  All right.  Did Williams Capital ever pay
13 you anything?
14     A.  Williams was the time I was in Cortview.
15     Q.  Did the multifamily pay you anything?
16     A.  That was at the time I was at Cortview.
17     Q.  Did Och-Ziff Fund ever pay you anything?
18     A.  Och-Ziff Fund was the counterparty to the
19 transaction that as a private investor -- that as an
20 independent I worked on with Priderock, which it did not
21 come to fruition.  I worked on that on a contingency
22 basis and it didn't come to fruition.
23     Q.  So you weren't paid anything on that,
24 right?
25     A.  No.

1      Q.  CD Richard Ellis Distressed Fund, I don't
2  remember if that's the right name; is that right?
3      A.  Yes.
4      Q.  Were you paid anything for the work you did
5  there?
6      A.  Yes.
7      Q.  What were you -- were you a consultant or
8  an employee?
9      A.  Consultant.
10     Q.  What were you paid?
11     A.  $400 per hour.
12     Q.  When?
13     A.  Either fall 2011 or spring 2012.  I would
14 have to see my notes.
15     Q.  All right.  And how much -- I don't need an
16 exact figure.  To the best of your memory, how much did
17 CD Richard Ellis pay you as a consultant fee in total?
18     A.  On the order of $100,000.
19     Q.  And were you developing a model for them?
20     A.  I explained what I did for them earlier.  I
21 built models for the cash flows and their financing
22 structures in order to provide evaluations.  I set up a
23 procedure to review their monthly dealer mark to markets
24 and to monitor those mark to markets in comparison to
25 other financial market indicators.

1      Q.  Is that -- would you consider the work that
2  you performed for CD Richard Ellis similar to the work
3  you performed for Priderock?
4      A.  It has some overlap.
5      Q.  Okay.  In terms of the model building and
6  the monitoring of the cash flow and the securities, would
7  that be the same?  Not the same, but very similar?
8      A.  From a high level perspective they would be
9  similar.  I would think that a very important overlap
10 would be the knowledge that I obtained for the issues
11 surrounding, expertise in issues surrounding being an
12 investor in these types of securities and using leverage
13 against these securities.
14     Q.  How many multifamily loans have you
15 originated?
16     A.  Zero.
17     Q.  How many have you collected?
18     A.  Zero.
19     Q.  How much have you worked out?
20     A.  Zero.
21     Q.  How much have you serviced?
22     A.  Zero.
23     Q.  How much Freddie Mac controlling class
24 securities have you managed?
25     A.  I have managed zero.

1      Q.  And the complaint, again on Paragraph 20,
2  let me know when you are ready, I'll ask you a question.
3      A.  I'm ready.
4      Q.  What role did you play in the preparation
5  of the private placement memorandum describing the
6  Priderock MDOF?
7      A.  I wrote portions of the section that
8  required subject matter expertise on these securities.
9  And my models, and analyses, and chart, and explanation
10 were used within the private placement memorandum.
11     Q.  Did you actually author sections of the
12 memorandum?
13     A.  I contributed text to sections of the
14 memorandum for the authors to utilize at their
15 discretion.
16     Q.  Who were the primary authors, if you know?
17     A.  I don't know.
18     Q.  Who did you submit your text to?
19     A.  These would have been, certainly to David
20 Worley.  Likely, other people were copied on e-mails.
21 That would be in my e-mails.
22     Q.  Okay.  But the one you recall anyway would
23 have been material that was -- excuse me, you submitted
24 material for the private placement memorandum to at least
25 David Worley?

1    A.   Yes, David Worley sent me drafts for the
2 private placement memorandum.  I reviewed certain
3 sections, wrote, contributed certain text, gave it back
4 to David Worley.
5    Q.   Is there any way for you to quantify what
6 you contributed to the private placement memorandum in
7 terms of paragraphs or pages?
8    A.   Not without a thorough -- I could possibly
9 quantify it with a review of the document to recognize
10 the parts that I had written, and charts and graphs that
11 were pulled from the work that I provided.
12    Q.   Let me direct your attention to Paragraph
13 26, if I can, please.  You ready?
14    A.   Yes.
15    Q.   The allegation is you created and
16 continually updated the financial models and ProForm
17 analyses, et cetera, that you alleged there.  Were these
18 models that you created -- excuse me, the models that you
19 are referring to in Paragraph 26, were they created from
20 scratch for Priderock or were they models that you had
21 created for other customers or clients that you modified
22 for Priderock?
23         MR. MARIANI:  Objection.  Form.
24    A.   I started -- I had simplified models in my
25 files, which I used as a starting point.  While working

1 for Priderock, I expanded those simple models to highly
2 customized and specialized models, specifically for the
3 Priderock security types, and with far greater detail.
4         For example, sensitivity to economic
5 variables.  For example, the financing structures that
6 Priderock utilizes.  For example, the partnership fee
7 structure that Priderock utilized.  These were all -- and
8 for example, the screen designs that enabled us to make
9 presentations to investors.
10         Those are all features and functionality
11 that I built into the model.  And those I built from
12 scratch using my 30 years of understanding and expertise
13 and experience in this area, and understanding of the
14 needs of the Priderock team and the investors for this
15 security type.
16 BY MR. MIOSSI:
17    Q.   Were any of the models that you created for
18 Priderock, are you aware that -- did any of them contain
19 any errors?
20    A.   Possibly.
21    Q.   Were there any errors that you detected?
22    A.   I would continually detect errors and
23 correct them.
24    Q.   At the end of the day, the model is really
25 a mathematical function; is that correct?

1    A.   The model uses mathematics to project the
2 specialized characteristics of the securities.
3    Q.   And the specialized characteristics are
4 variables that you glean from what source of information?
5    A.   I do not think they would be characterized
6 as variables.
7    Q.   Okay.
8    A.   Some input to the model could be
9 characterized as variables.  I would characterize them as
10 structural features of the security investments that are
11 defined in the perspectives and office memorandums for
12 the securities that then I utilized my coding expertise,
13 which I would distinguish from mathematical expertise, I
14 used my coding expertise to translate it into a financial
15 model.
16    Q.   And the purpose for the model is to come
17 to, what, a correct answer, if you will?
18    A.   The purpose of the model is to project the
19 returns and quantify risk, which is part of projecting
20 returns because risk is that the return would be low.
21 And to do so under assuming varying economic assumptions.
22    Q.   Are the assumptions that you built or input
23 to your model, were those assumptions that you chose or
24 were they driven or determined from some other source?
25    A.   Those are -- the assumptions that I

1 utilized in the model were ranges of possible economic
2 outcomes that I determined from studying historical
3 behavior of the security types as well as the economic
4 environment that would represent the range of
5 possibilities that an investor would be -- would, in my
6 experience, want to contemplate when determining the
7 risk.
8    Q.   Did anyone else at Priderock assist you in
9 maintaining or updating or refining the model that you
10 are testifying about?
11    A.   Yes.
12    Q.   Who were those people?
13    A.   Daniel Ng and Tinjing, whatever his name
14 is.  He was an analyst who worked for Danny.
15    Q.   And do you consider the work that they did,
16 were they competent?
17    A.   Yes.
18    Q.   In Paragraph 28, let me know when you are
19 ready.
20    A.   I'm ready.
21    Q.   What facts do you have that support the
22 allegation in Paragraph 28?
23    A.   The facts that I have to support that
24 allegation would be direct conversation with two specific
25 investors and a conversation -- and then e-mail evidence

1 and conversational evidence with Jonathan Diamond.

2     Q.   And Jonathan Diamond is a Priderock

3 employee; is that right?

4     A.   I'm not sure of his employee status.

5     Q.   Well, you met him through Priderock?

6     A.   Yes.

7     Q.   What I want to do here is to understand the

8 allegation in Paragraph 28 is to understand who said what

9 to you to form the basis of the allegation that you --

10 that investors would not have invested but for your

11 involvement. So whether that's quoting a person or an

12 e-mail or some other communication, who, what they said,

13 and when they said it.

14     A.   Okay. Trip McCoy at PSQ sent Jonathan

15 Diamond an e-mail and had a phone conversation with him,

16 it's my understanding, to say that PSQ was likely to

17 invest with another K-Deal investor unless Priderock can

18 demonstrate that the higher fees Priderock charged could

19 be justified and compensated for by obtaining leverage on

20 the securities.

21     Jonathan Diamond called me after hours,

22 after dinner, in the evening, saying he had to get an

23 analysis showing this to Trip or they would not invest.

24 Jonathan Diamond did not know how to perform that

25 analysis or what it would show.

1     Q.   This is something Jonathan told you, "I

2 don't know how to do this?"

3     A.   Jonathan was not -- Jonathan asked me to do

4 it and did not have any recommendations on how to do it.

5     Q.   Okay. And then what?

6     A.   So I spent the evening performing it, sent

7 it to Trip, got on the phone with Jonathan the next day

8 and explained it to Trip, and they agreed to invest.

9     Q.   PSQ did; is that right?

10     A.   Yes.

11     Q.   And did Trip McCoy say anything to you

12 about the influence the work that you performed had on

13 the decision -- PSQ's decision to invest?

14     A.   No, he did not.

15     Q.   Is there any other fact that supports the

16 allegation in Paragraph 28?

17     A.   Relating to Trip McCoy?

18     Q.   No, aside from the episode involving PSQ.

19     A.   David Shillington said unequivocally that

20 KeyBank would not have made the loan that they made

21 without my customized financial models and my customized

22 advice and help with fine-tuning those models and helping

23 them understand the whole transaction.

24     Q.   And David Shillington is a KeyBank officer

25 or representative; is that right?

1     A.   Yes, he is.

2     Q.   Did he say that to you?

3     A.   He said that to me. He said that to his

4 boss, and he said that to other people in the team who

5 reiterated it to me.

6     Q.   When was that comment made and who was

7 present when he made that comment?

8     A.   David made it to me multiple times.

9     Q.   David Shillington?

10     A.   Yes, during the course of our work on the

11 product. And then at a golf event with him and Norm

12 Nickels, and Norm Nickels reiterated that, which David

13 had told them.

14     Q.   Norm Nickels is at KeyBank?

15     A.   I think he is David's boss.

16     Q.   When was that?

17     A.   Beginning of April 2017.

18     Q.   So other than KeyBank, the instance with

19 KeyBank, and instance with PSQ, are there any other

20 instances or facts that support the contention in

21 Paragraph 28?

22     A.   I don't have facts, but I do have -- no, I

23 don't have facts.

24     Q.   At some point in time you and Priderock

25 exchanged proposed written contracts, correct?

1     A.   Correct.

2     Q.   And was that your idea to memorialize your

3 terms in a contract or were you asked to do that?

4     A.   I asked them to do that, and since they

5 didn't do that I did it.

6     Q.   So I'm going to show you Exhibit 2. So

7 Exhibit Number 2 is an e-mail from Webster Hughes to

8 David Worley dated October 24, 2016. The subject is

9 contract, and it's an e-mail with an attached PDF of

10 multiple pages titled Executive Compensation and Software

11 License Agreement.

12     You recognize this, correct?

13     (Defense Exhibit No. 2 was marked for

14 identification.)

15     A.   I recognize it on the face of it.

16 BY MR. MIOSSI:

17     Q.   You sent this to Mr. Worley and you were

18 asking in your e-mail, you are asking for his thoughts

19 before sending -- forwarding it to DK. And DK is David

20 Khoury, right?

21     A.   Yes.

22     Q.   Why -- what was the purpose for asking for

23 input before forwarding it to Mr. Khoury?

24     A.   Just the obvious reason that I would like

25 to have a version that I thought -- that we all thought

1 would be satisfactory. And David was my closest contact,
2 and naturally the first person I would ask to review it.
3      Q.   Okay. Mr. Khoury -- were you aware that
4 Mr. Khoury and George Banks and David Worley were the
5 principal partners in Priderock, correct?
6           MR. MARIANI: Objection. Form.
7      A.   It was my understanding that they were the
8 three general partners for the MDOF.
9 BY MR. MIOSSI:
10     Q.   Okay. And you are aware that the three of
11 them had to agree on any contract or any terms with you
12 in order for it to be effective; is that right?
13          MR. MARIANI: Objection form.
14     A.   I did not have an understanding of their
15 internal decision-making process or guidelines, whether
16 there would be a majority or unanimous.
17 BY MR. MIOSSI:
18     Q.   Didn't Mr. Worley tell you on numerous
19 occasions that anything that was agreed to with you had
20 to have the agreement of both Khoury and Banks as well as
21 Worley?
22     A.   No.
23     Q.   He never said that to you?
24     A.   No -- he said that to me after they had --
25 George had vetoed the agreement that David Worley, David

1 Khoury, and I reached after George vetoed it then David
2 Worley repeated that all three had to be unanimous.
3      Q.   Okay. In the agreement that's attached to
4 this Exhibit 2, can I direct your attention to Paragraph
5 3, Paragraph Number 3?
6           MR. MARIANI: Objection to form.
7 BY MR. MIOSSI:
8      Q.   Let me restate that. I'm on Exhibit
9 Number 2 and I'm directing your attention to Paragraph
10 Number 3 of the executive compensation and software
11 license agreement that you authored; do you understand
12 that?
13     A.   Yes, I do.
14     Q.   Paragraph 3 is the term you propose, a
15 four-year term, correct?
16     A.   Yes.
17     Q.   And I direct your attention to Paragraph
18 13, you proposed a term whereby either party could end
19 the contract after the second year, on the second year
20 anniversary of the launch date; is that correct?
21     A.   Correct.
22     Q.   And there are other conditions. I'm not
23 trying to read it out.
24     A.   Correct.
25     Q.   And it was your intent to have an agreement

1 of multiple years; is that right?
2      A.   It was my intent to have a fee agreement
3 that covered the life of the transaction that I was part
4 of the team in executing as stated on Exhibit B, and the
5 terms --
6           MR. MARIANI: Excuse me, B?
7           THE WITNESS: Exhibit B of this document.
8           MR. MARIANI: Okay. This document is
9 Exhibit 2.
10          THE WITNESS: Exhibit B of the agreement.
11          MR. MIOSSI: He is referring internally to
12 the exhibit.
13     A.   It was my intention that during the term of
14 my agreement any transactions that were executed that I
15 was part of the team that executed that, I would be paid
16 my share of the fees generated from that transaction over
17 the time period in which Priderock received those fees.
18 And my notion of the term, which that is what we agreed
19 to, and my notion of the term was simply the term on
20 which I would continue to work with Priderock to execute
21 deals.
22 BY MR. MIOSSI:
23     Q.   Okay. But on Exhibit A to Exhibit 2,
24 confusing as that may sound, these are the duties. It's
25 titled Executive Responsibilities, Software, and

1 Services, but this contains a description of the work
2 that you would perform under the terms of the contract
3 that you drafted; is that correct?
4      A.   Yes.
5      Q.   And this is work that you would perform
6 during the terms of the proposed contract in Exhibit 2,
7 right?
8      A.   Yes, it is.
9      Q.   Last question I have for you on this
10 exhibit is the final page of it. It's probably the
11 easier way to say it, which is Exhibit C. And this
12 contains an itemization of the sort of prelaunch and
13 postlaunch expenses. And my question to you is directed
14 to the prelaunch expenses. These are expenses you
15 contend you had incurred to date, so around October 2015;
16 is that right?
17     A.   Yes, they are.
18     Q.   Are those all expenses you contend were to
19 perform work for Priderock?
20     A.   Yes.
21     Q.   And this didn't include compensations that
22 you incurred otherwise, overhead for WH Advisory &
23 Investment, et cetera?
24     A.   I ceased those activities.
25     Q.   And this didn't cover any overhead for

1 Metrix?

2     A. I ceased -- the only activities that I was

3 actively working on were related to Priderock so,

4 therefore, I allocated my expenses to Priderock.

5     Q. Okay. Exhibit Number 3 --

6     MR. MARIANI: Are you finished with this

7 exhibit?

8     MR. MIOSSI: I am.

9     We'll have the court reporter keep all the

10 exhibits so we'll keep a pile for her.

11     MR. MARIANI: Excuse me, do you have a copy

12 for me?

13     MR. MIOSSI: Oh, I didn't give you one? I

14 thought I did.

15     MR. MARIANI: Thank you, Bill.

16 BY MR. MIOSSI:

17     Q. Exhibit Number 3 is an e-mail from Webster

18 Hughes to David Khoury, copied to David Worley, dated

19 November 4, 2016 regarding contract and reimbursement

20 request. It's an e-mail with an attached document titled

21 Executive Compensation and Software License Agreement.

22 Do you recognize Exhibit 3?

23     (Defense Exhibit No. 3 was marked for

24     identification.)

25     A. I recognize the e-mail and this does look

1 like a contract that I wrote.

2 BY MR. MIOSSI:

3     Q. Okay. In the body of the e-mail, the

4 second paragraph you state that the reimbursement request

5 is for $8,784; do you see that?

6     A. Yes.

7     Q. Was that what you would have incurred to

8 that date?

9     A. No, that was for third-party contractor

10 expenses. And specifically included my son, Web, in

11 payments to third-party for use of Bloomberg.

12     Q. Okay. And then the document, bear with me

13 a minute, the attached agreement. This was your proposal

14 again, correct?

15     A. Yes.

16     Q. And did this differ in any way from the

17 proposed contract that's Exhibit Number 2?

18     A. I would have -- I may have made adjustments

19 in the meantime, but I don't recall. We'd have to put

20 them side by side and read them.

21     Q. Nonetheless, you authored this is, this is

22 what it is?

23     A. Yes, it is.

24     Q. If you look at paragraph number -- sorry,

25 Exhibit B to Exhibit 3, and that's the compensation you

1 proposed. What happened to the $200,000 per year you

2 alleged you had orally agreed to?

3     A. On the first front the 200,000 per year

4 over time would actually come out a little bit more than

5 the 10 percent of the fixed annual fee they received. So

6 I thought that it would be a cleaner agreement rather

7 than saying 200 grand out of the fixed asset management

8 fee, just to say 10 percent across the board.

9     Because we had already agreed that I would

10 get 10 percent of the promote and 10 percent of the

11 annual or the quarterly asset management fee, which they

12 received, would equate to pretty close to 200 grand. So

13 I just simply proposed that we use 10 percent of all fees

14 to simplify the agreement.

15     Q. Okay.

16     A. And that would allow us to have -- to apply

17 this to other investment vehicles.

18     Q. This is 4. I don't have any more questions

19 on that exhibit. This one with the sticker is for you.

20     Exhibit Number 4 is an e-mail from Webster

21 Hughes to David Khoury dated November 9, 2016 regarding

22 contract and reimbursement requests. Do you recognize

23 the exhibit?

24     (Defense Exhibit No. 4 was marked for

25     identification.)

1     A. Yes, I do.

2 BY MR. MIOSSI:

3     Q. And then it references a handwritten note

4 on the third page of the exhibit.

5     A. Yes.

6     Q. I don't know if it's copied upside down or

7 what. In the first line of your e-mail you are

8 addressing this to David Khoury?

9     A. Right.

10     Q. And you say, "DW relayed your comments

11 yesterday, see attachment."

12     A. Yes.

13     Q. Is the last page of the handwritten note,

14 is that the attachment you are referring to?

15     A. Yes.

16     Q. And so the handwritten note that you were

17 referring to and is attached to the last page of the

18 exhibit are Mr. Khoury's notes or comments about your

19 proposed contract; is that your understanding?

20     A. Either -- I don't know who wrote the note,

21 but that's what David Worley had, and I told him to take

22 a picture of it and send it to me.

23     Q. I understand. So he took a picture,

24 scanned it to you, right?

25     A. Mm-hmm.

1    Q.   And Item Number 2 on the e-mail you're
2 asking to revert back to the 10 percent share?
3    A.   Yes.
4    Q.   Explain that.  What were you proposing
5 there?
6    A.   That was the agreement that we shook hands
7 on in David Khoury's office in the spring of 2016, and
8 that David Worley confirmed in subsequent conversations
9 that I was to be paid.  And then when I gave them my
10 agreement they came back with 5 percent.  So I said,
11 "please revert back."  I'm trying to be polite so I gave
12 him respect, and trying to be polite.
13    Q.   The term "promote" is the same thing as
14 carried interest in a real estate transaction, is that
15 your understanding of that term?
16        MR. MARIANI:  Objection.  Form.
17    A.   I would refer to the promote more precisely
18 as the incentive fee earned by the general partner as a
19 function of the extent to which the investment
20 outperforms a target total return.
21 BY MR. MIOSSI:
22    Q.   So is it a profit interest, as you would
23 understand that?
24    A.   Yes, a profit share.
25    Q.   That's fine.  It's a profit that

1 pertains -- there is no promote if there are no profits;
2 is that correct?
3    A.   Yes, correct.  No profit over and above the
4 promised hurdle return.
5    Q.   Correct.
6    A.   Yes.
7    Q.   And when did you anticipate or did your
8 model project, let me ask you that way, that this
9 investment would be profitable?
10    A.   Once the principal and 8 percent
11 interest -- 8 percent target return had been paid to
12 investors then the profits would start, and according to
13 the models that was anticipated to be in years seven or
14 eight for this first seven-year transaction.
15    Q.   You can set that aside.  This is 5.
16 Exhibit 5 is an e-mail from Webster Hughes to David
17 Worley dated December 20, 2016 regarding contract
18 and reimbursement request.  And you attach, I believe, a red
19 line in the clean version of the proposed Executive
20 Compensation and Software License Agreement; is that
21 correct?
22        (Defense Exhibit No. 5 was marked for
23        identification.)
24    A.   Yes.
25 BY MR. MIOSSI:

1    Q.   And as with every e-mail string we see it
2 repeats, but I'm interested only in the first e-mail on
3 the first page of this exhibit.  And you said -- so you
4 made revisions in line with what you believed David
5 Khoury and George Banks considered to be fair?
6    A.   Yes.
7    Q.   And where did you get that understanding?
8 Where did you get the information as to what Khoury and
9 Banks thought was fair?
10    A.   I got that information from discussions
11 with David Worley.
12    Q.   And then you -- if I read correctly you are
13 summarizing some of the changes, breaks out your
14 responsibilities between those which are more commonly
15 thought of as an executive, and then at the last sentence
16 before you signed off on your e-mail you left the term as
17 four-years effective two because you could terminate,
18 right?
19    A.   Yes.
20    Q.   Which we covered earlier you left in place,
21 right?
22    A.   Yes.
23    Q.   The first attachment is the -- excuse me,
24 the first version of the contract you attached to this
25 e-mail is the red line version, right?  Just take a look

1 at it because we have to do all this verbally since the
2 record doesn't have eyes.
3    A.   Yes.
4    Q.   Okay.  And these are edits -- the red line
5 in here reflect edits, your input on your proposal,
6 correct?
7    A.   Yes.
8    Q.   And we know how to read a red line.  The
9 lines on the left-hand column are one way to pick them
10 out, correct?
11    A.   Yes.
12    Q.   So you changed the proposed start date from
13 November 16th to January 1, 2017, was there a reason for
14 that change?
15    A.   Yes.
16    Q.   What?
17    A.   That I would -- I put the date as
18 contemporaneous when I'm writing it to anticipate
19 executing it.
20    Q.   Okay.  Don't need to cover old ground, but
21 in Exhibit A of the contract that's where I have a
22 question or two.
23    A.   Okay.
24    Q.   You had a title or a proposed title of
25 managing director of structuring and analysis, and you

1 described the duties that you would perform there, right?

2 A. Yes.

3 Q. Was this suggested to you or was this what

4 you proposed?

5 MR. MARIANI: Objection.

6 A. This was -- David Worley repeated that he

7 wanted to emphasize that I worked for him so I wrote that

8 in the contract.

9 BY MR. MIOSSI:

10 Q. Okay. And Item Number 1 there at the top,

11 it begins, "professionally represent himself to MDF

12 employee." And MDF is the multi debt fund?

13 A. Yes.

14 Q. And it mentioned there at the end of that

15 item that you would be a dedicated full-time executive of

16 Priderock fund; is that correct?

17 A. I would represent myself as a full-time

18 executive of the MDF.

19 Q. And that was your intent?

20 A. To represent myself as a full-time

21 representative executive of the MDF, yes.

22 Q. Okay. And on Exhibit B to the same exhibit

23 you proposed changes here to the compensation. In

24 particular you changed the annual salary to $175,000.

25 MR. MARIANI: Objection. Form.

1 A. I did put that in there because in response

2 to their e-mail trying to make concessions and get an

3 agreement.

4 BY MR. MIOSSI:

5 Q. And you mentioned a $25,000 lump sum bonus,

6 right?

7 A. Yes, because that's what he had said.

8 Q. Meaning Worley or someone else?

9 A. On the little sticky pad he said that's

10 what he wanted. I'm trying to agree with the guys.

11 Q. And you modified the incentive fees, I

12 think you were proposing 10 percent, they came back with

13 5, you proposed 8; is that correct?

14 MR. MARIANI: Objection.

15 A. No, I would not say I proposed 10 percent.

16 I would say David Khoury and David Worley proposed

17 10 percent. I agreed to it. So we had had an agreement

18 on 10 percent. They attempted to renege on it when they

19 sent me back the sticky pad that said 5 percent.

20 BY MR. MIOSSI:

21 Q. In any event, you proposed a change?

22 A. They had agreed to compromise at 8 percent

23 so I decided to go with it.

24 Q. What do you mean "they had agreed to

25 compromise at 8 percent?"

1 A. If you read the -- go back to the first

2 page of Exhibit 5.

3 Q. Yes.

4 A. I said I revised the agreement to bring it

5 more in line with what I think DK and George think is

6 fair and desire to accomplish, replaces previous

7 compensation. David had conveyed to me that after my

8 reaction to their 5 percent, that he and David Khoury had

9 gotten George to agree to 8 percent.

10 Q. Who said that to you?

11 A. David Worley.

12 Q. And when you say he conveyed, I don't mean

13 to be nitpicky, but I have to be nitpicky. What did he

14 say?

15 A. David told me that George had agreed to 8

16 percent.

17 Q. Mr. Worley told you that?

18 A. Yes.

19 Q. Did he tell you that Mr. Banks had agreed

20 to any other term?

21 A. No.

22 Q. I can show you an exhibit, but -- you can

23 set that aside. As of January 9, 2017 you still had no

24 agreement?

25 MR. MARIANI: Objection.

1 BY MR. MIOSSI:

2 Q. Excuse me, there was no written agreement

3 between the parties, right?

4 A. We had not memorialized an agreement.

5 Q. You never had a written agreement with

6 Priderock, right?

7 A. That's correct.

8 MR. MARIANI: What are your thoughts about

9 lunch?

10 MR. MIOSSI: I will go right through, but

11 it's up to the court reporter and if you tell me

12 you got to have something.

13 MR. MARIANI: We need to take a lunch break

14 at some point.

15 MR. MIOSSI: Okay. I'm not going to eat so

16 I'll just keep rolling. You got to tell me when

17 you need a break.

18 MR. MARIANI: Let's go about 15 more

19 minutes.

20 MR. MIOSSI: Okay.

21 BY MR. MIOSSI:

22 Q. Okay. Exhibit Number 6 is an e-mail from

23 Webster Hughes to David Khoury dated January 10, 2017

24 regarding the contract reimbursement request. You

25 forwarded Word version of the contract you had drafted to

1 Mr. Khoury and you were making a recommendation here in
2 this e-mail that you and Priderock's counsel review and
3 provide comments; is that fair?
4          (Defense Exhibit No. 6 was marked for
5     identification.)
6     A.   I'm sending this e-mail -- yes, that's
7 fair.
8 BY MR. MIOSSI:
9     Q.   And this was the most recent version, the
10 January 1, 2017 version of your proposed written
11 contract, right?
12    A.   With the full e-mail string attached.
13    Q.   Fine.  Why did you send this to Mr. Khoury?
14    A.   I sent this to Mr. Khoury because we needed
15 to have a contract.  I would say, in thinking about this,
16 I provided it to Mr. Khoury because we needed to have a
17 written and signed agreement.
18    Q.   Okay.  Exhibit 7 is one page e-mail from
19 David Khoury to you dated January 18, 2017.  The subject
20 is WPB office visit.
21         What did you understand Mr. Khoury was
22 telling you in this e-mail?
23         (Defense Exhibit No. 7 was marked for
24    identification.)
25    A.   Okay.  There are two e-mails here.

1 BY MR. MIOSSI:
2     Q.   Well, yeah.  That's fair.  And I, my
3 question really had to do with the e-mail that Mr. Khoury
4 wrote to you, but go ahead and answer it any way you
5 like.
6     A.   This e-mail was in response to an e-mail I
7 sent him regarding our efforts to finalize my written
8 agreement.
9     Q.   Yes.
10    A.   Memorialize our written agreement.  As you
11 can see from the previous e-mail there was an important,
12 it was a call with a client, Grosvenor, scheduled for
13 1/24/17 that I planned to fly down and attend.  David
14 Worley had asked me, recommended to me that I schedule a
15 time to meet with David Khoury to discuss my contract.
16 I'm asking David Khoury when he would like to schedule a
17 meeting.
18    Q.   About the contract?
19    A.   About the contract.
20    Q.   Okay.
21    A.   David Khoury's response says that
22 unbeknownst to me he has a red line of my contract that
23 he has given to David Worley and that he will then convey
24 to George Banks, but that he does not want to discuss the
25 agreement.

1     Q.   Meaning Khoury?
2     A.   Khoury says he doesn't want to discuss the
3 agreement.
4     Q.   At this point, I mean, did you have an
5 understanding that Priderock was working with you, they
6 were trying to get a written agreement with you?
7     A.   Yes.
8     Q.   Exhibit Number 8 is an e-mail starting at
9 the top from Webster Hughes to David Khoury dated
10 January 18, 2017, and I'm interested in your response to
11 Khoury e-mail.  You say, "that's fine."  What are you
12 referring to?
13         (Defense Exhibit No. 8 was marked for
14    identification.)
15    A.   I'm saying that -- I'm responding to what
16 he wants, that David -- he is saying that David Worley is
17 reviewing some changes and my assumption is that I would
18 be provided with that agreement, but he doesn't want to
19 discuss.  So I said, that's fine.  That's it.  That's
20 fine.  Worley is reviewing the agreement.  He is going to
21 give it to George Banks.  David Khoury doesn't want to
22 discuss.  I'm just saying, "that's fine.  I'll be down
23 there for the meeting."
24 BY MR. MIOSSI:
25    Q.   Did you ever have any discussion with

1 George Banks regarding the terms that you would work with
2 Priderock?
3     A.   On this meeting neither George Banks nor
4 David Khoury were willing to talk to me about the
5 agreement.
6     Q.   Okay.  Other than this instance, was there
7 a time before or after January 18, 2017 that you
8 discussed the terms of a contract with Mr. Banks?
9     A.   I never discussed any agreements with
10 George Banks.
11    Q.   Okay.  You are aware that he had to agree
12 on behalf of Priderock to anything that -- to any
13 contract with you; is that correct?
14         MR. MARIANI:  Objection.  Form.
15    A.   No, I was not aware of that.  To the
16 contrary, I assumed that David Khoury and David Worley
17 together were fully authorized to agree to compensation
18 terms.
19         MR. MARIANI:  Would this be a good time to
20    break for lunch?
21         MR. MIOSSI:  Let's do this one and we'll
22    take a break.
23 BY MR. MIOSSI:
24    Q.   Exhibit 9 is an e-mail from David Khoury
25 dated January 24, 2017 to Webster Hughes.  The subject

19 (Pages 70 - 73)

1 is, "red line of the employment document." Do you
2 recognize the e-mail and the attached document?
3          (Defense Exhibit No. 9 was marked for
4     identification.)
5     A.   I recognize this document.
6 BY MR. MIOSSI:
7     Q.   Okay.
8     A.   I don't recall the e-mail, but it makes
9 sense.
10    Q.   The e-mail to you, Mr. Khoury is saying in
11 the e-mail, and the part I want to ask you about, "we
12 still need to go over the expenses." What was your
13 understanding of that point he was making to you?
14    A.   My understanding of that point was that
15 they would need to review, just what it says, review my
16 line item reimbursement request and on an ongoing basis
17 put some guidelines around expenses, which was natural.
18    Q.   Okay. And then the attachment, which is a
19 red line, which states, "W&S comments, January 18, 2017."
20 Do you recognize this as a document that was prepared by
21 Priderock's counsel?
22    A.   I do.
23    Q.   And this was their response to you. And I
24 want to direct your attention to Paragraph Number 4.
25 Paragraph Number 4 regards responsibilities, software,

1 and services. And the edits, the additions to this
2 provision are I, think are self-evident, but if they are
3 not we can point them out. They, Priderock inserted a
4 term that you personally perform these responsibilities.
5 And later on in the same section that you devote at least
6 90 percent of your business time to the performance of
7 the responsibilities. Do you see that?
8     A.   I do.
9     Q.   Okay. Were you -- did you agree to that?
10         MR. MARIANI: Objection. Form.
11    A.   I did not agree to that in the context of
12 this contract.
13 BY MR. MIOSSI:
14    Q.   Were you agreeable to that personal
15 involvement and devoting 90 percent of your time is in
16 concept, take out the rest of the provisions in here,
17 were you willing to dedicate your time to Priderock to
18 that extent?
19         MR. MARIANI: Objection. Form.
20    A.   I was willing to dedicate my time to
21 Priderock to that extent assuming that I had an
22 acceptable agreement.
23 BY MR. MIOSSI:
24    Q.   All right. On Exhibit B to this Exhibit 9,
25 it's regarding compensation, the $175,000 figure that you

1 proposed remained the same?
2          MR. MARIANI: Objection. Form.
3 BY MR. MIOSSI:
4     Q.   You see where I am?
5          MR. MARIANI: Objection. Form.
6     A.   I'm looking at Exhibit B1. Exhibit B.
7 Okay.
8 BY MR. MIOSSI:
9     Q.   I'm just pointing out this red line didn't
10 change, the $175,000 figure that you had earlier
11 proposed?
12         MR. MARIANI: Objection. Form.
13    A.   This does not change the 175,000 figure.
14 This changes the term of that and it changes the meaning
15 of that in a very material way.
16 BY MR. MIOSSI:
17    Q.   How?
18    A.   Because the previous iterations of our
19 contract, which are consistent with the original
20 agreement that I had with David Worley and David Khoury
21 were that the 200,000, which has been changed to 175 plus
22 a 25,000 bonus, would be my share of the quarterly asset
23 management fee over the life of the transaction, and that
24 the term of my agreement would be the time period in
25 which I would continue to work on new transactions where

1 I would be paid consistent with that fee agreement on
2 those transactions.
3          This changes that payment structure to me
4 getting 175 only for the initial term of the agreement,
5 which is a very different concept.
6     Q.   They proposed that you become an employee
7 of Priderock, did you understand that?
8     A.   They started calling it employee and salary
9 once we got into these negotiations. Prior to that it
10 had been understood that I was a sweat equity partner,
11 for lack of a better word, that I was a -- I want to
12 correct that -- I don't want to imply that I was a
13 partner. They were specific I was not a general partner.
14 Previously, I had been characterized as a contractor. In
15 the forms that we filled out for SEC I was designated as
16 a contractor.
17    Q.   And then on the lower portion of this same
18 page, the bulleted items.
19    A.   Mm-hmm.
20    Q.   They -- plus, what did you understand the
21 plus to be, is that promote or something different?
22    A.   Promote.
23    Q.   And the bulleted items there, what did you
24 understand they were proposing to you?
25    A.   Some kind of a vesting schedule for the 8

1 percent.

2     Q.  Was that acceptable to you?

3     A.  No.

4     MR. MIOSSI:  Okay.  That's all I have on

5 that, if you want to take a break.  I'll be ready

6 to go as soon as you are back.

7     MR. MARIANI:  Okay.  Great.

8     (Break taken from 12:25 p.m. to 1:31 p.m.)

9 BY MR. MIOSSI:

10     Q.  Exhibit 10 is an e-mail from Webster Hughes

11 to David Worley dated January 25, 2017.  The subject is,

12 "WH contract bullet points."  And the attachment is a

13 document that contains various numbers of items.  Do you

14 recognize this document, this exhibit?

15     (Defense Exhibit No. 10 was marked for

16 identification.)

17     A.  I do.

18 BY MR. MIOSSI:

19     Q.  What was the purpose for this e-mail?

20     A.  The purpose of this e-mail was to frame the

21 final drafting of our agreement.

22     Q.  Was it something that you initiated or you

23 requested to do it or how did it come about?

24     A.  This specific document was David Worley's

25 recommendation that we complete it in a meeting on the

1 subsequent -- during the visit that we discussed in prior

2 e-mails in which I wanted to finalize a written

3 agreement.

4     Q.  So help me understand, the top seven

5 numbered items were proposed by you or authored by you or

6 suggested by you?  WH is sort of your column; is that

7 right?

8     MR. MARIANI:  Objection.  Form.

9 BY MR. MIOSSI:

10     Q.  So what's the first one in reference to

11 Item Number 1, "contractual compensation for prelaunch

12 investment based on historical billing rates?"

13     A.  That would be that I would be -- that my

14 contract would reflect the considerable prelaunch

15 speculative contingent upon success investment that I

16 made and it would reflect it in a manner that's

17 consistent with my historical billing rights.

18     Q.  So it's a $400 an hour a standard charge or

19 typical charge you would apply to one of your clients or

20 customers?

21     MR. MARIANI:  Objection.  Form.

22     A.  $400 an hour is a charge that I have

23 applied to customers.  It is less than I've charged some

24 customers.  It's greater than I've charged other

25 customers.

1 BY MR. MIOSSI:

2     Q.  And the $500,000 a year, what does that

3 represent, a full year working at $400 an hour or

4 something different?

5     A.  That was a -- I had a retainer agreement

6 with -- and a contract with Bank of America for $500,000

7 per year in which I provided consulting for them from my

8 own offices, managed my own time.  And so I'm

9 highlighting that as a historical billing right.

10     Q.  What year did you have that arrangement

11 with Bank of America?

12     A.  2005 through 2008.

13     Q.  And they paid you $500,000 each year?

14     A.  They paid me, in the first three months of

15 the contract they paid me 25,000 per month.  In the next

16 three months of the contract, they paid me 35,000 per

17 month. Starting in 2000 -- I can't remember the exact

18 2006 or 2007 they changed it to 500,000 per annum divided

19 by 12.

20     Q.  What were you doing for them?

21     A.  I wrote the business plan and spoke to and

22 educated their internal teams and helped set up all the

23 pricing and models, wrote risk papers, made presentation

24 s to investors, spoke at conferences all in connection to

25 a commercial real estate property risk management product

1 that we pioneered at Bank of America.

2     Q.  And you said 2005 through 2008?

3     A.  Yes.

4     Q.  And that was all you did during those

5 years?  Was that all your work time, is what I mean?

6     A.  No, not all my work time.  I also continued

7 to develop and market my residential real estate analysis

8 models.  Although, I did not obtain any contracts.  I

9 also participated as a principal in -- and developer, in

10 fact, in some small scale real estate transactions where

11 I made, you know, not insignificant amounts of money.

12     Q.  The duration of the contract, your intent

13 was to have a long-term deal?

14     A.  Long-term deal that grows with the

15 business, scales with work requirements, yes.

16     Q.  Your intent was to have a multiyear

17 agreement?

18     A.  Yes, that was my intent.

19     Q.  And then the item, the four items down at

20 the bottom under the heading "DW" those were points that

21 David Worley made; is that correct?

22     A.  That's correct.

23     Q.  You authored the document, but this is what

24 you believe -- points he proposed to you; is that fair?

25     A.  David dictated those points and we went

1 back and forth on them in face to face and then I
2 memorialized them in this document.
3     Q.   So after you met and discussed these items,
4 you later prepared what's Exhibit Number 10, right?
5     A.   I would more accurately characterize it as
6 I prepared it during your discussion.
7     Q.   And was the date of the discussion, the
8 date of the cover e-mail, January 25, 2017?
9     A.   That's my assumption.
10    Q.   Exhibit 11 is an e-mail from David Worley
11 to Webster Hughes, February 1, 2017, it attaches or
12 forwards an e-mail from Brian Kozlowski to David Worley.
13 And the main -- it attaches an executive compensation
14 software and agreement license.  Do you recognize this
15 exhibit?
16         (Defense Exhibit No. 11 was marked for
17         identification.)
18    A.   I don't recall this specific e-mail.  The
19 document, I don't recall any differences that it had from
20 the previous document.
21 BY MR. MIOSSI:
22    Q.   Okay.  I'm looking at the document.  You
23 are not denying receiving the e-mail and the attachment,
24 are you?
25         MR. MARIANI:  Objection.  Form.

1     A.   I'm not denying receiving it.
2 BY MR. MIOSSI:
3     Q.   Okay.  That's fine.  The questions I have
4 are on the agreement.  And this one proposes a start date
5 of February 1, 2017, and on Item Number 3 -- and you
6 understood this was a proposal from Priderock, correct?
7         MR. MARIANI:  Objection.  Form.
8     A.   I understand this as a response to my
9 contract.
10 BY MR. MIOSSI:
11    Q.   Okay.  And it was --
12    A.   From Priderock's lawyer drafted on behalf
13 of Priderock.
14    Q.   That's all I'm saying.  So Item Number 3
15 contains a proposal for a two-year term?
16         MR. MARIANI:  Objection.  Form.
17 BY MR. MIOSSI:
18    Q.   Is that correct?  I need an audible
19 otherwise she can't get your response.
20    A.   Yes, it is a two-year term that they are
21 proposing.
22    Q.   And then Item Number 4, it includes the
23 language in the third line regarding you personally
24 performing the responsibilities described in the
25 agreement.  Do you see that?

1         MR. MARIANI:  Objection.  Form.
2     A.   It says either personally or in concert
3 with Metrix, my wholly-owned work company, but I could
4 have people working for me in Metrix that would provide
5 some of it.
6 BY MR. MIOSSI:
7     Q.   Well, I won't debate with you, but you
8 recognize -- did you understand that Priderock valued or
9 it was important to Priderock that you personally perform
10 the responsibilities that were described in this
11 contract --
12         MR. MARIANI:  Objection.  Form.
13 BY MR. MIOSSI:
14    Q.   -- as opposed to delegating it to others?
15    A.   There are some responsibilities that only I
16 was capable of performing and Priderock would have, by
17 necessity, wanted me to perform them.  There are other
18 functions I could have delegated, and that would be the
19 reason that it says, in concert with Metrix.
20    Q.   Okay.  And on Item 15, the proposed
21 classification would be you would serve as an independent
22 contractor, was that -- were you prepared to accept that
23 condition?
24         MR. MARIANI:  Objection.  Form.
25    A.   I had consistently throughout these

1 discussions presented myself as an independent
2 contractor.  So, yes, I would accept that.
3 BY MR. MIOSSI:
4     Q.   You preferred to be an independent
5 contractor rather than a full-time employee; is that
6 correct?
7     A.   I did.
8     Q.   And then on Exhibit C to the exhibit it
9 describes the compensation terms.  The proposed 200,000
10 per annum fee was increased from the 175 that had earlier
11 been proposed.  Do you recognize that?
12         MR. MARIANI:  Objection.  Form.
13    A.   It was modified from 175 plus a $25,000
14 bonus to being just simply 200,000.
15 BY MR. MIOSSI:
16    Q.   Okay.  And the plus or I think we recognize
17 as the -- I'm blanking on the term all of the sudden.
18    A.   Vesting.
19    Q.   Well, that is a vesting schedule, but the
20 promote.  The plus is the promote, right?
21    A.   Yes, the plus is the promote.
22    Q.   And they proposed a schedule that
23 basically -- basically, a vesting schedule as you
24 understood it; is that right?
25    A.   Yes.

22 (Pages 82 - 85)

1    Q.   And on Schedule D, the next page,
2  concerning the expenses of prelaunch the term written on
3  the last half of that sentence, you would be reimbursed
4  for documented expenses that are, quote, eligible for
5  reimbursement by the fund under terms of the fund limited
6  partnership agreement.  Did you see that?
7    A.   I saw that.
8    Q.   What did you understand that to mean?
9    A.   I understood that to mean that within the
10 terms of the fund limited partnership agreement that it
11 was a definition of expenses that would be reimbursed by
12 the fund as opposed to by the general partnership, and
13 that my expenses would be reviewed and determined which
14 of them were eligible for that reimbursement.
15   Q.   Were you in agreement with that condition
16 or did you have an objection to that?
17        MR. MARIANI:  Objection.  Form.
18   A.   I was broadly -- I was generally in
19 agreement with the caveat that my expectation was that
20 the majority of the expenses that I was requesting
21 reimbursement for would be eligible for reimbursement.
22 BY MR. MIOSSI:
23   Q.   Did Priderock reimburse you for any
24 expenses during the time you were associated with them?
25   A.   Priderock only reimbursed me for travel

1  expenses.
2    Q.   Earlier you mentioned you were doing the
3  prelaunch work on a contingency basis; do you recall
4  that?
5    A.   Yes, I do.
6    Q.   Are you aware that the Priderock general
7  partnership was also engaging in the prelaunch period on
8  a contingency basis?
9    A.   I am.
10   Q.   So they wouldn't get paid either during the
11 prelaunch; is that your understanding?
12   A.   They would not be paid on the fund if it
13 were not launched.
14   Q.   You can put that aside.
15        Exhibit 12 is an e-mail from Webster Hughes
16 to David Worley dated February 6, 2017 regarding the
17 follow-up, and it attaches a Word document, Executive
18 Compensation Software and License Agreement.  This is an
19 e-mail you prepared and you marked up the contract
20 proposal that Priderock's lawyers had sent to you,
21 correct?
22        (Defense Exhibit No. 12 was marked for
23        identification.)
24   A.   I would have to review it to make that
25 assessment.

1
2  BY MR. MIOSSI:
3    Q.   Okay.  Take a look.
4    A.   I was reading the e-mail first.  Do I need
5  to read the e-mail?
6    Q.   Take your time and let me know when you are
7  ready.
8    A.   Okay.
9        MR. MARIANI:  Wait for a question.
10   A.   Okay.  Question.
11 BY MR. MIOSSI:
12   Q.   Go ahead, if you want to say something.
13   A.   I don't know what your question is.
14        MR. MARIANI:  Just answer a question.
15 Thank you.
16 BY MR. MIOSSI:
17   Q.   This document, which is Exhibit 12, you
18 prepared the edits and track line changes to it,
19 corrects?
20   A.   I do not think so.
21   Q.   So the document that you attached here is
22 something you did not mark up; is that correct?
23   A.   I question if I attached a document to this
24 e-mail.  It does not mention an attachment to the
25 document, to this e-mail.  I think that someone may have

1  inadvertently given you this as an attachment to an
2  e-mail.  This is not my work.  This is the initial
3  agreement.  My comments on this agreement are contained
4  on paragraph two of this e-mail.
5    Q.   I understand that.  So the second
6  paragraph, it speaks for itself.  But the document that's
7  attached, which is indicated comes from your e-mail and
8  it's the attachment is identified as Executive
9  Compensation Software License Agreement.DOCX.  Do you see
10 that?
11   A.   Yes.
12   Q.   You are challenging that the attachment to
13 this Exhibit Number 12 was something that you did not
14 attach to it?
15   A.   I do not recall attaching it.  I do not
16 recall -- there are essentially no markups in this
17 versus, for instance, the prior agreement -- well, if it
18 says attachments then perhaps it was attached, but I
19 don't recall those markups.  I could have just forwarded
20 this and attached a business plan ProForma and then just
21 provided the comments in paragraph two.
22   Q.   Well --
23   A.   I want to repeat, I do not think that this
24 document that was either attached or not attached to this
25 e-mail reflects any comments from me.

1    Q.   Then let's compare Exhibit Number 11 with
2 Exhibit Number 12. So Exhibit Number 11, you have that
3 in front of you. I'll take you to Exhibit Number 11,
4 Item Number 3, term, and that was forwarded by David
5 Worley from Priderock's lawyers?
6    A.   Yes.
7    Q.   And if you compare the very same Section 3
8 in Exhibit Number 12, there are track changes in there
9 concerning the term that alter the two-year proposal that
10 Priderock made to one timely term to the termination date
11 of the fund. Do you see that?
12         MR. MARIANI: Objection. Form.
13    A.   I do see that. Now, I did not see that
14 earlier. So yes, I can see that I would have made that
15 change.
16 BY MR. MIOSSI:
17    Q.   Okay.
18    A.   And that is consistent with paragraph two
19 of the e-mail.
20    Q.   It appears that way to me too.
21    A.   Yes.
22    Q.   My question on Item Number 3 -- I think we
23 can put 11 aside.
24    A.   Yes.
25    Q.   Because I'm really just asking about

1 Exhibit 12 at this point.
2    A.   I got you.
3    Q.   My question on Item 3 is you wanted a
4 contract term of longer than the two-year that Priderock
5 proposed; is that correct?
6    A.   I wanted a fee -- the fee agreement that we
7 agreed to at $200,000 per year as my share of the
8 quarterly asset management fee that Priderock was earning
9 to be paid for the full time period in which Priderock
10 was earning it.
11    Q.   Okay. Which in your mind was how long?
12 What time period did you expect the fund to run, five
13 years, 10 years?
14    A.   However long it runs. If we bought 10-year
15 security it would run 10 years. That's the time period
16 in which Priderock would receive the fees that I'm
17 entitled a share to.
18    Q.   Okay. That's fine. And then just so that
19 we are clear, if there appeared to be any other track
20 change edits in this Exhibit Number 12, you can easily
21 see them in black and white on the left-hand column,
22 those are changes that you input; is that correct? And I
23 can take you right to Exhibit C and D if you want to look
24 so we are clear.
25    A.   As far as marks on the page, that as you

1 know when you edit that could have been something on the
2 order I started to make a change then put a back space
3 and didn't include it, but it put a mark on the space.
4    Q.   I understand. That's fair. It draws your
5 attention to whether there is a clear line-out or an
6 underscore, which indicates either a deletion or an
7 addition?
8    A.   Okay. C, I changed "without cause" to
9 "with cause."
10    Q.   Yes. And you amended the percentages in
11 the vesting schedule; is that right?
12    A.   Correct. I put it back to the payments
13 that we had agreed to.
14    Q.   And then on Exhibit D, the edits that you
15 made, the changes you made there are self-evident, are
16 all underlines; is that correct, except for the change
17 the date?
18    A.   I agree.
19    Q.   Okay. So Exhibit 13 is an e-mail from
20 David Worley to Webster Hughes, February 7, 2017. Let me
21 know when you are ready for a question.
22         (Defense Exhibit No. 13 was marked for
23         identification.)
24    A.   What do you want me to do?
25 BY MR. MIOSSI:

1    Q.   Do you remember receiving this e-mail?
2    A.   I do.
3    Q.   The question I have for you is in the
4 second paragraph, and it's about the middle of the second
5 paragraph. So I will read the sentence so that you can
6 get your bearings. It reads: "You've told me several
7 times that the work you've done over the last 16 months
8 is worth between 250,000 and $450,000. Do you see that?
9    A.   I see that.
10    Q.   Did you tell David Worley that?
11    A.   I don't think I would have told him that.
12 I do not recall and I don't think I would have told him
13 that.
14    Q.   Do you deny saying that or do you have no
15 memory?
16    A.   I deny saying it.
17    Q.   You can set that aside -- actually, I do
18 have one more question on it. I'll draw your eye to it
19 as soon as I can find it.
20         Stay in that same paragraph that I had a
21 question about, and the sentence reads: "That seems high
22 to me given the fact that you had already built the model
23 for Kevin Donlon and just had to dust it off." Let me
24 stop right there and ask you, who is Kevin Donlon?
25    A.   Kevin Donlon is the CEO of Riverbank.

1    Q.   Okay.  And is that something you told David
2  Worley?
3          MR. MARIANI:  Objection.  Form.
4    A.   Is what something I told David Worley?
5  BY MR. MIOSSI:
6    Q.   The sentence I just read to you, is that an
7  accurate statement?
8    A.   No, it's not an accurate statement.
9    Q.   Do you deny telling Mr. Worley that
10 information that you already built the model for Kevin
11 Donlon and just had to dust it off?
12   A.   I deny saying that to David Worley.
13   Q.   Do you deny telling him you already built
14 the model for Kevin Donlon?
15   A.   No, I acknowledge that I told David that I
16 had various models that I built for Kevin Donlon.
17   Q.   And did you tell him that you used any of
18 that work to build a model for Priderock?
19   A.   I said I used some of that work as a
20 starting point to build a model for Priderock.
21   Q.   And if you continue in that same paragraph,
22 it's the next sentence, Mr. Worley makes the comment that
23 we are -- "the work we are asking you to do takes only
24 one to two days a month."  Do you agree with that?
25   A.   If there are no losses on the tranches then

1  the work on a monthly basis, once the transaction was
2  executed, takes very little time.  So one to two days per
3  month would, in most circumstances, be accurate.
4    Q.   And what would that one to two days of work
5  consist of?
6    A.   It would consist of collecting the monthly
7  reports provided by the servicer and the trustee,
8  reviewing the -- reconciling the cash flows that were
9  paid to the interest earned on the bonds and the loans
10 and the distributions shown in the servicing reports, and
11 possibly if Priderock decided it wanted to have an
12 abundance of caution or to provide an extra report to
13 investors to confirm that with the customized proprietary
14 models that I had created.
15   Q.   That's fine.  I understand that.
16        Exhibit 14 is an e-mail from Webster Hughes
17 to David Worley dated February 8, 2017.  Take a look --
18 I'm just going to ask you about the top e-mail that you
19 sent.
20        (Defense Exhibit No. 14 was marked for
21        identification.)
22   A.   I read it.
23 BY MR. MIOSSI:
24   Q.   So your response to Mr. Worley's e-mail,
25 which is in the string below is -- I mean, you

1  appreciated, you said you understand his perspective.
2    A.   I did.
3    Q.   Did you think his perspective was
4  unreasonable or unfair?
5    A.   Yes, I thought his perspective was faulty.
6    Q.   Okay.  You didn't say that in here, though,
7  but you express confidence in being able to work through
8  the issues, correct?
9    A.   I was trying to be polite and recognizing
10 that we had a live transaction to attend to, and that I
11 did not want to continue -- that it was not to the
12 benefit of anyone involved for us to continue these
13 contract discussions while we are trying to close a
14 transaction for the fund.  So this was my polite way of
15 saying, "we will resolve this after we get the fund, get
16 the investment executed."
17   Q.   Okay.  And Exhibit 15 is an e-mail from
18 Webster Hughes to George Banks, David Khoury, David
19 Worley dated April 20, 2017.  And it attaches a MDOF
20 compensation agreement, which consists of a memo form,
21 and you prepared this; is that correct?
22        (Defense Exhibit No. 15 was marked for
23        identification.)
24   A.   Yes, it is.
25 BY MR. MIOSSI:

1    Q.   Okay.  Now as of April 20, 2017 you still
2  were not in agreement with Priderock concerning your --
3  the terms that you provided services to them; is that a
4  fair statement?
5          MR. MARIANI:  Objection.  Form.
6    A.   We had not agreed on a -- we did not have a
7  written agreement.
8  BY MR. MIOSSI:
9    Q.   Okay.  In your e-mail you mentioned again
10 your preferences for fixed compensation to the life of
11 the investment, and I understand from your earlier
12 testimony, if I'm correct in what I heard, that that is
13 matched to the life of the bond.  So it could be seven
14 years.  It could be whatever the life of the bond is; is
15 that right?
16   A.   Yes, it is.
17   Q.   And then the attached memo that you
18 prepared and addressed to George Banks, David Khoury, and
19 David Worley, what did prepare -- what was your purpose
20 here?
21   A.   To tell them that it's time to finalize the
22 agreement and this is a proposal to finalize the
23 agreement.
24   Q.   Did you intend this to be, for lack of a
25 better term, this is my best or my final proposal?

25 (Pages 94 - 97)

1          MR. MARIANI: Objection. Form.
2      A.  I didn't make those stipulations.
3  BY MR. MIOSSI:
4      Q.  This is Exhibit 16, and it's an e-mail from
5  Webster Hughes to George Banks, David Khoury, David
6  Worley dated May 2, 2017.  And at this point you're
7  telling them in the second paragraph that you've engaged
8  counsel; is that right?
9          (Defense Exhibit No. 16 was marked for
10     identification.)
11     A.  I am.
12  BY MR. MIOSSI:
13     Q.  And at this point, do I understand
14  correctly that you are turning this over to your counsel
15  to work with Priderock's counsel in an effort to resolve
16  the terms the parties were at odds on; is that right?
17     A.  I am.
18     Q.  And Exhibit 17 is an e-mail from your
19  attorney, John Mariani to Brian Kozlowski, one of the
20  outside counsel for Priderock at Winston & Strawn dated
21  2017.  It's not apparent to me that you were copied on
22  this, but have you seen this before?
23         (Defense Exhibit No. 17 was marked for
24     identification.)
25     A.  I don't know that I was copied.  I don't

1  recall this exactly.  But I know that John made -- sent
2  e-mails of this nature.
3  BY MR. MIOSSI:
4      Q.  All right.  As you look at this e-mail sent
5  by your attorney, did you authorize him to make these
6  statements on your behalf?
7      A.  I authorized John to make whatever --
8          MR. MARIANI:  Just answer yes or no.
9      A.  Yes.
10  BY MR. MIOSSI:
11     Q.  Yeah, I don't want to know what you talked
12  about.
13     A.  Yes.
14     Q.  This is okay with you; is that right?
15     A.  Yes.
16     Q.  You can put that aside.  And then after
17  this communication, which is the end of May 2017, when
18  did you consider the relationship between you and
19  Priderock to be over?
20     A.  When I received a separation agreement.
21     Q.  Okay.  Which was late May or early
22  June 2017?
23     A.  Early June.  June 1st, I think.
24     Q.  And I gather that proposal was not
25  acceptable to you, correct?

1      A.  Correct.
2      Q.  Exhibit 18 is a spreadsheet that was
3  produced by you, Mr. Hughes, and is one of the reasons
4  they call it discovery because I want to discover what
5  this represents.  So what is this document, several pages
6  in length, titled WH Business Expenses?
7          (Defense Exhibit No. 18 was marked for
8      identification.)
9      A.  This is a Quicken download of all my
10  expenses that I classified as business expenses and that
11  I considered eligible for reimbursement from Priderock.
12  BY MR. MIOSSI:
13     Q.  And I'm not about to go through each line
14  item, it isn't necessary at this point anyway.  But each
15  of these expense items concern the date indicated and
16  the left-hand column is your contention are expenses that
17  you incurred on behalf of the Priderock MDOF; is that
18  correct?
19     A.  To the best of my estimation, there are a
20  lot of expenses, as you see.  Therefore, some of the
21  expenses may have not been incurred there.  For example,
22  UPS store expense for $3 I may have gotten something
23  copied that was not for Priderock.  So we can eliminate
24  that one.  So there a lot of miscellaneous expenses.
25     Q.  Is the total reflected on this document,

1  $73,209, is that what you are seeking to recover as part
2  of your damages in this lawsuit?
3      A.  Yes.
4      Q.  And that sum includes even items that
5  according to what you just said may not be properly
6  charged to Priderock?
7      A.  Possibly.
8      Q.  And before incurring any of these expenses,
9  did anyone from Priderock authorize you to do so?
10     A.  There are some expenses that were
11  explicitly authorized.  There were many other expenses
12  that were implicitly and assumed to be part of my
13  contribution.
14     Q.  How much of the $73,000 do you estimate
15  fall into the assumed or implicit category?
16     A.  Most.
17     Q.  Okay.  On the second page in the bottom 10
18  percent or so of the page, there is a series of items
19  under the column third from the left, it says, "to Hughes
20  Webster."  See all that?
21     A.  Mm-hmm.
22     Q.  What do those expenses reference?
23     A.  Payment to my son.
24     Q.  Okay.  What was he doing?
25     A.  He was downloading information from the

1 Freddie Mac website, assisting in making spreadsheets.
2 He brought in other college interns to do similar work as
3 part of our effort to collect the Freddie Mac loan data
4 for use with Priderock fund.
5     Q.   Does your son charge out at a certain
6 hourly rate?  It doesn't appear here.
7     A.   I paid him $15 per hour as I disclosed to
8 David Worley in another e-mail we saw earlier.
9     Q.   Did your son only perform work that you
10 directed him to perform?
11     A.   Yes.
12     Q.   Was all the work that you directed him to
13 perform on behalf of -- what you understood to be
14 Priderock business?
15     A.   Yes.
16     Q.   Exhibit 19 is an e-mail from John Mariani
17 to Brian Kozlowski dated June 27, 2017 attaching a
18 letter.  And the question I have for you concerns just
19 the attached letter.
20         This is a letter that your attorney sent to
21 us as attorneys for Priderock making a demand.  And the
22 question I have for you is in the first paragraph Roman
23 Numeral or little I, see that?
24         (Defense Exhibit No. 19 was marked for
25         identification.)

1     A.   Yes.
2 BY MR. MIOSSI:
3     Q.   "Priderock Capital Partners, LLC will cause
4 a cash payment of $350,000 to be paid to Dr. Hughes
5 immediately for the time and efforts Dr. Hughes devoted
6 to the MDOF project during the 21-month period
7 September 21, 2015 to June 1, 2017."  You see that?
8     A.   Yes, I do.
9     Q.   Is that what you consider to be the value
10 of your time and work to the Priderock MDOF during this
11 time period?
12         MR. MARIANI:  Objection.  Form.
13     A.   No, I consider that to be partial
14 compensation for my time and work.
15 BY MR. MIOSSI:
16     Q.   What did you base the $350,000 on?
17     A.   I don't recall -- oh, I do recall.  John --
18         MR. MARIANI:  You shouldn't discuss
19         anything.  So I'm going to direct the witness not
20         to answer that question.
21 BY MR. MIOSSI:
22     Q.   I don't want to hear what you and your
23 lawyer talked about.  Other than having you disclose
24 something you spoke to your lawyer about, can you answer
25 the question:  How did you devise or how did you come up

1 with $350,000?
2     A.   That was a prorated 200,000 per year over
3 that time period.
4     Q.   Okay.  Exhibit 20 is a series of Metrix
5 Credit Technologies, LLC invoices to a variety of
6 different clients, as I understand it, for services that
7 were provided.  Do you recognize this exhibit?
8         (Defense Exhibit No. 20 was marked for
9         identification.)
10     A.   I do.
11 BY MR. MIOSSI:
12     Q.   And this contains details expressed
13 sometimes as an hourly rate, for instance, the invoice to
14 loss modeling analysis for Santander Bank?
15     A.   Yes.
16     Q.   And you expressed that at 28 hours at $300
17 an hour, right?
18     A.   Yes.
19     Q.   Is that referencing work that you
20 performed?
21     A.   Yes, it does.
22     Q.   So you were the partner in that instance?
23     A.   Technically -- yes, I'm the partner that
24 provided my work.
25     Q.   What was the nature of this modeling?  What

1 were you doing for the bank?
2     A.   My business partner in Metrix, Dennis
3 Currier, had a standing agreement with Santander Bank to,
4 as part of that agreement, to help them on an ad hoc
5 basis with analysis of their consumer loan portfolio, and
6 they had a request for certain work that I fulfilled and
7 billed 28 hours.
8     Q.   Okay.  So there are occasions that are
9 reflected, at least in the invoices in Exhibit 20, when
10 you will record your time to bill your client, correct?
11     A.   In some cases I record my time.
12     Q.   And it just -- you testified earlier you
13 didn't record any time to reflect work you provided to
14 Priderock, correct?
15     A.   That's correct.
16     Q.   You never invoiced Priderock for any
17 services that you provided?  And I'm not talking about
18 expenses, I'm talking about professional services.
19     A.   No, I did not invoice.  We did not have a
20 consulting arrangement.  These are part of consulting
21 contracts.
22     Q.   If you want to look through them, are there
23 any projects that are reflected in these invoices in
24 Exhibit 20 that you would consider similar to the
25 modeling that you did for Priderock?

27 (Pages 102 - 105)

1    A. No.
2    Q. Are these all more complex, less complex?
3       MR. MARIANI: Objection. Form.
4    A. Some were more complex, some were less.
5 BY MR. MIOSSI:
6    Q. Can you identify one or two that were more
7 complex?
8    A. There are different definitions of complex.
9 These securities that we dealt with Priderock were more
10 complex and, therefore, required more specialized
11 understanding of certain CMBS structures.
12    Q. What's CMBS?
13    A. Commercial mortgage-backed securities,
14 which is my historic expertise. So they were more
15 complex in that regard. The other projects were more
16 complex in regard to having an economic forecast model.
17    Q. Which one would be more complex?
18    A. The Santander, the development of loan loss
19 models for Santander Bank, and the development for loan
20 loss models for Apollo.
21    Q. Okay. Apollo is the next -- I see. Okay.
22 So the rate, I'm looking at the Apollo invoice, and in
23 that instance you charged 10 days at $2,000 a day,
24 $20,000. Do you consider that a billing rate of $250 an
25 hour?

1       MR. MARIANI: Objection. Form.
2    A. No, I would consider that a billing rate of
3 $2,000 a day where I decide how much time I want to work.
4 BY MR. MIOSSI:
5    Q. Okay. So it could be one hour or it could
6 be 15?
7    A. Yes. The nature of these contracts was a
8 fixed payment contract. I've characterized, in a later
9 contract I've characterize these are a weekly payment
10 rather than a daily payment.
11    Q. But the -- we can look at the
12 interrogatories if you want to, but in response to some
13 of our interrogatories you stated that you developed some
14 loan loss models during March 2018 at a rate of $2,000
15 per day.
16    A. This would be this.
17    Q. Okay. Is it correct that you generally
18 charge $2,000 a day for loan loss modeling?
19       MR. MARIANI: Objection. Form.
20    A. No, I would not call that generally. I've
21 had many different arrangements.
22 BY MR. MIOSSI:
23    Q. Okay. And again you just charge by the day
24 regardless of the amount of time it actually takes you to
25 perform the work; is that right?

1    A. Sometimes I charge by the day. Sometimes I
2 charge by the week. Sometimes I charge by the monthly
3 retainer. Sometimes I charge a fixed amount of money for
4 a given project. It's really depends on what the client
5 wants.
6    Q. Okay. Have you ever recorded any
7 conversations with anyone at Priderock?
8    A. No, I have not.
9    Q. No audio or video or electronic recording
10 of any communication with anybody at Priderock?
11    A. No, I have not.
12    Q. Do you recall a conversation with
13 Mr. Worley where you heatedly demanded over a three or
14 five minute period of time in a quote-unquote, I want
15 your fucking money?
16    A. I remember a heated conversation. I deny
17 that I said, "I want your fucking money."
18    Q. Tell me what you remember about that
19 conversation?
20    A. I remember about that conversation, that
21 David said to me that Priderock would not go beyond the
22 terms that they had provided. This was at the time
23 period in which we exchanged these e-mails, on or around
24 February 7th.
25    Q. 2017?

1    A. Yes.
2    Q. Okay.
3    A. I then told him that I demanded it, and he
4 could go back to George and tell them that that's what I
5 demanded, and I would be happy to tell them myself. The
6 conversation became heated and then that precipitated to
7 me the next day saying that I was embarrassed at myself
8 for getting heated and that there was no place for that
9 in these discussions, and that I suggested that we work
10 on the transaction and that we table the compensation
11 discussion until the transaction is finished.
12    Q. Who did you express that to?
13    A. To David Worley.
14    Q. And what did Mr. Worley say in response?
15    A. He agreed.
16    Q. Okay. If a model that you developed for
17 Priderock MDOF produced results that was close to actual
18 but not exact, would that be acceptable to you?
19       MR. MARIANI: Objection. Form.
20    A. What do you mean by close to actual? How
21 do you define actual?
22 BY MR. MIOSSI:
23    Q. Well, according to the data and according
24 to the formula that you built into the model, you input
25 the data, the model applies the formula, and a result is

1 generated.

2     If it's close but doesn't correspond to the

3 actual data itself. For instance, if it doesn't

4 reconcile, if it doesn't match up with the Bloomberg data

5 or Freddie Mac data, is that a good model?

6     MR. MARIANI: Objection. Form.

7     A. Once again it would depend on what you mean

8 by actual and what I'm trying to match up to.

9 BY MR. MIOSSI:

10     Q. All the models that you prepared for

11 Priderock were based on the Bloomberg model, correct?

12     A. No.

13     MR. MARIANI: Objection.

14 BY MR. MIOSSI:

15     Q. What else did you base it on?

16     A. I based my analysis and model on a reading

17 of the Freddie Mac offering circulars for the securities.

18     Q. Okay. And did you rely at all on the

19 Bloomberg data?

20     A. No.

21     Q. Okay.

22     MR. MIOSSI: Okay. Let's give us a minute

23 and we'll see if we are done or we are not.

24     THE WITNESS: Okay.

25     (Break taken from 2:37 p.m. to 2:47 p.m.)

1 BY MR. MIOSSI:

2     Q. I want to go back, if your model that you

3 developed for Priderock MDOF doesn't reflect the cash

4 flow waterfall as stipulated in the Freddie Mac

5 prospectus, does that indicate a problem with the model?

6     MR. MARIANI: Form.

7     A. That indicates a problem with the model,

8 yes.

9     MR. MIOSSI: Okay. I don't have any

10 further questions. Thank you for your time.

11     MR. MARIANI: We will read.

12     COURT REPORTER: Do you want a copy of the

13 transcript? He ordered expedited for Monday.

14     MR. MIOSSI: I need it for mediation.

15     MR. MARIANI: I don't need it expedited.

16 But we will read. We are not going to read before

17 Monday.

18     MR. MIOSSI: I don't expect you to.

19     COURT REPORTER: I just need to know if

20 you --

21     MR. MARIANI: Just normal is fine. Thank

22 you.

23     MR. MIOSSI: I'd like electronic.

24     MR. MARIANI: Yeah, I will take electronic.

25 Thank you.

1     (Thereupon, the proceedings concluded at

2 2:49 p.m.)

1     CERTIFICATE OF OATH

2 THE STATE OF FLORIDA )

3 COUNTY OF PALM BEACH )

4

5

6

7

8     I, the undersigned authority, certify that

9 WEBSTER HUGHES personally appeared before me and was duly

10

11 sworn on the 16th day of August, 2018.

12

13     Signed this 19th day of August, 2019.

14

15

16

17

18

19

20

21

22 Dianelis Hernandez

23 Notary Public - State of Florida

24 My Commission No. GG136887

25 My Commission Expires: 9/23/2021

## Page 114

```
 1              CERTIFICATE OF REPORTER
 2
 3    THE STATE OF FLORIDA )
 4    COUNTY OF PALM BEACH )
 5
 6          I, Dianelis Hernandez, Florida
 7    Professional Reporter, certify that I was authorized to
 8    and did stenographically report the deposition of WEBSTER
 9    HUGHES, pages 1 through 113; that a review of the
10    transcript was requested; and that the transcript is a
11    true and complete record of my stenographic notes.
12          I further certify that I am not a
13    relative, employee, attorney, or counsel of any of the
14    parties, nor am I a relative or employee of any of the
15    parties' attorney or counsel connected with the action,
16    nor am I financially interested in the action.
17
18          DATED this 19th day of August, 2018.
19
20
21
22
23
24
25              Dianelis Hernandez
```

## Page 116

```
 1    Webster Hughes v. Priderock Capital Partners, LLC
 2              Webster Hughes
 3          E R R A T A
 4          - - - - -
 5    PAGE  LINE   CHANGE
 6    __ __ ___ _____
 7    Reason:_____
 8    __ __ ___ _____
 9    Reason:_____
10    __ __ ___ _____
11    Reason:_____
12    __ __ ___ _____
13    Reason:_____
14    __ __ ___ _____
15    Reason:_____
16    __ __ ___ _____
17    Reason:_____
18    __ __ ___ _____
19    Reason:_____
20    __ __ ___ _____
21    Reason:_____
22    __ __ ___ _____
23    Reason:_____
24    2982063
25
```

## Page 115

```
 1    Webster Hughes v. Priderock Capital Partners, LLC
 2              Webster Hughes
 3       INSTRUCTIONS TO THE WITNESS
 4          Please read your deposition over
 5    carefully and make any necessary corrections.
 6    You should state the reason in the
 7    appropriate space on the errata sheet for any
 8    corrections that are made.
 9          After doing so, please sign the errata
10    sheet and date it.
11          You are signing same subject to the
12    changes you have noted on the errata sheet,
13    which will be attached to your deposition.
14          It is imperative that you return the
15    original errata sheet to the deposing
16    attorney within thirty (30) days of receipt
17    of the deposition transcript by you.  If you
18    fail to do so, the deposition transcript may
19    be deemed to be accurate and may be used in
20    court.
21
22
23
24    2982063
25
```

## Page 117

```
 1    Webster Hughes v. Priderock Capital Partners, LLC
 2              Webster Hughes
 3       ACKNOWLEDGMENT OF DEPONENT
 4          I, _____, do
 5    hereby certify that I have read the foregoing
 6    pages and that the same is a correct
 7    transcription of the answers given by
 8    me to the questions therein propounded,
 9    except for the corrections or changes in form
10    or substance, if any, noted in the attached
11    Errata Sheet.
12
13    _____     _____
14    DATE           SIGNATURE
15
16
17
18
19
20
21
22
23
24    2982063
25
```

30 (Pages 114 - 117)

| & |
| --- |
| **&** 1:15 2:8 3:4 9:13,23 10:24 36:25 57:22 98:20 |

| 1 |
| --- |
| **1** 3:8 8:5,7,14 36:23 40:19 65:13 66:10 70:10 79:11 82:11 83:5 103:7 114:9 |

**1/10/2017** 3:10
**1/18/2017** 3:11,11
**1/24/17** 71:13
**1/24/2017** 3:12
**1/25/2017** 3:12
**10** 3:12 14:18 32:13 33:3 60:5,8 60:10,10,13 62:2 67:12,15,17,18 69:23 78:10,15 82:4 91:13,14,15 101:17 106:23
**10/26/2016** 3:8
**100** 3:16
**100,000** 43:18
**102** 3:17
**104** 3:17
**11** 3:13 14:13,18 82:10,16 90:1,2,3 90:23
**11/4/2016** 3:9
**11/9/2016** 3:9
**113** 3:3 114:9
**114** 3:4
**115** 3:4
**116** 3:5
**11802** 7:12
**11977** 113:21 114:24

**11:02** 39:8
**11:13** 39:8
**12** 3:13 14:14,15 14:18 80:19 87:15 87:22 88:17 89:13 90:2,8 91:1,20
**12/20/2016** 3:10
**120,000** 41:9
**1250** 1:24
**12:25** 78:8
**13** 3:14 55:18 92:19,22
**14** 3:14 95:16,20
**143b** 7:17
**15** 3:15 20:20 22:3 22:24 23:6 25:20 32:11 69:18 84:20 96:17,22 102:7 107:6
**16** 1:12 3:15 23:19 24:24 93:7 98:4,9
**1601** 2:4
**16th** 65:13 113:11
**17** 3:16 98:18,23
**1700** 2:9
**175** 76:21 77:4 85:10,13
**175,000** 66:24 75:25 76:10,13
**18** 3:16 31:13 70:19 72:10 73:7 74:19 100:2,7
**19** 3:17 102:16,24
**1980s** 24:17
**1997** 4:25
**19th** 113:13 114:18
**1:31** 78:8
**1st** 99:23

| 2 |
| --- |
| **2** 3:8 53:6,7,13 55:4,9 56:9,23 57:6 59:17 62:1 98:6 |

**2,000** 106:23 107:3 107:14,18
**2/1/2017** 3:13
**2/6/2017** 3:13
**2/7/2017** 3:14
**2/8/2017** 3:14
**20** 3:17 45:1 63:17 96:19 97:1 104:4 104:8 105:9,24
**20,000** 106:24
**200** 60:7,12
**200,000** 31:18 33:2 60:1,3 76:21 85:9 85:14 91:7 104:2
**2000** 80:17
**20005** 1:24
**20006** 2:9
**2005** 80:12 81:2
**2006** 80:18
**2007** 80:18
**2008** 80:12 81:2
**2009** 9:18 10:2,17
**2010** 4:25 14:13,22 41:3
**2011** 13:7 14:15,22 41:3 42:7 43:13
**2012** 10:19 14:23 42:7 43:13
**2015** 10:22,25 11:7 11:11 12:8 13:17 18:4 19:14,16 20:2 35:18 36:13 37:2 38:10 57:15 103:7
**2016** 11:13 53:8 58:19 60:21 62:7

63:17
**2017** 10:23,25 11:7 11:13 35:19,20 36:14 37:2 38:10 52:17 65:13 68:23 69:23 70:10,19 72:10 73:7,25 74:19 78:11 82:8 82:11 83:5 87:16 92:20 95:17 96:19 97:1 98:6,21 99:17,22 102:17 103:7 108:25
**2018** 1:12 107:14 113:11 114:18
**2019** 113:13
**202-282-5000** 2:10
**21** 103:6,7
**24** 53:8 73:25
**25** 78:11 82:8
**25,000** 67:5 76:22 80:15 85:13
**250** 106:24
**250,000** 93:8
**26** 46:13,19
**27** 102:17
**28** 49:18,22 50:8 51:16 52:21 104:16 105:7
**2982063** 115:24 116:24 117:24
**2:37** 110:25
**2:47** 110:25
**2:49** 1:13 112:2

| 3 |
| --- |
| **3** 3:9 55:5,5,10,14 58:5,17,22,23 59:25 83:5,14 90:4,7,22 91:3 100:22 |

**30** 24:15 25:17 26:6 47:12 115:16
**300** 104:16
**33401** 1:16 2:5
**35,000** 80:16
**350** 1:24
**350,000** 103:4,16 104:1

**4**

**4** 3:3,9 58:19 60:18,20,24 74:24 74:25 83:22
**4/20/2017** 3:15
**400** 43:11 79:18,22 80:3
**4100** 7:17
**450,000** 93:8
**4905** 7:23

**5**

**5** 3:10 62:10 63:15 63:16,22 67:13,19 68:2,8
**5/2/2017** 3:15
**5/25/2017** 3:16
**500** 2:4
**500,000** 80:2,6,13 80:18
**505** 1:15
**53** 3:8
**561-990-1590** 2:5
**58** 3:9 7:9

**6**

**6** 3:10 69:22 70:4 87:16
**6/27/2017** 3:17
**60** 3:9
**600** 1:16
**63** 3:10

**7**

**7** 3:11 70:18,23 92:20
**70** 3:10,11
**72** 3:11
**73,000** 101:14
**73,209** 101:1
**74** 3:12
**78** 3:12
**7th** 108:24

**8**

**8** 3:8,11 63:10,11 67:13,22,25 68:9 68:15 72:8,13 77:25 95:17
**8,784** 59:5
**80110** 1:2
**82** 3:13
**87** 3:13

**9**

**9** 3:12 60:21 68:23 73:24 74:3 75:24
**9/23/2021** 113:25
**90** 75:6,15
**92** 3:14
**95** 3:14
**96** 3:15
**98** 3:15,16
**9:18** 1:2
**9:57** 1:13 4:2

**a**

**a.m.** 1:13 4:2 39:8 39:8
**ability** 27:20 28:12
**able** 27:18 96:7
**abundance** 35:8 35:10 95:12
**accept** 84:22 85:2
**acceptable** 75:22 78:2 99:25 109:18

**access** 26:18,19 27:19 28:18 29:5
**accomplish** 68:6
**accounting** 38:18
**accurate** 9:6,9 94:7,8 95:3 115:19
**accurately** 16:9 82:5
**achieve** 17:3
**acknowledge** 94:15
**acknowledgment** 117:3
**acquire** 11:15
**action** 6:7 114:15 114:16
**active** 33:11
**actively** 23:22,23 24:9 25:1,11 26:9 58:3
**activities** 26:8 57:24 58:2
**actual** 9:21 109:17 109:20,21 110:3,8
**ad** 105:4
**addition** 25:21,24 92:7
**additions** 75:1
**address** 7:10,11,12 7:14,21
**addressed** 97:18
**addressing** 61:8
**adjustments** 59:18
**administratively** 10:3
**advice** 51:22
**advisory** 9:13,20 9:23,23 10:24 11:1 36:25 57:22

**affirm** 4:5
**affirmed** 4:12
**ago** 24:1
**agree** 27:1 35:19 54:11 67:10 68:9 73:11,17 75:9,11 92:18 94:24
**agreeable** 75:14
**agreed** 31:18 51:8 54:19 56:18 60:2 60:9 67:17,22,24 68:15,19 91:7 92:13 97:6 109:15
**agreement** 36:22 41:25 53:11 54:20 54:25 55:3,11,25 56:2,10,14 58:21 59:13 60:6,14 62:6,10 63:20 67:3,17 68:4,24 69:2,4,5 70:17 71:8,10,25 72:3,6 72:18,20 73:5 75:22 76:20,24 77:1,4 78:21 79:3 80:5 81:17 82:14 83:4,25 86:6,10,15 86:19 87:18 89:3 89:3,17 91:6 96:20 97:2,7,22,23 99:20 105:3,4
**agreement.docx.** 89:9
**agreements** 73:9
**ahead** 71:4 88:12
**allegation** 21:4 22:7 46:15 49:22 49:24 50:8,9 51:16
**allegations** 6:13 20:17

**allege** 20:23 23:19 31:17

**alleged** 22:23 24:25 34:5 46:17 60:2

**allocated** 58:4

**allow** 60:16

**alter** 90:9

**amended** 92:10

**america** 80:6,11 81:1

**amount** 33:13,23 35:22 38:16 107:24 108:3

**amounts** 81:11

**analyses** 45:9 46:17

**analysis** 50:23,25 65:25 81:7 104:14 105:5 110:16

**analyst** 49:14

**analyzing** 20:9

**anniversary** 55:20

**annual** 60:5,11 66:24

**annually** 36:3

**annum** 80:18 85:10

**answer** 6:22,25 13:14 16:4,9 18:13,17 25:19,20 27:9 28:22 35:4 48:17 71:4 88:14 99:8 103:20,24

**answered** 16:1

**answers** 117:7

**anticipate** 63:7 65:18

**anticipated** 63:13

**anybody** 108:10

**anyway** 6:9 45:22 100:14

**apartment** 8:1

**apollo** 106:20,21 106:22

**apologize** 23:21

**apparent** 98:21

**appear** 102:6

**appearances** 2:1

**appeared** 91:19 113:9

**appears** 8:15 90:20

**applied** 79:23

**applies** 109:25

**apply** 60:16 79:19

**appreciated** 96:1

**approached** 29:16

**appropriate** 27:9 115:7

**approval** 29:6

**approve** 29:20 30:2,18

**approved** 16:14 16:17 28:25 29:4 29:10,12,18

**approximately** 37:14

**april** 52:17 96:19 97:1

**area** 23:1,3 47:13

**areas** 21:9

**arrange** 26:15

**arrangement** 80:10 105:20

**arrangements** 107:21

**arranging** 36:21

**ashley** 7:23

**aside** 11:20 51:18 63:15 68:23 87:14

90:23 93:17 99:16

**asked** 6:23 10:1 12:3 15:25 18:21 19:7 21:21 38:13 51:3 53:3,4 71:14

**asking** 6:4 21:17 25:7 53:18,18,22 62:2 71:16 90:25 94:23

**aspects** 27:25

**assessing** 35:6

**assessment** 22:11 22:14,15 87:25

**asset** 14:1 15:3 60:7,11 76:22 91:8

**assist** 16:3 24:20 34:11 49:8

**assisting** 102:1

**associated** 86:24

**association** 29:14 35:18

**assume** 6:23

**assumed** 73:16 101:12,15

**assuming** 34:21 48:21 75:21

**assumption** 72:17 82:9

**assumptions** 48:21 48:22,23,25

**atlantic** 1:23

**attach** 63:18 89:14

**attached** 53:9 55:3 58:20 59:13 61:17 64:24 70:12 74:2 88:21,23 89:7,18 89:20,24,24 97:17 102:19 115:13 117:10

**attaches** 82:11,13 87:17 96:19

**attaching** 89:15 102:17

**attachment** 61:11 61:14 64:23 74:18 78:12 82:23 88:24 89:1,8,12

**attachments** 89:18

**attempted** 67:18

**attend** 71:13 96:10

**attended** 30:11

**attention** 10:23 46:12 55:4,9,17 74:24 92:5

**attorney** 98:19 99:5 102:20 114:13,15 115:16

**attorneys** 102:21

**audible** 83:18

**audio** 108:9

**august** 1:12 113:11,13 114:18

**author** 45:11

**authored** 55:11 59:21 79:5 81:23

**authority** 29:20 30:1,18 113:8

**authorize** 99:5 101:9

**authorized** 73:17 99:7 101:11 114:7

**authors** 45:14,16

**aware** 47:18 54:3 54:10 73:11,15 87:6

**b**

**b** 56:4,6,7,10 59:25 66:22 75:24 76:6

**b1** 76:6
**back** 14:10 18:3
36:23 38:19 39:10
46:3 62:2,10,11
67:12,19 68:1
78:6 82:1 92:2,12
109:4 111:2
**backed** 20:11 23:1
24:18 25:15,18,23
26:10,11 106:13
**background** 21:7
23:5,18
**backgrounds**
22:16,18 23:8,10
23:10
**bank** 80:6,11 81:1
104:14 105:1,3
106:19
**banker** 30:5
**banks** 21:13 54:4
54:20 64:5,9
68:19 71:24 72:21
73:1,3,8,10 96:18
97:18 98:5
**base** 103:16
110:15
**based** 22:7 32:11
37:6 41:6 79:12
110:11,16
**basically** 85:23,23
**basis** 21:4 33:14
36:7 39:19,20
42:22 50:9 74:16
87:3,8 95:1 105:5
**bathroom** 39:6
**beach** 1:16 2:5
19:19 37:7,11,20
38:6 113:3 114:4
**bear** 59:12
**bearings** 93:6

**began** 4:2 35:17
**beginning** 18:19
52:17
**begins** 66:11
**behalf** 2:3,8 32:22
73:12 83:12 99:6
100:17 102:13
**behavior** 49:3
**believe** 32:9,10,12
63:18 81:24
**believed** 64:4
**benefit** 34:10
96:12
**benefits** 41:16
**best** 6:25 36:4
38:18 43:16 97:25
100:19
**better** 77:11 97:25
**beyond** 108:21
**bill** 4:16 26:24
58:15 105:10
**billed** 105:7
**billing** 79:12,17
80:9 106:24 107:2
**bio** 23:13
**bios** 22:20,22
**bit** 60:4
**black** 91:21
**blanking** 85:17
**bloomberg** 17:16
17:18 59:11 110:4
110:11,19
**board** 60:8
**body** 59:3
**bond** 97:13,14
**bonds** 95:9
**bonus** 40:13 67:5
76:22 85:14
**boss** 52:4,15
**bottom** 9:12 81:20
101:17

**bought** 91:14
**box** 7:20
**break** 7:5 39:6,8
69:13,17 73:20,22
78:5,8 110:25
**breaks** 64:13
**brian** 82:12 98:19
102:17
**brickman** 30:16
30:17
**bring** 68:4
**broad** 22:2
**broadly** 25:14
86:18
**broker** 40:1,2,3
**brokerage** 39:25
**brothers** 24:18
**brought** 4:18
102:2
**build** 17:10,14,25
94:18,20
**building** 15:17
44:5
**built** 43:21 47:11
47:11 48:22 93:22
94:10,13,16
109:24
**bullet** 78:12
**bulleted** 77:18,23
**business** 3:16 7:14
7:21 9:16,19,20
10:2 11:2 23:11
35:23,25 36:6
37:12 38:14 40:4
75:6 80:21 81:15
89:20 100:6,10
102:14 105:2
**buy** 32:21
**buyer** 15:2

**c**

**c** 14:6 57:11 85:8
91:23 92:8
**calendar** 38:22
39:1,4
**call** 8:12,13 12:5
12:10 18:24 35:17
35:19 38:9 71:12
100:4 107:20
**called** 11:23 50:21
**calling** 77:8
**capability** 15:10
**capable** 84:16
**capacity** 21:24
22:1
**capital** 1:7 4:18
14:2,2 15:4 24:1,2
26:19 27:19,19
31:10 39:23 40:14
40:18 41:8,19
42:12 103:3 115:1
116:1 117:1
**caption** 36:25
**care** 36:2
**career** 24:15 40:23
**carefully** 6:1
115:5
**carmel** 7:17
**carolina** 7:13,18
7:24 10:7
**carried** 62:14
**case** 1:2 4:17 5:5,7
5:18,20,25 10:21
20:15 27:24
**cases** 5:1,8 17:17
105:11
**cash** 15:17 17:6,12
28:1,2 32:23
34:23,25 43:21
44:6 95:8 103:4
111:3

**categories** 27:17
**category** 101:15
**cause** 92:8,9 103:3
**caused** 8:25 9:2
**caution** 35:8,10
  95:12
**caveat** 86:19
**cb** 14:6 15:8 24:3
**cd** 43:1,17 44:2
**ceased** 31:1 36:21
  57:24 58:2
**ceo** 93:25
**certain** 6:6,8 46:2
  46:3 102:5 105:6
  106:11
**certainly** 14:21
  45:19
**certificate** 3:3,4
  113:1 114:1
**certificates** 12:14
  12:16 13:19,24
  14:12 21:1 22:5
  25:2,6 26:2,13
  28:19 30:18
**certify** 113:8
  114:7,12 117:5
**cetera** 18:9 46:17
  57:23
**challenging** 16:10
  89:12
**change** 65:14
  67:21 76:10,13
  90:15 91:20 92:2
  92:16 116:5
**changed** 65:12
  66:24 76:21 80:18
  92:8
**changes** 15:23
  64:13 66:23 72:17
  76:14,14 77:3
  88:18 90:8 91:22

92:15 115:12
  117:9
**characteristics**
  48:2,3
**characterize** 36:3
  36:12 48:9 82:5
  107:9
**characterized**
  33:16,18 48:5,9
  77:14 107:8
**charge** 79:18,19
  79:22 102:5
  107:18,23 108:1,2
  108:2,3
**charged** 50:18
  79:23,24 101:6
  106:23
**charlotte** 7:17,23
  37:6,11
**chart** 45:9
**charts** 46:10
**check** 35:9 37:17
**choose** 36:2
**chose** 48:23
**chronology** 18:20
**circulars** 110:17
**circumstances**
  17:8 95:3
**civil** 6:7
**claim** 21:5,6
**claims** 6:13,15
**class** 12:1 15:13
  20:25 22:5 23:23
  25:1,12 26:12
  44:23
**classification**
  84:21
**classified** 100:10
**clean** 63:19
**cleaner** 60:6

**clear** 6:10,19 7:4
  91:19,24 92:5
**client** 71:12
  105:10 108:4
**clients** 46:21 79:19
  104:6
**close** 40:16 60:12
  96:13 109:17,20
  110:2
**closed** 34:16,17
**closest** 54:1
**cmbs** 106:11,12
**cmo** 24:21
**coding** 48:12,14
**collect** 102:3
**collected** 44:17
**collecting** 95:6
**college** 9:6 102:2
**column** 65:9 79:6
  91:21 100:16
  101:19
**combination** 26:6
**combined** 26:10
**come** 11:22 42:21
  42:22 48:16 60:4
  78:23 103:25
**comes** 89:7
**comment** 52:6,7
  94:22
**comments** 61:10
  61:18 70:3 74:19
  89:3,21,25
**commercial** 80:25
  106:13
**commission** 40:5
  113:24,25
**committed** 36:5
**commonly** 64:14
**communication**
  50:12 99:17
  108:10

**comp** 33:1
**companies** 39:10
**company** 84:3
**compare** 90:1,7
**comparison** 43:24
**comparisons**
  15:22
**compensated**
  50:19
**compensation**
  32:20,25 40:13
  53:10 55:10 58:21
  59:25 63:20 66:23
  68:7 73:17 75:25
  79:11 82:13 85:9
  87:18 89:9 96:20
  97:10 103:14
  109:10
**compensations**
  57:21
**competencies** 24:8
  25:10,13,14 26:8
**competency** 25:16
  26:6
**competent** 49:16
**complaint** 20:14
  31:13 45:1
**complete** 6:25
  23:24 78:25
  114:11
**complex** 20:10
  25:14,18,23 26:9
  26:11 106:2,2,4,7
  106:8,10,15,16,17
**complicated** 15:12
  16:8 22:25
**component** 24:7
**compromise** 67:22
  67:25
**computer** 38:20

**concept** 75:16
77:5
**concerning** 86:2
90:9 97:2
**concerns** 102:18
**concert** 84:2,19
**concessions** 67:2
**conclude** 21:11
22:23
**concluded** 112:1
**conclusion** 22:2
**condition** 84:23
86:15
**conditions** 55:22
**conference** 30:12
30:13
**conferences** 80:24
**confidence** 96:7
**confirm** 95:13
**confirmed** 62:8
**confirming** 34:23
**confusing** 56:24
**connected** 114:15
**connection** 14:25
80:24
**connections** 29:19
**consider** 44:1
49:15 99:18 103:9
103:13 105:24
106:24 107:2
**considerable**
79:14
**considered** 64:5
100:11
**considering** 11:25
**consist** 23:12
34:24 35:5 95:5,6
**consisted** 23:13
37:15
**consistent** 35:7
76:19 77:1 79:17

90:18
**consistently** 84:25
**consists** 96:20
**consultant** 15:9
40:6 41:22 43:7,9
43:17
**consulting** 10:13
80:7 105:20,20
**consumer** 105:5
**contact** 54:1
**contain** 8:15 47:18
**contained** 8:24
10:9 89:3
**containing** 19:11
**contains** 57:1,12
78:13 83:15
104:12
**contemplate** 49:6
**contemplating**
30:25
**contemporaneous**
65:18
**contend** 6:15
20:23 57:15,18
**contention** 52:20
100:16
**context** 75:11
**contingency** 42:5
42:8,21 87:3,8
**contingent** 39:19
79:15
**continually** 10:18
46:16 47:22
**continue** 56:20
76:25 94:21 96:11
96:12
**continued** 81:6
**contract** 53:3,9
54:11 55:19 57:2
57:6 58:19 59:1
59:17 60:22 61:19

63:17 64:24 65:21
66:8 69:24,25
70:11,15 71:15,18
71:19,22 73:8,13
75:12 76:19 78:12
79:14 80:6,15,16
81:12 83:9 84:11
87:19 91:4 96:13
107:8,9
**contractor** 59:9
77:14,16 84:22
85:2,5
**contracts** 52:25
81:8 105:21 107:7
**contractual** 79:11
**contrary** 73:16
**contributed** 45:13
46:3,6
**contribution**
101:13
**controlling** 12:1
15:13 20:25 22:5
23:23 25:1,12
26:12 44:23
**conversation** 18:3
18:6 19:4 23:14
49:24,25 50:15
108:12,16,19,20
109:6
**conversational**
50:1
**conversations**
21:11 62:8 108:7
**convey** 71:23
**conveyed** 68:7,12
**copied** 45:20
58:18 61:6 98:21
98:25 100:23
**copy** 8:15 20:13
58:11 111:12

**core** 25:13,14
**corporation** 25:3
**correct** 8:22 9:8
14:16 16:22 22:7
22:8 29:11 31:23
32:17 33:11,22
41:20 47:23,25
48:17 52:25 53:1
53:12 54:5 55:15
55:20,21,24 57:3
59:14 63:2,3,5,21
65:6,10 66:16
67:13 69:7 73:13
77:12 81:21,22
83:6,18 85:6
87:21 88:22 91:5
91:22 92:12,16
96:8,21 97:12
99:25 100:1,18
105:10,14,15
107:17 110:11
117:6
**corrections** 115:5
115:8 117:9
**correctly** 33:7
64:12 98:14
**corrects** 88:19
**correspond** 110:2
**cortview** 14:2 24:2
39:23,24,25 40:2,8
40:18,25 41:8,18
42:14,16
**counsel** 7:1 18:23
70:2 74:21 98:8
98:14,15,20
114:13,15
**counterparty**
42:18
**county** 113:3
114:4

**course** 27:18 52:10
**court** 1:1 4:3 6:1 7:2 27:14 58:9 69:11 111:12,19 115:20
**cover** 7:7 57:25 65:20 82:8
**covered** 56:3 64:20
**create** 15:21
**created** 46:15,18 46:19,21 47:17 95:14
**creating** 17:14
**credit** 3:17 10:10 10:14 11:3,6 104:5
**current** 7:10,12
**currently** 10:15 11:16
**currier** 105:3
**custom** 6:7
**customer** 11:9,12 36:15 37:19
**customers** 11:11 11:15,15,16 13:4 26:4 46:21 79:20 79:23,24,25
**customized** 35:11 47:2 51:21,21 95:13
**cv** 1:2

**d**

**d** 86:1 91:23 92:14
**d.c.** 1:24 2:9
**daily** 38:25,25 107:10
**damages** 101:2
**dan** 19:23

**daniel** 21:14 49:13
**danny** 49:14
**data** 17:15,17,24 102:3 109:23,25 110:3,4,5,19
**database** 17:9
**date** 19:9,10,10 55:20 57:15 59:8 65:12,17 82:7,8 83:4 90:10 92:17 100:15 115:10 117:14
**dated** 53:8 58:18 60:21 63:17 69:23 70:19 72:9 73:25 78:11 87:16 95:17 96:19 98:6,20 102:17 114:18
**dates** 10:20 14:10 14:14,21 38:20,25 41:2
**david** 2:13 11:23 11:24 12:2,2,11 13:2,16 18:4 19:7 19:11,22,23 21:13 21:13 23:17 30:16 45:19,25 46:1,4 51:19,24 52:8,9,12 53:8,19 54:1,4,25 54:25 55:1 58:18 58:18 60:21 61:8 61:21 62:7,8 63:16 64:4,11 66:6 67:16,16 68:7,8,11,15 69:23 70:19 71:13,15,16 71:21,23 72:9,16 72:16,21 73:4,16 73:16,24 76:20,20 78:11,24 81:21,25 82:10,12 87:16

90:4 92:20 93:10 94:1,4,12,15 95:17 96:18,18 97:18,19 98:5,5 102:8 108:21 109:13
**david's** 52:15
**day** 6:10 7:6 47:24 51:7 106:23 107:3 107:15,18,23 108:1 109:7 113:11,13 114:18
**days** 19:10 30:11 94:24 95:2,4 106:23 115:16
**deal** 12:14,16 13:19,24 14:12 16:13 21:2 25:6 28:19 30:18 39:14 40:1 42:1,8,11 50:17 81:13,14
**dealer** 40:3 43:23
**dealers** 15:20,22
**dealing** 20:9
**deals** 15:13 26:2,3 39:11,13,17 56:21
**dealt** 106:9
**debate** 84:7
**debt** 31:3 66:12
**decades** 25:20,21
**december** 63:17
**decide** 107:3
**decided** 67:23 95:11
**decision** 51:13,13 54:15
**dedicate** 75:17,20
**dedicated** 36:7 66:15
**deemed** 115:19
**default** 34:19

**defaults** 34:20,21 34:21
**defendant** 1:8 2:8 4:17 5:13,16
**defense** 3:7 8:7 53:13 58:23 60:24 63:22 70:4,23 72:13 74:3 78:15 82:16 87:22 92:22 95:20 96:22 98:9 98:23 100:7 102:24 104:8
**define** 109:21
**defined** 48:11
**definite** 34:9
**definition** 86:11
**definitions** 106:8
**delegated** 84:18
**delegating** 84:14
**deletion** 92:6
**demand** 102:21
**demanded** 108:13 109:3,5
**demonstrate** 35:9 50:18
**demonstrated** 21:9
**dennis** 105:2
**deny** 93:14,16 94:9,12,13 108:16
**denying** 82:23 83:1
**depend** 32:4 110:7
**depends** 108:4
**deponent** 117:3
**deposing** 115:15
**deposition** 1:10 4:19 6:5,7 114:8 115:4,13,17,18
**depositions** 4:24

derivative 24:20
describe 34:15
  37:14
described 18:4
  19:4 37:3 66:1
  83:24 84:10
describes 85:9
describing 16:21
  45:5
description 3:7
  36:24 57:1
designated 77:15
designs 47:8
desire 68:6
detail 9:5 47:3
details 104:12
detect 47:22
detected 47:21
determined 48:24
  49:2 86:13
determining 49:6
develop 20:6
  21:17,18 81:7
developed 17:4
  107:13 109:16
  111:3
developer 81:9
developing 17:4,6
  26:19 43:19
development
  106:18,19
devise 103:25
devote 75:5
devoted 103:5
devoting 75:15
diamond 21:14
  50:1,2,15,21,24
dianelis 1:20
  113:22 114:6,25
diary 38:15

dictated 81:25
differ 59:16
differences 82:19
different 9:21 17:8
  21:20 28:3 77:5
  77:21 80:4 104:6
  106:8 107:21
difficult 36:8
dinner 50:22
direct 3:3 4:14
  25:24 26:3 46:12
  49:24 55:4,17
  74:24 103:19
directed 57:13
  102:10,12
directing 55:9
director 65:25
disclose 103:23
disclosed 102:7
discover 100:4
discovery 100:4
discretion 45:15
discuss 71:15,24
  72:2,19,22 103:18
discussed 19:24
  24:5 73:8,9 79:1
  82:3
discussion 30:23
  72:25 82:6,7
  109:11
discussions 21:8
  64:10 85:1 96:13
  109:9
dismissed 5:9
dissolved 10:3
distinguish 48:13
distressed 14:7
  15:10,11 43:1
distributions
  95:10

district 1:1,1
divided 80:18
dk 53:19,19 68:5
document 8:6
  38:22,23 46:9
  56:7,8 58:20
  59:12 74:1,2,5,20
  78:13,14,24 81:23
  82:2,19,20,22
  87:17 88:17,21,23
  88:25 89:6,24
  100:5,25
documented 86:4
doing 26:7 42:1
  80:20 87:2 101:24
  105:1 115:9
donlon 93:23,24
  93:25 94:11,14,16
download 100:9
downloading
  101:25
dr 8:10 103:4,5
drafted 57:3 69:25
  83:12
drafting 78:21
drafts 46:1
draw 17:10,12
  22:2 93:18
draws 25:20 92:4
drive 7:13
driven 48:24
duly 4:12 113:9
duration 81:12
dust 93:23 94:11
duties 56:24 66:1
dw 61:10 81:20

e

e 3:8,9,9,10,10,11
  3:11,12,12,13,13
  3:14,14,15,15,16
  3:17 19:11,13

38:19,25 45:20,21
  49:25 50:12,15
  53:7,9,18 58:17,20
  58:25 59:3 60:20
  61:7 62:1 63:16
  64:1,2,16,25 67:2
  69:22 70:2,6,12,18
  70:22,25 71:3,6,6
  71:11 72:8,11
  73:24 74:2,8,10,11
  78:10,19,20 79:2
  82:8,10,12,18,23
  87:15,19 88:4,5,24
  88:25 89:2,4,7,25
  90:19 92:19 93:1
  95:16,18,24 96:17
  97:9 98:4,18 99:2
  99:4 102:8,16
  108:23 116:3
earlier 43:20
  64:20 76:10 85:10
  87:2 90:14 97:11
  102:8 105:12
early 24:17 30:25
  99:21,23
earn 41:8
earned 62:18 95:9
earning 91:8,10
easier 57:11
easily 91:20
eat 69:15
economic 15:23
  17:8 28:3 47:4
  48:21 49:1,3
  106:16
edit 92:1
edits 65:4,5 75:1
  88:18 91:20 92:14
educate 28:12,14
educated 80:22

education 9:6,10
effective 54:12
    64:17
effectively 34:22
efficiently 6:11
effort 11:15 98:15
    102:3
efforts 71:7 103:5
eight 32:10 63:14
either 41:13 43:13
    55:18 61:20 84:2
    87:10 89:24 92:6
electronic 108:9
    111:23,24
eligible 86:4,14,21
    100:11
eliminate 100:23
ellis 14:6 15:8 24:3
    43:1,17 44:2
embarrassed
    109:7
emphasize 66:7
employee 40:7
    41:15,18 43:8
    50:3,4 66:12 77:6
    77:8 85:5 114:13
    114:14
employment 74:1
enabled 47:8
endeavored 15:1
ended 18:18 35:19
    41:25
engaged 98:7
engaging 87:7
entire 24:15
entities 15:18
    23:25 25:5
entitled 91:17
entity 10:12 29:10
environment 49:4

environments
    28:3
episode 51:18
equate 60:12
equity 24:21 33:1
    77:10
errata 3:5 115:7,9
    115:12,15 117:11
errors 47:19,21,22
esquire 2:6,10
essential 27:17
essentially 36:12
    41:11,12 89:16
establish 15:9
estate 15:10,12
    30:12,12 62:14
    80:25 81:7,10
estimate 36:1,4
    101:14
estimation 100:19
et 18:9 46:17
    57:23
evaluate 15:9
evaluations 43:22
evening 50:22
    51:6
event 34:20 52:11
    67:21
evidence 49:25
    50:1
evident 75:2 92:15
exact 14:14,21
    27:16 43:16 80:17
    109:18
exactly 99:1
examination 3:3
    4:14
examined 4:12
example 47:4,5,6
    47:8 100:21

examples 17:23
    24:14
excel 15:17 38:23
exchange 32:25
exchanged 52:25
    108:23
excuse 15:11
    23:20 39:5 45:23
    46:18 56:6 58:11
    64:23 69:2
execute 56:20
executed 56:14,15
    95:2 96:16
executing 56:4
    65:19
executive 53:10
    55:10 56:25 58:21
    63:19 64:15 66:15
    66:18,21 82:13
    87:17 89:8
exercise 35:8
exhibit 3:7,8,8,9,9
    3:10,10,11,11,12
    3:12,13,13,14,14
    3:15,15,16,16,17
    3:17 8:5,7,14,17
    8:19,25 20:14
    36:23 40:18 53:6
    53:7,13 55:4,8
    56:4,7,9,10,12,23
    56:23 57:6,10,11
    58:5,7,17,22,23
    59:17,25,25 60:19
    60:20,23,24 61:4
    61:18 63:16,22
    64:3 65:21 66:22
    66:22 68:2,22
    69:22 70:4,18,23
    72:8,13 73:24
    74:3 75:24,24
    76:6,6 78:10,14,15

82:4,10,15,16 85:8
    85:8 87:15,22
    88:17 89:13 90:1
    90:2,2,3,8 91:1,20
    91:23 92:14,19,22
    95:16,20 96:17,22
    98:4,9,18,23 100:2
    100:7 102:16,24
    104:4,7,8 105:9,24
exhibits 3:7 58:10
existence 9:17
    41:5
expanded 47:1
expect 91:12
    111:18
expectation 86:19
expected 34:20
expedited 111:13
    111:15
expense 100:15,22
expenses 3:16
    57:13,14,14,18
    58:4 59:10 74:12
    74:17 86:2,4,11,13
    86:20,24 87:1
    100:6,10,10,16,20
    100:21,24 101:8
    101:10,11,22
    105:18
experience 8:16
    9:7,10 17:13
    20:12,24 21:9,12
    22:3,23 23:2,6,15
    23:16,20,21 24:7
    24:25 25:9,17,20
    25:22,25 26:4,5,7
    26:14 47:13 49:6
experiences 24:5
expert 5:17 26:25
    27:3

**expertise** 17:14
20:9 21:17 23:20
23:21 24:8 25:10
26:5 44:11 45:8
47:12 48:12,13,14
106:14
**expires** 113:25
**explain** 62:4
**explained** 43:20
51:8
**explanation** 45:9
**explicitly** 101:11
**express** 96:7
109:12
**expressed** 104:12
104:16
**extend** 32:9
**extended** 14:23
**extends** 33:15
**extensive** 25:13
**extent** 34:19 62:19
75:18,21
**extra** 40:13 95:12
**eye** 1:24 93:18
**eyes** 65:2

**f**

**f** 2:6 14:6,6
**face** 53:15 82:1,1
**fact** 25:19 37:25
51:15 81:10 93:22
**facts** 6:14 21:5,6
49:21,23 52:20,22
52:23
**fail** 115:18
**fair** 21:25 22:6
27:11 64:5,9 68:6
70:3,7 71:2 81:24
92:4 97:4
**fall** 41:3,3 43:13
101:15

**familiar** 6:6
**far** 47:3 91:25
**fargo** 13:7 18:9
30:5,12
**faulty** 96:5
**favor** 5:12
**features** 47:10
48:10
**february** 82:11
83:5 87:16 92:20
95:17 108:24
**federal** 17:21 25:2
**fee** 33:2,14 43:17
47:6 56:2 60:5,8
60:11 62:18 76:23
77:1 85:10 91:6,6
91:8
**fees** 10:4 32:1
50:18 56:16,17
60:13 67:11 91:16
**field** 7:12
**figure** 43:16 75:25
76:10,13
**files** 13:4 38:20
46:25
**filled** 77:15
**final** 34:12 57:10
78:21 97:25
**finalize** 71:7 79:2
97:21,22
**finally** 28:12
**financial** 20:25
22:4 28:9 36:22
43:25 46:16 48:14
51:21
**financially** 114:16
**financing** 15:5,18
42:10 43:21 47:5
**find** 93:19
**finding** 23:14

**fine** 16:10 21:23
24:16 51:22 62:25
70:13 72:11,19,20
72:22 83:3 91:18
95:15 111:21
**finished** 13:11,13
13:14 58:6 109:11
**finishes** 35:3
**firm** 19:8
**first** 4:12 5:7 9:12
11:21 13:15 19:11
19:18 20:1,19
23:16 25:17,22
29:23 32:8 39:22
54:2 60:3 61:7
63:14 64:2,3,23,24
68:1 79:10 80:14
88:4 102:22
**firstly** 15:16
**fitzgerald** 1:15
**five** 27:17 38:4
91:12 108:14
**fixed** 33:2 60:5,7
97:10 107:8 108:3
**flagler** 1:15
**flew** 38:1
**florida** 1:1,16 2:5
38:1 113:2,23
114:3,6
**flow** 15:17 28:2
34:25 44:6 111:4
**flows** 17:6,12 28:2
32:23 34:23 43:21
95:8
**fly** 71:13
**focus** 6:15 9:11
10:23
**focused** 11:25
24:24
**follow** 5:24 87:17

**following** 4:2
**follows** 4:13
**forecast** 106:16
**foregoing** 117:5
**foremost** 25:17
**form** 14:17 18:11
18:15 22:9 24:4
25:8 26:23 28:21
32:18 33:12 34:1
34:8 46:23 50:9
54:6,13 55:6
62:16 66:25 73:14
75:10,19 76:2,5,12
79:8,21 82:25
83:7,16 84:1,12,24
85:12 86:17 90:12
94:3 96:20 97:5
98:1 103:12 106:3
107:1,19 109:19
110:6 111:6 117:9
**formal** 19:8 23:9
**forms** 77:15
**formula** 109:24,25
**formulating** 16:4
**forth** 38:19 82:1
**forum** 2:4
**forward** 32:24
38:24
**forwarded** 69:25
89:19 90:4
**forwarding** 53:19
53:23
**forwards** 82:12
**four** 55:15 64:17
81:19
**frame** 78:20
**freddie** 11:25
12:16 13:3,19
16:14 17:22 21:1
26:13 28:25 29:4
29:6,10,13,16,20

30:1,13 34:18
35:2 44:23 102:1
102:3 110:5,17
111:4
**front** 60:3 90:3
**fruition** 42:21,22
**fucking** 108:15,17
**fulfilled** 105:6
**full** 36:12 41:10,14
66:15,17,20 70:12
80:3 85:5 91:9
**fully** 36:7 73:17
**function** 47:25
62:19
**functionality**
47:10
**functions** 84:18
**fund** 14:4,7 23:22
24:9,21 25:11
26:6,9,16 27:18,23
31:4,24 32:10,13
32:17 33:8,10,10
33:15,21 34:2,7,10
34:10,16,17 42:17
42:18 43:1 66:12
66:16 86:5,5,10,12
87:12 90:11 91:12
96:14,15 102:4
**further** 31:1
111:10 114:12

**g**

**g** 2:10
**gather** 99:24
**general** 18:18 54:8
62:18 77:13 86:12
87:6
**generally** 86:18
107:17,20
**generated** 56:16
110:1

**george** 21:13 54:4
54:25 55:1 64:5
68:5,9,15 71:24
72:21 73:1,3,10
96:18 97:18 98:5
109:4
**getting** 18:5 22:21
34:22 77:4 109:8
**gg136887** 113:24
**give** 4:6 6:1,24
14:10,14 24:14
27:16,17 58:13
72:21 110:22
**given** 4:19 6:5
71:23 89:1 93:22
108:4 117:7
**glean** 48:4
**go** 9:4 14:10 18:3
18:22 28:4,4
39:10 67:23 68:1
69:10,18 71:4
74:12 78:6 88:12
100:13 108:21
109:4 111:2
**goal** 17:3,5
**going** 6:23 9:4
11:4 20:13,14
27:9 32:23 35:14
53:6 69:15 72:20
95:18 103:19
111:16
**golf** 52:11
**good** 4:16 73:19
110:5
**gotten** 68:9 100:22
**grand** 60:7,12
**graphs** 46:10
**great** 9:5 78:7
**greater** 47:3 79:24
**green** 30:4,9

**grosvenor** 71:12
**ground** 65:20
**grows** 81:14
**guess** 17:25
**guidelines** 54:15
74:17
**guys** 67:10

**h**

**h** 14:6
**half** 86:3
**hand** 4:3 20:13
23:16 65:9 91:21
100:16
**hands** 62:6
**handwritten** 61:3
61:13,16
**handy** 9:5
**happen** 42:6
**happened** 12:9
18:6 60:1
**happy** 109:5
**heading** 37:3
81:20
**hear** 103:22
**heard** 97:12
**heated** 108:16
109:6,8
**heatedly** 108:13
**hedge** 14:4
**help** 15:3,5 51:22
79:4 105:4
**helped** 80:22
**helping** 51:22
**hernandez** 1:20
113:22 114:6,25
**high** 44:8 93:21
**higher** 50:18
**highlighting** 80:9
**highly** 15:11 47:1
**hired** 15:8

**historic** 106:14
**historical** 49:2
79:12,17 80:9
**hmm** 61:25 77:19
101:21
**hoc** 105:4
**hold** 31:25 32:21
**holdings** 15:6,10
**home** 25:2
**hope** 6:11
**hour** 43:11 79:18
79:22 80:3 102:7
104:17 106:25
107:5
**hourly** 102:6
104:13
**hours** 35:23 36:2,5
36:8 50:21 104:16
105:7
**hughes** 1:4,10 3:2
4:11,16 6:3 8:10
27:2 53:7 58:18
60:21 63:16 69:23
72:9 73:25 78:10
82:11 87:15 92:20
95:16 96:18 98:5
100:3 101:19
103:4,5 113:9
114:9 115:1,2
116:1,2 117:1,2
**hurdle** 63:4

**i**

**idea** 53:2
**identification** 8:8
53:14 58:24 60:25
63:23 70:5,24
72:14 74:4 78:16
82:17 87:23 92:23
95:21 96:23 98:10
98:24 100:8
102:25 104:9

identified  14:11
16:13 24:1 89:8
identify  21:10
106:6
immediately  103:5
imperative  115:14
implicit  101:15
implicitly  101:12
imply  77:12
importance  26:15
important  26:16
26:18,18,21,22
27:22 28:8 44:9
71:11 84:9
inadvertently  89:1
incentive  41:25
42:4 62:18 67:11
include  24:12 36:9
36:10 38:5 40:23
57:21 92:3
included  59:10
includes  83:22
101:4
including  13:4
15:18
income  41:8
incorporated  10:7
increased  85:10
incurred  57:15,22
59:7 100:15,17,21
incurring  101:8
independent  41:22
42:20 84:21 85:1
85:4
index  3:1
indicate  24:25
111:5
indicated  89:7
100:15
indicates  92:6
111:7

indication  23:5
indicators  15:24
43:25
influence  51:12
information  5:21
8:24,25 9:2 10:9
12:12,20,25 13:1,2
13:4,15 17:10,20
17:21,22 18:8
19:7,12 22:17,19
26:11 48:4 64:8
64:10 94:10
101:25
informative  13:8
initial  12:10 13:1
18:5 19:3 77:4
89:2
initiated  78:22
input  33:10 48:8
48:22 53:23 65:5
91:22 109:24
inserted  75:3
insignificant  81:11
instance  7:2 17:16
52:18,19 73:6
89:17 104:13,22
106:23 110:3
instances  52:20
institution  36:15
instructions  115:3
intend  97:24
intent  55:25 56:2
66:19 81:12,16,18
intention  56:13
interest  15:23
62:14,22 63:11
95:9
interested  64:2
72:10 114:16
internal  54:15
80:22

internally  56:11
internet  17:21
interns  102:2
interrelated  26:7
interrogatories
107:12,13
interrupt  24:23
interruptions  10:5
interviewed  18:7
introduce  30:20
30:21
introduced  30:1,4
introduction
19:23 29:25 30:10
introductions  31:1
invest  16:15 29:9
29:13 31:2,6,7,8
31:10 50:17,23
51:8,13
invested  34:2
50:10
investigate  23:7
23:18
investigated  23:10
investigation  23:9
investing  20:9
27:24 29:7
investment  9:13
11:25 15:3 19:5,6
19:24 24:19,21
27:21 28:14,16
30:5,25 32:1,12,21
32:22,22 57:23
60:17 62:19 63:9
79:12,15 96:16
97:11
investments  9:24
10:24 20:8 28:15
36:25 42:11 48:10
investor  28:25
42:19 44:12 49:5

50:17
investors  26:19
27:20,20 28:14
29:3,3,20 30:2,18
30:21 32:1,22
35:10,11 38:4,7,8
47:9,14 49:25
50:10 63:12 80:24
95:13
invoice  104:13
105:19 106:22
invoiced  105:16
invoices  3:18
104:5 105:9,23
involve  15:14
involved  11:21
15:16,16 18:5
25:1 96:12
involvement  29:17
29:18 33:11 50:11
75:15
involving  13:19,21
13:22 51:18
issue  10:20
issued  21:1 25:2
26:13
issues  44:10,11
96:8
item  62:1 66:10,15
74:16 79:11 81:19
83:5,14,22 84:20
90:4,22 91:3
100:14
itemization  57:12
items  77:18,23
78:13 79:5 81:19
82:3 100:15 101:4
101:18
iterations  76:18

**j**

**jacksonville** 19:25
**january** 9:18
  65:13 68:23 69:23
  70:10,19 72:10
  73:7,25 74:19
  78:11 82:8
**jmariani** 2:6
**john** 2:6 18:19
  98:19 99:1,7
  102:16 103:17
**jonathan** 21:14
  50:1,2,14,21,24
  51:1,3,3,7
**judging** 22:18
**july** 19:15,16
  35:18 36:13 38:10
**june** 35:19,20
  36:14 38:10 99:22
  99:23,23 102:17
  103:7
**justified** 50:19

**k**

**k** 2:9 12:14,16,17
  13:19,24 14:12
  15:13 16:13 21:2
  25:6 26:2,3 28:19
  30:18 39:11,13,14
  42:8,11 50:17
**kammerer** 2:3
**kammerermaria...**
  2:6
**keep** 7:3 38:15
  58:9,10 69:16
**kevin** 93:23,24,25
  94:10,14,16
**keybank** 51:20,24
  52:14,18,19
**khoury** 21:13
  53:20,23 54:3,4,20

55:1 58:18 60:21
61:8 64:5,8 67:16
68:8 69:23 70:1
70:13,14,16,19,21
71:3,15,16 72:1,2
72:9,11,21 73:4,16
73:24 74:10 76:20
96:18 97:18 98:5
**khoury's** 61:18
  62:7 71:21
**kind** 14:24 77:25
**know** 5:1 16:14,16
  20:20 26:20 29:12
  38:13 45:2,16,17
  49:18 50:24 51:2
  61:6,20 65:8
  81:11 88:6,13
  92:1,21 98:25
  99:1,11 111:19
**knowing** 22:16
**knowledge** 17:13
  21:7 29:15,17
  44:10
**konopka** 1:15
**kozlowski** 82:12
  98:19 102:17

**l**

**lack** 77:11 97:24
**lane** 7:23
**language** 83:23
**late** 99:21
**launch** 55:20
**launched** 11:14
  33:8,21 87:13
**launching** 23:22
  24:20 25:11 26:6
  26:8,16
**lawsuit** 6:13 101:2
**lawyer** 6:8 83:12
  103:23,24

**lawyers** 87:20
  90:5
**led** 21:11 22:22
**lee** 30:4
**left** 30:6 41:22
  64:16,20 65:9
  91:21 100:16
  101:19
**legal** 1:23
**length** 100:6
**lesser** 26:18,22
**letter** 3:4 102:18
  102:19,20
**level** 44:8
**leverage** 15:19
  24:22 44:12 50:19
**leveraged** 24:20
**license** 53:11
  55:11 58:21 63:20
  82:14 87:18 89:9
**licensing** 36:22
**life** 31:19,24 32:17
  32:24 33:10,15
  34:7,10 56:3
  76:23 97:10,13,14
**limit** 38:3
**limited** 28:20,23
  86:5,10
**line** 61:7 63:19
  64:4,25 65:4,8
  68:5 71:22 74:1
  74:16,19 76:9
  83:23 88:18 92:5
  100:13 116:5
**lines** 65:9
**linkedin** 3:8 8:15
  8:21,23 36:24
  40:19,24
**listen** 5:25 27:20
**literally** 36:5

**litigation** 5:2
**little** 34:3 60:4
  67:9 95:2 102:23
**live** 96:10
**llc** 1:7 3:17 9:13
  9:23,24 10:10,11
  103:3 104:5 115:1
  116:1 117:1
**llcs** 9:21
**llp** 2:8
**loan** 25:2 34:20,21
  51:20 102:3 105:5
  106:18,19 107:14
  107:18
**loans** 34:19 44:14
  95:9
**located** 18:8 41:4
  41:5
**locations** 37:12
**long** 31:24 32:2
  33:9 40:25 81:13
  81:14 91:11,14
**longer** 40:3 41:5
  91:4
**look** 8:18 20:20
  30:11 58:25 59:24
  64:25 88:3 91:23
  95:17 99:4 105:22
  107:11
**looking** 23:13 25:4
  76:6 82:22 106:22
**loss** 104:14 106:18
  106:20 107:14,18
**losses** 94:25
**lot** 9:5 100:20,24
**low** 48:20
**lower** 77:17
**lump** 67:5
**lunch** 69:9,13
  73:20

| **m** |
|---|

**mac** 11:25 12:16
13:3,19 16:14
17:22 21:1 26:13
28:25 29:4,6,11,13
29:16,20 30:1,13
34:18 35:2 44:23
102:1,3 110:5,17
111:4

**mail** 3:8,9,9,10,10
3:11,11,12,12,13
3:13,14,14,15,15
3:16,17 19:11,13
49:25 50:12,15
53:7,9,18 58:17,20
58:25 59:3 60:20
61:7 62:1 63:16
64:1,2,16,25 67:2
69:22 70:2,6,12,18
70:22 71:3,6,6,11
72:8,11 73:24
74:2,8,10,11 78:10
78:19,20 82:8,10
82:12,18,23 87:15
87:19 88:4,5,24,25
89:2,4,7,25 90:19
92:19 93:1 95:16
95:18,24 96:17
97:9 98:4,18 99:4
102:8,16

**mails** 38:19,25
45:20,21 70:25
79:2 99:2 108:23

**main** 82:13

**maintaining** 26:20
49:9

**majority** 11:17
54:16 86:20

**making** 54:15 70:1
74:13 102:1,21

**manage** 20:7

**managed** 44:24,25
80:8

**management** 14:2
60:7,11 76:23
80:25 91:8

**manager** 12:2
15:3 24:19

**manages** 23:23
24:9 25:11 26:9

**managing** 9:13
25:1 65:25

**manner** 79:16

**march** 107:14

**mariani** 2:3,6 8:18
13:10 14:17 16:23
18:11,13,23 22:9
24:4 25:8 26:23
27:2,5,11,15 28:21
32:18 33:12 34:1
34:8 35:3 39:5
46:23 54:6,13
55:6 56:6,8 58:6
58:11,15 62:16
66:5,25 67:14
68:25 69:8,13,18
73:14,19 75:10,19
76:2,5,12 78:7
79:8,21 82:25
83:7,16 84:1,12,24
85:12 86:17 88:9
88:14 90:12 94:3
97:5 98:1,19 99:8
102:16 103:12,18
106:3 107:1,19
109:19 110:6,13
111:6,11,15,21,24

**mark** 8:5 43:23,24
88:22 92:3

**marked** 8:7 53:13
58:23 60:24 63:22

70:4,23 72:13
74:3 78:15 82:16
87:19,22 92:22
95:20 96:22 98:9
98:23 100:7
102:24 104:8

**market** 20:10 28:5
32:11 43:25 81:7

**marketing** 37:19

**markets** 43:23,24

**marks** 91:25

**markups** 89:16,19

**match** 110:4,8

**matched** 97:13

**material** 45:23,24
76:15

**mathematical**
47:25 48:13

**mathematics** 48:1

**matter** 4:6 20:8
45:8

**matters** 27:7 29:7

**maturity** 32:4,6

**mccoy** 50:14 51:11
51:17

**mdf** 66:11,12,18
66:21

**mdof** 31:7,8,11,19
45:6 54:8 96:19
100:17 103:6,10
109:17 111:3

**mean** 18:22 28:23
31:5,5,6 39:16
41:12 67:24 68:12
72:4 81:5 86:8,9
95:25 109:20
110:7

**meaning** 26:2,3
67:8 72:1 76:14

**means** 27:25 28:1

**mediation** 111:14

**meet** 38:4 71:15

**meeting** 39:4
71:17 72:23 73:3
78:25

**meetings** 37:21
38:2

**member** 9:13
10:11,12

**members** 28:13

**memo** 96:20 97:17

**memorandum**
45:5,10,12,14,24
46:2,6

**memorandums**
48:11

**memorialize** 53:2
71:10

**memorialized**
69:4 82:2

**memory** 43:16
93:15

**mention** 88:24

**mentioned** 18:7
39:11 66:14 67:5
87:2 97:9

**met** 29:23 38:6,8
50:5 82:3

**metrix** 3:17 10:9
10:14 11:3,6 58:1
84:3,4,19 104:4
105:2

**mid** 1:23

**middle** 93:4

**mind** 24:24 26:14
26:21 91:11

**minute** 8:4 24:23
59:13 108:14
110:22

**minutes** 69:19

**miossi** 2:10 3:3
4:15,17 8:5,9,20
13:12 14:19 16:24
19:1 22:12 24:11
26:1 27:1,4,8
28:17 29:1 33:4
33:19 34:4,14
35:12 39:7,9
47:16 53:16 54:9
54:17 55:7 56:11
56:22 58:8,13,16
59:2 61:2 62:21
63:25 66:9 67:4
67:20 69:1,10,15
69:20,21 70:8
71:1 72:24 73:21
73:23 74:6 75:13
75:23 76:3,8,16
78:4,9,18 79:9
80:1 82:21 83:2
83:10,17 84:6,13
85:3,15 86:22
88:2,11,16 90:16
92:25 94:5 95:23
96:25 97:8 98:3
98:12 99:3,10
100:12 103:2,15
103:21 104:11
106:5 107:4,22
109:22 110:9,14
110:22 111:1,9,14
111:18,23
**miscellaneous**
100:24
**mischaracterize**
31:22
**misunderstanding**
6:10
**mm** 61:25 77:19
101:21

**model** 15:21 16:25
17:10,14,25 26:19
26:20 33:22 43:19
44:5 47:11,24
48:1,8,15,16,18,23
49:1,9 63:8 93:22
94:10,14,18,20
106:16 109:16,24
109:25 110:5,11
110:16 111:2,5,7
**modeling** 20:25
22:4 104:14,25
105:25 107:18
**models** 15:17,20
16:21 17:3,5,14
20:6 21:17 28:9
34:6,9,11 35:9
43:21 45:9 46:16
46:18,18,20,24
47:1,2,17 51:21,22
63:13 80:23 81:8
94:16 95:14
106:19,20 107:14
110:10
**modified** 46:21
67:11 85:13
**moment** 11:20
14:4 24:1
**monday** 111:13,17
**money** 34:2,12
81:11 108:3,15,17
**monitor** 43:24
**monitoring** 15:9
15:14 34:22 44:6
**month** 34:18
80:15,17 94:24
95:3 103:6
**monthly** 15:9,20
15:22 34:21 36:3
43:23 95:1,6
108:2

**months** 80:14,16
93:7
**morning** 4:16
**mortgage** 12:17
20:11 23:1 24:18
24:20 25:2,15,18
25:23 26:10,11
106:13
**move** 6:11
**mrachek** 1:15
**multi** 31:3 66:12
**multifamily** 12:1
12:17 14:3 19:24
24:2 25:3 39:12
40:15 41:20 42:15
44:14
**multiple** 52:8
53:10 56:1
**multiyear** 81:16

**n**

**n.w.** 2:9
**name** 4:16 5:18,20
6:1 9:19 10:5 14:3
16:19 39:24 43:2
49:13
**names** 25:4
**narrative** 18:24
**natural** 74:17
**naturally** 54:2
**nature** 18:15
32:20 99:2 104:25
107:7
**necessary** 34:7
40:24 100:14
115:5
**necessity** 84:17
**need** 7:5 20:15
23:23 29:3 43:15
65:20 69:13,17
74:12,15 83:18
88:4 111:14,15,19

**needed** 70:14,16
**needs** 28:25 47:14
**negotiate** 28:6
**negotiation** 34:12
**negotiations** 77:9
**neither** 73:3
**never** 37:6 54:23
69:5 73:9 105:16
**new** 37:19 41:6
76:25
**ng** 19:23 21:14
49:13
**nickels** 52:12,12
52:14
**nitpicky** 68:13,13
**norm** 52:11,12,14
**normal** 23:11
111:21
**normally** 16:5
**north** 7:13,18,23
10:7
**notary** 113:23
**note** 7:1 61:3,13
61:16,20
**noted** 27:13
115:12 117:10
**notes** 16:2,3 37:18
38:15 43:14 61:18
114:11
**notion** 56:18,19
**november** 58:19
60:21 65:13
**number** 8:14
35:23 36:1,23
40:19 53:7 55:5,9
55:10 58:5,17
59:17,24 60:20
62:1 66:10 69:22
72:8 74:24,25
79:11 82:4 83:5
83:14,22 89:13

90:1,2,2,3,4,8,22
91:20
**numbered** 79:5
**numbers** 78:13
**numeral** 102:23
**numerous** 38:20
54:18
**nw** 1:24

**o**

**o** 14:6
**oath** 3:3 113:1
**objecting** 18:14
**objection** 7:1
14:17 16:23 18:11
22:9 24:4 25:8
26:23 27:9,12
28:21 32:18 33:12
34:1,8 46:23 54:6
54:13 55:6 62:16
66:5,25 67:14
68:25 73:14 75:10
75:19 76:2,5,12
79:8,21 82:25
83:7,16 84:1,12,24
85:12 86:16,17
90:12 94:3 97:5
98:1 103:12 106:3
107:1,19 109:19
110:6,13
**obtain** 15:19 81:8
**obtained** 11:15
44:10
**obtaining** 50:19
**obvious** 53:24
**obviously** 37:6
**occasions** 54:19
105:8
**och** 14:4 24:3
42:17,18
**october** 53:8 57:15

**odds** 98:16
**offered** 31:4
**offering** 28:16
110:17
**office** 7:20,25 8:2
48:11 62:7 70:20
**officer** 51:24
**offices** 19:19,20,21
38:6 41:6 80:8
**oh** 58:13 103:17
**okay** 5:8,18 6:23
7:19 8:3,13 9:25
10:14,20 11:4
12:20 13:25 16:5
18:16 19:13,18
20:3,13,22 24:17
31:16 34:15 35:16
37:24 39:18 40:5
40:18 41:15 44:5
45:22 48:7 50:14
51:5 54:3,10 55:3
56:8,23 58:5 59:3
59:12 60:15 65:4
65:20,23 66:10,22
69:15,20,22 70:18
70:25 71:20 73:6
73:11 74:7,18
75:9 76:7 78:4,7
82:22 83:3,11
84:20 85:16 88:3
88:8,10 90:17
91:11,18 92:8,19
94:1 96:6,17 97:1
97:9 99:14,21
101:17,24 104:4
105:8 106:21,21
107:5,17,23 108:6
109:2,16 110:18
110:21,22,24
111:9

**old** 7:8,9 65:20
**once** 34:2,16,17
63:10 77:9 95:1
110:7
**one's** 23:5
**ones** 39:21
**ongoing** 33:14
39:20 74:16
**open** 18:18
**operation** 9:17
10:2,15,17,19,24
11:7
**opinion** 21:22,24
22:8,10
**opportunities**
36:17
**opportunity** 19:5
19:7 31:4
**opposed** 84:14
86:12
**orally** 31:18 60:2
**order** 26:15 43:18
43:22 54:12 92:2
**ordered** 111:13
**original** 76:19
115:15
**originated** 44:15
**outcomes** 49:2
**outperforms**
62:20
**outside** 98:20
**overall** 24:7
**overhead** 57:22,25
**overlap** 44:4,9
**owned** 84:3

**p**

**p.a.** 1:15
**p.m.** 1:13 78:8,8
110:25,25 112:2
**pad** 67:9,19

**page** 3:2,7,8 8:15
8:18,21,23 9:12
36:24 57:10 61:4
61:13,17 64:3
68:2 70:18 77:18
86:1 91:25 101:17
101:18 116:5
**pages** 46:7 53:10
100:5 114:9 117:6
**paid** 31:18 32:1,23
33:14,17 39:18,20
40:6 41:7,23 42:3
42:5,23 43:4,10
56:15 62:9 63:11
77:1 80:13,14,15
80:16 87:10,12
91:9 95:9 102:7
103:4
**palm** 1:16 2:5
19:19 37:7,11,20
38:6 113:3 114:4
**papers** 80:23
**paragraph** 20:20
22:24 23:19 31:13
31:17 45:1 46:12
46:19 49:18,22
50:8 51:16 52:21
55:4,5,9,14,17
59:4,24 74:24,25
89:4,6,21 90:18
93:4,5,20 94:21
98:7 102:22
**paragraphs** 46:7
**paraphrasing**
31:21
**park** 7:23
**part** 15:13 25:12
25:13,22 28:8
30:20 40:1,23
48:19 56:3,15
74:11 101:1,12

102:3 105:4,20
**partial** 103:13
**participants** 21:7
**participate** 12:4
**participated** 81:9
**participation** 32:15
**particular** 12:13
12:21 13:21 16:15
25:5 29:5 32:2
66:24
**particularly** 21:2
**parties** 13:23,25
14:11,13 16:12,16
69:3 98:16 114:14
114:15
**partner** 23:11
62:18 77:10,13,13
104:22,23 105:2
**partners** 1:7 4:18
11:24 37:22,23
54:5,8 103:3
115:1 116:1 117:1
**partnership** 15:4
47:6 86:6,10,12
87:7
**parts** 46:10
**party** 5:5,7,16
11:2 13:25 36:14
42:2 55:18 59:9
59:11
**pay** 7:2 42:12,15
42:17 43:17
**payment** 33:16
39:21 77:3 101:23
103:4 107:8,9,10
**payments** 59:11
92:12
**pdf** 53:9
**people** 21:8,10
23:2,8 29:23

30:13 45:20 49:12
52:4 84:4
**people's** 22:16
23:18
**percent** 33:3 60:5
60:8,10,10,13 62:2
62:10 63:10,11
67:12,15,17,18,19
67:22,25 68:8,9,16
75:6,15 78:1
101:18
**percentage** 32:23
33:1
**percentages** 92:10
**perform** 21:25
22:2 32:16 33:21
37:7 50:24 57:2,5
57:19 66:1 75:4
84:9,17 102:9,10
102:13 107:25
**performance** 75:6
**performed** 21:25
38:17 44:2,3
51:12 104:20
**performing** 37:2
51:6 83:24 84:16
**period** 11:2 14:15
31:25 33:17 36:13
36:18 37:1,1
38:11 40:17 56:17
76:24 87:7 91:9
91:12,15 103:6,11
104:3 108:14,23
**person** 23:14,16
50:11 54:2
**person's** 23:15
**personal** 21:8
75:14
**personally** 75:4
83:23 84:2,9
113:9

**persons** 29:19
**perspective** 44:8
96:1,3,5
**perspectives** 48:11
**pertains** 63:1
**phases** 30:25
**philadelphia** 37:20
**phone** 12:5,10
50:15 51:7
**pick** 65:9
**picture** 61:22,23
**pile** 58:10
**pineville** 7:13
**pioneer** 24:18
**pioneered** 81:1
**place** 2:4 64:20
109:8
**placed** 15:20
**placement** 45:5,10
45:24 46:2,6
**plaintiff** 1:5 2:3
5:12,14,15
**plan** 80:21 89:20
**planned** 71:13
**play** 35:14 45:4
**please** 4:4 8:6,18
31:15 46:13 62:11
115:4,9
**pllc** 2:3
**plus** 76:21 77:20
77:21 85:13,16,20
85:21
**point** 22:6 46:25
52:24 69:14 72:4
74:13,14 75:3
91:1 94:20 98:6
98:13 100:14
**pointing** 76:9
**points** 78:12 81:20
81:24,25

**polite** 62:11,12
96:9,14
**portfolio** 12:2
42:11 105:5
**portion** 77:17
**portions** 45:7
**position** 32:15
**possibilities** 49:5
**possible** 49:1
**possibly** 46:8
47:20 95:11 101:7
**post** 7:20
**postgraduate** 9:7
**postlaunch** 57:13
**potential** 19:24
**powerpoint** 38:24
**precipitated** 109:6
**precisely** 15:14
62:17
**prefer** 8:11,11
**preferences** 97:10
**preferred** 85:4
**prelaunch** 57:12
57:14 79:11,14
86:2 87:3,7,11
**preliminary** 6:4
7:7 30:23
**preparation** 45:4
**prepare** 97:19
**prepared** 74:20
82:4,6 84:22
87:19 88:18 96:21
97:18 110:10
**present** 2:13 9:18
10:18 52:7
**presentation** 38:24 80:23
**presentations** 47:9
**presented** 85:1
**pretty** 60:12

**previous** 13:20
23:15 68:6 71:11
76:18 82:20
**previously** 14:1
31:5 77:14
**price** 28:7
**pricing** 20:10,25
22:4 80:23
**priderock** 1:7 4:18
11:12,14,22,24
18:5 19:3,9 20:4,6
20:24 21:12,16,24
29:12,14,15,17,24
30:2,6,7,8,21,22
30:24 31:3,7,8,10
31:18,19 32:16
34:6 35:17,19,23
35:25 36:5,15
37:4,8,12,22,23
38:14,17 39:3
42:20 44:3 45:6
46:20,22 47:1,3,6
47:7,14,18 49:8
50:2,5,17,18 52:24
54:5 56:17,20
57:19 58:3,4
66:16 69:6 72:5
73:2,12 75:3,17,21
77:7 83:6,13 84:8
84:9,16 86:23,25
87:6 90:10 91:4,8
91:9,16 94:18,20
95:11 97:2 98:20
99:19 100:11,17
100:23 101:6,9
102:4,14,21 103:3
103:10 105:14,16
105:25 106:9
108:7,10,21
109:17 110:11
111:3 115:1 116:1

117:1
**priderock's** 19:5,6
19:19,20,21 70:2
74:21 83:12 87:20
90:5 98:15
**primary** 34:11
45:16
**primer** 13:6
**primers** 13:5
**principal** 10:20
54:5 63:10 81:9
**printout** 3:8
**prior** 13:4,17 22:3
23:6,21 24:7 25:9
26:4 29:13,16,18
35:16 77:9 79:1
89:17
**priority** 27:7
**private** 42:19 45:5
45:10,24 46:2,6
**probably** 33:6
57:10
**problem** 111:5,7
**procedure** 32:19
43:23
**proceeded** 12:10
**proceedings** 3:1
4:2 112:1
**process** 54:15
**produce** 35:10
**produced** 100:3
109:17
**product** 10:13
13:5 27:23 52:11
80:25
**products** 23:2
**professional** 8:16
105:18 114:7
**professionally**
66:11

**profit** 62:22,24,25
63:3
**profitable** 63:9
**profits** 63:1,12
**proform** 46:16
**proforma** 89:20
**program** 12:17
13:3 21:2 25:3
**progress** 18:10
**project** 48:1,18
63:8 103:6 108:4
**projecting** 48:19
**projection** 17:6
28:9
**projects** 105:23
106:15
**promised** 63:4
**promote** 33:3
60:10 62:13,17
63:1 77:21,22
85:20,20,21
**properly** 25:19,19
101:5
**property** 80:25
**proposal** 27:21
59:13 65:5 83:6
83:15 87:20 90:9
97:22,25 99:24
**propose** 55:14
**proposed** 52:25
55:18 57:6 59:17
60:1,13 61:19
63:19 65:12,24
66:4,23 67:13,15
67:16,21 70:10
76:1,11 77:6 79:5
81:24 84:20 85:9
85:11,22 91:5
**proposes** 83:4
**proposing** 62:4
67:12 77:24 83:21

**propounded** 117:8
**proprietary** 95:13
**prorated** 104:2
**prospective** 11:12
**prospectus** 17:11
111:5
**provide** 12:11,23
17:6 20:8 35:11
36:4,14,16 43:22
70:3 84:4 95:12
**provided** 13:2,16
23:5 46:11 70:16
72:18 80:7 89:21
95:7 97:3 104:7
104:24 105:13,17
108:22
**providers** 15:4
**provides** 34:18
**providing** 11:10
33:9
**provision** 75:2
**provisions** 75:16
**psq** 50:14,16 51:9
51:18 52:19
**psq's** 51:13
**public** 17:20,24
113:23
**publications** 9:10
**published** 17:15
17:18
**pulled** 13:2 46:11
**purchase** 28:24
32:8,10 34:13
**purchased** 28:6
**purchases** 15:19
23:22 24:9 25:11
26:9 32:21
**purchasing** 24:21
**purpose** 6:12,14
17:2 48:16,18
53:22 78:19,20

**put** 8:25 9:2 36:10
97:19
38:24 59:19 65:17
67:1 74:17 87:14
90:23 92:2,3,12
99:16
**putting** 20:15

**q**

**qualify** 28:22
29:22
**quantify** 28:10
36:8 38:16 46:5,9
48:19
**quarterly** 60:11
76:22 91:8
**question** 6:5,17,19
6:22 10:1 11:5
13:11 15:25 16:8
18:13,15,17 20:21
21:20 22:6 25:19
26:24 27:10 28:22
29:2 31:14,15
33:6 35:4 45:2
57:9,13 65:22
71:3 88:9,10,13,14
88:23 90:22 91:3
92:21 93:3,18,21
102:18,22 103:20
103:25
**questions** 6:12,16
10:22 27:12 60:18
83:3 111:10 117:8
**quicken** 100:9
**quote** 86:4 108:14
**quoting** 50:11

**r**

**r** 116:3,3
**raise** 4:3 27:18,19
**raising** 27:19,23
34:12

**range** 49:4
**ranges** 49:1
**rank** 26:21 27:7
**ranking** 27:16
**rare** 34:19
**rate** 15:23 102:6
104:13 106:22,24
107:2,14
**rates** 79:12
**reached** 55:1
**reaction** 68:8
**read** 3:4 20:21
22:20,22 31:14
55:23 59:20 64:12
65:8 68:1 88:5
93:5 94:6 95:22
111:11,16,16
115:4 117:5
**reading** 35:5 88:4
110:16
**reads** 93:6,21
**ready** 20:21 45:2,3
46:13 49:19,20
78:5 88:7 92:21
**real** 15:10,12
30:12,12 62:14
80:25 81:7,10
**really** 24:24 47:24
71:3 90:25 108:4
**reason** 6:4 20:16
53:24 65:13 84:19
115:6 116:7,9,11
116:13,15,17,19
116:21,23
**reasons** 100:3
**recall** 16:20 30:16
37:17,18 39:12
45:22 59:19 74:8
82:18,19 87:3
89:15,16,19 93:12
99:1 103:17,17

108:12
**receipt** 115:16
**receive** 33:1 39:21
40:12,13 91:16
**received** 40:5,10
41:16 56:17 60:5
60:12 99:20
**receiving** 82:23
83:1 93:1
**recognize** 8:16,19
46:9 53:12,15
58:22,25 60:22
74:2,5,20 78:14
82:14 84:8 85:11
85:16 104:7
**recognizing** 96:9
**recommendation**
70:1 78:25
**recommendations**
51:4
**recommended**
71:14
**reconcile** 110:4
**reconciliation**
34:25
**reconciling** 95:8
**record** 7:3 18:14
27:6 35:22,24
65:2 105:10,11,13
114:11
**recorded** 38:13
39:1 108:6
**recording** 108:9
**records** 5:22 38:16
**recover** 101:1
**red** 63:18 64:25
65:4,8 71:22 74:1
74:19 76:9
**refer** 20:16 62:17
**reference** 79:10
101:22

**references** 61:3
**referencing**
104:19
**referring** 23:8,25
46:19 56:11 61:14
61:17 72:12
**refining** 49:9
**reflect** 19:14 38:15
38:16 39:2 65:5
79:14,16 105:13
111:3
**reflected** 100:25
105:9,23
**reflects** 89:25
**regard** 106:15,16
**regarding** 58:19
60:21 63:17 69:24
71:7 73:1 75:25
83:23 87:16
**regardless** 107:24
**regards** 74:25
**region** 1:23
**reimburse** 86:23
**reimbursed** 86:3
86:11,25
**reimbursement**
58:19 59:4 60:22
63:18 69:24 74:16
86:5,14,21,21
100:11
**reinhart** 1:2
**reit** 14:3 16:19
24:2 39:12,23
40:15 41:20
**reiterated** 52:5,12
**related** 24:6 39:16
58:3
**relating** 51:17
**relation** 37:4
**relationship** 39:25
99:18

relative 114:13,14
relayed 61:10
relevance 27:6
relied 22:19
relocated 37:7
rely 22:17 110:18
relying 17:15,24
remained 76:1
remember 5:18,20
14:3 24:3 43:2
80:17 93:1 108:16
108:18,20
rendered 33:16
renege 67:18
repaid 10:4
repeat 89:23
repeated 55:2 66:6
repeats 64:2
replaces 68:6
report 18:9 95:12
114:8
reported 1:19
reporter 3:4 4:3
6:2 7:2 27:14 58:9
69:11 111:12,19
114:1,7
reports 13:5 18:9
34:18,22 35:6,7,11
95:7,10
represent 4:17
49:4 66:11,17,20
80:3
representation 9:9
representative
51:25 66:21
represents 100:5
request 13:16,17
58:20 59:4 63:18
69:24 74:16 105:6
requested 12:3,11
78:23 114:10

requesting 86:20
requests 39:4
60:22
require 32:16
required 20:7
23:22 24:8 25:10
25:16,22 26:5,8
33:11,24 45:8
106:10
requirements
81:15
requires 27:19
29:6
research 13:5,5,6
reserve 17:22
residential 7:10
8:1 81:7
residuals 24:21
resolve 96:15
98:15
resolved 5:8,10,11
respect 33:22
40:14 62:12
responding 72:15
response 67:1 71:6
71:21 72:10 74:23
83:8,19 95:24
107:12 109:14
responsibilities
56:25 64:14 74:25
75:4,7 83:24
84:10,15
rest 75:16
restate 6:19 55:8
restricted 28:19
28:23
result 109:25
results 109:17
resume 8:16 40:19
retainer 80:5
108:3

retirement 30:24
31:2
return 28:15
48:20 62:20 63:4
63:11 115:14
returns 17:7 48:19
48:20
revert 62:2,11
review 43:23 46:9
54:2 70:2 74:15
74:15 87:24 114:9
reviewed 46:2
86:13
reviewing 72:17
72:20 95:8
revised 68:4
revisions 64:4
richard 14:6 15:8
24:3 43:1,17 44:2
right 4:3 6:20 8:21
9:1 11:7 12:18
18:1 19:8 21:2
25:6 28:4 31:19
34:7 39:7,13,15
40:2 42:12,24
43:2,2,15 50:3
51:9,25 53:20
54:12 56:1 57:7
57:16 61:9,24
64:18,21,25 66:1
67:6 69:3,6,10
70:11 75:24 79:7
80:9 82:4 85:20
85:24 91:23 92:11
93:24 97:15 98:8
98:16 99:4,14
104:17 107:25
rights 79:17
risk 28:15 48:19
48:20 49:7 80:23
80:25

riverbank 14:1
15:1,2 16:19 24:1
39:11,23 40:14
41:19,21,24 42:9
93:25
road 7:7,17
role 30:20 35:14
45:4
roles 23:3
rolling 69:16
roman 102:22
rose 1:15
rosenberg 1:2
rules 7:7
run 91:12,15
runs 91:14

**s**

s 80:24
salary 39:24 40:10
66:24 77:8
santander 104:14
105:3 106:18,19
satellite 41:6
satisfactory 54:1
save 38:25
saved 38:20
saves 9:5
saw 86:7 102:8
saying 22:3 50:22
60:7 72:15,16,22
74:10 83:14 93:14
93:16 94:12 96:15
109:7
says 71:21 72:2
74:15 84:2,19
89:18 101:19
scale 81:10
scales 81:15
scanned 61:24
schedule 71:14,16
77:25 85:19,22,23

86:1 92:11
**scheduled** 71:12
**scratch** 46:20
47:12
**screen** 47:8
**sec** 77:15
**second** 32:10
55:19,19 59:4
89:5 93:4,4 98:7
101:17
**section** 45:7 75:5
90:7
**sections** 45:11,13
46:3
**securities** 5:2 12:1
12:12,14,21 13:21
13:22 15:2,6,11,12
15:15,17,23 16:13
16:15 17:7,7
20:11 23:1 24:6
24:10,19 25:15,18
25:23,25 26:10,12
27:25 28:1,2,3,5,7
28:10,11,18,24,24
29:5,8,9,13,16,21
31:3,6 32:3,5
34:13 44:6,12,13
44:24 45:8 48:2
48:12 50:20 106:9
106:13 110:17
**securitization** 12:1
12:17 25:3
**security** 15:21
17:12,13 32:7,8,12
32:13 47:3,15
48:10 49:3 91:15
**see** 9:13 38:20,24
43:14 59:5 61:11
64:1 71:11 75:7
76:4 83:25 86:6
89:9 90:11,13,13

90:14 91:21 93:8
93:9 100:20
101:20 102:23
103:7 106:21
110:23
**seeking** 101:1
**seen** 16:6 98:22
**self** 75:2 92:15
**send** 61:22 70:13
**sending** 53:19
70:6
**sense** 74:9
**sensitivity** 47:4
**sent** 18:8 19:11
46:1 50:14 51:6
53:17 67:19 70:14
71:7 87:20 95:19
99:1,4 102:20
**sentence** 23:24
64:15 86:3 93:5
93:21 94:6,22
**separating** 11:14
**separation** 99:20
**september** 103:7
**series** 12:17 16:2,3
39:11,13 42:9
101:18 104:4
**serve** 84:21
**service** 33:9
**serviced** 44:21
**servicer** 95:7
**services** 11:10
33:16 36:14,16,24
57:1 75:1 97:3
104:6 105:17,18
**servicing** 34:17
35:5,6 95:10
**set** 11:20 13:1,15
25:13 28:13 43:22
63:15 68:23 80:22
93:17

**seven** 32:9 63:13
63:14 79:4 97:13
**share** 33:2,2,3
56:16 62:2,24
76:22 91:7,17
**sheet** 3:5 115:7,10
115:12,15 117:11
**shillington** 51:19
51:24 52:9
**shook** 62:6
**show** 50:25 53:6
68:22
**showing** 50:23
**shown** 8:14 95:10
**side** 5:12,15,16
59:20,20
**sign** 3:4 115:9
**signature** 28:14
113:21 114:24
117:14
**signed** 64:16 70:17
113:13
**significant** 23:20
24:8 26:5 40:22
**signing** 115:11
**similar** 44:2,7,9
102:2 105:24
**simple** 47:1
**simplified** 46:24
**simplify** 60:14
**simply** 56:19
60:13 85:14
**single** 10:11,12
**six** 23:25 38:9
**small** 33:13,23
81:10
**social** 19:22
**software** 36:21
53:10 55:10 56:25
58:21 63:20 74:25
82:14 87:18 89:9

**sold** 28:6
**sole** 10:12
**solemnly** 4:5
**solomon** 24:18
**solutions** 1:23
**son** 59:10 101:23
102:5,9
**soon** 78:6 93:19
**sorry** 14:20 29:22
59:24
**sort** 6:6 7:7 34:16
57:12 79:6
**sound** 26:24 56:24
**source** 17:9 48:4
48:24
**sources** 17:18,19
17:25
**south** 1:15 38:1
**southern** 1:1
**space** 92:2,3 115:7
**spanned** 14:15
**speak** 6:25
**speaks** 89:6
**specialized** 47:2
48:2,3 106:10
**specific** 13:22
20:17 22:25 23:3
25:10 26:10 49:24
77:13 78:24 82:18
**specifically** 13:6
24:6 37:18 38:1
47:2 59:10
**speculative** 79:15
**spell** 14:5
**spend** 11:17
**spent** 38:14 39:2,2
51:6
**spoke** 30:14 80:21
80:24 103:24
**spreadsheet** 3:16
38:23 100:2

**spreadsheets** 16:22,25 102:1
**spring** 20:2 43:13 62:7
**standard** 32:19,20 79:18
**standing** 105:3
**start** 18:18 19:4 63:12 65:12 83:4
**started** 10:4 14:22 19:6,9,21 29:24 39:22 46:24 77:8 92:2
**starting** 46:25 72:8 80:17 94:20
**startup** 39:25
**state** 59:4 113:2,23 114:3 115:6
**stated** 23:6 56:4 107:13
**statement** 94:7,8 97:4
**statements** 99:6
**states** 1:1 9:12,16 74:19
**status** 50:4
**stay** 93:20
**stenographic** 114:11
**stenographically** 1:19 114:8
**sticker** 60:19
**sticky** 67:9,19
**stipulate** 27:2
**stipulated** 111:4
**stipulations** 98:2
**stirling** 7:12
**stop** 18:20 93:24
**store** 100:22
**strawn** 2:8 98:20

**street** 1:24 2:9
**string** 64:1 70:12 95:25
**structural** 48:10
**structure** 10:13 15:3,5 20:7 28:16 33:14 47:7 77:3
**structured** 23:1
**structures** 43:22 47:5 106:11
**structuring** 20:24 22:4 34:12 65:25
**studying** 49:2
**stuff** 41:16
**subject** 20:8 45:8 53:8 70:19 73:25 78:11 115:11
**submit** 45:18
**submitted** 45:23
**subordinated** 21:1 22:5 25:1 26:12
**subsequent** 62:8 79:1
**subsequently** 29:23
**subset** 25:24
**substance** 117:10
**success** 79:15
**sudden** 85:17
**suggested** 66:3 79:6 109:9
**suggesting** 26:17
**suite** 1:16,24 2:4 7:17
**sum** 67:5 101:4
**summarizing** 64:13
**summary** 9:6
**summer** 12:8 19:14

**support** 6:15 21:5 21:6 33:9 49:21 49:23 52:20
**supports** 51:15
**sure** 5:6 14:21,22 16:9 39:7 50:4
**surrounding** 44:11,11
**swear** 4:5
**sweat** 33:1 77:10
**sworn** 4:12 113:11
**system** 30:24 31:2

**t**

**t** 116:3
**table** 109:10
**take** 7:2,5 18:6 37:10 38:14 39:5 61:21 64:25 69:13 73:22 75:16 78:5 88:3,6 90:3 91:23 95:17 111:24
**taken** 39:8 78:8 110:25
**takes** 94:23 95:2 107:24
**talk** 73:4
**talked** 99:11 103:23
**talking** 12:13 23:13 25:6 36:9 105:17,18
**target** 62:20 63:11
**team** 21:14 28:13 32:21,23 47:14 52:4 56:4,15
**teams** 80:22
**technically** 5:6 10:5 104:23
**technologies** 3:17 10:10,15 11:3,6 104:5

**telephone** 11:23 36:9
**tell** 6:18 18:19,19 22:22 27:5 54:18 68:19 69:11,16 93:10 94:17 97:21 108:18 109:4,5
**telling** 16:6 35:2 70:22 94:9,13 98:7
**term** 55:14,15,18 56:13,18,19,19 62:13,15 64:16 68:20 75:4 76:14 76:24 77:4 81:13 81:14 83:15,20 85:17 86:2 90:4,9 90:10 91:4 97:25
**terminate** 64:17
**termination** 90:10
**terms** 7:7 29:7 37:15 44:5 46:7 53:3 54:11 56:5 57:2,6 73:1,8,18 85:9 86:5,10 97:3 98:16 108:22
**testified** 4:13 105:12
**testifying** 21:15,19 21:21 49:10
**testimony** 4:6 97:12
**text** 45:13,18 46:3
**thank** 8:6 27:15 58:15 88:15 111:10,21,25
**thing** 27:22 28:8 62:13
**things** 18:10 26:21 40:23

**think** 5:6 7:6 9:11
10:21 12:14 18:18
19:14 27:8,17
40:22 44:9 48:5
52:15 67:12 68:5
68:5 75:2 85:16
88:20,25 89:23
90:22 93:11,12
96:3 99:23
**thinking** 36:10
70:15
**third** 11:2 32:12
37:25 59:9,11
61:4 83:23 101:19
**thirty** 115:16
**thomas** 1:15
**thomson** 36:22
**thorough** 46:8
**thought** 13:7
53:25,25 58:14
60:6 64:9,15 96:5
**thoughts** 53:18
69:8
**three** 37:18 39:22
54:8,10 55:2
80:14,16 108:13
**thursday** 1:12
**time** 6:24 7:3 9:5
9:18,20 10:1,2,3,6
10:18 11:2,18
19:18 31:25 35:16
35:18,22,24 36:4
36:11,12,18,25
37:8 38:10,13
39:2,2 40:17
41:10,14 42:14,16
52:24 56:17 60:4
66:15,17,20 71:15
73:7,19 75:6,15,17
75:20 76:24 80:8
81:5,6 85:5 86:24

88:6 91:9,12,15
95:2 97:21 103:5
103:10,11,14
104:3 105:10,11
105:13 107:3,24
108:14,22 111:10
**timely** 90:10
**times** 4:22 52:8
93:7
**tinjing** 49:13
**title** 65:24,24
**titled** 53:10 56:25
58:20 100:6
**today** 4:20 11:18
**told** 21:15,19,21
22:8,19 23:4 51:1
52:13 61:21 68:15
68:17 93:6,11,12
94:1,4,15 109:3
**top** 66:10 72:9
79:4 95:18
**total** 36:3 43:17
62:20 100:25
**track** 15:20,21,21
88:18 90:8 91:19
**trade** 10:5
**tranches** 94:25
**transaction** 13:18
15:5 19:22 32:19
32:20,24 40:16
42:9,10,19 51:23
56:3,16 62:14
63:14 76:23 95:1
96:10,14 109:10
109:11
**transactions** 13:20
14:25 33:15 56:14
76:25 77:2 81:10
**transcript** 111:13
114:10,10 115:17
115:18

**transcription**
117:7
**translate** 48:14
**travel** 37:5,10,11
37:14,21 86:25
**tried** 5:9,10,19
**trip** 38:5 50:14,23
51:7,8,11,17
**trips** 37:19 38:4,9
**true** 28:18,23
114:11
**trustee** 95:7
**truth** 4:7,7,8
**trying** 17:2 31:21
33:20 38:3 55:23
62:11,12 67:2,10
72:6 96:9,13
110:8
**tuning** 51:22
**turn** 36:17
**turning** 98:14
**twice** 4:23
**two** 9:21 16:16
37:17,18 39:13
49:24 64:17 65:22
70:25 83:15,20
89:4,21 90:9,18
91:4 94:24 95:2,4
106:6
**type** 25:18,23
47:15
**types** 5:1 17:13
20:7 24:6,9 25:25
26:11 28:24 31:6
44:12 47:3 49:3
**typical** 32:6 79:19

**u**

**unanimous** 54:16
55:2
**unbeknownst**
71:22

**unclear** 6:18
**underlines** 92:16
**underscore** 92:6
**undersigned** 113:8
**understand** 6:14
6:18 12:14 17:11
20:4 21:23 33:5
33:20 50:7,8
51:23 55:11 61:23
62:23 70:21 77:7
77:20,24 79:4
83:8 84:8 86:8
89:5 92:4 95:15
96:1 97:11 98:13
104:6
**understanding**
16:11 20:5,10
22:11,13,15 27:23
27:24,25 28:1,2,4
28:5,9 30:17
32:11,15 35:13
47:12,13 50:16
54:7,14 61:19
62:15 64:7 72:5
74:13,14 87:11
106:11
**understandings**
28:11
**understood** 6:23
77:10 83:6 85:24
86:9 102:13
**unequivocally**
51:19
**unfair** 96:4
**unimportant**
26:17
**united** 1:1
**unnamed** 41:20
**unquote** 108:14
**unreasonable** 96:4

updated 46:16
updating 49:9
ups 100:22
upside 61:6
usage 34:11
use 8:1 11:1 15:19
  17:17 34:9 35:8
  59:11 60:13 102:4
uses 48:1
utilize 45:14
utilized 15:19
  17:11 47:7 48:12
  49:1
utilizes 47:6

**v**

v 115:1 116:1
  117:1
valuation 15:20,22
value 103:9
valued 84:8
variables 47:5
  48:4,6,9
variety 104:5
various 17:24 21:7
  28:10 78:13 94:16
varying 48:21
vehicle 11:25
vehicles 60:17
verbally 65:1
veritext 1:23
version 53:25
  63:19 64:24,25
  69:25 70:9,10
versus 89:17
vesting 77:25
  85:18,19,23 92:11
vetoed 54:25 55:1
video 108:9
view 27:6
virginia 30:24
  31:2

virtually 6:8
visit 19:22 20:1
  70:20 79:1
visited 19:18,20,20
  38:6
vs 1:6

**w**

w&s 74:19
wait 13:10 35:3
  88:9
want 7:6 16:8
  20:16,17,19 31:14
  40:23 49:6 50:7
  71:24 72:2,18,21
  74:11,24 77:11,12
  78:5 88:12 89:23
  91:23 92:24 96:11
  99:11 100:4
  103:22 105:22
  107:3,12 108:14
  108:17 111:2,12
wanted 35:8,9
  66:7 67:10 79:2
  84:17 91:3,6
  95:11
wants 72:16 108:5
washington 1:24
  2:9
waterfall 111:4
way 5:8 19:2 30:3
  35:20 46:5 57:11
  59:16 63:8 65:9
  71:4 76:15 90:20
  96:14
ways 23:17
web 59:10
website 13:3 17:23
  102:1
webster 1:4,10 3:2
  4:11 6:3 8:11,12
  8:13 15:25 53:7

58:17 60:20 63:16
  69:23 72:9 73:25
  78:10 82:11 87:15
  92:20 95:16 96:18
  98:5 101:20 113:9
  114:8 115:1,2
  116:1,2 117:1,2
week 108:2
weekends 36:11
weekly 36:3 107:9
weiss 1:15
wells 13:6 18:9
  30:5,11
went 6:8 37:15,16
  81:25
west 1:16 2:5 37:7
  37:11
wh 3:16 9:13,19
  9:23,23 10:24
  11:1 36:25 57:22
  78:12 79:6 100:6
white 91:21
wholly 84:3
william 2:10
williams 14:2 24:1
  39:23 40:14 41:19
  42:12,14
willing 73:4 75:17
  75:20
winston 2:8 98:20
winston.com 2:11
wish 6:24 7:1
  20:20 24:16
witness 3:2,4 4:9
  5:17 18:12,16,21
  56:7,10 103:19
  110:24 115:3
wmiossi 2:11
word 38:22,23
  69:25 77:11 87:17

work 6:18 7:21
  9:7,10 14:25 15:1
  19:3 21:25 22:2
  32:16 33:13,21,24
  34:3,6,16 35:17
  36:12,21 37:2
  38:16 39:16,18
  40:13 41:23 43:4
  44:1,2 46:11
  49:15 51:12 52:10
  56:20 57:1,5,19
  73:1 76:25 81:5,6
  81:15 84:3 87:3
  89:2 93:7 94:18
  94:19,23 95:1,4
  96:7 98:15 102:2
  102:9,12 103:10
  103:14 104:19,24
  105:6,13 107:3,25
  109:9
worked 13:18,20
  13:23,25 14:1,11
  14:13 15:4 16:13
  16:17 24:18,19
  25:5 35:23,24
  36:2,7 39:14,15
  41:10,19,21 42:4
  42:20,21 44:19
  49:14 66:7
working 19:5,6,21
  32:25 36:8 37:8
  39:3 42:1 46:25
  58:3 72:5 80:3
  84:4
works 19:23 28:15
worley 2:13 11:23
  13:18 18:4,8
  21:13 23:17 45:20
  45:25 46:1,4 53:8
  53:17 54:4,18,21
  54:25 55:2 58:18

61:21 62:8 63:17
64:11 66:6 67:8
67:16 68:11,17
71:14,23 72:16,20
73:16 76:20 78:11
81:21 82:10,12
87:16 90:5 92:20
93:10 94:2,4,9,12
94:22 95:17 96:19
97:19 98:6 102:8
108:13 109:13,14
**worley's** 78:24
95:24
**worry** 10:21
**worth** 93:8
**wpb** 70:20
**writing** 65:18
**written** 13:7 38:15
46:10 52:25 69:2
69:5 70:10,17
71:7,10 72:6 79:2
86:2 97:7
**wrong** 28:4
**wrote** 16:1,3 45:7
46:3 59:1 61:20
66:7 71:4 80:21
80:23

## y

**yeah** 13:13 71:2
99:11 111:24
**year** 24:15 31:18
32:11,13 33:3
41:1 55:15,19,19
60:1,3 63:14 80:2
80:3,7,10,13 83:15
83:20 90:9 91:4,7
91:14 104:2
**years** 7:9 10:23,25
17:12 20:12 25:17
26:7 32:9,10
47:12 56:1 63:13

64:17 81:5 91:13
91:13,15 97:14
**yesterday** 61:11
**york** 37:19 41:6

## z

**z** 14:6
**zero** 44:16,18,20
44:22,25
**ziff** 14:4 24:3
42:17,18

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,

2016.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.