UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF FLORIDA
Case No. 9:18-cv-80110-Rosenberg/Reinhart

WEBSTER HUGHES,

               Plaintiff,

    -against-

PRIDEROCK CAPITAL PARTNERS, LLC,
              Defendant.
--------------------------------x


DEPOSITION OF MICHAEL WINCHELL

New York, New York

Thursday, October 25, 2018

1:07 p.m.


Reported by: David Levy, CSR, CCR, CLR

Page 2

```
1
2          DEPOSITION OF MICHAEL WINCHELL, taken by
3     the Defendant, pursuant to Notice, at the offices of
4     Winston & Strawn LLP, 200 Park Avenue, before DAVID
5     LEVY, CSR, CCR, CLR, a Notary Public of the State of
6     New York
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              C O N T E N T S
2     WITNESS        EXAMINATION        PAGE
3     MICHAEL WINCHELL   MR. MIOSSI        5
4
5     DEPOSITION EXHIBITS          FOR IDENT.
6     Exhibit 1  Notice of deposition        6
7
8     Exhibit 2  Expert report of Michael       39
9             Winchell
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1     A P P E A R A N C E S :
2
3     ON BEHALF OF THE PLAINTIFF:
4        JOHN F. MARIANI, ESQ.
5        KAMMERER MARIANI PLLC
6        1601 Forum Place, Suite 500
7        West Palm Beach, Florida 33401
8        561-990-1590
9
10    ON BEHALF OF THE DEFENDANT:
11       WILLIAM G. MIOSSI, ESQ.
12       WINSTON & STRAWN LLP
13       1700 K Street, NW
14       Washington, D.C. 20006-3817
15       202-282-5000
16       wmiossi@winston.com
17
18
19
20
21
22
23
24
25
```

Page 5

```
1     M I C H A E L   W I N C H E L L , having been duly
2          sworn by the Notary Public, was examined and
3          testified as follows:
4     EXAMINATION BY
5     MR. MIOSSI:
6        Q.   Mr. Winchell, my name is Bill Miossi.  I
7     represent Priderock Capital Partners in the lawsuit
8     that Webster Hughes has filed against them in Federal
9     Court in Florida.
10          You are presented as an expert witness
11    in this case; do you understand that?
12       A.   Yes.
13       Q.   Please state your name and your
14    residence or business address, whichever you prefer?
15       A.   Michael L. Winchell, 20 Stearns Avenue,
16    Atlantic Highlands, New Jersey, 07716 is my
17    residence.
18       Q.   Have you given a deposition before?
19       A.   Yes.
20       Q.   Many times?
21       A.   Not certain.  Four to five.
22       Q.   Have you ever testified as an expert
23    before?
24       A.   Yes.
25       Q.   Okay.  I'll ask you about that in a
```

2 (Pages 2 to 5)

Page 6

1   minute. But you sounds like you're familiar with the
2   rules of the road of a deposition. It's fairly
3   straightforward. But my purpose is to ask you
4   questions about the opinions you've expressed or you
5   are prepared to express in this case, the factual
6   basis and all the, you know, issues that surround
7   that.
8           If I ask you a question that is unclear,
9   please tell me that. I'll rephrase it or attempt to
10  state it in a way that it is clear so we can get a
11  good answer, okay?
12      **A.   Yes, sir.**
13      Q.   All right. And then just keep all your
14  answers verbal so the court reporter gets the answer
15  down clearly. We can take breaks whenever it suits
16  you, and I think that's all that we need to cover at
17  the moment.
18          So the first thing I want to start with
19  is Exhibit number 1.
20  EXH        (Exhibit 1, Notice of deposition, marked
21  for identification, as of this date.)
22      Q.   -- which is the notice of deposition
23  that we served in this case that got you here today.
24  And the question, principal question I have for you
25  concerns schedule A, which is on page 3. First, have

Page 7

1   you seen Exhibit 1 before?
2       **A.   Yes.**
3       Q.   And have you seen schedule A?
4       **A.   Yes.**
5       Q.   And you provided me a USB drive that
6   contains, I won't be able to count it as I sit here,
7   but a number of files, maybe thirty or so -- excuse
8   me, documents, perhaps thirty, maybe more. And is
9   this thumb drive containing those documents
10  responsive to the request stated in schedule A?
11      **A.   Yes.**
12      Q.   Okay. Did you receive the documents
13  that you produced in response to schedule A from
14  Dr. Hughes?
15      **A.   No. So -- I'm reading this and I want**
16  **to make sure that I'm correct. I did also, which is**
17  **not on that drive, have access to a database from a**
18  **service provider called Relativity that had roughly**
19  **4,500 items which I also used in my review and**
20  **opinion.**
21      Q.   Are they listed anywhere, or are they
22  identified?
23      **A.   I have not separately identified all the**
24  **items that I reviewed. But I did provide a document**
25  **of some e-mail extracts I that I relied on.**

Page 8

1       Q.   What document are you referring to?
2       **A.   One of the documents on the drive.**
3       Q.   Okay. You accessed Relativity through
4   what source, who had access to that?
5       **A.   Mr. Mariani and his colleague informed**
6   **me of a link, sent me an e-mail with that link, a**
7   **password they provided me, and my understanding was**
8   **that this was a collection of documents, e-mails,**
9   **.pdf files, various other documents that had been**
10  **provided, my understanding was, by Dr. Hughes to his**
11  **attorneys.**
12      Q.   Did you review all those materials?
13      **A.   I did not review all of them.**
14      Q.   Do you know which ones you did review?
15      **A.   I -- that would be difficult for me to**
16  **identify, each of the different items that I**
17  **reviewed. I reviewed roughly 2,500 that I felt were**
18  **fairly unique items.**
19      Q.   And did you identify those anywhere?
20      **A.   I identified a subset of those in a**
21  **specific document which was an e-mail chain or a**
22  **series of e-mails which I have provided on the thumb**
23  **drive.**
24      Q.   Okay. This was a set of documents that
25  were selected for you by Dr. Hughes' lawyers, is that

Page 9

1   correct?
2           MR. MARIANI: Objection, form.
3       **A.   I don't know who selected them. I don't**
4   **know who -- I don't know who assembled the documents.**
5       Q.   But it was provided to you by
6   Dr. Hughes' lawyers, is that right?
7       **A.   Access to the database was, yes.**
8       Q.   And do you know how they selected what
9   documents to place in the database?
10      **A.   Not aware of that.**
11      Q.   And the documents that you did review,
12  you said about 2,500?
13      **A.   Yes, sir.**
14      Q.   What did they consist of?
15      **A.   Nearly 90-some percent of which were**
16  **e-mail chains and threads, some of which -- many of**
17  **which were redundant, representing -- one document**
18  **might represent the first thread, first portion of an**
19  **e-mail chain, and then there would be subsequent**
20  **documents which were the same chain plus extensions**
21  **of that chain.**
22          **There were some -- there were many --**
23  **many of the e-mail items had either Excel**
24  **spreadsheets or PowerPoint presentations and/or .pdf**
25  **attachments. In many instances, they were too large**

3 (Pages 6 to 9)

1   **for me to download and gain access to the database.**
2   Q.   When were you provided access to this
3   Relativity database?
4   **A.   Early September.**
5   Q.   Early September?
6   **A.   Yes, sir.**
7   Q.   And how much time did you spend
8   reviewing the documents on that database?
9   **A.   Somewhere in the neighborhood between**
10   **the 40 and 50 hours.**
11   Q.   You indicated one of the documents that
12   you provided in the thumb drive lists specific
13   documents that you reviewed from the Relativity
14   database, is that correct?
15   **A.   Yes, sir.**
16   Q.   Do you know what that's called, just so
17   I can open it?
18   **A.   I don't remember the name.  I could**
19   **probably identify it from your file index.**
20   Q.   Sure.  I think there is a .pdf file that
21   says "e-mail chain," or "e-mail."
22   MR. MARIANI:  Bill, can we put that up
23   on the big screen?
24   MR. MIOSSI:  I think we can.  I don't
25   know that we need to look at all of it, but I will --

1   MR. MARIANI:  Well, the witness can walk
2   around and look over your shoulder --
3   MR. MIOSSI:  We can put it on the
4   screen.  I'm just trying to pick it out.
5   Q.   Why don't you pick it for me.  I
6   can't.  It doesn't jump off the page.
7   (A pause in the proceedings.)
8   **A.   It's entitled, "Priderock Correspondence**
9   **with Dr. Hughes."**
10   Q.   Okay.
11   **A.   So you can click on either the .pdf or**
12   **Word version there.**
13   Q.   It's titled, "Table of Contents"?
14   **A.   Think it's about 111 pages in total.**
15   Q.   It's 117 pages.
16   **A.   117 pages.  And the first three I**
17   **believe are a table of contents, which may or may not**
18   **provide an index linked to the specific e-mail.**
19   Q.   And does this document identify all the
20   documents that you reviewed to prepare your expert
21   report?
22   **A.   No, it does not.**
23   Q.   Okay, that's what I'm trying to figure
24   out.  Where would I find all the documents that you
25   reviewed in preparing your expert report?

1   **A.   They'd be in the Relativity database.  I**
2   **wasn't aware that you would not have access to all**
3   **those documents and I did not provide an index of all**
4   **the documents that I reviewed.**
5   Q.   What we would would be a list of
6   all the documents that you reviewed to prepare your
7   expert report and opinion in this case.
8   **A.   Okay.**
9   MR. MARIANI:  Can we define the word
10   "review" for the witness, because I think there's a
11   miscommunication here.
12   MR. MIOSSI:  I'm not sure.  I don't
13   think it's unusual to request an expert witness to
14   identify the documents that he or she relied on, or
15   reviewed --
16   MR. MARIANI:  That's why --
17   MR. MIOSSI:  -- in preparing an opinion.
18   MR. MARIANI:  That's what I'm asking
19   for, the difference between "relied" and "reviewed."
20   MR. MIOSSI:  I want anything he looked
21   at.  I'll be that open.
22   **A.   I would have to go back and assemble an**
23   **accession list.  The problem that I had with the**
24   **Relativity database -- so each thing had a number,**
25   **say, Hughes_000{NNN}, and there were literally 4,700.**

1   I had sat there through a great period of time going
2   one by one through each of those things in a -- what
3   I believe to be a sequential order, which was not in
4   fact sequential in terms of date.
5   And so this extract that I provided you
6   was based -- I was looking for -- and as I said,
7   there were many redundant threads or nearly redundant
8   threads and I was looking for a chain of interaction
9   between Dr. Hughes and the Priderock principals, and
10   tried to identify the beginning that have chain, that
11   time period, and the end of that time period.
12   And so what I have extracted were ones
13   when I realized that -- and I wanted to assemble a
14   time period of regular correspondence.  I went
15   through the trouble to copy each of the items out of
16   the Relativity database and deposit it in a document,
17   and then I needed to make sure I ordered that
18   document and, for my purpose, I provided a date and a
19   summary comment, since I was not able to extract
20   something like that for a table of contents.
21   And so my purpose was to assemble, as
22   you've seen in the document we've opened, essentially
23   a chain of correspondence beginning December 2nd,
24   2015, and continuing through April 13th, 2017.
25   Q.   And what was the purpose for preparing

4 (Pages 10 to 13)

Page 14

1  this -- does this represent -- I mean, this is a
2  table of contents.  And --
3      A.   There's more than just a table of
4  contents in the documents that you have in front of
5  you.
6      Q.   Right.
7      A.   There's another 111 some or 12 pages of
8  actual e-mail chains.
9      Q.   I understand that.  But I'm just asking,
10 the table of contents identifies what is in this
11 117-page document, is that right?
12     A.   Yes.  So for instance, one e-mail chain
13 might go two pages or three pages.  Another e-mail
14 chain might go four pages.
15     Q.   And you provided dates and what we call
16 Bates stamp numbers?
17     A.   I am aware of the term "Bates stamps."
18 I have no idea if those are Bates stamps.
19     Q.   Okay.  Well, you provided some
20 identification of each document.  And I'm only
21 curious to know about the set of documents or records
22 that you are relying on in rendering your opinion.
23          Is there anything that you're relying on
24 in rendering your opinion that is not contained in
25 the thumb drive you've provided this afternoon?

Page 15

1      A.   I don't believe so.
2      Q.   Is there a possibility there's something
3  that you relied on that's not been produced to us
4  today?  I'm just trying to understand the possibility
5  here.
6          MR. MARIANI:  Objection, form.
7      A.   I'd say some of my opinion comes from
8  nearly 35 years' experience in the industry.
9      Q.   Um-hum.
10     A.   So that's a very broad question.  There
11 are obviously things that make a part of my opinion
12 that are based on years of experience, not based on
13 reference to a specific document.
14     Q.   Which is fine.  We'll talk about that
15 later.  But in terms of the documents that you rely
16 on in rendering your opinion, the documents, not your
17 experience, are they all identified in the thumb
18 drive you've provided today?
19     A.   Yes.
20     Q.   When were you first contacted to provide
21 expert witness service?
22     A.   Let's clarify that question if we could.
23 I had a meeting about October of 2017 with
24 Mr. Mariani.  I don't know if that meeting was a --
25 would answer your question.  I was specifically asked

Page 16

1  to serve as an expert witness sometime in August of
2  2018.
3      Q.   Okay.  When you were first contacted by
4  Mr. Mariani, in, did you say October 2017?
5      A.   I believe so.
6      Q.   What was the purpose for that?  what did
7  you talk about?
8      A.   I was introduced to -- I was introduced
9  to Mr. Mariani, after discussing -- after Webster
10 Hughes called me and asked me whether I would be
11 interested in talking about a case that he was
12 involved in.  And I -- and I'm not exactly sure when
13 that contact occurred.  He didn't describe that he
14 was involved in a litigation.
15         I told Dr. Hughes that I was coming to
16 North Carolina State University for an event sometime
17 in October, I had multiple purposes for being there,
18 and that I would be happy to drive to Charlotte,
19 which is where he lived, and meet with him and get an
20 idea of what he wanted to discuss.
21     Q.   When did that happen?
22     A.   That happened in October -- as I said,
23 in October.  So I don't know when Dr. Hughes reached
24 out to me, but I do remember a meeting.  I had a day,
25 it was at a North Carolina State event, I could look

Page 17

1  up that date, and the next day I drove from Raleigh
2  to Charlotte and that evening had dinner with
3  Mr. Mariani and Mr. Hughes.
4      Q.   And what did you discuss?
5      A.   Mr. Hughes had a compensation dispute
6  with somebody that he'd worked for for a period of
7  years, that it involved a fund that was going to
8  invest in mortgage-backed securities.  Dr. Hughes
9  knew that I both had worked in the asset manager
10 arena most recently, and at the beginning of my
11 career, for a period of about 15 years at Bear,
12 Stearns and specifically with a lot of experience in,
13 you know, the creation and sale of mortgage-backed
14 securities, and so the question was, did I feel
15 comfortable that I could serve as an expert.
16         That was the ultimate question, would I
17 feel comfortable serving as an expert in a case
18 involving a fund that was designed to buy complex
19 mortgage-backed securities.  And I thought on both
20 counts of relevant information, one was that it was a
21 fund and I had spent since 2007 managing funds of
22 similar type; and then prior to that, from the period
23 from 1984 through 1999, a great deal of time
24 analyzing mortgage-backed securities and
25 understanding what went into the sale of the same,

Thompson Court Reporters, Inc
thompsonreporters.com

Page 18

1  purchase of the same, yeah, I felt that I had the
2  requisite expertise.
3      Q.    What else, was there anything else
4  discussed?
5      A.    I learned that Mr. Mariani played
6  football at Notre Dame.  My son-in-law went to Notre
7  Dame.  That was about it.
8      Q.    How long did the meeting last?
9      A.    We had a dinner that lasted roughly two
10 hours, and then before I left the next day, a
11 breakfast meeting for about 45 minutes.
12     Q.    Who was at the breakfast meeting?
13     A.    I think just Dr. Hughes.
14     Q.    Just the two of you?
15     A.    Yeah.
16     Q.    What did you talk about there?
17     A.    You know, catching up on mutual
18 acquaintances that they had done in their, you know,
19 careers since I think -- I'd seen Dr. Hughes
20 regularly when we worked at Bear, Stearns from 1990
21 to about '94 and then very irregularly once every --
22 I mean probably I went a period of about fifteen
23 years before I'd seen him again, and then I'd seen
24 him on two or three occasions at Mariner Investment
25 Group, where I was a portfolio manager, probably 2009

Page 19

1  or '10, and maybe again in 2012.  And, you know, we
2  have mutual colleagues that we knew, and we caught up
3  on, you know, some of the, you know, various details
4  about their lives.
5      Q.    When did you first meet Dr. Hughes?
6      A.    Not exactly sure of the date I first
7  met.  I know where I met him.  I first met him on the
8  trading floor at 245 Park Avenue, the fixed income
9  trading floor.  It was probably in 1990.
10     Q.    That's fine, I don't need an exact date.
11 And who were you working for?
12     A.    I worked for Bear, Stearns.
13     Q.    And was Dr. Hughes employed by Bear,
14 Stearns as well?
15     A.    Yes, sir.
16     Q.    Okay.  So you were work colleagues?
17     A.    Yes, sir.
18     Q.    Other than the meetings that you had
19 with, in October, that you describe, October 2017,
20 with Mr. Mariani and Dr. Hughes, when was the next
21 time that you communicated with either his lawyers or
22 Dr. Hughes about this case?
23     A.    I think Mr. Mariani contacted me in late
24 August -- August, late August of 2018.
25     Q.    So between October 2017 and August 2018,

Page 20

1  you didn't have any communication --
2      A.    No, I did not.
3      Q.    -- regarding this case?
4      A.    No, I did not.
5      Q.    Do you charge for your services as an
6  expert witness?
7      A.    Yes.  This is my first time doing it in
8  many, many, many years, and I did set a charge.
9      Q.    Okay, what do you charge?
10     A.    Five hundred dollars an hour.
11     Q.    Anything else?
12     A.    I haven't engaged in any significant
13 travel expenses but I would expect to be reimbursed
14 for my travel expenses or an overnight stay.
15     Q.    Anything else?
16     A.    No.
17     Q.    Is any portion of your compensation
18 contingent on the outcome of the case?
19     A.    No.
20     Q.    Did you ask to see any documents or
21 records that you were not given?
22     A.    Um -- no.  I wouldn't know what I was
23 not given to ask for.
24     Q.    Well, I'm saying, did you make a request
25 to either Dr. Hughes or his lawyers for a set of

Page 21

1  records or data and they didn't provide it to you?
2      A.    No.
3      Q.    Have you read the complaint in the case?
4      A.    I reviewed the complaint about
5  two-and-a-half months ago.
6      Q.    What was your understanding of what
7  Dr. Hughes is claiming here?
8      A.    Um -- my understanding is, Dr. Hughes
9  thought that he would be entitled to compensation
10 that would continue over the life of the fund and
11 that, for the approximately 18-month period prior to
12 the launch of a commitment period, he'd provided
13 services to the defendant, and had not been
14 compensated for his services.
15     Q.    Anything else that you understand?  Do
16 you understand how many claims he's asserted in this
17 case?
18     A.    I don't know how many claims he's
19 asserted in terms -- you know, I know that there's a
20 list in there and I would have to refer to that list
21 to review that to answer that correctly.
22     Q.    Are you aware that he's asserted breach
23 of contract?
24     A.    So, not being a lawyer --
25     Q.    Yes.

Page 22

1      A.    -- I don't necessarily know what all
2   this means. And I don't think that I was asked to
3   provide an opinion about those claims.
4      Q.    Okay. Did you review the answer that
5   was filed in the lawsuit?
6      A.    I did briefly.
7      Q.    Okay. And have you reviewed any
8   depositions that have been given in this case to
9   date?
10     A.    No.
11     Q.    Other than the documents that are
12  contained in the thumb drive you provided today, I
13  think you've answered the question, you didn't rely
14  on anything else in rendering your opinion, is that
15  correct?
16     A.    Other than my experience.
17     Q.    Yes, experience I don't consider a
18  document, unless you do. Unless I'm
19  misunderstanding --
20     A.    I'm sorry, I misunderstood the
21  documents. I thought you said other than the
22  documents that I reviewed, did I are rely on anything
23  else.
24     Q.    Okay, that's fair.
25     A.    And you didn't say "any other

Page 23

1   documents," so I'm sorry if I answered that
2   incorrectly.
3      Q.    My question is, I'll restate it, other
4   than the documents produced to us today on the thumb
5   drive, did you rely on any other documents?
6      A.    No, sir.
7      Q.    Did you do any research into Priderock
8   Capital Partners?
9      A.    Yes.
10     Q.    What did you do?
11     A.    I went to their website. I reviewed
12  their -- when I -- let me stop just for a second.
13  When you say Priderock Capital Partners, some of the
14  things that I reviewed pertain to subsidiaries of
15  Priderock Capital Partners, direct or indirect. So I
16  would lump my review of the Priderock entity, I would
17  say that I looked at things relating to the Priderock
18  entity, which might have included the SEC filings for
19  the Priderock Multifamily Debt Opportunity Fund,
20  sometimes referred to as MDOF.
21           There was an investment advisory filing
22  by the investment manager, which I think was
23  Priderock investment management. And there was
24  initial filing of that form ADV, which is an SEC
25  filing made by people who are setting themselves up

Page 24

1   to be investment managers under the SEC's guidelines,
2   the SEC registration, and you're required to indicate
3   the nature of your business, the fees that you're
4   going to charge and other relevant data that the SEC
5   requires. I've reviewed the private placement
6   memorandum which may have been provided to me by the
7   lawyers but was also available -- no, that wasn't
8   available on the web. The form D filing was on the
9   web.
10           So I -- and then obviously, there were
11  some documents provided to me through the Relativity
12  database that I reviewed that pertained to how
13  Priderock described its activities with respect to
14  its -- its potential management of this Multifamily
15  Debt Opportunity Fund.
16     Q.    And are these documents contained in the
17  thumb drive?
18     A.    Yes, sir.
19     Q.    Okay. Did you interview anyone to
20  gather facts or data relevant to your expert opinion?
21     A.    "Interview" would be a more precise
22  term, other than me verifying some things with some
23  friends in the industry.
24     Q.    Let me state it differently, then. Did
25  you talk to anybody?

Page 25

1      A.    Yes.
2      Q.    Okay. Who did you talk to collect
3   information that's relevant to your opinion in this
4   case?
5      A.    So I would say that I've talked mostly
6   on background to ascertain facts and make sure that
7   my belief about how, for instance, the Freddie Mac
8   K deals worked. The discussions I had were designed
9   to make certain that my understanding of how the
10  K series deal and the purchase of the controlling
11  class worked. And whether -- and the second question
12  I was seeking was whether the controlling class
13  certificates, the subordinated first loss pieces,
14  were, as a matter of course, whether those specific
15  classes which were typically not offered to the
16  public, were modeled in any of the three primary data
17  providers for mortgage-backed securities that I was
18  aware of.
19           And so I don't think that they were
20  interviews that particularly influenced my opinion of
21  the compensation. It was more of a background
22  verification.
23     Q.    Who did you speak with?
24     A.    Patrick O'Kelly of Markit.
25     Q.    Of --

Thompson Court Reporters, Inc
thompsonreporters.com

Page 26

1      A.     M-a-r-k-i-t.  It's a firm that provides
2  data for credit linked securities and mortgage-backed
3  securities.  He -- I apologize, I did not record the
4  name of an individual he had join me on the phone.
5  But Patrick worked for me at Bear, Stearns as a risk
6  manager.
7            I spoke with Seth Silverstein.
8      Q.     Who was he with?
9      A.     Formerly with Allied Bank, now serving
10 as a consultant within the last four weeks.  I don't
11 know what the name of his consulting firm is.
12     Q.     Anyone else?
13     A.     I don't recall anybody else.
14     Q.     Did you make any notes of your
15 discussions or your conversations with either
16 Mr. Kelly or Mr. Silverstein?
17     A.     Mr. O'Kelly.
18     Q.     I'm sorry, O'Kelly.
19     A.     No, I did not.
20     Q.     Okay.  How long did you speak to
21 Mr. O'Kelly?
22     A.     Roughly thirty minutes.
23     Q.     What did you talk to him about?
24     A.     A little background.  There are three
25 companies, one is called Intext, one is called TREP,

Page 27

1  and the third is Bloomberg which many people are
2  familiar with.
3            Each of those three companies have as
4  part of their business the providing of access to
5  models of mortgage-backed securities, both
6  single-family and multifamily, as well as other
7  collateralized securitizations.  When a security is
8  publicly offered, as is the case for the -- in these
9  K deals, that are the primary focus of the Priderock
10 purchase, the management of the fund, they are going
11 to buy K deal controlling class certificates.  Those
12 certificates represent first loss subordinated
13 pieces.
14            They are the source of a credit
15 enhancement and, to my belief, and which I wanted to
16 confirm, was that these particular non-offered
17 securities, non-public securities, were not modeled
18 by these three service providers as a typical
19 standard operating procedure of theirs, that they
20 typically limited their cash flow analysis to the
21 publicly-available tranches.
22            And that, in order to understand the
23 potential cash flows and in order to evaluate an
24 investment in those controlling class securities,
25 that you would need to either build your own model,

Page 28

1  which you could replicate obviously the
2  publicly-offered securities to understand how the
3  privately-offered securities would perform.
4            And so my specific request was, do
5  Intext, TREP or Bloomberg as a matter of course model
6  the controlling-class certificates?  Can one contract
7  with somebody there to do a bespoke calculation?  The
8  answer to that is yes, but that generally, they are
9  not modeled and therefore not available for people to
10 go and look at the economics of those purchases, or
11 those potential purchases.
12     Q.     And that's what you talked about with
13 Mr. O'Kelly?
14     A.     Yes, sir.
15     Q.     Anything else?
16     A.     No, sir.
17     Q.     What did you talk about with
18 Mr. Silverstein?
19     A.     Second confirmation of the first item.
20 And additionally, to talk about some of the other
21 potential competitors to Priderock, confirm who I
22 thought were the larger players in this space, to --
23 Mr. Silverstein specifically was a model developer
24 while he was at Bear, Stearns, and he did the same,
25 he was the head of structuring for Allied during his

Page 29

1  tenure there, and to benchmark any opinion about
2  compensation with Mr. Silverstein for people trained
3  like himself.
4      Q.     Well, what did Mr. Silverstein say to
5  you?  What did you learn from talking to him?
6      A.     I learned that my general range of
7  compensation, salary plus bonus for people who led
8  structuring teams and groups, was accurate.  I
9  learned that what Mr. O'Kelly had told me was
10 accurate, and that in order to understand the
11 controlling class certificates, you probably have to
12 build and develop your own model and replicate the
13 deal.
14            And there's a phrase, you know, that we
15 use in understanding mortgage-backed securities, to
16 "tie out" the numbers to another model.  So you would
17 tie out all the public securities and have fair
18 certainty that you could now understand what was
19 happening with the private securities.
20     Q.     Okay.  And anything else that
21 Mr. Silverstein told you?
22     A.     No.
23     Q.     And you asked him about compensation, is
24 that right?
25     A.     Yes, sir.

Page 30

1    Q.    And he told you what, that generally,
2    people who to what kind of work get paid a certain
3    way, or a certain amount or they have contracts, or
4    what did he explain there?
5    A.    That when employed by a firm, when he
6    would hire structurers, that the range of
7    compensation would be anywhere between 300,000 and
8    $700,000 a year; that there are two types of
9    structuring people out there.  There were the people
10   who understood the math and there were people who you
11   are understood the math and could explain the math,
12   and that the second, the latter were more valuable.
13   Q.    Okay.  Is there anyone else other than
14   Mr. O'Kelly or Mr. Silverstein who you spoke with to
15   collect information relevant to your expert report?
16   A.    No.
17   Q.    I'll go through the are resume that you
18   attached to your report in just a minute.  But just
19   very briefly, have you ever been cited for any
20   violation of any securities rules or regulations?
21   A.    No.
22   Q.    By the SEC or any FINRA litigation,
23   things like that?
24   A.    Never.
25   Q.    Okay.  What is the understanding of the

Page 31

1    reason that you were retained?
2    A.    To provide an estimate of Mr. Hughes'
3    value to the defendant.
4    Q.    Okay.  And you've rendered an opinion on
5    that.
6    A.    I did.
7    Q.    Before I get into your report, let me
8    just ask you quickly, have you ever rendered an
9    opinion concerning the value that a person such as
10   Dr. Hughes represented to an investment fund before?
11   A.    That's a pretty broad question.  I hired
12   four hundred people when I was at my firm.  I hired
13   many mathematicians, Ph.Ds.  So in the course of
14   doing so, in making recommendations to hire people, I
15   did have an idea of people's, what I thought their
16   fair compensation would be, what the market required
17   us to pay, and the type of skills that I thought were
18   important to the jobs that we were trying to
19   accomplish in my various roles over the years.  So
20   I've probably hired, or ultimately provided,
21   specifically during my time at Bear, Stearns to the
22   management and comp. committee, recommended two
23   things.
24        During my time at Bear, Stearns, every
25   year I was required to put forth from my group

Page 32

1    recommended salary and total compensation numbers,
2    which would be a number from which your salary would
3    be subtracted, and we would put a bonus so people
4    could have different salaries and be worth the same
5    amount of money and they get different bonuses.
6        And in hiring people during that time
7    period, I was also relied on to provide, you know, my
8    estimate to the management and compensation committee
9    why I wanted to hire somebody and why I wanted to may
10   them what I wanted to pay them.
11        When later I moved to Bear Hunter, I was
12   the chief operating officer.  I did all the hiring, I
13   did all the compensation process for the firm.  I
14   worked with other people, soliciting their opinion,
15   but I had my own concerning what their value was.  I
16   hired different types of people.  Not everyone who I
17   ever hired was a Ph.D. structuring person.  But I
18   hired at least 20 of those people in my day.
19   Q.    When you were making hiring
20   recommendations or decisions at Bear, Stearns or any
21   of the other employers that you mentioned, were you
22   working within a budget?
23   A.    No, I -- so at Bear, Stearns, we did not
24   prepare budgets.  As a managing -- senior managing
25   director of the firm, I was expected to operate a

Page 33

1    tight ship, so there was a sense of paying people a
2    fair amount but not overpaying people.
3        Bear, Stearns had a particular distaste
4    for hiring people with guarantees.  They wanted
5    people to prove their worth and to make their
6    decision, you know, after the fact.
7        When I was at Bear Hunter, I was the
8    budget, you know, I was the person setting the budget
9    and so to be sure there, I was looking at our
10   activities, what revenues we were generating, what
11   businesses we wanted to get into.
12        I had probably more freedom to make a
13   decision to hire somebody to begin a new business on
14   a couple of occasions.  But we did not have a -- we
15   did not have a formal budget process.  I did not
16   share my views with my CEO on what a budget for the
17   area was in any formal way.
18   Q.    So you consider yourself an expert in
19   providing an opinion on the value of Dr. Hughes to
20   Priderock Capital Partners, is that correct?
21   A.    Yes, sir.
22   Q.    Do consider yourself, are you proposing
23   to testify as an expert on any other subject?
24   A.    Could you repeat that?
25   Q.    Yes.  Do you propose or do you intend to

9  (Pages 30 to 33)

Page 34

1   testify as an expert on anything other than the value
2   of Dr. Hughes to Priderock Capital partners?
3       A.   Yes, in an indirect fashion, yes.
4       Q.   What?
5       A.   I don't believe that mortgage securities
6   are ever purchased without the use of the cash flow
7   model.  So I guess that's an opinion.  It's
8   indirectly related but not specific.
9       Q.   Do you address that topic in your
10  report?
11      A.   No.
12      Q.   All right.  Is there any other topic
13  that you intend to testify as an expert in this case
14  on, other than what you've just testified about?
15      A.   I guess a second topic that is an
16  indirect matter would be, is that the prospective
17  clients of Priderock, or the prospective limited
18  partners who manage money as registered investment
19  advisers, have a fiduciary responsibility to perform
20  due diligence on the investments that they make in
21  mortgage-backed securities using cash flow models.
22      Q.   Is that something you address in your
23  report?
24      A.   I believe only indirectly.
25      Q.   Okay.  Is there anything else that you

Page 35

1   propose to offer expert testimony on?
2       A.   No, sir.
3       Q.   All right.  You testified that you have
4   provided expert testimony in the past; is that right?
5       A.   Yes, sir.
6       Q.   How many times?
7       A.   Just once.
8       Q.   What was the case?
9       A.   It was in 1981.  I think the case was
10  something like Dellinger vs. Kraft, Inc.
11      Q.   What were you retained to do, do you
12  recall?
13      A.   I do recall.
14      Q.   What was it?
15      A.   I was retained -- so let me give a
16  little background?
17      Q.   Um-hum.
18      A.   1981 we did not have available to us the
19  types of spreadsheets that we have today.  And law
20  firms and other people didn't have the ability to
21  import vast amounts of data and sort it and analyze
22  it.  I was retained to perform that task for -- by a
23  law firm for the plaintiff.
24      Q.   What was at issue?  What was the
25  dispute?

Page 36

1       A.   I probably don't know the law correctly
2   but it was either price discrimination or predatory
3   pricing.
4       Q.   Was it an antitrust case?
5       A.   I believe so.
6       Q.   What did you do?  What were you
7   analyzing?
8       A.   I was supplied with a large box of
9   invoices and other data indicating the price of
10  various forms of dairy products.  So gallon, plastic
11  gallon jugs of whole milk, quarts of chocolate milk,
12  two-percent milk in plastic jugs and in quarts.  So
13  half-and-half in a pint, roughly 20-odd products that
14  would have been on a purchase order.
15           Kraft, through one of its subsidiaries,
16  I'm not sure which particular dairy, would charge for
17  this milk, for these milk products, they would charge
18  small stores throughout the North Carolina region,
19  maybe down into South Carolina or east Tennessee,
20  they'd deliver the milk to those small stores.  And
21  those small stores, I believe the complaint was,
22  couldn't -- found themselves unable to compete
23  effectively against large supermarket chains.  Piggly
24  Wiggly is a name I recall.
25           And my job was to go through vast

Page 37

1   amounts of data and to try to align the actual
2   transactions that had been billed across this wide
3   range of customers and a narrower range of products,
4   and to perform an analysis on whether Kraft charged
5   significantly more and regularly the smaller stores
6   than they did the larger buyers like Piggly Wiggly.
7            So on any given day, you know, maybe
8   they were charged 1.19 for a gallon of milk and
9   Piggly Wiggly was charged 1.09.  And another day,
10  Piggly Wiggly was charged 99 cents and they might
11  have been charged 1.15.
12           And so in order to do what you could
13  easily do with spreadsheets today, I had to
14  rationalize a bunch of data by date, by type of
15  customer, by type of product, and essentially put all
16  of those data onto IBM punch cards at the time, and
17  build large matrices showing the pricing of milk
18  products to essentially two different classes of
19  customers over a period of time with enough
20  consistency to demonstrate that this was a regular
21  and systematic process.
22      Q.   Were you performing a statistical
23  analysis?
24      A.   That's a broad term, "Statistical
25  analysis."  Yes, there are things like mean, median,

10 (Pages 34 to 37)

Page 38

1    mode, variance.
2        Q.   Sure.
3        A.   I did perform some of those statistical
4    calculations.
5        Q.   Okay.  But this didn't have to do with
6    valuing the services of an individual to a company,
7    right?
8        A.   No, it did not.
9        Q.   And you applied, just through
10   statistical methods of analysis to render your
11   opinion in that case, is that --
12       A.   Yes, sir.
13       Q.   Okay.  Are there any other instances
14   when you've been retained to provide expert witness
15   testimony?
16       A.   No, sir.
17       Q.   Have you ever provided an expert opinion
18   concerning the value of an individual to any company,
19   regardless of what they do?
20       A.   Could you -- we simply had a discussion
21   a little bit a while ago about my hiring people.
22   Does the term "expert" in this case --
23       Q.   What I'm saying is, I just want to be
24   clear, if I understand correctly, that you never
25   provided expert testimony in connection with any

Page 39

1    lawsuit concerning the value of an individual to
2    their employer.  Is that correct?
3        A.   Yes, sir.
4        Q.   Have you ever provided any expert
5    testimony in connection with any litigation on fund,
6    investment fund formation?
7        A.   No, sir.
8        Q.   Have you published any articles on
9    valuing an individual's service to an employer in the
10   financial services industry?
11       A.   No, sir.
12       Q.   Have you taught any courses on that
13   topic, how to value an individual's services to an
14   employer?
15       A.   No, sir.
16       Q.   In preparing -- well, let me just, so we
17   know what we're talking about here, I'm going to show
18   you Exhibit number 2.
19   EXH        (Exhibit 2, expert report of Michael
20   Winchell, marked for identification, as of this
21   date.)
22       Q.   And that is the opinion and the report,
23   rather, that you've issued in this case, is that
24   correct?
25           MR. MARIANI:  This is Exhibit 2?

Page 40

1            THE WITNESS:  Yes, sir.
2        Q.   That's it?
3        A.   Yes, sir.
4        Q.   In preparing the actual report,
5    Exhibit 2, did you rely on any reference texts or
6    treatises in forming your opinions?
7        A.   I'm not sure what you mean by those
8    specific terms.  But in the documents that I
9    provided, there are some items I believe relevant
10   that could be, you know, that could create an
11   affirmative response.
12           So for example, there is a survey of
13   various types of investment banking jobs performed
14   during 2016 by a firm in London that had somewhere in
15   the neighborhood of twenty different types of jobs
16   performed, investment banking, one of which was the
17   securitization and structuring -- structured finance
18   groups, and individuals employed in that capacity.
19       Q.   And is that contained here in this thumb
20   drive?
21       A.   Yes, sir.
22       Q.   Do you recall what that document dis
23   typed?
24       A.   I do not recall.  I could look at your
25   screen and identify it.

Page 41

1        Q.   Sure.  I'll turn it over to you.
2        A.   It's entitled, "Banking Asset Management
3    Salary Survey."
4        Q.   Thank you.
5        A.   It's the third item from the top in your
6    list.
7        Q.   Okay.  It won't let me open.  "Banking
8    Asset Management Salary Survey"?
9        A.   Correct.
10       Q.   We'll come back to that.  Do you have a
11   hard copy?
12       A.   I don't have a hard copy, but I have my
13   laptop, and I have a copy of that same file loaded on
14   my -- loaded native --
15       Q.   Maybe you could just e-mail it to me.
16   That would be quicker than...
17           (A pause in the proceedings.)
18       A.   Take a minute so I can load up the file.
19           (A pause in the proceedings.)
20       A.   I don't have any problem opening it.
21   What would you like me to do with it?
22       Q.   Would you just open it so I can see it?
23   I may just have a question.
24       A.   You're welcome to scroll down.
25       Q.   Okay.

11  (Pages 38 to 41)

Page 42

```
 1            (A pause in the proceedings.)
 2       A.    The section that's specific to this
 3  opinion is probably towards the end, probably item
 4  number 16 or 17.
 5       Q.    "Securitization structured finance"?
 6       A.    Yes, sir.
 7       Q.    Okay.
 8       A.    But in general I relied on the entire
 9  document to giver me a state of the salaries in the
10  industry as reported by a well-recorded, you know,
11  management consultant and recruiting firm.
12       Q.    And do you know the population that they
13  surveyed?
14       A.    No, I do not. `
15       Q.    Do you know whether they surveyed
16  private investment funds?
17       A.    I believe they actually discuss private
18  funds at the bottom of their analysis.
19       Q.    All right.  Well, I can ask about it
20  later.  But I think this is sufficient for right now.
21            Other than the survey that you've
22  mentioned, were there any other external sort of
23  academic or reference sources that you are relied on
24  in forming your opinion?
25       A.    Not academic, but yes, other external.
```

Page 43

```
 1       Q.    All right, what are the other external
 2  references?
 3       A.    There was a -- there was a federal
 4  agency that oversees Fannie Mae and Freddie Mac, did
 5  a compensation analysis.  In, I believe, 2011-2012
 6  period in a report to Congress, they listed --
 7       Q.    What was the time frame?
 8       A.    I believe it was 2011-2012.
 9       Q.    Did you include that in your documents?
10       A.    Yes, sir.
11       Q.    Okay.  And what is the -- it's FH -- I
12  forget.
13       A.    It's not the FHA but it's something like
14  FHA.
15       Q.    But the regulator for Freddie and
16  Fannie, correct?
17       A.    Correct.
18       Q.    And what did the survey report, or what
19  did the document report?  I don't know what it was.
20       A.    The document was a report on
21  compensation -- median compensation for employees of
22  both Fannie and Freddie with a summary by -- broad
23  title, so let's say, other than the CEO, they would
24  have included median compensation for the executive
25  vice-presidents, senior vice-presidents, and
```

Page 44

```
 1  vice-presidents, which may have corollaries with
 2  different titles in the private space.
 3            They -- I used that to examine, there
 4  are people who are employed as structurers by both
 5  Fannie Mae and Freddie Mac who carry those titles.
 6  The -- so if you were looking at an individual who
 7  was a structurer at Freddie Mac, you would see that
 8  they are a vice-president.  The median compensation
 9  for vice-presidents might have been $360,000, I'm not
10  sure of the exact number, but it's in the document.
11            I would say the vice-president of Fannie
12  Mae is similar to a director at an investment bank.
13  A managing director at an investment bank might be
14  equivalent to a senior VP, and again, different banks
15  and different organizations use those titles for
16  different levels.
17            I used those to try to identify other
18  structurers within explicitly the Freddie Mac
19  community to see what they might be expected to earn
20  on a median basis.  Of course, I don't have a broad
21  range, they just publish the median compensation.
22       Q.    And that was a survey of employees of
23  Freddie and Fannie, correct?
24       A.    It wasn't a survey, I think it was
25  actually a census accounting that was provided to
```

Page 45

```
 1  Congress, how much are people at these organizations
 2  making.  I think the political backdrop, all the CEOs
 3  of these organizations which the taxpayers bailed out
 4  earning too much, might be the motivation.  So I
 5  would call it more of an audit than a survey.
 6       Q.    Okay, the data contained in there, what
 7  did you rely on to render an opinion in this case?
 8       A.    Simply description of the individuals
 9  that I identified in the Freddie Mac and Fannie Mae
10  annual reports or in other -- some other web pages
11  about the -- who these people were, what their titles
12  they carried, and they been what those -- what those
13  titles -- what the median compensation for those
14  titles was.
15       Q.    Okay.  And is is that referenced
16  anywhere in your report?
17       A.    No.
18       Q.    Is the survey that you referenced from
19  Banking Asset Management Salary referenced anywhere
20  in your report?
21       A.    No.
22       Q.    Did you, when you were identifying a
23  title or a job classification, did you try to find
24  one that was equivalent to what Mr. Hughes did at
25  Priderock, or Dr. Hughes did?
```

1    A.    Yes.
2    Q.    So what were you looking for?  What did
3  you consider as an equivalent job title that would
4  capture what Dr. Hughes did at Priderock?
5    A.    So I think that Dr. Hughes performed two
6  primary functions at Priderock.  One was the
7  development or the provision, and I couldn't
8  ascertain whether Dr. Hughes built a model for cash
9  flow analysis on a de novo basis or whether he
10  modified a previously existing model.  Both are
11  irrelevant to me.
12        At the point that you need a model, it's
13  kind of like a car engine.  Whether you take an old
14  engine out of another car and put it into a new car
15  or build a new engine, kind of irrelevant.  The car's
16  got to run.  That's how I viewed this.
17        As I said, I believe that it's essential
18  for the sale of securities -- sale of a fund that
19  invests in mortgage-backed securities to understand
20  how those mortgage-backed securities can perform
21  under different market environments.  And the only
22  way to do that in my opinion is the use of a cash
23  flow model.
24        So first off was, if you had to develop
25  a model or bring a model, I looked for people who had

1  that type of expertise, structuring and -- and
2  there's a fair number of them out there in the world.
3  I'm not a headhunter, I haven't hired them in ten
4  years.
5        The second thing I was looking for were
6  people who could represent -- I don't want to use the
7  word "represent" -- persons who could explain what
8  happens to the mortgage-backed securities in sort of
9  plain English terms and how a model reveals that,
10  which is a different type of job than the job of a
11  pure structurer.
12        And I would say that that individual
13  with the ability to do both, build a model and
14  explain the model and explain the value of
15  mortgage-backed securities or sell those
16  mortgage-backed securities, that's more unique, and
17  typically those two jobs are segmented, separated in
18  the investment banking world.  The structurers are in
19  a research or a technology division and the
20  salespeople obviously are selling and in another
21  division or in a linked division.
22        So I saw Dr. Hughes as performing two
23  essential tasks.  And my review of the correspondence
24  between Priderock and Dr. Hughes was evidence of
25  that.  Can you provide a model, and are you available

1  to explain the model to a potential customer.
2    Q.    So back to the question, what job titles
3  did you focus in on, looking at the Freddie and
4  Fannie Mae survey, or audit, in the banking asset
5  management that you think captured what you
6  understand Dr. Hughes did?
7    A.    In the Federal Government's audit,
8  senior vice-president and vice-president, somewhere
9  in those two.  And in the banking asset management
10  survey, structured products, structured finance
11  structurer.
12    Q.    That's where you were looking?
13    A.    Yes, sir.
14    Q.    But was it largely, I mean, were you in
15  a sense kind of guessing, "This is where I think
16  Hughes would end up"?
17        MR. MARIANI:  Objection, form.
18    Q.    Where you would slot him in, in these
19  classifications?
20        MR. MARIANI:  Objection, form.
21    A.    As I said, I have some personal
22  experience with Dr. Hughes, knowing his background,
23  his capabilities.  What I was attempting to do was to
24  find classifications or descriptions of individuals
25  who I thought had the same sort of total skillset,

1  and try to identify what they were paid through
2  information that was publicly available.
3    Q.    Okay, and those are the two sources that
4  you just testified about.  Let me back up a step.
5        When you worked with Dr. Hughes, was it
6  at Bear, Stearns?
7    A.    Yes.
8    Q.    Was it only at Bear, Stearns?
9    A.    Yes, sir.
10    Q.    What was his job, was he primarily an
11  analyst, a modeler, what did he do?
12    A.    Dr. Hughes was, during my tenure at
13  Bear, Stearns, a mortgage-backed securities salesman.
14    Q.    So he was in sales?
15    A.    He was in sales.
16    Q.    And he was not a modeler?
17    A.    He was not employed by Bear as a
18  modeler.  But he could model.
19    Q.    Okay.  But that wasn't his job at Bear,
20  Stearns, right?
21    A.    No, sir, his job was to sell
22  mortgage-backed securities.
23    Q.    Did you supervise him?
24    A.    No, I did not.
25    Q.    Did you do the same thing?

13  (Pages 46 to 49)

Page 50

1        A.    No, I did not.
2        Q.    Okay.  Are you able to quantify or do
3    you have any information that would allow you to
4    quantify the amount of time that Dr. Hughes spent
5    working for Priderock on the MDOF?
6        A.    I don't have anything that I'd be able
7    to total the number of days or hours per day that he
8    worked.
9        Q.    Did you ask for that information?
10        A.    No, I did not.
11        Q.    Prior to preparing your report which is
12    Exhibit 2, did you prepare a preliminary report prior
13    to issuing the one you've tendered in this case?
14        A.    I wrote numerous drafts, all of which,
15    over a period of days, as I refined it.  So yes, I
16    prepared preliminary drafts but I didn't report to
17    anybody, did not provide those to anybody.
18        Q.    Okay.  You didn't provide them to
19    Dr. Hughes or his lawyers?
20        A.    No.
21        Q.    Did Dr. Hughes or his lawyers ask you to
22    change anything in your report?
23        A.    No.
24        Q.    And I think I got -- I'm not sure that I
25    got an answer, excuse me, or asked this question.

Page 51

1              How much time did you spend preparing
2    your report?
3              MR. MARIANI:  Objection, asked and
4    answered.
5        A.    So as a matter of form, if he makes an
6    objection, I can answer?
7              MR. MARIANI:  You can still answer, yes.
8              THE WITNESS:  Just want to make sure.
9              MR. MARIANI:  Just trying to protect the
10    record.
11              THE WITNESS:  Yes, I got you.
12        A.    Actual preparation of the report,
13    probably twenty hours.
14        Q.    And how much time studying or preparing
15    to draft the report did you spend?
16        A.    Probably thirty to forty hours.
17        Q.    Okay.  And over what period of time,
18    when did you start, when did you finish?
19        A.    Started in late September, mid
20    September, probably around the 18th or 19th of
21    September.  I don't know when I sent the report,
22    maybe October 9th or something.  Does that sound
23    right?
24        Q.    There's a date at the bottom.  It says,
25    Wednesday, September 26th, 2018.  Does that refresh

Page 52

1    your memory?
2        A.    Yeah, that refreshes my memory.
3        Q.    Is that the date that you sent it to
4    Dr. Hughes' lawyers?
5        A.    Yep.  If that's the date I put on the
6    file.
7        Q.    Did anyone assist you in preparing the
8    report?
9        A.    Nope.
10        Q.    So I want to go through questions I have
11    about the report itself, so if you want to put that
12    exhibit in front of you, I'll go through it.
13              I believe you testified, you didn't
14    interview anyone employed by Priderock Capital other
15    than Dr. Hughes?
16        A.    I never even interviewed Dr. Hughes
17    specifically.  I had only one question of Dr. Hughes
18    in the preparation of my report.
19        Q.    What did you ask him?
20        A.    I asked him whether Freddie Mac -- my
21    belief was that Freddie Mac did not require Priderock
22    to tie out their model, and I wanted to confirm that
23    that was the case.
24        Q.    And what was the answer?
25        A.    That you did not have to tie out --

Page 53

1    Priderock did not have to tie out their model to
2    Freddie Mac, that they were not required by Freddie
3    Mac in the bidding process to present a model.
4        Q.    Okay, that's fine, so I understand.  So
5    in order for Priderock -- first of all, Priderock has
6    to be an approved purchaser, correct, do you
7    understand that, by Freddie?
8        A.    Yes.
9        Q.    And do you know whether Dr. Hughes had
10    anything to do with obtaining that approval from
11    Freddie Mac?
12        A.    I am not aware of specific actions
13    Dr. Hughes took to gain that.  I do know that I saw
14    in some correspondence Freddie Mac informing
15    Dr. Hughes that they were either in a position or
16    permitted to participate in a bidding process, and I
17    could only identify Dr. Hughes -- he was the only
18    Priderock official identified in that correspondence.
19        Q.    Okay.  So on the first page of your
20    report, there's a heading, "Description of the
21    Priderock Multifamily Debt Opportunity Fund."
22              And then there's perhaps three
23    paragraphs.  Where did you get the information that's
24    contained under that heading, where does that come
25    from?

Thompson Court Reporters, Inc
thompsonreporters.com

Page 54

1    A.   Primarily the private placement
2  memorandum.
3    Q.   And then -- so you just sort of
4  summarized what you read there, is that correct?
5    A.   I primarily used the private placement
6  memorandum and also some of the filings that they had
7  made with the SEC.
8    Q.   And then --
9    A.   Some of the other files they had made
10 with the SEC.
11   Q.   The next heading on the same page is,
12 "Various Terms and Conditions Applicable to the
13 Limited Partners of the Fund."
14       What is the source of the information
15 that follows under that heading?
16   A.   Private placement memorandum.
17   Q.   Did you read the entire private
18 placement memorandum?
19   A.   Numerous times.
20   Q.   And on page 2, there is a heading,
21 two-thirds of the way down, "Approximate Fees and
22 Other Amounts to Be Earned By the Investment
23 Manager," do you see that?
24   A.   Yes, sir.
25   Q.   What is the source for the information

Page 55

1  contained under that heading?
2    A.   Private placement memorandum.
3    Q.   And on page 3, the heading, about the
4  middle of the page, states, "Description of the
5  Mortgage-Backed Securities to Be Purchased By the
6  Investment Manager."
7        What is the source for the information
8  under that heading?
9    A.   So there are numerous sources. And
10 documents are provided on the thumb drive. They
11 include -- I won't be able to provide you with an
12 exhaustive list but they are from the documents that
13 are on the thumb drive. Freddie Mac multifamily --
14 description of the Freddie Mac multifamily series, at
15 least there were three specific prospectuses of about
16 three hundred pages each that describe various types
17 of K deal -- K deals. There is private placement
18 memorandum -- reliance on the private placement
19 memorandum's description of the same.
20   Q.   Any other source for the information?
21   A.   I'd say just sort of general experience,
22 understanding the Bloomberg, TREP and Intext, but I
23 couldn't identify a specific other item right now.
24   Q.   Do you have any experience investing in
25 Freddie Mac K series multifamily loans securitization

Page 56

1  program?
2    A.   I don't have personal experience
3  investing in K deals.
4    Q.   Either as an investor or as a manager?
5    A.   That's a different statement.
6    Q.   Okay.
7    A.   So K deals in my mind are nothing other
8  than an evolution of a market that's been in place
9  for 30-some years. They are an attempt to -- let me
10 start over.
11       The process of securitizing
12 mortgage-backed securities really was a 1980s
13 phenomenon. And the goal was to take a large
14 collection of underlying loans, place them into pools
15 and allocate the cash flows according to a set of
16 rules.
17       So one of my earliest jobs on Wall
18 Street was to build models to do that. I was hired
19 by Bear, Stearns in 1985, after doing that for one
20 year at Merrill Lynch. I worked for -- I was hired
21 by a guy, Dr. Blaine Roberts, Ph.D. from the
22 University of Florida, I think, mathematician, hired
23 me because I could program and engage in this process
24 that we now loosely refer to as financial
25 engineering, but it was about taking underlying

Page 57

1  mortgage loans and allocating the cash flows from
2  those underlying mortgage loans to various tranches
3  of securities with various risk properties to try to
4  reduce the prepayment risk. In some of those
5  securities, that was the primary risk. And within a
6  couple of years, that modeling came to include
7  non-guaranteed securities and jumbo loans, private
8  loans and things like that.
9        The K deals represent an evolution in
10 that reallocation of cash flows, and risk transfer
11 within a trust. So the idea is, all the
12 mortgages are placed into a trust. There's a series
13 of rules that have to be modeled. The model
14 incorporates descriptions of how various events will
15 occur; you know, if a mortgage loan defaults, this
16 tranche will not get paid. And so there's various
17 terminologies in the mortgage-backed securities
18 business that's evolved over a thirty -- from 1982 or
19 so forward, and my participation in this from 1984
20 forward until '99.
21       So what I -- the first 15 years of my
22 career, I rose to the position of senior managing
23 director and ultimately a member of the board of
24 directors; and I would say primarily based on my
25 understanding of how mortgage backed securities

Thompson Court Reporters, Inc
thompsonreporters.com

Page 58

1    worked, and how these cash flow models captured, you
2    know, the performance of the securities under
3    different states of the world, and -- and I was --
4    the most lucrative part of my career at Bear, Stearns
5    was probably being the risk manager for the firm, and
6    that was largely based on my understanding of
7    mortgage-backed securities.
8            Bear, Stearns is a leader in the
9    mortgage-backed securities market.  Relied heavily on
10   its profits for a number of years on the
11   mortgate-backed securities unit was the most
12   profitable unit in the firm.  Dr. Hughes was a
13   salesman in that division.
14           And so when you say do I have experience
15   or an expertise in investing in K deals, specifically
16   K deals are just a form of credit enhancement
17   technique.  They -- their program has a specific form
18   which I'm very familiar with, and which I, you know,
19   analyzed billions of dollars of securities when I was
20   at Bear, Stearns.  So yes, think I'm an expert in
21   understanding the investment in K deals as a broad
22   class of commercial mortgage-backed securities.
23       Q.    Have you ever participated as a
24   purchaser of a K deal certificate?
25       A.    Not specifically of a K deal

Page 59

1    certificate.
2        Q.    And have you participated as an adviser
3    of purchasers of K deal certificates?
4        A.    No.
5        Q.    Have you managed a fund that invests in
6    K deal certificates?
7        A.    No.
8        Q.    On page 4 under the heading, "The
9    Necessity of Structuring Models and the Creation and
10   Analysis of K Deal REMIC Securities."
11           Is this a topic that you -- excuse me,
12   the material, the paragraph following that heading,
13   you authored that?
14       A.    The paragraph following is to fully
15   understand the potential investment?
16       Q.    Yes.
17       A.    Yes.
18       Q.    You state that the investor must have
19   access to a model; do you see that ,In the second
20   line there?
21       A.    Yes.
22       Q.    And what do you base that statement on?
23       A.    Fifteen years of experience with
24   mortgage-backed securities.
25       Q.    Okay.  But it's a model, it's not

Page 60

1    necessarily a model that Dr. Hughes created, it's
2    just a model, right?
3        A.    That's correct.
4        Q.    And further down, you mention, which
5    you've already mentioned earlier, which is Bloomberg,
6    TREP and Intext have developed and provide models
7    that permit investors to understand the cash flow of
8    these securities; is that correct?
9            MR. MARIANI:  Objection, form.
10       A.    That's incorrect.  As I stated earlier,
11   you generally cannot analyze K deal securities
12   specifically using -- I'll repeat, sorry.  You cannot
13   analyze the first loss subordinate piece typically
14   having access to Bloomberg, TREP or Intext.
15       Q.    What do you mean by "typically"?
16       A.    My understanding is, you may be able to
17   engage Intext or TREP to perform a bespoke analysis,
18   a one-off analysis of those, or a specialized
19   analysis of the controlling class securities or
20   certificates.
21       Q.    And do you know what sort of fee that
22   TREP or Intext would charge for that service?
23       A.    No, I do not.
24       Q.    In the last paragraph of page 4, it
25   reads, "Investors commonly analyze an investment in a

Page 61

1    mortgage-backed security utilizing a cash flow yield
2    presentation," and it goes on.  I'm just trying to
3    direct your attention to what I have a question
4    about.
5        A.    Okay.
6        Q.    When you say investors commonly analyze,
7    did you conduct any kind of a survey to make that
8    statement or is there survey data available that
9    would support that statement?
10       A.    I'm not aware of survey data but, in my
11   entire experience during my term at Bear, Stearns in
12   the mortgage-backed securities arena, I never
13   understood one investor to purchase something without
14   requiring that -- in fact, my job when I came to
15   Bear, Stearns was to build the models to allow
16   investors to do that.
17           And it was my understanding at that time
18   that our legal department required us to present a
19   cash flow yield analysis whenever we sold a
20   mortgage-backed security, which also had a full-page
21   disclaimer that was attached to it of all of the
22   things that might not be included in the analysis
23   that was prepared by our salespeople.
24           So it -- you know, you're asking me
25   about a survey that I relied on -- I sort of liken

Thompson Court Reporters, Inc
thompsonreporters.com

Page 62

1  this to going to the doctor. Whenever you go to the
2  doctor, no matter what your ailment, they take your
3  temperature, your blood pressure and your pulse rate.
4  I don't know why doctors do that every time you come
5  in, whether you have a cut on your finger or you're
6  complaining of the flu. That's the protocol.
7         The protocol in the mortgage-backed
8  securities business, in the entire time that I was
9  involved with it, required us to present these types
10 of cash flow analyses to our potential customers.
11        Q.   I think you said you were in the
12 mortgage-backed securities industry from 1985 to
13 1999?
14        A.   1984.
15        Q.   '84?
16        A.   Yes.
17        Q.   To 1999?
18        A.   Yes.
19        Q.   And since that time, you have not worked
20 in the mortgage-backed securities industry?
21        A.   That's correct.
22        Q.   Have you ever conducted any research or
23 read any materials on investor behavior?
24        A.   That's a broad question. In some of my
25 asset management positions, I tried to understand

Page 63

1  some things known as behavioral finance, which -- so
2  if that's what you're referring to, yes, I have read
3  some things about investor behavior.
4         Q.   Is any of that information that acquired
5  regarding investment behavior reflected in this
6  report?
7         A.   No.
8         Q.   In the third -- I should say next page,
9  page 5, the third line, it starts -- it reads,
10 rather, "My understanding is that Dr. Hughes provided
11 to Priderock, or built for Priderock, the initial
12 model analyzing the K deal investments."
13        Where did you learn that information?
14        A.   I guess I surmised that from the
15 correspondence between Dr. Hughes and the principals
16 of Priderock.
17        Q.   Did Dr. Hughes tell you that?
18        A.   I don't think so.
19        Q.   In the next paragraph down, it quotes
20 the section that references Dr. Hughes and the
21 private placement memorandum, do you see that?
22        A.   Yes, sir.
23        Q.   And that's a quote that you took from
24 that document, is that correct?
25        A.   Yes, sir, that's from the private

Page 64

1  placement memorandum, page 19.
2         Q.   Okay. Other than the time that you
3  worked with Dr. Hughes at Bear, Stearns, do you have
4  any independent knowledge of the statements contained
5  in that paragraph?
6         A.   Could you repeat that question?
7         Q.   Yes. Other than -- you worked with him,
8  or at least you worked at Bear, Stearns together, as
9  I understood. You say you didn't supervise him, and
10 you didn't work doing the same thing, is that right?
11        A.   Correct.
12        Q.   But you were both at Bear, Stearns.
13        A.   Correct.
14        Q.   Outside of that experience, when you
15 both had the same employer, do you have any
16 independent knowledge of the accuracy of the
17 description contained here on page 5 of Dr. Hughes'
18 skillset?
19        A.   Um -- so this is a quote that is put in
20 a private placement memorandum that's filed with the
21 SEC.
22        Q.   Right.
23        A.   And so I take this as an accurate
24 reflection that the Priderock Group in filing a
25 document with a governmental authority had, so I

Page 65

1  don't have separate understanding that this is a
2  truthful statement, other than the fact that it
3  appears in a filing with the government for a private
4  placement memorandum.
5         Q.   All right. Do you know what role, if
6  any, or what, you know, what role, if any, Dr. Hughes
7  performed in conducting due diligence of the
8  securities that MDOF invested in or bid on?
9         A.   So as I understand that process, I would
10 say -- I understand the process to be, once you have
11 bid on the K deal security and are aware, in the case
12 of the first one that I believe they purchased, the
13 KF 29 deal, you have an opportunity to analyze the --
14 in this case, I think there were 54 underlying
15 multifamily loans. I'm not sure of their due
16 diligence process and what was Dr. Hughes' specific
17 role, but I believe that there's a -- a fair number
18 of activities that go on and I believe that
19 Dr. Hughes' model would have been used in the due
20 diligence process when they substituted one loan --
21 as I said, these cash flow models, need to look at
22 the 54 underlying loans and how their cash flows will
23 drive the return to the investor through a waterfall
24 structure.
25        The due diligence period, is my

Page 66

1  understanding for the K deal, gave the controlling
2  class purchaser a right to analyze those 54 loans and
3  to make some substitutions at the initial point of
4  investment, to discard some that didn't meet their
5  criteria.
6          Having discarded a loan and then
7  substituted a new loan, or even without substituting
8  a new loan, one would have to rerun the cash flow
9  analysis to understand the impact of removing that
10 particular loan from the pool that was going to now
11 be placed in the trust.
12         So when you ask me what I know about
13 Dr. Hughes' specific role, from some correspondence
14 that I read, it appears that there is a, during that
15 due diligence period, there are requests of
16 Dr. Hughes to run some scenarios and do some --
17 perform some tasks.  So from my reading and review of
18 the e-mail correspondence, it appears that he has a
19 role which is distinct and separate from other people
20 who have other roles.
21         And I look at this as a -- you know,
22 once they bid for this thing, they have all got to
23 work together.  It's four wheels on a car and they
24 all have to be on the car for the thing to go down
25 the road together.  And Dr. Hughes is one of those

Page 67

1  wheels and there seem to be some other people
2  involved that have their roles, too.
3          So I -- short answer is, yes, I think
4  Dr. Hughes is engaged in the due diligence process.
5  Q.     Okay.  Now, on page 6 --
6         THE WITNESS:  Can we take a break?
7         MR. MIOSSI:  Yes, sure.
8         (Recess taken.)
9  EXAMINATION (Cont'd.)
10 BY MR. MIOSSI:
11 Q.     At the bottom of page 6, you start the
12 last paragraph by, "In my opinion."  Do you see that?
13 A.     Yes.
14 Q.     Now, from that point over to page 7, so
15 page -- bottom of page 6 to bottom of page 7, does
16 that contain all the opinions that you are preparing
17 to offer in this case?
18 A.     Um -- so I -- I would have included all
19 the way to the end of page 9.
20 Q.     Okay.  Well, than fine, so let's go all
21 the way over to page 9.  So the bottom of page 6 to
22 the end of page 9, those are all the opinions that
23 you intend to offer in this case, is that right?
24 A.     Based on my knowledge at this point in
25 time, yeah.

Page 68

1  Q.     Okay.  Do you intend to revise this or
2  change your opinions?
3  A.     So, I don't know how this process goes
4  completely, but I would assume that, given additional
5  information, if it was presented to me, yeah, I
6  would -- I'd have to be open to changing my opinion
7  based on different facts.
8  Q.     Okay.  But that would depend upon new
9  information that you currently haven't --
10 A.     Correct.
11 Q.     -- seen, is that right?
12 A.     Correct.
13 Q.     Now, in rendering your opinion here, do
14 you apply any particular methodology?
15 A.     Uh -- "methodology" meaning, you know,
16 discounted present value of cash flows, or --
17 "methodology" to me can mean a set of assumptions.
18 Q.     It's just, I can't answer the question.
19 I'm just asking if you have applied a methodology in
20 reaching, in expressing the opinions that you have in
21 this report.
22         MR. MARIANI:  Objection, form.
23 A.     I would say I have some methodology,
24 yes.
25 Q.     Okay.  What is it?

Page 69

1  A.     My methodology is based on my personal
2  experience as an asset manager and portfolio manager
3  of fund.  That's the first point.  And I can
4  elaborate.
5  Q.     Okay.  Well, go ahead.  I mean, I don't
6  even want to finish -- is there more or is that it?
7  A.     No, there's more.
8  Q.     Okay, go ahead.
9  A.     Methodology would include the continuity
10 of Dr. Hughes' activities over the life of the
11 marketing period.  So my methodology, which was on
12 the pages 6 and 7, I think, that there is a marketing
13 and selling period, a commitment period, and a hold
14 to maturity period.
15         So I do think that my opinion of
16 Dr. Hughes' value to the Priderock Investment
17 Advisory Capital Partners collection of entities is
18 based on a methodology of understanding how difficult
19 it is to raise money for funds, the necessity of
20 winning investor confidence during that period, how
21 hard that task can be for many de novo funds, and
22 therefore, the methodology by which I arrived at
23 Dr. Hughes' value to Priderock, is a function of me
24 assigning higher value to the first stage than I
25 would to the third stage.  That's the methodology.

18  (Pages 66 to 69)

Page 70

1    Q.    Is there anything else?
2    A.    Second methodology I have is with
3    respect to managing -- or selling -- selling
4    mortgage-backed securities, purchasing them on behalf
5    of other investors to whom one owes a fiduciary
6    responsibility, is that a cash flow model is
7    absolutely necessary and it appears that Priderock
8    relied on Dr. Hughes for their model.
9    Q.    Okay.  Anything else?
10   A.    Yes, I think so.  So based on my
11   experience over the last ten years, and my current
12   experience now in the business of asset management,
13   many de novo funds begin with a collection of
14   individuals agreeing to contribute their time with
15   the expectation that they may draw no salaries today
16   but have an expectation of sharing in the fees in the
17   future once the fund gets up and running.
18         And I believe that that was another
19   critical aspect of this, that there was a significant
20   risk reduction by not engaging in a salary
21   arrangement with Dr. Hughes, that there was not a lot
22   of money that had to be spent in -- taking an
23   expertise that Priderock had and taking it to another
24   level, taking their expertise as owners and operators
25   of multifamily properties and getting into a

Page 71

1    completely new business, which was managing,
2    purchasing securities that represented a different
3    type of activity, but linked, and that one of the
4    features of that was, you know, the ability to
5    understand those securities, which I think Dr. Hughes
6    provides.
7          But as I said, the risk reduction of
8    doing so without -- and I'm not aware of what other
9    principals were paid would come in to the picture,
10   but there appears to be a group of people who were at
11   Priderock before they decided to launch a multifamily
12   debt opportunity fund, why some are getting paid
13   their salaries for the activities that they do, and
14   they are engaged at various times and in various
15   durations with this whole de novo fund launch.
16         There's an individual, David Worley, who
17   is -- I can't tell whether he was previously employed
18   by the fund but he appears to be and, by virtue of
19   the description in the private placement memorandum,
20   the vast majority of his time is focused on this
21   launch in this marketing period, in period one, and
22   that he will be very engaged during period two, which
23   is relatively short due diligence period, and may not
24   be that much engaged in period three, the hold to
25   maturity phase.

Page 72

1          And so my methodology is saying -- I
2    don't know whether Mr. Worley was paid for his
3    services during this time.  My sense was that, like
4    Dr. Hughes, in this de novo launch it was, "Let's try
5    to keep our costs as low as possible, and if this
6    thing works out, we'll all do well together."
7          So yes, I have a methodology.
8    Q.    Is your methodology, then, really a
9    function or based upon your own personal experience?
10   A.    No.  I probably could name twenty other
11   funds with different people that have done, so -- I
12   guess because I personally am familiar with other
13   people's circumstances, yes.  The correct answer, my
14   own personal experience not being limited to my own
15   fund launch, but to the launch of other funds over
16   the last ten years.
17   Q.    And I mean, is the method that you
18   applied to render an opinion in this case, can it be
19   tested?  Could you give your methodology to another
20   person who has experience with mortgage-backed
21   securities and/or working on Wall Street, and/or
22   modeling, and they would come up with a conclusion
23   similar to yours?
24   A.    Yes, I believe so.  I don't think I'm a
25   unique expert.

Page 73

1    Q.    And so what would be the components,
2    what's the method?  What steps, what standards, would
3    you explain, are brought to bear to render the
4    opinion in this case?
5    A.    I haven't thought specifically about a
6    set of standards that I can delineate.  I'd like to
7    take a little time to think about that.
8    Q.    I mean, does the methodology that you
9    have articulated, does it have a known error rate?
10   A.    No, I'm not aware of a known error rate.
11   Q.    At the bottom of page 6, there's a
12   phrase that you use which I just want to understand
13   what you mean by it.
14         The very second-to-the-last line, it
15   talks about, "Greatest economic capture."  What do
16   you mean by that?
17   A.    Because the investor is committing to
18   Priderock to provide funds for the purchase of these
19   controlling class certificates, and is committing to
20   be a participant for a seven-year period with no
21   liquid market for their interests, fees which are
22   paid over roughly a ten-year period or based upon
23   somebody committing in this commitment period, in
24   this marketing period; and so once you've landed that
25   client, once they've committed, they're promising to

Page 74

```
1   pay you as the investment manager for a ten-year
2   period.
3          That's a great economic capture in the
4   sense of, I don't know what -- how the law works, but
5   if you got a retainer and it was guaranteed for ten
6   years from a company, that would be a pretty good
7   deal.
8          So we I look at the fact that if you
9   have a customer commit during the commitment period,
10  they are unable to pay you fees for a ten-year
11  period.  They can't get out of the deal.  Everything
12  that they have learned to that point to make them
13  comfortable, there's no turning back afterwards.
14         So economic -- greatest economic capture
15  means landing the customer on what appears to be day
16  one of their involvement, is to lock them into a
17  ten-year commitment that's very lucrative.
18      Q.    Okay.  In the, on page 7, in the first
19  paragraph, you're referring to this initial, I guess
20  I can -- if I use the term "marketing period," I want
21  to make sure that we're talking about the same thing.
22         During the period when the investment
23  manager is working to attract investors, I'll call
24  that the marketing period, leading up to the time
25  they make the commitment that you just referenced, do
```

Page 75

```
1   you know what role Webster Hughes played in
2   convincing investors to invest in the MDOF?
3      A.    By way of correspondence between
4   Priderock principals and agents, it appears that
5   Dr. Hughes played a significant role in explaining
6   the returns of the K deal certificates and the
7   various potential market impacts.  He seems to be --
8   and again, based on my reviewing a couple of thousand
9   of the e-mails, he appears to be the only one who's
10  ever asked to provide an economic analysis to the
11  customers, potential customers.  He's provided a
12  model which seems to be viable through an Internet
13  connection, an online link, that the investors, once
14  given a password, can run.
15         So he seems -- but -- Mr. Hughes is not
16  the only person engaged in attracting investors.
17  There are other people.  But he seems to be critical,
18  as I said, as critical as a wheel on a car.  He's one
19  of the four wheels driving this thing.  It appears
20  that if I were looking at the correspondence,
21  Jonathan Diamond clearly has a known set of potential
22  customers.  There were people that David Khoury knows
23  and is introducing to the concept of launching this
24  fund.  David Worley seems to bring an expertise, but
25  he doesn't seem in, the correspondence that I
```

Page 76

```
1   reviewed, bringing a set of investors.
2          But when Mr. Diamond and Mr. Khoury are
3   bringing investors, they are bringing them to
4   Dr. Hughes repeatedly, and then there's an ongoing
5   e-mail chain back and forth between those potential
6   investors and Dr. Hughes directly or through
7   Mr. Diamond most often, sometimes through Mr. Khoury,
8   in the refinement of understanding, you know, more
9   clarity, "Can you please run this?"  "What happens if
10  this happened?"
11         There's also specific times in the
12  correspondence where Priderock Capital are asking
13  Dr. Hughes to, "Let's model it, let's, you know, can
14  you tell me if I used a five-year and seven-year
15  float or how that would look."
16         So again, my opinion of his importance
17  during the marketing period is that he's essential.
18      Q.    Are you able to quantify the investment
19  dollars that were attracted based upon either
20  meetings or phone conferences that Dr. Hughes
21  participated in?
22      A.    Upon a provision of information about
23  which investors invested how much, and based on the
24  correspondence, it's clear that I could do some of
25  that.  And I'm not -- part of my opinion is, once
```

Page 77

```
1   Dr. Hughes provides a model and other people at
2   Priderock learn how to use it, they could clearly,
3   you know, when we talked about the two roles
4   Dr. Hughes played, there are people who can build
5   models and there are people who can explain models.
6   And certainly somebody having learned how to use
7   Dr. Hughes' model could learn how to explain it as
8   well.  Maybe not as effectively, maybe more
9   effectively.
10         So I can't link specific clients because
11  I don't have those data, who invested how much,
12  whether a conversation that occurred during
13  Dr. Hughes' time frame ended up with a customer
14  coming back three months after the initial launch and
15  buying something.  So I couldn't give you a specific
16  matrix of Dr. Hughes' contacts with customers and the
17  money invested.
18      Q.    In your experience, the investors in
19  these funds, like the MDOF, is it your experience
20  that they are sophisticated investors?
21      A.    I have known people that bought
22  mortgage-backed securities and lost all their money,
23  or heard of those people.
24      Q.    Bear, Stearns is one of them, right?
25      A.    Bear, Stearns got left with all the
```

Page 78

1    stuff that they couldn't sell to people.
2        Q.    Yes.
3        A.    Okay?  So sophistication, you know, if
4    you -- I don't know if you're sophisticated just
5    because you're winning at the gambling table.  You
6    know?  You can win at the gambling table and not be
7    sophisticated, and you can have all sorts of
8    theories.  They should be sophisticated.  They should
9    be sophisticated.
10        Q.    Let me ask you differently, a little
11    more specifically.  Is it your experience that these
12    investors in these types of funds, like the MDOF,
13    often, if not always, have their own analysts who
14    provide advice regarding the anticipated performance
15    of an investment and the way the investment will
16    work?
17        A.    Not necessarily.  I think within three
18    or four days' time, I could explain to you how the
19    K deal securities worked so that you feel comfortable
20    investing your own money because that means that, you
21    know, you are a sophisticated cash flow modeler
22    yourself, or you understand it?
23        So I think that people charged with
24    investing people's money need to understand the
25    securities and they need somebody to teach them.

Page 79

1    Whether that person then goes on and feels that it's
2    essential enough -- so for instance, there's a Stone
3    Ridge Asset Management that I saw.  They probably
4    have their own people to do exactly what you say.
5    But I don't know whether every investor needs to have
6    their own cash flow models or model it on Bloomberg.
7        But they do have to have an
8    understanding through this cash flow modelling
9    process.  Somebody needs to present how it works, and
10    they need to be satisfied in their due diligence for
11    their investors that they perform the fiduciary role,
12    you know, and understanding it.
13        Q.    Have you asked the investors who
14    participated or have invested in the MDOF to
15    understand who they are and make a judgement as to
16    their level of sophistication?
17        A.    So you'll see in my notes that I
18    provided you that in some cases, when I encountered
19    an e-mail and a customer, I actually, a potential
20    customer, I actually went to LinkedIn or some other
21    site to try to gauge the nature of this customer, you
22    know, whether it was another investment adviser,
23    whether it was a state pension plan, whether it was
24    a -- somebody who shows up as a, you know, ready to
25    recognize fund, just to get a sense.

Page 80

1        And so -- but I don't have an exhaustive
2    list of who bought the securities, who ultimately
3    invested in the fund, how many times they spoke
4    directly or by e-mail to Dr. Hughes.  I don't have
5    any of those data.
6        Q.    On page 8, at the top, it reads,
7    "Factors determining a fair, usual and customary
8    compensation for Webster Hughes."
9        What standards are you applying to
10    determine what is fair, usual and customary
11    compensation?
12        A.    I actually talked about it in my
13    methodologies, so the terms "fair," "usual" and
14    "customary" probably are a combination of my
15    methodology and my experience and my own personal,
16    direct experience, and my personal experience of
17    other people.
18        Q.    Is it anecdotal?
19        MR. MARIANI:  Objection, form.
20        A.    I did not perform a survey for this
21    analysis.  But I would think that my experience is
22    well beyond the scope of anecdotal experience.
23        Q.    In the second bullet, you state that
24    it's your opinion that Priderock appears to have had
25    very little experience investing on behalf of

Page 81

1    themselves or others in K deals.  What is the source
2    of that opinion?
3        A.    My belief is that had they had that
4    experience, they would have demonstrated it and
5    explained that experience in the private placement
6    memorandum.  That would have been a selling point
7    that would have been valuable for them to have
8    displayed.
9        Q.    And you just didn't see it in there?
10        A.    Didn't see it in there.
11        Q.    So is that the basis for your assertion
12    that the firm had little experience in investing?
13        A.    Yes.
14        Q.    Okay.  Are you familiar with the
15    experience of, just by way of example, David Worley,
16    for example in the mortgage-backed securities
17    industry?
18        A.    David Worley was a senior vice-president
19    at Fannie Mae.
20        Q.    At one time?
21        A.    At one time.  He also worked with
22    Dr. Hughes at, maybe, Wachovia Bank, First Union.
23        Q.    I think Dr. Hughes reported to him at
24    some level.
25        A.    So they were obviously familiar with one

Thompson Court Reporters, Inc
thompsonreporters.com

Page 82

1  another.
2      Q.   At one point, yes.
3      A.   So I would, based on my reading and the
4  same types of presentation in the private placement
5  memorandum, it appears that David Worley has
6  significant experience in understanding the ways to
7  reduce credit risk in multifamily originations.
8      Q.   Do you have any knowledge about the
9  experience of David Khoury or George Banks in
10  investing in multifamily assets?
11          MR. MARIANI:  Objection form.
12     A.   Multifamily assets is a broad term to
13  include all of the various properties that they
14  purchased that were multifamily properties.  They
15  clearly have significant experience investing in
16  multifamily properties and understanding the dynamics
17  of getting loans from banks and what you require to
18  run a good business in that, and clearly that's
19  valuable to Priderock and the Multifamily Debt
20  Opportunity Fund.
21          But there's not an equivalency between
22  investing in those properties and owning the first
23  loss piece of a K deal directly.  There's some
24  similarity.  They -- they would understand the nature
25  of the credit risk and the likelihood of defaults and

Page 83

1  how that might impact the controlling classes.
2  That's not the same as directly investing in the K
3  deals' controlling class.
4      Q.   Do you think Freddie Mac would have
5  approved Priderock as a purchaser of K deals if they
6  were not satisfied they had the expertise and
7  experience to successfully manage these types of
8  investments?
9          MR. MARIANI:  Objection, form.
10     A.   It's like I said.  I think that
11  Priderock presented a team to Freddie Mac that
12  Freddie Mac approved, and that all the members of
13  that team were probably critical in that
14  presentation.
15     Q.   Do you have any idea what role, if any,
16  Dr. Hughes played in persuading Freddie Mac to
17  approve Priderock as a purchaser of K deal
18  certificates?
19     A.   No, I do no.
20     Q.   In the next bullet, third bullet, you
21  mentioned the model that Dr. Hughes provided.  I
22  think you've answered this that you don't know
23  whether he developed this model or adopted it from
24  some other place, is that right?
25     A.   So provenance of the model, that's an

Page 84

1  interesting discussion, right?  Are you saying that
2  Dr. Hughes copied a model somewhere else?
3      Q.   If he did, would that change your
4  opinion?
5      A.   No.  Only that maybe if he had a model
6  developed somewhere else, that they might have a
7  claim to some of the money as well.  The model is
8  valuable.
9      Q.   Okay.  And have you studied or reviewed,
10  gone through Dr. Hughes' model?
11     A.   I have not.
12     Q.   So you haven't gone through it and
13  understand exactly how his model works?
14     A.   I don't have -- so I understand how the
15  models in general work, having built some of them
16  myself but under different programming languages in
17  the past.
18          When I developed models in the '80s, I
19  did not develop models using a spreadsheet format
20  with Visual Basic calls.  All of my models were
21  written in C+ and ran on a, you know, Data General
22  computer at the time.
23          So -- but I understand many of the
24  mechanics that it would have involved but I did not
25  take apart that model spreadsheet to see whether it

Page 85

1  was actually performing calculations correctly.
2      Q.   Okay.  Are you aware, do you have any
3  knowledge that there were errors in Dr. Hughes'
4  model?
5      A.   There's always errors in every model
6  that you build.
7      Q.   Do you --
8          MR. MARIANI:  Let him finish the answer,
9  please.
10     Q.   Do you understand -- were you are aware
11  that there --
12     A.   No, I'm not aware that there are errors
13  in Dr. Hughes' model.
14     Q.   So you don't know whether the errors
15  were routine or non-routine, right?
16          MR. MARIANI:  Objection.
17     Q.   You don't know anything about it, right?
18          MR. MARIANI:  Objection, form.
19     A.   So -- I don't know whether -- as I said,
20  I think that I they are, in the development of all
21  models, there's a process by which there are errors,
22  many of which can go undetected for years and which
23  are not significant, and there are errors which are
24  significant.  Some of those errors are -- I can
25  remember the very first model that I built was built

Page 86

1  under the assumption that you could buy something for
2  96, cut it up and sell it for 98 in various pieces.
3       You know, the first time I had something
4  where some of that return came in over time, my model
5  continued to fail. So yes, I had an error that
6  wasn't -- the model wasn't yet robust enough to
7  handle the new types of conditions in the
8  marketplace.
9       I think that, as I said, the development
10 of all models includes the constant debugging and
11 discovery of errors. During my time on Wall Street
12 in 1991, I discovered that every single model, OAS
13 model on Wall Street had a fundamental flaw in
14 calculating something. And I published a paper about
15 that.
16      And so you're asking me a question, I
17 don't really -- I think that the whole, the process
18 of building things in computer code, there's going to
19 be a ongoing debugging and discovery of errors.
20      Q.   In the fourth bullet, you mention, or
21 you state, "On numerous occasions, from June 2016
22 through March 2017" -- I don't mean to read it out
23 loud, but --
24      A.   Right.
25      Q.   -- my question is, how many? How many

Page 87

1  are --
2       A.   I don't know. I didn't perform a count.
3       Q.   Okay.
4            MR. MARIANI: Excuse me, Bill, I'm sorry
5  to do this, but could we take a five-minute recess?
6  I have to make a phone call to a government agency
7  that's going to close and I would like to do that now
8  if I can.
9            MR. MIOSSI: Sure.
10           MR. MARIANI: Just five minutes.
11           MR. MIOSSI: Um-hum.
12           MR. MARIANI: Thank you, appreciate it.
13           (Recess taken.)
14 EXAMINATION (Cont'd.)
15 BY MR. MIOSSI:
16      Q.   Okay, we're going to go back. In the
17 fifth bullet --
18      A.   On page 8.
19      Q.   -- on page 8, there's a reference there
20 in the second sentence, "Khoury and Worley frequently
21 called upon Dr. Hughes to provide information to them
22 and to respond to queries posed by potential
23 investors."
24           Can you quantify, you used the word
25 "frequently," and I'm asking you whether you're able

Page 88

1  to quantify that statement.
2       A.   So first off, I'm not sure I have all of
3  the correspondence. I could conceivably go back to
4  the Relativity database and search and try to qualify
5  it, but I do know specific instances.
6       Q.   Okay. Well, tell me about the ones that
7  you know specific.
8       A.   All right. So just to be sure, if I
9  see -- if I have something that says
10 "Hughes_0000279," that's the Bates stamp, so the very
11 first one in my table of contents that I had for the
12 extracted e-mails, Dr. Hughes sending models after
13 Khoury requested Dr. Hughes to provide models to
14 Larry Schiffman.
15      Q.   Okay. He doesn't yawn, and just count
16 them, that's fine.
17      A.   Well, I don't known if I have a complete
18 count but I would have a count of what I've extracted
19 here.
20      Q.   That's fine.
21      A.   So specifically Worley and Khoury?
22      Q.   Well, your statement here is, "Khoury
23 and Worley frequently called upon Hughes to provide
24 information to them and to respond to queries posed
25 by potential investors."

Page 89

1            I'm simply trying to understand, is
2  there a way that you could quantify that?
3       A.   It would be incomplete. So -- because
4  I'm just -- would be going from my self-described
5  titles. I could give you a count of what I have in
6  the table of contents that I think would be that, but
7  I'm sure there's more than I would give you in a
8  total -- in my count from my table of contents.
9       Q.   Okay, well, give me the best answer that
10 you can. Was the title of your index again in your
11 documents here? What did you place it under?
12      A.   "Priderock --"
13      Q.   -- "correspondence with Dr. Hughes"?
14      A.   -- "correspondence with Dr. Hughes."
15      Q.   Okay.
16      A.   Somewhere in the order of 28 or so
17 direct requests.
18      Q.   Okay. Do you know who Priderock's
19 competitors were for the MDOF, were there other
20 investment funds that were marketing the same type of
21 K deals?
22      A.   Same type of funds that invested in
23 K deals.
24      Q.   Um-hum, yes.
25      A.   Yes. So I identified two significant

Page 90

```
 1    competitors in my analysis.  One actually is
 2    corresponding with Priderock at one point in time,
 3    which was the Bridge Investment Group.  They are a
 4    significant competitor, from my review, and I have
 5    provided you with some documents that are -- on that
 6    thumb drive that, some screen shots of Bridge
 7    Investment Group and some of their website data.
 8        Q.    Yes.
 9        A.    A review of some of their form D
10    filings, their ADVs, so they look to be about, a
11    creative -- more than a billion dollars' worth of
12    this fund investment.
13          Kayne Anderson would be a second
14    competitor that I identified.  I didn't go much
15    beyond that, but I looked at both of those because
16    I -- just to benchmark my belief in how the process
17    works.  Similar in structure.  There's -- there
18    appears to be people capable of the same, you know --
19    Bridge, for instance, has a CIO who seems to be a
20    highly capable structurer, very similar -- a set of
21    background more like Dr. Hughes than anybody else at
22    Priderock.
23          But Bridge also has many people who
24    fulfill the roles that David Khoury or George Banks
25    have fulfilled, so I would say that there's a great
```

Page 91

```
 1    similarity in the nature of the teams at Bridge and
 2    Kayne Anderson that there was at Priderock.
 3        Q.    Did you speak to anybody at campaign or
 4    Bridge?
 5        A.    I really didn't attempt to do that
 6    because I really didn't know limitations on
 7    discussing a litigation.  I did not want to somehow
 8    do something that would jeopardize Priderock's...
 9        Q.    Do you know anyone personally at
10    Bridgerock or Kayne?
11        A.    It's Bridge Investment Group is what I
12    have.  And there was an ROC Group.  They originally
13    launched some of their funds under an ROC Group and
14    then they started calling them Bridge Debt Funds, I
15    think.  No, I don't know anybody particularly there.
16          And I think I would know people who
17    would know them, but I didn't feel that that was
18    appropriate for me.  I just didn't -- didn't feel
19    comfortable doing that.
20        Q.    Okay.  The second bullet from the
21    bottom, you state, "I believe having access to
22    Dr. Hughes' model enabled Priderock to avoid the
23    expense and time required to analyze potential
24    investments using models from Bloomberg, Intext or
25    perhaps TREP."
```

Page 92

```
 1          In stating that conclusion, did you
 2    review any data?
 3        A.    So I had no data about whether Priderock
 4    ever used any one of those three services.  Didn't
 5    contact anybody at Bloomberg, Intext or TREP to find
 6    out if Priderock was a customer.  So that's more of a
 7    belief, probably.  Just based on the fact that
 8    they -- no e-mails going back and forth saying, "Hey,
 9    I ran this versus Bloomberg or Intext or TREP and I'm
10    getting a different number."
11        Q.    And I think -- let me ask this:  Did you
12    speak with or communicate with any party who invested
13    in the MDOF?
14        A.    No.  Similarly, that probably would have
15    been inappropriate.
16        Q.    On page 9, the second bullet, you offer
17    an opinion, and I won't quote the entire thing, but
18    it -- your statement, rather, that you believe that
19    the fund was able to operate with lower expenses.  Do
20    you see that?
21        A.    Yes, sir.
22        Q.    So did you review any data to arrive at
23    that conclusion?
24        A.    No, I don't have any accounting
25    statements or anything.  There are some instances in
```

Page 93

```
 1    which the fund, the expenses that are going to be
 2    charged to the investors as part of this, are
 3    evidenced in the inputs to the model and there are
 4    very, very low direct expenses affiliated to any
 5    salaries.
 6          Most of the direct expenses appear to be
 7    set up, legal fees, things like that.  Very, very --
 8    I mean, we're talking maybe less than $200,000, which
 9    is, I know when I set up a business, I spend that
10    much on lawyers.  So it didn't appear to be anybody
11    else's salaries, and that was where I drew my
12    conclusion that they were not paying salaries to the
13    direct participants, specifically Worely and Hughes,
14    who are listed as sort of a primary non-PRCP people.
15        Q.    In the fourth bullet, you're talking
16    about -- I won't even summarize it.  But I'll ask
17    this question:
18          Do you have any knowledge of the
19    modeling skills of other employees at Priderock?
20        A.    Not -- not directly.  And although it
21    appears late in the game, late in Dr. Hughes' tenure,
22    a gentleman is hired whose name begins with Z, it's
23    Z-e-n-g-o --
24        Q.    Daniel Ng?
25        A.    No, Daniel appears to be there the
```

Thompson Court Reporters, Inc
thompsonreporters.com

Page 94

```
 1    entire time that Dr. Hughes was.  He appears to be an
 2    on going participant, familiar with models.  Doesn't
 3    appear to be the guy building a model.  He has, from
 4    what I reviewed, never encountered or debugged a
 5    model to discover an error, but later on there is
 6    some back-and-forth between an individual who has
 7    encountered some errors in the model.
 8         And that -- and so by definition, then,
 9    because he provides some specific formula, he appears
10    to have some skill at developing a model.  But he
11    appears to show up in maybe February '17.
12         Q.    In the, I believe it's the fifth bullet
13    down, you state, "Many investment funds are launched
14    under similar circumstances."
15         Do you have reference to any data upon
16    which that opinion is based?
17         A.    No, not -- not hard data.  Just direct
18    experience.  I mean, I knew -- I know ten to 15
19    managers who bootstrapped themselves in similar ways.
20         Q.    Anything else?
21         A.    No.
22         Q.    In the next bullet down, you --
23    actually, I guess I'd say the next two bullets down,
24    you're offering an opinion as to what Dr. Hughes'
25    value to Priderock Capital Partners is or should be,
```

Page 95

```
 1    correct?
 2         A.    Yes.
 3         Q.    And if I understand you correctly,
 4    you've never before provided expert testimony
 5    concerning the value of an individual to a company,
 6    is that --
 7         A.    I have not.
 8         Q.    Do you have any training in compensation
 9    analysis or compensation of employees generally?
10         A.    I don't have training in ascertaining
11    the compensation through some -- again, I'll go back
12    to the fact that I hired hundreds and hundreds of
13    employees during my time, and so I became very
14    familiar with judging an individual's value to an
15    organization.  But I never attended a course to do
16    so.
17         Q.    All right.  You testified that
18    Dr. Hughes' value to Priderock -- not you testified,
19    but you state, is between a million-and-a-half and $3
20    million, correct?
21         A.    I guess I provided an example, the ten
22    to twenty percent based on a 1.5 percent fee
23    collected over a ten-year period on a hundred
24    million, so it's a -- it's more of a number that's
25    arrived at by virtue of applying a mathematical
```

Page 96

```
 1    formula.
 2         Q.    Let me back up.  It says "in my opinion,
 3    Dr. Hughes could have expected a share and such fees
 4    equal to 10 percent to 20 percent of the amount paid
 5    to the investment manager over the life of the fund."
 6         Right?
 7         A.    Yes.
 8         Q.    Does that assume he continues working
 9    the entire life of the fund?
10         A.    Well, no.  It seems that, as I said, the
11    greatest economic capture occurred during the
12    commitment period, the marketing, selling period
13    leading up to the commitment period.  And it's sort
14    of an originator concept.  If you get the fund
15    launched, you can count on the money coming in.  And
16    so whether or not Dr. Hughes continued, as I said, I
17    don't believe there's a lot of work performed in that
18    third period, this last ten years.
19         Q.    But the basic assumption you're making
20    is that he would have been participating or receiving
21    a share of these investment fees, correct?
22         A.    Correct.
23         Q.    Where do you get that from?
24         A.    So in many instances that I've
25    encountered in third-party markets, so for instance,
```

Page 97

```
 1    Jonathan Diamond, I would expect Jonathan Diamond to
 2    share in a set of fees for a number of years.  That's
 3    a fair typically arrangement for bringing potential
 4    purchasers to the fund.  So whether -- in this
 5    particular case, there are some asset management
 6    activities in which, once you get the money, the work
 7    really begins.
 8         And then there are other asset
 9    management activities that getting the money is all
10    the work, and not much happens.  You sort of allow
11    the initial decisions to bear fruit over time.  So my
12    methodology says that there's a very, very large
13    economic capture by getting the investors and little
14    actual work required once they've purchased the
15    K class securities and done their initial due
16    diligence.
17         Q.    But -- I understand that, but what is
18    the basis for your contention that someone in
19    Dr. Hughes -- you're aware he invested no capital in
20    the MDOF, are you aware of that?
21         A.    I'm not sure that that's relative.
22         Q.    I'm just asking, are you aware that he
23    didn't invest any capital?
24         A.    I'm not specifically aware of that.  If
25    your saying that's the case, I wouldn't change my
```

Thompson Court Reporters, Inc
thompsonreporters.com

Page 98

1    opinion.
2       Q.   So that doesn't matter to you.  Okay.
3    The answer is no, the fact that he didn't invest
4    capital doesn't alter your opinion, is that right?
5       A.   That's correct.
6       Q.   Okay.  What is the basis for your
7    opinion that Dr. Hughes should have participated in a
8    share of the investment fees?  Where does that come
9    from?  Whether you've got to continue working or not
10   continue working, what is the basis for that
11   assertion?
12      A.   The basis for that assertion is that as
13   an integral member, an essential member in making the
14   presentations to the prospective clients, that he is
15   performing a substantial service to the company, an
16   almost necessary service to the com -- maybe not
17   necessary and sufficient, but a necessary service to
18   the company in attracting capital; that attracting
19   the capital is the primary source of the economic
20   value of the fund because once attracted and
21   committed it is -- it is -- it continues, and it
22   continues on a pool of securities which has some
23   amortization, but not a lot, over the ten-year
24   period.
25           So it's not -- so the fee structure, if

Page 99

1    you collect a hundred million from capital -- from
2    customers, and then you deploy that capital, those
3    fees are going to be earned on roughly a hundred
4    million that amortizes down to something close to 85
5    million over a ten-year period.
6           There's very little drop-off in the
7    underlying, absent loan defaults of which, given all
8    the work that David Worley and other people link him
9    did, are very, very low.  They report less than one
10   percent loan defaults.  So you're unlikely to have a
11   significant interruption of the cash flows.  So you
12   go out and you buy 54 pools for the first deal -- 54
13   loans in the first ideal, and you go out and buy
14   another deal, and you set it and forget it.
15          It doesn't require a lot of hands-on
16   management similar to what, in many funds that I'm
17   familiar with, we were constantly trading the
18   underlying assets, changing economic conditions.
19   There doesn't appear to be a lot of what we would
20   call active management or transactions of the
21   underlying mortgage pools once the customer has
22   committed their money and it gets put to work by
23   Priderock over that commitment period.
24      Q.   Is this the way -- Dr. Hughes was either
25   an employee or a consultant.  Do you know which he

Page 100

1    was?
2           MR. MARIANI:  Objection, form.
3       A.   Well, I don't agree that those are the
4    only two forms in which he can do things.
5       Q.   Okay.  What would be the other, then?
6       A.   You could be an intended partner, you
7    could be a profit sharing participant.  I'm in direct
8    discussions right now with an individual about
9    becoming a 15 percent owner of an LLC if we raise $50
10   million for a seed investor, and strive to then build
11   a fund that would, you know, have billions under
12   management.
13          During the time period in which I'm
14   engaged with that individual in discussing, I'm not
15   an employee because we haven't formed our company.
16   I'm not exactly sure when they actually form the
17   investment manager, I'm not sure -- it's not clear
18   for -- who -- for whom David Worley works, for whom
19   Webster Hughes works, because they are in this
20   formation stage.  It's almost like a big-bang
21   concept.
22          Once we get enough going, once we've
23   convinced enough investors and got a lead investor
24   and line up Key Bank as a potential lender if we need
25   some bridge between securing the first investors'

Page 101

1    commitments, but we don't have enough money to pay
2    for the entire K 29 deal.  There's a lot of stuff
3    that goes on into this congealing of the opportunity.
4    And -- in which you're -- and if it -- I certainly
5    wouldn't have waited as long as it seems Dr. Hughes
6    has to secure clarity in his participation.  I mean,
7    there's a problem now.  But I don't know the nature
8    of the back-and-forth between them and what their
9    conversations were.
10          But you don't have to be either an
11   employee with a salary or an intend -- or partner.
12   I've created LLC agreements that allow for various
13   classes of partners so that I can award some interest
14   to somebody who puts up cash and they would have a
15   priority return and, if they put up the operating
16   capital, they are going to have a priority return on
17   their money.
18          And the second class of partners might
19   be deferring compensation but getting to some sort of
20   counter that says, "Okay, once the real cash money
21   gets returned, we're going to return you for five
22   years the amount of time you've deferred
23   compensation, so you can be what I would call a
24   deferred compensation participant."
25          I don't know the nature of those

26  (Pages 98 to 101)

Page 102

1  discussions.
2      Q.   And you're not aware of the proposals
3  and counterproposals that Dr. Hughes and Priderock
4  exchanged, is that right?
5      A.   I encountered a few of those and just
6  deemed them for be irrelevant to my determination of
7  value.  I just thought it would, getting involved in
8  the he-said/she-said, and the timeliness of stuff,
9  just, I didn't look at them.
10     Q.   So you didn't consider what they
11 actually --
12     A.   No.
13     Q.   -- made proposals --
14     A.   No.
15         (Continued on following page.)
16
17
18
19
20
21
22
23
24
25

Page 103

1      Q.   Okay, thank you.
2          MR. MIOSSI:  I don't have any more
3  questions.
4          MR. MARIANI:  No questions.  We'll read,
5  though.
6          THE WITNESS:  We'll what?
7          MR. MARIANI:  Read the transcript after
8  its prepared.
9          If he orders, then I will.  I'll have a
10 copy also.
11         (Time noted:  4:03 p.m.)
12
13         _____
14           MICHAEL WINCHELL
15
16 Subscribed and sworn to before me
17 this _____ day of _____, 20___.
18
19 _____
20
21
22
23
24
25

Page 104

1              C E R T I F I C A T E
2  STATE OF NEW YORK   )
3                      : ss.
4  COUNTY OF KINGS     )
5
6      I, DAVID LEVY, CSR, a Shorthand
7  Reporter and Notary Public within and for
8  the State of New York, do hereby certify:
9      That MICHAEL WINCHELL, the witness
10 whose deposition is hereinbefore set forth,
11 was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by the witness.
14     I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage, and that I am in no
17 way interested in the outcome of this
18 matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 9th day of November 2018.
21
22    _____
23
24    DAVID LEVY, CSR, CCR, CLR
25

Page 105

1          *** ERRATA SHEET ***
2  NAME OF CASE: HUGHES v. PRIDEROCK, etc.
   DATE OF DEPOSITION:  OCTOBER 25, 2018
3  WITNESS:  MICHAEL WINCHELL
   PAGE  LINE      FROM              TO
4  ____|_____|_____|_____
5  ____|_____|_____|_____
6  ____|_____|_____|_____
7  ____|_____|_____|_____
8  ____|_____|_____|_____
9  ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 _____
21           MICHAEL WINCHELL
22 Subscribed and sworn to before me
23 this _____ day of _____, 20_____.
24 _____     _____
25 (Notary Public)       My Commission Expires:

Thompson Court Reporters, Inc
thompsonreporters.com

**A**

ability 35:20 47:13 71:4
able 7:6 13:19 50:2 50:6 55:11 60:16 76:18 87:25 92:19
absent 99:7
absolutely 70:7
academic 42:23,25
access 7:17 8:4 9:7 10:1,2 12:2 27:4 59:19 60:14 91:21
accessed 8:3
accession 12:23
accomplish 31:19
according 56:15
accounting 44:25 92:24
accuracy 64:16
accurate 29:8,10 64:23
acquaintances 18:18
acquired 63:4
across 37:2
action 104:15
actions 53:12
active 99:20
activities 24:13 33:10 65:18 69:10 71:13 97:6,9
activity 71:3
actual 14:8 37:1 40:4 51:12 97:14
actually 42:17 44:25 79:19,20 80:12 85:1 90:1 94:23 100:16 102:11
additional 68:4
additionally 28:20
address 5:14 34:9 34:22
adopted 83:23
ADV 23:24
advice 78:14
adviser 59:2 79:22
advisers 34:19
advisory 23:21 69:17
ADVs 90:10
affiliated 93:4
affirmative 40:11
after 16:9,9 33:6 56:19 77:14 88:12 103:7

afternoon 14:25
afterwards 74:13
again 18:23 19:1 44:14 75:8 76:16 89:10 95:11
against 5:8 36:23
against- 1:4
agency 43:4 87:6
agents 75:4
ago 21:5 38:21
agree 100:3
agreeing 70:14 74:10
agreements 101:12
ahead 69:5,8
ailment 62:2
align 37:1
Allied 26:9 28:25
allocate 56:15
allocating 57:1
allow 50:3 61:15 97:10 101:12
almost 98:16 100:20
already 60:5
also 7:16,19 24:7 32:7 54:6 61:20 76:11 81:21 90:23 103:10
alter 98:4
although 93:20
always 78:13 85:5
am 14:17 53:12 72:12 104:14,16
amortization 98:23
amortizes 99:4
amount 30:3 32:5 33:2 50:4 96:4 101:22
amounts 35:21 37:1 54:22
analyses 62:10
analysis 27:20 37:4 37:23,25 38:10 42:18 43:5 46:9 59:10 60:17,18,19 61:19,22 66:9 75:10 80:21 90:1 95:9
analyst 49:11
analysts 78:13
analyze 35:21 60:11 60:13,25 61:6 65:13 66:2 91:23
analyzed 58:19
analyzing 17:24 36:7 63:12

and/or 9:24 72:21 72:21
Anderson 90:13 91:2
anecdotal 80:18,22
annual 45:10
another 14:7,13 29:16 37:9 46:14 47:20 70:18,23 72:19 79:22 82:1 99:14
answer 6:11,14 15:25 21:21 22:4 28:8 50:25 51:6,7 52:24 67:3 68:18 72:13 85:8 89:9 98:3
answered 22:13 23:1 51:4 83:22
answers 6:14
anticipated 78:14
antitrust 36:4
anybody 24:25 26:13 50:17,17 90:21 91:3,15 92:5 93:10
anyone 24:19 26:12 30:13 52:7,14 91:9
anything 12:20 14:23 18:3 20:11 20:15 21:15 22:14 22:22 28:15 29:20 34:1,25 50:6,22 53:10 70:1,9 85:17 92:25 94:20
anywhere 7:21 8:19 30:7 45:16,19
apart 84:25
apologize 26:3
appear 93:6,10 94:3 99:19
appears 65:3 66:14 66:18 70:7 71:10 71:18 74:15 75:4 75:9,19 80:24 82:5 90:18 93:21 93:25 94:1,9,11
Applicable 54:12
applied 38:9 68:19 72:18
apply 68:14
applying 80:9 95:25
appreciate 87:12
appropriate 91:18
approval 53:10

approve 83:17
approved 53:6 83:5 83:12
Approximate 54:21
approximately 21:11
April 13:24
area 33:17
arena 17:10 61:12
around 11:2 51:20
arrangement 70:21 97:3
arrive 92:22
arrived 69:22 95:25
articles 39:8
articulated 73:9
ascertain 25:6 46:8
ascertaining 95:10
ask 5:25 6:3,8 20:20 20:23 31:8 42:19 50:9,21 52:19 66:12 78:10 92:11 93:16
asked 15:25 16:10 22:2 29:23 50:25 51:3 52:20 75:10 79:13
asking 12:18 14:9 61:24 68:19 76:12 86:16 87:25 97:22
aspect 70:19
assemble 12:22 13:13,21
assembled 9:4
asserted 21:16,19 21:22
assertion 81:11 98:11,12
asset 17:9 41:2,8 45:19 48:4,9 62:25 69:2 70:12 79:3 97:5,8
assets 82:10,12 99:18
assigning 69:24
assist 52:7
assume 68:4 96:8
assumption 86:1 96:19
assumptions 68:17
Atlantic 5:16
attached 30:18 61:21
attachments 9:25
attempt 6:9 56:9 91:5

approve 83:17
attempting 48:23
attended 95:15
attention 61:3
attorneys 8:11
attract 74:23
attracted 76:19 98:20
attracting 75:16 98:18,18
audit 45:5 48:4,7
August 16:1 19:24 19:24,24,25
authored 59:13
authority 64:25
available 24:7,8 28:9 35:18 47:25 49:2 61:8
Avenue 2:4 5:15 19:8
avoid 91:22
award 101:13
aware 9:10 12:2 14:17 21:22 25:18 53:12 61:10 65:11 71:8 73:10 85:2 85:10,12 97:19,20 97:22,24 102:2

**B**

back 12:22 41:10 48:2 49:4 74:13 76:5 77:14 87:16 88:3 92:8 95:11 96:2
back-and-forth 94:6 101:8
backdrop 45:2
backed 57:25
background 25:6 25:21 26:24 35:16 48:22 90:21
bailed 45:3
bank 26:9 44:12,13 81:22 100:24
banking 40:13,16 41:2,7 45:19 47:18 48:4,9
banks 44:14 82:9,17 90:24
base 59:22
based 13:6 15:12,12 57:24 58:6 67:24 68:7 69:1,18 70:10 72:9 73:22 75:8 76:19,23 82:3 92:7 94:16

95:22
**basic** 84:20 96:19
**basis** 6:6 44:20 46:9
  81:11 97:18 98:6
  98:10,12
**Bates** 14:16,17,18
  88:10
**Beach** 3:7
**became** 95:13
**because** 12:10 56:23
  72:12 73:17 77:10
  78:5,20 89:3
  90:15 91:6 94:9
  98:20 100:15,19
**becoming** 100:9
**been** 5:1 8:9 15:3
  21:13 22:8 24:6
  30:19 36:14 37:2
  37:11 38:14 44:9
  45:12 56:8 65:19
  81:6,7 92:15
  96:20
**before** 2:4 5:18,23
  7:1 18:10,23 31:7
  31:10 71:11 95:4
  103:16 105:22
**begin** 33:13 70:13
**beginning** 13:10,23
  17:10
**begins** 93:22 97:7
**behalf** 3:3,10 70:4
  80:25
**behavior** 62:23 63:3
  63:5
**behavioral** 63:1
**being** 16:17 21:24
  58:5 72:14
**belief** 25:7 27:15
  52:21 81:3 90:16
  92:7
**believe** 11:17 13:3
  15:1 16:5 34:5,24
  36:5,21 40:9
  42:17 43:5,8
  46:17 52:13 65:12
  65:17,18 70:18
  72:24 91:21 92:18
  94:12 96:17
**benchmark** 29:1
  90:16
**bespoke** 28:7 60:17
**best** 89:9
**between** 10:9 12:19
  13:9 19:25 30:7
  47:24 63:15 75:3
  76:5 82:21 94:6

95:19 100:25
  101:8
**beyond** 80:22 90:15
**bid** 65:8,11 66:22
**bidding** 53:3,16
**big** 10:23
**big-bang** 100:20
**Bill** 5:6 10:22 87:4
**billed** 37:2
**billion** 90:11
**billions** 58:19
  100:11
**bit** 38:21
**Blaine** 56:21
**blood** 62:3 104:16
**Bloomberg** 27:1
  28:5 55:22 60:5
  60:14 79:6 91:24
  92:5,9
**board** 57:23
**bonus** 29:7 32:3
**bonuses** 32:5
**bootstrapped** 94:19
**both** 17:9,19 27:5
  43:22 44:4 46:10
  47:13 64:12,15
  90:15
**bottom** 42:18 51:24
  67:11,15,15,21
  73:11 91:21
**bought** 77:21 80:2
**box** 36:8
**breach** 21:22
**break** 67:6
**breakfast** 18:11,12
**breaks** 6:15
**bridge** 90:3,6,19,23
  91:1,4,11,14
  100:25
**Bridgerock** 91:10
**briefly** 22:6 30:19
**bring** 46:25 75:24
**bringing** 76:1,3,3
  97:3
**broad** 15:10 31:11
  37:24 43:22 44:20
  58:21 62:24 82:12
**brought** 73:3
**budget** 32:22 33:8,8
  33:15,16
**budgets** 32:24
**build** 27:25 29:12
  37:17 46:15 47:13
  56:18 61:15 77:4
  85:6 100:10
**building** 86:18 94:3

**built** 46:8 63:11
  84:15 85:25,25
**bullet** 80:23 83:20
  83:20 86:20 87:17
  91:20 92:16 93:15
  94:12,22
**bullets** 94:23
**bunch** 37:14
**business** 5:14 24:3
  27:4 33:13 57:18
  62:8 70:12 71:1
  82:18 93:9
**businesses** 33:11
**buy** 17:18 27:11
  86:1 99:12,13
**buyers** 37:6
**buying** 77:15

_____

**C**

**C** 3:1 4:1 5:1,1
  84:21 104:1,1
**calculating** 86:14
**calculation** 28:7
**calculations** 38:4
  85:1
**call** 14:15 45:5
  74:23 87:6 99:20
  101:23
**called** 7:18 10:16
  16:10 26:25,25
  87:21 88:23
**calling** 91:14
**calls** 84:20
**came** 57:6 61:14
  86:4
**campaign** 91:3
**can't** 11:6 68:18
  71:17 74:11 77:10
**cannot** 60:11,12
**capabilities** 48:23
**capable** 90:18,20
**capacity** 40:18
**capital** 1:5 5:7 23:8
  23:13,15 33:20
  34:2 52:14 69:17
  76:12 94:25 97:19
  97:23 98:4,18,19
  99:1,2 101:16
**capture** 46:4 73:15
  74:3,14 96:11
  97:13
**captured** 48:5 58:1
**car** 46:13,14,14
  66:23,24 75:18
**car's** 46:15
**cards** 37:16

**career** 17:11 57:22
  58:4
**careers** 18:19
**Carolina** 16:16,25
  36:18,19
**carried** 45:12
**carry** 44:5
**cases** 79:18
**cash** 27:20,23 34:6
  34:21 46:8,22
  56:15 57:1,10
  58:1 60:7 61:1,19
  62:10 65:21,22
  66:8 68:16 70:6
  78:21 79:6,8
  99:11 101:14,20
**catching** 18:17
**caught** 19:2
**CCR** 1:23 2:5
  104:23
**census** 44:25
**cents** 37:10
**CEO** 33:16 43:23
**CEOs** 45:2
**certain** 5:21 25:9
  30:2,3
**certainly** 77:6 101:4
**certainty** 29:18
**certificate** 58:24
  59:1
**certificates** 25:13
  27:11,12 28:6
  29:11 59:3,6
  60:20 73:19 75:6
  83:18
**certify** 104:8,14
**chain** 8:21 9:19,20
  9:21 10:21 13:8
  13:10,23 14:12,14
  76:5
**chains** 9:16 14:8
  36:23
**change** 50:22 68:2
  84:3 97:25
**changing** 68:6
  99:18
**charge** 20:5,8,9
  24:4 36:16,17
  60:22
**charged** 37:4,8,9,10
  37:11 78:23 93:2
**Charlotte** 16:18
  17:2
**chief** 32:12
**chocolate** 36:11
**CIO** 90:19

**circumstances**
  72:13 94:14
**cited** 30:19
**claim** 84:7
**claiming** 21:7
**claims** 21:16,18
  22:3
**clarify** 15:22
**clarity** 76:9 101:6
**class** 25:11,12 27:11
  27:24 29:11 58:22
  60:19 66:2 73:19
  83:3 97:15 101:18
**classes** 25:15 37:18
  83:1 101:13
**classification** 45:23
**classifications** 48:19
  48:24
**clear** 6:10 38:24
  76:24 100:17
**clearly** 6:15 75:21
  77:2 82:15,18
**click** 11:11
**client** 73:25
**clients** 34:17 77:10
  98:14
**close** 87:7 99:4
**CLR** 1:23 2:5
  104:23
**code** 86:18
**collateralized** 27:7
**colleague** 8:5
**colleagues** 19:2,16
**collect** 25:2 30:15
  99:1
**collected** 95:23
**collection** 8:8 56:14
  69:17 70:13
**com** 98:16
**combination** 80:14
**come** 41:10 53:24
  62:4 71:9 72:22
  98:8
**comes** 15:7
**comfortable** 17:15
  17:17 74:13 78:19
  91:19
**coming** 16:15 77:14
  96:15
**comment** 13:19
**commercial** 58:22
**Commission** 105:25
**commit** 74:9
**commitment** 21:12
  69:13 73:23 74:9
  74:17,25 96:12,13

99:23
**commitments** 101:1
**committed** 73:25 98:21 99:22
**committee** 31:22 32:8
**committing** 73:17 73:19,23
**commonly** 60:25 61:6
**communicate** 92:12
**communicated** 19:21
**communication** 20:1
**community** 44:19
**comp** 31:22
**companies** 26:25 27:3
**company** 38:6,18 74:6 95:5 98:15 98:18 100:15
**compensated** 21:14
**compete** 36:22
**competitor** 90:4,14
**competitors** 28:21 89:19 90:1
**complaining** 62:6
**complaint** 21:3,4 36:21
**complete** 88:17
**completely** 68:4 71:1
**complex** 17:18
**components** 73:1
**computer** 84:22 86:18
**conceivably** 88:3
**concept** 75:23 96:14 100:21
**concerning** 31:9 32:15 38:18 39:1 95:5
**concerns** 6:25
**conclusion** 72:22 92:1,23 93:12
**conditions** 54:12 86:7 99:18
**conduct** 61:7
**conducted** 62:22
**conducting** 65:7
**conferences** 76:20
**confidence** 69:20
**confirm** 27:16 28:21 52:22
**confirmation** 28:19

congealing 101:3
**Congress** 43:6 45:1
**connection** 38:25 39:5 75:13
**consider** 22:17 33:18,22 46:3 102:10
**consist** 9:14
**consistency** 37:20
**constant** 86:10
**constantly** 99:17
**consultant** 26:10 42:11 99:25
**consulting** 26:11
**Cont'd** 67:9 87:14
**contact** 16:13 92:5
**contacted** 15:20 16:3 19:23
**contacts** 77:16
**contain** 67:16
**contained** 14:24 22:12 24:16 40:19 45:6 53:24 55:1 64:4,17
**containing** 7:9
**contains** 7:6
**contention** 97:18
**contents** 11:13,17 13:20 14:2,4,10 88:11 89:6,8
**contingent** 20:18
**continue** 21:10 98:9 98:10
**continued** 86:5 96:16 102:15
**continues** 96:8 98:21,22
**continuing** 13:24
**continuity** 69:9
**contract** 21:23 28:6
**contracts** 30:3
**contribute** 70:14
**controlling** 25:10,12 27:11,24 29:11 60:19 66:1 73:19 83:1,3
**controlling-class** 28:6
**conversation** 77:12
**conversations** 26:15 101:9
**convinced** 100:23
**convincing** 75:2
**copied** 84:2
**copy** 13:15 41:11,12 41:13 103:10

corollaries 44:1
**correctly** 21:21 36:1 38:24 85:1 95:3
**correspondence** 11:8 13:14,23 47:23 53:14,18 63:15 66:13,18 75:3,20,25 76:12 76:24 88:3 89:13 89:14
**corresponding** 90:2
**costs** 72:5
**couldn't** 36:22 46:7 55:23 77:15 78:1
**count** 7:6 87:2 88:15,18,18 89:5 89:8 96:15
**counter** 101:20
**counterproposals** 102:3
**counts** 17:20
**COUNTY** 104:4
**couple** 33:14 57:6 75:8
**course** 25:14 28:5 31:13 44:20 95:15
**courses** 39:12
**court** 1:1 5:9 6:14
**cover** 6:16
**create** 40:10
**created** 60:1 101:12
**creation** 17:13 59:9
**creative** 90:11
**credit** 26:2 27:14 58:16 82:7,25
**criteria** 66:5
**critical** 70:19 75:17 75:18 83:13
**CSR** 1:23 2:5 104:6 104:23
**curious** 14:21
**current** 70:11
**currently** 68:9
**customary** 80:7,10 80:14
**customer** 37:15 48:1 74:9,15 77:13 79:19,20,21 92:6 99:21
**customers** 37:3,19 62:10 75:11,11,22 77:16 99:2
**cut** 62:5 86:2

_____
**D**
**D** 24:8 90:9

**D.C** 3:14
**dairy** 36:10,16
**Dame** 18:6,7
**Daniel** 93:24,25
**data** 21:1 24:4,20 25:16 26:2 35:21 36:9 37:1,14,16 45:6 61:8,10 77:11 80:5 84:21 90:7 92:2,3,22 94:15,17
**database** 7:17 9:7,9 10:1,3,8,14 12:1 12:24 13:16 24:12 88:4
**date** 6:21 13:4,18 17:1 19:6,10 22:9 37:14 39:21 51:24 52:3,5 105:2
**dates** 14:15
**David** 1:23 2:4 71:16 75:22,24 81:15,18 82:5,9 90:24 99:8 100:18 104:6,23
**day** 16:24 17:1 18:10 32:18 37:7 37:9 50:7 74:15 103:17 104:20 105:23
**days** 50:7,15
**days'** 78:18
**de** 46:9 69:21 70:13 71:15 72:4
**deal** 17:23 25:10 27:11 29:13 55:17 58:24,25 59:3,6 59:10 60:11 63:12 65:11,13 66:1 74:7,11 75:6 78:19 82:23 83:17 99:12,14 101:2
**deals** 25:8 27:9 55:17 56:3,7 57:9 58:15,16,21 81:1 83:5 89:21,23
**deals'** 83:3
**debt** 23:19 24:15 53:21 71:12 82:19 91:14
**debugged** 94:4
**debugging** 86:10,19
**December** 13:23
**decided** 71:11
**decision** 33:6,13
**decisions** 32:20

97:11
**deemed** 102:6
**defaults** 57:15 82:25 99:7,10
**defendant** 1:6 2:3 3:10 21:13 31:3
**deferred** 101:22,24
**deferring** 101:19
**define** 12:9
**definition** 94:8
**delineate** 73:6
**deliver** 36:20
**Dellinger** 35:10
**demonstrate** 37:20
**demonstrated** 81:4
**department** 61:18
**depend** 68:8
**deploy** 99:2
**deposit** 13:16
**deposition** 1:8 2:2 4:5,6 5:18 6:2,20 6:22 104:10,12 105:2
**depositions** 22:8
**describe** 16:13 19:19 55:16
**described** 24:13
**description** 45:8 53:20 55:4,14,19 64:17 71:19
**descriptions** 48:24 57:14
**designed** 17:18 25:8
**details** 19:3
**determination** 102:6
**determine** 80:10
**determining** 80:7
**develop** 29:12 46:24 84:19
**developed** 60:6 83:23 84:6,18
**developer** 28:23
**developing** 94:10
**development** 46:7 85:20 86:9
**Diamond** 75:21 76:2,7 97:1,1
**difference** 12:19
**different** 8:16 32:4 32:5,16 37:18 40:15 44:2,14,15 44:16 46:21 47:10 56:5 58:3 68:7 71:2 72:11 84:16 92:10

**differently** 24:24
78:10
**difficult** 8:15 69:18
**diligence** 34:20 65:7
65:16,20,25 66:15
67:4 71:23 79:10
97:16
**dinner** 17:2 18:9
**direct** 23:15 61:3
80:16 89:17 93:4
93:6,13 94:17
100:7
**directly** 76:6 80:4
82:23 83:2 93:20
**director** 32:25
44:12,13 57:23
**directors** 57:24
**dis** 40:22
**discard** 66:4
**discarded** 66:6
**disclaimer** 61:21
**discounted** 68:16
**discover** 94:5
**discovered** 86:12
**discovery** 86:11,19
**discrimination** 36:2
**discuss** 16:20 17:4
42:17
**discussed** 18:4
**discussing** 16:9 91:7
100:14
**discussion** 38:20
84:1
**discussions** 25:8
26:15 100:8 102:1
**displayed** 81:8
**dispute** 17:5 35:25
**distaste** 33:3
**distinct** 66:19
**DISTRICT** 1:1,1
**division** 47:19,21,21
58:13
**doctor** 62:1,2
**doctors** 62:4
**document** 7:24 8:1
8:21 9:17 11:19
13:16,18,22 14:11
14:20 15:13 22:18
40:22 42:9 43:19
43:20 44:10 63:24
64:25
**does** 11:19,22 14:1
38:22 51:22,25
53:24 67:15 73:8
73:9 96:8 98:8
**doesn't** 11:6 75:25

**down** 6:15 36:19
41:24 54:21 60:4
63:19 66:24 94:13
94:22,23 99:4
**download** 10:1
**draft** 51:15
**drafts** 50:14,16
**draw** 70:15
**drew** 93:11
**drive** 7:5,9,17 8:2
8:23 10:12 14:25
15:18 16:18 22:12
23:5 24:17 40:20
55:10,13 65:23
90:6
**driving** 75:19
**drop-off** 99:6
**drove** 17:1
**due** 34:20 65:7,15
65:19,25 66:15
67:4 71:23 79:10
97:15
**duly** 5:1 104:11
**durations** 71:15
**during** 28:25 31:21
31:24 32:6 40:14
49:12 61:11 66:14
69:20 71:22 72:3
74:9,22 76:17
77:12 86:11 95:13
96:11 100:13
**dynamics** 82:16

**E**

**E** 3:1,1 4:1 5:1,1
104:1,1
**e-mail** 7:25 8:6,21
9:16,19,23 10:21
10:21 11:18 14:8
14:12,13 41:15
66:18 76:5 79:19
80:4
**e-mails** 8:8,22 75:9
88:12 92:8
**each** 8:16 12:24
13:2,15 14:20

**end** 13:11 42:3
48:16 67:19,22
**ended** 77:13
**engage** 56:23 60:17
**engaged** 20:12 67:4
71:14,22,24 75:16
100:14
**engaging** 70:20
**engine** 46:13,14,15
**engineering** 56:25
**English** 47:9
**enhancement** 27:15

**88:15 94:2 98:2,4**
99:15,19
**doing** 20:7 31:14
56:19 64:10 71:8
91:19
**dollars** 20:10 58:19
76:19
**dollars'** 90:11
**done** 18:18 72:11
97:15

**27:3 55:16**
**earlier** 60:5,10
**earliest** 56:17
**Early** 10:4,5
**earn** 44:19
**earned** 54:22 99:3
**earning** 45:4
**easily** 37:13
**east** 36:19
**economic** 73:15
74:3,14,14 75:10
96:11 97:13 98:19
99:18
**economics** 28:10
**effectively** 36:23
77:8,9
**either** 9:23 11:11
19:21 20:25 26:15
27:25 36:2 53:15
56:4 76:19 99:24
101:10
**elaborate** 69:4
**else** 18:3,3 20:11,15
21:15 22:14,23
26:12,13 28:15
29:20 30:13 34:25
70:1,9 84:2,6
90:21 94:20
**else's** 93:11
**employed** 19:13
30:5 40:18 44:4
49:17 52:14 71:17
**employee** 99:25
100:15 101:11
**employees** 43:21
44:22 93:19 95:9
95:13
**employer** 39:2,9,14
64:15
**employers** 32:21
**enabled** 91:22
**encountered** 79:18
94:4,7 96:25
102:5

**58:16**
**enough** 37:19 79:2
86:6 100:22,23
101:1
**entire** 42:8 54:17
61:11 62:8 92:17
94:1 96:9 101:2
**entities** 69:17
**entitled** 11:8 21:9
41:2
**entity** 23:16,18
**environments** 46:21
**equal** 96:4
**equivalency** 82:21
**equivalent** 44:14
45:24 46:3
**ERRATA** 105:1
**error** 73:9,10 86:5
94:5
**errors** 85:3,5,12,14
85:21,23,24 86:11
86:19 94:7
**ESQ** 3:4,11
**essential** 46:17
47:23 76:17 79:2
98:13
**essentially** 13:22
37:15,18
**estimate** 31:2 32:8
**etc** 105:2
**evaluate** 27:23
**even** 52:16 66:7
69:6 93:16
**evening** 17:2
**event** 16:16,25
**events** 57:14
**ever** 5:22 30:19
31:8 32:17 34:6
38:17 39:4 58:23
62:22 75:10 92:4
**every** 18:21 31:24
62:4 79:5 85:5
86:12
**everyone** 32:16
**Everything** 74:11
**evidence** 47:24
**evidenced** 93:3
**evolution** 56:8 57:9
**evolved** 57:18
**exact** 19:10 44:10
**exactly** 16:12 19:6
79:4 84:13 100:16
**EXAMINATION**
4:2 5:4 67:9 87:14
**examine** 44:3
**examined** 5:2

**example** 40:12
81:15,16 95:21
**Excel** 9:23
**exchanged** 102:4
**excuse** 7:7 50:25
59:11 87:4
**executive** 43:24
**EXH** 6:20 39:19
**exhaustive** 55:12
80:1
**exhibit** 4:6,8 6:19
6:20 7:1 39:18,19
39:25 40:5 50:12
52:12
**EXHIBITS** 4:5
**existing** 46:10
**expect** 20:13 97:1
**expectation** 70:15
70:16
**expected** 32:25
44:19 96:3
**expense** 91:23
**expenses** 20:13,14
92:19 93:1,4,6
**expertise** 18:2 47:1
58:15 70:23,24
75:24 83:6
**Expires** 105:25
**explain** 30:4,11 47:7
47:14,14 48:1
73:3 77:5,7 78:18
**explained** 81:5
**explaining** 75:5
**explicitly** 44:18
**express** 6:5
**expressed** 6:4
**expressing** 68:20
**extensions** 9:20
**external** 42:22,25
43:1
**extract** 13:5,19
**extracted** 13:12
88:12,18
**extracts** 7:25

**F**

**F** 3:4 104:1
**fact** 13:4 33:6 61:14
65:2 74:8 92:7
95:12 98:3
**Factors** 80:7
**facts** 24:20 25:6
68:7
**factual** 6:5
**fail** 86:5
**fair** 22:24 29:17

31:16 33:2 47:2
65:17 80:7,10,13
97:3
**fairly** 6:2 8:18
**familiar** 6:1 27:2
58:18 72:12 81:14
81:25 94:2 95:14
99:17
**Fannie** 43:4,16,22
44:5,11,23 45:9
48:4 81:19
**fashion** 34:3
**features** 71:4
**February** 94:11
**federal** 5:8 43:3
48:7
**fee** 60:21 95:22
98:25
**feel** 17:14,17 78:19
91:17,18
**feels** 79:1
**fees** 24:3 54:21
70:16 73:21 74:10
93:7 96:3,21 97:2
98:8 99:3
**felt** 8:17 18:1
**few** 102:5
**FH** 43:11
**FHA** 43:13,14
**fiduciary** 34:19
70:5 79:11
**fifteen** 18:22 59:23
**fifth** 87:17 94:12
**figure** 11:23
**file** 10:19,20 41:13
41:18 52:6
**filed** 5:8 22:5 64:20
**files** 7:7 8:9 54:9
**filing** 23:21,24,25
24:8 64:24 65:3
**filings** 23:18 54:6
90:10
**finance** 40:17 42:5
48:10 63:1
**financial** 39:10
56:24
**find** 11:24 45:23
48:24 92:5
**fine** 15:14 19:10
53:4 67:20 88:16
88:20
**finger** 62:5
**finish** 51:18 69:6
85:8
**FINRA** 30:22
**firm** 26:1,11 30:5

31:12 32:13,25
35:23 40:14 42:11
58:5,12 81:12
**firms** 35:20
**five** 5:21 20:10
87:10 101:21
**five-minute** 87:5
**five-year** 76:14
**fixed** 19:8
**flaw** 86:13
**float** 76:15
**floor** 19:8,9
**Florida** 1:1 3:7 5:9
56:22
**flow** 27:20 34:6,21
46:9,23 58:1 60:7
61:1,19 62:10
65:21 66:8 70:6
78:21 79:6,8
**flows** 27:23 56:15
57:1,10 65:22
68:16 99:11
**flu** 62:6
**focus** 27:9 48:3
**focused** 71:20
**following** 59:12,14
102:15
**follows** 5:3 54:15
**football** 18:6
**forget** 43:12 99:14
**form** 9:2 15:6 23:24
24:8 48:17,20
51:5 58:16,17
60:9 68:22 80:19
82:11 83:9 85:18
90:9 100:2,16
**formal** 33:15,17
**format** 84:19
**formation** 39:6
100:20
**formed** 100:15
**Formerly** 26:9
**forming** 40:6 42:24
**forms** 36:10 100:4
**formula** 94:9 96:1
**forth** 31:25 76:5
92:8 104:10
**forty** 51:16
**Forum** 3:6
**forward** 57:19,20
**found** 36:22
**four** 5:21 14:14
26:10 31:12 66:23
75:19 78:18
**fourth** 86:20 93:15
**frame** 43:7 77:13

**Freddie** 25:7 43:4
43:15,22 44:5,7
44:18,23 45:9
48:3 52:20,21
53:2,2,7,11,14
55:13,14,25 83:4
83:11,12,16
**freedom** 33:12
**frequently** 87:20,25
88:23
**friends** 24:23
**front** 14:4 52:12
**fruit** 97:11
**fulfill** 90:24
**fulfilled** 90:25
**full-page** 61:20
**fully** 59:14
**function** 69:23 72:9
**functions** 46:6
**fundamental** 86:13
**funds** 17:21 42:16
42:18 69:19,21
70:13 72:11,15
73:18 77:19 78:12
89:20,22 91:13,14
94:13 99:16
**further** 60:4 104:14
**future** 70:17

_____
**G**

**G** 3:11
**gain** 10:1 53:13
**gallon** 36:10,11
37:8
**gambling** 78:5,6
**game** 93:21
**gather** 24:20
**gauge** 79:21
**gave** 66:1
**general** 29:6 42:8
55:21 84:15,21
**generally** 28:8 30:1
60:11 95:9
**generating** 33:10
**gentleman** 93:22
**George** 82:9 90:24
**get** 6:10 16:19 30:2
31:7 32:5 33:11
53:23 57:16 74:11
79:25 96:14,23
97:6 100:22
**gets** 6:14 70:17
99:22 101:21
**getting** 70:25 71:12
82:17 92:10 97:9
97:13 101:19

102:7
**give** 35:15 72:19
77:15 89:5,7,9
**given** 5:18 20:21,23
22:8 37:7 68:4
75:14 99:7 104:13
**giver** 42:9
**go** 12:22 14:13,14
28:10 30:17 36:25
52:10,12 62:1
65:18 66:24 67:20
69:5,8 85:22
87:16 88:3 90:14
95:11 99:12,13
**goal** 56:13
**goes** 6:2 68:3 79:1
101:3
**going** 13:1 17:7
24:4 27:10 39:17
62:1 66:10 86:18
87:7,16 89:4 92:8
93:1 94:2 99:3
100:22 101:16,21
**gone** 84:10,12
**good** 6:11 74:6
82:18
**got** 6:23 46:16
50:24,25 51:11
66:22 74:5 77:25
98:9 100:23
**government** 65:3
87:6
**Government's** 48:7
**governmental** 64:25
**great** 13:1 17:23
74:3 90:25
**greatest** 73:15
74:14 96:11
**group** 18:25 31:25
64:24 71:10 90:3
90:7 91:11,12,13
**groups** 29:8 40:18
**guaranteed** 74:5
**guarantees** 33:4
**guess** 34:7,15 63:14
72:12 74:19 94:23
95:21
**guessing** 48:15
**guidelines** 24:1
**guy** 56:21 94:3

_____
**H**

**H** 5:1,1
**half-and-half** 36:13
**hand** 104:20
**handle** 86:7

**hands-on** 99:15
**happen** 16:21
**happened** 16:22
76:10
**happening** 29:19
**happens** 47:8 76:9
97:10
**happy** 16:18
**hard** 41:11,12 69:21
94:17
**has** 5:8 53:5 58:17
66:18 72:20 75:21
82:5 90:19,23
94:3,6 98:22
99:21 101:6
**haven't** 20:12 47:3
68:9 73:5 84:12
100:15
**having** 5:1 60:14
66:6 77:6 84:15
91:21
**he'd** 17:6 21:12
**he's** 21:16,18,22
75:11,18 76:17
**he-said/she-said**
102:8
**head** 28:25
**headhunter** 47:3
**heading** 53:20,24
54:11,15,20 55:1
55:3,8 59:8,12
**heard** 77:23
**heavily** 58:9
**here** 6:23 7:6 12:11
15:5 21:7 39:17
40:19 64:17 68:13
88:19,22 89:11
**hereby** 104:8
**hereinbefore** 104:10
**hereunto** 104:19
**Hey** 92:8
**higher** 69:24
**Highlands** 5:16
**highly** 90:20
**him** 16:9 18:23,24
19:7,7 26:23 29:5
29:23 48:18 49:23
52:19,20 64:7,9
81:23 85:8 99:8
**himself** 29:3
**hire** 30:6 31:14 32:9
33:13
**hired** 31:11,12,20
32:16,17,18 47:3
56:18,20,22 93:22
95:12

hiring 32:6,12,19
    33:4 38:21
his 8:5,10 19:21
    20:25 21:14 26:11
    28:25 48:22,23
    49:10,19,21 50:19
    50:21 71:20 72:2
    76:16 84:13 101:6
hold 69:13 71:24
hour 20:10
hours 10:10 18:10
    50:7 51:13,16
Hughes' 8:25 9:6
    31:2 52:4 64:17
    65:16,19 66:13
    69:10,16,23 77:7
    77:13,16 84:10
    85:3,13 91:22
    93:21 94:24 95:18
Hughes_000{NNN
    12:25
Hughes_0000279
    88:10
hundred 20:10
    31:12 55:16 95:23
    99:1,3
hundreds 95:12,12
Hunter 32:11 33:7

**I**

I'd 15:7 18:19,23,23
    50:6 55:21 68:6
    73:6 94:23
I'll 5:25 6:9 12:21
    23:3 30:17 41:1
    52:12 60:12 74:23
    93:16 95:11 103:9
I've 24:5 25:5 31:20
    88:18 96:24
    101:12
IBM 37:16
idea 14:18 16:20
    31:15 57:11 83:15
ideal 99:13
IDENT 4:5
identification 6:21
    14:20 39:20
identified 7:22,23
    8:20 15:17 45:9
    53:18 89:25 90:14
identifies 14:10
identify 8:16,19
    10:19 11:19 12:14
    13:10 40:25 44:17
    49:1 53:17 55:23
identifying 45:22

impact 66:9 83:1
impacts 75:7
import 35:21
importance 76:16
important 31:18
inappropriate
    92:15
Inc 35:10
include 43:9 55:11
    57:6 69:9 82:13
included 23:18
    43:24 61:22 67:18
includes 86:10
income 19:8
incomplete 89:3
incorporates 57:14
incorrect 60:10
incorrectly 23:2
independent 64:4
    64:16
index 10:19 11:18
    12:3 89:10
indicate 24:2
indicated 10:11
indicating 36:9
indirect 23:15 34:3
    34:16
indirectly 34:8,24
individual 26:4 38:6
    38:18 39:1 44:6
    47:12 71:16 94:6
    95:5 100:8,14
individual's 39:9,13
    95:14
individuals 40:18
    45:8 48:24 70:14
industry 15:8 24:23
    39:10 42:10 62:12
    62:20 81:17
influenced 25:20
information 17:20
    25:3 30:15 49:2
    50:3,9 53:23
    54:14,25 55:7,20
    63:4,13 68:5,9
    76:22 87:21 88:24
informed 8:5
informing 53:14
initial 23:24 63:11
    66:3 74:19 77:14
    97:11,15
inputs 93:3
instance 14:12 25:7
    79:2 90:19 96:25
instances 9:25
    38:13 88:5 92:25

96:24
integral 98:13
intend 33:25 34:13
    67:23 68:1 101:11
intended 100:6
interaction 13:8
interest 101:13
interested 16:11
    104:17
interesting 84:1
interests 73:21
Internet 75:12
interruption 99:11
interview 24:19,21
    52:14
interviewed 52:16
interviews 25:20
Intext 26:25 28:5
    55:22 60:6,14,17
    60:22 91:24 92:5
    92:9
into 17:25 23:7 31:7
    33:11 36:19 46:14
    56:14 57:12 70:25
    74:16 101:3
introduced 16:8,8
introducing 75:23
invest 17:8 75:2
    97:23 98:3
invested 65:8 76:23
    77:11,17 79:14
    80:3 89:22 92:12
    97:19
investing 55:24 56:3
    58:15 78:20,24
    80:25 81:12 82:10
    82:15,22 83:2
investments 34:20
    63:12 83:8 91:24
investor 56:4 59:18
    61:13 62:23 63:3
    65:23 69:20 73:17
    79:5 100:10,23
investors 60:7,25
    61:6,16 70:5
    74:23 75:2,13,16
    76:1,3,6,23 77:18
    77:20 78:12 79:11
    79:13 87:23 88:25
    93:2 97:13 100:23
investors' 100:25
invests 46:19 59:5
invoices 36:9
involved 16:12,14
    17:7 62:9 67:2
    84:24 102:7

involvement 74:16
involving 17:18
irregularly 18:21
irrelevant 46:11,15
    102:6
issue 35:24
issued 39:23
issues 6:6
issuing 50:13
its 24:13,14,14
    36:15 58:10 103:8
itself 52:11

**J**

jeopardize 91:8
Jersey 5:16
job 36:25 45:23
    46:3 47:10,10
    48:2 49:10,19,21
    61:14
jobs 31:18 40:13,15
    47:17 56:17
JOHN 3:4
join 26:4
Jonathan 75:21
    97:1,1
judgement 79:15
judging 95:14
jugs 36:11,12
jumbo 57:7
jump 11:6
June 86:21

**K**

KAMMERER 3:5
Kayne 90:13 91:2
    91:10
keep 6:13 72:5
Kelly 26:16
Key 100:24
KF 65:13
Khoury 75:22 76:2
    76:7 82:9 87:20
    88:13,21,22 90:24
kind 30:2 46:13,15
    48:15 61:7
KINGS 104:4
knew 17:9 19:2
    94:18
knowing 48:22
knowledge 64:4,16

67:24 82:8 85:3
    93:18
known 63:1 73:9,10
    75:21 77:21 88:17
knows 75:22
Kraft 35:10 36:15
    37:4

**L**

L 5:1,1,1,15
landed 73:24
landing 74:15
languages 84:16
laptop 41:13
large 9:25 36:8,23
    37:17 56:13 97:12
largely 48:14 58:6
larger 28:22 37:6
Larry 88:14
last 18:8 26:10
    60:24 67:12 70:11
    72:16 96:18
lasted 18:9
late 19:23,24 51:19
    93:21,21
later 15:15 32:11
    42:20 94:5
latter 30:12
launch 21:12 71:11
    71:15,21 72:4,15
    72:15 77:14
launched 91:13
    94:13 96:15
launching 75:23
law 35:19,23 36:1
    74:4
lawsuit 5:7 22:5
    39:1
lawyer 21:24
lawyers 8:25 9:6
    19:21 20:25 24:7
    50:19,21 52:4
    93:10
lead 100:23
leader 58:8
leading 74:24 96:13
learn 29:5 63:13
    77:2,7
learned 18:5 29:6,9
    74:12 77:6
least 32:18 55:15
    64:8
led 29:7
left 18:10 77:25
legal 61:18 93:7
lender 100:24

less 93:8 99:9
let 23:12 24:24 31:7
  35:15 39:16 41:7
  49:4 56:9 78:10
  85:8 92:11 96:2
let's 15:22 43:23
  67:20 72:4 76:13
  76:13
level 70:24 79:16
  81:24
levels 44:16
Levy 1:23 2:5 104:6
  104:23
life 21:10 69:10 96:5
  96:9
like 6:1 13:20 29:3
  30:23 35:10 37:6
  37:25 41:21 43:13
  46:13 57:8 72:3
  73:6 77:19 78:12
  83:10 87:7 90:21
  93:7 99:8 100:20
likelihood 82:25
liken 61:25
limitations 91:6
limited 27:20 34:17
  54:13 72:14
line 59:20 63:9
  73:14 100:24
  105:3
link 8:6,6 75:13
  77:10
linked 11:18 26:2
  47:21 71:3
LinkedIn 79:20
liquid 73:21
list 12:5,23 21:20,20
  41:6 55:12 80:2
listed 7:21 43:6
  93:14
lists 10:12
literally 12:25
litigation 16:14
  30:22 39:5 91:7
little 26:24 35:16
  38:21 73:7 78:10
  80:25 81:12 97:13
  99:6
lived 16:19
lives 19:4
LLC 1:5 100:9
  101:12
LLP 2:4 3:12
load 41:18
loaded 41:13,14
loan 57:15 65:20

66:6,7,8,10 99:7
  99:10
loans 55:25 56:14
  57:1,2,7,8 65:15
  65:22 66:2 82:17
  99:13
lock 74:16
London 40:14
long 18:8 26:20
  101:5
look 10:25 11:2
  16:25 28:10 40:24
  65:21 66:21 74:8
  76:15 90:10 102:9
looked 12:20 23:17
  46:25 90:15
looking 13:6,8 33:9
  44:6 46:2 47:5
  48:3,12 75:20
loosely 56:24
loss 25:13 27:12
  60:13 82:23
lost 77:22
lot 17:12 70:21
  96:17 98:23 99:15
  99:19 101:2
loud 86:23
low 72:5 93:4 99:9
lower 92:19
lucrative 58:4 74:17
lump 23:16
Lynch 56:20

M

M 5:1
M-a-r-k-i-t 26:1
Mac 25:7 43:4 44:5
  44:7,18 45:9
  52:20,21 53:2,3
  53:11,14 55:13,14
  55:25 83:4,11,12
  83:16
made 23:25 54:7,9
  102:13
Mae 43:4 44:5,12
  45:9 48:4 81:19
majority 71:20
make 7:16 13:17
  15:11 20:24 25:6
  25:9 26:14 33:5
  33:12 34:20 51:8
  61:7 66:3 74:12
  74:21,25 79:15
  87:6
makes 51:5
making 31:14 32:19

45:2 96:19 98:13
manage 34:18 83:7
managed 59:5
management 23:23
  24:14 27:10 31:22
  32:8 41:2,8 42:11
  45:19 48:5,9
  62:25 70:12 79:3
  97:5,9 99:16,20
  100:12
manager 17:9 18:25
  23:22 26:6 54:23
  55:6 56:4 58:5
  69:2,2 74:1,23
  96:5 100:17
managers 24:1
  94:19
managing 17:21
  32:24,24 44:13
  57:22 70:3 71:1
many 5:20 9:16,22
  9:23,25 13:7 20:8
  20:8,8 21:16,18
  27:1 31:13 35:6
  69:21 70:13 80:3
  84:23 85:22 86:25
  86:25 90:23 94:13
  96:24 99:16
March 86:22
Mariner 18:24
marked 6:20 39:20
market 31:16 46:21
  56:8 58:9 73:21
  75:7
marketing 69:11,12
  71:21 73:24 74:20
  74:24 76:17 89:20
  96:12
marketplace 86:8
markets 96:25
Markit 25:24
marriage 104:16
material 59:12
materials 8:12
  62:23
math 30:10,11,11
mathematical 95:25
mathematician
  56:22
mathematicians
  31:13
matrices 37:17
matrix 77:16
matter 25:14 28:5
  34:16 51:5 62:2
  98:2 104:18

maturity 69:14
  71:25
may 11:17,17 24:6
  32:9 41:23 44:1
  60:16 70:15 71:23
maybe 7:7,8 19:1
  36:19 37:7 41:15
  51:22 77:8,8
  81:22 84:5 93:8
  94:11 98:16
MDOF 23:20 50:5
  65:8 75:2 77:19
  78:12 79:14 89:19
  92:13 97:20
mean 14:1 18:22
  37:25 40:7 48:14
  60:15 68:17 69:5
  72:17 73:8,13,16
  86:22 93:8 94:18
  101:6
meaning 68:15
means 22:2 74:15
  78:20
mechanics 84:24
median 37:25 43:21
  43:24 44:8,20,21
  45:13
meet 16:19 19:5
  66:4
meeting 15:23,24
  16:24 18:8,11,12
meetings 19:18
  76:20
member 57:23
  98:13,13
members 83:12
memorandum 24:6
  54:2,6,16,18 55:2
  55:18 63:21 64:1
  64:20 65:4 71:19
  81:6 82:5
memorandum's
  55:19
memory 52:1,2
mention 60:4 86:20
mentioned 32:21
  42:22 60:5 83:21
Merrill 56:20
met 19:7,7,7
method 72:17 73:2
methodologies
  80:13
methodology 68:14
  68:15,17,19,23
  69:1,9,11,18,22
  69:25 70:2 72:1,7

72:8,19 73:8
  80:15 97:12
methods 38:10
Michael 1:8 2:2 4:3
  4:8 5:15 39:19
  103:14 104:9
  105:3,21
mid 51:19
middle 55:4
might 9:18 14:13,14
  23:18 37:10 44:9
  44:13,19 45:4
  61:22 83:1 84:6
  101:18
milk 36:11,11,12,17
  36:17,20 37:8,17
million 95:20,24
  99:1,4,5 100:10
million-and-a-half
  95:19
mind 56:7
minute 6:1 30:18
  41:18
minutes 18:11
  26:22 87:10
Miossi 3:11 4:3 5:5
  5:6 10:24 11:3
  12:12,17,20 67:7
  67:10 87:9,11,15
  103:2
miscommunication
  12:11
misunderstanding
  22:19
misunderstood
  22:20
mode 38:1
modeled 25:16
  27:17 28:9 57:13
modeler 49:11,16
  49:18 78:21
modeling 57:6
  72:22 93:19
modelling 79:8
models 27:5 34:21
  56:18 58:1 59:9
  60:6 61:15 65:21
  77:5,5 79:6 84:15
  84:18,19,20 85:21
  86:10 88:12,13
  91:24 94:2
modified 46:10
moment 6:17
money 32:5 34:18
  69:19 70:22 77:17
  77:22 78:20,24

84:7 96:15 97:6,9
99:22 101:1,17,20
months 21:5 77:14
more 7:8 14:3 24:21
25:21 30:12 33:12
37:5 45:5 47:16
69:6,7 76:8 77:8
78:11 89:7 90:11
90:21 92:6 95:24
103:2
mortgage 34:5 57:1
57:2,15,25 99:21
mortgages 57:12
mortgate-backed
58:11
most 17:10 58:4,11
76:7 93:6
mostly 25:5
motivation 45:4
moved 32:11
much 10:7 45:1,4
51:1,14 71:24
76:23 77:11 90:14
93:10 97:10
multifamily 23:19
24:14 27:6 53:21
55:13,14,25 65:15
70:25 71:11 82:7
82:10,12,14,16,19
multiple 16:17
must 59:18
mutual 18:17 19:2
myself 84:16

**N**

N 3:1 4:1,1 5:1
name 5:6,13 10:18
26:4,11 36:24
72:10 93:22 105:2
narrower 37:3
native 41:14
nature 24:3 79:21
82:24 91:1 101:7
101:25
nearly 9:15 13:7
15:8
necessarily 22:1
60:1 78:17
necessary 70:7
98:16,17,17
necessity 59:9 69:19
need 6:16 10:25
12:5 19:10 27:25
46:12 65:21 78:24
78:25 79:10
100:24

needed 13:17
needs 79:5,9
neighborhood 10:9
40:15
never 30:24 38:24
52:16 61:12 94:4
95:4,15
new 1:9,9 2:6 5:16
33:13 46:14,15
66:7,8 68:8 71:1
86:7 104:2,8
next 17:1 18:10
19:20 54:11 63:8
63:19 83:20 94:22
94:23
Ng 93:24
non-guaranteed
57:7
non-offered 27:16
non-PRCP 93:14
non-public 27:17
non-routine 85:15
Nope 52:9
North 16:16,25
36:18
Notary 2:5 5:2
104:7 105:25
noted 103:11
notes 26:14 79:17
nothing 56:7
notice 2:3 4:6 6:20
6:22
Notre 18:6,6
November 104:20
novo 46:9 69:21
70:13 71:15 72:4
now 26:9 29:18
42:20 55:23 56:24
66:10 67:5,14
68:13 70:12 87:7
100:8 101:7
number 6:19 7:7
12:24 32:2 39:18
42:4 44:10 47:2
50:7 58:10 65:17
92:10 95:24 97:2
numbers 14:16
29:16 32:1
numerous 50:14
54:19 55:9 86:21
NW 3:13

**O**

O 4:1
O'Kelly 25:24 26:17
26:18,21 28:13

29:9 30:14
OAS 86:12
objection 9:2 15:6
48:17,20 51:3,6
60:9 68:22 80:19
82:11 83:9 85:16
85:18 100:2
obtaining 53:10
obviously 15:11
24:10 28:1 47:20
81:25
occasions 18:24
33:14 86:21
occur 57:15
occurred 16:13
77:12 96:11
October 1:10 15:23
16:4,17,22,23
19:19,19,25 51:22
105:2
off 11:6 46:24 88:2
offer 35:1 67:17,23
92:16
offered 25:15 27:8
offering 94:24
officer 32:12
offices 2:3
official 53:18
often 76:7 78:13
old 46:13
once 18:21 35:7
65:10 66:22 70:17
73:24,25 75:13
76:25 97:6,14
98:20 99:21
100:22,22 101:20
one-off 60:18
ones 8:14 13:12
88:6
ongoing 76:4 86:19
online 75:13
only 14:20 34:24
46:21 49:8 52:17
53:17,17 75:9,16
84:5 100:4
onto 37:16
open 10:17 12:21
41:7,22 68:6
opened 13:22
opening 41:20
operate 32:25 92:19
operating 27:19
32:12 101:15
operators 70:24
opinions 6:4 40:6
67:16,22 68:2,20

opportunity 23:19
24:15 53:21 65:13
71:12 82:20 101:3
order 13:3 27:22,23
29:10 36:14 37:12
53:5 89:16
ordered 13:17
orders 103:9
organization 95:15
organizations 44:15
45:1,3
originally 91:12
originations 82:7
originator 96:14
others 81:1
our 33:9 61:18,23
62:10 72:5 100:15
out 11:4,5,24 13:15
16:24 29:16,17
30:9 45:3 46:14
47:2 52:22,25
53:1 72:6 74:11
86:22 92:6 99:12
99:13
outcome 20:18
104:17
Outside 64:14
over 11:2 21:10
31:19 37:19 41:1
50:15 51:17 56:10
57:18 67:14,21
69:10 70:11 72:15
73:22 86:4 95:23
96:5 97:11 98:23
99:5,23
overnight 20:14
overpaying 33:2
oversees 43:4
owes 70:5
own 27:25 29:12
32:15 72:9,14,14
78:13,20 79:4,6
80:15
owner 100:9
owners 70:24
owning 82:22

**P**

P 3:1,1
p.m 1:11 103:11
pages 11:14,15,16
14:7,13,13,14
45:10 55:16 69:12
paid 30:2 49:1
57:16 71:9,12
72:2 73:22 96:4

opportunity — Palm

Palm 3:7
paper 86:14
paragraph 59:12,14
60:24 63:19 64:5
67:12 74:19
paragraphs 53:23
Park 2:4 19:8
part 15:11 27:4
58:4 76:25 93:2
participant 73:20
94:2 100:7 101:24
participants 93:13
participate 53:16
participated 58:23
59:2 76:21 79:14
98:7
participating 96:20
participation 57:19
101:6
particular 27:16
33:3 36:16 66:10
68:14 97:5
particularly 25:20
91:15
parties 104:15
partner 100:6
101:11
partners 1:5 5:7
23:8,13,15 33:20
34:2,18 54:13
69:17 94:25
101:13,18
party 92:12
password 8:7 75:14
past 35:4 84:17
Patrick 25:24 26:5
pause 11:7 41:17,19
42:1
pay 31:17 32:10
74:1,10 101:1
paying 33:1 93:12
pdf 8:9 9:24 10:20
11:11
pension 79:23
people's 31:15
72:13 78:24
per 50:7
percent 9:15 95:22
95:22 96:4,4
99:10 100:9
perform 28:3 34:19
35:22 37:4 38:3
46:20 60:17 66:17
79:11 80:20 87:2
performance 58:2
78:14

**performed** 40:13,16
46:5 65:7 96:17
**performing** 37:22
47:22 85:1 98:15
**perhaps** 7:8 53:22
91:25
**permit** 60:7
**permitted** 53:16
**person** 31:9 32:17
33:8 72:20 75:16
79:1
**personal** 48:21 56:2
69:1 72:9,14
80:15,16
**personally** 72:12
91:9
**persons** 47:7
**persuading** 83:16
**pertain** 23:14
**pertained** 24:12
**Ph.D** 32:17 56:21
**Ph.Ds** 31:13
**phase** 71:25
**phenomenon** 56:13
**phone** 26:4 76:20
87:6
**phrase** 29:14 73:12
**pick** 11:4,5
**picture** 71:9
**piece** 60:13 82:23
**pieces** 25:13 27:13
86:2
**Piggly** 36:23 37:6,9
37:10
**pint** 36:13
**place** 3:6 9:9 56:8
56:14 83:24 89:11
**placed** 57:12 66:11
**placement** 24:5
54:1,5,16,18 55:2
55:17,18 63:21
64:1,20 65:4
71:19 81:5 82:4
**plain** 47:9
**plaintiff** 1:3 3:3
35:23
**plan** 79:23
**plastic** 36:10,12
**played** 18:5 75:1,5
77:4 83:16
**players** 28:22
**please** 5:13 6:9 76:9
85:9
**PLLC** 3:5
**plus** 9:20 29:7
**point** 46:12 66:3

67:14,24 69:3
74:12 81:6 82:2
90:2
**political** 45:2
**pool** 66:10 98:22
**pools** 56:14 99:12
99:21
**population** 42:12
**portfolio** 18:25 69:2
**portion** 9:18 20:17
**posed** 87:22 88:24
**position** 53:15
57:22
**positions** 62:25
**possibility** 15:2,4
**possible** 72:5
**potential** 24:14
27:23 28:11,21
48:1 59:15 62:10
75:7,11,21 76:5
79:19 87:22 88:25
91:23 97:3 100:24
**PowerPoint** 9:24
**precise** 24:21
**predatory** 36:2
**prefer** 5:14
**preliminary** 50:12
50:16
**preparation** 51:12
52:18
**prepare** 11:20 12:6
32:24 50:12
**prepared** 6:5 50:16
61:23 103:8
**preparing** 11:25
12:17 13:25 39:16
40:4 50:11 51:1
51:14 52:7 67:16
**prepayment** 57:4
**present** 53:3 61:18
62:9 68:16 79:9
**presentation** 61:2
82:4 83:14
**presentations** 9:24
98:14
**presented** 5:10 68:5
83:11
**pressure** 62:3
**pretty** 31:11 74:6
**previously** 46:10
71:17
**price** 36:2,9
**pricing** 36:3 37:17
**Priderock's** 89:18
91:8
**primarily** 49:10

54:1,5 57:24
**primary** 25:16 27:9
46:6 57:5 93:14
98:19
**principal** 6:24
**principals** 13:9
63:15 71:9 75:4
**prior** 17:22 21:11
50:11,12
**priority** 101:15,16
**private** 24:5 29:19
42:16,17 44:2
54:1,5,16,17 55:2
55:17,18 57:7
63:21,25 64:20
65:3 71:19 81:5
82:4
**privately-offered**
28:3
**probably** 10:19
18:22,25 19:9
29:11 31:20 33:12
36:1 42:3,3 51:13
51:16,20 58:5
72:10 79:3 80:14
83:13 92:7,14
**problem** 12:23
41:20 101:7
**procedure** 27:19
**proceedings** 11:7
41:17,19 42:1
**process** 32:13 33:15
37:21 53:3,16
56:11,23 65:9,10
65:16,20 67:4
68:3 79:9 85:21
86:17 90:16
**produced** 7:13 15:3
23:4
**product** 37:15
**products** 36:10,13
36:17 37:3,18
48:10
**profit** 100:7
**profitable** 58:12
**profits** 58:10
**program** 56:1,23
58:17
**programming**
84:16
**promising** 73:25
**properties** 57:3
70:25 82:13,14,16
82:22
**proposals** 102:2,13
**propose** 33:25 35:1

**proposing** 33:22
**prospective** 34:16
34:17 98:14
**prospectuses** 55:15
**protect** 51:9
**protocol** 62:6,7
**prove** 33:5
**provenance** 83:25
**provide** 7:24 11:18
12:3 15:20 21:1
22:3 31:2 32:7
38:14 47:25 50:17
50:18 55:11 60:6
73:18 75:10 78:14
87:21 88:13,23
**provider** 7:18
**providers** 25:17
27:18
**provides** 26:1 71:6
77:1 94:9
**providing** 27:4
33:19
**provision** 46:7
76:22
**public** 2:5 5:2 25:16
29:17 104:7
105:25
**publicly** 27:8 49:2
**publicly-available**
27:21
**publicly-offered**
28:2
**publish** 44:21
**published** 39:8
86:14
**pulse** 62:3
**punch** 37:16
**purchase** 18:1
25:10 27:10 36:14
61:13 73:18
**purchased** 34:6
55:5 65:12 82:14
97:14
**purchaser** 53:6
58:24 66:2 83:5
83:17
**purchasers** 59:3
97:4
**purchases** 28:10,11
**purchasing** 70:4
71:2
**pure** 47:11
**purpose** 6:3 13:18
13:21,25 16:6
**purposes** 16:17
**pursuant** 2:3

**put** 10:22 11:3
31:25 32:3 37:15
46:14 52:5,11
64:19 99:22
101:15
**puts** 101:14

___

**Q**

**qualify** 88:4
**quantify** 50:2,4
76:18 87:24 88:1
89:2
**quarts** 36:11,12
**queries** 87:22 88:24
**question** 6:8,24,24
15:10,22,25 17:14
17:16 22:13 23:3
25:11 31:11 41:23
48:2 50:25 52:17
61:3 62:24 64:6
68:18 86:16,25
93:17
**questions** 6:4 52:10
103:3,4
**quicker** 41:16
**quickly** 31:8
**quote** 63:23 64:19
92:17
**quotes** 63:19

___

**R**

**R** 3:1 104:1
**raise** 69:19 100:9
**Raleigh** 17:1
**ran** 84:21 92:9
**range** 29:6 30:6
37:3,3 44:21
**rate** 62:3 73:9,10
**rather** 39:23 63:10
92:18
**rationalize** 37:14
**reached** 16:23
**reaching** 68:20
**read** 21:3 54:4,17
62:23 63:2 66:14
86:22 103:4,7
**reading** 7:15 66:17
82:3
**reads** 60:25 63:9
80:6
**ready** 79:24
**real** 101:20
**realized** 13:13
**reallocation** 57:10
**really** 56:12 72:8
86:17 91:5,6 97:7

reason 31:1
recall 26:13 35:12
    35:13 36:24 40:22
    40:24
receive 7:12
receiving 96:20
recently 17:10
recess 67:8 87:5,13
recognize 79:25
recommendations
    31:14 32:20
recommended
    31:22 32:1
record 26:3 51:10
    104:12
records 14:21 20:21
    21:1
recruiting 42:11
reduce 57:4 82:7
reduction 70:20
    71:7
redundant 9:17
    13:7,7
refer 21:20 56:24
reference 15:13
    40:5 42:23 87:19
    94:15
referenced 45:15,18
    45:19 74:25
references 43:2
    63:20
referred 23:20
referring 8:1 63:2
    74:19
refined 50:15
refinement 76:8
reflected 63:5
reflection 64:24
refresh 51:25
refreshes 52:2
regarding 20:3 63:5
    78:14
regardless 38:19
region 36:18
registered 34:18
registration 24:2
regular 13:14 37:20
regularly 18:20
    37:5
regulations 30:20
regulator 43:15
reimbursed 20:13
related 34:8 104:15
relating 23:17
relative 97:21
relatively 71:23

Relativity 7:18 8:3
    10:3,13 12:1,24
    13:16 24:11 88:4
relevant 17:20 24:4
    24:20 25:3 30:15
    40:9
reliance 55:18
relied 7:25 12:14,19
    15:3 32:7 42:8,23
    58:9 61:25 70:8
rely 15:15 22:13,22
    23:5 40:5 45:7
relying 14:22,23
remember 10:18
    16:24 85:25
REMIC 59:10
removing 66:9
render 38:10 45:7
    72:18 73:3
rendered 31:4,8
rendering 14:22,24
    15:16 22:14 68:13
repeat 33:24 60:12
    64:6
repeatedly 76:4
rephrase 6:9
replicate 28:1 29:12
reported 1:23 42:10
    81:23
reporter 6:14 104:7
reports 45:10
represent 5:7 9:18
    14:1 27:12 47:6,7
    57:9
represented 31:10
    71:2
representing 9:17
request 7:10 12:13
    20:24 28:4
requested 88:13
requests 66:15
    89:17
require 52:21 82:17
    99:15
required 24:2 31:16
    31:25 53:2 61:18
    62:9 91:23 97:14
requires 24:5
requiring 61:14
requisite 18:2
rerun 66:8
research 23:7 47:19
    62:22
residence 5:14,17
respect 24:13 70:3
respond 87:22

88:24
response 7:13 40:11
responsibility 34:19
    70:6
responsive 7:10
restate 23:3
resume 30:17
retained 31:1 35:11
    35:15,22 38:14
retainer 74:5
return 65:23 86:4
    101:15,16,21
returned 101:21
returns 75:6
reveals 47:9
revenues 33:10
review 7:19 8:12,13
    8:14 9:11 12:10
    21:21 22:4 23:16
    47:23 66:17 90:4
    90:9 92:2,22
reviewed 7:24 8:17
    8:17 10:13 11:20
    11:25 12:4,6,15
    12:19 21:4 22:7
    22:22 23:11,14
    24:5,12 76:1 84:9
    94:4
reviewing 10:8 75:8
revise 68:1
Ridge 79:3
risk 26:5 57:3,4,5
    57:10 58:5 70:20
    71:7 82:7,25
road 6:2 66:25
Roberts 56:21
robust 86:6
ROC 91:12,13
role 65:5,6,17 66:13
    66:19 75:1,5
    79:11 83:15
roles 31:19 66:20
    67:2 77:3 90:24
rose 57:22
roughly 7:18 8:17
    18:9 26:22 36:13
    73:22 99:3
routine 85:15
rules 6:2 30:20
    56:16 57:13
run 46:16 66:16
    75:14 76:9 82:18
running 70:17

S
S 3:1 4:1

said 9:12 13:6 16:22
    22:21 46:17 48:21
    62:11 65:21 71:7
    75:18 83:10 85:19
    86:9 96:10,16
salaries 32:4 42:9
    70:15 71:13 93:5
    93:11,12
salary 29:7 32:1,2
    41:3,8 45:19
    70:20 101:11
sale 17:13,25 46:18
    46:18
sales 49:14,15
salesman 49:13
    58:13
salespeople 47:20
    61:23
same 9:20 17:25
    18:1 28:24 32:4
    41:13 48:25 49:25
    54:11 55:19 64:10
    64:15 74:21 82:4
    83:2 89:20,22
    90:18
sat 13:1
satisfied 79:10 83:6
saw 47:22 53:13
    79:3
say 12:25 15:7 16:4
    22:25 23:13,17
    25:5 29:4 43:23
    44:11 47:12 55:21
    57:24 58:14 61:6
    63:8 64:9 65:10
    68:23 79:4 90:25
    94:23
saying 20:24 38:23
    72:1 84:1 92:8
    97:25
says 10:21 51:24
    88:9 96:2 97:12
    101:20
scenarios 66:16
schedule 6:25 7:3
    7:10,13
Schiffman 88:14
scope 80:22
screen 10:23 11:4
    40:25 90:6
scroll 41:24
search 88:4
SEC 23:18,24 24:2
    24:4 30:22 54:7
    54:10 64:21
SEC's 24:1

second 23:12 25:11
    28:19 30:12 34:15
    47:5 59:19 70:2
    80:23 87:20 90:13
    91:20 92:16
    101:18
second-to-the-last
    73:14
section 42:2 63:20
secure 101:6
securing 100:25
securitization 40:17
    42:5 55:25
securitizations 27:7
securitizing 56:11
security 27:7 61:1
    61:20 65:11
see 20:20 41:22 44:7
    44:19 54:23 59:19
    63:21 67:12 79:17
    81:9,10 84:25
    88:9 92:20
seed 100:10
seeking 25:12
seem 67:1 75:25
seems 75:7,12,15,17
    75:24 90:19 96:10
    101:5
seen 7:1,3 13:22
    18:19,23,23 68:11
segmented 47:17
selected 8:25 9:3,8
self-described 89:4
sell 47:15 49:21
    78:1 86:2
selling 47:20 69:13
    70:3,3 81:6 96:12
sending 88:12
senior 32:24 43:25
    44:14 48:8 57:22
    81:18
sense 33:1 48:15
    72:3 74:4 79:25
sent 8:6 51:21 52:3
sentence 87:20
separate 65:1 66:19
separated 47:17
separately 7:23
September 10:4,5
    51:19,20,21,25
sequential 13:3,4
series 8:22 25:10
    55:14,25 57:12
serve 16:1 17:15
served 6:23
service 7:18 15:21

27:18 39:9 60:22
98:15,16,17
**services** 20:5 21:13
21:14 38:6 39:10
39:13 72:3 92:4
**serving** 17:17 26:9
**set** 8:24 14:21 20:8
20:25 56:15 68:17
73:6 75:21 76:1
90:20 93:7,9 97:2
99:14 104:10,20
**Seth** 26:7
**setting** 23:25 33:8
**seven-year** 73:20
76:14
**share** 33:16 96:3,21
97:2 98:8
**sharing** 70:16 100:7
**she** 12:14
**SHEET** 105:1
**ship** 33:1
**short** 67:3 71:23
**Shorthand** 104:6
**shots** 90:6
**should** 63:8 78:8,8
94:25 98:7
**shoulder** 11:2
**show** 39:17 94:11
**showing** 37:17
**shows** 79:24
**significant** 20:12
70:19 75:5 82:6
82:15 85:23,24
89:25 90:4 99:11
**significantly** 37:5
**Silverstein** 26:7,16
28:18,23 29:2,4
29:21 30:14
**similar** 17:22 44:12
72:23 90:17,20
94:14,19 99:16
**similarity** 82:24
91:1
**Similarly** 92:14
**simply** 38:20 45:8
89:1
**since** 13:19 17:21
18:19 62:19
**single** 86:12
**single-family** 27:6
**sit** 7:6
**site** 79:21
**skill** 94:10
**skills** 31:17 93:19
**skillset** 48:25 64:18
**slot** 48:18

**small** 36:18,20,21
**smaller** 37:5
**sold** 61:19
**soliciting** 32:14
**somebody** 17:6 28:7
32:9 33:13 73:23
77:6 78:25 79:9
79:24 101:14
**somehow** 91:7
**someone** 97:18
**something** 13:20
15:2 34:22 35:10
43:13 51:22 61:13
77:15 86:1,3,14
88:9 91:8 99:4
**sometime** 16:1,16
**sometimes** 23:20
76:7
**somewhere** 10:9
40:14 48:8 84:2,6
89:16
**son-in-law** 18:6
**sophisticated** 77:20
78:4,7,8,9,21
**sophistication** 78:3
79:16
**sorry** 22:20 23:1
26:18 60:12 87:4
**sort** 35:21 42:22
47:8 48:25 54:3
55:21 60:21 61:25
93:14 96:13 97:10
101:19
**sorts** 78:7
**sound** 51:22
**sounds** 6:1
**source** 8:4 27:14
54:14,25 55:7,20
81:1 98:19
**sources** 42:23 49:3
55:9
**South** 36:19
**space** 28:22 44:2
**speak** 25:23 26:20
91:3 92:12
**specialized** 60:18
**specific** 8:21 10:12
11:18 15:13 25:14
28:4 34:8 40:8
42:2 53:12 55:15
55:23 58:17 65:16
66:13 76:11 77:10
77:15 88:5,7 94:9
**specifically** 15:25
17:12 28:23 31:21
52:17 58:15,25

60:12 73:5 78:11
88:21 93:13 97:24
**spend** 10:7 51:1,15
93:9
**spent** 17:21 50:4
70:22
**spoke** 26:7 30:14
80:3
**spreadsheet** 84:19
84:25
**spreadsheets** 9:24
35:19 37:13
**ss** 104:3
**stage** 69:24,25
100:20
**stamp** 14:16 88:10
**stamps** 14:17,18
**standard** 27:19
**standards** 73:2,6
80:9
**start** 6:18 51:18
56:10 67:11
**started** 51:19 91:14
**starts** 63:9
**state** 2:5 5:13 6:10
16:16,25 24:24
42:9 59:18 79:23
80:23 86:21 91:21
94:13 95:19 104:2
104:8
**stated** 7:10 60:10
**statement** 56:5
59:22 61:8,9 65:2
88:1,22 92:18
**statements** 64:4
92:25
**states** 1:1 55:4 58:3
**stating** 92:1
**statistical** 37:22,24
38:3,10
**stay** 20:14
**step** 49:4
**steps** 73:2
**still** 51:7
**Stone** 79:2
**stop** 23:12
**stores** 36:18,20,21
37:5
**straightforward** 6:3
**Strawn** 2:4 3:12
**Street** 3:13 56:18
72:21 86:11,13
**strive** 100:10
**structure** 65:24
90:17 98:25
**structured** 40:17

42:5 48:10,10
**structurer** 44:7
47:11 48:11 90:20
**structurers** 30:6
44:4,18 47:18
**structuring** 28:25
29:8 30:9 32:17
40:17 47:1 59:9
**studied** 84:9
**studying** 51:14
**stuff** 78:1 101:2
102:8
**subject** 33:23
**subordinate** 60:13
**subordinated** 25:13
27:12
**Subscribed** 103:16
105:22
**subsequent** 9:19
**subset** 8:20
**subsidiaries** 23:14
36:15
**substantial** 98:15
**substituted** 65:20
66:7
**substituting** 66:7
**substitutions** 66:3
**subtracted** 32:3
**successfully** 83:7
**such** 31:9 96:3
104:11
**sufficient** 42:20
98:17
**Suite** 3:6
**suits** 6:15
**summarize** 93:16
**summarized** 54:4
**summary** 13:19
43:22
**supermarket** 36:23
**supervise** 49:23
64:9
**supplied** 36:8
**support** 61:9
**sure** 7:16 10:20
12:12 13:17 16:12
19:6 25:6 33:9
36:16 38:2 40:7
41:1 44:10 50:24
51:8 65:15 67:7
74:21 87:9 88:2,8
89:7 97:21 100:16
100:17
**surmised** 63:14
**surround** 6:6
**survey** 40:12 41:3,8

42:21 43:18 44:22
44:24 45:5,18
48:4,10 61:7,8,10
61:25 80:20
**surveyed** 42:13,15
**sworn** 5:2 103:16
104:11 105:22
**systematic** 37:21

---
**T**
---

**T** 4:1,1 104:1,1
**table** 11:13,17
13:20 14:2,3,10
78:5,6 88:11 89:6
89:8
**take** 6:15 41:18
46:13 56:13 62:2
64:23 67:6 73:7
84:25 87:5
**taken** 2:2 67:8
87:13
**taking** 56:25 70:22
70:23,24
**talk** 15:14 16:7
18:16 24:25 25:2
26:23 28:17,20
**talked** 25:5 28:12
77:3 80:12
**talking** 16:11 29:5
39:17 74:21 93:8
93:15
**talks** 73:15
**task** 35:22 69:21
**tasks** 47:23 66:17
**taught** 39:12
**taxpayers** 45:3
**teach** 78:25
**team** 83:11,13
**teams** 29:8 91:1
**technique** 58:17
**technology** 47:19
**tell** 6:9 63:17 71:17
76:14 88:6
**temperature** 62:3
**ten** 47:2 70:11
72:16 74:5 94:18
95:21 96:18
**ten-year** 73:22 74:1
74:10,17 95:23
98:23 99:5
**tendered** 50:13
**Tennessee** 36:19
**tenure** 29:1 49:12
93:21
**term** 14:17 24:22
37:24 38:22 61:11

74:20 82:12
**terminologies** 57:17
**terms** 13:4 15:15
  21:19 40:8 47:9
  54:12 80:13
**tested** 72:19
**testified** 5:3,22
  34:14 35:3 49:4
  52:13 95:17,18
**testify** 33:23 34:1
  34:13
**testimony** 35:1,4
  38:15,25 39:5
  95:4 104:12
**texts** 40:5
**thank** 41:4 87:12
  103:1
**theirs** 27:19
**them** 5:8 8:13 9:3
  32:10,10 47:2,3
  50:18 56:14 70:4
  74:12,16 76:3
  77:24 78:25 81:7
  84:15 87:21 88:16
  88:24 91:14,17
  101:8 102:6,9
**themselves** 23:25
  36:22 81:1 94:19
**then** 6:13 9:19
  13:17 17:22 18:10
  18:21,23 24:10,24
  53:22 54:3,8 66:6
  72:8 76:4 79:1
  91:14 94:8 97:8
  99:2 100:5,10
  103:9
**theories** 78:8
**therefore** 28:9
  69:22
**these** 24:16 27:8,16
  27:18 36:17 45:1
  45:3,11 48:18
  58:1 60:8 62:9
  65:21 73:18 77:19
  78:11,12 83:7
  96:21
**they'd** 12:1 36:20
**they're** 73:25
**they've** 73:25 97:14
**thing** 6:18 12:24
  47:5 49:25 64:10
  66:22,24 72:6
  74:21 75:19 92:17
**things** 13:2 15:11
  23:14,17 24:22
  30:23 31:23 37:25

57:8 61:22 63:1,3
  86:18 93:7 100:4
**third** 27:1 41:5 63:8
  63:9 69:25 83:20
  96:18
**third-party** 96:25
**thirty** 7:7,8 26:22
  51:16 57:18
**though** 103:5
**thought** 17:19 21:9
  22:21 28:22 31:15
  31:17 48:25 73:5
  102:7
**thousand** 75:8
**thread** 9:18
**threads** 9:16 13:7,8
**three** 11:16 14:13
  18:24 25:16 26:24
  27:3,18 53:22
  55:15,16 71:24
  77:14 78:17 92:4
**through** 8:3 13:1,2
  13:15,24 17:23
  24:11 30:17 36:15
  36:25 38:9 49:1
  52:10,12 65:23
  75:12 76:6,7 79:8
  84:10,12 86:22
  95:11
**throughout** 36:18
**thumb** 7:9 8:22
  10:12 14:25 15:17
  22:12 23:4 24:17
  40:19 55:10,13
  90:6
**Thursday** 1:10
**tie** 29:16,17 52:22
  52:25 53:1
**tight** 33:1
**timeliness** 102:8
**times** 5:20 35:6
  54:19 71:14 76:11
  80:3
**title** 43:23 45:23
  46:3 89:10
**titled** 11:13
**titles** 44:2,5,15
  45:11,13,14 48:2
  89:5
**today** 6:23 15:4,18
  22:12 23:4 35:19
  37:13 70:15
**together** 64:8 66:23
  66:25 72:6
**told** 16:15 29:9,21
  30:1

**too** 9:25 45:4 67:2
**took** 53:13 63:23
**top** 41:5 80:6
**topic** 34:9,12,15
  39:13 59:11
**total** 11:14 32:1
  48:25 50:7 89:8
**towards** 42:3
**trading** 19:8,9
  99:17
**trained** 29:2
**training** 95:8,10
**tranche** 57:16
**tranches** 27:21 57:2
**transactions** 37:2
  99:20
**transcript** 103:7
**transfer** 57:10
**travel** 20:13,14
**treatises** 40:6
**TREP** 26:25 28:5
  55:22 60:6,14,17
  60:22 91:25 92:5
  92:9
**tried** 13:10 62:25
**trouble** 13:15
**true** 104:12
**trust** 57:11,12 66:11
**truthful** 65:2
**try** 37:1 44:17 45:23
  49:1 57:3 72:4
  79:21 88:4
**trying** 11:4,23 15:4
  31:18 51:9 61:2
  89:1
**turn** 41:1
**turning** 74:13
**twenty** 40:15 51:13
  72:10 95:22
**two** 14:13 18:9,14
  18:24 30:8 31:22
  37:18 46:5 47:17
  47:22 48:9 49:3
  71:22 77:3 89:25
  94:23 100:4
**two-and-a-half** 21:5
**two-percent** 36:12
**two-thirds** 54:21
**type** 17:22 31:17
  37:14,15 47:1,10
  71:3 89:20,22
**typed** 40:23
**types** 30:8 32:16
  35:19 40:13,15
  55:16 62:9 78:12
  82:4 83:7 86:7

**typical** 27:18
**typically** 25:15
  27:20 47:17 60:13
  60:15 97:3

_____
U
_____

**Uh** 68:15
**ultimate** 17:16
**ultimately** 31:20
  57:23 80:2
**Um** 20:22 21:8
  64:19 67:18
**Um-hum** 15:9 35:17
  87:11 89:24
**unable** 36:22
**unclear** 6:8
**under** 24:1 46:21
  53:24 54:15 55:1
  55:8 58:2 59:8
  84:16 86:1 89:11
  91:13 94:14
  100:11
**underlying** 56:14
  56:25 57:2 65:14
  65:22 99:7,18,21
**understanding** 8:7
  8:10 17:25 21:6,8
  25:9 29:15 30:25
  55:22 57:25 58:6
  58:21 60:16 61:17
  63:10 65:1 66:1
  69:18 76:8 79:8
  79:12 82:6,16
**understood** 30:10
  30:11 61:13 64:9
**undetected** 85:22
**Union** 81:22
**unique** 8:18 47:16
  72:25
**unit** 58:11,12
**UNITED** 1:1
**University** 16:16
  56:22
**unless** 22:18,18
**unlikely** 99:10
**until** 57:20
**unusual** 12:13
**up** 10:22 17:1 18:17
  19:2 23:25 41:18
  48:16 49:4 70:17
  72:22 74:24 77:13
  79:24 86:2 93:7,9
  94:11 96:2,13
  100:24 101:14,15
**upon** 68:8 72:9
  73:22 76:19,22

87:21 88:23 94:15
**us** 15:3 23:4 31:17
  35:18 61:18 62:9
**USB** 7:5
**use** 29:15 34:6
  44:15 46:22 47:6
  73:12 74:20 77:2
  77:6
**used** 7:19 44:3,17
  54:5 65:19 76:14
  87:24 92:4
**using** 34:21 60:12
  84:19 91:24
**usual** 80:7,10,13
**utilizing** 61:1

_____
V
_____

**v** 105:2
**valuable** 30:12 81:7
  82:19 84:8
**value** 31:3,9 32:15
  33:19 34:1 38:18
  39:1,13 47:14
  68:16 69:16,23,24
  94:25 95:5,14,18
  98:20 102:7
**valuing** 38:6 39:9
**variance** 38:1
**various** 8:9 19:3
  31:19 36:10 40:13
  54:12 55:16 57:2
  57:3,14,16 71:14
  71:14 75:7 82:13
  86:2 101:12
**vast** 35:21 36:25
  71:20
**verbal** 6:14
**verification** 25:22
**verifying** 24:22
**version** 11:12
**versus** 92:9
**very** 15:10 18:21
  30:19 58:18 71:22
  73:14 74:17 80:25
  85:25 88:10 90:20
  93:4,4,7,7 95:13
  97:12,12 99:6,9,9
**viable** 75:12
**vice-president** 44:8
  44:11 48:8,8
  81:18
**vice-presidents**
  43:25,25 44:1,9
**viewed** 46:16
**views** 33:16
**violation** 30:20

**virtue** 71:18 95:25
**Visual** 84:20
**VP** 44:14
**vs** 35:10

_____ **W** _____

**W** 5:1
**Wachovia** 81:22
**waited** 101:5
**walk** 11:1
**Wall** 56:17 72:21
  86:11,13
**want** 6:18 7:15
  12:20 38:23 47:6
  51:8 52:10,11
  69:6 73:12 74:20
  91:7
**wanted** 13:13 16:20
  27:15 32:9,9,10
  33:4,11 52:22
**Washington** 3:14
**wasn't** 12:2 24:7
  44:24 49:19 86:6
  86:6
**waterfall** 65:23
**way** 6:10 30:3 33:17
  46:22 54:21 67:19
  67:21 75:3 78:15
  81:15 89:2 99:24
  104:17
**ways** 82:6 94:19
**we'll** 15:14 41:10
  72:6 103:4,6
**we're** 39:17 74:21
  87:16 93:8 101:21
**we've** 13:22 100:22
**web** 24:8,9 45:10
**website** 23:11 90:7
**Webster** 1:3 5:8
  16:9 75:1 80:8
  100:19
**Wednesday** 51:25
**weeks** 26:10
**welcome** 41:24
**well** 11:1 14:19
  19:14 20:24 27:6
  29:4 39:16 42:19
  67:20 69:5 72:6
  77:8 80:22 84:7
  88:6,17,22 89:9
  96:10 100:3
**well-recorded** 42:10
**went** 13:14 17:25
  18:6,22 23:11
  79:20
**West** 3:7

**what's** 73:2
**wheel** 75:18
**wheels** 66:23 67:1
  75:19
**whenever** 6:15
  61:19 62:1
**where** 11:24 16:19
  18:25 19:7 48:12
  48:15,18 53:23,24
  63:13 76:12 86:4
  93:11 96:23 98:8
**WHEREOF** 104:19
**whichever** 5:14
**while** 28:24 38:21
**who's** 75:9
**whole** 36:11 71:15
  86:17
**whom** 70:5 100:18
  100:18
**whose** 93:22 104:10
**why** 11:5 12:16 32:9
  32:9 62:4 71:12
**wide** 37:2
**Wiggly** 36:24 37:6,9
  37:10
**will** 10:25 57:14,16
  65:22 71:22 78:15
  103:9
**WILLIAM** 3:11
**win** 78:6
**Winchell** 1:8 2:2 4:3
  4:9 5:6,15 39:20
  103:14 104:9
  105:3,21
**winning** 69:20 78:5
**Winston** 2:4 3:12
**within** 26:10 32:22
  44:18 57:5,11
  78:17 104:7
**without** 34:6 61:13
  66:7 71:8
**witness** 4:2 5:10
  11:1 12:10,13
  15:21 16:1 20:6
  38:14 40:1 51:8
  51:11 67:6 103:6
  104:9,13,19 105:3
**wmiossi@winston...**
  3:16
**won't** 7:6 41:7
  55:11 92:17 93:16
**word** 11:12 12:9
  47:7 87:24
**Worely** 93:13
**work** 19:16 30:2
  64:10 66:23 78:16

84:15 96:17 97:6
  97:10,14 99:8,22
**worked** 17:6,9
  18:20 19:12 25:8
  25:11 26:5 32:14
  49:5 50:8 56:20
  58:1 62:19 64:3,7
  64:8 78:19 81:21
**working** 19:11
  32:22 50:5 72:21
  74:23 96:8 98:9
  98:10
**works** 72:6 74:4
  79:9 84:13 90:17
  100:18,19
**world** 47:2,18 58:3
**Worley** 71:16 72:2
  75:24 81:15,18
  82:5 87:20 88:21
  88:23 99:8 100:18
**worth** 32:4 33:5
  90:11
**wouldn't** 20:22
  97:25 101:5
**written** 84:21
**wrote** 50:14

_____ **X** _____

**x** 1:6

_____ **Y** _____

**yawn** 88:15
**yeah** 18:1,15 52:2
  67:25 68:5
**year** 30:8 31:25
  56:20
**years** 15:12 17:7,11
  18:23 20:8 31:19
  47:4 56:9 57:6,21
  58:10 59:23 70:11
  72:16 74:6 85:22
  96:18 97:2 101:22
**years'** 15:8
**Yep** 52:5
**yet** 86:6
**yield** 61:1,19
**York** 1:9,9 2:6
  104:2,8
**you'll** 79:17
**you're** 6:1 14:23
  24:2,3 41:24
  61:24 62:5 63:2
  74:19 78:4,5
  86:16 87:25 93:15
  94:24 96:19 97:19
  99:10 101:4 102:2

**you've** 6:4 13:22
  14:25 15:18 22:13
  31:4 34:14 38:14
  39:23 42:21 50:13
  60:5 73:24 83:22
  95:4 98:9 101:22
**yours** 72:23
**yourself** 33:18,22
  78:22

_____ **Z** _____

**Z** 93:22
**Z-e-n-g-o** 93:23

_____ **0** _____

**07716** 5:16

_____ **1** _____

**1** 4:6 6:19,20 7:1
**1.09** 37:9
**1.15** 37:11
**1.19** 37:8
**1.5** 95:22
**1:07** 1:11
**10** 19:1 96:4
**111** 11:14 14:7
**117** 11:15,16
**117-page** 14:11
**12** 14:7
**13th** 13:24
**15** 17:11 57:21
  94:18 100:9
**16** 42:4
**1601** 3:6
**17** 42:4 94:11
**1700** 3:13
**18-month** 21:11
**18th** 51:20
**19** 64:1
**1980s** 56:12
**1981** 35:9,18
**1982** 57:18
**1984** 17:23 57:19
  62:14
**1985** 56:19 62:12
**1990** 18:20 19:9
**1991** 86:12
**1999** 17:23 62:13,17
**19th** 51:20

_____ **2** _____

**2** 4:8 39:18,19,25
  40:5 50:12 54:20
**2,500** 8:17 9:12
**20** 5:15 32:18 96:4
  103:17 105:23

**20-odd** 36:13
**200** 2:4
**200,000** 93:8
**20006-3817** 3:14
**2007** 17:21
**2009** 18:25
**2011-2012** 43:5,8
**2012** 19:1
**2015** 13:24
**2016** 40:14 86:21
**2017** 13:24 15:23
  16:4 19:19,25
**2017'** 86:22
**2018** 1:10 16:2
  19:24,25 51:25
  104:20 105:2
**202-282-5000** 3:15
**245** 19:8
**25** 1:10 105:2
**26th** 51:25
**28** 89:16
**29** 65:13 101:2
**2nd** 13:23

_____ **3** _____

**3** 6:25 55:3 95:19
**30-some** 56:9
**300,000** 30:7
**33401** 3:7
**35** 15:8
**360,000** 44:9
**39** 4:8

_____ **4** _____

**4** 59:8 60:24
**4,500** 7:19
**4,700** 12:25
**4:03** 103:11
**40** 10:10
**45** 18:11

_____ **5** _____

**5** 4:3 63:9 64:17
**50** 10:10 100:9
**500** 3:6
**54** 65:14,22 66:2
  99:12,12
**561-990-1590** 3:8

_____ **6** _____

**6** 4:6 67:5,11,15,21
  69:12 73:11

_____ **7** _____

**7** 67:14,15 69:12
  74:18

**700,000** 30:8

---
**8**

**8** 80:6 87:18,19
**80s** 84:18
**84** 62:15
**85** 99:4

---
**9**

**9** 67:19,21,22 92:16
**9:18-cv-80110-Ro...**
  1:2
**90-some** 9:15
**94** 18:21
**96** 86:2
**98** 86:2
**99** 37:10 57:20
**9th** 51:22 104:20