# EXHIBIT 8

Hughes v. Priderock                                        10/11/2018
David Worley

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:19-cv-80110-ROSENBERG/REINHART

WEBSTER HUGHES,

        Plaintiff,

-vs-

PRIDEROCK CAPITAL PARTNERS, LLC,

        Defendant.
_____/

DEPOSITION OF DAVID S. WORLEY

Thursday, October 11, 2018
11:55 a.m. - 2:55 p.m.

505 S. Flagler Drive
Suite 600
West Palm Beach, Florida 33401

Stenographically Reported By
Pamela J. Pelino, RPR, FPR, CLR
Notary Public, State of Florida
FLORIDA COURT REPORTING

-   -   -

Hughes v. Priderock
David Worley

10/11/2018

---

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3       CHRISTOPHER W. KAMMERER, ESQUIRE
         KAMMERER MARIANI, PLLC
 4       1601 Forum Place
         Suite 500
 5       West Palm Beach, Florida 33401
         561.990.1591
 6       ckammerer@kammerermariani.com
 7
 8
 9   On behalf of the Defendant:
10       WILLIAM G. MIOSSI, ESQUIRE, ESQUIRE
         WINSTON & STRAWN, LLP
11       1700 K Street, NW
         Washington, DC 20006
12       202.282.5708
         wmiossi@winston.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1                   - - -
 2              I N D E X
 3                   - - -
 4   DAVID S. WORLEY      DIRECT   CROSS   REDIRECT
 5   BY MR. KAMMERER        4
 6
 7
 8
 9                   - - -
10          E X H I B I T S   M A R K E D
                     - - -
11   DESCRIPTION                      PAGE
12   Plaintiff's Exhibit 19           6
       (Witness' LinkedIn Pages)
13   Plaintiff's Exhibit 20           40
       (Freddie Mac 2018 Announcement Calendar,
14      Hughes 0000330-331)
15   Plaintiff's Exhibit 21           71
       (Handwritten List, Hughes 0000030)
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1            P R O C E E D I N G S
 2                   - - -
 3       Deposition taken before Pamela J. Pelino,
 4   Registered Professional Court Reporter and Notary Public
 5   in and for the State of Florida at Large, in the above
 6   cause.
 7                   - - -
 8   Thereupon,
 9            DAVID S. WORLEY,
10   having been first duly sworn or affirmed, was examined
11   and testified as follows:
12       THE WITNESS:  Yes.
13            DIRECT EXAMINATION
14   BY MR. KAMMERER:
15       Q.  Good morning, Mr. Worley.  Chris Kammerer,
16   one of the attorneys for Mr. Hughes.
17            Have you ever had your deposition taken
18   before?
19       A.  Yes.
20       Q.  How many times?
21       A.  I have no idea.  Many.
22       Q.  Many times.  Recently?
23       A.  Define "recently."
24       Q.  Within the last year.
25       A.  No.
```

---

Page 5

```
 1       Q.  Or within the last three years?
 2       A.  No.
 3       Q.  Well, it sounds like you have an
 4   understanding of your experience with depositions.  You
 5   have an understanding of how they work, but I'll just
 6   give you a few quick procedural rules, if you will.  As
 7   you know, there's a court reporter who's taking down
 8   what you and I are going to be saying, and for her
 9   convenience, let's agree that we won't speak over one
10   another.  And I'll try ask a question, and I'll try to
11   be quiet and allow you to answer the question; okay?
12       A.  That's fine.
13       Q.  And then all of your answers have to be
14   verbal because you can't take down shaking of the head
15   or, you know, an uh-huh or an huh-uh.  Everything has to
16   be yes or no or verbalized; okay?
17       A.  I agree.
18       Q.  And if you don't understand any of the -- my
19   questions or they're confusing or you don't follow, just
20   feel free to ask me to restate or to clarify; okay?
21       A.  Okay.
22       Q.  And if Mr. Miossi objects from time to time,
23   I may ask you just to go ahead and answer, or I may ask
24   him to tell me what the reason for the objection is, or
25   I may rephrase the question; okay?
```

2 (Pages 2 to 5)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 6

1      A.  Okay.
2      Q.  What is your current residence?
3      A.  Address?
4      Q.  Do you reside in Palm Beach County, or where
5   do you reside?
6      A.  Martin County.
7      Q.  You reside in Martin County.  And how long
8   have you resided there?
9      A.  About four years.
10      Q.  And where did you reside prior to that?
11      A.  Washington, D.C.
12      MR. KAMMERER:  I'm going to mark this
13   document as Exhibit 19.
14      (Plaintiff's Exhibit 19 was marked for
15   identification.)
16   BY MR. KAMMERER:
17      Q.  I'd ask you if you could review that.  Let me
18   know if this is an accurate copy of a LinkedIn page for
19   you.
20      A.  Appears to be.
21      Q.  And the second page says you graduated from
22   the University of Texas at Austin in -- is it 1973, or
23   you attended between 1973 and 1977?
24      A.  I attended between '73 and '77, graduated in
25   '77.

Page 7

1      Q.  And then you obtained a BA in finance
2   subsequently?
3      A.  Correct.
4      Q.  And what year was that?
5      A.  1977.
6      Q.  Do you have any professional licenses or
7   certifications?
8      A.  No.
9      Q.  Any other education other than what's
10   reflected on your -- this Exhibit 19?
11      A.  No.
12      Q.  Okay.  I'd like to go through your employers.
13   Who's your current employer?
14      A.  I'm not sure of the exact entity, but it's an
15   entity related to -- I think it's the fund management
16   company for Priderock, but I couldn't tell you the
17   name -- the exact name of the entity.
18      Q.  All right.  Your LinkedIn page says you had
19   recently joined PRC Capital Partners as a partner.  Does
20   that mean Priderock Capital Partners, LLC?
21      A.  You know, I don't know.  I don't recall what
22   that means.
23      Q.  Who do you get paid by?
24      A.  Like I said, I don't know the entity.  I
25   think it's the asset management or fund management

Page 8

1   entity of -- for the fund.
2      Q.  Let me hand you what we marked as Exhibit 3;
3   okay?  This is for reference.
4      So the fund is the Priderock multifamily debt
5   opportunity fund; right?
6      A.  Yes.
7      Q.  We'll just call that the "fund" for today;
8   okay?  Now, this PPM, which is Exhibit 3, says the fund
9   is a private investment vehicle organized as a Delaware
10   limited partnership and sponsored by Priderock Fund
11   Management Partners, LLC, the investment manager.
12      Is that the entity you're referring to?  The
13   fund manager?
14      A.  It could be.
15      Q.  Okay.  It then goes on to say an affiliate of
16   Priderock Capital Partners, LLC.  How is the
17   Priderock Fund Management Partners, LLC, affiliated with
18   Priderock Capital Partners, LLC?
19      A.  Yeah.  That's a legal question I couldn't
20   answer.  You'd have to talk to the attorneys.
21      Q.  Are you a member or an owner of
22   Priderock Capital Partners, LLC?
23      A.  No.
24      Q.  Are you a member or an owner of
25   Priderock Fund Management Partners, LLC?

Page 9

1      A.  Which entity?  Tell me --
2      Q.  Sure.  Priderock Fund Management Partners,
3   LLC.
4      A.  I believe that's the one I'm a member or a
5   partner.
6      Q.  Prior to --
7      MR. MIOSSI:  You done with this?
8      MR. KAMMERER:  Yeah.
9   BY MR. KAMMERER:
10      Q.  -- joining whichever entity, Priderock, okay,
11   who were you employed by?
12      A.  Fannie Mae.
13      Q.  And before Fannie Mae?
14      A.  First Union/Wachovia.
15      Q.  And prior to First Union/Wachovia?
16      A.  InterFirst Bank.
17      Q.  Any more before InterFirst?
18      A.  Texas Commerce Bank.
19      Q.  And before that?
20      A.  And Frost National Bank.
21      Q.  Frost.  All right.  What positions did you
22   hold with Frost National Bank?
23      A.  I was a budget analyst.
24      Q.  And how many years were you with them
25   approximately?

3 (Pages 6 to 9)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                          10/11/2018
David Worley

Page 10

1      A.   Approximately three.
2      Q.   And what was your position with Texas
3  Commerce Bank?
4      A.   I was a controller and ran loan operations.
5      Q.   What type of loans?
6      A.   All loans.
7      Q.   Business?  Home?
8      A.   Everything.
9      Q.   InterFirst Bank, what was your position with
10  them?
11      A.   I had two roles, loan review and then
12  commercial real estate lending officer.
13      Q.   Now, those are all positions and employers
14  before you began working with First Union and Wachovia;
15  right?
16      A.   Correct.
17      Q.   Approximately when did you first begin
18  working with First Union and Wachovia?
19      A.   I want to say mid '80s.
20      Q.   And you were with First Union/Wachovia for
21  about 17 years?
22      A.   I believe I left in, yeah, 2004 or '05, I
23  think.
24      Q.   And what was your position or what were your
25  positions at First Union/Wachovia?

Page 11

1      A.   I started as the real -- regional real estate
2  credit officer for Central Florida.
3      Q.   Okay.
4      A.   Then I took over as head of production for
5  commercial real estate lending for central Florida, and
6  then I moved to be the credit officer for the national
7  real estate, commercial real estate lending unit.  And
8  then I took over as a credit officer for the mortgage
9  warehouse lending division, and then I took over as
10  chief risk officer for real estate capital markets.
11      Q.   And then after that, you left.  You went
12  to --
13      A.   Fannie Mae.
14      Q.   -- Fannie Mae.
15           And what positions did you hold at
16  Fannie Mae?
17      A.   Chief risk officer for the multifamily
18  division.
19      Q.   And what years were you in that role with
20  Fannie Mae?
21      A.   2005 to 2014.
22      Q.   On your LinkedIn page is a reference to
23  FirstCity Bank of Commerce.  What is your role there,
24  and how long have you been there?
25      A.   I'm the chairman of the board.

Page 12

1      Q.   And how long is that?
2      A.   I've been the chairman of the board for
3  approximately two and a half years.
4      Q.   There's also an entity called Senderra
5  Funding you're involved with?
6      A.   That was a company that I cofounded with
7  another gentleman.  I was involved in the founding of
8  it.  It was sold to Goldman Sachs.
9      Q.   What type of work did Senderra Funding do?
10      A.   It was a residential mortgage company.
11      Q.   And what time period were you involved with
12  Senderra Funding?
13      A.   That was early 2005.
14      Q.   Until when?
15      A.   Until I joined Fannie Mae.
16      Q.   I'm going to hand you what we previously
17  marked as Exhibit Number 2.  Are you familiar with this?
18      A.   Nope.
19      Q.   I'll represent to you this is a screenshot
20  printout from Priderock Capital Partners LLC's website;
21  okay?
22      A.   Okay.
23      Q.   All right.  The bottom of the page.  See some
24  handwriting -- or not some handwriting.  Some print?
25      A.   Uh-huh.

Page 13

1      Q.   States:  "Priderock Capital Partners is a
2  private multi-family asset manager.  Priderock's
3  principals have over 100 years of experience in
4  acquiring, developing, financing, managing and
5  renovating apartment communities across the continental
6  U.S."
7      A.   Right.
8      Q.   The senior management team has acquired,
9  developed, renovated and managed over 40,000 units in
10  their careers.  Priderock currently owns and manages
11  over 12,000 units across 16 states."  I'm not going to
12  read the states.  Their website also describes Priderock
13  Capital Partners as an asset management company.
14           What is your understanding of what Priderock
15  Capital Partners does?
16      A.   They own and operate apartments.
17      Q.   And their asset management is focused on
18  specifically owning and operating apartment complexes?
19      A.   Yes.
20      Q.   Specifically multifamily apartment complexes?
21      A.   Yes.
22      Q.   And I believe you said you began working with
23  a Priderock entity sometime in 2014?
24      A.   I can't recall.
25      Q.   Okay.  So tell me how you began

4  (Pages 10 to 13)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                                10/11/2018
David Worley

---

Page 14

1   working -- what led you to begin working with Priderock
2   Capital Partners or whatever Priderock entity you work
3   with?
4       A.   I just knew the guys from my days at
5   Fannie Mae.  They asked me if I would -- wanted to come
6   work with them.  I told them I didn't -- wasn't really
7   looking for a job.  They asked me if I would just come
8   down and help them with financing on apartments.  I said
9   sure and -- but I didn't really take a -- take pay and,
10  you know, I helped them whenever they needed help.
11      Q.   So which guys are you referring to?  Which --
12      A.   The two partners, George Banks and
13  David Khoury.
14      Q.   And you knew them from your time at
15  Fannie Mae?
16      A.   Fannie Mae, yes.
17      Q.   And they asked if you would help them
18  with -- in regards to financing their acquisition of
19  apartment complexes?
20      A.   Yes.
21      Q.   And specifically what type of help were they
22  seeking from you?
23      A.   Just how to get best execution on their debt.
24      Q.   What does that mean in lay person's terms?
25      A.   Best rate, best terms on their debt.

---

Page 15

1       Q.   Would they have you review prospective deals
2   that they were seeking -- apartment complexes they were
3   seeking to acquire and prospective financing for those
4   acquisitions?
5       A.   Loosely.
6       Q.   All right.  That was what you were -- they
7   asked you to do initially?
8       A.   Yes.
9       Q.   What was your affiliation with them?  Were
10  you an employee?  Were you independent contractor?
11      A.   Just basically a friend.
12      Q.   Did you get paid --
13      A.   No.
14      Q.   -- for your work?
15           All right.  At any time did you become more
16  than a friend with -- in regards to Priderock Capital
17  Partners or Mr. Banks or Mr. Khoury with regards to the
18  consulting -- I will put it that way -- you were doing
19  for them?
20      A.   Did I become more than a friend?
21      Q.   Well, that's a bad way of putting it.  Did
22  they hire you?  Did they make you an employee?  Did they
23  start paying you somehow?
24      A.   I became an employee of an entity affiliated
25  with the fund after the fund was launched.

---

Page 16

1       Q.   Well, when you began assisting Mr. Banks and
2   Mr. Khoury, there was no fund; right?
3       A.   Correct.
4       Q.   And whose idea was it to create the fund?
5       A.   I think that was a joint idea between
6   David Khoury and myself.
7       Q.   Tell me how -- what your recollection is of
8   how the idea for creating the fund came about.
9       A.   I believe I had a conversation with
10  David Khoury and explained to him the -- how Freddie Mac
11  securitized their debt.  And he asked if there would be
12  an opportunity to create a fund to buy the subordinate
13  bonds, and I said sure.  And he asked me to start
14  looking into that.
15      Q.   All right.  Prior to this discussion with
16  Mr. Khoury, what experience did you have with
17  Freddie Mac and how they securitized their debt?
18      A.   Well, let's see.  I mean, their -- being
19  their chief competitor at Fannie Mae, we securitized our
20  debt differently than they securitize theirs.  I had
21  built the pipes and all the accounting regimen to
22  securitize the way Freddie Mac did before Freddie Mac
23  was doing that.
24           MR. MIOSSI:  For Fannie Mae?
25           THE WITNESS:  For Fannie Mae.  I did that for

---

Page 17

1   Fannie Mae.
2           And we would routinely reverse engineer
3   Freddie Mac securitizations to understand the
4   execution that they were getting vis-à-vis the
5   execution we would get in our securitizations.  So
6   I would say that I had, you know, very substantial
7   knowledge of how they securitized.
8   BY MR. KAMMERER:
9       Q.   My understanding is that Fannie Mae did not
10  securitize its multifamily loan debt?
11      A.   That's incorrect.
12      Q.   Can you tell me in what way Fannie -- how did
13  Fannie Mae securitize a multifamily debt?
14      A.   Fannie Mae securitizes in a whole loan
15  fashion versus a pool, which Freddie Mac does, and
16  Fannie Mae and the lender retain the risk versus
17  Freddie Mac sells the risk.
18      Q.   So what Freddie Mac does, as I understand it,
19  they do the -- their K-Deals are a version of a
20  commercial mortgage backed security; is that correct?
21      A.   That's correct.
22      Q.   So these are a pool of mortgages that they
23  then securitize?
24      A.   That's correct.
25      Q.   Okay.  And Fannie Mae does not securitize

---

5  (Pages 14 to 17)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                                    10/11/2018
David Worley

Page 18

1    pools of mortgages.  It sounds like they securitize
2    individual mortgages or individual loans?
3        A.   That's not exactly correct.
4        Q.   Then explain, if you would, for me, please.
5        A.   They do both.
6        Q.   Okay.  Can you tell me what the difference is
7    between how Freddie Mac securitizes debt and how
8    Fannie Mae securitizes debt with regard specifically to
9    multifamily loans?
10        A.   So Fannie Mae primarily securitizes on an
11    asset-by-asset basis.
12        Q.   Okay.  What does that mean?
13        A.   A loan-by-loan basis.  What they will
14    frequently do is retain all of those individual
15    securities and then resecuritize them in a large pool,
16    but the primary difference is Fannie Mae and the lender
17    retain the risk.  AKA, they are the B-piece buyer of
18    their own securities, and Freddie Mac sells the risk.
19    So Fannie Mae is effectively the largest B-piece buyer
20    in the world of multifamily securities.
21        Q.   Prior to your work with Priderock, I assume
22    you hadn't led a -- strike that.
23             You had not led a team that did a K-Deal with
24    Freddie Mac?
25        A.   Explain "did a K-Deal."

Page 19

1        Q.   You weren't part of an investment group that
2    purchased a portion of a K-Deal.
3        A.   That's correct.  They didn't start issuing
4    K-Deals until probably about 2009.  Prior to conservancy
5    Freddie Mac kept all loans on the balance sheet.  So
6    with the advent of conservancy, they had to start
7    securitizing their loans.  Fannie had, you know,
8    securitized many, many loans years before that, but I
9    was an employee at Fannie Mae.  So I was precluded from
10    doing business with Freddie Mac.
11        Q.   How long have you known Webster Hughes?
12        A.   You know, he came to work for First Union
13    back -- I couldn't tell you what years but while I was
14    in Charlotte.
15        Q.   So you met him through your work at
16    First Union?
17        A.   Yes.
18        Q.   Do you recall what his position was at
19    First Union?
20        A.   He was, you know, some kind of quant.
21        Q.   What does that mean?
22        A.   He would -- I'm not even sure exactly what he
23    did.
24        Q.   Quant means quantitative --
25        A.   An analyst, a quantitative -- an analyst.

Page 20

1        Q.   And what do quantitative analysts do?
2        A.   They, you know, analyze things.
3        Q.   Do you have an understanding of what type of
4    things that Mr. Hughes analyzed?
5        A.   No.
6        Q.   How well did you get to know Mr. Hughes while
7    you were at First Union?
8        A.   You know, I knew him a little bit.  He was in
9    a role, and I'm not even sure exactly what he did.  I
10    can't remember if we touched on a business perspective
11    or not, to tell you the truth.
12        Q.   Did you have much contact with Mr. Hughes
13    while you were at First Union?
14        A.   Just my recollection is more social than
15    business.
16        Q.   Prior --
17        A.   I don't recall him being involved in my part
18    of the world, which was commercial mortgage backed
19    securities and creation of those.
20        Q.   Prior to what I'm going to call your
21    consulting work with Priderock beginning around 2014,
22    did you meet with Mr. Hughes?
23        A.   Yeah.  I believe I did, yeah.
24        Q.   Did you have any discussions with Mr. Hughes
25    with regards to Freddie Mac K-Deals prior to your

Page 21

1    consulting for Priderock?
2        A.   No, not that I can recall.
3        Q.   When you began doing your consulting for
4    Priderock, did you have any discussions with Mr. Hughes
5    with regards to K-Deals?
6        A.   Not that I recall.
7        Q.   Did you socialize with Mr. Hughes in or about
8    2014, 2015?
9        A.   Played golf with him, yes.
10        Q.   That was in Charlotte?
11        A.   In Charlotte.
12        Q.   Did you have discussions with him with
13    regards to -- strike that.
14             Did you have any understanding that
15    Mr. Hughes had experience with Freddie Mac K-Deals at
16    that time?
17        A.   Not until I started working on this fund
18    concept.
19        Q.   How did that come about?  How you gained an
20    understanding that Mr. Hughes had some knowledge about
21    Freddie Mac K-Deals?
22        A.   Started working on this.  I knew he worked on
23    structured products.  I think primarily residential
24    securities was my understanding.  I called him and asked
25    him if he had ever worked on anything regarding the

                                              6  (Pages 18 to 21)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 22

1    K-Series.
2       Q.   Why did you do that?
3       A.   Well, you know, a couple of things.  You
4    know, primarily I had gotten to know him socially.  I
5    knew he was kind of down on his luck.  He'd not been
6    employed for a while and really trying to help the guy
7    out and give him something, you know, that he could work
8    towards, towards getting a job.
9       Q.   Why did you think he was down on his luck?
10      A.   Kind of that was the word from everybody in
11   Charlotte.
12      Q.   Any reason why it was believed he was down on
13   his luck?
14      A.   I don't know.  Just generally people said he
15   hadn't been able to get a job in a long time and was
16   looking for work.
17      Q.   Were there other people that you knew from
18   your work at Fannie Mae who you could have just asked
19   about Freddie Mac K-Deals?
20      A.   Sure.
21      Q.   Did you?
22      A.   Did I?  I talked to a couple of guys, yeah.
23      Q.   And who are they?
24      A.   The only one I remember is Drew Ades.
25      Q.   Who is Mr. Ades?

Page 23

1       A.   He worked for me at Fannie Mae.
2       Q.   How did he have a knowledge base with regards
3    to Freddie Mac K-Deals?
4       A.   Well, he helped me build all the pipes to
5    do -- you know, to securitize Fannie in a CMBS-like
6    structure.
7       Q.   What were his qualifications?
8       A.   He's --
9       Q.   Was he a quant as well as you described?
10      A.   Yeah.  He's good at math.
11      Q.   Quantitative analysis?
12      A.   Yes.
13      Q.   All right.  So tell me what your -- you
14   recall of your discussion with Mr. Hughes with regards
15   to Freddie Mac K-Deals, what he imparted to you.
16      A.   He told me he had done a bunch of work for
17   Kevin Donlon, who was one of the BP -- was one of the BP
18   spires, and he already had a model built.  And I went
19   over to his office, and he had pulled it up, you know,
20   out of his -- on his computer.
21      Q.   Do you have an understanding of models?
22      A.   You know, I understand how they work.  I'm
23   not proficient at Excel, but I'm certainly proficient at
24   math and understand how structured products work.
25      Q.   Do you have any experience in building models

Page 24

1    or what's entailed in building them?
2       A.   I have always had analysts working for me to
3    do them.  I had a bigger job than that.
4       Q.   Building a model is a pretty important job,
5    wouldn't you say?
6       A.   In what regard?
7       Q.   Well, if you are trying to determine whether
8    to make a certain investment, you're going to want to
9    have an accurate model, I assume; right?
10      A.   I guess if you were making an investment,
11   that might be important.
12      Q.   Would you make an investment without viewing
13   these type of investments we're referring to without a
14   model being available?
15      A.   Sure.
16      Q.   So how does it translate from Webster Hughes
17   on the golf course down on his luck to Webster Hughes,
18   director of structuring, surveillance, and analytics
19   with regards to the fund?
20      A.   So I told David Khoury and George that there
21   was a guy that wasn't working at the time that had a
22   little bit of knowledge with regards to the K-Series,
23   and he'd be willing to kind of help us, you know, along
24   this journey to try to start a fund.  And I spoke to
25   him, and I said, look, when you start a fund, everybody

Page 25

1    is specing their own time.  Nobody gets paid.  If you
2    want to get paid for your modeling work, we can do that,
3    or you can spec your time with a chance to get a job.
4    And he said, well, I would prefer to spec my time with a
5    chance to get a job.
6       Q.   What does specing your time mean?
7       A.   It means work for free.
8       Q.   So it's like a contingency; right?
9       A.   I don't know that it's a contingency.  It's
10   just you're working for free.
11      Q.   Well, when do you get paid?
12      A.   You don't know if you'll -- ever are going to
13   get paid.
14      Q.   Well, with regards to the fund.
15      A.   Right.  So he would have gotten paid if he
16   accepted the job offer we gave him.
17      Q.   Well, that was a -- let's talk about you said
18   you had the -- again, I guess, reacquainted -- would
19   that be a right term -- with Webster, with Mr. Hughes,
20   on the golf course in Charlotte?
21      A.   Right.
22      Q.   And viewed a model on his computer at his
23   office or his home, and then he becomes associated with
24   the fund; right?
25      A.   (The witness nods.)

7  (Pages 22 to 25)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                                      10/11/2018
David Worley

Page 26

1      Q.   What period of time was that between meeting
2   him again on the golf course and him becoming associated
3   with the fund?
4      A.   I can't recall.  I mean, the years get
5   blurry.
6      Q.   Well, did you value Mr. Hughes's expertise at
7   that time?
8      A.   Not really.
9      Q.   Tell me why not really.
10      A.   I told him numerous times I had 10 or 12 math
11   Ph.D.'s working for me at Fannie Mae, and a model is
12   just a model, and the answer is always wrong.  So I
13   never managed my business at Fannie Mae using the
14   modeling team.  I managed it using the common sense and
15   experience that I derived over 30 years, and that served
16   our group very well.
17      Q.   So why even bring Mr. Hughes on board, then,
18   the fund?
19      A.   It's basically building a budget effectively
20   on how -- if you think about a model for a security,
21   it's basically, you know, a budget on how the cash flows
22   will come out.
23      Q.   So the reason --
24      A.   It's available on Bloomberg for 2,000 a
25   month, which we now subscribe.

Page 27

1      Q.   Okay.  So I think you're -- and let me
2   dissect your answer because I think you're saying a
3   couple of things there, which is fine.
4         So my first question, though, is why is
5   Mr. Hughes even associated with the fund?
6      A.   Because I was trying to help a guy out who
7   was down on his luck.
8      Q.   Is that the only reason he appears on this
9   PPM?
10      A.   He wrote his own title and his own bio.  So
11   we put everybody in there who had done anything with the
12   fund in there, including my wife, who has gotten paid
13   nothing.
14      Q.   You raised $200 million based on this PPM; is
15   that right?
16      A.   I couldn't tell you the exact amount but --
17      Q.   Tell me a ballpark what your understanding
18   is.
19      A.   That's probably close.  I don't think it was
20   based on the PPM, but we did raise $220 million.
21      Q.   And you had Winston & Strawn prepare this
22   PPM; right?
23      A.   Right.
24      Q.   So you're telling me you just lightly put
25   people in the PPM?

Page 28

1      A.   I'm telling you we put everybody who had
2   anything to do with working on this into the PPM.
3      Q.   Now, prior to setting up the fund, Priderock
4   Capital Partners, LLC, had no experience in creating a
5   securities fund, did they?
6      A.   That would be correct.
7      Q.   And Priderock Capital Partners had no
8   experience with creating a fund to invest in Freddie Mac
9   K-Deals; right?
10      A.   That would be correct.
11      Q.   And you never led an investor group that was
12   seeking to invest in a Freddie Mac K-Deal; right?
13      A.   That's correct or did Webster.
14      Q.   Well, he had experience as part of an
15   acquisition of a Freddie Mac K-Deal; is that your
16   understanding?
17      A.   No.
18      Q.   Did you have an understanding that he had
19   previously been involved with -- I believe it was
20   RiverBank's acquisition of a -- involvement in a K-Deal?
21         (Witness phone ringing.)
22         THE WITNESS:  Excuse me.
23         That was what he explained to us.  We
24   subsequently found out that he didn't.
25      Q.   Why don't you explain that to me.

Page 29

1      A.   He explained to me that he had helped
2   Kevin Donlon in trying -- in resecuritizing or trying to
3   resecuritize some bonds that Kevin had.  Not the
4   acquisition of any bonds but trying to resecuritize.
5   Kevin Donlon didn't use any of his work.
6      Q.   And how do you know that?
7      A.   From Webster's deposition.
8      Q.   Have you ever spoken with Mr. -- was it
9   Donlon?
10      A.   I'm friends with Mr. Donlon, yes.
11      Q.   And what did he tell you about Webster?
12      A.   I've not spoken about this specific thing.
13      Q.   You haven't -- I'm sorry.  His name is
14   Donlon; correct?
15      A.   Donlon.
16      Q.   And you haven't spoken to him about
17   Mr. Hughes?
18      A.   Correct.
19      Q.   Or Mr. Hughes's prior work for Mr. Donlon?
20      A.   Not that I recall.
21      Q.   So the answer that you gave me was based
22   on --
23      A.   Webster's deposition.
24      Q.   Okay.  If you'd look at page 6, and actually
25   it's the overview, Mr. Worley.  It doesn't have actually

8  (Pages 26 to 29)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                      10/11/2018
David Worley

Page 30

1    a page number on it although -- that's it right there.
2    All right.
3         The third paragraph states: "The Fund has
4    been identified by Freddie Mac as having the expertise
5    and infrastructure required to invest in and represent
6    the Controlling Class."
7         What expertise did the fund have as referred
8    to there?
9         A.   Freddie Mac knew me well, and they knew that
10   I effectively had managed the largest book of
11   subordinate risk in the world.  And they know Priderock
12   well because they're a large borrower, and because of
13   those two reasons, they approved us to be a buyer of
14   their subordinate bonds.
15        Q.   The K-Deals, is that what you're referring to
16   when you say the subordinate --
17        A.   Yes.
18        Q.   In order to buy a portion though, they have
19   to be allocated to a prospective purchaser; is that
20   correct?
21        A.   That's correct.
22        Q.   And it's allocated by Freddie Mac?
23        A.   Correct.
24        Q.   And what infrastructure did the fund have
25   that's referred to here?

Page 31

1         A.   What infrastructure?
2         Q.   Yeah.  This says the fund has been identified
3    by Freddie Mac as having the expertise and
4    infrastructure.
5         A.   Yeah.  So it was basically my expertise and
6    Priderock's ability to take an apartment building, and
7    if we have a problem -- and take it over and operate it.
8         Q.   Does that expertise that's referred to in
9    this paragraph include Mr. Hughes's expertise?
10        A.   No.
11        Q.   All right.  If you could turn to the next
12   page.
13        A.   Freddie Mac has no idea who Webster Hughes
14   is.
15        Q.   If you turn to the next page, it
16   states -- the last paragraph states: "The Fund is
17   managed by a very experienced and cohesive investment
18   team with over one hundred years of cumulative
19   experience owning, operating and financing multifamily
20   residential housing."
21        A.   Correct.
22        Q.   And then it lists George Banks, David Khoury,
23   yourself, Dan Ng, Barb Gaziano, and Webster Hughes.  It
24   says: "Have worked together for over a decade in
25   various capacities."

Page 32

1         A.   Right.
2         Q.   Why is Mr. Hughes listed there?
3         A.   I couldn't tell you.
4         Q.   Who prepared this private placement
5    memorandum other than the attorney at Winston Strawn?
6         A.   I think various people contributed.
7         Q.   Can you tell me who those people were?
8         A.   I mean, I contributed some.  I can't tell you
9    for certain.  I think everybody who worked on the team,
10   but I'm not certain.
11        Q.   Who is the team?
12        A.   I think Barb Gaziano may have contributed
13   some.  I think David Khoury, but I'm not for certain.
14   Webster certainly wrote his own stuff.
15        Q.   So tell me your recollection of, again, the
16   transition from knowing Webster socially to him becoming
17   involved with the fund.  You explained to me some of the
18   initial discussions you had with him and going to his
19   office and looking at the model.  How does that then
20   become -- and you had some discussions with Mr. Khoury
21   about Mr. Hughes.
22        How then does Mr. Hughes become
23   further involved -- actually become involved in the fund
24   and become part of the team?
25        A.   You know, I can't recall exactly how it

Page 33

1    happened but just -- you know, just in general
2    recollection is me asking him if he wanted to become
3    more involved with a chance to get a job, and he seemed
4    very interested with the chance of getting a job.
5         Q.   Okay.  And you talked about spec work; right?
6    I think is the way you --
7         A.   Right.  Yeah.
8         Q.   What did you refer to that?  Spec?
9         A.   Yeah.  Specing your time.
10        Q.   Specing your time.
11        A.   And we did offer him the opportunity to get
12   paid for whatever time he invested, and he chose to spec
13   his time with the chance to get a job.
14        Q.   And when were those discussions had about
15   whether specing his time or --
16        A.   At the very beginning, whenever we started.
17   I couldn't tell you but --
18        Q.   At the beginning?
19        A.   The year, yeah.
20        Q.   When was it the beginning?
21        A.   I couldn't tell you the year.  I mean, I --
22        Q.   How about mid 2015?
23        A.   Could be.  I don't know.
24        Q.   What specifically did you discuss with
25   regards to specing your time?

9  (Pages 30 to 33)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 34

1         A.   Just exactly what I just told you.
2         Q.   I understand what it means generally, but
3    specifics. Specing your time for what?  To get what?
4    How much?
5         A.   To get how much what?
6         Q.   Compensation you would receive.
7         A.   Oh, we didn't talk about it.  We just said
8    get a -- to have a chance to get a job.
9         Q.   That was it?
10        A.   That was it, and then at some point later on,
11   we talked about potentially 200,000 a year, but that was
12   later on.
13        Q.   Okay.  So the initial discussions that you
14   had with Webster with regards to either specing his time
15   or getting paid for his time, are you stating that there
16   were no discussions about any details about what that
17   would result in?  Specing the time?
18        A.   Not initially, no.
19        Q.   When is the first time in your recollection
20   that actually dollar figures or percentages were
21   discussed?
22        A.   It was well after we started the process.
23        Q.   And were there any discussions when
24   you -- you know, initially with regards to either
25   specing his time or getting paid as to, as you state,

Page 35

1    specing your time to get a job?  What that job would
2    have entailed?  The job he was supposedly specing his
3    time for?
4         A.   Yeah.  I mean, it was basically an analyst
5    job.
6         Q.   And any discussions about what his expected
7    compensation would be as an analyst?
8         A.   When we first started or after we --
9         Q.   No, no.  When you first started speaking to
10   him --
11        A.   When we first started, we didn't talk money
12   at all.
13        Q.   Okay.  Do you recall when this private
14   placement memorandum was issued?  Finalized?
15        A.   I don't recall.  There's probably a date on
16   it somewhere.
17        Q.   Yeah, there is.  Mr. Diamond pointed it out
18   earlier.  It's April of 2016.  Yeah.  Here it is.
19   Page 3.
20        A.   Okay.
21            MR. MIOSSI:  That's on the cover sheet.
22   First page, the top paragraph, second line.
23            MR. KAMMERER:  Okay.  Very good.  Yeah.
24            THE WITNESS:  April 2016.
25

Page 36

1    BY MR. KAMMERER:
2         Q.   Okay.  So here is the date.  April of 2016
3    private placement memorandum is issued?
4         A.   Correct.
5         Q.   And what's your understanding of the purpose
6    of the private placement memorandum?
7         A.   I think it's you -- an information piece for
8    potential investors.
9         Q.   All right.  Prior to the April 2016, do you
10   have a recollection of how long Mr. Hughes had been
11   involved with you in regards to this fund in whatever
12   capacity?
13        A.   You know, probably a year and a half,
14   something like that approximately.
15        Q.   And during that year and a half, what was
16   Mr. Hughes doing with regards to the fund?
17        A.   He worked on the model with some oversight
18   from Dan Ng.  I think he played a lot of golf.  I think
19   he did -- went and worked on his family's farm.  I don't
20   know what all he did, but he spent some time on this.
21        Q.   How much time do you think Mr. Hughes spent
22   working on the fund prior to the April 2016?
23        A.   I have no way of knowing.
24        Q.   Just give me your feelings or your
25   understanding.  What do you think?

Page 37

1         A.   A few hours a week.
2         Q.   You know, it sounds like you don't think that
3    Mr. Hughes contributed much to the fund.
4         A.   I think he had a model that he had
5    already -- he said he had already built.  I'm not sure
6    he actually even built it, and I think he -- you know,
7    he spent some time.  He talked to a few investors, most
8    of which didn't invest with us.
9         Q.   Do you think Mr. Hughes brought any value to
10   the fund?
11        A.   I think he brought some limited value.
12        Q.   And what was that?
13        A.   I think he helped one investor, PSQ, kind of
14   understand how this worked a little bit, and I think he
15   worked with David Shillington and helped him understand
16   how the cash flows worked.  I think that was the primary
17   value he added.
18            (Discussion held off the record.)
19            (A luncheon recess was taken from 12:55 p.m.
20   to 1:30 p.m.)
21   BY MR. KAMMERER:
22        Q.   So let's start off again with what the plan
23   was with regards to creating the fund.  Before a fund
24   existed, what was the general plan of organizing and
25   creating the fund?  You know, there's certain steps that

10  (Pages 34 to 37)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 38

1    have to be taken?
2        A.   I think, you know, it was kind of capital
3    raising and getting the PPM done and, I mean, that was
4    probably the bulk of the work, I would imagine.
5        Q.   I would imagine that you have this idea for
6    the creation of the fund and discussed it with
7    him, Mr. Khoury and, I assume, with Mr. Banks; right?
8        A.   Little bit with him but mainly with Khoury.
9        Q.   And the creation of a fund, you actually have
10   to create a company; right?  And file it?
11       A.   Right.  That's legal stuff, all the legal
12   stuff you have to do.
13       Q.   Right.  So the fund is actually a limited
14   partnership; right?  So that has to be created and
15   filed.  This was filed in Delaware, I believe; correct?
16       A.   Whatever it says.  I wasn't involved that
17   much with all of the filing of the legal documents.
18       Q.   But the main steps would be you got to raise
19   funds from investors?
20       A.   Uh-huh.
21       Q.   Right?  Yes or no?
22       A.   Well, you have to get -- first thing you have
23   to have access to the product that you're going to be
24   investing in.  So that was primary.  So I spent time
25   talking to Freddie Mac, and they approved me right away.

Page 39

1        Q.   What did you need to -- what did you do with
2    regards to getting access to the product, as you stated?
3        A.   Really just, you know, spoke to them as peers
4    in a duopoly.  They know me very well, and my wife
5    worked there for 17 years.  So we're very well-known
6    commodities.  I talked to the head of multifamily, told
7    them we wanted to start buying.  He knew I was
8    affiliated with Priderock, who was a big borrower, and I
9    said you -- me -- all right.  Check all the right boxes.
10   You know how to underwrite loans.  You know how to
11   manage and service loans, and you've got an apartment
12   owner-operator who can deal with any problems if you end
13   up with an REO.  So...
14       Q.   Say that again.  An REO?
15       A.   A foreclosure.
16       Q.   Did you or did Priderock Capital Partners or
17   any Priderock entity have to submit any paperwork to
18   Freddie Mac?
19       A.   I don't recall.  I think we did, but I don't
20   recall exactly what it was.
21       Q.   And there's a difference -- strike that.
22   Freddie Mac, at a certain point when they have a
23   deal -- and I guess they list -- well, let me use this
24   as an example.
25           MR. KAMMERER:  I'll mark this document as

Page 40

1    Exhibit 20.
2           (Plaintiff's Exhibit 20 was marked for
3    identification.)
4    BY MR. KAMMERER:
5        Q.   So Freddie Mac announces deals that are
6    upcoming.
7        A.   Right.
8        Q.   Is that a fair statement?
9        A.   That's fair.
10       Q.   Do you have to apply with regards to a
11   specific -- or does a potential purchaser have to apply
12   with regards to a specific deal to be allocated a part
13   of that deal?
14       A.   No.
15       Q.   How do you -- strike that.
16           How does a prospective buyer get access to a
17   deal that Freddie Mac is offering?
18       A.   Well, they have periodic auctions.  You
19   participate in the auction.  If you win that auction,
20   you get that particular deal and, you know, if you are
21   close in the bidding, then they kind of slot you in, in
22   order of your bids.  And there were certain people that
23   only focus on certain products, and so they have a
24   certain rotation for those certain products.
25       Q.   When you say "products," are you referring to

Page 41

1    an aspect --
2        A.   Fixed, floating, you know, seniors, that kind
3    of thing.
4        Q.   So I take it that a prospective purchaser has
5    to be approved to even get into the auction?  To bid in
6    the auction?
7        A.   Correct.
8        Q.   And is that the approval that you were
9    referring to?
10       A.   I believe so, yes.
11       Q.   What does it mean for the -- Freddie Mac to
12   allocate a deal to a prospective purchaser?
13       A.   It's like I just mentioned.  You know, you
14   kind of stack up, and if you don't win the auction, you
15   kind of rank order bids.  That's my understanding.  It's
16   somewhat a black box, but they seem to rank order bids.
17   And then they kind of allocate, and then they just
18   dictate to you what the yield is.
19       Q.   All right.  So going back to sort of what the
20   plan is and the creation of the funds, you have to get
21   access to the product, have to raise funds; right?
22       A.   Raise capital.
23       Q.   Then you have to have a PPM prepared?
24       A.   That's part of the -- you know,
25   ultimately -- I mean, I think that's -- you know, I'm

11  (Pages 38 to 41)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                        10/11/2018
David Worley

Page 42

1    not a lawyer, but I think that's required by law
2    probably.
3        Q.   That's part of the raising of the capital?
4        A.   Yes.
5        Q.   And then I assume at some point where you
6    believe that you're going to have a sufficient number of
7    investors to make a commitment to the fund that you will
8    be in a position to bid at a Freddie Mac auction.  Is
9    that how it works?
10       A.   Yes.
11       Q.   And after a purchaser acquires a deal and
12   purchases one of these deals or an aspect of the deal,
13   what then does a purchaser have to do?
14       A.   They do due diligence.  They
15   underwrite -- reunderwrite the loans, do site
16   inspections, and they...
17       Q.   Is that after you bid on the deal, or is that
18   prior to?
19       A.   After.
20       Q.   But before the purchase closes; is that
21   correct?
22       A.   Correct.
23       Q.   So all that you described takes place before
24   the purchase of the K-Deal closes?
25       A.   There's probably a six-week window

Page 43

1    between -- you know, either award -- the awarding of a
2    bond and the closing.  Six weeks to two months.
3        Q.   Is it a fair statement to say the vast
4    majority of the work for a prospective purchaser is
5    raising the capital, bidding at the auction, doing the
6    due diligence, and then closing on the purchase?
7        A.   Well, first, it's qualifying too.  So
8    qualify.  Either bid or win a bid or get allocated.
9    Subsequent deal.  Then do -- you know, have raised
10   capital and due diligence and close.
11       Q.   Close on the purchase.  Because after the
12   close, there's no real management of the underlying
13   loans.  You basically have bought this package,
14   securities interest in this underlying pool of loans.
15   There's really not much to do after that; is that
16   correct?
17       A.   If the loans are performing, there's not a
18   lot to do.  If they have issues, then you have work to
19   do.
20       Q.   Okay.  What type of work would be
21   done -- well, let's back up.
22            So after the purchase, at that point the
23   purchaser would receive a quarterly report from
24   Freddie Mac with regards to the underlying -- the
25   performance of the underlying loans?

Page 44

1        A.   Monthly.
2        Q.   Monthly.  And if there are no loans that are
3    not in default or not performing, is there anything to
4    do?
5        A.   Well, you look at -- you get quarterly -- you
6    get monthly reports -- quarterly -- the performance of
7    the underlying properties gets updated.  So if you see
8    something that's trending wrong, you might make a phone
9    call to a servicer and find out what's going on with a
10   particular property, and then you can have miscellaneous
11   things.  Like, you know, an easement needs to be
12   granted.  Or there was a fire in a unit, and what
13   happens to the insurance proceeds?  And, you know,
14   there's all kinds of things that you're basically taking
15   the place of the lender, the servicing arm of the lender
16   and making decisions on the underlying loans.
17       Q.   And who does that at Priderock?
18       A.   I do.
19       Q.   Is that what it means to be the portfolio
20   manager?
21       A.   It's part of it.
22       Q.   So once the purchase is complete, is it
23   effectively then your job?  You just sort of manage the
24   portfolio of what was purchased, monitoring the
25   performance of the loans, and taking action if there's

Page 45

1    failure to perform?
2        A.   Correct.  And then monthly distributions.
3        Q.   And who handles that, the monthly
4    distributions?
5        A.   You know, it's kind of a combination of
6    Zhenshi and Dan and myself and then, you know,
7    the -- Barb Gaziano's area.  The money gets wired.
8        Q.   These are distributions to the investors?
9        A.   Investors, right.
10       Q.   And so the investors get a distribution on a
11   monthly basis?
12       A.   That's correct.
13       Q.   And then the fund manager receives two
14   things, as I understand it.  One, a management fee?
15       A.   When you say the "fund manager," meaning me
16   or meaning the entity?
17       Q.   An entity receives --
18       A.   Right.
19       Q.   -- a management fee; right?
20       A.   Correct.
21       Q.   1.5 percent --
22       A.   No.  It's a sliding scale depending on the
23   level of investment.
24       Q.   With regards to the fund, what is the
25   management fee that the entity receives?

12  (Pages 42 to 45)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 46

```
 1        A.   They receive whatever the -- you know, it's
 2   an aggregate of whatever the investors are --
 3        Q.   There's a percentage, isn't there?
 4        A.   Yeah.  Right.
 5        Q.   What is that percentage?  The 1.5 percent?
 6        A.   No.  Some investors it's 1.5; some it's 1;
 7   some it's 1.25.  Just depends on the amount they
 8   invested.  It's a sliding scale.
 9        Q.   So the entity receives a monthly management
10   fee; right?
11        A.   Right.
12        Q.   And then it receives a percent of the promote
13   shares; is that correct?  Or it receives a promote, I
14   should say?
15        A.   A promote?  There's nothing on the promote
16   until the very end.
17        Q.   Understood.
18        A.   So --
19        Q.   How does that work?
20        A.   It's essentially a bonus based on
21   performance.  So if, you know, everything works well,
22   you know, it will be one thing; if it doesn't work well,
23   then it can be nothing.
24        Q.   And the performance means the performance of
25   the pool of loans over that term of the --
```

Page 47

```
 1        A.   Correct.
 2        Q.   -- of the fund or the --
 3        A.   Correct.
 4        Q.   I take it that that performance is -- once
 5   you made the purchase, it's sort of locked in?
 6        A.   No, absolutely not.
 7        Q.   Let me ask you this:  Isn't the performance
 8   based on the pool that you bought into?
 9        A.   Correct.
10        Q.   So once you make the purchase, you have an
11   interest in this pool of loans; correct?
12        A.   Right.
13        Q.   And obviously the performance can be varied
14   depending on how those individual loans perform; right?
15        A.   Right.
16        Q.   But there's not a lot that the Priderock
17   entity can do about the performance of the underlying
18   loans at that stage after they're purchased?
19        A.   I would disagree with that.
20        Q.   Tell me how you would disagree then.
21        A.   Well, I'll give you an example.  Part of my
22   responsibilities at Fannie Mae -- I ran the workout.  So
23   I personally did all -- any workouts above probably $25
24   million, and the outcomes of those loans that -- you
25   know, those are loans that default, and the outcomes of
```

Page 48

```
 1   those can vary dramatically depending on how good the
 2   guy doing the workout is.  It can be -- go from losing
 3   50 percent of your principal to recovering all of your
 4   principal plus default interest.
 5        Q.   But that's with regards to loans that
 6   default?  Loans that are part of the pool that default;
 7   right?
 8        A.   Right.
 9        Q.   And it's a small percentage of the -- with
10   regards to the Freddie Mac K-Deals, it was a small
11   percentage of the loans that actually default; is that
12   correct?
13        A.   Historically.
14        Q.   With regards to the rest, they perform
15   however they're going to perform?
16        A.   Correct.
17        Q.   So it sounds like to me a lot of end
18   promote -- the performance, right?  The bonus, as you
19   said, is really based on the initial selection process?
20        A.   That has something to do with it because
21   during the initial selection process, you can kick loans
22   out.  So if you identify a loan that potentially may
23   have a problem in the future, you've saved yourself a
24   lot of potential future grief.
25        Q.   Well, are there not at least two
```

Page 49

```
 1   opportunities?  One is making the decision whether
 2   you're going to bid on a particular deal or not; right?
 3        A.   Correct.  Now, those auctions only happen
 4   twice a year.
 5        Q.   But prior to an auction to -- does an
 6   investor or purchaser have the ability to review the
 7   loans that make up the pool of each of these individual
 8   K-Deals?
 9        A.   Correct.
10        Q.   So you at that stage can say we're interested
11   in maybe this deal and that deal but not these three
12   deals for whatever reason?
13        A.   You can say that.
14        Q.   And that would be part of the selection
15   process though, right?  Determining what K-Deal to bid
16   on?
17        A.   Like I said, they issue six or seven
18   securities a month.  They have two auctions a year.  So
19   whatever 7 times 12 is.  What is that?  10 times 12
20   is --
21             MR. MIOSSI:  120.
22             THE WITNESS:  That's 60, 80 deals a year.
23   They have two to three auctions a year.  The other
24   75 deals are allocated, and so you don't stop a
25   choice of -- you don't have a choice of
```

13  (Pages 46 to 49)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                        10/11/2018
David Worley

Page 50

1        whether -- you have a choice of whether you want to
2     participate in the allocation or not.
3     BY MR. KAMMERER:
4        Q.   That's sort of what I was trying to explain.
5        A.   Right.  It's not a bid, you know, but you can
6     say no.  And once you say no, then it'll probably be a
7     long time before your phone rings again.
8        Q.   Okay.  And then the next step is to review,
9     during that six-week period, the underlying loans?
10       A.   Right.
11       Q.   And you can negotiate with Freddie Mac as to
12    which ones you'd like to kick out?
13       A.   There's a little leeway for negotiation.
14    Very little.
15       Q.   What is your understanding of -- strike that.
16           Who was involved with the raising of capital
17    for the fund?
18       A.   John Diamond.  David Khoury did some and
19    George Banks did some.
20       Q.   Were you involved?
21       A.   I was involved in talking to the potential
22    investors, but I didn't really bring investors to the
23    table.
24       Q.   So as I understand it, in raising
25    capital -- when you use the word "raise capital," you're

Page 51

1     meaning bringing investors to the table?
2        A.   Right.  That's --
3        Q.   And then after that -- but just -- you need
4     to actually get those prospective investors to choose to
5     invest?
6        A.   Correct.
7        Q.   And that's where the talking to the investors
8     comes into play?
9        A.   Correct.
10       Q.   You would do that.  Who else at Priderock
11    would --
12       A.   John Diamond, George Banks some, and
13    David Khoury.
14       Q.   Okay.
15       A.   And myself and Webster participated in a few.
16       Q.   Well, I was going to ask:  Did Priderock use
17    Webster with regards to speaking to prospective
18    investors?
19       A.   He talked to a couple of investors that
20    invested with us, and he talked to a number that didn't
21    invest with us.
22       Q.   I assume you spoke with a number who didn't
23    invest as well; is that right?
24       A.   Some.  Probably, yeah.
25       Q.   How many prospective investors do you believe

Page 52

1     Priderock -- the various individuals you listed -- how
2     many prospective investors do you believe they spoke to
3     prior to the first purchase?
4        A.   I couldn't tell you.
5        Q.   Can you give me a ballpark?
6        A.   You'd have to ask JD on that.
7        Q.   Is there any list of those?
8        A.   That's not really my job.  That would be JD.
9        Q.   Now, the raising of capital phase was during
10    what period of time?
11       A.   I think we closed on the first deal in spring
12    of 2016 maybe.  Sometime around April or something like.
13       Q.   When you say "closed," you mean --
14       A.   Closed on the first investment.
15       Q.   So that was April of 2017?
16       A.   Was that '17?  I --
17           MR. MIOSSI:  I think that's right.
18           THE WITNESS:  Are you sure?
19           MR. MIOSSI:  No, I'm not, and I'm not a
20    witness.  So anything I say doesn't matter.
21           THE WITNESS:  I don't know.  Whenever it was.
22    So capital raising would have taken place six
23    months to -- six to eight months before the
24    purchase of the first one.
25

Page 53

1     BY MR. KAMMERER:
2        Q.   So my notes are this:  There are three
3     purchases as part of -- the fund has made three
4     purchases.  April 2017, purchased $109 million of K-F29.
5        A.   Okay.  So it would have been -- capital
6     raising would have been six months before that, six to
7     eight months before that.
8        Q.   The second purchase was January 22nd, 2018,
9     58 million of K1504.  Does that sound accurate?
10       A.   That wasn't the purchase price of the bond.
11    That might have been the size of the bond.
12       Q.   Okay.  Tell me the difference there.
13       A.   It's a discount bond.  So the purchase price
14    was approximately 20 million, 19 to 20 million.
15       Q.   Okay.  And then the third was May 31st, 2018.
16    Purchased $82 million of K-F46C.
17       A.   Okay.
18       Q.   Those all sound accurate?
19       A.   Uh-huh.
20       Q.   You have to say yes or no.
21       A.   Yes.
22       Q.   What documents does Priderock have with
23    regards to its purchase, just identifying the amount
24    actually paid and the amount purchased.
25       A.   I think there's probably a trade ticket on

                                      14  (Pages 50 to 53)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

---

Page 54

1   each one.
2       Q.   And what would the trade ticket show?
3       A.   It's the name of the bond, the face amount of
4   the bond, the dollar price, the investor and the dealer
5   that we dealt with.
6       Q.   Okay.  All right.  So about six to eight
7   months prior to the purchase, you would raise funds?
8       A.   Sounds accurate.
9       Q.   I'm just repeating what you said.
10      A.   Yeah.
11      Q.   Okay.  Good.  Now, was that true with regards
12  to each of these purchases?  That there would
13  be -- there was a first purchase.  There was a certain
14  amount raised, and then the -- $109 million of K-F29 was
15  purchased?
16      A.   Right.  So there were -- you know, basically
17  a two phase capital raised.  The first phase was enough
18  to close K-F29, and then subsequent to that --
19  subsequent to the closing of that, more capital was
20  raised that allowed the purchase of the next two.
21      Q.   Do you know how much was raised in regards to
22  the -- as part of the first purchase?
23      A.   About 100 million.
24      Q.   Does that include the loan from KeyBank?
25      A.   No.

Page 55

1       Q.   There was a loan obtained by Priderock to
2   close that purchase; right?
3       A.   Correct.
4       Q.   And that was about $40 million?
5       A.   20 million.
6       Q.   How much capital was raised as part of the
7   second phase?
8       A.   About 120 million.  Somewhere between a 100
9   and 120 million.
10      Q.   And what documents would Priderock have with
11  regards to the amount raised in the investors in each of
12  those two phases through the capital raised?
13      A.   I don't know.  JD would know the answer to
14  that.
15      Q.   During the discussion with respect to
16  investors, was there any reliance on Webster to explain
17  the projected cash flows from the investment to
18  investors?
19      A.   Like I mentioned earlier, he talked to PSQ
20  and, I believe, two other small investors that invested
21  with us.  So --
22      Q.   Those are the only ones that you're aware
23  that Webster spoke with?
24      A.   I think he spoke to a number that didn't
25  invest, but I don't know who those are.

Page 56

1       Q.   Well, you're aware, are you not,
2   that's -- that they're -- Webster had a model, a
3   financial model, for the --
4       A.   Right.
5       Q.   Right.  And that investors were provided the
6   opportunity to have access to that model?
7       A.   Correct.
8       Q.   And did you find it valuable that Webster was
9   available to explain how the model worked to prospective
10  investors?
11      A.   Not particularly.  I could have explained it
12  as well as he did.  In fact, many of the calls we -- his
13  presentation style was so poor we had to restrict him
14  from speaking to the investors.
15      Q.   And tell me about that.  What do you mean by
16  that?
17      A.   Well, he was inaccurate with his facts.  He
18  would be on the phone, panting heavily.  So we would
19  have to make him mute.  And generally wouldn't give
20  concise, direct answers.  So we had to make him not
21  speak unless we ask him a specific question.
22      Q.   Why even have him involved with any
23  discussions then?
24      A.   It was more driven by him.  He wanted to be
25  involved as much as he could, but it became more of a

Page 57

1   nuisance to everybody.
2       Q.   You said that KeyBank -- it was necessary to
3   obtain a loan from KeyBank to close the purchase of the
4   first purchase of securities; right?
5       A.   No.
6       Q.   No?
7       A.   Not necessary.
8       Q.   Tell me why it wasn't necessary.
9       A.   We had a number of investors who wanted more.
10  We closed the loan because we thought it was going to
11  enhance the yield somewhat to the investors and, in
12  fact, the loan paid off in less than a -- or about a
13  year.  We didn't achieve the desired results with the
14  leverage, but we had two to three investors who wanted
15  much more and would have filled that gap.
16      Q.   Were you concerned about not being able to
17  obtain a loan from KeyBank?
18      A.   No.
19      Q.   Did you participate in any discussions with
20  David Shillington of KeyBank?
21      A.   Yes.
22      Q.   Sorry?
23      A.   I would say I was initially concerned about
24  it, and then David Khoury told me do not be concerned.
25  My family would like the rest of it.

Florida Court Reporting
561-689-0999

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 58

1     Q.  Why were you initially concerned?
2     A.  Because I'm a credit risk person, and I worry
3  about everything.
4     Q.  If KeyBank had not provided a loan and
5  Mr. Khoury's family wasn't available, what would have
6  been the impact on being able to close the purchase of
7  the first set of security?
8     A.  Well, we had several other families that
9  wanted more also.  So...
10    Q.  If you could look back to the PMM, which is
11  Exhibit 3.
12    A.  (Witness complies.)
13    Q.  Page 19, the section with regards to
14  Mr. Hughes, the paragraph that begins with "Dr. Hughes'
15  mortgage-backed security structuring and analytical
16  expertise is directly relevant to the fund."  And it
17  continues.  And it says:  "Effective negotiation and
18  management of the Controlling Class requires:  The
19  specialized understanding of the securitization
20  structures, processes and economics; highly detailed,
21  modeling of the investment cash flows, returns and
22  financing structures; and an in-depth understanding of
23  the underlying multifamily collateral."  And it
24  continues.
25        Who else at Priderock had that -- those

Page 59

1  structuring and analytical expertise?
2     A.  Well, I would say a combination of myself and
3  any, you know, analyst who can run an Excel spreadsheet.
4  So that would be Dan or Zhenshi and myself.
5     Q.  You independently didn't have the ability to
6  do that; is that correct?
7     A.  To run an Excel spreadsheet?
8     Q.  No.  To do this, what I've just read here.
9     A.  I've done this for $200 billion worth of
10  securities, sir.
11    Q.  All right.
12        MR. KAMMERER:  I'm sorry, Bill.  You had an
13  objection?
14        MR. MIOSSI:  No.  He answered it.  That's
15  fine.
16  BY MR. KAMMERER:
17    Q.  Well, let me just reread it.  It said:  "A
18  specialized understanding of securitization structures,
19  processes and economics and highly detailed modeling of
20  investment cash flows, returns and financing
21  structures."  That part I assume you could do, the
22  detailed modeling of the cash flows, returns, and
23  financing structures?
24    A.  I understand the financing structures.  I ran
25  the risk for the largest CMBS conduit in the country.  I

Page 60

1  understand them very well.  The modeling -- we have
2  analysts, Dan and Zhenshi, who can do that.
3     Q.  That's what I'm trying to --
4     A.  This was Webster's language.  We didn't write
5  it.
6     Q.  Fair enough.  But the modeling aspect, that's
7  just -- that's something you cannot do; right?
8     A.  Say what?
9     Q.  The modeling part, you could not do that?
10    A.  No.  Zhenshi does that and Dan.  They had to
11  go correct Webster's models.
12    Q.  What did they have to correct about his
13  models?
14    A.  They found numerous flaws.  I don't know what
15  they were.
16    Q.  What was the impact of those flaws?
17    A.  Gave you wrong answers.
18    Q.  What was the magnitude of the effect on the
19  fund?
20    A.  No magnitude because they all -- everything
21  was corrected.  The model is irrelevant to the fund.
22    Q.  The model is used just as part of raising
23  capital; right?
24    A.  I'm not sure I can answer that question.
25    Q.  What was the purpose of the model that

Page 61

1  Mr. Webster prepared?
2     A.  It had little relevance to me.  You'd have to
3  ask investors.  I don't know.
4     Q.  Why did Priderock even offer a model to
5  investors?
6     A.  We wanted to differentiate ourselves from
7  every other B-piece buyer who doesn't offer a model to
8  investors.
9     Q.  Because doing so you would have a -- your own
10  proprietary model, and you have an analyst who could
11  explain that model to investors.  Is that the idea?
12    A.  It turned out that most investors didn't even
13  look at it at all.
14    Q.  Do you believe that there's no value to a
15  model with regards to raising funds for the -- for -- in
16  regards to capital raises for this fund?
17        (Reporters clarifies.)
18  BY MR. KAMMERER:
19    Q.  Strike that.  That's fine.  It wasn't well
20  asked.
21        Do you see any value in any model for this
22  fund in regards to assisting and raising capital?
23    A.  That's hard for me to answer.  You'd have to
24  ask investors, and speaking to other B-piece buyers,
25  they would tell you there's no value.

16  (Pages 58 to 61)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                              10/11/2018
David Worley

Page 62

1      Q.   I'm asking for your view though because, you
2   know, you were part of raising the capital for the fund.
3      A.   I see limited value.  Some value.  Maybe a
4   little bit.  I'm not sure.
5      Q.   What is the value you see?
6      A.   Some transparency for people who want, you
7   know, to get into the weeds on past securities work,
8   which are very few people.
9      Q.   Who was involved with the negotiations with
10   KeyBank to obtain the loan that was used as part of the
11   first purchase or to close the first purchase?
12      A.   Define "negotiations."
13      Q.   Speak to KeyBank about getting the loan
14   approved.
15      A.   If you define "negotiations" as negotiating
16   the terms, the structure, the tenure --
17      Q.   That's fine.
18      A.   That would be myself and David Khoury.
19      Q.   Did Mr. Hughes have any involvement with
20   regards to obtaining the loan from Key Bank?
21      A.   He ran models as any analyst would do and
22   helped them understand the cash flow.
23      Q.   Was that of assistance to Priderock in
24   closing the loan from KeyBank?
25      A.   You'd probably have to ask KeyBank, but I

Page 63

1   suspect that the personal guarantees that Mr. Banks
2   Mr. Khoury, and myself put on the loan was probably the
3   biggest driver.
4      Q.   Do you know whether KeyBank had ever made a
5   loan as part of a -- to close a purchase as part of a
6   K-Deal?
7      A.   No, they had not --
8           MR. MIOSSI:  Could we go off the record just
9   one second?
10           MR. KAMMERER:  Sure.
11           THE WITNESS:  -- to my knowledge.
12           (Discussion held off the record.)
13   BY MR. KAMMERER:
14      Q.   Do you have any understanding of the
15   performance of the fund since the purchase of the first
16   securities?  The first K-Deal?
17      A.   Yes.
18      Q.   And what documents would show the performance
19   of the fund?
20      A.   I think our own internal model.
21      Q.   And who prepared that?
22      A.   Dan and Zhenshi.
23      Q.   And do they maintain it?
24      A.   Yes.
25      Q.   And that model shows the ongoing performance

Page 64

1   of the fund?
2      A.   Yes.
3      Q.   And that would include all three securities
4   purchases?
5      A.   Yes.
6      Q.   Are reports prepared for investors with
7   regards to the performance of the fund?
8      A.   They get monthly information with their
9   distributions.
10      Q.   And what monthly information would that be?
11      A.   I don't think it gives fund performance.
12   It's just what their distributions are.
13      Q.   Does the fund maintain any projections with
14   regards to the performance of the fund?
15      A.   I don't know.
16      Q.   Is there any projection with regards to the
17   management fees to be paid to whatever entity is going
18   to receive the management fees?
19      A.   I've not seen it projected out, but that
20   doesn't mean that it's not there.
21      Q.   Who would be in charge of doing that?
22      A.   Dan and Zhenshi.
23      Q.   What about projections with regards to the
24   promote?
25      A.   Same, but you'd have to ask Dan or Zhenshi.

Page 65

1      Q.   What documents exist with regards to the
2   amount of management fees earned to date by the
3   Priderock entity?
4      A.   Just the model, I believe.  I'm not sure what
5   else there is.  I mean, financial statements, I would
6   guess.
7      Q.   Are you aware of the amount of management
8   fees that the Priderock entity has received?
9      A.   Not specifically, no.
10      Q.   Do you know what entity is actually receiving
11   the management fees?
12      A.   No.
13      Q.   And do you know what entity will receive the
14   promote?
15      A.   No.
16      Q.   Will you receive a share of the promote?
17      A.   Yes.
18      Q.   Through an entity, or how will you receive
19   it?
20      A.   I don't know.  I haven't -- I don't know.  I
21   haven't looked into that.  That's so far in the future,
22   I've not even given it a moment's thought.
23      Q.   What percentage of the promote are you to
24   receive?
25      A.   I believe 30 percent.

17  (Pages 62 to 65)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                                      10/11/2018
David Worley

---

Page 66

1      Q.   What about Mr. Khoury?  What percentage of
2  the promote is he to receive?
3      A.   I believe the same.
4      Q.   And what about Mr. Banks?
5      A.   I believe the same.
6      Q.   Is there anyone else that's going to
7  participate in the promote?
8      A.   I believe Barb and Dan.
9      Q.   Do you have an understanding of how much of
10  the promote they will receive?
11      A.   I don't recall.
12      Q.   And then that's 100 percent between
13  the -- between yourself, Mr. Khoury, Mr. Banks,
14  Ms. Gaziano, and Mr. Ng?
15      A.   Like I say, I don't know their specific
16  numbers, and there might be more.
17      Q.   Do you know anyone else who might be
18  participating in the promote?
19      A.   No.
20      Q.   So basically the promote is going to be just
21  distributed to you and Mr. Khoury, Mr. Banks,
22  Ms. Gaziano, and Mr. Ng and whoever else may be that you
23  can't recall?
24      A.   Right.
25      Q.   Do you get a percentage of the management

---

Page 67

1  fees earned?
2      A.   I own a piece of the company that owns the
3  management fees.
4      Q.   And what company is that?
5      A.   I don't know the name of it.  I couldn't tell
6  you.
7      Q.   The distribution of the promote, is there an
8  agreement where that's written down as to how much
9  everybody gets?
10      A.   I believe it's in the general partner
11  agreement.
12      Q.   Any other documents you're aware of?
13      A.   No.
14      Q.   What percentage of the management fee do you
15  receive?
16      A.   I don't receive any percentage of the
17  management fee.  I own a percentage of the company that
18  receives management fees, but there's all kinds of
19  expenses that go into that company.  So...
20      Q.   What is the compensation that you receive on
21  a monthly basis for being the portfolio manager of
22  the --
23      A.   20,000 a month.
24      Q.   That's a salary?
25      A.   It's a salary, yeah.

---

Page 68

1      Q.   Whatever distributions do you receive as a
2  part of a -- being an owner of the company with regards
3  to the fund?
4      A.   I've received no other distributions.
5      Q.   What other distributions are you entitled to
6  receive?
7      A.   Nothing.  I'm not entitled to anything unless
8  we elect to make a distribution, but to date, all we've
9  had is capital calls.  We're losing money, not making
10  money.  So I can't distribute any losses.
11      Q.   Who is losing money?
12      A.   The asset management company that I own a
13  piece of.
14      Q.   And why is that?
15      A.   Because our expenses are higher than our
16  revenue.
17      Q.   What expenses does the company have -- and I
18  understand we don't have the document in front of
19  us -- that you can recall?
20      A.   I'd have to refer to the income statement,
21  but my salary is one of them.  I can give you a few of
22  them.  There's money we pay for the capital raise.
23  There's accounting fees.  There's audit fees.  There's
24  overhead costs, you know, for computers, rent,
25  et cetera.  There's our fund administrator fees to

---

Page 69

1  O'Connor & Davies.  There's probably more in there.
2      Q.   The fund manager, whatever entity it is,
3  doesn't have a separate office, does it?  It operates
4  out of the Priderock Capital Partners offices; right?
5      A.   Right.  We've got -- basically my office
6  and -- is in there, and that's basically where the fund
7  is, yeah.  We pay for that space.
8      Q.   And Mr. Ng and Ms. Gaziano, they're employees
9  of Priderock Capital Partners; right?
10      A.   Correct.
11      Q.   And as is, I assume, Mr. Khoury and
12  Mr. Banks?
13      A.   I don't know if they're employees or owners
14  of such, yeah.
15      Q.   So it sounds to me, though, the expenses
16  you're referring to are just an allocation of whatever
17  pro rata share the space that --
18      A.   Space, computers, IT, you know, insurance
19  costs, I mean, you know.
20      Q.   Because the entity you're referring to
21  doesn't own its own equipment; right?  It doesn't have
22  any separate employees other than you?
23      A.   Right.  I'm the only employee.
24      Q.   And it didn't own any equipment, does it?
25      A.   I don't know who my -- who owns my computer.

---

18  (Pages 66 to 69)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 70

1    I couldn't tell you.
2        Q.   All right.  We discussed earlier about the
3    compensation Mr. Hughes is to receive for his work, and
4    we talked about the difference between specing his work
5    versus getting paid for his work.  And you said that
6    there were no figures discussed initially is my
7    recollection of what you testified.
8        A.   Right.  When we first started talking.
9        Q.   Now, Mr. Hughes had stated that early on
10   there was a discussion between you and him and
11   Mr. Khoury, that he was to receive effectively
12   10 percent of the management fees to be earned by the
13   fund and 10 percent of the promote earned by the fund.
14       A.   That's untrue.  That would be a lie.
15       Q.   Okay.  Did you ever have a discussion,
16   anywhere remotely near to that with him?
17       A.   No.  Did he say that under oath?
18       Q.   I think it's in the complaint.
19       A.   Did he say that under oath?
20           MR. MIOSSI:  No.  It's a one-way street here.
21   He gets to ask the questions; you answer them.
22           THE WITNESS:  Okay.
23           MR. MIOSSI:  It goes smoother that way.
24           MR. KAMMERER:  We're not in a senate
25   confirmation hearing of a justice unfortunately.

Page 71

1    BY MR. KAMMERER:
2        Q.   I'm going to mark -- hand you this mystery
3    document here.
4           MR. KAMMERER:  Please mark this as Exhibit
5    21.
6           (Plaintiff's Exhibit 21 was marked for
7    identification.)
8    BY MR. KAMMERER:
9        Q.   Are you familiar with this document?
10       A.   No.  Never seen it before.
11       Q.   Do you know whose handwriting that is?
12       A.   I have no idea.  It's not mine.
13       Q.   Did you ever provide this to Mr. Hughes?
14       A.   Not that I recall.
15       Q.   Well, let's look at this.  175,000 annual
16   salary and bonus.  That's right.  175,00 annual salary,
17   25 to 35,000 bonus, 5 percent promote share, expenses.
18   I can't read that word.  Database.  And can't read the
19   word.  Reimbursed.  Something about pick share of annual
20   upper DW database jointly owned.
21           Does any of that refresh your recollection
22   or -- as to any conversations you may have had with
23   anyone at Priderock with regards to Dr. Hughes's
24   compensation?
25       A.   So this is similar to what I told you

Page 72

1    after -- you know, after we initially started.  You
2    know, somewhere along the road, we started talking about
3    compensation, and I told you it was around 200,000 a
4    year, which 175 plus 25 equals about 200.  And we were
5    offering a piece of the promote.
6           I can't read these words.  So I don't know
7    what those other things are.
8        Q.   You don't recognize --
9        A.   And this looks similar to the written offer
10   that we gave him that he rejected.
11       Q.   All right.  Let's ask you this.  I'm going to
12   hand you some documents that --
13           MR. KAMMERER:  I'm not going to remark
14   because they were marked previously at -- when you
15   took Mr. Hughes's deposition.  All right, Bill?
16           MR. MIOSSI:  It's your deposition.
17           MR. KAMMERER:  What's that?
18           MR. MIOSSI:  It's your deposition; however
19   you want to do it.
20           MR. KAMMERER:  That's fine.  I don't want to.
21   I think we can refer to them.
22   BY MR. KAMMERER:
23       Q.   Exhibit 2 was marked at Mr. Hughes's
24   deposition.  This is an email dated October 24, 2016.
25       A.   Uh-huh.

Page 73

1           MR. MIOSSI:  Just one thing.  The
2    highlighting on here was -- this highlighting
3    that -- you put on; is that right?
4           MR. KAMMERER:  That's correct.
5           MR. MIOSSI:  Okay.  Continue.
6    BY MR. KAMMERER:
7        Q.   Do you recall receiving this email?
8        A.   I don't specifically recall it, but if it's
9    addressed to me, I probably received it.
10       Q.   All right.  Do you recall in general in late
11   October 2016 that Mr. -- Dr. Hughes sent a draft of -- a
12   written draft laying out the compensation terms?
13       A.   I recall -- I don't know when but him sending
14   a draft, yep.
15       Q.   Okay.  If you would look at -- let's see.
16   Exhibit B deals with compensation.
17           MR. MIOSSI:  Second to last page.
18   BY MR. KAMMERER:
19       Q.   All right.  This provides 10 percent of all
20   company fees plus in addition to be determined a percent
21   of all company fees received by company pursuant to
22   company fee agreements executed during the term of this
23   agreement.
24           All right.  So I'm trying to get an
25   understanding from your perspective of when you and

                                   19  (Pages 70 to 73)

Florida Court Reporting
561-689-0999

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 74

1    Mr. Khoury and Mr. -- and Dr. Hughes started actually
2    talking about numbers with regards to his compensation.
3    Was it around this time?
4        A.  I couldn't tell you.
5        Q.  Do you recall having any discussions with
6    Dr. Hughes with regards to him receiving a percentage of
7    the management fees and a percentage of the other fees
8    to be earned from the fund?
9        A.  I don't recall specifically.  I mean, my only
10   conversations with him around compensation is nobody
11   would ever give you a percentage of any fees, and nobody
12   is going to give you a long-term contract.  I told him,
13   you know, the only long-term contracts are people in
14   sports that I'm aware of.  And I used Alex Rodriguez.
15   You know, like, I told him you're no A-Rod.  You're not
16   even close.
17       So the rest of us don't work with a contract
18   and, you know, we would expect you to be the same.  And
19   I told him numerous times the term "sweat
20   equity" -- you've done nothing.  You're not signing a
21   guarantee.  You're not putting any capital in.  You
22   didn't have much value.  We'll offer you a job, which we
23   did and, you know, he declined our offer.
24       Q.  Okay.  Did you ever offer Dr. Hughes a
25   percentage of the promote to be earned?

Page 75

1        A.  I believe in our job offer -- our written job
2    offer, we offered him a percentage of the promote.
3    Absolutely.
4        Q.  Do you recall what that amount was?
5        A.  I don't recall specifically.  Less than 10
6    percent but...
7        Q.  All right.  Well, let's go through some of
8    these and see if we can trigger your memory a little
9    better.  Okay.  I'm going to hand you a --
10       A.  Why don't you just pull out my job offer?
11   That lays it all out.
12       Q.  Well, because there was this --
13       A.  This is just him telling us what he wants.
14       MR. MIOSSI:  That's okay.
15       THE WITNESS:  I wouldn't even have read this.
16   BY MR. KAMMERER:
17       Q.  Yeah.
18       A.  I don't care what he wants.
19       Q.  All right.  Let me hand you what was marked
20   as Exhibit 3.  This was an email from Dr. Hughes dated
21   November 4th, 2016, to Mr. Khoury and yourself and
22   Mr. Banks.  In the email, he says I went over the
23   agreement with DW, which I assume means you; is that a
24   fair statement?
25       A.  It's a fair statement that I'm DW.

Page 76

1        Q.  All right.  I'm going to show you just a
2    couple of these just to see if you recall having any
3    conversation with Dr. Hughes.  I'll hand you what we've
4    marked as Exhibit 4 at Dr. Hughes's deposition.  You're
5    not copied on this so it's not going to help you.  I'll
6    show you Exhibit Number 5.
7        MR. KAMMERER:  I handed you a copy there,
8    Bill.
9    BY MR. KAMMERER:
10       Q.  All right.  Exhibit Number 5 is from
11   Dr. Hughes's deposition, and it's an email dated
12   December 20th, 2016, from Dr. Hughes to you.  This
13   states:  "I received the Agreement" -- sorry -- "I
14   revised the Agreement to bring it more in line with what
15   I think you, DK, and George think is fair and desire to
16   accomplish."
17       Again, do you have any recollection of having
18   discussions with Mr. -- with Dr. Hughes with regards to
19   providing him a percentage of the promote?
20       A.  Yes.
21       Q.  Okay.  When is it -- from -- when is it your
22   testimony the first time that there was a discussion
23   with Dr. Hughes with regards to providing him a
24   percentage of the promote?
25       A.  I don't recall.

Page 77

1        Q.  Does looking at any of these documents in the
2    emails help you recall that?
3        A.  No.
4        Q.  When you say you don't recall -- I mean, I'm
5    looking at something -- we looked at a couple of emails
6    in November and December of 2016; okay?  Right?
7        A.  Right.
8        Q.  Would you have had a discussion -- do you
9    recall having a discussion with Dr. Hughes prior to
10   November of 2016 with regards to Priderock providing him
11   with a percentage of the promote?
12       A.  I just don't recall dates specifically.  When
13   you get old, years blend together, and so I just don't
14   recall when those conversations happened.
15       Q.  I'm going to hand you what was marked as
16   Exhibit 9 at Dr. Hughes's deposition.  This is an email
17   from David Khoury dated January 24th, 2017, to
18   Dr. Hughes and cc'd to you.  It states:  "We still need
19   to go over the expenses, but we wanted to make this
20   really simple...base, bonus and piece of the promote for
21   the first fund."
22       A.  Right.
23       Q.  "We can work the reimbursements and some
24   ongoing expenses, but those need to be vetted.  We are
25   not looking to create some large cost center.  We've

20  (Pages 74 to 77)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                          10/11/2018
David Worley

Page 78

1   outlined a deal we view is fair and consistent with the
2   initial discussion.  Let's discuss when you are down
3   tomorrow."
4          MR. MIOSSI:  The second page of this exhibit
5   is blank.  Just pointing it out.
6          MR. KAMMERER:  Yeah.  I think that's the way
7   it was in the deposition.
8          MR. MIOSSI:  Okay.
9   BY MR. KAMMERER:
10     Q.   All right.  In the email Mr. Khoury says or
11  writes:  "We have outlined a deal we view is fair and
12  consistent with the initial discussions."  Do you know
13  what initial discussions Mr. Khoury is referring to?
14     A.   No, not really.  I mean, I think he would
15  have separate discussions with Mr. Khoury without me in
16  the office or whatever, but all of our decisioning is
17  unanimous.  And Webster knew that, and he was told
18  numerous times that we all -- every decision that's
19  made -- and it's in our partnership agreement -- has to
20  be a unanimous decision.
21     Q.   Do you have any recollection of when there
22  was an initial discussion either between you and
23  Dr. Hughes or between Mr. Khoury and Dr. Hughes and with
24  regards to the compensation he would be paid for his
25  work?

Page 79

1      A.   I can't recall exactly.
2      Q.   Well, "exact" to me means date and a month
3   and a year.  What about within --
4      A.   I think it would be -- I think 2016.  I can
5   zero in to that.
6      Q.   When in 2016?
7      A.   I couldn't tell you.
8      Q.   Whether at the beginning or the end?
9      A.   I'm running a bank.  I'm running -- trying to
10  raise -- do a fund.  I got a zillion things going on in
11  my life and focusing on, you know, Webster calling me
12  every ten minutes about how much he's going to get paid
13  was, like, on the bottom of my priority list.
14     Q.   Well, when was that occurring?
15     A.   2016.
16     Q.   No.  You said that he was -- Webster was
17  calling you every -- did you say ten minutes about how
18  much he was going to get paid?
19     A.   Yeah.
20     Q.   I recognize that's an exaggeration, but
21  apparently he was calling you about his compensation?
22     A.   And sometime in the second half of 2016.  I
23  can zero it down to that.
24     Q.   And this is before any of these documents, I
25  assume?  The exhibits that we've been looking at?  These

Page 80

1   emails?
2      A.   I don't know.  I can't recall.
3      Q.   Okay.  I'm going to hand you what was marked
4   as Exhibit 13 at Dr. Hughes's deposition.
5      A.   Okay.
6      Q.   And your email is in response to the email in
7   the second page from Dr. Hughes?
8          MR. MIOSSI:  Why don't you read it first.
9          THE WITNESS:  (Witness complies.)
10         MR. MIOSSI:  Off the record for just a
11  second.
12         (Discussion held off the record.)
13         (A brief recess was taken.)
14  BY MR. KAMMERER:
15     Q.   You can confirm that you sent this email
16  February 7th, 2017; right?
17     A.   Yes.
18     Q.   All right.  Do you see in the first
19  paragraph, which is highlighted:  "A year ago you and
20  David Khoury and I spoke about what your role might look
21  like if the fund ever got formed.  We had talked about a
22  $200,000 salary and a 10% promoted interest."
23     A.   Correct.
24     Q.   Does that refresh your recollection with
25  regards to any conversation that you had with Dr. Hughes

Page 81

1   and Mr. Khoury?
2      A.   Yeah.
3      Q.   Tell me what you recall.
4      A.   I recall having that conversation, and then
5   Mr. Khoury talked to Mr. Banks.  And Mr. Banks said no
6   way on 10 percent promote.
7      Q.   Did anyone relay that to Dr. Hughes?
8      A.   Yes.
9      Q.   Who relayed that to Dr. Hughes?
10     A.   I believe both of -- David Khoury and myself.
11  I know for sure me and I think David also.
12     Q.   So a year ago would have been approximately
13  February of 2016; right?
14     A.   Yep.  And then after that, everything died
15  down for a good long while.
16     Q.   The concept here though, the $200,000 salary,
17  as you wrote, would be only after the fund was launched;
18  right?
19     A.   Correct.
20     Q.   And the fund was launched in April of 2017
21  with the first purchase?
22     A.   I believe so, yes.
23     Q.   If you look in the third paragraph and the
24  fourth -- or the third line.  Well, let me read it to
25  put it in proper context:  "The $200,000 per year on a

                                    21  (Pages 78 to 81)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 82

1    two year contract, annually renewable, plus a piece of
2    the promote, is what we are offering.  It is more than
3    fair given the little amount of time you will be
4    required to spend on it."
5            Now, that's a reference to going forward
6    after the purchase; right?
7        A.   Correct.
8        Q.   And why do you say the little amount of time
9    you will be required to spend on it.
10       A.   Because his role being an analyst -- that
11   doesn't require much time.
12       Q.   After the purchase of the fund?
13       A.   Right.
14       Q.   Sorry.  After the first securities purchase;
15   right?
16       A.   Right.  This is the work that Zhenshi and Dan
17   do, and they spend, you know, maybe two days a month.
18       Q.   What about for all the work that he had done
19   prior to the first purchase?  How was he to be
20   compensated for that?
21       A.   Getting the job was his compensation.
22       Q.   So basically it's earning a job is what he
23   was getting?
24       A.   Right.  Just like I did.
25       Q.   In the first paragraph, one, two, three,

Page 83

1    four, five, five lines down, you wrote:  "We have all
2    spent a great deal of time on this."
3            What is that a reference to?
4        A.   Kind of everybody from myself, David Khoury,
5    George Banks, Dan Webster, Jonathan Diamond had all
6    spent a great deal of time getting the fund ready to
7    launch.
8        Q.   Do you recall having any discussions with
9    Dr. Hughes with regards to payment of expenses that he
10   incurred prior to the launch of the fund?
11       A.   I mean, we did have conversations.  I told
12   him relevant expenses, turn them in to Priderock, and
13   they'll pay them.  But he was trying to get Priderock to
14   pay for office space, and he told me all along he had
15   two or three other businesses he was running and this
16   and that.  And I said we're not paying for your office
17   space to run three businesses out of.
18       Q.   What would relevant expenses have been to
19   you?
20       A.   I think travel expenses primarily, you know,
21   office supplies, that kind of thing.
22       Q.   Has Priderock paid any of the expenses that
23   Dr. Hughes incurred that he submitted for reimbursement?
24       A.   I couldn't tell you.
25       Q.   Who would know that?

Page 84

1        A.   I guess the accounting people.
2        Q.   Okay.
3            MR. KAMMERER:  No further questions.
4            MR. MIOSSI:  Thank you.  We'll reserve the
5    right to read and sign.
6            (Deposition concluded at 2:55 p.m.)
7                    - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

1            CERTIFICATE OF OATH
2    THE STATE OF FLORIDA
3    COUNTY OF PALM BEACH
4
5
6        I, the undersigned authority, certify that
7    DAVID S. WORLEY personally appeared before me and was
8    duly sworn.
9
10       Dated this 22nd day of October, 2018.
11
12
13
14
                _____
15       Pamela J. Pelino, RPR, FPR, CLR
         Notary Public - State of Florida
16       My Commission No.:  GG 225932
         My Commission Expires:  June 7, 2022
17
18
19
20
21
22
23
24
25

                                    22  (Pages 82 to 85)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                    10/11/2018
David Worley

Page 86

1         C E R T I F I C A T E
2    THE STATE OF FLORIDA
3    COUNTY OF PALM BEACH
4
5       I, Pamela J. Pelino, Registered Professional Court
     Reporter and Notary Public in and for the State of
6    Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
7    stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
8    deposition.
9       I further certify that said deposition was taken at
     the time and place hereinabove set forth and that the
10   taking of said deposition was commenced and completed as
     hereinabove set out.
11
        I further certify that I am not attorney or counsel
12   of any of the parties, nor am I a relative or employee
     of any attorney or counsel of party connected with the
13   action, nor am I financially interested in the action.
14      The foregoing certification of this transcript does
     not apply to any reproduction of the same by any means
15   unless under the direct control and/or direction of the
     certifying reporter.
16
        Dated this 22nd day of October, 2018.
17
18
19
20
     _____
21      Pamela J. Pelino, RPR, FPR, CLR
22
23
24
25

Page 87

1
2          C E R T I F I C A T E
3               - - -
4    THE STATE OF FLORIDA
5    COUNTY OF PALM BEACH
6       I hereby certify that I have read the foregoing
7    deposition by me given, and that the statements
8    contained herein are true and correct to the best of my
9    knowledge and belief, with the exception of any
10   corrections or notations made on the errata sheet, if
11   one was executed.
12
13      Dated this _____ day of _____, 2018.
14
15
16
17
18   _____
     DAVID S. WORLEY
19
20
21
22
23
24
25

Page 88

1          E R R A T A   S H E E T
2    IN RE: HUGHES V. PRIDEROCK
3    CR: PAMELA J. PELINO, RPR, FPR, CLR
4    DEPOSITION OF: DAVID S. WORLEY
5    DATE TAKEN: October 11, 2018
6       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
7    PAGE #  LINE #   CHANGE          REASON
     _____
8
     _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   Please forward the original signed errata sheet to this
     office so that copies may be distributed to all parties.
21
     Under penalty of perjury, I declare that I have read my
22   deposition and that it is true and correct subject to
     any changes in form or substance entered here.
23
     DATE: _____
24
     SIGNATURE OF DEPONENT:_____
25

                          23  (Pages 86 to 88)

100c8d72-1ef4-4376-9387-555fa17375ac

Hughes v. Priderock                                      10/11/2018
David Worley

Page 89

**A**

**A-Rod** 74:15
**a.m** 1:16
**ability** 31:6 49:6
  59:5
**able** 22:15 57:16
  58:6
**absolutely** 47:6
  75:3
**accepted** 25:16
**access** 38:23 39:2
  40:16 41:21
  56:6
**accomplish** 76:16
**accounting** 16:21
  68:23 84:1
**accurate** 6:18
  24:9 53:9,18
  54:8
**achieve** 57:13
**acquire** 15:3
**acquired** 13:8
**acquires** 42:11
**acquiring** 13:4
**acquisition** 14:18
  28:15,20 29:4
**acquisitions** 15:4
**action** 44:25
  86:13,13
**added** 37:17
**addition** 73:20
**Address** 6:3
**addressed** 73:9
**Ades** 22:24,25
**administrator**
  68:25
**advent** 19:6
**affiliate** 8:15
**affiliated** 8:17
  15:24 39:8
**affiliation** 15:9
**affirmed** 4:10
**aggregate** 46:2
**ago** 80:19 81:12
**agree** 5:9,17

**agreement** 67:8
  67:11 73:23
  75:23 76:13,14
  78:19
**agreements** 73:22
**ahead** 5:23
**AKA** 18:17
**Alex** 74:14
**allocate** 41:12,17
**allocated** 30:19
  30:22 40:12
  43:8 49:24
**allocation** 50:2
  69:16
**allow** 5:11
**allowed** 54:20
**amount** 27:16
  46:7 53:23,24
  54:3,14 55:11
  65:2,7 75:4 82:3
  82:8
**analysis** 23:11
**analyst** 9:23
  19:25,25 35:4,7
  59:3 61:10
  62:21 82:10
**analysts** 20:1 24:2
  60:2
**analytical** 58:15
  59:1
**analytics** 24:18
**analyze** 20:2
**analyzed** 20:4
**and/or** 86:15
**Announcement**
  3:13
**announces** 40:5
**annual** 71:15,16
  71:19
**annually** 82:1
**answer** 5:11,23
  8:20 26:12 27:2
  29:21 55:13
  60:24 61:23
  70:21

**answered** 59:14
**answers** 5:13
  56:20 60:17
**apartment** 13:5
  13:18,20 14:19
  15:2 31:6 39:11
**apartments** 13:16
  14:8
**apparently** 79:21
**APPEARANCES**
  2:1
**appeared** 85:7
**appears** 6:20 27:8
**apply** 40:10,11
  86:14
**approval** 41:8
**approved** 30:13
  38:25 41:5
  62:14
**approximately**
  9:25 10:1,17
  12:3 36:14
  53:14 81:12
**April** 35:18,24
  36:2,9,22 52:12
  52:15 53:4
  81:20
**area** 45:7
**arm** 44:15
**asked** 14:5,7,17
  15:7 16:11,13
  21:24 22:18
  61:20
**asking** 33:2 62:1
**aspect** 41:1 42:12
  60:6
**asset** 7:25 13:2,13
  13:17 68:12
**asset-by-asset**
  18:11
**assistance** 62:23
**assisting** 16:1
  61:22
**associated** 25:23
  26:2 27:5

**assume** 18:21
  24:9 38:7 42:5
  51:22 59:21
  69:11 75:23
  79:25
**attended** 6:23,24
**attorney** 32:5
  86:11,12
**attorneys** 4:16
  8:20
**auction** 40:19,19
  41:5,6,14 42:8
  43:5 49:5
**auctions** 40:18
  49:3,18,23
**audit** 68:23
**Austin** 6:22
**authority** 85:6
**authorized** 86:6
**available** 24:14
  26:24 56:9 58:5
**award** 43:1
**awarding** 43:1
**aware** 55:22 56:1
  65:7 67:12
  74:14

**B**

**B** 3:9 73:16
**B-piece** 18:17,19
  61:7,24
**BA** 7:1
**back** 19:13 41:19
  43:21 58:10
**backed** 17:20
  20:18
**bad** 15:21
**balance** 19:5
**ballpark** 27:17
  52:5
**bank** 9:16,18,20
  9:22 10:3,9
  11:23 62:20
  79:9
**Banks** 14:12

**15:17 16:1
  31:22 38:7
  50:19 51:12
  63:1 66:4,13,21
  69:12 75:22
  81:5,5 83:5
**Barb** 31:23 32:12
  45:7 66:8
**base** 23:2 77:20
**based** 27:14,20
  29:21 46:20
  47:8 48:19
**basically** 15:11
  26:19,21 31:5
  35:4 43:13
  44:14 54:16
  66:20 69:5,6
  82:22
**basis** 18:11,13
  45:11 67:21
**Beach** 1:18 2:5
  6:4 85:3 86:3
  87:5
**becoming** 26:2
  32:16
**began** 10:14 13:22
  13:25 16:1 21:3
**beginning** 20:21
  33:16,18,20
  79:8
**begins** 58:14
**behalf** 2:2,9
**belief** 87:9
**believe** 9:4 10:22
  13:22 16:9
  20:23 28:19
  38:15 41:10
  42:6 51:25 52:2
  55:20 61:14
  65:4,25 66:3,5,8
  67:10 75:1
  81:10,22
**believed** 22:12
**best** 14:23,25,25
  87:8

Hughes v. Priderock                                          10/11/2018
David Worley

**better** 75:9
**bid** 41:5 42:8,17
  43:8,8 49:2,15
  50:5
**bidding** 40:21
  43:5
**bids** 40:22 41:15
  41:16
**big** 39:8
**bigger** 24:3
**biggest** 63:3
**Bill** 59:12 72:15
  76:8
**billion** 59:9
**bio** 27:10
**bit** 20:8 24:22
  37:14 38:8 62:4
**black** 41:16
**blank** 78:5
**blend** 77:13
**Bloomberg** 26:24
**blurry** 26:5
**board** 11:25 12:2
  26:17
**bond** 43:2 53:10
  53:11,13 54:3,4
**bonds** 16:13 29:3
  29:4 30:14
**bonus** 46:20 48:18
  71:16,17 77:20
**book** 30:10
**borrower** 30:12
  39:8
**bottom** 12:23
  79:13
**bought** 43:13 47:8
**box** 41:16
**boxes** 39:9
**BP** 23:17,17
**brief** 80:13
**bring** 26:17 50:22
  76:14
**bringing** 51:1
**brought** 37:9,11
**budget** 9:23 26:19

26:21
**build** 23:4
**building** 23:25
  24:1,4 26:19
  31:6
**built** 16:21 23:18
  37:5,6
**bulk** 38:4
**bunch** 23:16
**business** 10:7
  19:10 20:10,15
  26:13
**businesses** 83:15
  83:17
**buy** 16:12 30:18
**buyer** 18:17,19
  30:13 40:16
  61:7
**buyers** 61:24
**buying** 39:7

**C**

**C** 4:1 86:1,1 87:2
  87:2
**Calendar** 3:13
**call** 8:7 20:20 44:9
**called** 12:4 21:24
**calling** 79:11,17
  79:21
**calls** 56:12 68:9
**capacities** 31:25
**capacity** 36:12
**capital** 1:7 7:19
  7:20 8:16,18,22
  11:10 12:20
  13:1,13,15 14:2
  15:16 28:4,7
  38:2 39:16
  41:22 42:3 43:5
  43:10 50:16,25
  50:25 52:9,22
  53:5 54:17,19
  55:6,12 60:23
  61:16,22 62:2
  68:9,22 69:4,9

74:21
**care** 75:18
**careers** 13:10
**CASE** 1:2
**cash** 26:21 37:16
  55:17 58:21
  59:20,22 62:22
**cause** 4:6
**cc'd** 77:18
**center** 77:25
**central** 11:2,5
**certain** 24:8 32:9
  32:10,13 37:25
  39:22 40:22,23
  40:24,24 54:13
**certainly** 23:23
  32:14
**CERTIFICATE**
  85:1
**certification**
  86:14
**certifications** 7:7
**certify** 85:6 86:6,9
  86:11 87:6
**certifying** 86:15
**cetera** 68:25
**chairman** 11:25
  12:2
**chance** 25:3,5
  33:3,4,13 34:8
**CHANGE** 88:7
**changes** 88:6,22
**charge** 64:21
**Charlotte** 19:14
  21:10,11 22:11
  25:20
**Check** 39:9
**chief** 11:10,17
  16:19
**choice** 49:25,25
  50:1
**choose** 51:4
**chose** 33:12
**Chris** 4:15
**CHRISTOPHER**

2:3
**ckammerer@k...**
  2:6
**clarifies** 61:17
**clarify** 5:20
**Class** 30:6 58:18
**close** 27:19 40:21
  43:10,11,12
  54:18 55:2 57:3
  58:6 62:11 63:5
  74:16
**closed** 52:11,13
  52:14 57:10
**closes** 42:20,24
**closing** 43:2,6
  54:19 62:24
**CLR** 1:22 85:15
  86:21 88:3
**CMBS** 59:25
**CMBS-like** 23:5
**cofounded** 12:6
**cohesive** 31:17
**collateral** 58:23
**combination** 45:5
  59:2
**come** 14:5,7 21:19
  26:22
**comes** 51:8
**commenced** 86:10
**Commerce** 9:18
  10:3 11:23
**commercial** 10:12
  11:5,7 17:20
  20:18
**Commission**
  85:16,16
**commitment** 42:7
**commodities** 39:6
**common** 26:14
**communities** 13:5
**company** 7:16
  12:6,10 13:13
  38:10 67:2,4,17
  67:19 68:2,12
  68:17 73:20,21

73:21,22
**compensated**
  82:20
**compensation**
  34:6 35:7 67:20
  70:3 71:24 72:3
  73:12,16 74:2
  74:10 78:24
  79:21 82:21
**competitor** 16:19
**complaint** 70:18
**complete** 44:22
**completed** 86:10
**complexes** 13:18
  13:20 14:19
  15:2
**complies** 58:12
  80:9
**computer** 23:20
  25:22 69:25
**computers** 68:24
  69:18
**concept** 21:18
  81:16
**concerned** 57:16
  57:23,24 58:1
**concise** 56:20
**concluded** 84:6
**conduit** 59:25
**confirm** 80:15
**confirmation**
  70:25
**confusing** 5:19
**connected** 86:12
**conservancy** 19:4
  19:6
**consistent** 78:1,12
**consulting** 15:18
  20:21 21:1,3
**contact** 20:12
**contained** 87:8
**context** 81:25
**continental** 13:5
**contingency** 25:8
  25:9

Hughes v. Priderock
David Worley

10/11/2018

Page 91

**Continue** 73:5
**continues** 58:17
  58:24
**contract** 74:12,17
  82:1
**contractor** 15:10
**contracts** 74:13
**contributed** 32:6
  32:8,12 37:3
**control** 86:15
**controller** 10:4
**Controlling** 30:6
  58:18
**convenience** 5:9
**conversation** 16:9
  76:3 80:25 81:4
**conversations**
  71:22 74:10
  77:14 83:11
**copied** 76:5
**copies** 88:20
**copy** 6:18 76:7
**correct** 7:3 10:16
  16:3 17:20,21
  17:24 18:3 19:3
  28:6,10,13
  29:14,18 30:20
  30:21,23 31:21
  36:4 38:15 41:7
  42:21,22 43:16
  45:2,12,20
  46:13 47:1,3,9
  47:11 48:12,16
  49:3,9 51:6,9
  55:3 56:7 59:6
  60:11,12 69:10
  73:4 80:23
  81:19 82:7 86:7
  87:8 88:22
**corrected** 60:21
**corrections** 87:10
**cost** 77:25
**costs** 68:24 69:19
**counsel** 86:11,12
**country** 59:25

**County** 6:4,6,7
  85:3 86:3 87:5
**couple** 22:3,22
  27:3 51:19 76:2
  77:5
**course** 24:17
  25:20 26:2
**court** 1:1,23 4:4
  5:7 86:5
**cover** 35:21
**CR** 88:3
**create** 16:4,12
  38:10 77:25
**created** 38:14
**creating** 16:8 28:4
  28:8 37:23,25
**creation** 20:19
  38:6,9 41:20
**credit** 11:2,6,8
  58:2
**CROSS** 3:4
**cumulative** 31:18
**current** 6:2 7:13
**currently** 13:10

**— D —**

**D** 3:2,9 4:1
**D.C** 6:11
**Dan** 31:23 36:18
  45:6 59:4 60:2
  60:10 63:22
  64:22,25 66:8
  82:16 83:5
**database** 71:18,20
**date** 35:15 36:2
  65:2 68:8 79:2
  88:5,23
**dated** 72:24 75:20
  76:11 77:17
  85:10 86:16
  87:13
**dates** 77:12
**David** 1:14 3:4
  4:9 14:13 16:6
  16:10 24:20

31:22 32:13
  37:15 50:18
  51:13 57:20,24
  62:18 77:17
  80:20 81:10,11
  83:4 85:7 87:18
  88:4
**Davies** 69:1
**day** 85:10 86:16
  87:13
**days** 14:4 82:17
**DC** 2:11
**deal** 39:12,23
  40:12,13,17,20
  41:12 42:11,12
  42:17 43:9 49:2
  49:11,11 52:11
  78:1,11 83:2,6
**dealer** 54:4
**deals** 15:1 40:5
  42:12 49:12,22
  49:24 73:16
**dealt** 54:5
**debt** 8:4 14:23,25
  16:11,17,20
  17:10,13 18:7,8
**decade** 31:24
**December** 76:12
  77:6
**decision** 49:1
  78:18,20
**decisioning** 78:16
**decisions** 44:16
**declare** 88:21
**declined** 74:23
**default** 44:3 47:25
  48:4,6,6,11
**Defendant** 1:8 2:9
**define** 4:23 62:12
  62:15
**Delaware** 8:9
  38:15
**depending** 45:22
  47:14 48:1
**depends** 46:7

**DEPONENT**
  88:24
**deposition** 1:14
  4:3,17 29:7,23
  72:15,16,18,24
  76:4,11 77:16
  78:7 80:4 84:6
  86:6,8,9,10 87:7
  88:4,22
**depositions** 5:4
**derived** 26:15
**described** 23:9
  42:23
**describes** 13:12
**DESCRIPTION**
  3:10
**desire** 76:15
**desired** 57:13
**detailed** 58:20
  59:19,22
**details** 34:16
**determine** 24:7
**determined** 73:20
**Determining**
  49:15
**developed** 13:9
**developing** 13:4
**Diamond** 35:17
  50:18 51:12
  83:5
**dictate** 41:18
**died** 81:14
**difference** 18:6,16
  39:21 53:12
  70:4
**differentiate** 61:6
**differently** 16:20
**diligence** 42:14
  43:6,10
**direct** 3:4 4:13
  56:20 86:15
**direction** 86:15
**directly** 58:16
**director** 24:18
**disagree** 47:19,20

**discount** 53:13
**discuss** 33:24 78:2
**discussed** 34:21
  38:6 70:2,6
**discussion** 16:15
  23:14 37:18
  55:15 63:12
  70:10,15 76:22
  77:8,9 78:2,22
  80:12
**discussions** 20:24
  21:4,12 32:18
  32:20 33:14
  34:13,16,23
  35:6 56:23
  57:19 74:5
  76:18 78:12,13
  78:15 83:8
**dissect** 27:2
**distribute** 68:10
**distributed** 66:21
  88:20
**distribution** 45:10
  67:7 68:8
**distributions** 45:2
  45:4,8 64:9,12
  68:1,4,5
**DISTRICT** 1:1,1
**division** 11:9,18
**DK** 76:15
**document** 6:13
  39:25 68:18
  71:3,9
**documents** 38:17
  53:22 55:10
  63:18 65:1
  67:12 72:12
  77:1 79:24
**doing** 15:18 16:23
  19:10 21:3
  36:16 43:5 48:2
  61:9 64:21
**dollar** 34:20 54:4
**Donlon** 23:17
  29:2,5,9,10,14

Hughes v. Priderock
David Worley

10/11/2018

Page 92

29:15,19
**Dr** 58:14 71:23
  73:11 74:1,6,24
  75:20 76:3,4,11
  76:12,18,23
  77:9,16,18
  78:23,23 80:4,7
  80:25 81:7,9
  83:9,23
**draft** 73:11,12,14
**dramatically** 48:1
**Drew** 22:24
**Drive** 1:17
**driven** 56:24
**driver** 63:3
**due** 42:14 43:6,10
**duly** 4:10 85:8
**duopoly** 39:4
**DW** 71:20 75:23
  75:25

**E**
**E** 3:2,9,9 4:1,1
  86:1,1 87:2,2
  88:1,1,1
**earlier** 35:18
  55:19 70:2
**early** 12:13 70:9
**earned** 65:2 67:1
  70:12,13 74:8
  74:25
**earning** 82:22
**easement** 44:11
**economics** 58:20
  59:19
**education** 7:9
**effect** 60:18
**Effective** 58:17
**effectively** 18:19
  26:19 30:10
  44:23 70:11
**eight** 52:23 53:7
  54:6
**either** 34:14,24
  43:1,8 78:22

**elect** 68:8
**email** 72:24 73:7
  75:20,22 76:11
  77:16 78:10
  80:6,6,15
**emails** 77:2,5 80:1
**employed** 9:11
  22:6
**employee** 15:10
  15:22,24 19:9
  69:23 86:12
**employees** 69:8
  69:13,22
**employer** 7:13
**employers** 7:12
  10:13
**engineer** 17:2
**enhance** 57:11
**entailed** 24:1 35:2
**ENTER** 88:6
**entered** 88:22
**entitled** 68:5,7
**entity** 7:14,15,17
  7:24 8:1,12 9:1
  9:10 12:4 13:23
  14:2 15:24
  39:17 45:16,17
  45:25 46:9
  47:17 64:17
  65:3,8,10,13,18
  69:2,20
**equals** 72:4
**equipment** 69:21
  69:24
**equity** 74:20
**errata** 87:10
  88:20
**ESQUIRE** 2:3,10
  2:10
**essentially** 46:20
**estate** 10:12 11:1
  11:5,7,7,10
**et** 68:25
**everybody** 22:10
  24:25 27:11

28:1 32:9 57:1
  67:9 83:4
**exact** 7:14,17
  27:16 79:2
**exactly** 18:3 19:22
  20:9 32:25 34:1
  39:20 79:1
**exaggeration**
  79:20
**EXAMINATION**
  4:13
**examined** 4:10
**example** 39:24
  47:21
**Excel** 23:23 59:3
  59:7
**exception** 87:9
**Excuse** 28:22
**executed** 73:22
  87:11
**execution** 14:23
  17:4,5
**exhibit** 3:11,13,15
  6:13,14 7:10 8:2
  8:8 12:17 40:1,2
  58:11 71:4,6
  72:23 73:16
  75:20 76:4,6,10
  77:16 78:4 80:4
**exhibits** 79:25
**exist** 65:1
**existed** 37:24
**expect** 74:18
**expected** 35:6
**expenses** 67:19
  68:15,17 69:15
  71:17 77:19,24
  83:9,12,18,20,22
**experience** 5:4
  13:3 16:16
  21:15 23:25
  26:15 28:4,8,14
  31:19
**experienced**
  31:17

**expertise** 26:6
  30:4,7 31:3,5,8
  31:9 58:16 59:1
**Expires** 85:16
**explain** 18:4,25
  28:25 50:4
  55:16 56:9
  61:11
**explained** 16:10
  28:23 29:1
  32:17 56:11

**F**
**F** 86:1 87:2
**face** 54:3
**fact** 56:12 57:12
**facts** 56:17
**failure** 45:1
**fair** 40:8,9 43:3
  60:6 75:24,25
  76:15 78:1,11
  82:3
**familiar** 12:17
  71:9
**families** 58:8
**family** 57:25 58:5
**family's** 36:19
**Fannie** 9:12,13
  11:13,14,16,20
  12:15 14:5,15
  14:16 16:19,24
  16:25 17:1,9,12
  17:13,14,16,25
  18:8,10,16,19
  19:7,9 22:18
  23:1,5 26:11,13
  47:22
**far** 65:21
**farm** 36:19
**fashion** 17:15
**February** 80:16
  81:13
**fee** 45:14,19,25
  46:10 67:14,17
  73:22

**feel** 5:20
**feelings** 36:24
**fees** 64:17,18 65:2
  65:8,11 67:1,3
  67:18 68:23,23
  68:25 70:12
  73:20,21 74:7,7
  74:11
**figures** 34:20 70:6
**file** 38:10
**filed** 38:15,15
**filing** 38:17
**filled** 57:15
**Finalized** 35:14
**finance** 7:1
**financial** 56:3
  65:5
**financially** 86:13
**financing** 13:4
  14:8,18 15:3
  31:19 58:22
  59:20,23,24
**find** 44:9 56:8
**fine** 5:12 27:3
  59:15 61:19
  62:17 72:20
**fire** 44:12
**first** 4:10 9:14,15
  10:14,17,18,20
  10:25 19:12,16
  19:19 20:7,13
  27:4 34:19 35:8
  35:9,11,22
  38:22 43:7 52:3
  52:11,14,24
  54:13,17,22
  57:4 58:7 62:11
  62:11 63:15,16
  70:8 76:22
  77:21 80:8,18
  81:21 82:14,19
  82:25
**FirstCity** 11:23
**five** 83:1,1
**Fixed** 41:2

Hughes v. Priderock
David Worley

10/11/2018

**Flagler** 1:17
**flaws** 60:14,16
**floating** 41:2
**Florida** 1:1,18,23
 1:23 2:5 4:5
 11:2,5 85:2,15
 86:2,6 87:4
**flow** 62:22
**flows** 26:21 37:16
 55:17 58:21
 59:20,22
**focus** 40:23
**focused** 13:17
**focusing** 79:11
**follow** 5:19
**follows** 4:11
**foreclosure** 39:15
**foregoing** 86:7,14
 87:6
**form** 88:22
**formed** 80:21
**forth** 86:9
**Forum** 2:4
**forward** 82:5
 88:20
**found** 28:24 60:14
**founding** 12:7
**four** 6:9 83:1
**fourth** 81:24
**FPR** 1:22 85:15
 86:21 88:3
**Freddie** 3:13
 16:10,17,22,22
 17:3,15,17,18
 18:7,18,24 19:5
 19:10 20:25
 21:15,21 22:19
 23:3,15 28:8,12
 28:15 30:4,9,22
 31:3,13 38:25
 39:18,22 40:5
 40:17 41:11
 42:8 43:24
 48:10 50:11
**free** 5:20 25:7,10

**frequently** 18:14
**friend** 15:11,16
 15:20
**friends** 29:10
**front** 68:18
**Frost** 9:20,21,22
**fund** 7:15,25 8:1,4
 8:5,7,8,10,13,17
 8:25 9:2 15:25
 15:25 16:2,4,8
 16:12 21:17
 24:19,24,25
 25:14,24 26:3
 26:18 27:5,12
 28:3,5,8 30:3,7
 30:24 31:2,16
 32:17,23 36:11
 36:16,22 37:3
 37:10,23,23,25
 38:6,9,13 42:7
 45:13,15,24
 47:2 50:17 53:3
 58:16 60:19,21
 61:16,22 62:2
 63:15,19 64:1,7
 64:11,13,14
 68:3,25 69:2,6
 70:13,13 74:8
 77:21 79:10
 80:21 81:17,20
 82:12 83:6,10
**Funding** 12:5,9
 12:12
**funds** 38:19 41:20
 41:21 54:7
 61:15
**further** 32:23
 84:3 86:9,11
**future** 48:23,24
 65:21

 **G**
**G** 2:10 4:1
**gained** 21:19
**gap** 57:15

**Gaziano** 31:23
 32:12 66:14,22
 69:8
**Gaziano's** 45:7
**general** 33:1
 37:24 67:10
 73:10
**generally** 22:14
 34:2 56:19
**gentleman** 12:7
**George** 14:12
 24:20 31:22
 50:19 51:12
 76:15 83:5
**getting** 17:4 22:8
 33:4 34:15,25
 38:3 39:2 62:13
 70:5 82:21,23
 83:6
**GG** 85:16
**give** 5:6 22:7
 36:24 47:21
 52:5 56:19
 68:21 74:11,12
**given** 65:22 82:3
 87:7
**gives** 64:11
**go** 5:23 7:12 48:2
 60:11 63:8
 67:19 75:7
 77:19
**goes** 8:15 70:23
**going** 5:8 6:12
 12:16 13:11
 20:20 24:8
 25:12 32:18
 38:23 41:19
 42:6 44:9 48:15
 49:2 51:16
 57:10 64:17
 66:6,20 71:2
 72:11,13 74:12
 75:9 76:1,5
 77:15 79:10,12
 79:18 80:3 82:5

**Goldman** 12:8
**golf** 21:9 24:17
 25:20 26:2
 36:18
**good** 4:15 23:10
 35:23 48:1
 54:11 81:15
**gotten** 22:4 25:15
 27:12
**graduated** 6:21
 6:24
**granted** 44:12
**great** 83:2,6
**grief** 48:24
**group** 19:1 26:16
 28:11
**guarantee** 74:21
**guarantees** 63:1
**guess** 24:10 25:18
 39:23 65:6 84:1
**guy** 22:6 24:21
 27:6 48:2
**guys** 14:4,11
 22:22

 **H**
**H** 3:9 88:1
**half** 12:3 36:13,15
 79:22
**hand** 8:2 12:16
 71:2 72:12 75:9
 75:19 76:3
 77:15 80:3
**handed** 76:7
**handles** 45:3
**handwriting**
 12:24,24 71:11
**Handwritten** 3:15
**happen** 49:3
**happened** 33:1
 77:14
**happens** 44:13
**hard** 61:23
**head** 5:14 11:4
 39:6

**hearing** 70:25
**heavily** 56:18
**held** 37:18 63:12
 80:12
**help** 14:8,10,17,21
 22:6 24:23 27:6
 76:5 77:2
**helped** 14:10 23:4
 29:1 37:13,15
 62:22
**hereinabove** 86:9
 86:10
**higher** 68:15
**highlighted** 80:19
**highlighting** 73:2
 73:2
**highly** 58:20
 59:19
**hire** 15:22
**Historically** 48:13
**hold** 9:22 11:15
**home** 10:7 25:23
**hours** 37:1
**housing** 31:20
**Hughes** 1:4 3:14
 3:15 4:16 19:11
 20:4,6,12,22,24
 21:4,7,15,20
 23:14 24:16,17
 25:19 26:17
 27:5 29:17
 31:13,23 32:2
 32:21,22 36:10
 36:16,21 37:3,9
 58:14 62:19
 70:3,9 71:13
 73:11 74:1,6,24
 75:20 76:3,12
 76:18,23 77:9
 77:18 78:23,23
 80:7,25 81:7,9
 83:9,23 88:2
**Hughes'** 58:14
**Hughes's** 26:6
 29:19 31:9

71:23 72:15,23
76:4,11 77:16
80:4
**huh-uh** 5:15
**hundred** 31:18

**I**

**idea** 4:21 16:4,5,8
31:13 38:5
61:11 71:12
**identification**
6:15 40:3 71:7
**identified** 30:4
31:2
**identify** 48:22
**identifying** 53:23
**imagine** 38:4,5
**impact** 58:6 60:16
**imparted** 23:15
**important** 24:4
24:11
**in-depth** 58:22
**inaccurate** 56:17
**include** 31:9
54:24 64:3
**including** 27:12
**income** 68:20
**incorrect** 17:11
**incurred** 83:10,23
**independent**
15:10
**independently**
59:5
**individual** 18:2,2
18:14 47:14
49:7
**individuals** 52:1
**information** 36:7
64:8,10
**infrastructure**
30:5,24 31:1,4
**initial** 32:18 34:13
48:19,21 78:2
78:12,13,22
**initially** 15:7

**InterFirst** 9:16,17
10:9
**internal** 63:20
**invest** 28:8,12
30:5 37:8 51:5
51:21,23 55:25
**invested** 33:12
46:8 51:20
55:20
**investing** 38:24
**investment** 8:9,11
19:1 24:8,10,12
31:17 45:23
52:14 55:17
58:21 59:20
**investments** 24:13
**investor** 28:11
37:13 49:6 54:4
**investors** 36:8
37:7 38:19 42:7
45:8,9,10 46:2,6
50:22,22 51:1,4
51:7,18,19,25
52:2 55:11,16
55:18,20 56:5
56:10,14 57:9
57:11,14 61:3,5
61:8,11,12,24
64:6
**involved** 12:5,7
12:11 20:17
28:19 32:17,23
32:23 33:3
36:11 38:16
50:16,20,21

34:18,24 57:23
58:1 70:6 72:1
**inspections** 42:16
**insurance** 44:13
69:18
**interest** 43:14
47:11 48:4
80:22
**interested** 33:4
49:10 86:13

56:22,25 62:9
**involvement**
28:20 62:19
**irrelevant** 60:21
**issue** 49:17
**issued** 35:14 36:3
**issues** 43:18
**issuing** 19:3
**it'll** 50:6

**J**

**J** 1:22 4:3 85:15
86:5,21 88:3
**January** 53:8
77:17
**JD** 52:6,8 55:13
**job** 14:7 22:8,15
24:3,4 25:3,5,16
33:3,4,13 34:8
35:1,1,2,5 44:23
52:8 74:22 75:1
75:1,10 82:21
82:22
**John** 50:18 51:12
**joined** 7:19 12:15
**joining** 9:10
**joint** 16:5
**jointly** 71:20
**Jonathan** 83:5
**journey** 24:24
**June** 85:16
**justice** 70:25

**K**

**K** 2:11 3:9
**K-Deal** 18:23,25
19:2 28:12,15
28:20 42:24
49:15 63:6,16
**K-Deals** 17:19
19:4 20:25 21:5
21:15,21 22:19
23:3,15 28:9
30:15 48:10
49:8

**K-F29** 53:4 54:14
54:18
**K-F46C** 53:16
**K-Series** 22:1
24:22
**K1504** 53:9
**Kammerer** 2:3,3
3:5 4:14,15 6:12
6:16 9:8,9 17:8
35:23 36:1
37:21 39:25
40:4 50:3 53:1
59:12,16 61:18
63:10,13 70:24
71:1,4,8 72:13
72:17,20,22
73:4,6,18 75:16
76:7,9 78:6,9
80:14 84:3
**kept** 19:5
**Kevin** 23:17 29:2
29:3,5
**Key** 62:20
**KeyBank** 54:24
57:2,3,17,20
58:4 62:10,13
62:24,25 63:4
**Khoury** 14:13
15:17 16:2,6,10
16:16 24:20
31:22 32:13,20
38:7,8 50:18
51:13 57:24
62:18 63:2 66:1
66:13,21 69:11
70:11 74:1
75:21 77:17
78:10,13,15,23
80:20 81:1,5,10
83:4
**Khoury's** 58:5
**kick** 48:21 50:12
**kind** 19:20 22:5
22:10 24:23
37:13 38:2

40:21 41:2,14
41:15,17 45:5
83:4,21
**kinds** 44:14 67:18
**knew** 14:4,14 20:8
21:22 22:5,17
30:9,9 39:7
78:17
**know** 5:7,15 6:18
7:21,21,24
14:10 17:6 19:7
19:12,20 20:2,6
20:8 22:3,4,4,7
22:14 23:5,19
23:22 24:23
25:9,12 26:21
29:6 30:11
32:25 33:1,23
34:24 36:13,20
37:2,6,25 38:2
39:3,4,10,10
40:20 41:2,13
41:24,25 43:1,9
44:11,13 45:5,6
46:1,21,22
47:25 50:5
52:21 54:16,21
55:13,13,25
59:3 60:14 61:3
62:2,7 63:4
64:15 65:10,13
65:20,20 66:15
66:17 67:5
68:24 69:13,18
69:19,25 71:11
72:1,2,6 73:13
74:13,15,18,23
78:12 79:11
80:2 81:11
82:17 83:20,25
**knowing** 32:16
36:23
**knowledge** 17:7
21:20 23:2
24:22 63:11

Hughes v. Priderock
David Worley

10/11/2018

Page 95

87:9
known 19:11

**L**

language 60:4
large 4:5 18:15
  30:12 77:25
  86:6
largest 18:19
  30:10 59:25
late 73:10
launch 83:7,10
launched 15:25
  81:17,20
law 42:1
lawyer 42:1
lay 14:24
laying 73:12
lays 75:11
led 14:1 18:22,23
  28:11
leeway 50:13
left 10:22 11:11
legal 8:19 38:11
  38:11,17
lender 17:16
  18:16 44:15,15
lending 10:12
  11:5,7,9
let's 5:9 16:18
  25:17 37:22
  43:21 71:15
  72:11 73:15
  75:7 78:2
level 45:23
leverage 57:14
licenses 7:6
lie 70:14
life 79:11
lightly 27:24
limited 8:10 37:11
  38:13 62:3
line 35:22 76:14
  81:24 88:7
lines 83:1

LinkedIn 3:12
  6:18 7:18 11:22
list 3:15 39:23
  52:7 79:13
listed 32:2 52:1
lists 31:22
little 20:8 24:22
  37:14 38:8
  50:13,14 61:2
  62:4 75:8 82:3,8
LLC 1:7 7:20
  8:11,16,17,18,22
  8:25 9:3 28:4
LLC's 12:20
LLP 2:10
loan 10:4,11
  17:10,14 48:22
  54:24 55:1 57:3
  57:10,12,17
  58:4 62:10,13
  62:20,24 63:2,5
loan-by-loan
  18:13
loans 10:5,6 18:2
  18:9 19:5,7,8
  39:10,11 42:15
  43:13,14,17,25
  44:2,16,25
  46:25 47:11,14
  47:18,24,25
  48:5,6,11,21
  49:7 50:9
locked 47:5
long 6:7 11:24
  12:1 19:11
  22:15 36:10
  50:7 81:15
long-term 74:12
  74:13
look 24:25 29:24
  44:5 58:10
  61:13 71:15
  73:15 80:20
  81:23
looked 65:21 77:5

looking 14:7
  16:14 22:16
  32:19 77:1,5,25
  79:25
looks 72:9
Loosely 15:5
losing 48:2 68:9
  68:11
losses 68:10
lot 36:18 43:18
  47:16 48:17,24
luck 22:5,9,13
  24:17 27:7
luncheon 37:19

**M**

M 3:9
Mac 3:13 16:10
  16:17,22,22
  17:3,15,17,18
  18:7,18,24 19:5
  19:10 20:25
  21:15,21 22:19
  23:3,15 28:8,12
  28:15 30:4,9,22
  31:3,13 38:25
  39:18,22 40:5
  40:17 41:11
  42:8 43:24
  48:10 50:11
Mae 9:12,13
  11:13,14,16,20
  12:15 14:5,15
  14:16 16:19,24
  16:25 17:1,9,13
  17:14,16,25
  18:8,10,16,19
  19:9 22:18 23:1
  26:11,13 47:22
magnitude 60:18
  60:20
main 38:18
maintain 63:23
  64:13
majority 43:4

making 24:10
  44:16 49:1 68:9
manage 39:11
  44:23
managed 13:9
  26:13,14 30:10
  31:17
management 7:15
  7:25,25 8:11,17
  8:25 9:2 13:8,13
  13:17 43:12
  45:14,19,25
  46:9 58:18
  64:17,18 65:2,7
  65:11 66:25
  67:3,14,17,18
  68:12 70:12
  74:7
manager 8:11,13
  13:2 44:20
  45:13,15 67:21
  69:2
manages 13:10
managing 13:4
MARIANI 2:3
mark 6:12 39:25
  71:2,4
marked 6:14 8:2
  12:17 40:2 71:6
  72:14,23 75:19
  76:4 77:15 80:3
markets 11:10
Martin 6:6,7
math 23:10,24
  26:10
matter 52:20
mean 7:20 14:24
  16:18 18:12
  19:21 25:6 26:4
  32:8 33:21 35:4
  38:3 41:11,25
  52:13 56:15
  64:20 65:5
  69:19 74:9 77:4
  78:14 83:11

meaning 45:15,16
  51:1
means 7:22 19:24
  25:7 34:2 44:19
  46:24 75:23
  79:2 86:14
meet 20:22
meeting 26:1
member 8:21,24
  9:4
memorandum
  32:5 35:14 36:3
  36:6
memory 75:8
mentioned 41:13
  55:19
met 19:15
mid 10:19 33:22
million 27:14,20
  47:24 53:4,9,14
  53:14,16 54:14
  54:23 55:4,5,8,9
mine 71:12
minutes 79:12,17
Miossi 2:10 5:22
  9:7 16:24 35:21
  49:21 52:17,19
  59:14 63:8
  70:20,23 72:16
  72:18 73:1,5,17
  75:14 78:4,8
  80:8,10 84:4
miscellaneous
  44:10
model 23:18 24:4
  24:9,14 25:22
  26:11,12,20
  32:19 36:17
  37:4 56:2,3,6,9
  60:21,22,25
  61:4,7,10,11,15
  61:21 63:20,25
  65:4
modeling 25:2
  26:14 58:21

Hughes v. Priderock
David Worley

10/11/2018

Page 96

59:19,22 60:1,6
  60:9
models 23:21,25
  60:11,13 62:21
moment's 65:22
money 35:11 45:7
  68:9,10,11,22
monitoring 44:24
month 26:25
  49:18 67:23
  79:2 82:17
monthly 44:1,2,6
  45:2,3,11 46:9
  64:8,10 67:21
months 43:2
  52:23,23 53:6,7
  54:7
morning 4:15
mortgage 11:8
  12:10 17:20
  20:18
mortgage-backed
  58:15
mortgages 17:22
  18:1,2
moved 11:6
multi-family 13:2
multifamily 8:4
  11:17 13:20
  17:10,13 18:9
  18:20 31:19
  39:6 58:23
mute 56:19
mystery 71:2

**N**

N 3:2 4:1
name 7:17,17
  29:13 54:3 67:5
national 9:20,22
  11:6
near 70:16
necessary 57:2,7
  57:8
need 39:1 51:3

77:18,24
needed 14:10
needs 44:11
negotiate 50:11
negotiating 62:15
negotiation 50:13
  58:17
negotiations 62:9
  62:12,15
never 26:13 28:11
  71:10
Ng 31:23 36:18
  66:14,22 69:8
nods 25:25
Nope 12:18
Notary 1:23 4:4
  85:15 86:5
notations 87:10
notes 53:2 86:7
November 75:21
  77:6,10
nuisance 57:1
number 12:17
  30:1 42:6 51:20
  51:22 55:24
  57:9 76:6,10
numbers 66:16
  74:2
numerous 26:10
  60:14 74:19
  78:18
NW 2:11

**O**

O 4:1
O'Connor 69:1
oath 70:17,19
  85:1
objection 5:24
  59:13
objects 5:22
obtain 57:3,17
  62:10
obtained 7:1 55:1
obtaining 62:20

obviously 47:13
occurring 79:14
October 1:15
  72:24 73:11
  85:10 86:16
  88:5
offer 25:16 33:11
  61:4,7 72:9
  74:22,23,24
  75:1,2,10
offered 75:2
offering 40:17
  72:5 82:2
office 23:19 25:23
  32:19 69:3,5
  78:16 83:14,16
  83:21 88:20
officer 10:12 11:2
  11:6,8,10,17
offices 69:4
Oh 34:7
okay 5:11,16,20
  5:21,25 6:1 7:12
  8:3,8,15 9:10
  11:3 12:21,22
  13:25 17:25
  18:6,12 27:1
  29:24 33:5
  34:13 35:13,20
  35:23 36:2
  43:20 50:8
  51:14 53:5,12
  53:15,17 54:6
  54:11 70:15,22
  73:5,15 74:24
  75:9,14 76:21
  77:6 78:8 80:3,5
  84:2
old 77:13
once 44:22 47:4
  47:10 50:6
one-way 70:20
ones 50:12 55:22
ongoing 63:25
  77:24

operate 13:16
  31:7
operates 69:3
operating 13:18
  31:19
operations 10:4
opportunities
  49:1
opportunity 8:5
  16:12 33:11
  56:6
order 30:18 40:22
  41:15,16
organized 8:9
organizing 37:24
original 88:20
outcomes 47:24
  47:25
outlined 78:1,11
overhead 68:24
oversight 36:17
overview 29:25
owned 71:20
owner 8:21,24
  68:2
owner-operator
  39:12
owners 69:13
owning 13:18
  31:19
owns 13:10 67:2
  69:25

**P**

P 4:1
p.m 1:16 37:19,20
  84:6
package 43:13
page 3:10 6:18,21
  7:18 11:22
  12:23 29:24
  30:1 31:12,15
  35:19,22 58:13
  73:17 78:4 80:7
  88:7

pages 3:12 86:7
paid 7:23 15:12
  25:1,2,11,13,15
  27:12 33:12
  34:15,25 53:24
  57:12 64:17
  70:5 78:24
  79:12,18 83:22
Palm 1:18 2:5 6:4
  85:3 86:3 87:5
Pamela 1:22 4:3
  85:15 86:5,21
  88:3
panting 56:18
paperwork 39:17
paragraph 30:3
  31:9,16 35:22
  58:14 80:19
  81:23 82:25
part 19:1 20:17
  28:14 32:24
  40:12 41:24
  42:3 44:21
  47:21 48:6
  49:14 53:3
  54:22 55:6
  59:21 60:9,22
  62:2,10 63:5,5
  68:2
participate 40:19
  50:2 57:19 66:7
participated
  51:15
participating
  66:18
particular 40:20
  44:10 49:2
particularly
  56:11
parties 86:12
  88:20
partner 7:19 9:5
  67:10
partners 1:7 7:19
  7:20 8:11,16,17

Hughes v. Priderock                                          10/11/2018
David Worley

8:18,22,25 9:2
12:20 13:1,13
13:15 14:2,12
15:17 28:4,7
39:16 69:4,9
**partnership** 8:10
38:14 78:19
**party** 86:12
**pay** 14:9 68:22
69:7 83:13,14
**paying** 15:23
83:16
**payment** 83:9
**peers** 39:3
**Pelino** 1:22 4:3
85:15 86:5,21
88:3
**penalty** 88:21
**people** 22:14,17
27:25 32:6,7
40:22 62:6,8
74:13 84:1
**percent** 45:21
46:5,12 48:3
65:25 66:12
70:12,13 71:17
73:19,20 75:6
81:6
**percentage** 46:3,5
48:9,11 65:23
66:1,25 67:14
67:16,17 74:6,7
74:11,25 75:2
76:19,24 77:11
**percentages** 34:20
**perform** 45:1
47:14 48:14,15
**performance**
43:25 44:6,25
46:21,24,24
47:4,7,13,17
48:18 63:15,18
63:25 64:7,11
64:14
**performing** 43:17

44:3
**period** 12:11 26:1
50:9 52:10
**periodic** 40:18
**perjury** 88:21
**person** 58:2
**person's** 14:24
**personal** 63:1
**personally** 47:23
85:7
**perspective** 20:10
73:25
**Ph.D.'s** 26:11
**phase** 52:9 54:17
54:17 55:7
**phases** 55:12
**phone** 28:21 44:8
50:7 56:18
**pick** 71:19
**piece** 36:7 67:2
68:13 72:5
77:20 82:1
**pipes** 16:21 23:4
**place** 2:4 42:23
44:15 52:22
86:9
**placement** 32:4
35:14 36:3,6
**Plaintiff** 1:5 2:2
**Plaintiff's** 3:11,13
3:15 6:14 40:2
71:6
**plan** 37:22,24
41:20
**play** 51:8
**played** 21:9 36:18
**please** 18:4 71:4
88:20
**PLLC** 2:3
**plus** 48:4 72:4
73:20 82:1
**PMM** 58:10
**point** 34:10 39:22
42:5 43:22
**pointed** 35:17

**pointing** 78:5
**pool** 17:15,22
18:15 43:14
46:25 47:8,11
48:6 49:7
**pools** 18:1
**poor** 56:13
**portfolio** 44:19,24
67:21
**portion** 19:2
30:18
**position** 10:2,9,24
19:18 42:8
**positions** 9:21
10:13,25 11:15
**potential** 36:8
40:11 48:24
50:21
**potentially** 34:11
48:22
**PPM** 8:8 27:9,14
27:20,22,25
28:2 38:3 41:23
**PRC** 7:19
**precluded** 19:9
**prefer** 25:4
**prepare** 27:21
**prepared** 32:4
41:23 61:1
63:21 64:6
**presentation**
56:13
**pretty** 24:4
**previously** 12:16
28:19 72:14
**price** 53:10,13
54:4
**Priderock** 1:7
7:16,20 8:4,10
8:16,17,18,22,25
9:2,10 12:20
13:1,10,12,14,23
14:1,2 15:16
18:21 20:21
21:1,4 28:3,7

30:11 39:8,16
39:17 44:17
47:16 51:10,16
52:1 53:22 55:1
55:10 58:25
61:4 62:23 65:3
65:8 69:4,9
71:23 77:10
83:12,13,22
88:2
**Priderock's** 13:2
31:6
**primarily** 18:10
21:23 22:4
83:20
**primary** 18:16
37:16 38:24
**principal** 48:3,4
**principals** 13:3
**print** 12:24
**printout** 12:20
**prior** 6:10 9:6,15
16:15 18:21
19:4 20:16,20
20:25 28:3
29:19 36:9,22
42:18 49:5 52:3
54:7 77:9 82:19
83:10
**priority** 79:13
**private** 8:9 13:2
32:4 35:13 36:3
36:6
**pro** 69:17
**probably** 19:4
27:19 35:15
36:13 38:4 42:2
42:25 47:23
50:6 51:24
53:25 62:25
63:2 69:1 73:9
**problem** 31:7
48:23
**problems** 39:12
**procedural** 5:6

**proceeds** 44:13
**process** 34:22
48:19,21 49:15
**processes** 58:20
59:19
**product** 38:23
39:2 41:21
**production** 11:4
**products** 21:23
23:24 40:23,24
40:25
**professional** 4:4
7:6 86:5
**proficient** 23:23
23:23
**projected** 55:17
64:19
**projection** 64:16
**projections** 64:13
64:23
**promote** 46:12,13
46:15,15 48:18
64:24 65:14,16
65:23 66:2,7,10
66:18,20 67:7
70:13 71:17
72:5 74:25 75:2
76:19,24 77:11
77:20 81:6 82:2
**promoted** 80:22
**proper** 81:25
**properties** 44:7
**property** 44:10
**proprietary** 61:10
**prospective** 15:1
15:3 30:19
40:16 41:4,12
43:4 51:4,17,25
52:2 56:9
**provide** 71:13
**provided** 56:5
58:4
**provides** 73:19
**providing** 76:19
76:23 77:10

Hughes v. Priderock                                    10/11/2018
David Worley

**PSQ** 37:13 55:19
**Public** 1:23 4:4
  85:15 86:5
**pull** 75:10
**pulled** 23:19
**purchase** 42:20
  42:24 43:6,11
  43:22 44:22
  47:5,10 52:3,24
  53:8,10,13,23
  54:7,13,20,22
  55:2 57:3,4 58:6
  62:11,11 63:5
  63:15 81:21
  82:6,12,14,19
**purchased** 19:2
  44:24 47:18
  53:4,16,24
  54:15
**purchaser** 30:19
  40:11 41:4,12
  42:11,13 43:4
  43:23 49:6
**purchases** 42:12
  53:3,4 54:12
  64:4
**purpose** 36:5
  60:25
**pursuant** 73:21
**put** 15:18 27:11
  27:24 28:1 63:2
  73:3 81:25
**putting** 15:21
  74:21

─────── **Q** ───────
**qualifications**
  23:7
**qualify** 43:8
**qualifying** 43:7
**quant** 19:20,24
  23:9
**quantitative**
  19:24,25 20:1
  23:11

**quarterly** 43:23
  44:5,6
**question** 5:10,11
  5:25 8:19 27:4
  56:21 60:24
**questions** 5:19
  70:21 84:3
**quick** 5:6
**quiet** 5:11

─────── **R** ───────
**R** 3:9 4:1 86:1
  87:2 88:1,1
**raise** 27:20 38:18
  41:21,22 50:25
  54:7 68:22
  79:10
**raised** 27:14 43:9
  54:14,17,20,21
  55:6,11,12
**raises** 61:16
**raising** 38:3 42:3
  43:5 50:16,24
  52:9,22 53:6
  60:22 61:15,22
  62:2
**ran** 10:4 47:22
  59:24 62:21
**rank** 41:15,16
**rata** 69:17
**rate** 14:25
**reacquainted**
  25:18
**read** 13:12 59:8
  71:18,18 72:6
  75:15 80:8
  81:24 84:5 87:6
  88:21
**ready** 83:6
**real** 10:12 11:1,1
  11:5,7,7,10
  43:12
**really** 14:6,9 22:6
  26:8,9 39:3
  43:15 48:19

50:22 52:8
  77:20 78:14
**reason** 5:24 22:12
  26:23 27:8
  49:12 88:7
**reasons** 30:13
**recall** 7:21 13:24
  19:18 20:17
  21:2,6 23:14
  26:4 29:20
  32:25 35:13,15
  39:19,20 66:11
  66:23 68:19
  71:14 73:7,8,10
  73:13 74:5,9
  75:4,5 76:2,25
  77:2,4,9,12,14
  79:1 80:2 81:3,4
  83:8
**receive** 34:6 43:23
  46:1 64:18
  65:13,16,18,24
  66:2,10 67:15
  67:16,20 68:1,6
  70:3,11
**received** 65:8
  68:4 73:9,21
  76:13
**receives** 45:13,17
  45:25 46:9,12
  46:13 67:18
**receiving** 65:10
  73:7 74:6
**recess** 37:19
  80:13
**recognize** 72:8
  79:20
**recollection** 16:7
  20:14 32:15
  33:2 34:19
  36:10 70:7
  71:21 76:17
  78:21 80:24
**record** 37:18 63:8
  63:12 80:10,12

**recovering** 48:3
**REDIRECT** 3:4
**refer** 33:8 68:20
  72:21
**reference** 8:3
  11:22 82:5 83:3
**referred** 30:7,25
  31:8
**referring** 8:12
  14:11 24:13
  30:15 40:25
  41:9 69:16,20
  78:13
**reflected** 7:10
**refresh** 71:21
  80:24
**regard** 18:8 24:6
**regarding** 21:25
**regards** 14:18
  15:16,17 20:25
  21:5,13 23:2,14
  24:19,22 25:14
  33:25 34:14,24
  36:11,16 37:23
  39:2 40:10,12
  43:24 45:24
  48:5,10,14
  51:17 53:23
  54:11,21 55:11
  58:13 61:15,16
  61:22 62:20
  64:7,14,16,23
  65:1 68:2 71:23
  74:2,6 76:18,23
  77:10 78:24
  80:25 83:9
**regimen** 16:21
**regional** 11:1
**Registered** 4:4
  86:5
**Reimbursed**
  71:19
**reimbursement**
  83:23
**reimbursements**

77:23
**rejected** 72:10
**related** 7:15
**relative** 86:12
**relay** 81:7
**relayed** 81:9
**relevance** 61:2
**relevant** 58:16
  83:12,18
**reliance** 55:16
**remark** 72:13
**remember** 20:10
  22:24
**remotely** 70:16
**renewable** 82:1
**renovated** 13:9
**renovating** 13:5
**rent** 68:24
**REO** 39:13,14
**repeating** 54:9
**rephrase** 5:25
**report** 43:23 86:6
**Reported** 1:22
**reporter** 4:4 5:7
  86:5,15
**Reporters** 61:17
**REPORTING**
  1:23
**reports** 44:6 64:6
**represent** 12:19
  30:5
**reproduction**
  86:14
**require** 82:11
**required** 30:5
  42:1 82:4,9
**requires** 58:18
**reread** 59:17
**resecuritize** 18:15
  29:3,4
**resecuritizing**
  29:2
**reserve** 84:4
**reside** 6:4,5,7,10
**resided** 6:8

Hughes v. Priderock                                                      10/11/2018
David Worley

| | | | | |
|---|---|---|---|---|
| **residence** 6:2 | 66:24 69:4,5,9 | 78:10 | **senior** 13:8 | **social** 20:14 |
| **residential** 12:10 | 69:21,23 70:2,8 | **scale** 45:22 46:8 | **seniors** 41:2 | **socialize** 21:7 |
| 21:23 31:20 | 71:16 72:11,15 | **screenshot** 12:19 | **sense** 26:14 | **socially** 22:4 |
| **respect** 55:15 | 73:3,10,19,24 | **second** 6:21 35:22 | **sent** 73:11 80:15 | 32:16 |
| **response** 80:6 | 75:7,19 76:1,10 | 53:8 55:7 63:9 | **separate** 69:3,22 | **sold** 12:8 |
| **responsibilities** | 77:6,7,22 78:10 | 73:17 78:4 | 78:15 | **somewhat** 41:16 |
| 47:22 | 80:16,18 81:13 | 79:22 80:7,11 | **served** 26:15 | 57:11 |
| **rest** 48:14 57:25 | 81:18 82:6,13 | **section** 58:13 | **service** 39:11 | **sorry** 29:13 57:22 |
| 74:17 | 82:15,16,24 | **securities** 18:15 | **servicer** 44:9 | 59:12 76:13 |
| **restate** 5:20 | 84:5 | 18:18,20 20:19 | **servicing** 44:15 | 82:14 |
| **restrict** 56:13 | **ringing** 28:21 | 21:24 28:5 | **set** 58:7 86:9,10 | **sort** 41:19 44:23 |
| **result** 34:17 | **rings** 50:7 | 43:14 49:18 | **setting** 28:3 | 47:5 50:4 |
| **results** 57:13 | **risk** 11:10,17 | 57:4 59:10 62:7 | **seven** 49:17 | **sound** 53:9,18 |
| **retain** 17:16 | 17:16,17 18:17 | 63:16 64:3 | **shaking** 5:14 | **sounds** 5:3 18:1 |
| 18:14,17 | 18:18 30:11 | 82:14 | **share** 65:16 69:17 | 37:2 48:17 54:8 |
| **returns** 58:21 | 58:2 59:25 | **securitization** | 71:17,19 | 69:15 |
| 59:20,22 | **RiverBank's** | 58:19 59:18 | **shares** 46:13 | **SOUTHERN** 1:1 |
| **reunderwrite** | 28:20 | **securitizations** | **sheet** 19:5 35:21 | **space** 69:7,17,18 |
| 42:15 | **road** 72:2 | 17:3,5 | 87:10 88:20 | 83:14,17 |
| **revenue** 68:16 | **Rodriguez** 74:14 | **securitize** 16:20 | **Shillington** 37:15 | **speak** 5:9 56:21 |
| **reverse** 17:2 | **role** 11:19,23 20:9 | 16:22 17:10,13 | 57:20 | 62:13 |
| **review** 6:17 10:11 | 80:20 82:10 | 17:23,25 18:1 | **shorthand** 86:7 | **speaking** 35:9 |
| 15:1 49:6 50:8 | **roles** 10:11 | 23:5 | **show** 54:2 63:18 | 51:17 56:14 |
| **revised** 76:14 | **rotation** 40:24 | **securitized** 16:11 | 76:1,6 | 61:24 |
| **right** 7:18 8:5 | **routinely** 17:2 | 16:17,19 17:7 | **shows** 63:25 | **spec** 25:3,4 33:5,8 |
| 9:21 10:15 | **RPR** 1:22 85:15 | 19:8 | **sign** 84:5 | 33:12 |
| 12:23 13:7 15:6 | 86:21 88:3 | **securitizes** 17:14 | **SIGNATURE** | **specialized** 58:19 |
| 15:15 16:2,15 | **rules** 5:6 | 18:7,8,10 | 88:24 | 59:18 |
| 23:13 24:9 25:8 | **run** 59:3,7 83:17 | **securitizing** 19:7 | **signed** 88:20 | **specific** 29:12 |
| 25:15,19,21,24 | **running** 79:9,9 | **security** 17:20 | **signing** 74:20 | 40:11,12 56:21 |
| 27:15,22,23 | 83:15 | 26:20 58:7,15 | **similar** 71:25 72:9 | 66:15 |
| 28:9,12 30:1,2 | | **see** 12:23 16:18 | **simple** 77:20 | **specifically** 13:18 |
| 31:11 32:1 33:5 | **S** | 44:7 61:21 62:3 | **sir** 59:10 | 13:20 14:21 |
| 33:7 36:9 38:7 | **S** 1:14,17 3:4,9 | 62:5 73:15 75:8 | **site** 42:15 | 18:8 33:24 65:9 |
| 38:10,11,13,14 | 4:1,9 85:7 87:18 | 76:2 80:18 | **six** 43:2 49:17 | 73:8 74:9 75:5 |
| 38:21,25 39:9,9 | 88:1,4 | **seeking** 14:22 | 52:22,23 53:6,6 | 77:12 |
| 40:7 41:19,21 | **Sachs** 12:8 | 15:2,3 28:12 | 54:6 | **specifics** 34:3 |
| 45:9,18,19 46:4 | **salary** 67:24,25 | **seen** 64:19 71:10 | **six-week** 42:25 | **specing** 25:1,6 |
| 46:10,11 47:12 | 68:21 71:16,16 | **selection** 48:19,21 | 50:9 | 33:9,10,15,25 |
| 47:14,15 48:7,8 | 80:22 81:16 | 49:14 | **size** 53:11 | 34:3,14,17,25 |
| 48:18 49:2,15 | **saved** 48:23 | **sells** 17:17 18:18 | **sliding** 45:22 46:8 | 35:1,2 70:4 |
| 50:5,10 51:2,23 | **saying** 5:8 27:2 | **senate** 70:24 | **slot** 40:21 | **spend** 82:4,9,17 |
| 52:17 54:6,16 | **says** 6:21 7:18 8:8 | **Senderra** 12:4,9 | **small** 48:9,10 | **spent** 36:20,21 |
| 55:2 56:4,5 57:4 | 31:2,24 38:16 | 12:12 | 55:20 | 37:7 38:24 83:2 |
| 59:11 60:7,23 | 58:17 75:22 | **sending** 73:13 | **smoother** 70:23 | 83:6 |

Hughes v. Priderock
David Worley

10/11/2018

**spires** 23:18
**spoke** 24:24 39:3
  51:22 52:2
  55:23,24 80:20
**spoken** 29:8,12,16
**sponsored** 8:10
**sports** 74:14
**spreadsheet** 59:3
  59:7
**spring** 52:11
**stack** 41:14
**stage** 47:18 49:10
**start** 15:23 16:13
  19:3,6 24:24,25
  37:22 39:7
**started** 11:1 21:17
  21:22 33:16
  34:22 35:8,9,11
  70:8 72:1,2 74:1
**state** 1:23 4:5
  34:25 85:2,15
  86:2,5 87:4
**stated** 39:2 70:9
**statement** 40:8
  43:3 68:20
  75:24,25
**statements** 65:5
  87:7
**states** 1:1 13:1,11
  13:12 30:3
  31:16,16 76:13
  77:18
**stating** 34:15
**Stenographically**
  1:22
**stenotype** 86:7
**step** 50:8
**steps** 37:25 38:18
**stop** 49:24
**Strawn** 2:10
  27:21 32:5
**street** 2:11 70:20
**strike** 18:22 21:13
  39:21 40:15
  50:15 61:19

**structure** 23:6
  62:16
**structured** 21:23
  23:24
**structures** 58:20
  58:22 59:18,21
  59:23,24
**structuring** 24:18
  58:15 59:1
**stuff** 32:14 38:11
  38:12
**style** 56:13
**subject** 88:22
**submit** 39:17
**submitted** 83:23
**subordinate**
  16:12 30:11,14
  30:16
**subscribe** 26:25
**subsequent** 43:9
  54:18,19
**subsequently** 7:2
  28:24
**substance** 88:22
**substantial** 17:6
**sufficient** 42:6
**Suite** 1:17 2:4
**supplies** 83:21
**supposedly** 35:2
**sure** 7:14 9:2 14:9
  16:13 19:22
  20:9 22:20
  24:15 37:5
  52:18 60:24
  62:4 63:10 65:4
  81:11
**surveillance**
  24:18
**suspect** 63:1
**sweat** 74:19
**sworn** 4:10 85:8

——————
**T**
——————
**T** 3:9 86:1,1 87:2
  87:2 88:1,1

**table** 50:23 51:1
**take** 5:14 14:9,9
  31:6,7 41:4 47:4
**taken** 4:3,17
  37:19 38:1
  52:22 80:13
  86:9 88:5
**takes** 42:23
**talk** 8:20 25:17
  34:7 35:11
**talked** 22:22 33:5
  34:11 37:7 39:6
  51:19,20 55:19
  70:4 80:21 81:5
**talking** 38:25
  50:21 51:7 70:8
  72:2 74:2
**team** 13:8 18:23
  26:14 31:18
  32:9,11,24
**tell** 5:24 7:16 9:1
  13:25 16:7
  17:12 18:6
  19:13 20:11
  23:13 26:9
  27:16,17 29:11
  32:3,7,8,15
  33:17,21 47:20
  52:4 53:12
  56:15 57:8
  61:25 67:5 70:1
  74:4 79:7 81:3
  83:24
**telling** 27:24 28:1
  75:13
**ten** 79:12,17
**tenure** 62:16
**term** 25:19 46:25
  73:22 74:19
**terms** 14:24,25
  62:16 73:12
**testified** 4:11 70:7
**testimony** 76:22
**Texas** 6:22 9:18
  10:2

**Thank** 84:4
**theirs** 16:20
**thing** 29:12 38:22
  41:3 46:22 73:1
  83:21
**things** 20:2,4 22:3
  27:3 44:11,14
  45:14 72:7
  79:10
**think** 7:15,25
  10:23 16:5
  21:23 22:9
  26:20 27:1,2,19
  32:6,9,12,13
  33:6 36:7,18,18
  36:21,25 37:2,4
  37:6,9,11,13,14
  37:16 38:2
  39:19 41:25
  42:1 52:11,17
  53:25 55:24
  63:20 64:11
  70:18 72:21
  76:15,15 78:6
  78:14 79:4,4
  81:11 83:20
**third** 30:3 53:15
  81:23,24
**thought** 57:10
  65:22
**three** 5:1 10:1
  49:11,23 53:2,3
  57:14 64:3
  82:25 83:15,17
**Thursday** 1:15
**ticket** 53:25 54:2
**time** 5:22,22
  12:11 14:14
  15:15 21:16
  22:15 24:21
  25:1,3,4,6 26:1
  26:7 33:9,10,12
  33:13,15,25
  34:3,14,15,17,19
  34:25 35:1,3

**36**:20,21 **37**:7,7
  38:24 50:7
  52:10 74:3
  76:22 82:3,8,11
  83:2,6 86:9
**times** 4:20,22
  26:10 49:19,19
  74:19 78:18
**title** 27:10
**today** 8:7
**told** 14:6 23:16
  24:20 26:10
  34:1 39:6 57:24
  71:25 72:3
  74:12,15,19
  78:17 83:11,14
**tomorrow** 78:3
**top** 35:22
**touched** 20:10
**trade** 53:25 54:2
**transcript** 86:14
  88:6
**transcription**
  86:7
**transition** 32:16
**translate** 24:16
**transparency**
  62:6
**travel** 83:20
**trending** 44:8
**trigger** 75:8
**true** 54:11 86:7
  87:8 88:22
**truth** 20:11
**try** 5:10,10 24:24
**trying** 22:6 24:7
  27:6 29:2,2,4
  50:4 60:3 73:24
  79:9 83:13
**turn** 31:11,15
  83:12
**turned** 61:12
**twice** 49:4
**two** 10:11 12:3
  14:12 30:13

Hughes v. Priderock
David Worley

10/11/2018

43:2 45:13
48:25 49:18,23
54:17,20 55:12
55:20 57:14
82:1,17,25
83:15
**type** 10:5 12:9
14:21 20:3
24:13 43:20

**U**

**U.S** 13:6
**uh-huh** 5:15
12:25 38:20
53:19 72:21
**ultimately** 41:25
**unanimous** 78:17
78:20
**underlying** 43:12
43:14,24,25
44:7,16 47:17
50:9 58:23
**undersigned** 85:6
**understand** 5:18
17:3,18 23:22
23:24 34:2
37:14,15 45:14
50:24 59:24
60:1 62:22
68:18
**understanding**
5:4,5 13:14 17:9
20:3 21:14,20
21:24 23:21
27:17 28:16,18
36:5,25 41:15
50:15 58:19,22
59:18 63:14
66:9 73:25
**Understood** 46:17
**underwrite** 39:10
42:15
**unfortunately**
70:25
**Union** 10:14,18

19:12,16,19
20:7,13
**Union/Wachovia**
9:14,15 10:20
10:25
**unit** 11:7 44:12
**UNITED** 1:1
**units** 13:9,11
**University** 6:22
**untrue** 70:14
**upcoming** 40:6
**updated** 44:7
**upper** 71:20
**use** 29:5 39:23
50:25 51:16

**V**

**V** 88:2
**valuable** 56:8
**value** 26:6 37:9,11
37:17 61:14,21
61:25 62:3,3,5
74:22
**varied** 47:13
**various** 31:25
32:6 52:1
**vary** 48:1
**vast** 43:3
**vehicle** 8:9
**verbal** 5:14
**verbalized** 5:16
**version** 17:19
**versus** 17:15,16
70:5
**vetted** 77:24
**view** 62:1 78:1,11
**viewed** 25:22
**viewing** 24:12
**vis-à-vis** 17:4
**vs-** 1:6

**W**

**W** 2:3
**Wachovia** 10:14
10:18

**want** 10:19 24:8
25:2 50:1 62:6
72:19,20
**wanted** 14:5 33:2
39:7 56:24 57:9
57:14 58:9 61:6
77:19
**wants** 75:13,18
**warehouse** 11:9
**Washington** 2:11
6:11
**wasn't** 14:6 24:21
38:16 53:10
57:8 58:5 61:19
**way** 15:18,21
16:22 17:12
33:6 36:23
70:23 78:6 81:6
**We'll** 8:7 74:22
84:4
**we're** 24:13 39:5
49:10 68:9
70:24 83:16
**we've** 68:8 69:5
76:3 77:25
79:25
**website** 12:20
13:12
**Webster** 1:4
19:11 24:16,17
25:19 28:13
29:11 31:13,23
32:14,16 34:14
51:15,17 55:16
55:23 56:2,8
61:1 78:17
79:11,16 83:5
**Webster's** 29:7,23
60:4,11
**weeds** 62:7
**week** 37:1
**weeks** 43:2
**well-known** 39:5
**went** 11:11 23:18
36:19 75:22

**weren't** 19:1
**West** 1:18 2:5
**whichever** 9:10
**wife** 27:12 39:4
**WILLIAM** 2:10
**willing** 24:23
**win** 40:19 41:14
43:8
**window** 42:25
**Winston** 2:10
27:21 32:5
**wired** 45:7
**witness** 4:12
16:25 25:25
28:21,22 35:24
49:22 52:18,20
52:21 58:12
63:11 70:22
75:15 80:9,9
**Witness'** 3:12
**wmiossi@winst...**
2:12
**word** 22:10 50:25
71:18,19
**words** 72:6
**work** 5:5 12:9
14:2,6 15:14
18:21 19:12,15
20:21 22:7,16
22:18 23:16,22
23:24 25:2,7
29:5,19 33:5
38:4 43:4,18,20
46:19,22 62:7
70:3,4,5 74:17
77:23 78:25
82:16,18
**worked** 21:22,25
23:1 31:24 32:9
36:17,19 37:14
37:15,16 39:5
56:9
**working** 10:14,18
13:22 14:1,1
21:17,22 24:2

24:21 25:10
26:11 28:2
36:22
**workout** 47:22
48:2
**workouts** 47:23
**works** 42:9 46:21
**world** 18:20 20:18
30:11
**Worley** 1:14 3:4
4:9,15 29:25
85:7 87:18 88:4
**worry** 58:2
**worth** 59:9
**wouldn't** 24:5
56:19 75:15
**write** 60:4 88:6
**writes** 78:11
**written** 67:8 72:9
73:12 75:1
**wrong** 26:12 44:8
60:17
**wrote** 27:10 32:14
81:17 83:1

**X**

**X** 3:2,9

**Y**

**yeah** 8:19 9:8
10:22 20:23,23
22:22 23:10
31:2,5 33:7,9,19
35:4,17,18,23
46:4 51:24
54:10 67:25
69:7,14 75:17
78:6 79:19 81:2
**year** 4:24 7:4
33:19,21 34:11
36:13,15 49:4
49:18,22,23
57:13 72:4 79:3
80:19 81:12,25
82:1

Hughes v. Priderock                                          10/11/2018
David Worley

Page 102

| | | | |
|---|---|---|---|
| **years** 5:1 6:9 9:24 10:21 11:19 12:3 13:3 19:8 19:13 26:4,15 31:18 39:5 77:13<br>**yep** 73:14 81:14<br>**yield** 41:18 57:11 | **175** 72:4<br>**175,00** 71:16<br>**175,000** 71:15<br>**19** 3:11 6:13,14 7:10 53:14 58:13<br>**1973** 6:22,23<br>**1977** 6:23 7:5 | **220** 27:20<br>**225932** 85:16<br>**22nd** 53:8 85:10 86:16<br>**24** 72:24<br>**24th** 77:17<br>**25** 47:23 71:17 72:4 | **80s** 10:19<br>**82** 53:16 |

**9**

**9** 77:16
**9:19-cv-80110-...** 1:2

**Z**

**zero** 79:5,23
**Zhenshi** 45:6 59:4 60:2,10 63:22 64:22,25 82:16
**zillion** 79:10

**0**

**0000030** 3:15
**0000330-331** 3:14
**05** 10:22

**1**

**1** 46:6
**1.25** 46:7
**1.5** 45:21 46:5,6
**1:30** 37:20
**10** 26:10 49:19 70:12,13 73:19 75:5 81:6
**10%** 80:22
**100** 13:3 54:23 55:8 66:12
**109** 53:4 54:14
**11** 1:15 88:5
**11:55** 1:16
**12** 26:10 49:19,19
**12,000** 13:11
**12:55** 37:19
**120** 49:21 55:8,9
**13** 80:4
**16** 13:11
**1601** 2:4
**17** 10:21 39:5 52:16
**1700** 2:11

**2**

**2** 12:17 72:23
**2,000** 26:24
**2:55** 1:16 84:6
**20** 3:13 40:1,2 53:14,14 55:5
**20,000** 67:23
**200** 27:14 59:9 72:4
**200,000** 34:11 72:3 80:22 81:16,25
**20006** 2:11
**2004** 10:22
**2005** 11:21 12:13
**2009** 19:4
**2014** 11:21 13:23 20:21 21:8
**2015** 21:8 33:22
**2016** 35:18,24 36:2,9,22 52:12 72:24 73:11 75:21 76:12 77:6,10 79:4,6 79:15,22 81:13
**2017** 52:15 53:4 77:17 80:16 81:20
**2018** 1:15 3:13 53:8,15 85:10 86:16 87:13 88:5
**202.282.5708** 2:12
**2022** 85:16
**20th** 76:12
**21** 3:15 71:5,6

**3**

**3** 8:2,8 35:19 58:11 75:20
**30** 26:15 65:25
**31st** 53:15
**33401** 1:18 2:5
**35,000** 71:17

**4**

**4** 3:5 76:4
**40** 3:13 55:4
**40,000** 13:9
**4th** 75:21

**5**

**5** 71:17 76:6,10
**50** 48:3
**500** 2:4
**505** 1:17
**561.990.1591** 2:5
**58** 53:9

**6**

**6** 3:11 29:24
**60** 49:22
**600** 1:17

**7**

**7** 49:19 85:16
**71** 3:15
**73** 6:24
**75** 49:24
**77** 6:24,25
**7th** 80:16

**8**

**80** 49:22