**EXHIBIT 9**

Hughes v. Priderock                                    10/11/2018
David Khoury

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:19-cv-80110-ROSENBERG/REINHART

WEBSTER HUGHES,

      Plaintiff,

-vs-

PRIDEROCK CAPITAL PARTNERS, LLC,

      Defendant.

_____/

DEPOSITION OF DAVID KHOURY

Thursday, October 11, 2018
3:07 p.m. - 4:32 p.m.

505 S. Flagler Drive
Suite 600
West Palm Beach, Florida 33401

Stenographically Reported By
Pamela J. Pelino, RPR, FPR, CLR
Notary Public, State of Florida
FLORIDA COURT REPORTING

- - -

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                          10/11/2018
David Khoury

---

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3      CHRISTOPHER W. KAMMERER, ESQUIRE
        KAMMERER MARIANI, PLLC
4      1601 Forum Place
        Suite 500
5      West Palm Beach, Florida 33401
        561.990.1591
6      ckammerer@kammerermariani.com
7
8
9  On behalf of the Defendant:
10     WILLIAM G. MIOSSI, ESQUIRE, ESQUIRE
        WINSTON & STRAWN, LLP
11     1700 K Street, NW
        Washington, DC 20006
12     202.282.5708
        wmiossi@winston.com
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1                  - - -
2               I N D E X
3                  - - -
4
5  DAVID KHOURY      DIRECT   CROSS   REDIRECT
6  BY MR. KAMMERER        4
7
8
9
10                 - - -
      E X H I B I T S   M A R K E D
11                 - - -
   DESCRIPTION                        PAGE
12
   Plaintiff's Exhibit 22             7
13  (Priderock Sunbiz Corporations Pages,
       Articles of Incorporation, Filing,
14     Cover Letter, Articles of Amendment,  )
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1              P R O C E E D I N G S
2                     - - -
3       Deposition taken before Pamela J. Pelino,
4  Registered Professional Court Reporter and Notary Public
5  in and for the State of Florida at Large, in the above
6  cause.
7                     - - -
8  Thereupon,
9              DAVID KHOURY,
10 having been first duly sworn or affirmed, was examined
11 and testified as follows:
12       THE WITNESS:  Yes.
13         DIRECT EXAMINATION
14 BY MR. KAMMERER:
15    Q.   Good afternoon.  I'm Chris Kammerer.  I
16 represent Dr. Hughes in this matter.
17    A.   Great.
18    Q.   Have you ever had your deposition taken
19 before?
20    A.   No.
21    Q.   Okay.  So I'm just going to just give you a
22 brief overview of how it works.  Obviously there's a
23 court reporter here.  We're on opposite sides of this
24 table.  This is really an opportunity for me to ask you
25 questions to understand your understanding of what's at

---

Page 5

1  issue here.
2        And for the ease of the court
3  reporter -- because everything she's doing is going to
4  go into a transcript, and so she can listen -- so that
5  she can listen to us and so that she can make a clean
6  transcript, I'd ask that when I ask a question if you
7  could allow me to finish the question, and then I'll try
8  to be quiet while you answer the question so we're not
9  speaking over one another and making it difficult for
10 the court reporter to take down what we're saying; okay?
11    A.   Sounds good.
12    Q.   All right.  Because she's taking down
13 everything we say, we actually have to say our answers.
14 We have to verbally express them.  So, you know, you
15 can't shake your head because she can't take that down
16 or, you know, if you -- like, uh-huh or huh-uh.  It
17 would be better to say yes or no; okay?
18    A.   Sounds good.
19    Q.   All right.  If any of my questions aren't
20 clear to you, just let me know, and I'll try to reask
21 them in a way that's clear; okay?
22    A.   Yes.
23    Q.   All right.  Just some brief background.  You
24 currently reside in Palm Beach County?
25    A.   I do.

---

Florida Court Reporting
561-689-0999

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

Page 6

1      Q.   And how long have you lived here for?
2      A.   Somewhere between 12 and 13 years.
3      Q.   All right.  Can you give me a little bit of a
4  brief background on your education?  Where you went to
5  college and where you graduated?
6      A.   Sure.  I went to Boston College; graduated
7  from Boston College.  I went to the Harvard Business
8  School; graduated from the Harvard Business School.
9      Q.   And when did you graduate from Boston
10 College?
11     A.   Class of 1995.
12     Q.   And what was your undergraduate degree?
13     A.   Economics.
14     Q.   And Harvard Business School, when did you
15 graduate?
16     A.   Class of 2000.
17     Q.   Can you give me an overview of your career
18 since you graduated from Harvard?  Basically tell me who
19 you worked for.
20     A.   Sure.  I started out of college in the high
21 yield finance group at Merrill Lynch in New York.  That
22 is the noninvestment grade debt group focused on
23 leveraged buyouts.  From there I went back to business
24 school after being an analyst and went back to
25 Merrill Lynch to the real estate group, which is really

Page 7

1  a generalist group.  So you focus on kind of everything,
2  whether it's M&A, CMBS, corporate bond offerings,
3  structuring joint ventures, raising capital for joint
4  ventures, raising private equity funds.
5          From there I went to a group in Chicago
6  called M3.  It was previously McCoy Capital Partners,
7  and that group is specifically focused on structuring
8  and raising capital for large real estate operating
9  companies.  So that includes raising, you know, private
10 equity from around the globe, as well as raising the
11 debt to placing those vehicles, whether it's insurance
12 company debt, CMBS debt, bank debt.
13         And then from there I came back to Florida.
14 Worked at The Bainbridge Companies.  Focused on
15 acquisitions and then started Priderock Capital Partners
16 with George Banks.
17     MR. KAMMERER:  Let me do this.  So I'm going
18 to mark as Exhibit 22 the Secretary of State filing
19 for Priderock Capital Partners.
20         (Plaintiff's Exhibit 22 was marked for
21 identification.)
22 BY MR. KAMMERER:
23     Q.   And just look at this document, and it
24 indicates that the articles of organization for
25 Priderock Capital Partners, LLC, was filed in July 2008;

Page 8

1  is that correct?
2      A.   That could be right.
3      Q.   Does it refresh your recollection of
4  approximately when you formed Priderock Capital Partners
5  with Mr. Banks?
6      A.   That sounds about right.  You know, 10, 11
7  years ago is when we founded the company, and probably I
8  was working then.  Yeah, that sounds about right.
9      Q.   And as I understand it -- I think Mr. Miossi
10 is tired of me asking the question.
11         It appears to me that Priderock Capital
12 Partners is an asset manager?  Manages real estate
13 acquisitions?
14     A.   Are you asking what Priderock Capital
15 Partners is?
16     Q.   We can ask it that way, yes.  What does it
17 do?
18     A.   Well, we own and operate real estate.  So we
19 buy real estate.  We build buildings; we design
20 buildings.  We manage properties across the country.  So
21 you could say it's an asset management company.  It's
22 also, you know, a full-service real estate company.
23 It's a real estate operating business.
24     Q.   The only reason I termed it asset management
25 is because the website for Priderock Capital Partners,

Page 9

1  LLC, indicates that it's -- I'll show it to you.
2      A.   I think asset management is fair but, you
3  know, there are a lot of asset management companies that
4  don't manage properties and design buildings.  So it's a
5  little bit of both.
6      Q.   So what I handed you, I believe, was marked
7  as Exhibit --
8      MR. MIOSSI:  2.
9  BY QUESTIONER:
10     Q.   -- 2.  And what I was referring to is what's
11 written on the bottom of -- this is a screen print from
12 the website.
13     A.   Uh-huh.
14     Q.   And it states:  "Priderock Capital Partners
15 is a private multi-family asset manager.  Priderock's
16 principals have over 100 years of experience in
17 acquiring, developing, financing, managing and
18 renovating apartment communities across the continental
19 U.S.  The senior management team has acquired,
20 developed, renovated and managed over 40,000 units in
21 their careers.  Priderock currently owns and manages
22 over 12,000 units across 16 states."  And I won't go
23 through the states.
24         Is that an accurate description of what
25 Priderock Capital Partners does?

3 (Pages 6 to 9)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

---

Page 10

1     A.  Yeah.  I think that's reasonable.
2     Q.  And as I asked one of the earlier witnesses,
3  "multifamily" means rental properties; is that correct?
4     A.  Yeah.
5     Q.  I'd like to hand you what we've marked as
6  Exhibit 3 previously, which is the private placement
7  memorandum for the fund?
8     A.  Yeah.
9     Q.  I'm going to refer to the Priderock
10  Multifamily Debt Opportunity Fund, L.P., as the "fund";
11  okay?
12     A.  Yes.
13     Q.  All right.  Do you recognize the -- Exhibit 3
14  as a private placement memorandum from April of 2016 for
15  the fund?
16     A.  Yeah.  Yes.  Yes.  It looks like our
17  document.
18     Q.  Did you have any involvement in the
19  preparation of the private placement memorandum?
20     A.  Yes.
21     Q.  Can you tell me what involvement you recall
22  you had with regards to the preparation of the private
23  placement memorandum?
24     A.  I remember trying to look at the background,
25  you know, general structure of the document.  Looking

---

Page 11

1  for other documents to see how we should put our
2  document together.  You know, talking to the lawyers
3  about how the document should be put together,
4  presenting information on our company, presenting
5  information on the opportunity, that kind of thing.
6     Q.  Okay.  If you could look at page 6, the
7  overview.  It doesn't have a page number on it, but it
8  has the overview.  It's up at the top of the page.
9     A.  Sure.
10     Q.  Right there.  Okay.  So in the second
11  paragraph -- and I'm going to ask you a few questions
12  about what's stated on this page, but to start off, in
13  the second paragraph, it reads:  "The investment
14  strategy of the Fund is to purchase and actively manage
15  Controlling Class subordinated certificates
16  ('Controlling Class') issued under the Freddie Mac
17  K-Series Multifamily Mortgage Securitization Program
18  (K-Deals.)"
19          So for today's purposes, I'm just going to
20  refer to those as "K-Deals"; all right?
21     A.  Yes.
22     Q.  Now, prior to the creation of the fund, had
23  Priderock Capital Partners had any experience with the
24  acquisition of K-Deals?
25     A.  No.

---

Page 12

1     Q.  Had Priderock Capital Partners created any
2  investment fund to invest in securities related to real
3  estate?
4     A.  No.
5     Q.  What experience did you have with K-Deals
6  prior to the creation of the fund?
7     A.  None.
8     Q.  And do you know what experience Mr. Banks had
9  with regards to K-Deals prior to the creation of the
10  fund?
11     A.  I do not.
12     Q.  Daniel Ng is an employee of Priderock Capital
13  Partners; is that correct?
14     A.  Yes.
15     Q.  Do you know what experience he had with
16  regards to K-Deals prior to the creation of the fund?
17     A.  I do not.
18     Q.  Okay.
19     A.  I mean, I don't think it's Dan's background,
20  but that's a question for him.  I don't exactly know.
21     Q.  Would that go with regards to, like,
22  Zhenshi Jin, I think, as well?
23     A.  Same answer.
24     Q.  In the first paragraph, it states:
25  "Priderock Multifamily Debt Opportunity Fund, L.P., (the

---

Page 13

1  'Fund') is a private investment vehicle organized as a
2  Delaware limited partnership and sponsored by Priderock
3  Fund Management Partners LLC, (the 'Investment
4  Manager'), an affiliate of Priderock Capital
5  Partners LLC."
6          How is Priderock Fund Management Partners,
7  LLC, affiliated with Priderock Capital Partners, LLC?
8     A.  You mean legally?
9     Q.  Yeah.  What is your understanding of how they
10  are affiliates of one another?
11     A.  Well, I would guess if they're affiliates of
12  one another, George and I would be involved.
13     Q.  I assume or I take it that you and Mr. Banks
14  are principals in both the entities?
15     A.  We are.
16     Q.  Meaning you're both owners of -- in both
17  entities?
18     A.  We are.
19     Q.  Who are the owners of Priderock Capital
20  Partners LLC, or who are the members, I should say?
21     A.  You know, I'd have to get the document but,
22  you know, we have a lot of entities.  But generally
23  speaking, George and myself.
24     Q.  Okay.  And with regards to Priderock Fund
25  Management Partners, LLC, who are the members or the

---

4  (Pages 10 to 13)

Florida Court Reporting
561-689-0999

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

Page 14

1   owners of that entity?
2       A.  I'd have to see the organizational chart to
3   see if David Worley is also part of that document.  So,
4   I mean, it's tough for me to answer the question without
5   the organizational chart.  With the organizational
6   chart, then I can tell you exactly which.
7       Q.  Certainly you and Mr. Banks, though, would be
8   owners --
9       A.  Certainly, we would, yes.
10      Q.  -- of Priderock Fund Management Partners,
11  LLC; right?
12      A.  Yeah.
13      Q.  You see in the third paragraph -- it reads:
14  "The fund has been identified by Freddie Mac as having
15  the expertise and infrastructure required to invest in
16  and represent the Controlling Class."
17          What is your understanding of the expertise
18  that the fund had with regards to investing in the
19  K-Deal?
20      A.  Sure.  K-Deals are multifamily.  The
21  underlying collateral generally speaking are loans
22  underpinning multifamily properties.  We are multifamily
23  experts.
24      Q.  By virtue of your Priderock Capital Partners
25  ownership interest in the various properties that you

Page 15

1   described earlier?
2       A.  You know, by virtue of the experience of the
3   employees at our company.  You know, we also are
4   frequent borrowers of Freddie Mac.  So, you know, they
5   know us very well.  We have a very important
6   relationship with them.  So that's part of it.
7       Q.  Can you explain that to me?  What you mean by
8   that?  You have a very important relationship?
9       A.  Sure.  We buy real estate around the country,
10  and the largest lenders in multifamily space are the
11  agencies Freddie Mac and Fannie Mae, and we have a very
12  extensive relationship with Freddie Mac.  So that
13  relationship and that trust in us as a borrower is part
14  of that relationship.  So that's part of it.
15          And I'd say the other part is David Worley's
16  background.  You know, David has extensive knowledge of
17  both agencies, you know, his career in the lending
18  industry, his position as the chief risk officer in the
19  multifamily division of Freddie Mac's, you know, kind of
20  sister competitor.  So it is that combination of
21  expertise that I would think that that would refer to.
22      Q.  So how did the concept of creating the fund
23  arise?  Your recollection?
24      A.  We are multifamily folks.  The controlling
25  class is an extension of multifamily investing.  It's

Page 16

1   just a little bit of a different area in the capital
2   structure and, really, it's through conversations
3   between us and David Worley that, you, know, drove the
4   idea.
5       Q.  There is a distinction, though, between the
6   type of direct ownership interest that you acquire
7   traditionally versus acquiring an ownership interest in
8   a securitization of a pool of loans which --
9       A.  You know, I really think you'd have to talk
10  to different investors to get that answer.  I mean, to
11  us it's multifamily exposure.  If you know how to
12  operate multifamily assets, that's what's important.  At
13  the end of the day, you have a return, and you have a
14  group that can either do something with the asset if
15  there's a problem, or you don't.  You have a group that
16  can underwrite a property, or you don't.  You know, is
17  it a different part of the capital structure?  Yes.  But
18  at the end of the day, it's multifamily exposure.
19      Q.  So who -- well, let me go back.
20          How did you get introduced to Mr. Worley?
21      A.  Through George.
22      Q.  All right.  And so do you recall
23  approximately when you first met Mr. Worley?
24      A.  I mean, you know, that's --
25      Q.  Approximately?

Page 17

1       A.  I don't know.
2       Q.  What I'm trying to do is get a general idea.
3   So can I ask --
4       A.  Is it three years ago?  It's some years ago,
5   not ten.  So, you know...
6       Q.  Well, what I'm trying to get an understanding
7   of from your perspective is, you know, who you had
8   discussions with that led up to the idea of creating a
9   fund and how those sort of evolved.
10      A.  You know, we had discussions with David and
11  you know, David knows, you know, the senior folks at
12  Freddie Mac.  He knows other buyers of K-Series.  So,
13  you know, in terms of, you know, kind of getting into
14  the program, access to the -- I mean, David, you know,
15  understands the relationship between agencies and
16  borrowers.  So he knows that we have a good relationship
17  with Freddie Mac.  He knows we have a good relationship
18  with Fannie Mae, and he has very senior relationships
19  within Freddie Mac.  And so it was a simple discussion.
20  You know, this is interesting.  You know, let's kind of
21  push it down the road kind of thing.
22      Q.  I understand that he was -- after leaving
23  Fannie Mae, he was doing some work with Priderock
24  Capital Partners, basically consulting with regards to
25  the acquisition of certain deals.  Is that a fair

5  (Pages 14 to 17)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

---

Page 18

1   statement?
2       A.   Yeah.
3       Q.   And is it during that sort of -- I'm just
4   going to call it consulting that he was providing.
5           Did he raise the idea of Priderock Capital
6   Partners creating a fund to invest in K-Deals?
7       A.   You know, I don't recall.  I think the idea
8   of a fund evolved from discussions about multifamily,
9   meaning, you know, this is another area.  You know, this
10  is what the yields look like on, you know, K-Series
11  debt.  You know, talking about here's the risk of the
12  equity.  You know, that kind of thing.  So you have
13  conversations about a product, and then those
14  discussions became, you know, more detailed once -- you
15  know.
16      Q.   Before meeting Mr. Worley, did you have any
17  interest in creating a fund to invest in K-Deals?
18      A.   I've had a interest in creating a fund for
19  different areas of the capital structure, whether that's
20  mezzanine financing on construction deals or mezzanine
21  financing in acquisitions.  So an interest,
22  yes -- pursue.
23      Q.   Okay.  So if you could take me from your
24  initial discussions you described between you and
25  Mr. Worley with regards to -- ideas of creating a fund

---

Page 19

1   to invest in K-Deals.  What's sort of the evolution of
2   that, how that became actually a plan?
3       A.   How it became a plan?
4       Q.   Because what I ultimately would ask you is
5   what was the plan?  Because at some point I understand
6   you're having discussions, but those discussions
7   solidified into, okay, this is -- let's try this.  This
8   is the idea here.
9       A.   Well, I guess, you know, once you understand
10  what the yields are -- you know, is it attractive to
11  investors?  Is it attractive to our investors?  Is it
12  attractive to our families.  So that's something, you
13  know, on my side.  So it's something that -- we
14  understand the area of the capital structure it sits in.
15  We issue Freddie Mac debt all the time.  So that part,
16  you know, we understand very well.  Then the question
17  is, you know, can you access the product?  You know,
18  will Freddie Mac allow you into the program?  And that's
19  where David came in.
20          And so I think that's how it advanced.  Do we
21  think there's demand for it.  Yes, we think there's
22  demand for it.  Will the combination of David Worley and
23  our multifamily expertise be attractive to Freddie Mac
24  so we can get the product.  Yes.  We think that's going
25  to -- we think that will be the case.

---

Page 20

1       Q.   At some point I assume that there
2   was -- after the discussion there was plan of this is
3   what we're going to do.  We're going to move forward.
4   We're going to feel out prospective investors with
5   regards to raising capital.  We're going to initiate the
6   process of creating a private placement memorandum, and
7   then it's going to be a jump off where we try to get
8   commitments.  Is that sort of --
9       A.   Sure.
10      Q.   -- you know, basically the steps that would
11  be required?
12      A.   Yeah.  This might work.  Let's move through
13  the details of trying to make it work.
14      Q.   Right.  And what was Mr. Worley's position
15  with Priderock Capital Partners prior to the creation of
16  the fund?
17      A.   Well, David is not an employee of Priderock
18  Capital Partners.
19      Q.   Does he have any --
20      A.   He's not an employee of Priderock Capital,
21  yeah.
22      Q.   Did he have any associate -- well, the
23  employment wasn't the important thing.  Was he a
24  consultant at all to Priderock Capital Partners?
25      A.   You know, we didn't have a contract or

---

Page 21

1   anything with him.  You know, we did -- you know, he
2   helped us with some capital market stuff.  He did some
3   consulting.  Sure.
4       Q.   Provided advice?
5       A.   Yeah.
6       Q.   Okay.  How did you get introduced to
7   Webster Hughes?
8       A.   Through David Worley.
9       Q.   And when during the conversation of creating
10  the fund did that -- did he come up?
11      A.   Well, I don't know.
12      Q.   Well, was it early on, or was it late in the
13  game?
14      A.   Late in the game, meaning closing of the
15  fund.  Somewhere in the middle before that document was
16  done, I guess.
17      Q.   Okay.  And I think you were introduced to him
18  through Mr. Worley; right?
19      A.   Yes.
20      Q.   Do you recall what Mr. Worley told you about
21  Mr. Hughes as to bringing him on and participating in
22  the fund or having some role with regards to the fund?
23      A.   I mean, no, other than he was going to do
24  some model work.
25      Q.   What type of work?

---

6  (Pages 18 to 21)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Page 22

```
 1    A.   Analytics.
 2    Q.   I'm sorry.  The term you used?
 3    A.   Analytics.
 4    Q.   Oh, analytics.
 5    A.   Model work.  We call it model work.
 6         (Discussion held off the record.)
 7  BY MR. KAMMERER:
 8    Q.   Did Mr. Worley tell you why it would be
 9  useful to have Mr. Hughes provide model work with
10  regards to the creation of this fund?
11    A.   You know, I don't really have a memory for
12  that kind of stuff.  You know, that's really on David.
13  If David says, hey, I want to have a guy do some
14  analytics for us, then I -- you know, I kind of have
15  to...
16    Q.   What was the first time you met Dr. Hughes?
17    A.   I don't know.  Let me think.
18    Q.   I assume you have met him; right?
19    A.   Oh, yeah.
20    Q.   Oh.
21    A.   You know, I remember being at a couple of
22  meetings with him, but I don't really recall our first
23  meeting.
24    Q.   Did he attend some meetings with investors
25  with you?
```

Page 23

```
 1    A.   He did.
 2    Q.   Prospective investors?
 3    A.   He did.
 4    Q.   And what was the purpose of him attending
 5  those meetings with investors with you?
 6    A.   Generally to answer questions that analysts
 7  would answer.  So that's what he was there for.  And it
 8  doesn't matter if it's a property deal, a debt deal,
 9  raising capital for something.  You know, I started at
10  Merrill Lynch.  I was an analyst.  I was the numbers
11  guy.  So I'd go to meetings; I'd answer questions.  You
12  know, how does your model work?  He was there to answer
13  those questions.
14    Q.   How many meetings with prospective investors
15  did you attend with Dr. Hughes?
16    A.   You know, I don't know how many.  I can
17  recall at least four meetings offhand that I
18  roughly -- I don't know how many but at least four.  I
19  can say that because can I remember four.
20    Q.   And did he interact with the
21  investors -- with respect to investors?
22    A.   Yeah.  He answered questions about the model.
23  How does your model work?  You know, maybe they went
24  around a scenario.
25    Q.   Did you ever access his model and view it and
```

Page 24

```
 1  have him explain his model to you?
 2    A.   I have seen the model.  I've asked him
 3  questions about the model but, you know, generally
 4  speaking I understand the model.
 5    Q.   Was he able to answer your questions?
 6    A.   I don't recall.  I'm sure he got to answer.
 7  So...
 8    Q.   What about the meetings with prospective
 9  investors that you attended with Dr. Hughes?  Was he
10  able to answer those prospective investors' questions
11  about the functioning of his model?
12    A.   I would say he was generally able to answer
13  questions about the function of the model.
14    Q.   Was he responsive to investors' questions?
15    A.   That, I, you know -- you know, was it
16  us -- sure.  I mean, was he responsive to their
17  questions?
18    Q.   To answer their questions.  The purpose of
19  having an analyst there is to answer questions --
20    A.   Generally speaking, you know, we kind of
21  answer -- we kind of answer the questions.  In investor
22  meetings the analyst is there to answer certain
23  questions, but generally speaking it's the principals
24  that take the lead in answering questions.  If it's a
25  question about -- you know, a specific question about
```

Page 25

```
 1  the model, he can answer.
 2    Q.   All right.  Dan Ng is an employee of
 3  Priderock Capital Partners; right?
 4    A.   (The witness nods.)
 5    Q.   You have to say yes or no.  Daniel Ng is an
 6  employee of Priderock Capital Partners; right?
 7    A.   He is.
 8    Q.   Is he an analyst?
 9    A.   Dan is not an analyst.
10    Q.   Were there any analysts capable of explaining
11  a K-Deal model to your prospective investors in the fund
12  that were -- was employed by Priderock Capital Partners?
13    A.   At that time?  No.  Dan, myself, David Worley
14  are all able to speak to the models, but Webster's job
15  was to be -- you know, his task was to be the analyst.
16    Q.   Was it your understanding that he had created
17  the model that was used by Priderock to -- with regards
18  to the fund?
19    A.   I don't have a very good understanding of
20  exactly where that model came from, meaning I'm not
21  exactly sure.
22    Q.   Was it your understanding that he created it?
23    A.   It's my understanding that it was a model he
24  had and knew how to use.  I don't know if Webster
25  created the model or not.
```

7 (Pages 22 to 25)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                          10/11/2018
David Khoury

Page 26

1       Q.   All right.  It's a model that he provided.
2       A.   It is a model that he provided, yes.
3       Q.   And that Priderock used with regards
4    to -- provided to its investors in order to explain
5    functioning of a K-Deal?
6       A.   How the cash flows worked, yes.  You can
7    explain it -- yes.
8       Q.   And did you understand that Dr. Hughes had
9    experience with K-Deals?
10      A.   I was not aware that -- and not to
11   this -- until right now, I'm not aware that Dr. Hughes
12   has experience with K-Deals.  I have been told that
13   Dr. Hughes had experience with securitizations.  It's
14   not necessarily K-Deals.
15      Q.   Was it necessary that Priderock had an
16   analyst who was able to explain financial models with
17   regards to the K-Deals for prospective investors of the
18   fund?
19      A.   It was part of talking to investors as having
20   numbers.  So, you know, it's part of the role.  So you
21   need to have the numbers there.
22      Q.   And the numbers being, as you said --
23      A.   Whether it's Webster or someone in-house
24   doesn't -- you should have numbers, yes.
25      Q.   But Priderock didn't have somebody in-house

Page 27

1    to do the analysis with regards to the K-Deal
2    investments?
3       A.   We did not.
4       Q.   All right.  Did you find Webster's model
5    useful with regards to interacting with the investors
6    you interacted with?
7       A.   I did.
8       Q.   And can you give any depth to that answer?
9    How you found it useful?
10      A.   Well, you know, it's kind of like anything.
11   You know, having numbers to talk from is helpful with,
12   you know, investors.  The analyst function is, you know,
13   a very basic function, real estate deal, whatever, you
14   know.
15      Q.   But aren't K-Deals sort of a niche area of
16   CMBS securitizations?
17      A.   Yeah, it's a niche area.  I mean, you can
18   pull the cash flows off Bloomberg.
19      Q.   That I understand, but that's not what --
20      A.   I'm just saying.
21      Q.   But that's not what Priderock chose to do;
22   right?
23      A.   No.  David brought in Webster to do -- well,
24   modeling work.
25      Q.   As I understand it, there are other models

Page 28

1    that are sort of just off the rack that Bloomberg offers
2    that Priderock Capital could have paid an expense for
3    and used rather than having Webster provide his model
4    and explain his model?
5       A.   Are you asking if we could have done it
6    without Webster's model?  The answer is sure.
7       Q.   Sure.  And you could have used -- what is it?
8    Bloomberg, they provide financial models?
9       A.   You can actually download the cash flows.
10   Bond cash flows, sure.
11      Q.   But there was a decision made not to do that;
12   correct?
13      A.   You know, David brought in Webster, and we
14   went with it.
15      Q.   Well, did you?
16      A.   Well, yeah, that's the answer.
17      Q.   But then if you use a Bloomberg model, you
18   don't have anybody there to answer the questions.  The
19   model is the model?
20      A.   No.  I mean, once you download the cash
21   flows -- it's something that's easily learned.  So any
22   analyst in our shop, you know, could take the time,
23   learn the skill, answer the questions.
24      Q.   Do you have a --
25           THE WITNESS:  Do we have two minutes?

Page 29

1           MR. KAMMERER:  Sure.
2           (A brief recess was taken.)
3    BY MR. KAMMERER:
4       Q.   Hand you the private placement memorandum
5    back.  If you could look at -- I'm just getting to the
6    page.  If you could look at page 19.  There's a bullet
7    point on structured transaction analysis and
8    negotiation, and it refers to paragraphs that follow
9    through Dr. Hughes.
10      A.   Uh-huh.
11      Q.   If you could just read the first paragraph
12   and the beginning of the second.
13      A.   Read the first paragraph?
14      Q.   To yourself.
15      A.   (Witness complies.)  Okay.
16      Q.   Okay.  All right.  Does that seem like an
17   accurate description of what Dr. Hughes' role was to be
18   with the fund?
19           MR. MIOSSI:  You talking about the entire two
20      paragraphs or any portion?  Because you just asked
21      him to read part of it.
22   BY MR. KAMMERER:
23      Q.   Let me do this.  What you read, the first
24   paragraph and -- how far did you read into the second
25   paragraph?

8  (Pages 26 to 29)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                      10/11/2018
David Khoury

Page 30

1      A.  I just read the second paragraph.
2      Q.  Okay.  Does that seem accurate to you?
3      A.  You know, I really had envisioned -- you
4   know, I don't -- you know, I envisioned the role
5   as -- you know, the securitization part really isn't
6   important.  That's not important.  You know, generally
7   if you have a smart person, you know, good at
8   math -- you know, the idea would be to have them do, you
9   know, some ongoing asset management.
10          So, you know, you take the reports, that kind
11  of thing, that the servicer provides, watch over the
12  portfolio, use the data provided by Freddie Mac to
13  understand market performance, underwriting, you know,
14  properties.  Learning how to underwrite properties.  So
15  taking a role in underwriting the individual assets and
16  loans in the pools as we get them.  You know, there's
17  really not a lot of negotiation with Freddie Mac.  They
18  basically tell you what to bid and how to bid.  I mean
19  that's really -- I mean, that's really David Worley.
20      Q.  But with regards to the investors,
21  understanding the financial projections, I assume, would
22  have some importance to the -- to Priderock?
23      A.  That's the analyst role.  That's the analyst
24  role, which is part of the role.
25      Q.  That's to give -- I assume to give investors

Page 31

1   some confidence that what's being represented to them is
2   accurate and that they -- the returns they can expect?
3      A.  Well, I think investors are very
4   sophisticated but, again, you know, confidence in terms
5   of what they get, yeah.  They too have Bloomberg's, and
6   they can print the cash flows off of Bloomberg.  But
7   it's like a demonstration tool.  Here's the return that
8   you can expect.
9      Q.  Now, I assume that's the bottom line for the
10  investors; right?
11      A.  No.  No.  That's not correct.
12      Q.  Can you tell me why that's not correct?
13      A.  Well, that's only a very small part of it.  I
14  mean, you know, what's return without understanding
15  risk.
16      Q.  That, I grant you, but, I mean, isn't that --
17      A.  Well, I mean, that's -- the most important
18  thing is risk and return.  You can't understand risk
19  through a model.  And so, you know, it's not -- so it's
20  just not the bottom line for an investor, at least any
21  good investor.
22      Q.  Okay.  Let me ask you to turn to page 25, and
23  I'm going to ask you again to read to yourself the last
24  paragraph.
25      A.  Uh-huh.  (Witness complies.)

Page 32

1      Yep.
2      Q.  You read it all?
3      A.  Yeah, I've read it all.
4      Q.  Fast.  Does that seem to accurately portray
5   what Dr. Hughes's role was to be with regards to the
6   fund?
7      A.  The role is the same, I mean, that we just
8   discussed.  So I don't...
9      Q.  My question simply is:  Is this accurate as
10  to what role he was going to play with regards to the
11  fund?
12      A.  He was going to -- you know, he was going to
13  work, provide surveillance, analytics, underwriting.
14  You know, that was the role I had envisioned.
15      Q.  Why is he even listed in the PPM under
16  management?  If you look to the previous page.
17      A.  Really, you know, he was working on it at the
18  time.  So he's working on it as we were going through
19  the process.  So we include him.  And it's not, you
20  know, Dan; Barbara, David Worley's wife, who, you know,
21  has -- you know, she has a track record and worked at
22  Freddie for a long time, but...
23      Q.  You're not likely including people in the PPM
24  under management, I assume though; right?
25      A.  We were including people that were working on

Page 33

1   it at the time that we envisioned for all -- for it
2   going forward.  The most important part of the PPM is
3   George Banks, myself, and David Worley.  Those are the
4   three most important participants.
5      Q.  And I'm not suggesting that you're not.
6      A.  Okay.  It's our responsibility at the end of
7   the day to make sure that we have, you know, the right
8   resources working on it, whether that's Webster and Dan
9   and Barbara, or it's X, Y, and Z.
10      Q.  Do you have an understanding that besides
11  attending some meetings with prospective investors that
12  Dr. Hughes was speaking with Jonathan Diamond and also
13  attending meetings with investors with Jonathan Diamond
14  to explain his model as well?
15      A.  I'm aware that I have not been in all of the
16  meetings or calls that Webster has been in.
17      Q.  So you were aware, though, that
18  Jonathan Diamond was using him effectively as an asset
19  as part of his presentations to investors?
20          MR. MIOSSI:  Object to the form of the
21      question.
22  BY MR. KAMMERER:
23      Q.  Or let's look to solve that question, that
24  Jonathan Diamond was including Webster in either calls
25  with investors or meetings with investors?

9  (Pages 30 to 33)

Florida Court Reporting
561-689-0999

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                      10/11/2018
David Khoury

| Page 34 | Page 36 |
|---|---|

**Page 34**

1      A.   I am aware of that.
2      Q.   And you're aware that he -- that
3  Jonathan Diamond -- strike that.  You're aware that
4  Webster had put on, I guess, his firm's website the
5  model so investors could access the model themselves?
6      A.   I am aware of that.
7      Q.   Okay.  And that the link was given out to
8  various investors by Priderock or by Jonathan Diamond?
9      A.   I don't know if -- I'm aware that he had a
10  link to give to investors, and that's -- you know, how
11  it got to them, I don't...
12      Q.   Maybe I asked you this but -- yeah.  You
13  answered it earlier.
14          Do you recall the people who are involved
15  with meeting with prospective investors with regards to
16  raising capital for the fund?  The specific individuals?
17      A.   Who are what?
18      Q.   Who were involved with raising capital.
19      A.   Raising capital?  Let's see.  Well, Jonathan.
20  Yeah.  There's a lot of different parts to raising
21  capital, but the investors were generally brought to the
22  table by George, myself, or Jonathan.  They were either
23  previous investors or, you know, new investors that are
24  in other relationships or that Jonathan or his brokerage
25  firm brought to the table.  So call it Niagara, I think

**Page 35**

1  is the name of that.
2      Q.   You told me there were several parts to
3  raising capital.  What are those parts?
4      A.   Identifying prospective investors.
5      Q.   And besides that?  You have to meet with the
6  investors.  You have to provide them with the
7  information?
8      A.   Yeah.  Introducing your core competencies to
9  the investors, and then you go talk to them about the
10  opportunity.  And then, you know, if you move through
11  all those stages, then it's really getting them
12  comfortable with your documentation process, with, you
13  know, your back office controls, all of the stuff that a
14  big organization brings to the table.
15      Q.   Now, with regards to private placement
16  memorandums dated April 2016, as I understand it there
17  were three securities purchased through the fund, and
18  then in April 2017, there's a purchase of $109 million
19  of K-F29.  January 22nd, 2018, there is a purchase of
20  $58 million from K-1504, and May 31st, 2018, a purchase
21  of $82 million of K-F46C.
22          Do those all seem accurate to you?
23      A.   Seems accurate to me.
24      Q.   All right.  Between the April 2016
25  preparation of the date of this private placing

**Page 36**

1  memorandum in April of 2017, would the efforts have
2  mainly been at that stage to capital raise?
3      A.   You know, I think capital raising really goes
4  all the way up.  Capital raising doesn't stop.  We
5  didn't have a -- the vehicle isn't you raise all the
6  capital.  Then you go buy the securities.  Everything is
7  done along the same time.  So, for example, some of the
8  largest investors in the last deal were new investors
9  that were introduced at that time.
10      Q.   When you say the "last deal," do you mean the
11  first securities --
12      A.   The last -- the third floating rate
13  transaction, you know, those are new investors that were
14  brought on literally at that time.
15      Q.   Okay.
16      A.   So it is not -- you know, it's not
17  fund-raising, then deployment.  It's deployment,
18  fund-raising, deployment, fund-raising, deployment,
19  fund-raising.  It's just the evolution of this vehicle.
20  It's not always like that, but that's how this works.
21      Q.   And as I understand it, there was
22  a -- David Worley said there was a loan by KeyBank of
23  $20 million in order to close the first purchase; is
24  that accurate?
25      A.   We didn't need it, but we used it, yeah.

**Page 37**

1      Q.   But it was solicited from KeyBank, and it --
2      A.   Yes.
3      Q.   -- was used?
4      A.   Accurate.
5      Q.   And what was the reason for having KeyBank
6  make that loan to enable the purchase?
7      A.   Well, you know, the returns are a little
8  higher when you add a little bit of leverage given the
9  cost of the debt.  It was created to the returns.  But
10  that's really the answer.
11      Q.   Did Dr. Hughes play any role with regards to
12  getting KeyBank on board to make the loan for the --
13      A.   He did.  Again, he played the role of the
14  analyst.  This is how the model works.  They want to see
15  what a scenario looks like if this happens.  You know,
16  run it for us.  For sure.
17      Q.   KeyBank had been involved with making a loan
18  with regards to financing the purchase in a K-Deal.  Is
19  that your understanding?
20      A.   KeyBank has a lot of sophistication with
21  respect to Freddie Mac debt.  They're a special
22  servicer.  Their real estate professionals are very
23  knowledgeable as relates to securitization and
24  servicing.  So there's a lot of knowledge there.
25      Q.   Right.  Are you aware that they were

10  (Pages 34 to 37)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                                    10/11/2018
David Khoury

Page 38

1   financing the purchase of a K-Deal?
2        A.   I'm not aware of it.  That's not to say they
3   haven't.  I'm just not aware of it.
4        Q.   Do you know the amounts that were raised by
5   the fund in the various phases of raising capital?
6        A.   You know, offhand, no.  But it's just a
7   matter of pulling a sheet and --
8        Q.   What document would exist?  Would you show me
9   that?
10       A.   Well, I don't know.  I mean, it's --
11       Q.   Like, when you have your --
12       A.   You know, at each closing you have a list of,
13  you know, investors at each closing.  You know, you have
14  all of your subscription agreements and that kind of
15  thing.  So that's really what it would be.
16       Q.   And I think we did request that in document
17  requests.  Your response is not due yet, but that should
18  provide us -- we asked for the subscription agreements,
19  the lists of the investors.  We should be able to get
20  who invested and the amounts they invested so we will
21  understand the total amount of capital raised.
22       A.   You know, those documents will have the total
23  amount of capital raised and when it was raised.
24       Q.   And what documents are you aware of that will
25  show the performance of the fund since the inception?

Page 39

1        A.   You know, we really don't -- you know, we
2   don't have just a global report.  You know, if an
3   investor wants us to, you know, recap their
4   distributions for them, we do it, but there's -- I don't
5   think there's really a document.  You know, the
6   investors have a portal and you, know, they get their
7   distributions and -- so...
8        Q.   Is there a projection of the -- well, strike
9   that.
10            My understanding is the fund manager received
11  two fees.  One is a management fee.  I guess it's paid
12  monthly, quarterly, and the other is a promote at the
13  end of the -- I guess the maturity of the securities
14  purchase.  Is that an accurate statement?
15       A.   Yes.
16       Q.   Okay.  Do you have any -- does Priderock have
17  any projections of what management fees it will obtain
18  with regards to the fund?
19       A.   We look at different scenarios.  Yeah.  It
20  depends.  It's not linear with this kind of thing.
21  Unfortunately it's not a set formulaic answer.  We know
22  generally what the fee percentages are.  There's a scale
23  per the document, whether it's one and a half, you know,
24  1.15, one and a quarter, and then there's prepayments.
25  And we've had a lot of prepayments.  So that reduces the

Page 40

1   value of the fee and, you know -- so...
2        Q.   Is there a financial sheet that shows that in
3   it, whether it's a model or an Excel spreadsheet that
4   has that information in it that would show here's what
5   we're running, here is what we project to run?
6        A.   Yeah, we have a sheet like that.
7        Q.   What would that be called?
8        A.   You know, it would be called the promote
9   sheet, you know, that kind of thing.  We don't have a
10  name for it.  It's just...
11       Q.   And I'm just asking that just so I know what
12  specifically to ask for.
13       A.   But I don't have any answer.  It's the sheet
14  with the promote on it and the fees.
15       Q.   Okay.
16       A.   Anyway, that's the sheet.
17       Q.   And the same thing would -- with regards to
18  the sheet with the management fees?
19       A.   Yeah.  And all of the costs associated with
20  it and everything and that kind of thing.  Because it's
21  obviously very expensive to have a vehicle like that.
22       Q.   What participation does Priderock Capital
23  Partners, LLC, have with regards to the fees earned by
24  the fund manager from the fund?
25       A.   Zero.  The only reimbursement -- and I don't

Page 41

1   know exactly how it works.  You've asked about Priderock
2   Capital Partners and, again, it's tough for me to answer
3   it because there's an entity issue that I have.  So I
4   don't know if it's -- you know, which Priderock entity,
5   but anything that -- anything that comes out of or is
6   paid by the fund manager to anyone else is reimbursement
7   for services.  Underwriting services, back office
8   services, that kind of thing.
9        Q.   You said you have an entity issue.  What did
10  you mean by that?
11       A.   Meaning I don't know.  There's a lot of
12  different entities.  You said Priderock Capital
13  Partners, and I can't tell that you Priderock Capital
14  Partners gets anything because I don't know if it's
15  Priderock Capital Partners.
16       Q.   What entity receives the management fees?
17       A.   I don't know.
18       Q.   And --
19       A.   I would guess the fund manager, but I
20  don't -- again, I don't know.
21       Q.   And the fund manager?
22       A.   If you say, hey, go look it up for me, I
23  can -- that I can do.  I just don't know.
24       Q.   Well, I may.
25       A.   I don't know.

11  (Pages 38 to 41)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                      10/11/2018
David Khoury

---

Page 42

1    Q.   The Priderock Fund Management Partners, LLC,
2  is the investment manager as stated --
3    A.   I don't know if the GP or the fund
4  manager -- I have no -- I'm unsure of which entity gets
5  the fees.  So if this document says the fund manager
6  gets the fees, then the fund manager gets the fees.
7    Q.   Well, what entities conceivably could get the
8  fees -- the management fees and the promote?
9    A.   I guess the general partner or the -- you
10  know, the fund manager.  Those would be my...
11    Q.   Okay.  Now, with regards to the promote, I
12  understand that actually individuals are receiving
13  percentages of the promote from the fund?
14    A.   Correct.
15    Q.   Not the fund manager itself?
16    A.   Individuals receive a share of the promote,
17  yes.
18    Q.   And Mr. Worley testified earlier that
19  Mr. Banks is receiving 30 percent, you're receiving 30
20  percent, and Mr. Worley is receiving 30 percent of the
21  promote from the fund.
22    A.   I would need to look at a document, but that
23  seems reasonable.
24    Q.   It also indicates --
25    A.   Those numbers will be the same.  That's about

---

Page 43

1  right.
2    Q.   Also indicated that Dan Ng and
3  Barbara Gaziano were also receiving some portion of the
4  promote?
5    A.   I believe 4 percent each.
6    Q.   And Mr. Worley was unsure if anybody else
7  might be participating in the promote.  Are you aware of
8  anyone else who's --
9    A.   I'm not.
10    Q.   So that would be 98 percent right there if I
11  add -- you know, you --
12    A.   I would have to look at the document to see
13  if your 30/30/30 is correct.
14    Q.   And what document would you have to look at?
15    A.   The general partnership document.
16    Q.   And that would be the general partner of the
17  fund, Priderock MDOF GP, LLC?
18    A.   I believe so.
19    Q.   So it sounds like however this is done, the
20  promote is actually passed through to the individuals?
21    A.   Yeah.  Sounds reasonable.
22    Q.   So tell me what your understanding -- well,
23  strike that.
24         When Mr. Hughes -- Dr. Hughes became involved
25  with the fund, was there any discussions with regards to

---

Page 44

1  how he's going to be compensated for his work?
2    A.   Yeah, there were discussions.
3    Q.   All right.  And do you recall -- what's your
4  first recollection of the discussion with regards to his
5  compensation?
6    A.   You know, David had most of the discussions,
7  I would say, with Webster.  He was almost like a liaison
8  in that regard.  I had some discussions with David, and
9  it's a topic I didn't really like to take up with
10  Webster.
11    Q.   Can you explain that to me?
12    A.   You know, I think one line of communication
13  is enough, and that was -- you know, that was David.
14    Q.   Mr. Worley was delegated basically with the
15  task of discussing compensation with Dr. Hughes?
16    A.   I wouldn't say there's a delegation.  It's
17  just that's how it was.  You know, I didn't say you're
18  the only one responsible for dealing with Webster, you
19  know.
20    Q.   I recognize that, but it sounds like
21  effectively he was.
22    A.   Effectively he was the person that talked to
23  Webster.
24    Q.   And that would be David Worley?
25    A.   Yeah.

---

Page 45

1         THE WITNESS:  Give me a second here because
2  I -- there was one email that may help with time
3  reference.
4         (A brief recess was taken.)
5  BY MR. KAMMERER:
6    Q.   I'm going to hand you what was marked as
7  Exhibit 13 at Dr. Hughes's deposition, and we asked
8  Mr. Worley about it.  It's an email, February 2017.
9    A.   Yep.  Do I need to read this whole email?
10    Q.   No, you don't.
11    A.   Okay.
12    Q.   What I would ask you to read, though, is the
13  last three -- say, three sentences of the first
14  paragraph.
15    A.   Uh-huh.
16    Q.   Beginning with "A year ago you."
17    A.   Sure.  Read it.
18    Q.   Okay.  So when I asked Mr. Worley -- I said,
19  okay, so you -- about a year ago would be sometime in
20  February 2016.  He was a little hazy on dates.  In this
21  sentence, he wrote:  "A year ago you and David Khoury
22  and I spoke about what your role might look like if the
23  fund ever got formed.  We had talked about a $200,000
24  salary and 10% promoted interest."
25         Can you tell me if you have a recollection of

---

12  (Pages 42 to 45)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                      10/11/2018
David Khoury

Page 46

1   a discussion with Dr. Hughes in the early part of 2016?
2       A.   I don't have a recollection of talking to
3   Dr. Hughes about it.  I have a recollection -- I recall
4   these numbers.  I recall talking to David Worley about
5   it in some fashion, but I don't recall exactly the
6   scenario.
7       Q.   Can you give me, like, a time parameter when
8   you think you may have discussed it with him?  With
9   David Worley?
10      A.   Sometime during -- I don't know.  Sometime in
11  that period of time.
12      Q.   What do you recall discussing with him?  With
13  David Worley?
14      A.   A role for Webster.  You know, a job.
15      Q.   At what point?  A role for Webster when?
16  After the fund was launched?  Prior to it?
17      A.   A role for Webster once we had successfully
18  executed a fund.  A job, yeah.  Analytics, underwriting.
19      Q.   Understood.  And what was the compensation
20  that you had discussed with David Worley for Dr. Hughes?
21      A.   We had discussed numbers.  I think around
22  these numbers.  I think these are reasonable as a job.
23  You know, these are numbers but, you know, again, it's
24  not these are the numbers, but I remember discussing
25  numbers like that.

Page 47

1       Q.   Do you recall having any discussion with
2   Dr. Hughes with regards to you're going to get $200,000
3   a year through the life of the fund?
4       A.   No.
5       Q.   In any discussions you had with Dr. Hughes,
6   do you recall having discussions about these fees that
7   he was to receive being effectively a percentage of
8   either the management fee or the promote that was to be
9   received with regards to the fund?
10      A.   No.
11      Q.   In this sentence it refers to 10 percent
12  promoted interest, which I assume means 10 percent of
13  the promote.  Is that a fair statement?
14      A.   That's accurate.
15      Q.   That would obviously be a percentage of what
16  the fund manager would have received of the promote;
17  right?
18      A.   It's just a percentages of the promote.  I
19  don't know how else to characterize it.  There's a
20  promote paid.
21      Q.   To the fund manager?
22      A.   It's for a piece of the promote.
23      Q.   And we can look through the actual drafts
24  that were sent, and they were all -- the exhibits we've
25  marked are November of 2016, December of 2016, January

Page 48

1   of 2017.
2       Q.   Do you have any idea why it took so long to
3   get to even exchanging any sort of written agreements?
4       A.   I don't.
5       Q.   Because I take it you assume that Webster
6   would be compensated somehow, assuming the fund
7   launched?
8       A.   That was my assumption.  That's my
9   assumption, that -- you know, that there would be, you
10  know, something.  But, again, it's not -- at the end of
11  the day, it's not that big a deal.
12      Q.   What's not that big of a deal?
13      A.   Meaning, you know, it's the compensation of
14  an analyst.  So you're going to -- either he wants the
15  gig or he doesn't.
16      Q.   Uh-huh.
17      A.   And you just pick out a different analyst.
18      Q.   Would you agree that he put in a fair amount
19  of work with regards to the fund prior to the launch of
20  the fund?
21      A.   I don't know how many hours Webster put into
22  it but, yeah, he definitely did some work.  I mean, we
23  all did.  It's specing time.
24      Q.   Well, David Worley does write, "We've all
25  spent a great deal of time on this."  Does that seem to

Page 49

1   be an accurate statement by --
2       A.   It's tough for me to tell you how much time
3   Webster spent on it because I don't -- I mean, I know
4   how many hours he was in the meeting.  I know that I
5   spent a lot of time on it.  I know that David Worley
6   did, but I can't tell you how many hours Webster did.
7   You know, I guess you could add up the number of calls
8   he was on and that kind of thing and traveling, you
9   know.
10      Q.   What about the creation of the models and
11  downloading and the --
12      A.   I don't know what he did.  I don't know if he
13  built that model.  I don't know if someone else built
14  that model.  I mean, it's a -- it's a bond model.  You
15  know, it's not some sort of you know, crazy algorithmic
16  trading model.
17      Q.   Well --
18      A.   You know, there's a document.  The document
19  tells you how the cash flows work.  That's Excel work.
20      Q.   It's a model but with regards to a niche
21  area.  Would you agree with that?
22      A.   All I can tell you is that I don't know how
23  many hours he spent on it.  I don't know if it's his
24  model.  I don't know if he built it for us.  I don't
25  know if someone built it for him.  I don't know if he

13  (Pages 46 to 49)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

Page 50

1    took it from someone else.  I have no clue.  So I can't
2    answer that question.  I know that I did a lot of work
3    on it.
4         Q.   Okay.  If you would look at Exhibit 9.  I
5    will hand it to you.  Just confirm this is an email that
6    you sent to Dr. Hughes and cc'd David Worley.
7         A.   Uh-huh.
8         Q.   You have to say yes or no.
9         A.   Oh, I'm sorry.  Yes, this is an email that
10   looks like I sent.  Do I remember typing the email?  No.
11        Q.   That's okay.
12        A.   But good enough.  Okay.
13        Q.   All right.  If you turn to the compensation
14   part, which is Exhibit B.
15        A.   Uh-huh.  All right.  Exhibit B.
16        Q.   175,000 per year plus an annual bonus of no
17   less than 25,000 per year.  Plus this has 8 percent --
18        A.   Okay.
19        Q.   -- of the executives applicable, percentage
20   of all incentive fees received by the general partner
21   pursuant to the fund agreement.
22             Is that your recollection of -- where did
23   that --
24             MR. MIOSSI:  Did you say 8 percent?  That was
25   struck out.

Page 51

1             MR. KAMMERER:  I said 8 percent.  Okay.  So
2    this is the -- you're right.  It was struck out.
3    The applicable -- the executive's applicable
4    percentage.
5             THE WITNESS:  So what's the question?
6    BY MR. KAMMERER:
7         Q.   The question:  This is the draft that you
8    sent to David or to Dr. Hughes; right?
9         A.   You know, sure.
10        Q.   Let me ask you this:  Is this document Number
11   21 that I just handed to you?
12        A.   No.  This is the schedule right here.  So it
13   eventually gets up to eight with vesting.  That looks
14   like my handwriting.
15        Q.   Okay.  That's what I was going to ask you.
16   Let's just look at 21 for a second.  You can put the 9
17   off to the side for one moment, and then go back to it.
18        A.   Okay.
19        Q.   In Exhibit 21, do you have any recollection
20   of when you wrote this?
21        A.   I don't.
22        Q.   Do you have any idea why you wrote this?
23        A.   I don't.
24        Q.   Can you actually read this?  I mean, I can
25   read some smarts parts of it.  I can't read all the

Page 52

1    words.
2         A.   "175K, annual salary, bonus, 25 to 35K, 5
3    percent promote share, expenses, fund database, work
4    reimbursed."
5         Q.   Okay.  Stop there.  What does that mean?
6    "Expenses fund database"?
7         A.   If he wants some -- I think that what that
8    means is if he wants some expenses reimbursed, like,
9    whatever they were, that, you know, we'd consider
10   reimbursement.
11        Q.   And then what is the next -- and -- it looks
12   like an "and" to me.  And what?
13        A.   And work reimbursed.
14        Q.   What does that mean, "work reimbursed"?
15        A.   I think that could be -- you know, I don't
16   know.  I think it's just what it is.  It's -- if he had
17   some expenses he incurred that we'd consider it.
18        Q.   All right.  And what do the next two points
19   state?
20        A.   If he wanted to -- you know, I don't know
21   exactly.
22        Q.   Can you actually just tell me what it says?
23        A.   I don't really know what it says.  So...
24        Q.   It looks like it says, "Pick share --
25        A.   -- share of annual op per DW."

Page 53

1             That's -- that would be David Worley, but I
2    don't know what that is.  Anyway.  Database jointly
3    owned if Webster created a database, you know, from
4    Freddie's database.  The database already exists, but we
5    wanted to create our database that, you know, would be
6    our database.  But there is no database, to my
7    knowledge.  So anyway.
8         Q.   Are you aware of any problems with the model
9    that Dr. Hughes provided to Priderock?
10        A.   I am.
11        Q.   Can you tell me what --
12        A.   I can't go through them all.  I have to go
13   back and check my notes.  I go through this stuff a lot.
14   So we've been through a lot of different models.  So I
15   have to go back and check.
16        Q.   When you say "I go through this stuff a lot,"
17   you're referring to different models of different
18   investments or this particular fund investment?
19        A.   I go through a lot of models, but I do
20   remember conversations about errors that we had to fix
21   with the model for sure.
22        Q.   Do you know what, if any, impact those errors
23   had on anything?
24        A.   It changed the returns.  You know, how
25   much -- I'd have to go back and see every single

14  (Pages 50 to 53)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock
David Khoury

10/11/2018

---

Page 54

1   adjustment, you know, when we built our model correctly.
2   Going back and seeing, making -- okay.  Here's the error
3   that was in the model before, but it's not in the model
4   now.  How many bases points of return does that take
5   away?  Okay.  That's one error.  Isolate another error.
6   Whether it's -- you know, was the debt model
7   correctly -- was the payment period modeled correctly?
8   Was it Model 360 or was it modeled actual, these sorts
9   of things.
10       Q.   I think you may have said you had to build
11  your own model?  I wasn't sure.  Was that what you said?
12       MR. MIOSSI:  I object.  I don't think that's
13  what he said.
14  BY MR. KAMMERER:
15       Q.   Okay.  So was there a revision to the model
16  that Dr. Hughes provided?  A correction, as you said?
17  There was no new model created by Priderock for the
18  fund?
19       A.   When you say, "was a revision to the model,"
20  we don't use that model.
21       Q.   What does Priderock use, or what does the
22  fund use?
23       A.   For our internal analytics purposes?
24       Q.   Yes.
25       A.   We use a Priderock model.

---

Page 55

1        Q.   Does the Priderock model do the same thing as
2   the model provided by Dr. Hughes?
3        A.   Sure.  The same thing that's done by
4   Bloomberg.  It's a basic bond math.
5        Q.   And who created it?
6        A.   Zhenshi and Dan.
7        Q.   Give me one moment, if you would.
8        (Discussion held off the record.)
9        MR. KAMMERER:  Okay.  I don't have any
10  further questions.
11       MR. MIOSSI:  All right.  We'll reserve the
12  right to read and sign the deposition.  Thank you,
13  David.
14       THE WITNESS:  Sounds good.  Thank you.
15       (Deposition concluded at 4:33 p.m.)
16                 - - -
17
18
19
20
21
22
23
24
25

---

Page 56

1              CERTIFICATE OF OATH
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5
6        I, the undersigned authority, certify that
7   DAVID KHOURY personally appeared before me and was duly
8   sworn.
9
10       Dated this 22nd day of October, 2018.
11
12
13
14
15       Pamela J. Pelino, RPR, FPR, CLR
         Notary Public - State of Florida
16       My Commission No.: GG 225932
         My Commission Expires:  June 7, 2022
17
18
19
20
21
22
23
24
25

---

Page 57

1              C E R T I F I C A T E
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5        I, Pamela J. Pelino, Registered Professional Court
     Reporter and Notary Public in and for the State of
6    Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
7    stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
8    deposition.
9        I further certify that said deposition was taken at
     the time and place hereinabove set forth and that the
10   taking of said deposition was commenced and completed as
     hereinabove set out.
11
         I further certify that I am not attorney or counsel
12   of any of the parties, nor am I a relative or employee
     of any attorney or counsel of party connected with the
13   action, nor am I financially interested in the action.
14       The foregoing certification of this transcript does
     not apply to any reproduction of the same by any means
15   unless under the direct control and/or direction of the
     certifying reporter.
16
         Dated this 22nd day of October, 2018.
17
18
19
20
21       Pamela J. Pelino, RPR, FPR, CLR
22
23
24
25

---

15  (Pages 54 to 57)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock                                    10/11/2018
David Khoury

Page 58

```
 1              C E R T I F I C A T E
 2                    - - -
 3     THE STATE OF FLORIDA
 4     COUNTY OF PALM BEACH
 5         I hereby certify that I have read the foregoing
 6     deposition by me given, and that the statements
 7     contained herein are true and correct to the best of my
 8     knowledge and belief, with the exception of any
 9     corrections or notations made on the errata sheet, if
10     one was executed.
11
12         Dated this ____ day of _____, 2018.
13
14
15
16
17     _____
       DAVID KHOURY
18
19
20
21
22
23
24
25
```

Page 59

```
 1              E R R A T A   S H E E T
 2     IN RE: HUGHES V. PRIDEROCK
 3     CR: PAMELA J. PELINO, RPR, FPR, CLR
 4     DEPOSITION OF: DAVID KHOURY
 5     DATE TAKEN: October 11, 2018
 6         DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 7     PAGE # LINE #  CHANGE          REASON
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     Please forward the original signed errata sheet to this
       office so that copies may be distributed to all parties.
21
       Under penalty of perjury, I declare that I have read my
22     deposition and that it is true and correct subject to
       any changes in form or substance entered here.
23
       DATE: _____
24
       SIGNATURE OF DEPONENT:_____
25
```

                                    16 (Pages 58 to 59)

296a07fa-9f2f-457f-b352-3a2c6cb63762

Hughes v. Priderock
David Khoury

10/11/2018

Page 60

| A | Amendment | | B | bonus |
|---|---|---|---|---|

**A**
**able** 24:5,10,12
25:14 26:16
38:19
**access** 17:14
19:17 23:25
34:5
**accurate** 9:24
29:17 30:2 31:2
32:9 35:22,23
36:24 37:4
39:14 47:14
49:1
**accurately** 32:4
**acquire** 16:6
**acquired** 9:19
**acquiring** 9:17
16:7
**acquisition** 11:24
17:25
**acquisitions** 7:15
8:13 18:21
**action** 57:13,13
**actively** 11:14
**actual** 47:23 54:8
**add** 37:8 43:11
49:7
**adjustment** 54:1
**advanced** 19:20
**advice** 21:4
**affiliate** 13:4
**affiliated** 13:7
**affiliates** 13:10,11
**affirmed** 4:10
**afternoon** 4:15
**agencies** 15:11,17
17:15
**ago** 8:7 17:4,4
45:16,19,21
**agree** 48:18 49:21
**agreement** 50:21
**agreements** 38:14
38:18 48:3
**algorithmic** 49:15
**allow** 5:7 19:18

**Amendment** 3:14
**amount** 38:21,23
48:18
**amounts** 38:4,20
**analysis** 27:1 29:7
**analyst** 6:24
23:10 24:19,22
25:8,9,15 26:16
27:12 28:22
30:23,23 37:14
48:14,17
**analysts** 23:6
25:10
**analytics** 22:1,3,4
22:14 32:13
46:18 54:23
**and/or** 57:15
**annual** 50:16 52:2
52:25
**answer** 5:8 12:23
14:4 16:10 23:6
23:7,11,12 24:5
24:6,10,12,18,19
24:21,21,22
25:1 27:8 28:6
28:16,18,23
37:10 39:21
40:13 41:2 50:2
**answered** 23:22
34:13
**answering** 24:24
**answers** 5:13
**anybody** 28:18
43:6
**anyway** 40:16
53:2,7
**apartment** 9:18
**APPEARANCES**
2:1
**appeared** 56:7
**appears** 8:11
**applicable** 50:19
51:3,3
**apply** 57:14
**approximately**

8:4 16:23,25
**April** 10:14 35:16
35:18,24 36:1
**area** 16:1 18:9
19:14 27:15,17
49:21
**areas** 18:19
**articles** 3:13,14
7:24
**asked** 10:2 24:2
29:20 34:12
38:18 41:1 45:7
45:18
**asking** 8:10,14
28:5 40:11
**asset** 8:12,21,24
9:2,3,15 16:14
30:9 33:18
**assets** 16:12 30:15
**associate** 20:22
**associated** 40:19
**assume** 13:13
20:1 22:18
30:21,25 31:9
32:24 47:12
48:5
**assuming** 48:6
**assumption** 48:8
48:9
**attend** 22:24
23:15
**attended** 24:9
**attending** 23:4
33:11,13
**attorney** 57:11,12
**attractive** 19:10
19:11,12,23
**authority** 56:6
**authorized** 57:6
**aware** 26:10,11
33:15,17 34:1,2
34:3,6,9 37:25
38:2,3,24 43:7
53:8

**B**
**B** 3:10 50:14,15
**back** 6:23,24 7:13
16:19 29:5
35:13 41:7
51:17 53:13,15
53:25 54:2
**background** 5:23
6:4 10:24 12:19
15:16
**Bainbridge** 7:14
**bank** 7:12
**Banks** 7:16 8:5
12:8 13:13 14:7
33:3 42:19
**Barbara** 32:20
33:9 43:3
**bases** 54:4
**basic** 27:13 55:4
**basically** 6:18
17:24 20:10
30:18 44:14
**Beach** 1:18 2:5
5:24 56:3 57:3
58:4
**beginning** 29:12
45:16
**behalf** 2:2,9
**belief** 58:8
**believe** 9:6 43:5
43:18
**best** 58:7
**better** 5:17
**bid** 30:18,18
**big** 35:14 48:11
48:12
**bit** 6:3 9:5 16:1
37:8
**Bloomberg** 27:18
28:1,8,17 31:6
55:4
**Bloomberg's** 31:5
**board** 37:12
**bond** 7:2 28:10
49:14 55:4

**bonus** 50:16 52:2
**borrower** 15:13
**borrowers** 15:4
17:16
**Boston** 6:6,7,9
**bottom** 9:11 31:9
31:20
**brief** 4:22 5:23
6:4 29:2 45:4
**bringing** 21:21
**brings** 35:14
**brokerage** 34:24
**brought** 27:23
28:13 34:21,25
36:14
**build** 8:19 54:10
**buildings** 8:19,20
9:4
**built** 49:13,13,24
49:25 54:1
**bullet** 29:6
**business** 6:7,8,14
6:23 8:23
**buy** 8:19 15:9
36:6
**buyers** 17:12
**buyouts** 6:23

**C**
**C** 4:1 57:1,1 58:1
58:1
**call** 18:4 22:5
34:25
**called** 7:6 40:7,8
**calls** 33:16,24
49:7
**capable** 25:10
**capital** 1:7 7:3,6,8
7:15,19,25 8:4
8:11,14,25 9:14
9:25 11:23 12:1
12:12 13:4,7,19
14:24 16:1,17
17:24 18:5,19
19:14 20:5,15

Hughes v. Priderock                                    10/11/2018
David Khoury

20:18,20,24
21:2 23:9 25:3,6
25:12 28:2
34:16,18,19,21
35:3 36:2,3,4,6
38:5,21,23
40:22 41:2,12
41:13,15
**career** 6:17 15:17
**careers** 9:21
**case** 1:2 19:25
**cash** 26:6 27:18
28:9,10,20 31:6
49:19
**cause** 4:6
**cc'd** 50:6
**certain** 17:25
24:22
**Certainly** 14:7,9
**CERTIFICATE**
56:1
**certificates** 11:15
**certification**
57:14
**certify** 56:6 57:6,9
57:11 58:5
**certifying** 57:15
**CHANGE** 59:7
**changed** 53:24
**changes** 59:6,22
**characterize**
47:19
**chart** 14:2,5,6
**check** 53:13,15
**Chicago** 7:5
**chief** 15:18
**chose** 27:21
**Chris** 4:15
**CHRISTOPHER**
2:3
**ckammerer@k...**
2:6
**class** 6:11,16
11:15 14:16
15:25

**Class'** 11:16
**clean** 5:5
**clear** 5:20,21
**close** 36:23
**closing** 21:14
38:12,13
**CLR** 1:22 56:15
57:21 59:3
**clue** 50:1
**CMBS** 7:2,12
27:16
**collateral** 14:21
**college** 6:5,6,7,10
6:20
**combination**
15:20 19:22
**come** 21:10
**comes** 41:5
**comfortable**
35:12
**commenced** 57:10
**Commission**
56:16,16
**commitments**
20:8
**communication**
44:12
**communities** 9:18
**companies** 7:9,14
9:3
**company** 7:12 8:7
8:21,22 11:4
15:3
**compensated** 44:1
48:6
**compensation**
44:5,15 46:19
48:13 50:13
**competencies**
35:8
**competitor** 15:20
**completed** 57:10
**complies** 29:15
31:25
**conceivably** 42:7

**concept** 15:22
**concluded** 55:15
**confidence** 31:1,4
**confirm** 50:5
**connected** 57:12
**consider** 52:9,17
**construction**
18:20
**consultant** 20:24
**consulting** 17:24
18:4 21:3
**contained** 58:7
**continental** 9:18
**contract** 20:25
**control** 57:15
**controlling** 11:15
11:16 14:16
15:24
**controls** 35:13
**conversation** 21:9
**conversations**
16:2 18:13
53:20
**copies** 59:20
**core** 35:8
**corporate** 7:2
**Corporations**
3:13
**correct** 8:1 10:3
12:13 28:12
31:11,12 42:14
43:13 57:7 58:7
59:22
**correction** 54:16
**corrections** 58:9
**correctly** 54:1,7,7
**cost** 37:9
**costs** 40:19
**counsel** 57:11,12
**country** 8:20 15:9
**County** 5:24 56:3
57:3 58:4
**couple** 22:21
**court** 1:1,23 4:4
4:23 5:2,10 57:5

**Cover** 3:14
**CR** 59:3
**crazy** 49:15
**create** 53:5
**created** 12:1
25:16,22,25
37:9 53:3 54:17
55:5
**creating** 15:22
17:8 18:6,17,18
18:25 20:6 21:9
**creation** 11:22
12:6,9,16 20:15
22:10 49:10
**CROSS** 3:5
**currently** 5:24
9:21

## D

**D** 3:2,10 4:1
**Dan** 25:2,9,13
32:20 33:8 43:2
55:6
**Dan's** 12:19
**Daniel** 12:12 25:5
**data** 30:12
**database** 52:3,6
53:2,3,4,4,5,6,6
**date** 35:25 59:5
59:23
**dated** 35:16 56:10
57:16 58:12
**dates** 45:20
**David** 1:14 3:5
4:9 14:3 15:15
15:16 16:3
17:10,11,14
19:19,22 20:17
21:12,12,13
25:13 27:23
28:13 30:19
32:20 33:3
36:22 44:6,8,13
44:24 45:21
46:4,9,13,20

48:24 49:5 50:6
51:8 53:1 55:13
56:7 58:17 59:4
**day** 16:13,18 33:7
48:11 56:10
57:16 58:12
**DC** 2:11
**deal** 23:8,8 27:13
36:8,10 48:11
48:12,25
**dealing** 44:18
**deals** 17:25 18:20
**debt** 6:22 7:11,12
7:12,12 10:10
12:25 18:11
19:15 23:8 37:9
37:21 54:6
**December** 47:25
**decision** 28:11
**declare** 59:21
**Defendant** 1:8 2:9
**definitely** 48:22
**degree** 6:12
**Delaware** 13:2
**delegated** 44:14
**delegation** 44:16
**demand** 19:21,22
**demonstration**
31:7
**depends** 39:20
**deployment** 36:17
36:17,18,18
**DEPONENT**
59:24
**deposition** 1:14
4:3,18 45:7
55:12,15 57:6,8
57:9,10 58:6
59:4,22
**depth** 27:8
**described** 15:1
18:24
**description** 3:11
9:24 29:17
**design** 8:19 9:4

Hughes v. Priderock                                                    10/11/2018
David Khoury

Page 62

**detailed** 18:14
**details** 20:13
**developed** 9:20
**developing** 9:17
**Diamond** 33:12
  33:13,18,24
  34:3,8
**different** 16:1,10
  16:17 18:19
  34:20 39:19
  41:12 48:17
  53:14,17,17
**difficult** 5:9
**direct** 3:5 4:13
  16:6 57:15
**direction** 57:15
**discussed** 32:8
  46:8,20,21
**discussing** 44:15
  46:12,24
**discussion** 17:19
  20:2 22:6 44:4
  46:1 47:1 55:8
**discussions** 17:8
  17:10 18:8,14
  18:24 19:6,6
  43:25 44:2,6,8
  47:5,6
**distinction** 16:5
**distributed** 59:20
**distributions** 39:4
  39:7
**DISTRICT** 1:1,1
**division** 15:19
**document** 7:23
  10:17,25 11:2,3
  13:21 14:3
  21:15 38:8,16
  39:5,23 42:5,22
  43:12,14,15
  49:18,18 51:10
**documentation**
  35:12
**documents** 11:1
  38:22,24

**doing** 5:3 17:23
**download** 28:9,20
**downloading**
  49:11
**Dr** 4:16 22:16
  23:15 24:9 26:8
  26:11,13 29:9
  29:17 32:5
  33:12 37:11
  43:24 44:15
  45:7 46:1,3,20
  47:2,5 50:6 51:8
  53:9 54:16 55:2
**draft** 51:7
**drafts** 47:23
**Drive** 1:17
**drove** 16:3
**due** 38:17
**duly** 4:10 56:7
**DW** 52:25

**E**

**E** 3:2,10,10 4:1,1
  57:1,1 58:1,1
  59:1,1,1
**earlier** 10:2 15:1
  34:13 42:18
**early** 21:12 46:1
**earned** 40:23
**ease** 5:2
**easily** 28:21
**Economics** 6:13
**education** 6:4
**effectively** 33:18
  44:21,22 47:7
**efforts** 36:1
**eight** 51:13
**either** 16:14 33:24
  34:22 47:8
  48:14
**email** 45:2,8,9
  50:5,9,10
**employed** 25:12
**employee** 12:12
  20:17,20 25:2,6

57:12
**employees** 15:3
**employment**
  20:23
**enable** 37:6
**ENTER** 59:6
**entered** 59:22
**entire** 29:19
**entities** 13:14,17
  13:22 41:12
  42:7
**entity** 14:1 41:3,4
  41:9,16 42:4
**envisioned** 30:3,4
  32:14 33:1
**equity** 7:4,10
  18:12
**errata** 58:9 59:20
**error** 54:2,5,5
**errors** 53:20,22
**ESQUIRE** 2:3,10
  2:10
**estate** 6:25 7:8
  8:12,18,19,22,23
  12:3 15:9 27:13
  37:22
**eventually** 51:13
**evolution** 19:1
  36:19
**evolved** 17:9 18:8
**exactly** 12:20 14:6
  25:20,21 41:1
  46:5 52:21
**EXAMINATION**
  4:13
**examined** 4:10
**example** 36:7
**Excel** 40:3 49:19
**exception** 58:8
**exchanging** 48:3
**executed** 46:18
  58:10
**executive's** 51:3
**executives** 50:19
**Exhibit** 3:12 7:18

7:20 9:7 10:6,13
  45:7 50:4,14,15
  51:19
**exhibits** 47:24
**exist** 38:8
**exists** 53:4
**expect** 31:2,8
**expense** 28:2
**expenses** 52:3,6,8
  52:17
**expensive** 40:21
**experience** 9:16
  11:23 12:5,8,15
  15:2 26:9,12,13
**expertise** 14:15
  14:17 15:21
  19:23
**experts** 14:23
**Expires** 56:16
**explain** 15:7 24:1
  26:4,7,16 28:4
  33:14 44:11
**explaining** 25:10
**exposure** 16:11,18
**express** 5:14
**extension** 15:25
**extensive** 15:12
  15:16

**F**

**F** 57:1 58:1
**fair** 9:2 17:25
  47:13 48:18
**families** 19:12
**Fannie** 15:11
  17:18,23
**far** 29:24
**fashion** 46:5
**Fast** 32:4
**February** 45:8,20
**fee** 39:11,22 40:1
  47:8
**feel** 20:4
**fees** 39:11,17
  40:14,18,23

41:16 42:5,6,6,8
  42:8 47:6 50:20
**filed** 7:25
**filing** 3:13 7:18
**finance** 6:21
**financial** 26:16
  28:8 30:21 40:2
**financially** 57:13
**financing** 9:17
  18:20,21 37:18
  38:1
**find** 27:4
**finish** 5:7
**firm** 34:25
**firm's** 34:4
**first** 4:10 12:24
  16:23 22:16,22
  29:11,13,23
  36:11,23 44:4
  45:13
**fix** 53:20
**Flagler** 1:17
**floating** 36:12
**Florida** 1:1,18,23
  1:23 2:5 4:5
  7:13 56:2,15
  57:2,6 58:3
**flows** 26:6 27:18
  28:9,10,21 31:6
  49:19
**focus** 7:1
**focused** 6:22 7:7
  7:14
**folks** 15:24 17:11
**follow** 29:8
**follows** 4:11
**foregoing** 57:7,14
  58:5
**form** 33:20 59:22
**formed** 8:4 45:23
**formulaic** 39:21
**forth** 57:9
**Forum** 2:4
**forward** 20:3 33:2
  59:20

Hughes v. Priderock
David Khoury

10/11/2018

Page 63

found 27:9
founded 8:7
four 23:17,18,19
FPR 1:22 56:15
  57:21 59:3
Freddie 11:16
  14:14 15:4,11
  15:12,19 17:12
  17:17,19 19:15
  19:18,23 30:12
  30:17 32:22
  37:21
Freddie's 53:4
frequent 15:4
full-service 8:22
function 24:13
  27:12,13
functioning 24:11
  26:5
fund 10:7,10,10
  10:15 11:14,22
  12:2,6,10,16,25
  13:3,6,24 14:10
  14:14,18 15:22
  17:9 18:6,8,17
  18:18,25 20:16
  21:10,15,22,22
  22:10 25:11,18
  26:18 29:18
  32:6,11 34:16
  35:17 38:5,25
  39:10,18 40:24
  40:24 41:6,19
  41:21 42:1,3,5,6
  42:10,13,15,21
  43:17,25 45:23
  46:16,18 47:3,9
  47:16,21 48:6
  48:19,20 50:21
  52:3,6 53:18
  54:18,22
Fund' 13:1
fund-raising
  36:17,18,18,19
funds 7:4

further 55:10
  57:9,11

___ G ___

G 2:10 4:1
game 21:13,14
Gaziano 43:3
general 10:25
  17:2 42:9 43:15
  43:16 50:20
generalist 7:1
generally 13:22
  14:21 23:6 24:3
  24:12,20,23
  30:6 34:21
  39:22
George 7:16
  13:12,23 16:21
  33:3 34:22
getting 17:13 29:5
  35:11 37:12
GG 56:16
gig 48:15
give 4:21 6:3,17
  27:8 30:25,25
  34:10 45:1 46:7
  55:7
given 34:7 37:8
  58:6
global 39:2
globe 7:10
go 5:4 9:22 12:21
  16:19 23:11
  35:9 36:6 41:22
  51:17 53:12,12
  53:13,15,16,19
  53:25
goes 36:3
going 4:21 5:3
  7:17 10:9 11:11
  11:19 18:4
  19:24 20:3,3,4,5
  20:7 21:23
  31:23 32:10,12
  32:12,18 33:2

44:1 45:6 47:2
  48:14 51:15
  54:2
good 4:15 5:11,18
  17:16,17 25:19
  30:7 31:21
  50:12 55:14
GP 42:3 43:17
grade 6:22
graduate 6:9,15
graduated 6:5,6,8
  6:18
grant 31:16
great 4:17 48:25
group 6:21,22,25
  7:1,5,7 16:14,15
guess 13:11 19:9
  21:16 34:4
  39:11,13 41:19
  42:9 49:7
guy 22:13 23:11

___ H ___

H 3:10 59:1
half 39:23
hand 10:5 29:4
  45:6 50:5
handed 9:6 51:11
handwriting
  51:14
happens 37:15
Harvard 6:7,8,14
  6:18
hazy 45:20
head 5:15
held 22:6 55:8
help 45:2
helped 21:2
helpful 27:11
hereinabove 57:9
  57:10
hey 22:13 41:22
high 6:20
higher 37:8
hours 48:21 49:4

49:6,23
Hughes 1:4 4:16
  21:7,21 22:9,16
  23:15 24:9 26:8
  26:11,13 29:9
  33:12 37:11
  43:24,24 44:15
  46:1,3,20 47:2,5
  50:6 51:8 53:9
  54:16 55:2 59:2
Hughes' 29:17
Hughes's 32:5
  45:7
huh-uh 5:16

___ I ___

idea 16:4 17:2,8
  18:5,7 19:8 30:8
  48:2 51:22
ideas 18:25
identification
  7:21
identified 14:14
Identifying 35:4
impact 53:22
importance 30:22
important 15:5,8
  16:12 20:23
  30:6,6 31:17
  33:2,4
in-house 26:23,25
incentive 50:20
inception 38:25
include 32:19
includes 7:9
including 32:23
  32:25 33:24
Incorporation
  3:13
incurred 52:17
indicated 43:2
indicates 7:24 9:1
  42:24
individual 30:15
individuals 34:16

42:12,16 43:20
industry 15:18
information 11:4
  11:5 35:7 40:4
infrastructure
  14:15
initial 18:24
initiate 20:5
insurance 7:11
interact 23:20
interacted 27:6
interacting 27:5
interest 14:25
  16:6,7 18:17,18
  18:21 45:24
  47:12
interested 57:13
interesting 17:20
internal 54:23
introduced 16:20
  21:6,17 36:9
Introducing 35:8
invest 12:2 14:15
  18:6,17 19:1
invested 38:20,20
investing 14:18
  15:25
investment 11:13
  12:2 13:1,3 42:2
  53:18
investments 27:2
  53:18
investor 24:21
  31:20,21 39:3
investors 16:10
  19:11,11 20:4
  22:24 23:2,5,14
  23:21,21 24:9
  25:11 26:4,17
  26:19 27:5,12
  30:20,25 31:3
  31:10 33:11,13
  33:19,25,25
  34:5,8,10,15,21
  34:23,23 35:4,6

35:9 36:8,8,13
38:13,19 39:6
**investors'** 24:10
24:14
**involved** 13:12
34:14,18 37:17
43:24
**involvement**
10:18,21
**Isolate** 54:5
**issue** 5:1 19:15
41:3,9
**issued** 11:16

---

**J**

**J** 1:22 4:3 56:15
57:5,21 59:3
**January** 35:19
47:25
**Jin** 12:22
**job** 25:14 46:14
46:18,22
**joint** 7:3,3
**jointly** 53:2
**Jonathan** 33:12
33:13,18,24
34:3,8,19,22,24
**July** 7:25
**jump** 20:7
**June** 56:16

---

**K**

**K** 2:11 3:10
**K-1504** 35:20
**K-Deal** 14:19
25:11 26:5 27:1
37:18 38:1
**K-Deals** 11:18,20
11:24 12:5,9,16
14:20 18:6,17
19:1 26:9,12,14
26:17 27:15
**K-F29** 35:19
**K-F46C** 35:21
**K-Series** 11:17

17:12 18:10
**Kammerer** 2:3,3
3:6 4:14,15 7:17
7:22 22:7 29:1,3
29:22 33:22
45:5 51:1,6
54:14 55:9
**KeyBank** 36:22
37:1,5,12,17,20
**Khoury** 1:14 3:5
4:9 45:21 56:7
58:17 59:4
**kind** 7:1 11:5
15:19 17:13,20
17:21 18:12
22:12,14 24:20
24:21 27:10
30:10 38:14
39:20 40:9,20
41:8 49:8
**knew** 25:24
**know** 5:14,16,20
7:9 8:6,22 9:3
10:25 11:2 12:8
12:15,20 13:21
13:22 15:2,3,4,5
15:16,17,19
16:3,9,11,16,24
17:1,5,7,10,11
17:11,13,13,14
17:20,20 18:7,9
18:9,10,11,12,14
18:15 19:9,10
19:13,16,17,17
20:10,25 21:1,1
21:11 22:11,12
22:14,17,21
23:9,12,16,16,18
23:23 24:3,15
24:15,20,25
25:15,24 26:20
27:10,11,12,12
27:14 28:13,22
30:3,4,4,5,6,7,8
30:9,10,13,16

31:4,14,19
32:12,14,17,20
32:20,21 33:7
34:9,10,23
35:10,13 36:3
36:13,16 37:7
37:15 38:4,6,10
38:12,13,13,22
39:1,1,2,3,5,6,21
39:23 40:1,8,9
40:11 41:1,4,4
41:11,14,17,20
41:23,25 42:3
42:10 43:11
44:6,12,13,17,19
46:10,14,23,23
47:19 48:9,10
48:13,21 49:3,4
49:5,7,9,12,12
49:13,15,15,18
49:22,23,24,25
49:25 50:2 51:9
52:9,15,16,20,20
52:23 53:2,3,5
53:22,24 54:1,6
**knowledge** 15:16
37:24 53:7 58:8
**knowledgeable**
37:23
**knows** 17:11,12
17:16,17

---

**L**

**L.P** 10:10 12:25
**large** 4:5 7:8 57:6
**largest** 15:10 36:8
**late** 21:12,14
**launch** 48:19
**launched** 46:16
48:7
**lawyers** 11:2
**lead** 24:24
**learn** 28:23
**learned** 28:21
**Learning** 30:14

**leaving** 17:22
**led** 17:8
**legally** 13:8
**lenders** 15:10
**lending** 15:17
**let's** 17:20 19:7
20:12 33:23
34:19 51:16
**Letter** 3:14
**leverage** 37:8
**leveraged** 6:23
**liaison** 44:7
**life** 47:3
**limited** 13:2
**line** 31:9,20 44:12
59:7
**linear** 39:20
**link** 34:7,10
**list** 38:12
**listed** 32:15
**listen** 5:4,5
**lists** 38:19
**literally** 36:14
**little** 6:3 9:5 16:1
37:7,8 45:20
**lived** 6:1
**LLC** 1:7 7:25 9:1
13:3,5,7,7,20,25
14:11 40:23
42:1 43:17
**LLP** 2:10
**loan** 36:22 37:6
37:12,17
**loans** 14:21 16:8
30:16
**long** 6:1 32:22
48:2
**look** 7:23 10:24
11:6 18:10 29:5
29:6 32:16
33:23 39:19
41:22 42:22
43:12,14 45:22
47:23 50:4
51:16

**Looking** 10:25
**looks** 10:16 37:15
50:10 51:13
52:11,24
**lot** 9:3 13:22
30:17 34:20
37:20,24 39:25
41:11 49:5 50:2
53:13,14,16,19
**Lynch** 6:21,25
23:10

---

**M**

**M** 3:10
**M&A** 7:2
**M3** 7:6
**Mac** 11:16 14:14
15:4,11,12
17:12,17,19
19:15,18,23
30:12,17 37:21
**Mac's** 15:19
**Mae** 15:11 17:18
17:23
**making** 5:9 37:17
54:2
**manage** 8:20 9:4
11:14
**managed** 9:20
**management** 8:21
8:24 9:2,3,19
13:3,6,25 14:10
30:9 32:16,24
39:11,17 40:18
41:16 42:1,8
47:8
**manager** 8:12
9:15 39:10
40:24 41:6,19
41:21 42:2,4,5,6
42:10,15 47:16
47:21
**Manager'** 13:4
**manages** 8:12
9:21

Hughes v. Priderock                                    10/11/2018
David Khoury

**managing** 9:17
**MARIANI** 2:3
**mark** 7:18
**marked** 7:20 9:6
  10:5 45:6 47:25
**market** 21:2
  30:13
**math** 30:8 55:4
**matter** 4:16 23:8
  38:7
**maturity** 39:13
**McCoy** 7:6
**MDOF** 43:17
**mean** 12:19 13:8
  14:4 15:7 16:10
  16:24 17:14
  21:23 24:16
  27:17 28:20
  30:18,19 31:14
  31:16,17 32:7
  36:10 38:10
  41:10 48:22
  49:3,14 51:24
  52:5,14
**meaning** 13:16
  18:9 21:14
  25:20 41:11
  48:13
**means** 10:3 47:12
  52:8 57:14
**meet** 35:5
**meeting** 18:16
  22:23 34:15
  49:4
**meetings** 22:22,24
  23:5,11,14,17
  24:8,22 33:11
  33:13,16,25
**members** 13:20
  13:25
**memorandum**
  10:7,14,19,23
  20:6 29:4 36:1
**memorandums**
  35:16

**memory** 22:11
**Merrill** 6:21,25
  23:10
**met** 16:23 22:16
  22:18
**mezzanine** 18:20
  18:20
**middle** 21:15
**million** 35:18,20
  35:21 36:23
**minutes** 28:25
**Miossi** 2:10 8:9
  9:8 29:19 33:20
  50:24 54:12
  55:11
**model** 21:24 22:5
  22:5,9 23:12,22
  23:23,25 24:1,2
  24:3,4,11,13
  25:1,11,17,20,23
  25:25 26:1,2
  27:4 28:3,4,6,17
  28:19,19 31:19
  33:14 34:5,5
  37:14 40:3
  49:13,14,14,16
  49:20,24 53:8
  53:21 54:1,3,3,6
  54:8,11,15,17,19
  54:20,25 55:1,2
**modeled** 54:7,8
**modeling** 27:24
**models** 25:14
  26:16 27:25
  28:8 49:10
  53:14,17,19
**moment** 51:17
  55:7
**monthly** 39:12
**Mortgage** 11:17
**move** 20:3,12
  35:10
**multi-family** 9:15
**multifamily** 10:3
  10:10 11:17

12:25 14:20,22
14:22 15:10,19
15:24,25 16:11
16:12,18 18:8
19:23

---

### N

**N** 3:2 4:1
**name** 35:1 40:10
**necessarily** 26:14
**necessary** 26:15
**need** 26:21 36:25
  42:22 45:9
**negotiation** 29:8
  30:17
**new** 6:21 34:23
  36:8,13 54:17
**Ng** 12:12 25:2,5
  43:2
**Niagara** 34:25
**niche** 27:15,17
  49:20
**nods** 25:4
**noninvestment**
  6:22
**Notary** 1:23 4:4
  56:15 57:5
**notations** 58:9
**notes** 53:13 57:7
**November** 47:25
**number** 11:7 49:7
  51:10
**numbers** 23:10
  26:20,21,22,24
  27:11 42:25
  46:4,21,22,23,24
  46:25
**NW** 2:11

---

### O

**O** 4:1
**OATH** 56:1
**object** 33:20
  54:12
**obtain** 39:17

**obviously** 4:22
  40:21 47:15
**October** 1:15
  56:10 57:16
  59:5
**offerings** 7:2
**offers** 28:1
**offhand** 23:17
  38:6
**office** 35:13 41:7
  59:20
**officer** 15:18
**Oh** 22:4,19,20
  50:9
**okay** 4:21 5:10,17
  5:21 10:11 11:6
  11:10 12:18
  13:24 18:23
  19:7 21:6,17
  29:15,16 30:2
  31:22 33:6 34:7
  36:15 39:16
  40:15 42:11
  45:11,18,19
  50:4,11,12,18
  51:1,15,18 52:5
  54:2,5,15 55:9
**once** 18:14 19:9
  28:20 46:17
**ongoing** 30:9
**op** 52:25
**operate** 8:18
  16:12
**operating** 7:8
  8:23
**opportunity** 4:24
  10:10 11:5
  12:25 35:10
**opposite** 4:23
**order** 26:4 36:23
**organization** 7:24
  35:14
**organizational**
  14:2,5,5
**organized** 13:1

**original** 59:20
**overview** 4:22
  6:17 11:7,8
**owned** 53:3
**owners** 13:16,19
  14:1,8
**ownership** 14:25
  16:6,7
**owns** 9:21

---

### P

**P** 4:1
**p.m** 1:16,16 55:15
**page** 3:11 11:6,7,8
  11:12 29:6,6
  31:22 32:16
  59:7
**pages** 3:13 57:7
**paid** 28:2 39:11
  41:6 47:20
**Palm** 1:18 2:5
  5:24 56:3 57:3
  58:4
**Pamela** 1:22 4:3
  56:15 57:5,21
  59:3
**paragraph** 11:11
  11:13 12:24
  14:13 29:11,13
  29:24,25 30:1
  31:24 45:14
**paragraphs** 29:8
  29:20
**parameter** 46:7
**part** 14:3 15:6,13
  15:14,15 16:17
  19:15 26:19,20
  29:21 30:5,24
  31:13 33:2,19
  46:1 50:14
**participants** 33:4
**participating**
  21:21 43:7
**participation**
  40:22

Hughes v. Priderock
David Khoury

10/11/2018

Page 66

**particular** 53:18
**parties** 57:12
  59:20
**partner** 42:9
  43:16 50:20
**Partners** 1:7 7:6
  7:15,19,25 8:4
  8:12,15,25 9:14
  9:25 11:23 12:1
  12:13 13:3,5,6,7
  13:20,25 14:10
  14:24 17:24
  18:6 20:15,18
  20:24 25:3,6,12
  40:23 41:2,13
  41:14,15 42:1
**partnership** 13:2
  43:15
**parts** 34:20 35:2,3
  51:25
**party** 57:12
**passed** 43:20
**payment** 54:7
**Pelino** 1:22 4:3
  56:15 57:5,21
  59:3
**penalty** 59:21
**people** 32:23,25
  34:14
**percent** 42:19,20
  42:20 43:5,10
  47:11,12 50:17
  50:24 51:1 52:3
**percentage** 47:7
  47:15 50:19
  51:4
**percentages** 39:22
  42:13 47:18
**performance**
  30:13 38:25
**period** 46:11 54:7
**perjury** 59:21
**person** 30:7 44:22
**personally** 56:7
**perspective** 17:7

**phases** 38:5
**pick** 48:17 52:24
**piece** 47:22
**place** 2:4 57:9
**placement** 10:6
  10:14,19,23
  20:6 29:4 35:15
**placing** 7:11
  35:25
**Plaintiff** 1:5 2:2
**Plaintiff's** 3:12
  7:20
**plan** 19:2,3,5 20:2
**play** 32:10 37:11
**played** 37:13
**Please** 59:20
**PLLC** 2:3
**plus** 50:16,17
**point** 19:5 20:1
  29:7 46:15
**points** 52:18 54:4
**pool** 16:8
**pools** 30:16
**portal** 39:6
**portfolio** 30:12
**portion** 29:20
  43:3
**portray** 32:4
**position** 15:18
  20:14
**PPM** 32:15,23
  33:2
**preparation**
  10:19,22 35:25
**prepayments**
  39:24,25
**presentations**
  33:19
**presenting** 11:4,4
**previous** 32:16
  34:23
**previously** 7:6
  10:6
**Priderock** 1:7
  3:13 7:15,19,25

8:4,11,14,25
  9:14,21,25 10:9
  11:23 12:1,12
  12:25 13:2,4,6,7
  13:19,24 14:10
  14:24 17:23
  18:5 20:15,17
  20:20,24 25:3,6
  25:12,17 26:3
  26:15,25 27:21
  28:2 30:22 34:8
  39:16 40:22
  41:1,4,12,13,15
  42:1 43:17 53:9
  54:17,21,25
  55:1 59:2
**Priderock's** 9:15
**principals** 9:16
  13:14 24:23
**print** 9:11 31:6
**prior** 11:22 12:6,9
  12:16 20:15
  46:16 48:19
**private** 7:4,9 9:15
  10:6,14,19,22
  13:1 20:6 29:4
  35:15,25
**probably** 8:7
**problem** 16:15
**problems** 53:8
**process** 20:6
  32:19 35:12
**product** 18:13
  19:17,24
**Professional** 4:4
  57:5
**professionals**
  37:22
**program** 11:17
  17:14 19:18
**project** 40:5
**projection** 39:8
**projections** 30:21
  39:17
**promote** 39:12

40:8,14 42:8,11
  42:13,16,21
  43:4,7,20 47:8
  47:13,16,18,20
  47:22 52:3
**promoted** 45:24
  47:12
**properties** 8:20
  9:4 10:3 14:22
  14:25 30:14,14
**property** 16:16
  23:8
**prospective** 20:4
  23:2,14 24:8,10
  25:11 26:17
  33:11 34:15
  35:4
**provide** 22:9 28:3
  28:8 32:13 35:6
  38:18
**provided** 21:4
  26:1,2,4 30:12
  53:9 54:16 55:2
**provides** 30:11
**providing** 18:4
**Public** 1:23 4:4
  56:15 57:5
**pull** 27:18
**pulling** 38:7
**purchase** 11:14
  35:18,19,20
  36:23 37:6,18
  38:1 39:14
**purchased** 35:17
**purpose** 23:4
  24:18
**purposes** 11:19
  54:23
**pursuant** 50:21
**pursue** 18:22
**push** 17:21
**put** 11:1,3 34:4
  48:18,21 51:16

**Q**

**quarter** 39:24
**quarterly** 39:12
**question** 5:6,7,8
  8:10 12:20 14:4
  19:16 24:25,25
  32:9 33:21,23
  50:2 51:5,7
**QUESTIONER**
  9:9
**questions** 4:25
  5:19 11:11 23:6
  23:11,13,22
  24:3,5,10,13,14
  24:17,18,19,21
  24:23,24 28:18
  28:23 55:10
**quiet** 5:8

**R**

**R** 3:10 4:1 57:1
  58:1 59:1,1
**rack** 28:1
**raise** 18:5 36:2,5
**raised** 38:4,21,23
  38:23
**raising** 7:3,4,8,9
  7:10 20:5 23:9
  34:16,18,19,20
  35:3 36:3,4 38:5
**rate** 36:12
**read** 29:11,13,21
  29:23,24 30:1
  31:23 32:2,3
  45:9,12,17
  51:24,25,25
  55:12 58:5
  59:21
**reads** 11:13 14:13
**real** 6:25 7:8 8:12
  8:18,19,22,23
  12:2 15:9 27:13
  37:22
**really** 4:24 6:25
  16:2,9 22:11,12
  22:22 30:3,5,17

Hughes v. Priderock                                          10/11/2018
David Khoury

30:19,19 32:17
35:11 36:3
37:10 38:15
39:1,5 44:9
52:23
**reask** 5:20
**reason** 8:24 37:5
59:7
**reasonable** 10:1
42:23 43:21
46:22
**recall** 10:21 16:22
18:7 21:20
22:22 23:17
24:6 34:14 44:3
46:3,4,5,12 47:1
47:6
**recap** 39:3
**receive** 42:16 47:7
**received** 39:10
47:9,16 50:20
**receives** 41:16
**receiving** 42:12
42:19,19,20
43:3
**recess** 29:2 45:4
**recognize** 10:13
44:20
**recollection** 8:3
15:23 44:4
45:25 46:2,3
50:22 51:19
**record** 22:6 32:21
55:8
**REDIRECT** 3:5
**reduces** 39:25
**refer** 10:9 11:20
15:21
**reference** 45:3
**referring** 9:10
53:17
**refers** 29:8 47:11
**refresh** 8:3
**regard** 44:8
**regards** 10:22

12:9,16,21
13:24 14:18
17:24 18:25
20:5 21:22
22:10 25:17
26:3,17 27:1,5
30:20 32:5,10
34:15 35:15
37:11,18 39:18
40:17,23 42:11
43:25 44:4 47:2
47:9 48:19
49:20
**Registered** 4:4
57:5
**reimbursed** 52:4
52:8,13,14
**reimbursement**
40:25 41:6
52:10
**related** 12:2
**relates** 37:23
**relationship** 15:6
15:8,12,13,14
17:15,16,17
**relationships**
17:18 34:24
**relative** 57:12
**remember** 10:24
22:21 23:19
46:24 50:10
53:20
**renovated** 9:20
**renovating** 9:18
**rental** 10:3
**report** 39:2 57:6
**Reported** 1:22
**reporter** 4:4,23
5:3,10 57:5,15
**REPORTING**
1:23
**reports** 30:10
**represent** 4:16
14:16
**represented** 31:1

**reproduction**
57:14
**request** 38:16
**requests** 38:17
**required** 14:15
20:11
**reserve** 55:11
**reside** 5:24
**resources** 33:8
**respect** 23:21
37:21
**response** 38:17
**responsibility**
33:6
**responsible** 44:18
**responsive** 24:14
24:16
**return** 16:13 31:7
31:14,18 54:4
**returns** 31:2 37:7
37:9 53:24
**revision** 54:15,19
**right** 5:12,19,23
6:3 8:2,6,8
10:13 11:10,20
14:11 16:22
20:14 21:18
22:18 25:2,3,6
26:1,11 27:4,22
29:16 31:10
32:24 33:7
35:24 37:25
43:1,10 44:3
47:17 50:13,15
51:2,8,12 52:18
55:11,12
**risk** 15:18 18:11
31:15,18,18
**road** 17:21
**role** 21:22 26:20
29:17 30:4,15
30:23,24,24
32:5,7,10,14
37:11,13 45:22
46:14,15,17

**roughly** 23:18
**RPR** 1:22 56:15
57:21 59:3
**run** 37:16 40:5
**running** 40:5

─────────

**S**

**S** 1:17 3:10 4:1
59:1
**salary** 45:24 52:2
**saying** 5:10 27:20
**says** 22:13 42:5
52:22,23,24
**scale** 39:22
**scenario** 23:24
37:15 46:6
**scenarios** 39:19
**schedule** 51:12
**school** 6:8,8,14,24
**screen** 9:11
**second** 11:10,13
29:12,24 30:1
45:1 51:16
**Secretary** 7:18
**securities** 12:2
35:17 36:6,11
39:13
**securitization**
11:17 16:8 30:5
37:23
**securitizations**
26:13 27:16
**see** 11:1 14:2,3,13
34:19 37:14
43:12 53:25
**seeing** 54:2
**seen** 24:2
**senior** 9:19 17:11
17:18
**sent** 47:24 50:6,10
51:8
**sentence** 45:21
47:11
**sentences** 45:13
**servicer** 30:11

37:22
**services** 41:7,7,8
**servicing** 37:24
**set** 39:21 57:9,10
**shake** 5:15
**share** 42:16 52:3
52:24,25
**sheet** 38:7 40:2,6
40:9,13,16,18
58:9 59:20
**shop** 28:22
**shorthand** 57:7
**show** 9:1 38:8,25
40:4
**shows** 40:2
**side** 19:13 51:17
**sides** 4:23
**sign** 55:12
**SIGNATURE**
59:24
**signed** 59:20
**simple** 17:19
**simply** 32:9
**single** 53:25
**sister** 15:20
**sits** 19:14
**skill** 28:23
**small** 31:13
**smart** 30:7
**smarts** 51:25
**solicited** 37:1
**solidified** 19:7
**solve** 33:23
**somebody** 26:25
**sophisticated** 31:4
**sophistication**
37:20
**sorry** 22:2 50:9
**sort** 17:9 18:3
19:1 20:8 27:15
28:1 48:3 49:15
**sorts** 54:8
**sounds** 5:11,18
8:6,8 43:19,21
44:20 55:14

Hughes v. Priderock                                      10/11/2018
David Khoury

**SOUTHERN** 1:1
**space** 15:10
**speak** 25:14
**speaking** 5:9
    13:23 14:21
    24:4,20,23
    33:12
**special** 37:21
**specific** 24:25
    34:16
**specifically** 7:7
    40:12
**specing** 48:23
**spent** 48:25 49:3,5
    49:23
**spoke** 45:22
**sponsored** 13:2
**spreadsheet** 40:3
**stage** 36:2
**stages** 35:11
**start** 11:12
**started** 6:20 7:15
    23:9
**state** 1:23 4:5 7:18
    52:19 56:2,15
    57:2,5 58:3
**stated** 11:12 42:2
**statement** 18:1
    39:14 47:13
    49:1
**statements** 58:6
**states** 1:1 9:14,22
    9:23 12:24
**Stenographically**
    1:22
**stenotype** 57:7
**steps** 20:10
**stop** 36:4 52:5
**strategy** 11:14
**STRAWN** 2:10
**Street** 2:11
**strike** 34:3 39:8
    43:23
**struck** 50:25 51:2
**structure** 10:25

16:2,17 18:19
    19:14
**structured** 29:7
**structuring** 7:3,7
**stuff** 21:2 22:12
    35:13 53:13,16
**subject** 59:22
**subordinated**
    11:15
**subscription**
    38:14,18
**substance** 59:22
**successfully** 46:17
**suggesting** 33:5
**Suite** 1:17 2:4
**Sunbiz** 3:13
**sure** 6:6,20 11:9
    14:20 15:9 20:9
    21:3 24:6,16
    25:21 28:6,7,10
    29:1 33:7 37:16
    45:17 51:9
    53:21 54:11
    55:3
**surveillance**
    32:13
**sworn** 4:10 56:8

---
                 **T**
**T** 3:10 57:1,1 58:1
    58:1 59:1,1
**table** 4:24 34:22
    34:25 35:14
**take** 5:10,15
    13:13 18:23
    24:24 28:22
    30:10 44:9 48:5
    54:4
**taken** 4:3,18 29:2
    45:4 57:9 59:5
**talk** 16:9 27:11
    35:9
**talked** 44:22
    45:23
**talking** 11:2 18:11

26:19 29:19
    46:2,4
**task** 25:15 44:15
**team** 9:19
**tell** 6:18 10:21
    14:6 22:8 30:18
    31:12 41:13
    43:22 45:25
    49:2,6,22 52:22
    53:11
**tells** 49:19
**ten** 17:5
**term** 22:2
**termed** 8:24
**terms** 17:13 31:4
**testified** 4:11
    42:18
**Thank** 55:12,14
**thing** 11:5 17:21
    18:12 20:23
    30:11 31:18
    38:15 39:20
    40:9,17,20 41:8
    49:8 55:1,3
**things** 54:9
**think** 8:9 9:2 10:1
    12:19,22 15:21
    16:9 18:7 19:20
    19:21,21,24,25
    21:17 22:17
    31:3 34:25 36:3
    38:16 39:5
    44:12 46:8,21
    46:22 52:7,15
    52:16 54:10,12
**third** 14:13 36:12
**three** 17:4 33:4
    35:17 45:13,13
**Thursday** 1:15
**time** 19:15 22:16
    25:13 28:22
    32:18,22 33:1
    36:7,9,14 45:2
    46:7,11 48:23
    48:25 49:2,5

57:9
**tired** 8:10
**today's** 11:19
**told** 21:20 26:12
    35:2
**tool** 31:7
**top** 11:8
**topic** 44:9
**total** 38:21,22
**tough** 14:4 41:2
    49:2
**track** 32:21
**trading** 49:16
**traditionally** 16:7
**transaction** 29:7
    36:13
**transcript** 5:4,6
    57:14 59:6
**transcription**
    57:7
**traveling** 49:8
**true** 57:7 58:7
    59:22
**trust** 15:13
**try** 5:7,20 19:7
    20:7
**trying** 10:24 17:2
    17:6 20:13
**turn** 31:22 50:13
**two** 28:25 29:19
    39:11 52:18
**type** 16:6 21:25
**typing** 50:10

---
                 **U**
**U.S** 9:19
**uh-huh** 5:16 9:13
    29:10 31:25
    45:15 48:16
    50:7,15
**ultimately** 19:4
**undergraduate**
    6:12
**underlying** 14:21
**underpinning**

14:22
**undersigned** 56:6
**understand** 4:25
    8:9 17:22 19:5,9
    19:14,16 24:4
    26:8 27:19,25
    30:13 31:18
    35:16 36:21
    38:21 42:12
**understanding**
    4:25 13:9 14:17
    17:6 25:16,19
    25:22,23 30:21
    31:14 33:10
    37:19 39:10
    43:22
**understands**
    17:15
**Understood** 46:19
**underwrite** 16:16
    30:14
**underwriting**
    30:13,15 32:13
    41:7 46:18
**Unfortunately**
    39:21
**UNITED** 1:1
**units** 9:20,22
**unsure** 42:4 43:6
**use** 25:24 28:17
    30:12 54:20,21
    54:22,25
**useful** 22:9 27:5,9

---
                 **V**
**V** 59:2
**value** 40:1
**various** 14:25
    34:8 38:5
**vehicle** 13:1 36:5
    36:19 40:21
**vehicles** 7:11
**ventures** 7:3,4
**verbally** 5:14
**versus** 16:7

Hughes v. Priderock                                                    10/11/2018
David Khoury

Page 69

vesting 51:13
view 23:25
virtue 14:24 15:2
vs- 1:6

**W**

W 2:3
want 22:13 37:14
wanted 52:20
  53:5
wants 39:3 48:14
  52:7,8
Washington 2:11
wasn't 20:23
  54:11
watch 30:11
way 5:21 8:16
  36:4
We'll 55:11
we're 4:23 5:8,10
  20:3,3,4,5 40:5
we've 10:5 39:25
  47:24 48:24
  53:14
website 8:25 9:12
  34:4
Webster 1:4 21:7
  25:24 26:23
  27:23 28:3,13
  33:8,16,24 34:4
  44:7,10,18,23
  46:14,15,17
  48:5,21 49:3,6
  53:3
Webster's 25:14
  27:4 28:6
went 6:4,6,7,23,24
  7:5 23:23 28:14
West 1:18 2:5
wife 32:20
WILLIAM 2:10
WINSTON 2:10
witness 4:12 25:4
  28:25 29:15
  31:25 45:1 51:5

55:14
witnesses 10:2
wmiossi@winst...
  2:12
words 52:1
work 17:23 20:12
  20:13 21:24,25
  22:5,5,9 23:12
  23:23 27:24
  32:13 44:1
  48:19,22 49:19
  49:19 50:2 52:3
  52:13,14
worked 6:19 7:14
  26:6 32:21
working 8:8 32:17
  32:18,25 33:8
works 4:22 36:20
  37:14 41:1
Worley 14:3 16:3
  16:20,23 18:16
  18:25 19:22
  21:8,18,20 22:8
  25:13 30:19
  33:3 36:22
  42:18,20 43:6
  44:14,24 45:8
  45:18 46:4,9,13
  46:20 48:24
  49:5 50:6 53:1
Worley's 15:15
  20:14 32:20
wouldn't 44:16
write 48:24 59:6
written 9:11 48:3
wrote 45:21 51:20
  51:22

**X**

X 3:2,10 33:9

**Y**

Y 33:9
yeah 8:8 10:1,4,8
  10:16 13:9

14:12 18:2
  20:12,21 21:5
  22:19 23:22
  27:17 28:16
  31:5 32:3 34:12
  34:20 35:8
  36:25 39:19
  40:6,19 43:21
  44:2,25 46:18
  48:22
year 45:16,19,21
  47:3 50:16,17
years 6:2 8:7 9:16
  17:4,4
Yep 32:1 45:9
yield 6:21
yields 18:10 19:10
York 6:21

**Z**

Z 33:9
Zero 40:25
Zhenshi 12:22
  55:6

**0**

**1**

1.15 39:24
10 8:6 47:11,12
10% 45:24
100 9:16
109 35:18
11 1:15 8:6 59:5
12 6:2
12,000 9:22
13 6:2 45:7
16 9:22
1601 2:4
1700 2:11
175,000 50:16
175K 52:2
19 29:6
1995 6:11

**2**

2 9:8,10
20 36:23
200,000 45:23
  47:2
2000 6:16
20006 2:11
2008 7:25
2016 10:14 35:16
  35:24 45:20
  46:1 47:25,25
2017 35:18 36:1
  45:8 48:1
2018 1:15 35:19
  35:20 56:10
  57:16 58:12
  59:5
202.282.5708 2:12
2022 56:16
21 51:11,16,19
22 3:12 7:18,20
225932 56:16
22nd 35:19 56:10
  57:16
25 31:22 52:2
25,000 50:17

**3**

3 10:6,13
3:07 1:16
30 42:19,19,20
30/30/30 43:13
31st 35:20
33401 1:18 2:5
35K 52:2
360 54:8

**4**

4 3:6 43:5
4:32 1:16
4:33 55:15
40,000 9:20

**5**

5 52:2
500 2:4

505 1:17
561.990.1591 2:5
58 35:20

**6**

6 11:6
600 1:17

**7**

7 3:12 56:16

**8**

8 50:17,24 51:1
82 35:21

**9**

9 50:4 51:16
9:19-cv-80110-...
  1:2
98 43:10