# EXHIBIT 11

Hughes v. Priderock                                        10/10/2018
Daniel Ng

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  9:18-cv-80110-ROSENBERG/REINHART

WEBSTER HUGHES,

          Plaintiff,

vs.

PRIDEROCK CAPITAL PARTNERS, LLC,

          Defendant.

_____/



DEPOSITION OF DANIEL C. NG


Taken on Behalf of the Plaintiff

DATE TAKEN:           Wednesday, October 10, 2018

TIME:                 10:00 a.m. to 11:43 a.m.

PLACE:                505 South Flagler Drive
                      Suite 600
                      West Palm Beach, Florida  33401


Examination of the witness taken before:
Tamala L. Moore
Court Reporter and Notary Public
Florida Court Reporting
2161 Palm Beach Lakes Boulevard, Suite 302
West Palm Beach, Florida  33409
(561) 689-0999

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                        10/10/2018
Daniel Ng

---

Page 2

APPEARANCES FOR THE PLAINTIFF:
JOHN F. MARIANI, ESQ.
KAMMERER MARIANI, PLLC
1601 Forum Place
Suite 500
West Palm Beach, Florida 33401
(561) 990-1591
jmariani@kammerermariani.com

APPEARANCES FOR THE DEFENDANT:
WILLIAM G. MIOSSI, ESQ.
WINSTON & STRAWN, LLP
1700 K Street, NW
Washington, DC 20006
(202) 282-5708
wmiossi@winston.com

---

Page 3

### INDEX

Deposition of Daniel C. Ng                    Page No.
   Direct Examination by Mr. Mariani        4
Certificate of Oath                          55
Certificate of Reporter                      56
Errata Sheet                                 57
         - - - - -
PLAINTIFF'S EXHIBITS INDEX
NO.      DESCRIPTION            Page No.
         **** N O N E ****

DEFENDANT'S EXHIBITS INDEX

NO.      DESCRIPTION            Page No.

         **** N O N E ****

         - - - - -

### S T I P U L A T I O N S

It is hereby stipulated and agreed

by and between counsel for the respective

parties and the deponent that the reading

and signing of the deposition transcript

be RESERVED.

         - - - - -

---

Page 4

1           P R O C E E D I N G S
2               *********
3        THE COURT REPORTER:  Do you swear or affirm
4    the testimony you're about to give will be the
5    truth, the whole truth, and nothing but the truth?
6        THE WITNESS:  Yes.
7        THE COURT REPORTER:  Thank you.
8    AND THEREUPON,
9             DANIEL C. NG,
10   having been first duly sworn, was examined and testified
11   under oath as follows:
12            DIRECT EXAMINATION
13   BY MR. MARIANI:
14       Q   Good morning.
15       A   Good morning.
16       Q   Please state your full name and residence
17   address for the record.
18       A   Daniel C. Ng, spelled N-G; address 1560
19   Northwest 12th Way, Boca Raton, Florida.
20       Q   Are you employed?
21       A   Yes.
22       Q   By whom?
23       A   Priderock Capital Partners.
24       Q   Priderock Capital Partners.
25       A   Uh-huh.

---

Page 5

1        Q   How long have you been employed with them?
2        A   Since 2008, I believe.
3        Q   When you were hired in 2008, what was your job
4    description?
5        A   When I was hired, my job description was -- I
6    think I was the Vice-President of Acquisitions.
7        Q   How long were you Vice-President of
8    Acquisitions for Priderock Capital Partners?
9        A   Until 2015 or '16.  I got promoted to Managing
10   Director.
11       Q   Did your job description change?
12       A   When I got promoted?
13       Q   Yes.
14       A   No.  I was doing a little bit more than a
15   vice-president would be doing at that point.
16       Q   Have you ever been Vice-President of Finance
17   and Acquisitions at Priderock?
18       A   Yes.
19       Q   And when did you accomplish that role?
20       A   I don't remember.
21       Q   Was it after you became the managing director?
22       A   No.
23       Q   Was it prior to when you became a managing
24   director?
25       A   Yes.

2 (Pages 2 to 5)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                          10/10/2018
Daniel Ng

---

Page 6

1     Q   How many years prior?
2     A   I don't recall.
3     Q   Is that still your title at Priderock,
4   Vice-President of Finance and Acquisitions?
5     A   No.
6     Q   When was that no longer your title?
7     A   I don't recall.
8     Q   What was your title after that title at
9   Priderock?
10    A   Managing Director of Investments.
11    Q   When did you become Managing Director of
12  Investments at Priderock Capital Partners?
13    A   I don't recall.
14    Q   What's your best recollection?
15    A   Probably 2015/2016.
16    Q   Was that before you became managing director?
17    A   It's all the same title, roughly.
18    Q   In the Private Placement Memorandum that was
19  used relating to the transactions that we're here about,
20  you're listed as the Vice-President of Finance and
21  Acquisitions at Priderock.  Are you aware of that?
22    A   Yes.
23    Q   Who made that decision to identify you as that
24  with that title?
25    A   I believe that was the title that I had at the

---

Page 7

1   time.
2     Q   Is it the title you still have today?
3     A   No.
4     Q   When did that title change?
5     A   Changed from -- I'm sorry?
6     Q   When did you stop being Vice-President of
7   Finance and Acquisitions at Priderock?
8     A   I don't really recall the dates.
9     Q   Well, give me your best estimate, please.
10    A   Probably 2015/2016.
11    Q   Well, if I refreshed your recollection to
12  suggest that the Private Placement Memorandum was used
13  in respect of a transaction that closed in April of
14  2017, would that refresh your recollection?
15    A   Then maybe I got promoted in 2017, then.
16    Q   In respect of the title that's in the Private
17  Placement Memorandum, was that a new title that you
18  received at or about the time of preparation for the
19  K-Deal transaction?
20    A   No.
21    Q   Was it a title independent of the K-Deal
22  transaction?
23    A   No.
24    Q   It was specifically for the K-Deal
25  transaction; is that your testimony?

---

Page 8

1     A   No, no.  I am the Vice-President of Finance
2   and Acquisitions at that time.
3     Q   Let me go in a different direction.  Since you
4   started with Priderock in 2008, what have been your
5   duties and responsibilities at Priderock?
6     A   My duties include sourcing investment
7   opportunities that primarily focus on acquisitions of
8   multi-family assets across the United States.  I also am
9   involved in the financing of those investments in terms
10  of sourcing equity and securing debt for those
11  investment opportunities.
12    Q   When you refer to multi-family assets,
13  specifically what are you referring to?
14    A   Apartment buildings.
15    Q   Since 2008 for Priderock, have you worked on
16  any acquisitions of commercial properties?
17    A   I have analyzed multiple commercial properties
18  for investment opportunities.  We have not acquired an
19  office building at Priderock, if that's what you're
20  referring to.
21    Q   Since 2008; is that correct?
22    A   That's correct.
23    Q   Priderock has not bought commercial property?
24    A   I have not been involved with that.
25    Q   Fair enough.

---

Page 9

1       Do you know whether Priderock has purchased
2   commercial properties since 2008?
3     A   I'm not aware of them acquiring office
4   buildings since 2008.
5     Q   Have they acquired any raw land since you've
6   been with Priderock in 2008?
7     A   Yes.
8     Q   Have you assisted with the purchase and
9   sourcing of funds to purchase raw property?
10    A   Yes.
11    Q   From 2008 through the present, approximately
12  how many transactions have you worked on relating to the
13  purchase of multi-family assets and raw property?
14    A   Please describe "worked on."
15    Q   Activity that you engaged in that assisted
16  Priderock to close on the purchase of assets that
17  included multi-family apartment buildings or raw
18  property.
19    A   So it would have to close is what you're
20  saying?  Like something we acquired actually?
21    Q   That's my question now, yes.
22    A   I probably worked on about 40 to 50
23  transactions with Priderock since 2008.
24    Q   Which closed?
25    A   Which closed.

Florida Court Reporting
561-689-0999

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

---

Page 10

1    Q   Meaning which Priderock purchased.
2    A   Purchased or sold.
3    Q   Okay.  Now, in respect of those transactions,
4  describe your role generally as it relates to apartment
5  buildings and raw land that Priderock purchased.  And if
6  you would, I can ask a separate question, but I'm
7  interested in what's the difference in your role when
8  Priderock has sold either raw land or apartment
9  buildings that you've participated in the transaction.
10   A   What's the difference between -- can you
11 repeat the question?
12   Q   Okay.  Let me break it into two questions.
13 I'm sorry.  Describe your role, if you would, in respect
14 of purchases of apartment buildings and raw property
15 that Priderock has closed on since you've been involved
16 in 2008.
17   A   I am involved with sourcing the opportunities
18 as well as underwriting the opportunities that we
19 acquired.  Then I also am involved with closing the
20 transactions.
21   Q   So explain what you mean by "sourcing."
22   A   I deal with investment brokers, sellers,
23 owners of properties and raw land across the country.
24   Q   So does that mean you study the properties and
25 decide which ones might be attractive for Priderock to

---

Page 11

1  purchase?
2    A   Yes.
3    Q   So when you use the word "sourcing," you mean
4  identify potential properties to purchase.
5    A   Yes.
6    Q   And you used the word "underwriting."  Explain
7  what your role is in underwriting, what that means.
8    A   We analyze and underwrite the properties from
9  a macro and micro perspective.  We look at market
10 fundamentals to analyze the location of these assets.
11 In addition, we create complex financial models that
12 analyze the cash flows and returns of these investment
13 opportunities.
14   Q   So we're using the word "underwriting" to mean
15 doing cash flow models?
16   A   Part of it, yes.
17   Q   Is there any other part of it?
18       Well, let me ask it this way.  Is there a part
19 of it that acquires money for purposes of the purchase?
20   A   I don't understand that question.
21   Q   Do you -- are you involved directly in
22 obtaining the financing for purposes of purchasing
23 properties?
24   A   Yes.
25   Q   And how do you go about that?

---

Page 12

1    A   We provide information in the returns from our
2  analysis.
3    Q   To who?
4    A   Our investors.
5    Q   In respect of those transactions of the
6  purchase of apartment buildings or raw land, is there
7  ever a borrowing component from a financial
8  institution, --
9    A   Yes.
10   Q   -- bank, or other institution?
11       Are you involved in that as well?
12   A   Yes.
13   Q   And describe what you do in that activity.
14   A   I work with multiple lending institutions to
15 find the best debt for our investment.
16   Q   Does Priderock ever borrow, say, as much as
17 80 percent of a purchase price of an apartment building
18 or series of buildings or other purchases its made?
19   A   Yes.
20   Q   And for other purchases, I take it that you
21 gather money from private investors who participate in
22 the opportunity of a purchase.
23   A   Can you repeat that question?
24   Q   In other times, when you're not borrowing
25 money from banks, are you soliciting investors who share

---

Page 13

1  in the risk relative to a purchase of apartment
2  buildings or raw land?
3    A   I am not.
4    Q   You do not do that?
5    A   No.
6    Q   So when you referred to the investors whom you
7  have done cash flow analyses for of respective purchases
8  of apartment buildings or raw land, do you not deal with
9  those investors directly?
10   A   Yes.
11   Q   So who deals with those investors in those
12 circumstances?
13   A   In what circumstances?
14   Q   Where Priderock is asking investors to invest
15 in the purchase of apartment buildings and raw land.
16   A   The managing principals, David and George.
17   Q   And David's last name?
18   A   Khoury.
19   Q   George's last name?
20   A   Banks.
21   Q   Are they the only two principals at Priderock
22 Capital Partners?
23   A   I don't know.
24   Q   They're the two you deal with; is that a fair
25 statement?

---

4  (Pages 10 to 13)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

Page 14

1    A   I deal with David and George, yes.
2    Q   Now, prior to 2008, were you employed?
3    A   Yes.
4    Q   By whom?
5    A   Bainbridge Companies.
6    Q   That's B-A-I-N-B-R-I-D-G-E?
7    A   Correct.
8    Q   And what did you do at Bainbridge?
9    A   I was an associate at Bainbridge.
10   Q   I'm asking what did you do there.
11   A   I also analyzed acquisition opportunities
12   across the country.
13   Q   Of what?
14   A   Apartment buildings.
15   Q   Exclusively apartment buildings when you were
16   at Bainbridge?
17   A   No.
18   Q   What else?
19   A   Retail, mixed-use developments, apartment
20   developments.
21   Q   Anything else?  Any other type of purchases
22   while you were at Bainbridge?
23   A   No.
24   Q   And like Priderock Capital Partners, did
25   Bainbridge actually buy the real estate, meaning buy the

Page 15

1    apartment buildings, buy the retail space or vacant
2    land --
3    A   Yes.
4    Q   -- which was converted to retail space?
5        How many years were you with Bainbridge?
6    A   Two.
7    Q   And when you left Bainbridge, did you go
8    immediately to Priderock?
9    A   Yes.
10   Q   And again, that was in 2008; is that right?
11   A   Yes.
12   Q   So is it accurate to say you started with
13   Bainbridge in 2006?
14   A   Yes.
15   Q   Before 2006, were you employed?
16   A   Yes.
17   Q   By whom?
18   A   Fifteen Group.
19   Q   Fifteen, one-five?
20   A   Yes.
21   Q   What is the Fifteen Group?
22   A   They're also a real estate investment company.
23   Q   Where are they located?
24   A   Miami, Florida.
25   Q   How long were you with Fifteen Group?

Page 16

1    A   Less than a year.
2    Q   What did you do there?
3    A   I was also on the writing and sourcing of
4    acquisition opportunities.
5    Q   Of what type of opportunities?
6    A   Real estate investment opportunities as well
7    as any other opportunities Fifteen Group was interested
8    in.
9    Q   Let's deal with the real estate investment
10   opportunities first.  What type of real estate
11   investment opportunities?
12   A   Apartment buildings, office buildings, land,
13   hotels, retail.
14   Q   In your less than a year at Fifteen Group, how
15   many deals did you work on?
16   A   We closed on zero transactions.
17   Q   And a couple answers ago you said real estate
18   investment and other opportunities.  What were you
19   referring to in respect of saying "other opportunities"?
20   A   They had me analyze equity investments,
21   potential equity investments, companies, stocks.
22   Q   What type of companies?
23   A   I don't recall.
24   Q   Privately held companies, public companies?
25   A   Public companies.

Page 17

1    Q   In what industry?
2    A   It ranged.  I don't remember, you know, which
3    specific industries I analyzed.  It was a while ago.
4    Q   Were there any in the real estate industry?
5    A   Yes.
6    Q   And when you refer to stocks, are you
7    referring to the potential purchase of stocks of
8    companies that are publicly-traded companies?
9    A   I don't know if it was their intent to
10   purchase the stock.  I just looked at it in terms of a
11   valuation.
12   Q   I see.  Was that stock of a publicly-traded
13   companies?
14   A   I believe so.
15   Q   So prior to your employment at the Fifteen
16   Group, were you employed?
17   A   Yes.
18   Q   By whom?
19   A   Crocker Partners.
20   Q   In Palm Beach County?
21   A   Yes.
22   Q   How long were you employed by Crocker
23   Partners?
24   A   Three years.
25   Q   What did you do there?  What were your duties

5  (Pages 14 to 17)

Florida Court Reporting
561-689-0999

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                                    10/10/2018
Daniel Ng

Page 18

1    and responsibilities?
2        A   I was an analyst that focused on the
3    acquisition of office buildings in the southeast.
4        Q   Solely office buildings?
5        A   There were a few mixed-use investment
6    opportunities in there as well.
7        Q   And what do you mean by "mixed-use"?
8        A   It could have a component of office, hotel,
9    retail, apartments.
10       Q   Were all the properties you analyzed, were
11   they already built out?
12       A   No.
13       Q   Did you analyze value of raw land for purposes
14   of building office buildings or mixed-use buildings?
15       A   Yes.
16       Q   And were you involved in any actual closings
17   during your three years at Crocker Partners?
18       A   Yes.
19       Q   Were they all of office buildings or land --
20       A   Yes.
21       Q   -- upon which to build office buildings or
22   mixed-use buildings?
23       A   Yes.
24       Q   Were you employed prior to when you joined
25   Crocker Partners?

Page 19

1        A   Yes.
2        Q   By whom?
3        A   Lazard.
4        Q   For how long?
5        A   Two years.
6        Q   Where?
7        A   New York.
8        Q   Let me ask.  In the Private Placement
9    Memorandum it describes employment you may have had with
10   CRT.  Did you ever work for CRT?
11       A   CRT and Crocker Partners is the same company.
12       Q   They're the same company?
13       A   Yeah, pretty much.
14       Q   Okay.  Thank you.
15           Is Crocker Partners a subsequent name of the
16   same company, CRT?
17       A   I think so.
18       Q   Do you know why both are referred to in the
19   Private Placement Memorandum?
20       A   I'm sorry?
21       Q   Do you know why both CRT and Crocker Real
22   Estate are referred to in the Private Placement
23   Memorandum under your name as former employment of
24   yours?
25       A   I need to review that again.  Do you have a

Page 20

1    copy of it I could take a look at?
2        Q   Yeah, I don't right now, but we'll talk about
3    that later.
4            While I'm on it, though, did you provide
5    information that was included in the Private Placement
6    Memorandum?
7        A   Yes.
8        Q   To whom?
9        A   I don't recall who I specifically sent that
10   information to.
11       Q   I'm not asking you -- okay, do you know
12   whether you provided it to someone within Priderock
13   Capital Partners or someone outside of Priderock Capital
14   Partners?
15       A   No, I don't recall.
16       Q   Do you recall when you provided that
17   information?
18       A   I believe that information is taken from my
19   bio on our corporate website.  And that's what I think
20   was done, but I can't be sure.
21       Q   But I'm asking when did you provide that for
22   purposes of the Private Placement Memorandum?
23       A   I don't recall a specific date.
24       Q   Do you remember -- do you recall whether you
25   reviewed it prior to publication?

Page 21

1        A   Yes.
2        Q   Who asked you to review it?
3        A   I believe it was Jonathan Diamond.
4        Q   So let's go back to Lazard.  You said you were
5    there for two years?
6        A   Yes.
7        Q   You received an undergraduate degree in New
8    York; is that accurate?
9        A   Yes.
10       Q   And was Lazard your first employment after
11   graduating from school?
12       A   Yes.
13       Q   Congratulations.  That's a good company to get
14   retained by.
15           Tell me what you did with Lazard.
16       A   I worked on the analysis of mergers and
17   acquisitions, potential transactions, comp analyses for
18   acquisitions of companies at Lazard.
19       Q   Did any of the companies that you reviewed for
20   merger and acquisition purposes, were any actually
21   acquired?
22       A   None in my time there.
23       Q   Was there a particular industry that your
24   analysis was focused on when you were at Lazard
25   Brothers?

6  (Pages 18 to 21)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                              10/10/2018
Daniel Ng

Page 22

1      A   No.
2      Q   Do you recall the nature of the industries
3  that you reviewed for merger and acquisition purposes at
4  Lazard?
5      A   No.
6      Q   Just so I have a better sense of it, what two
7  years were you working in New York at Lazard?
8      A   I believe it was 2003 to 2005.
9      Q   Well, let's try that again.  Because you said
10  you started at Priderock Capital Partners in 2008.
11      A   Yes.
12      Q   So it seems unlikely that you would have been
13  at Lazard in 2005 if you had all these other employments
14  at Bainbridge and Fifteen Group and Crocker, which so
15  far add up to about six or seven years.
16      A   So 2002 is when I graduated.  I worked for
17  them for about two years.
18      Q   Okay.
19      A   So that puts us around 2004, 2005-ish.
20      Q   That's correct.
21      A   Then I worked for Crocker for, I think, two to
22  three years.
23      Q   Okay.  Remember when you started with Crocker?
24      A   No.  I can pull it up.
25      Q   Is it on the website?

Page 23

1      A   Potentially.
2      Q   Do you have a LinkedIn page?  Will it be on
3  your LinkedIn page?
4      A   I'm not sure.
5      Q   Okay.  But we know you graduated in 2002.
6      A   Correct.
7      Q   Nobody's going to dispute that.
8      A   No, I graduated in 2002.
9      Q   And for approximately two years you were at
10  Lazard.
11      A   Correct.
12      Q   And then for approximately three years you
13  were at Crocker, which was also CRT.
14      A   Yeah, probably two to three, around there,
15  let's say.
16      Q   And then for a little -- well, tell me.
17  Fifteen Group, were you there for approximately a year
18  or just a couple --
19      A   It was less.  It was like six months maybe or
20  eight months, less than a year.
21      Q   Okay.  And then Bainbridge for approximately
22  two years?
23      A   Yeah.  That's roughly about right.
24      Q   Okay.  That's good enough.
25          Now, during all that employment up to through,

Page 24

1  let's say, 2016, had you ever been involved in any
2  mortgage-backed securities transactions?
3      A   When you say "involved," what do you mean?
4      Q   I mean were you involved with a company that
5  made a purchase or sale of mortgage-backed securities
6  that you had some level of material involvement.
7      A   No.
8      Q   Are you familiar with -- well, let me ask this
9  question first.  Are you familiar with the company named
10  Priderock Multi-Family Debt Opportunity Fund, LP?
11      A   Yes.
12      Q   What's your understanding of that entity?
13      A   Can you be more specific?
14      Q   How do you know about that entity?
15      A   That's the entity we acquired -- I believe
16  that's the entity we are working on to acquire the BP
17  securities.
18      Q   So when you say "we acquired," to whom are you
19  referring?
20      A   Priderock.
21      Q   Priderock Capital Partners?  Is that who you
22  meant, Priderock Capital Partners?
23      A   (No response).
24      Q   If you know, fine.  If you don't know, just --
25      A   Yeah, I don't know.

Page 25

1      Q   It's not really a memory test.
2      A   I just don't know if it's part of the same.
3      Q   But you've heard the name apparently -- have
4  you heard the name Priderock Multi-Family Debt
5  Opportunity Fund, LP?
6      A   Yes.
7      Q   You've heard that name before.
8      A   Yes.
9      Q   Okay.  And do you know the name Priderock Fund
10  Management Partners, LLC?
11      A   Yes.
12      Q   And do you know the name Priderock MDOF GP?
13      A   Yes.
14      Q   So let me ask you about are you aware of the
15  purchase of $109 million in respect of the Freddie Mac
16  KF-29 Securities that were purchased?  Are you familiar
17  with that transaction?
18      A   Purchased by whom?
19      Q   Purchased by one of those entities that I just
20  referred to.
21      A   Yes.
22      Q   You're familiar with that?
23      A   Yes.
24      Q   And are you familiar with the purchase of $58
25  million of Freddie Mac K-1504 by one of the same

7  (Pages 22 to 25)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

Page 26

1   entities?
2       A   Yes.
3       Q   And are you also familiar with the purchase of
4   $82 million of Freddie Mac KF-46C?
5       A   Yes.
6       Q   Now, what's your understanding of each of
7   those purchases?
8       A   What do you mean?
9       Q   I mean they were purchased by whom?  What's
10  your understanding of who purchased those?  Let me be
11  more simple for you.  I'm sorry.
12          Did an entity associated with Priderock
13  Capital Partners make those purchases?
14      A   I don't know.
15      Q   Well, how do you know of those three
16  purchases, then?
17      A   I worked on the acquisition of those
18  purchases.
19      Q   All three?
20      A   Yes.
21      Q   And what did you do in respect of each of the
22  purchases?
23      A   We analyzed the -- I analyzed the cash flow of
24  the transactions of each of the securities as well as
25  underlying collateral.

Page 27

1       Q   Did you make a recommendation in respect of
2   the purchase?
3       A   No.
4       Q   Are you familiar with the Priderock
5   Multi-Family Debt Opportunity Fund, LP?
6       A   Yes.
7       Q   Is that the fund that purchased all three of
8   the transactions we just referred to, the 109 million of
9   the KF-29, the 58 million of the K-1504, and the 82
10  million of the KF-46C?
11      A   I don't recall.
12      Q   Did you know at one time?
13      A   I can look that up.  I just don't -- I don't
14  know which entities acquired which investments.
15      Q   You don't.  Okay.
16          Do you know what the Priderock Multi-Family
17  Debt Opportunity Fund is?
18      A   Yes.
19      Q   What is it?
20      A   It's a fund that acquires debt opportunities.
21      Q   Does it acquire -- did it acquire those three
22  purchases that we just described, the 109 million KF-29
23  deal, the 58 million K-1504 deal, and the 82 million
24  KF-46C deal?
25      A   I don't recall.

Page 28

1       Q   Do you know how much funds were raised by the
2   Priderock Multi-Family Debt Opportunity Fund?
3       A   No.
4       Q   In order of magnitude, was it more than a $100
5   million?
6       A   I don't recall.
7       Q   Was it more than a $150 million?
8       A   I don't recall.
9       Q   Did you ever know how much was raised?
10      A   No.
11      Q   What document would you look at at Priderock
12  to determine how much money was raised for the Priderock
13  Multi-Family Debt Opportunity Fund?
14      A   I don't know.
15      Q   So you would not know how to answer that
16  question if somebody asked you to look it up?
17      A   I would have to ask someone for that
18  information.
19      Q   Whom would you ask?
20      A   I would most likely ask David Khoury.
21      Q   Anybody else?
22      A   David Worley.
23      Q   Anybody else?
24      A   I think those two would be the people that I
25  would ask.

Page 29

1       Q   You believe that they would know the answer to
2   that question, how much money was raised?
3       A   Yes.
4       Q   What is your undergraduate degree in, Mr. Ng?
5       A   Finance and Accounting.
6       Q   Have you taken any postgraduate courses and
7   received any certificates beyond your undergraduate
8   degree?
9       A   No.
10      Q   Are you a CPA?
11      A   No.
12      Q   In your degree in Finance and Accounting, was
13  there a -- what's the word?  Was there a concentration?
14      A   No.
15      Q   Do you remember in April, 2017, when the
16  purchase of the $109 million of the Freddie Mac -- let
17  me start again.
18          Do you remember in April 2017, the time when
19  the purchase of the $109 million Freddie Mac KF-29 was
20  closed?
21      A   Yes.
22      Q   What do you remember about that day or that
23  time period?
24      A   We closed on a transaction.
25      Q   How many transactions do you normally close on

8  (Pages 26 to 29)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                          10/10/2018
Daniel Ng

Page 30

1   in a year?
2       A   That's hard to say.  It depends on how many
3   opportunities I find that are viable.
4       Q   Okay.  Since you've been at Priderock, what's
5   the most in terms of a purchase you've closed on in a
6   single year?
7       A   The most in terms of what?
8       Q   Purchase.
9       A   Price?
10      Q   No, no, purchase, the number.  How many?  One,
11  two, three, five, ten?
12      A   Of just apartment buildings or any
13  transactions, inclusive of sales?
14      Q   No, purchases --
15      A   Just purchases of apartment buildings or --
16      Q   Apartments or raw land or any other asset
17  that's been purchased.
18      A   I don't recall the most that we've done.  I
19  don't have that handy.
20      Q   In order of magnitude, would it be more than
21  three?
22      A   Yes.
23      Q   Would it more than five?
24      A   Yes.
25      Q   Would it be more than ten?

Page 31

1       A   I don't know.
2       Q   Okay.  That's fair.
3           Do you know whether in April, '17, that's the
4   first time Priderock was involved in the purchase of
5   Freddie Mac K-Deal Securities?
6       A   Yes.
7       Q   It was the first time; correct?
8       A   Yes.
9       Q   Did you speak or have any involvement with
10  anyone at Key Bank in respect of the three transactions
11  we were describing, the KF-29, the K-1504, and the
12  KF-46C?
13      A   Yes.
14      Q   Whom at Key Bank have you spoken to?
15      A   Dave Shillington.
16      Q   Anyone else?
17      A   Joe Fadus.
18      Q   Spell that name, please.
19      A   J-O-E.
20      Q   Thank you.
21      A   Fadus, F-A-D-U-S.
22      Q   Anyone else at Key Bank?
23      A   No.
24      Q   In respect of the KF-29 transaction, did you
25  speak with Mr. Shillington?

Page 32

1       A   Yes.
2       Q   About what?
3       A   I don't recall.
4       Q   In respect of all three of the deals, the
5   KF-29, the K-1504, and the KF-46C, have you spoken with
6   Dave Shillington and Joe Fadus?
7       A   Can you repeat the question one more time.
8       Q   In respect to those three transactions, the
9   KF-29, the K-1504, and the KF-46C, have you spoken with
10  David Shillington and Joe Fadus?
11      A   I don't recall which transactions I spoke to
12  those individuals about, which specific ones.
13      Q   Was it only in respect of one of the
14  transactions?
15      A   No.
16      Q   Was it more than one?
17      A   Yes.
18      Q   How many?
19      A   More than two.  It could have been two or
20  three.
21      Q   You don't remember?
22      A   No, I don't remember which person I spoke with
23  regarding which investment opportunity.
24      Q   Do you remember the topic or subject matter?
25      A   Yes.

Page 33

1       Q   What was the subject matter?
2       A   Financing of the securities.
3       Q   What level of financing?
4       A   Potentially in terms of -- what level do you
5   mean?
6       Q   How much?
7       A   It would range potentially from anywhere from
8   20 to 35 percent.
9       Q   Of what number?
10      A   Of the purchase price of the security.
11      Q   Let's be specific.  In respect of the KF-29
12  deal, purchase price was $109 million.  Did you have
13  discussions with Key Bank about financing a portion of
14  that purchase?
15      A   I was involved in those conversations.  Yes, I
16  did.
17      Q   With whom?
18      A   Dave Shillington.
19      Q   And who else?
20      A   David Worley.
21      Q   Who else?
22      A   That was it from my side.
23      Q   How about from the Key Bank side?
24      A   It was Dave Shillington.
25      Q   Do you have a recollection of how much, if

9  (Pages 30 to 33)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

Page 34

1   any, was borrowed from Key Bank for the financing of the
2   $109 million KF-29 transaction?
3       A   Yes.
4       Q   How much?
5       A   Approximately 20 million.
6       Q   Did Key Bank lend 20 million on that purchase?
7       A   Yes.
8       Q   All of it?  All 20 million?
9       A   I'm not sure.
10      Q   Was the commitment of Key Bank to lend up to
11  20 million?
12      A   I don't recall.
13      Q   Did you negotiate with Mr. Shillington about
14  the amount or the rate?
15      A   No.
16      Q   Did Mr. Worley?
17      A   I believe so.
18      Q   Were you there when Worley was negotiating the
19  rate with David Shillington?
20      A   No.
21      Q   You were not.  So how do you account for your
22  last answer?  What information do you use to
23  affirmatively state that you think Worley negotiated
24  with Shillington?  What's the basis of that answer?
25      A   He was involved in conversations with David

Page 35

1   Shillington.
2       Q   So you infer from that he negotiated.
3       A   Yes.
4       Q   Now, in respect of the next transaction, the
5   $58 million purchase of the K-1504, did you speak with
6   Mr. Shillington or Mr. Fadus about that transaction?
7       A   Yes.
8       Q   Which one?  David or Joe?
9       A   I don't recall.
10      Q   Did you ever meet either of them in person?
11      A   Yes.
12      Q   When you had conversations with them, did you
13  meet them in person or was it by phone?
14      A   We had conversations in person and on the
15  phone.
16      Q   Where are they located geographically?
17      A   I don't recall.
18      Q   Did you visit them or they visit you?
19      A   They visited us.
20      Q   So what do you remember about the
21  conversation, if any, you had with either of them in
22  respect of the $58 million K-1504 transaction?
23      A   They had questions about the financial model
24  that I answered.
25      Q   When you say "they," were they both present?

Page 36

1       A   I'm not sure.
2       Q   What's your understanding of Mr. Shillington's
3   title at Key Bank?
4       A   I believe he no longer works at Key Bank.
5       Q   What was his title?
6       A   I don't recall.
7       Q   What was Mr. Fadus's title?
8       A   I don't recall.
9       Q   Is he still with Key Bank?
10      A   Yes.
11      Q   Was Mr. Shillington still involved with Key
12  Bank at the time of the Freddie Mac K-1504 transaction?
13      A   I don't know.
14      Q   And in respect of the Freddie Mac KF-46C
15  transaction, do you know whether he was still employed
16  with Key Bank or by Key Bank?
17      A   I don't recall.
18      Q   Do you recall if he was employed by Key Bank
19  for the purchase of the $109 million KF-29 transaction?
20      A   Yes.
21      Q   When both Mr. Shillington and Fadus were
22  employed at Key Bank, did you have a sense of who
23  outranked whom?
24      A   Yes.
25      Q   Who was the higher-up at Key Bank among the

Page 37

1   two or between the two?
2       A   It seemed like Shillington was the higher-up.
3           MR. MIOSSI:  Go off the record for just a
4   second.
5           (Whereupon, a brief recess was had, after
6   which the deposition continued as follows:)
7   BY MR. MARIANI:
8       Q   In respect of these three transactions we're
9   describing or talking of, the KF-29, the K-1504, and the
10  KF-46C, did you communicate directly with any of the
11  investors in those funds?  Excuse me, those securities?
12      A   Define "communicate."
13      Q   Speak to, email, meet with.
14      A   Yes.
15      Q   With whom?
16      A   Nick Coleman.
17      Q   Last name is spelled how?
18      A   C-O-L-E-M-A-N.
19      Q   C-O-L-E-M --
20      A   -- A-N.
21      Q   Thank you.
22          In respect of which of the purchases?
23      A   All of them.
24      Q   Does Mr. Coleman have a company?
25          Let me rephrase that.

10  (Pages 34 to 37)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                          10/10/2018
Daniel Ng

| | Page 38 |
|---|---|

1       Did he invest through a company or his own
2   name?
3       A   I don't know.
4       Q   Where is he located geographically?
5       A   Florida.
6       Q   In the Palm Beach area?
7       A   I believe so.
8       Q   Did you speak or communicate in any way with
9   any other investor?
10      A   I don't recall.
11      Q   What was the substance of your communication
12  with Mr. Coleman?
13      A   He wanted to see the returns on his
14  investment.
15      Q   What's your best recollection of when you
16  spoke with him?
17      A   Regarding what?
18      Q   Regarding you said you spoke with him
19  regarding all three purchases of the K deals, the KF-29,
20  the K-1504, and the KF-46C.  Was that your testimony?
21      A   Yes.
22      Q   So when did you speak with him?
23      A   This year.
24      Q   After the third purchase, meaning the purchase
25  of the KF-46C?

| | Page 39 |
|---|---|

1       A   I don't recall.
2       Q   Was it in the spring that you spoke with him?
3       A   I don't recall.
4       Q   Was it during the summer?
5       A   I don't recall.
6       Q   Did you meet with him?
7       A   No.
8       Q   How did you communicate with him?
9       A   Email.
10      Q   Did he email you first?
11      A   No.
12      Q   Did you email him?
13      A   Yes.
14      Q   Why did you email him?
15      A   David Khoury said Nick Coleman wanted to see
16  the returns on his investments.
17      Q   How much did Mr. Coleman or his company
18  invest?
19      A   I don't recall.
20      Q   When you communicated to Mr. Coleman, did you
21  communicate specifically about his investment and the
22  amount of his investment and the specific return
23  relative to the amount of his investment?
24      A   Yes.
25      Q   In order of magnitude, what's your best

| | Page 40 |
|---|---|

1   estimate of Mr. Coleman's investment?
2       A   I don't know.
3       Q   So more than $5 million?
4       A   No.
5       Q   Was it less than $5 million?
6       A   Yes.
7       Q   Was it less than $3 million?
8       A   I don't know.
9       Q   Have you communicated with any other investors
10  besides Mr. Coleman?
11      A   No, I don't think so.  I don't recall
12  actually, I mean.
13      Q   After the Private Placement Memorandum was
14  completed, do you remember that time when the Private
15  Placement Memorandum was completed and was sent out to
16  potential investors?
17      A   No.
18      Q   Not asking you for a specific date but I am
19  asking if you remember that that happened.
20      A   Yes.
21      Q   And after it was sent out to potential
22  investors, did you speak with any of them at any time
23  prior to your conversation with Mr. Coleman.
24          Let me rephrase that question.
25          Prior to your conversation with Mr. Coleman,

| | Page 41 |
|---|---|

1   did you speak with any investor or any potential
2   investor all the way back to when the Private Placement
3   Memorandum was distributed?
4       A   Yes.
5       Q   Whom?
6       A   I don't recall.
7       Q   How many?
8       A   I don't recall.
9       Q   Were you contacted directly by any investors
10  or potential investors?
11      A   What do you mean?
12      Q   I mean did you receive any communication from
13  an investor or potential investor that was not solicited
14  by you?
15      A   I don't recall.
16      Q   Did you ever instigate communication with an
17  investor or potential investor?
18      A   No.
19      Q   Does Priderock Capital Partners receive --
20  well, withdraw that.
21          Does any Priderock entity receive fees based
22  on the KF-29 transaction, the K-1504 transaction, and
23  the KF-46C transaction?
24      A   I don't know.
25      Q   Are you unaware whether any entity receives

11  (Pages 38 to 41)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

---

Page 42

1  fees based on those three transactions?
2      A   Please repeat that.
3      Q   Are you unaware whether any entity receives
4  fees based on those three transactions, the KF-29, the
5  K-1504, and the KF-46C?
6      A   No.
7      Q   So you are unaware?  Is that your testimony?
8      A   I know that there are fees, but I don't know
9  which entity or who receives them.
10      Q   Okay.  What do you know about fees?
11      A   I know about the fees that have been modeled
12  in the pro forma.
13      Q   Is that the full extent of your knowledge?
14      A   Yes.
15      Q   What do you understand from the model that the
16  fees are or amount to?
17      A   There is an asset management fee.
18      Q   Do you understand who receives that?
19      A   I don't know who receives that.
20      Q   Do you know who manages the asset?
21      A   I don't know.
22      Q   Do you have any understanding of the amount of
23  the asset management fee that you just referred to?
24      A   I don't recall.
25      Q   Do you know how it's calculated?

Page 43

1      A   Yes.
2      Q   How is it calculated?
3      A   It's based on a percentage of equity invested.
4      Q   Does that mean the amount of money in the
5  fund, in the Priderock Multi-Family Debt Opportunity
6  Fund?
7      A   Repeat the question.
8      Q   When you say a percentage of equity invested,
9  is the equity invested the amount in the Priderock
10  Multi-Family Debt Opportunity Fund?
11      A   Yes.
12      Q   Do you recall what the percentage is in the
13  model?
14      A   Yes.
15      Q   What is the percentage in the model?
16      A   1.25 percent.
17      Q   What time -- amount of time is that
18  1.25 percent calculated?  Meaning is that an annual
19  percentage rate, a quarterly percentage rate, or some
20  other timeframe?
21      A   Annual.
22      Q   And is it your understanding does that mean
23  1.25 percent of all the money that's in the Priderock
24  Multi-Family Debt Opportunity Fund?
25      A   That's how the model is presented.

Page 44

1      Q   Do you have any information to suggest that
2  the fee is calculated any other way?
3      A   Yes.
4      Q   What information do you have that suggests it
5  would be calculated some other way?
6      A   Depends on the amount of equity invested.
7      Q   Does the amount of equity invested in the fund
8  change the percentage rate?
9      A   Per investor.
10      Q   Meaning what?
11      A   Depending on the size of the investment, the
12  fee would change.
13      Q   So you're saying there's different fees for --
14  or different percentage of fees for different investors.
15      A   No.
16      Q   Okay.  Then I'm lost.  I'm sorry.  Is the
17  1.25 percent you referred to calculated on the entirety
18  of the amount invested into the Priderock Multi-Family
19  Debt Opportunity Fund?
20      A   That is how the model is presented.
21      Q   Do you know that that's not occurring in
22  reality?  Is that your testimony?  Something different
23  from that is happening?
24      A   Yes.
25      Q   Well, tell me what's happening.

Page 45

1      A   The fee is based on the amount of equity each
2  investor invests in the deal.  So for a large
3  investment, it might not be 1.25 percent, it would be
4  something lower.  And for a smaller investment, it could
5  be something higher.
6      Q   Does it average out to 1.25 percent?
7      A   I don't recall.
8      Q   How are the asset management fees collected,
9  from what timeframe?
10      A   I don't know.
11      Q   Do you know who's in charge of collecting or
12  determining the actual fees?
13      A   No.
14      Q   Do you know whether there's any other fees or
15  remuneration in respect of performance of the fund?
16      A   No.
17      Q   Have you ever heard the word "promote"?
18      A   Yes.
19      Q   What's that word mean to you in this context?
20      A   A promote is a bonus that the GP would receive
21  based on the performance of the investment.
22      Q   And who's the GP you're referring to?
23      A   Whoever the general partner is.
24      Q   Is that an entity affiliated with Priderock
25  Capital Partners, Inc. --

12  (Pages 42 to 45)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

| Page 46 |
| --- |

```
 1        A   I don't know.
 2        Q   -- with respect to the three funds we're
 3   describing?
 4        A   Is it affiliated -- please repeat the
 5   question.
 6        Q   Do you understand that the general partner is
 7   a person or entity affiliated with Priderock Capital
 8   Partners, LLC?
 9        A   Yes.  Yes.
10        Q   Do you know who the general partner is of the
11   fund?
12        A   I don't recall.
13        Q   So what's the amount of that bonus you just
14   referred to?  Or how is it calculated?
15        A   I don't know the amount.  It depends on the
16   performance of the investment.
17        Q   How is it calculated based on the performance
18   of the investment?
19        A   It's based on a disproportionate split of
20   profits after an investment hurdle is reached.
21        Q   What do you mean by "disproportionate split"?
22        A   After the investment reaches a specific
23   hurdle, cash flow would be distributed based on a
24   pro rata or percentage share.  I don't recall the
25   percentages.
```

| Page 47 |
| --- |

```
 1        Q   Distributed to whom?
 2        A   GP, LP.
 3        Q   So a portion is distributed to the general
 4   partner and the other portion is distributed to the
 5   limited partners?
 6        A   Correct.
 7        Q   And the limited partners are the investors;
 8   correct?
 9        A   Correct.
10        Q   Now, in respect of the portion that's
11   allocated to the general partner, how is that expected
12   to be distributed?
13        A   I don't understand the question.
14        Q   Okay.  Do you know who shares in the
15   distribution of the portion of the promote that's
16   assigned to the general partner?
17        A   Yes.
18        Q   Who is going to share in that?
19        A   For these investment opportunities?
20        Q   Yes.  Specifically for the three purchases
21   we've been talking of, the KF-29, the K-1504, and the
22   KF-46C.
23        A   I don't recall all of the people that are
24   involved with the promote.
25        Q   Can you tell me who it's going to be that you
```

| Page 48 |
| --- |

```
 1   remember?  Who's going to share in that?
 2        A   David Khoury, George Banks, myself, Barbara
 3   Gaziano.
 4        THE COURT REPORTER:  Excuse me?
 5   BY MR. MARIANI:
 6        Q   Spell her last name, please.
 7        A   G-A-Z-I-A-N-O.
 8        David Worley.
 9        Q   Anyone else that you know of?
10        A   Not that I know of.
11        Q   What percentage of the promote do you expect
12   to share in?  I'm sorry, what percentage of the promote
13   do you expect to receive?
14        A   I don't recall.
15        Q   Is it more than 2 percent?
16        A   I don't recall.
17        Q   Is it more than 4 percent?
18        A   I don't recall.
19        Q   Is it a single-digit percent?
20        A   Yes.
21        Q   Is it 4 percent?
22        A   I don't recall.
23        Q   Where would you find out what percentage of
24   the promote you're going to share in?
25        A   I would ask David Khoury.
```

| Page 49 |
| --- |

```
 1        Q   What document would you look at?
 2        A   Most likely the partnership document.
 3        Q   Which partnership document?
 4        A   I don't know.
 5        Q   Who told you you're sharing in the promote?
 6        A   David Khoury.
 7        Q   What did he say to you when he said you're
 8   sharing in the promote?
 9        A   He said, "You're sharing in the promote."
10        Q   Did he mention a percentage?
11        A   Yes.
12        Q   What percentage did he mention?
13        A   I don't recall.
14        Q   Did you write it down anywhere?
15        A   No.
16        Q   How do you know that Barbara Gaziano is
17   sharing in the promote?
18        A   I believe he told her as well.
19        Q   Were you all together?
20        A   I don't recall.
21        Q   Was there a meeting where the promote was
22   discussed?
23        A   I don't recall.
24        Q   Did you speak with Barbara Gaziano about the
25   fact that you and she were sharing in the promote?
```

13  (Pages 46 to 49)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

| Page 50 | Page 52 |
|---|---|

**Page 50**

1    A   I don't recall.
2    Q   Did you speak with David Worley about your
3    sharing in the promote?
4    A   Yes.
5    Q   What did you say to David Worley?
6    A   "Thank you."
7    Q   And what did he say to you?
8    A   "You're welcome."
9    Q   That was it?  That was the conversation?
10   A   Yes.  I believe so.
11   Q   Did he mention a percentage?
12   A   Yes.
13   Q   What did he mention?
14   A   I don't recall the percentage.
15   Q   What do you expect the percentage to be?
16   A   Single digit.
17   Q   Okay, 5 percent?
18   A   I don't have any expectations.
19   Q   Literally no expectation?
20   A   It would be nice.  But yes, I mean -- I just
21   don't remember what percentage was mentioned.
22   Q   Okay.  Let's do it this way.
23   A   I think there was --
24   Q   I'm sorry; I didn't mean to cut you off.
25       You have no expectation about the percentage;

**Page 51**

1    is that your testimony?
2    A   I don't get the question.
3    Q   Do you have an expectation of a particular
4    percentage or a range of percentages to share in the
5    promote?
6    A   No.
7    Q   So if it's zero percent, you have no
8    expectation that it would be higher than that?
9        MR. MIOSSI:  Object to the form of that
10       question.
11   BY MR. MARIANI:
12   Q   I'll rephrase.
13       If it were one percent, would you be
14   disappointed?
15   A   The percentage was provided.  I just don't
16   remember -- I don't recall what percentage it was.
17   Q   Was it greater than one percent?
18   A   Yes.
19   Q   Was it greater than two percent?
20   A   I don't recall.
21   Q   Is it the best of your recollection that these
22   five people are the people sharing in the promote; that
23   is to say, Khoury, Banks, you, Gaziano, and Worley?
24   A   Can you please repeat the question.
25   Q   Is it your understanding that these five

**Page 52**

1    people that you mentioned are the only people sharing in
2    the promote; those people being Khoury, Banks, you,
3    Gaziano, and Worley?
4    A   I don't know.
5    Q   Do you have any knowledge or understanding
6    that anyone outside of these five people have been told
7    they will share in the promote?
8    A   No.
9    Q   So if the promote is distributed among these
10   five people, what percentage of the promote would you
11   expect to receive?
12       MR. MIOSSI:  I think this has been asked and
13       answered many times.  He just doesn't know.
14       MR. MARIANI:  Fair enough.  He can tell me
15       that.  Thanks, Bill.
16       THE WITNESS:  Yeah, I don't recall.
17   BY MR. MARIANI:
18   Q   Would you expect to share equally with Barbara
19   Gaziano or more than Barbara Gaziano?
20   A   I don't have an expectation.
21   Q   Really.  Okay.
22       Would you expect to be treated equally among
23   the five people?
24   A   Excuse me?  What was that again?
25   Q   Would you expect to be treated equally among

**Page 53**

1    the five people?
2    A   I don't have an expectation.
3    Q   Just so it's clear that -- the percentage that
4    you were grateful for is written down somewhere, is it?
5    When you said "thank you" to Mr. Worley?
6    A   I don't know.
7        MR. MARIANI:  Tell you what.  Let's take a
8        break, Bill.  I might be finished.
9        MR. MIOSSI:  All right.
10       (Whereupon, a brief recess was had, after
11   which the deposition continued as follows:)
12       MR. MARIANI:  Thank you.  I have no other
13   questions today.
14       You have the right to read the transcript to
15   check it for accuracy.  Your counsel can advise
16   you.
17       MR. MIOSSI:  Yeah, we'll reserve the right to
18   read and sign.
19       There's one other thing.  We haven't had the
20   confidentiality order entered in the case.  But I
21   know we've agreed on one, and I think Chris was
22   going to get it entered.  But pending that, there's
23   information in here, some of which is confidential,
24   the names of investors and things.  So until we
25   kind of get that sorted out, I would just designate

14  (Pages 50 to 53)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock                                    10/10/2018
Daniel Ng

---

**Page 54**

1   the testimony confidential under that order and
2   then we'll sort out what parts really are and what
3   parts --
4       MR. MARIANI:  That's fine.  Whatever you have
5   to do, Bill.
6       MR. MIOSSI:  That's all I wanted to do, then.
7   I'm done.
8       (DEPOSITION CONCLUDED AT 11:43 A.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 55**

1
2               CERTIFICATE OF OATH
3
4
    STATE OF FLORIDA      )
5                         )
    COUNTY OF PALM BEACH  )
6
7
8       I, Tamala L. Moore, Professional Court
9   Reporter, Notary Public, State of Florida, certify that
10  DANIEL C. NG, personally appeared before me on the 10th
11  of October, 2018, and was duly sworn.
12
13      Signed this 24th day of October, 2018.
14
15
16      _____
        Tamala L. Moore
17      Professional Court Reporter
18      Notary Public - State of Florida
        Commission No.:  GG181619
19      Expires:  February 1, 2022
20
21
22      Personally known _____
23      OR Produced identification - XXX
24  Type of Identification Produced- FL DRIVERS LICENSE
25

---

**Page 56**

1               CERTIFICATE OF REPORTER
2
    STATE OF FLORIDA  )
3                     )
    COUNTY OF MARTIN  )
4
5       I, Tamala L. Moore, Professional Court
6   Reporter, do hereby certify that I was authorized to and
7   did stenographically report the deposition of DANIEL C.
8   NG; that a review of the transcript was requested; and
9   that the foregoing transcript, pages 4 through 54, is a
10  true record of my stenographic notes.
11
12      I FURTHER CERTIFY that I am not a relative,
13  employee, or attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorney or counsel connected with the action, nor am I
16  financially interested in the action.
17
18      DATED this 24th day of October, 2018.
19
20
        _____
21      Tamala L. Moore
        Professional Court Reporter
22
23
24
25

---

**Page 57**

1           E R R A T A   S H E E T
2   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS SHEET
3   IN RE:   WEBSTER HUGHES V PRIDEROCK CAPITAL PARTNERS
4
    Deposition of:  DANIEL C. NG
5
6   Taken on:  October 10, 2018
7   _____
8   PAGE NO.  LINE NO.     CHANGE          REASON
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
22  are true and correct, subject to any changes in form or
    substance entered here.
23
24  _____   _____
    DATE          DANIEL C. NG
25

---

                        15  (Pages 54 to 57)

b15ccd89-5497-4f5f-9241-6090a6e5f00a

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 58

**A**

**A-N** 37:20
**a.m** 1:15,15 54:8
**accomplish** 5:19
**account** 34:21
**Accounting** 29:5
　29:12
**accuracy** 53:15
**accurate** 15:12
　21:8
**acquire** 24:16
　27:21,21
**acquired** 8:18 9:5
　9:20 10:19
　21:21 24:15,18
　27:14
**acquires** 11:19
　27:20
**acquiring** 9:3
**acquisition** 14:11
　16:4 18:3 21:20
　22:3 26:17
**acquisitions** 5:6,8
　5:17 6:4,21 7:7
　8:2,7,16 21:17
　21:18
**action** 56:15,16
**activity** 9:15
　12:13
**actual** 18:16
　45:12
**add** 22:15
**addition** 11:11
**address** 4:17,18
**advise** 53:15
**affiliated** 45:24
　46:4,7
**affirm** 4:3
**affirmatively**
　34:23
**ago** 16:17 17:3
**agreed** 3:17 53:21
**allocated** 47:11
**amount** 34:14
　39:22,23 42:16

42:22 43:4,9,17
　44:6,7,18 45:1
　46:13,15
**analyses** 13:7
　21:17
**analysis** 12:2
　21:16,24
**analyst** 18:2
**analyze** 11:8,10
　11:12 16:20
　18:13
**analyzed** 8:17
　14:11 17:3
　18:10 26:23,23
**annual** 43:18,21
**answer** 28:15 29:1
　34:22,24
**answered** 35:24
　52:13
**answers** 16:17
**Anybody** 28:21
　28:23
**apartment** 8:14
　9:17 10:4,8,14
　12:6,17 13:1,8
　13:15 14:14,15
　14:19 15:1
　16:12 30:12,15
**apartments** 18:9
　30:16
**apparently** 25:3
**APPEARANCES**
　2:1,7
**appeared** 55:10
**approximately**
　9:11 23:9,12,17
　23:21 34:5
**April** 7:13 29:15
　29:18 31:3
**area** 38:6
**asked** 21:2 28:16
　52:12
**asking** 13:14
　14:10 20:11,21
　40:18,19

**asset** 30:16 42:17
　42:20,23 45:8
**assets** 8:8,12 9:13
　9:16 11:10
**assigned** 47:16
**assisted** 9:8,15
**associate** 14:9
**associated** 26:12
**attorney** 56:13,15
**attractive** 10:25
**authorized** 56:6
**average** 45:6
**aware** 6:21 9:3
　25:14

**B**

**B-A-I-N-B-R-I-...**
　14:6
**back** 21:4 41:2
**Bainbridge** 14:5,8
　14:9,16,22,25
　15:5,7,13 22:14
　23:21
**bank** 12:10 31:10
　31:14,22 33:13
　33:23 34:1,6,10
　36:3,4,9,12,16
　36:16,18,22,25
**banks** 12:25
　13:20 48:2
　51:23 52:2
**Barbara** 48:2
　49:16,24 52:18
　52:19
**based** 41:21 42:1
　42:4 43:3 45:1
　45:21 46:17,19
　46:23
**basis** 34:24
**Beach** 1:17,22,23
　2:4 17:20 38:6
　55:5
**Behalf** 1:13
**believe** 5:2 6:25
　17:14 20:18

21:3 22:8 24:15
　29:1 34:17 36:4
　38:7 49:18
　50:10
**best** 6:14 7:9
　12:15 38:15
　39:25 51:21
**better** 22:6
**beyond** 29:7
**Bill** 52:15 53:8
　54:5
**bio** 20:19
**bit** 5:14
**Boca** 4:19
**bonus** 45:20 46:13
**borrow** 12:16
**borrowed** 34:1
**borrowing** 12:7
　12:24
**bought** 8:23
**Boulevard** 1:22
**BP** 24:16
**break** 10:12 53:8
**brief** 37:5 53:10
**brokers** 10:22
**Brothers** 21:25
**build** 18:21
**building** 8:19
　12:17 18:14
**buildings** 8:14 9:4
　9:17 10:5,9,14
　12:6,18 13:2,8
　13:15 14:14,15
　15:1 16:12,12
　18:3,4,14,14,19
　18:21,22 30:12
　30:15
**built** 18:11
**buy** 14:25,25 15:1

**C**

**C** 1:11 3:2 4:1,9
　4:18 55:10 56:7
　57:4,24
**C-O-L-E-M**

37:19
**C-O-L-E-M-A-N**
　37:18
**calculated** 42:25
　43:2,18 44:2,5
　44:17 46:14,17
**Capital** 1:6 4:23
　4:24 5:8 6:12
　13:22 14:24
　20:13,13 22:10
　24:21,22 26:13
　41:19 45:25
　46:7 57:3
**case** 1:2 53:20
**cash** 11:12,15
　13:7 26:23
　46:23
**Certificate** 3:4,5
　55:2 56:1
**certificates** 29:7
**certify** 55:9 56:6
　56:12
**change** 5:11 7:4
　44:8,12 57:8
**Changed** 7:5
**changes** 57:2,22
**charge** 45:11
**check** 53:15
**Chris** 53:21
**circumstances**
　13:12,13
**clear** 53:3
**close** 9:16,19
　29:25
**closed** 7:13 9:24
　9:25 10:15
　16:16 29:20,24
　30:5
**closing** 10:19
**closings** 18:16
**Coleman** 37:16,24
　38:12 39:15,17
　39:20 40:10,23
　40:25
**Coleman's** 40:1

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 59

collateral 26:25
collected 45:8
collecting 45:11
commercial 8:16
  8:17,23 9:2
Commission
  55:18
commitment
  34:10
communicate
  37:10,12 38:8
  39:8,21
communicated
  39:20 40:9
communication
  38:11 41:12,16
comp 21:17
companies 14:5
  16:21,22,24,24
  16:25 17:8,8,13
  21:18,19
company 15:22
  19:11,12,16
  21:13 24:4,9
  37:24 38:1
  39:17
completed 40:14
  40:15
complex 11:11
component 12:7
  18:8
concentration
  29:13
CONCLUDED
  54:8
confidential 53:23
  54:1
confidentiality
  53:20
Congratulations
  21:13
connected 56:15
contacted 41:9
context 45:19
continued 37:6

53:11
conversation
  35:21 40:23,25
  50:9
conversations
  33:15 34:25
  35:12,14
converted 15:4
copy 20:1
corporate 20:19
correct 8:21,22
  14:7 22:20 23:6
  23:11 31:7 47:6
  47:8,9 57:22
counsel 3:18
  53:15 56:13,15
country 10:23
  14:12
County 17:20
  55:5 56:3
couple 16:17
  23:18
courses 29:6
Court 1:1,21,22
  4:3,7 48:4 55:8
  55:17 56:5,21
CPA 29:10
create 11:11
Crocker 17:19,22
  18:17,25 19:11
  19:15,21 22:14
  22:21,23 23:13
CRT 19:10,10,11
  19:16,21 23:13
cut 50:24

          D
D 3:1 4:1
Daniel 1:11 3:2
  4:9,18 55:10
  56:7 57:4,24
date 1:14 20:23
  40:18 57:24
DATED 56:18
dates 7:8

Dave 31:15 32:6
  33:18,24
David 13:16 14:1
  28:20,22 32:10
  33:20 34:19,25
  35:8 39:15 48:2
  48:8,25 49:6
  50:2,5
David's 13:17
day 29:22 55:13
  56:18
DC 2:9
deal 10:22 13:8,24
  14:1 16:9 27:23
  27:23,24 33:12
  45:2
deals 13:11 16:15
  32:4 38:19
debt 8:10 12:15
  24:10 25:4 27:5
  27:17,20 28:2
  28:13 43:5,10
  43:24 44:19
decide 10:25
decision 6:23
declare 57:21
Defendant 1:7 2:7
DEFENDANT'S
  3:11
Define 37:12
degree 21:7 29:4
  29:8,12
Depending 44:11
depends 30:2 44:6
  46:15
deponent 3:19
deposition 1:11
  3:2,20 37:6
  53:11 54:8 56:7
  57:4
describe 9:14
  10:4,13 12:13
described 27:22
describes 19:9
describing 31:11

37:9 46:3
description 3:9,12
  5:4,5,11
designate 53:25
determine 28:12
determining
  45:12
developments
  14:19,20
Diamond 21:3
difference 10:7,10
different 8:3
  44:13,14,14,22
digit 50:16
Direct 3:3 4:12
direction 8:3
directly 11:21
  13:9 37:10 41:9
director 5:10,21
  5:24 6:10,11,16
disappointed
  51:14
discussed 49:22
discussions 33:13
disproportionate
  46:19,21
dispute 23:7
distributed 41:3
  46:23 47:1,3,4
  47:12 52:9
distribution 47:15
DISTRICT 1:1,1
document 28:11
  49:1,2,3 57:21
doing 5:14,15
  11:15
Drive 1:16
DRIVERS 55:24
duly 4:10 55:11
duties 8:5,6 17:25

          E
E 3:1,10,13 4:1,1
  57:1,1,1
eight 23:20

either 10:8 35:10
  35:21
email 37:13 39:9
  39:10,12,14
employed 4:20
  5:1 14:2 15:15
  17:16,22 18:24
  36:15,18,22
employee 56:13
  56:14
employment
  17:15 19:9,23
  21:10 23:25
employments
  22:13
engaged 9:15
ENTER 57:2
entered 53:20,22
  57:22
entirety 44:17
entities 25:19
  26:1 27:14
entity 24:12,14,15
  24:16 26:12
  41:21,25 42:3,9
  45:24 46:7
equally 52:18,22
  52:25
equity 8:10 16:20
  16:21 43:3,8,9
  44:6,7 45:1
Errata 3:6
ESQ 2:2,8
estate 14:25 15:22
  16:6,9,10,17
  17:4 19:22
estimate 7:9 40:1
Examination 1:20
  3:3 4:12
examined 4:10
Exclusively 14:15
Excuse 37:11 48:4
  52:24
EXHIBITS 3:8,11
expect 48:11,13

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 60

50:15 52:11,18
52:22,25
**expectation** 50:19
50:25 51:3,8
52:20 53:2
**expectations**
50:18
**expected** 47:11
**Expires** 55:19
**explain** 10:21
11:6
**extent** 42:13

---

**F**

F 2:2
**F-A-D-U-S** 31:21
**fact** 49:25
**facts** 57:21
**Fadus** 31:17,21
32:6,10 35:6
36:21
**Fadus's** 36:7
**fair** 8:25 13:24
31:2 52:14
**familiar** 24:8,9
25:16,22,24
26:3 27:4
**far** 22:15
**February** 55:19
**fee** 42:17,23 44:2
44:12 45:1
**fees** 41:21 42:1,4
42:8,10,11,16
44:13,14 45:8
45:12,14
**Fifteen** 15:18,19
15:21,25 16:7
16:14 17:15
22:14 23:17
**Finance** 5:16 6:4
6:20 7:7 8:1
29:5,12
**financial** 11:11
12:7 35:23
**financially** 56:16

**financing** 8:9
11:22 33:2,3,13
34:1
**find** 12:15 30:3
48:23
**fine** 24:24 54:4
**finished** 53:8
**first** 4:10 16:10
21:10 24:9 31:4
31:7 39:10
**five** 30:11,23
51:22,25 52:6
52:10,23 53:1
**FL** 55:24
**Flagler** 1:16
**Florida** 1:1,17,22
1:23 2:4 4:19
15:24 38:5 55:4
55:9,18 56:2
**flow** 11:15 13:7
26:23 46:23
**flows** 11:12
**focus** 8:7
**focused** 18:2
21:24
**follows** 4:11 37:6
53:11
**foregoing** 56:9
57:21
**form** 51:9 57:22
**forma** 42:12
**former** 19:23
**Forum** 2:3
**Freddie** 25:15,25
26:4 29:16,19
31:5 36:12,14
**full** 4:16 42:13
**fund** 24:10 25:5,9
27:5,7,17,20
28:2,13 43:5,6
43:10,24 44:7
44:19 45:15
46:11
**fundamentals**
11:10

**funds** 9:9 28:1
37:11 46:2
**FURTHER** 56:12

---

**G**

G 2:8 4:1
**G-A-Z-I-A-N-O**
48:7
**gather** 12:21
**Gaziano** 48:3
49:16,24 51:23
52:3,19,19
**general** 45:23
46:6,10 47:3,11
47:16
**generally** 10:4
**geographically**
35:16 38:4
**George** 13:16
14:1 48:2
**George's** 13:19
**GG181619** 55:18
**give** 4:4 7:9
**go** 8:3 11:25 15:7
21:4 37:3
**going** 23:7 47:18
47:25 48:1,24
53:22
**good** 4:14,15
21:13 23:24
**GP** 25:12 45:20
45:22 47:2
**graduated** 22:16
23:5,8
**graduating** 21:11
**grateful** 53:4
**greater** 51:17,19
**Group** 15:18,21
15:25 16:7,14
17:16 22:14
23:17

---

**H**

H 57:1
**handy** 30:19

**happened** 40:19
**happening** 44:23
44:25
**hard** 30:2
**heard** 25:3,4,7
45:17
**held** 16:24
**higher** 45:5 51:8
**higher-up** 36:25
37:2
**hired** 5:3,5
**hotel** 18:8
**hotels** 16:13
**HUGHES** 1:3
57:3
**hurdle** 46:20,23

---

**I**

**identification**
55:23,24
**identify** 6:23 11:4
**immediately** 15:8
**include** 8:6
**included** 9:17
20:5
**inclusive** 30:13
**independent** 7:21
**INDEX** 3:8,11
**individuals** 32:12
**industries** 17:3
22:2
**industry** 17:1,4
21:23
**infer** 35:2
**information** 12:1
20:5,10,17,18
28:18 34:22
44:1,4 53:23
**instigate** 41:16
**institution** 12:8
12:10
**institutions** 12:14
**intent** 17:9
**interested** 10:7
16:7 56:16

**invest** 13:14 38:1
39:18
**invested** 43:3,8,9
44:6,7,18
**investment** 8:6,11
8:18 10:22
11:12 12:15
15:22 16:6,9,11
16:18 18:5
32:23 38:14
39:21,22,23
40:1 44:11 45:3
45:4,21 46:16
46:18,20,22
47:19
**investments** 6:10
6:12 8:9 16:20
16:21 27:14
39:16
**investor** 38:9 41:1
41:2,13,13,17,17
44:9 45:2
**investors** 12:4,21
12:25 13:6,9,11
13:14 37:11
40:9,16,22 41:9
41:10 44:14
47:7 53:24
**invests** 45:2
**involved** 8:9,24
10:15,17,19
11:21 12:11
18:16 24:1,3,4
31:4 33:15
34:25 36:11
47:24
**involvement** 24:6
31:9

---

**J**

**J-O-E** 31:19
**jmariani@kam...**
2:5
**job** 5:3,5,11
**Joe** 31:17 32:6,10

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 61

35:8
**JOHN** 2:2
**joined** 18:24
**Jonathan** 21:3

**K**

**K** 2:9 38:19
**K-1504** 25:25
27:9,23 31:11
32:5,9 35:5,22
36:12 37:9
38:20 41:22
42:5 47:21
**K-Deal** 7:19,21,24
31:5
**KAMMERER**
2:2
**Key** 31:10,14,22
33:13,23 34:1,6
34:10 36:3,4,9
36:11,16,16,18
36:22,25
**KF-29** 25:16 27:9
27:22 29:19
31:11,24 32:5,9
33:11 34:7
36:19 37:9
38:19 41:22
42:4 47:21
**KF-46C** 26:4
27:10,24 31:12
32:5,9 36:14
37:10 38:20,25
41:23 42:5
47:22
**Khoury** 13:18
28:20 39:15
48:2,25 49:6
51:23 52:2
**kind** 53:25
**know** 9:1 13:23
17:2,9 19:18,21
20:11 23:5
24:14,24,24,25
25:2,9,12 26:14

26:15 27:12,14
27:16 28:1,9,14
28:15 29:1 31:1
31:3 36:13,15
38:3 40:2,8
41:24 42:8,8,10
42:11,19,20,21
42:25 44:21
45:10,11,14
46:1,10,15
47:14 48:9,10
49:4,16 52:4,13
53:6,21
**knowledge** 42:13
52:5
**known** 55:22

**L**

**L** 1:21 3:16 55:8
55:16 56:5,21
**Lakes** 1:22
**land** 9:5 10:5,8,23
12:6 13:2,8,15
15:2 16:12
18:13,19 30:16
**large** 45:2
**Lazard** 19:3 21:4
21:10,15,18,24
22:4,7,13 23:10
**left** 15:7
**lend** 34:6,10
**lending** 12:14
**let's** 16:9 21:4
22:9 23:15 24:1
33:11 50:22
53:7
**level** 24:6 33:3,4
**LICENSE** 55:24
**limited** 47:5,7
**LINE** 57:8
**LinkedIn** 23:2,3
**listed** 6:20
**Literally** 50:19
**little** 5:14 23:16
**LLC** 1:6 25:10

46:8
**LLP** 2:8
**located** 15:23
35:16 38:4
**location** 11:10
**long** 5:1,7 15:25
17:22 19:4
**longer** 6:6 36:4
**look** 11:9 20:1
27:13 28:11,16
49:1
**looked** 17:10
**lost** 44:16
**lower** 45:4
**LP** 24:10 25:5
27:5 47:2

**M**

**Mac** 25:15,25
26:4 29:16,19
31:5 36:12,14
**macro** 11:9
**magnitude** 28:4
30:20 39:25
**management**
25:10 42:17,23
45:8
**manages** 42:20
**managing** 5:9,21
5:23 6:10,11,16
13:16
**Mariani** 2:2,2 3:3
4:13 37:7 48:5
51:11 52:14,17
53:7,12 54:4
**market** 11:9
**MARTIN** 56:3
**material** 24:6
**matter** 32:24 33:1
**MDOF** 25:12
**mean** 10:21,24
11:3,14 18:7
24:3,4 26:8,9
33:5 40:12
41:11,12 43:4

43:22 45:19
46:21 50:20,24
**meaning** 10:1
14:25 38:24
43:18 44:10
**means** 11:7
**meant** 24:22
**meet** 35:10,13
37:13 39:6
**meeting** 49:21
**Memorandum**
6:18 7:12,17
19:9,19,23 20:6
20:22 40:13,15
41:3
**memory** 25:1
**mention** 49:10,12
50:11,13
**mentioned** 50:21
52:1
**merger** 21:20
22:3
**mergers** 21:16
**Miami** 15:24
**micro** 11:9
**million** 25:15,25
26:4 27:8,9,10
27:22,23,23
28:5,7 29:16,19
33:12 34:2,5,6,8
34:11 35:5,22
36:19 40:3,5,7
**MIOSSI** 2:8 37:3
51:9 52:12 53:9
53:17 54:6
**mixed-use** 14:19
18:5,7,14,22
**model** 35:23
42:15 43:13,15
43:25 44:20
**modeled** 42:11
**models** 11:11,15
**money** 11:19
12:21,25 28:12
29:2 43:4,23

**months** 23:19,20
**Moore** 1:21 55:8
55:16 56:5,21
**morning** 4:14,15
**mortgage-backed**
24:2,5
**multi-family** 8:8
8:12 9:13,17
24:10 25:4 27:5
27:16 28:2,13
43:5,10,24
44:18
**multiple** 8:17
12:14

**N**

**N** 3:1,10,10,13,13
3:16 4:1
**N-G** 4:18
**name** 4:16 13:17
13:19 19:15,23
25:3,4,7,9,12
31:18 37:17
38:2 48:6
**named** 24:9
**names** 53:24
**nature** 22:2
**need** 19:25
**negotiate** 34:13
**negotiated** 34:23
35:2
**negotiating** 34:18
**new** 7:17 19:7
21:7 22:7
**Ng** 1:11 3:2 4:9,18
29:4 55:10 56:8
57:4,24
**nice** 50:20
**Nick** 37:16 39:15
**Nobody's** 23:7
**normally** 29:25
**Northwest** 4:19
**Notary** 1:21 55:9
55:18
**notes** 56:10

Hughes v. Priderock                                    10/10/2018
Daniel Ng

number 30:10
  33:9
NW 2:9

_____
O
_____

O 3:10,13,16 4:1
oath 3:4 4:11 55:2
Object 51:9
obtaining 11:22
occurring 44:21
October 1:14
  55:11,13 56:18
  57:6
office 8:19 9:3
  16:12 18:3,4,8
  18:14,19,21
okay 10:3,12
  19:14 20:11
  22:18,23 23:5
  23:21,24 25:9
  27:15 30:4 31:2
  42:10 44:16
  47:14 50:17,22
  52:21
one-five 15:19
ones 10:25 32:12
opportunities 8:7
  8:11,18 10:17
  10:18 11:13
  14:11 16:4,5,6,7
  16:10,11,18,19
  18:6 27:20 30:3
  47:19
opportunity
  12:22 24:10
  25:5 27:5,17
  28:2,13 32:23
  43:5,10,24
  44:19
order 28:4 30:20
  39:25 53:20
  54:1
outranked 36:23
outside 20:13
  52:6

owners 10:23

_____
P
_____

P 3:16 4:1
page 3:2,9,12 23:2
  23:3 57:8
pages 56:9
Palm 1:17,22,23
  2:4 17:20 38:6
  55:5
part 11:16,17,18
  25:2
participate 12:21
participated 10:9
particular 21:23
  51:3
parties 3:19 56:13
parties' 56:14
partner 45:23
  46:6,10 47:4,11
  47:16
partners 1:6 4:23
  4:24 5:8 6:12
  13:22 14:24
  17:19,23 18:17
  18:25 19:11,15
  20:13,14 22:10
  24:21,22 25:10
  26:13 41:19
  45:25 46:8 47:5
  47:7 57:3
partnership 49:2
  49:3
parts 54:2,3
penalties 57:21
pending 53:22
people 28:24
  47:23 51:22,22
  52:1,1,2,6,10,23
  53:1
percent 12:17
  33:8 43:16,18
  43:23 44:17
  45:3,6 48:15,17
  48:19,21 50:17

51:7,13,17,19
percentage 43:3,8
  43:12,15,19,19
  44:8,14 46:24
  48:11,12,23
  49:10,12 50:11
  50:14,15,21,25
  51:4,15,16
  52:10 53:3
percentages 46:25
  51:4
performance
  45:15,21 46:16
  46:17
period 29:23
perjury 57:21
person 32:22
  35:10,13,14
  46:7
personally 55:10
  55:22
perspective 11:9
phone 35:13,15
Place 1:16 2:3
Placement 6:18
  7:12,17 19:8,19
  19:22 20:5,22
  40:13,15 41:2
Plaintiff 1:4,13
  2:1
PLAINTIFF'S
  3:8
please 4:16 7:9
  9:14 31:18 42:2
  46:4 48:6 51:24
PLLC 2:2
point 5:15
portion 33:13
  47:3,4,10,15
postgraduate
  29:6
potential 11:4
  16:21 17:7
  21:17 40:16,21
  41:1,10,13,17

potentially 23:1
  33:4,7
preparation 7:18
present 9:11
  35:25
presented 43:25
  44:20
pretty 19:13
price 12:17 30:9
  33:10,12
Priderock 1:6
  4:23,24 5:8,17
  6:3,9,12,21 7:7
  8:4,5,15,19,23
  9:1,6,16,23 10:1
  10:5,8,15,25
  12:16 13:14,21
  14:24 15:8
  20:12,13 22:10
  24:10,20,21,22
  25:4,9,12 26:12
  27:4,16 28:2,11
  28:12 30:4 31:4
  41:19,21 43:5,9
  43:23 44:18
  45:24 46:7 57:3
primarily 8:7
principals 13:16
  13:21
prior 5:23 6:1
  14:2 17:15
  18:24 20:25
  40:23,25
private 6:18 7:12
  7:16 12:21 19:8
  19:19,22 20:5
  20:22 40:13,14
  41:2
Privately 16:24
pro 42:12 46:24
probably 6:15
  7:10 9:22 23:14
Produced 55:23
Produced- 55:24
Professional 55:8

55:17 56:5,21
profits 46:20
promote 45:17,20
  47:15,24 48:11
  48:12,24 49:5,8
  49:9,17,21,25
  50:3 51:5,22
  52:2,7,9,10
promoted 5:9,12
  7:15
properties 8:16
  8:17 9:2 10:23
  10:24 11:4,8,23
  18:10
property 8:23 9:9
  9:13,18 10:14
provide 12:1 20:4
  20:21
provided 20:12,16
  51:15
public 1:21 16:24
  16:25 55:9,18
publication 20:25
publicly-traded
  17:8,12
pull 22:24
purchase 9:8,9,13
  9:16 11:1,4,19
  12:6,17,22 13:1
  13:15 17:7,10
  24:5 25:15,24
  26:3 27:2 29:16
  29:19 30:5,8,10
  31:4 33:10,12
  33:14 34:6 35:5
  36:19 38:24,24
  purchased 9:1
  10:1,2,5 25:16
  25:18,19 26:9
  26:10 27:7
  30:17
purchases 10:14
  12:18,20 13:7
  14:21 26:7,13
  26:16,18,22

Hughes v. Priderock
Daniel Ng

10/10/2018

27:22 30:14,15
37:22 38:19
47:20
**purchasing** 11:22
**purposes** 11:19,22
18:13 20:22
21:20 22:3
**puts** 22:19

___

**Q**

**quarterly** 43:19
**question** 9:21
10:6,11 11:20
12:23 24:9
28:16 29:2 32:7
40:24 43:7 46:5
47:13 51:2,10
51:24
**questions** 10:12
35:23 53:13

___

**R**

**R** 4:1 57:1,1
**raised** 28:1,9,12
29:2
**range** 33:7 51:4
**ranged** 17:2
**rata** 46:24
**rate** 34:14,19
43:19,19 44:8
**Raton** 4:19
**raw** 9:5,9,13,17
10:5,8,14,23
12:6 13:2,8,15
18:13 30:16
**reached** 46:20
**reaches** 46:22
**read** 53:14,18
57:21
**reading** 3:19
**real** 14:25 15:22
16:6,9,10,17
17:4 19:21
**reality** 44:22
**really** 7:8 25:1

52:21 54:2
**REASON** 57:8
**recall** 6:2,7,13 7:8
16:23 20:9,15
20:16,23,24
22:2 27:11,25
28:6,8 30:18
32:3,11 34:12
35:9,17 36:6,8
36:17,18 38:10
39:1,3,5,19
40:11 41:6,8,15
42:24 43:12
45:7 46:12,24
47:23 48:14,16
48:18,22 49:13
49:20,23 50:1
50:14 51:16,20
52:16
**receive** 41:12,19
41:21 45:20
48:13 52:11
**received** 7:18
21:7 29:7
**receives** 41:25
42:3,9,18,19
**recess** 37:5 53:10
**recollection** 6:14
7:11,14 33:25
38:15 51:21
**recommendation**
27:1
**record** 4:17 37:3
56:10
**refer** 8:12 17:6
**referred** 13:6
19:18,22 25:20
27:8 42:23
44:17 46:14
**referring** 8:13,20
16:19 17:7
24:19 45:22
**refresh** 7:14
**refreshed** 7:11
**regarding** 32:23

38:17,18,19
**relates** 10:4
**relating** 6:19 9:12
**relative** 13:1
39:23 56:12,14
**remember** 5:20
17:2 20:24
22:23 29:15,18
29:22 32:21,22
32:24 35:20
40:14,19 48:1
50:21 51:16
**remuneration**
45:15
**repeat** 10:11
12:23 32:7 42:2
43:7 46:4 51:24
**rephrase** 37:25
40:24 51:12
**report** 56:7
**Reporter** 1:21 3:5
4:3,7 48:4 55:9
55:17 56:1,6,21
**Reporting** 1:22
**requested** 56:8
**reserve** 53:17
**RESERVED** 3:21
**residence** 4:16
**respect** 7:13,16
10:3,13 12:5
16:19 25:15
26:21 27:1
31:10,24 32:4,8
32:13 33:11
35:4,22 36:14
37:8,22 45:15
46:2 47:10
**respective** 3:18
13:7
**response** 24:23
**responsibilities**
8:5 18:1
**retail** 14:19 15:1,4
16:13 18:9
**retained** 21:14

**return** 39:22
**returns** 11:12
12:1 38:13
39:16
**review** 19:25 21:2
56:8
**reviewed** 20:25
21:19 22:3
**right** 15:10 20:2
23:23 53:9,14
53:17
**risk** 13:1
**role** 5:19 10:4,7
10:13 11:7
**roughly** 6:17
23:23

___

**S**

**S** 3:16,16 4:1 57:1
**sale** 24:5
**sales** 30:13
**saying** 9:20 16:19
44:13
**school** 21:11
**second** 37:4
**securing** 8:10
**securities** 24:2,5
24:17 25:16
26:24 31:5 33:2
37:11
**security** 33:10
**see** 17:12 38:13
39:15
**sellers** 10:22
**sense** 22:6 36:22
**sent** 20:9 40:15,21
**separate** 10:6
**series** 12:18
**seven** 22:15
**share** 12:25 46:24
47:18 48:1,12
48:24 51:4 52:7
52:18
**shares** 47:14
**sharing** 49:5,8,9

49:17,25 50:3
51:22 52:1
**Sheet** 3:6 57:2
**Shillington** 31:15
31:25 32:6,10
33:18,24 34:13
34:19,24 35:1,6
36:11,21 37:2
**Shillington's** 36:2
**side** 33:22,23
**sign** 53:18
**Signed** 55:13
**signing** 3:20
**simple** 26:11
**single** 30:6 50:16
**single-digit** 48:19
**six** 22:15 23:19
**size** 44:11
**smaller** 45:4
**sold** 10:2,8
**Solely** 18:4
**solicited** 41:13
**soliciting** 12:25
**somebody** 28:16
**sorry** 7:5 10:13
19:20 26:11
44:16 48:12
50:24
**sort** 54:2
**sorted** 53:25
**sourcing** 8:6,10
9:9 10:17,21
11:3 16:3
**South** 1:16
**southeast** 18:3
**SOUTHERN** 1:1
**space** 15:1,4
**speak** 31:9,25
35:5 37:13 38:8
38:22 40:22
41:1 49:24 50:2
**specific** 17:3
20:23 24:13
32:12 33:11
39:22 40:18

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 64

46:22
**specifically** 7:24
  8:13 20:9 39:21
  47:20
**Spell** 31:18 48:6
**spelled** 4:18 37:17
**split** 46:19,21
**spoke** 32:11,22
  38:16,18 39:2
**spoken** 31:14 32:5
  32:9
**spring** 39:2
**start** 29:17
**started** 8:4 15:12
  22:10,23
**state** 4:16 34:23
  55:4,9,18 56:2
**stated** 57:21
**statement** 13:25
**States** 1:1 8:8
**stenographic**
  56:10
**stenographically**
  56:7
**stipulated** 3:17
**stock** 17:10,12
**stocks** 16:21 17:6
  17:7
**stop** 7:6
**STRAWN** 2:8
**Street** 2:9
**study** 10:24
**subject** 32:24
  33:1 57:22
**subsequent** 19:15
**substance** 38:11
  57:22
**suggest** 7:12 44:1
**suggests** 44:4
**Suite** 1:17,22 2:3
**summer** 39:4
**sure** 20:20 23:4
  34:9 36:1
**swear** 4:3
**sworn** 4:10 55:11

**T**

**T** 3:16,16 57:1,1
**take** 12:20 20:1
  53:7
**taken** 1:13,14,20
  20:18 29:6 57:6
**talk** 20:2
**talking** 37:9 47:21
**Tamala** 1:21 55:8
  55:16 56:5,21
**tell** 21:15 23:16
  44:25 47:25
  52:14 53:7
**ten** 30:11,25
**terms** 8:9 17:10
  30:5,7 33:4
**test** 25:1
**testified** 4:10
**testimony** 4:4
  7:25 38:20 42:7
  44:22 51:1 54:1
**thank** 4:7 19:14
  31:20 37:21
  50:6 53:5,12
**Thanks** 52:15
**thing** 53:19
**things** 53:24
**think** 5:6 19:17
  20:19 22:21
  28:24 34:23
  40:11 50:23
  52:12 53:21
**third** 38:24
**three** 17:24 18:17
  22:22 23:12,14
  26:15,19 27:7
  27:21 30:11,21
  31:10 32:4,8,20
  37:8 38:19 42:1
  42:4 46:2 47:20
**time** 1:15 7:1,18
  8:2 21:22 27:12
  29:18,23 31:4,7
  32:7 36:12
  40:14,22 43:17

43:17
**timeframe** 43:20
  45:9
**times** 12:24 52:13
**title** 6:3,6,8,8,17
  6:24,25 7:2,4,16
  7:17,21 36:3,5,7
**today** 7:2 53:13
**told** 49:5,18 52:6
**topic** 32:24
**transaction** 7:13
  7:19,22,25 10:9
  25:17 29:24
  31:24 34:2 35:4
  35:6,22 36:12
  36:15,19 41:22
  41:22,23
**transactions** 6:19
  9:12,23 10:3,20
  12:5 16:16
  21:17 24:2
  26:24 27:8
  29:25 30:13
  31:10 32:8,11
  32:14 37:8 42:1
  42:4
**transcript** 3:20
  53:14 56:8,9
  57:2
**treated** 52:22,25
**true** 56:10 57:22
**truth** 4:5,5,5
**try** 22:9
**two** 10:12 13:21
  13:24 15:6 19:5
  21:5 22:6,17,21
  23:9,14,22
  28:24 30:11
  32:19,19 37:1,1
  51:19
**type** 14:21 16:5
  16:10,22 55:24

**U**

**U** 3:16

**Uh-huh** 4:25
**unaware** 41:25
  42:3,7
**undergraduate**
  21:7 29:4,7
**underlying** 26:25
**understand** 11:20
  42:15,18 46:6
  47:13
**understanding**
  24:12 26:6,10
  36:2 42:22
  43:22 51:25
  52:5
**underwrite** 11:8
**underwriting**
  10:18 11:6,7,14
**United** 1:1 8:8
**use** 11:3 34:22

**V**

**V** 57:3
**vacant** 15:1
**valuation** 17:11
**value** 18:13
**viable** 30:3
**vice-president** 5:6
  5:7,15,16 6:4,20
  7:6 8:1
**visit** 35:18,18
**visited** 35:19
**vs** 1:5

**W**

**wanted** 38:13
  39:15 54:6
**Washington** 2:9
**way** 4:19 11:18
  38:8 41:2 44:2,5
  50:22
**we'll** 20:2 53:17
  54:2
**we're** 6:19 11:14
  37:8 46:2
**we've** 30:18 47:21

53:21
**website** 20:19
  22:25
**WEBSTER** 1:3
  57:3
**Wednesday** 1:14
**welcome** 50:8
**West** 1:17,23 2:4
**WILLIAM** 2:8
**WINSTON** 2:8
**withdraw** 41:20
**witness** 1:20 4:6
  52:16
**wmiossi@winst...**
  2:10
**word** 11:3,6,14
  29:13 45:17,19
**work** 12:14 16:15
  19:10
**worked** 8:15 9:12
  9:14,22 21:16
  22:16,21 26:17
**working** 22:7
  24:16
**works** 36:4
**Worley** 28:22
  33:20 34:16,18
  34:23 48:8 50:2
  50:5 51:23 52:3
  53:5
**write** 49:14 57:2
**writing** 16:3
**written** 53:4

**X**

**X** 3:1
**XXX** 55:23

**Y**

**Yeah** 19:13 20:2
  23:14,23 24:25
  52:16 53:17
**year** 16:1,14
  23:17,20 30:1,6
  38:23

Hughes v. Priderock
Daniel Ng

10/10/2018

Page 65

**years** 6:1 15:5
  17:24 18:17
  19:5 21:5 22:7
  22:15,17,22
  23:9,12,22
**York** 19:7 21:8
  22:7

**Z**

**zero** 16:16 51:7

**0**

**1**

**1** 55:19
**1.25** 43:16,18,23
  44:17 45:3,6
**10** 1:14 57:6
**10:00** 1:15
**100** 28:4
**109** 25:15 27:8,22
  29:16,19 33:12
  34:2 36:19
**10th** 55:10
**11:43** 1:15 54:8
**12th** 4:19
**150** 28:7
**1560** 4:18
**16** 5:9
**1601** 2:3
**17** 31:3
**1700** 2:9

**2**

**2** 48:15
**20** 33:8 34:5,6,8
  34:11
**20006** 2:9
**2002** 22:16 23:5,8
**2003** 22:8
**2004** 22:19
**2005** 22:8,13
**2005-ish** 22:19
**2006** 15:13,15
**2008** 5:2,3 8:4,15
  8:21 9:2,4,6,11

**9:23** 10:16 14:2
  15:10 22:10
**2015** 5:9
**2015/2016** 6:15
  7:10
**2016** 24:1
**2017** 7:14,15
  29:15,18
**2018** 1:14 55:11
  55:13 56:18
  57:6
**202** 2:10
**2022** 55:19
**2161** 1:22
**24th** 55:13 56:18
**282-5708** 2:10

**3**

**3** 40:7
**302** 1:22
**33401** 1:17 2:4
**33409** 1:23
**35** 33:8

**4**

**4** 3:3 48:17,21
  56:9
**40** 9:22

**5**

**5** 40:3,5 50:17
**50** 9:22
**500** 2:3
**505** 1:16
**54** 56:9
**55** 3:4
**56** 3:5
**561** 1:24 2:4
**57** 3:6
**58** 25:24 27:9,23
  35:5,22

**6**

**600** 1:17
**689-0999** 1:24

**7**

**8**

**80** 12:17
**82** 26:4 27:9,23

**9**

**9:18-cv-80110-...**
  1:2
**990-1591** 2:4